# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

**JANE DOE,**
**Plaintiff-Appellant,**

v.

**CENK SIDAR,**
**Defendant-Appellee.**

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

### JOINT APPENDIX - VOLUME I

Walter E. Steimel, Jr.
STEIMEL COUNSELORS LAW
  GROUP PLLC
Suite 400
1455 Pennsylvania Ave., NW
Washington, DC    20004
(202) 271-9258  PH
wes@sclgrp.com

**Counsel for Appellant**

Thomas F. Urban, II
FLETCHER, HEALD
& HILDRETH, PLC
Suite 1100
1300 North 17th St.
Arlington, VA 22209
(703) 861-5235  PH
urban@fhhlaw.com

**Counsel for Appellant**

John D. Perry
Mariam W. Tadros
REES BROOME, PC
1900 Gallows Rd.
Tysons Corner, VA
  22182
(703) 790-6221 PH
jperry@reesbroome.
  com
mtadros@rees-
broome.com

**Counsel for Appellee**

# Joint Appendix Index
## Volume I

Relevant Docket Entries, Case No. 22-cv-00545-CMH-JFA
(current as of June 24, 2023) ......................................................... JA001

Complaint and Demand for Jury Trial, filed 05-12-2022 .................... JA021

    1-1 – Exhibit 1 – Judge Bellow's June 16,2020 Order,
        Finding Personal Jurisdiction Over Defendant ..................... JA035

    1-2 – Exhibit 2 – Text Messages Between Plaintiff and
        Defendant ............................................................................. JA041

Motion to File Complaint and Proceed Under a Pseudonym,
filed 05-12-2022 .............................................................................. JA059

    4-1 - Proposed Order to Proceed Under a Pseudonym ........... JA057

Order Granting Motion to File Complaint and Proceed under
Pseudonym, filed 05-13-2022 ......................................................... JA063

Answer Filed by Cenk Sidar, filed 05-23-2022 ................................. JA064

Defendant's Motion to Remove Pseudonym Designation,
filed 06-27-2022 .............................................................................. JA072

    19-1 - Proposed Order Granting Defendant's Motion to
        Remove Pseudonym Designation .................................. JA074

Defendant's Memorandum in Support of Motion to Remove
Pseudonym Designation, filed 06-27-2022 ...................................... JA075

    20-1 - Exhibit A - Plaintiff's Responses to Defendant's First
        Set of Interrogatories to Plaintiff ...................................... JA090

Plaintiff's Opposition to Defendant's Motion to Remove Pseudonym
Designation, filed 07-11-2022 ......................................................... JA113

24-1 - Exhibit A - Frontiers in Psychology Article .................... JA125

24-2 - Exhibit B - Asia Times Article ........................................ JA147

24-3 - Proposed Order Denying Motion to Remove
           Pseudonym Designation ................................................. JA151

Plaintiff's Opposition to Defendant's Motion to Remove
  Pseudonym Designation, filed 07-11-2022 ..................................... JA153

Plaintiff's Motion to Obtain Physical Examination and DNA
  Sample from Defendant, filed 07-15-2022 ..................................... JA165

26-1 - Exhibit A - Plaintiff's Notice of Physical Examination
           and DNA Sample of Defendant ...................................... JA171

26-2  - Exhibit B - D'Angelo v. Potter ........................................ JA173

26-3  - Exhibit C - McGrath v. Nassau ..................................... JA178

26-4  - Exhibit D - Sidar's Motion for Protective Order ............ JA188

26-5  - Exhibit E - Ashby v. Mortimer ...................................... JA202

26-6  - Proposed Order .......................................................... JA208

Defendant's Reply to Plaintiff's Opposition to Defendant's
  Motion to Remove Pseudonym Designation, filed 07-18-2022 ...... JA210

28-1- Exhibit A - Declaration of Cenk Sidar ............................. JA228

28-2- Exhibit B ....................................................................... JA230

28-3 - Exhibit C ..................................................................... JA235

Plaintiff's Notice of Supplemental Evidence, filed 07-25-2022 ......... JA240

31-1 - Exhibit A - Affidavit of Walter Earl Steimel, Jr.
           Regarding Pseudonym Reply Allegations .................... JA243

31-2 - Exhibit B - Affidavit of Plaintiff Jane Doe Regarding
Defense Motion to Lift Pseudonym.................................. JA253

Defendant's Objection to Affidavit of Plaintiff Jane Doe
Regarding Defense Motion to Lift Pseudonym, filed 07-28-2022 ... JA257

33-1  - Exhibit A - Email from Tadros to Urban,
dated 07-20-2022 ......................................................... JA261

33-2 - Exhibit B - Plaintiff's Responses to Defendant's First
Set of Interrogatories to Plaintiff .................................... JA264

Defendant's Notice of Supplemental Evidence,
filed 07-28-2022.................................................................. JA287

34-1 - Exhibit A - Declaration of Cenk Sidar............................ JA289

Minute Entry for proceedings held before District Judge
Claude M. Hilton Motion, filed 07-29-2022 ..................................... JA319

Transcript of Motion Hearing before Honorable Claude M.
Hilton, held 07-29-2022 .................................................. JA291

Order Denying Defendant's Motion to Remove Pseudonym,
filed 07-29-2022 ............................................................... JA320

Defendant's Opposition to Plaintiff's Motion to Obtain Physical
Examination of and DNA Sample from Defendant,
filed 07-29-2022 ............................................................... JA321

37-1 - Exhibit A - Defendant's Objections to Plaintiff's
Notice of Physical Examination and DNA Sampling
of Defendant................................................................... JA341

37-2 - Proposed Order ........................................................... JA344

Plaintiff's Reply to Defendant's Opposition to Plaintiff's
  Motion to Obtain Physical Examination of DNA Sample from
  Defendant, filed 08-03-2022 ........................................................... JA345

    38-1  - Exhibit A - Partial DNA Timeline ................................... JA352

    38-2  - Exhibit B - Judge Smith's Remarks ............................. JA380

    38-3  - Exhibit C - Exemplar DNA Correspondence
          Between Counsel ........................................................ JA392

    38-4 - Exhibit D - Medovations No Show Fee......................... JA400

    38-5 - Exhibit E - Excerpts of Defendant's Statements to
          London Police................................................................ JA403

    38-6 - Exhibit F - Defendant Denial of Penetration in
          Interrogatories................................................................ JA413

    38-7 - Exhibit G - Bode Technology Retention ........................ JA426

Minute Entry for proceedings held before Magistrate Judge
  Theresa Carroll, filed 08-05-2022 .................................................... JA430

Order Granting Plaintiff's Motion to Obtain Physical
  Evidence and DNA from Defendant, filed 08-05-2022.................... JA440

Transcript of Motion Hearing before Honorable Theresa
  Carroll Buchanan, held 08-05-2022................................................. JA431

Defendant's Memorandum in Support of Objection to
  Buchanan's August 5, 2022 Order, filed 08-19-2022 ..................... JA442

    41-1 - Proposed Order ........................................................... JA462

Defendant's Objection to Buchanan's August 5, 2022 Order,
  filed 08-19-2022 ............................................................................... JA463

Corrected Memorandum in Support of Defendant's Objection
  to Buchanan's August 5, 2022 Order, filed 08-19-2022 ................. JA465

44-1 - Proposed Order ........................................................... JA485

Defendant's Motion to Stay Buchanan's August 5, 2022
  Order, filed 08-28-2022 .................................................... JA486

Defendant's Memorandum in Support of Motion to Stay, filed
  08-28-2022 ...................................................................... JA488

47-1 - Proposed Order ........................................................... JA494

Defendant's Motion to Continue Hearing, filed 09-02-2022 ............. JA495

49-1 - Exhibit A - Memorandum in Support oof Motion to
    Continue Hearing ........................................................... JA497

49-2  - Exhibit B - Notice of Waiver of Oral Argument ............. JA499

49-3 - Proposed Order ........................................................... JA501

# Joint Appendix Index
## Volume II

Plaintiff's Opposition to Defendant's Motion to Continue
  Hearing, filed 09-02-2022 ................................................................ JA502

Plaintiff's Opposition to Defendant's Objection to Buchanan's
  August 5, 2022 Order, filed 09-02-2022 ......................................... JA505

    51-1  - Exhibit A - Comparison of Defendant's
        Memorandum.................................................................... JA516

    51-2  - Exhibit B - Discussions Defendant and London
        Police from July 2020....................................................... JA563

    51-3  - Exhibit C - Plaintiff's Email to Defendant's Counsel ..... JA568

    51-4  - Exhibit D - Invoice from J & M Paternity ...................... JA573

    51-5  - Exhibit E - Technical Information for Bode
        Technologies and J & M Paternity ................................. JA575

    51-6 - Proposed Order ............................................................ JA589

Defendant's Reply to Plaintiff's Opposition for Motion to
  Continue Hearing, filed 09-06-2022 ............................................... JA591

    52-1  - Exhibit A - Email from Tadros to Urban
        dated 08-26-2022 ........................................................... JA594

    52-2  - Exhibit B - Email from Tadros to Steimel
        dated 08-19-2022........................................................... JA598

Plaintiff's Opposition to Defendant's Motion to Stay
  Buchanan's August 5, 2022 Order, filed 09-07-2022 .................... JA601

Defendant's Reply to Plaintiff's Opposition to Defendant's
  Objection to Buchanan's August 5, 2022
  Order, filed 09-08-2022................................................................... JA603

54-1- Exhibit A - Email from Tadros to Steimel
dated 09-19-2022 ........................................................... JA611

Order Affirming Buchanan's August 5, 2022 Order,
filed 09-12-2022................................................................ JA614

Defendant's Notice of Appeal, filed 10-13-2022.............................. JA615

Plaintiff's Motion for Sanctions and to Further Compel
Compliance, filed 11-23-2022............................................ JA617

63-1 - Proposed Order ........................................... JA621

Plaintiff's Memorandum Supporting Motion for Sanctions and
Further Compel Compliance, filed 11-23-2022 ............................... JA623

64-1 - Exhibit A - Sidar Responses to Requests for
Admissions ..................................................... JA634

64-2- Exhibit B - Partial DNA Timeline ................................... JA638

64-3 - Exhibit C - Correspondence Regarding Failure to
Comply with Order ........................................... JA641

Opposition to Plaintiff's Motion for Sanctions and Further
Compel Compliance, filed 11-30-2022 ........................................... JA645

65-1 - Proposed Order ........................................... JA656

65-2 - Exhibit A - Circuit Court Order..................................... JA657

65-3 - Exhibit B - Transcript of Circuit Court
November 19, 2021 Hearing............................................ JA660

65-4  - Exhibit C - Email from Tadros to Steimel
dated 08-19-2022 ........................................... JA679

65-5  - Exhibit D - Email from Tadros to Popplewell

dated 09-30-2022............................................ JA682

65-6 - Exhibit E - Declaration of Mariam W. Trados ............... JA685

65-7 - Exhibit F - Plaintiff's Responses to Defendant's First
    Set of Requests for Documents to Plaintiff...................... JA686

65-8 - Exhibit G - Plaintiff's Responses to Defendant
    Cenk Sidar's First Set for Production of Documents
    to Plaintiff ...................................................................... JA693

Plaintiff's Reply to Defendnant's Opposition of Motion for
  Sanctions and Further Compel Compliance, filed 12-01-2022 ....... JA708

67-1 - Exhibit A - Circuit Court Order dated 02-21-2020.......... JA712

Minute Entry for proceedings held before Magistrate Judge
  John F. Anderson, filed 12-02-2022 ................................................ JA735

Transcript of Motion Hearing before Honorable John F.
  Anderson, 12-02-2022..................................................................... JA713

Order Granting Motion to Compel, filed 12-02-2022 ........................ JA736

Plaintiff's Second Motion for Sanctions and to Further
Compel Compliance with August 5, 2022 Order, filed 12-08-2022 ... JA738

74-1- Proposed Order .............................................................. JA741

Plaintiff's Memorandum Supporting Second Motion for
  Sanctions and to Further Compel Compliance with
  August 5, 2022 Order, filed 12-08-2022 ......................................... JA743

75-2  - Exhibit A - Notice for DNA Sampling........................... JA752

75-2 - Exhibit B - Objections ................................................... JA755

75-3 - Exhibit C - Email from Urban to Tadros
    dated 12-06-2022............................................................ JA760

Order Denying Second Motion to Compel and to Further Compel
  Compliance with August 5, 2022 Order, filed 12-12-2022 .............. JA763

Minute Entry for proceedings held before District Judge
  Claude M. Hilton, filed 12-15-2022 .................................................. JA780

Transcript of Motion Hearing before Honorable Claude M.
  Hilton, held 12-15-2022 .................................................................... JA766

Order of Default Judgement Against Defendant as to Liability,
  filed 12-16-2022................................................................................. JA781

Voluntary Dismissal of Defendant's Appeal, filed 12-16-2022 ......... JA783

Plaintiff's Rule 72(a) Objection to Order Denying Second
  Motion to Compel, filed 12-23-2022................................................. JA784

    101-1 - Exhibit A - Transcript of September 4, 2020 Hearing .. JA795

    101-2 - Proposed Order .......................................................... JA806

Defendant's Renewed Motion to Remove Pseudonym
  Designation, filed 12-30-2022............................................................ JA808

    104-1 - Exhibit A - Memorandum in Support of Motion ........... JA810

    104-2 - Exhibit B - Notice of Hearing...................................... JA837

    104-3 - Proposed Order .......................................................... JA839

Defendant's Opposition to Plaintiff's Objection to
  December 12, 2022 Order, filed 01-11-2023 ................................... JA840

    107-1 - Proposed Order .......................................................... JA847

Plaintiff's Opposition to Defendant's Renewed Motion to Remove
  Pseudonym Designation, filed 01-11-2023 ..................................... JA848

    108-1 - Exhibit A - Affidavit of Plaintiff Jane Doe..................... JA860

    108-2 - Proposed Order .......................................................... JA864

ix.

Plaintiff's Reply to Defendant's Opposition to Rule 72(a)
Objection filed 01-11-2023 ............................................................ JA866

    109-1 - Exhibit A - Defendant's Objections to Plaintiff's
Notice of Physical Examination and DNA Sampling
Of Defendant .................................................................. JA870

Defendant's Reply to Plaintiff's Opposition to Defendant's
Renewed Motion to Remove Pseudonym Designation, filed
01-12-2023 ...................................................................................... JA874

    111-1 - Exhibit A – Declaration of Cenk Sidar ......................... JA892

    111-2 - Exhibit B – Correspondence to Chief Administrative
Officer of Enquire AI, Inc. dated May 5, 2022 .................... JA894

    111-3 - Exhibit C - Fairfax Circuit Court, Court's Public
Access Network Information Package ........................... JA899

Order Overruling Plaintiff's Objection to December 12, 2022
Order, filed 01-8-2023 .................................................................... JA904

Plaintiff's Notice of Appeal, filed 02-08-2023 ................................... JA905

Plaintiff's Motion to Stay Proceedings, filed 02-15-2023 ................. JA907

    145-1 - Proposed Order ........................................................... JA909

Plaintiff's Memorandum Supporting Motion to Stay,
filed 02-15-2023 ...................................................................... JA911

Order Granting Defendant's Renewed Motion to Remove Pseudonym
Designation, filed 02-16-2023 ........................................................ JA920

Plaintiff's Notice of Appeal, filed 02-16-2023 .................................... JA924

Plaintiff's Emergency Motion to Stay Proceedings,
filed 02-16-2023 ............................................................................. JA926

    155-1 - Proposed Order ........................................................... JA928

Plaintiff's Memorandum In Support of Emergency Motion to
  Stay, filed 02-16-2023 ................................................................... JA930

Order Granting Emergency Motion to Stay Proceeding,
  filed 02-24-2023 ................................................................................ JA937

Order for Transcript, filed 03-06-2023 ............................................. JA938

Transcript Order Acknowledgment, filed 03-07-2023 ....................... JA939

APPEAL,JURY,PROTO,STAYED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00545-CMH-JFA

Doe v. Sidar                                      Date Filed: 05/12/2022
Assigned to: District Judge Claude M. Hilton       Jury Demand: Plaintiff
Referred to: Magistrate Judge John F. Anderson     Nature of Suit: 360 P.I.: Other
Demand: $2,000,000                                 Jurisdiction: Diversity
Case in other court:  4th CCA, case manager Naeemah Sims,,
                      22-02087
                      4CCA, case manager Ricki Edwards,,
                      23-01151
                      4CCA, case manager Ricki Edwards,,
                      23-01177
Cause: 28:1332 Diversity-Personal Injury

**Plaintiff**

**Jane Doe**                    represented by    **Walter Earl Steimel , Jr.**
                                                  Steimel Counselors Law Group (DC-NA)
                                                  1455 Pennsylvania Ave, N.W.
                                                  Suite 400
                                                  Washington, DC 20004
                                                  **NA**
                                                  202-271-9258
                                                  Fax: 202-652-2308
                                                  Email: wes@sclgrp.com
                                                  *PRO HAC VICE*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Thomas F Urban , II**
                                                  Fletcher Heald & Hildreth, PLC
                                                  Fletcher Heald & Hildreth, PLC
                                                  1300 N. 17th Street
                                                  Suite 1100
                                                  Arlington, VA 22209
                                                  703-861-5235
                                                  Fax: 703-812-0486
                                                  Email: urban@fhhlaw.com
                                                  *ATTORNEY TO BE NOTICED*

JA001

**Defendant**

**Cenk Sidar**                      represented by    **Alexandros Kosmas Mitrakas**
                                                      Mitrakas & Co.
                                                      10521 Judicial Drive
                                                      Suite 310
                                                      Fairfax, VA 22315
                                                      703-888-5516
                                                      Email: amitrakas@mitrakasco.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Corinne Marie Bahner**
                                                      Rees Broome, PC
                                                      1900 Gallows Road
                                                      Suite 700
                                                      Tysons Corner, VA 22182
                                                      703-770-0466
                                                      Email: cbahner@reesbroome.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **John David Perry**
                                                      Rees Broome, P.C.
                                                      1900 Gallows Rd.
                                                      Suite 700
                                                      Tysons Corner, VA 22182
                                                      703-790-6221
                                                      Email: jperry@reesbroome.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Mariam Waigh Tadros**
                                                      Rees Broome, PC
                                                      1900 Gallows Road
                                                      Suite 700
                                                      Tysons Corner, VA 22182
                                                      703-790-1911
                                                      Fax: 703-848-2530
                                                      Email: mtadros@reesbroome.com
                                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/12/2022 | 1 | Complaint ( Filing fee $ 402, receipt number AVAEDC-8388041.), filed by Jane Doe. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Urban, Thomas) (Entered: 05/12/2022) |

| 05/12/2022 | 2 | Civil Cover Sheet re 1 Complaint by Jane Doe. (Urban, Thomas) (Entered: 05/12/2022) |
|---|---|---|
| 05/12/2022 | 3 | Proposed Summons re 1 Complaint by Jane Doe. (Urban, Thomas) (Entered: 05/12/2022) |
| 05/12/2022 | | Initial Case Assignment to District Judge Claude M. Hilton and Magistrate Judge Theresa Carroll Buchanan. (dvanm) (Entered: 05/12/2022) |
| 05/12/2022 | 4 | MOTION Proceed Under Pseudonym by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 05/12/2022) |
| 05/13/2022 | | Notice of Correction re 4 MOTION Proceed Under Pseudonym. The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument. (dvanm) (Entered: 05/13/2022) |
| 05/13/2022 | 5 | Waiver of re 4 MOTION Proceed Under Pseudonym *Hearing* by Jane Doe (Urban, Thomas) (Entered: 05/13/2022) |
| 05/13/2022 | 6 | NOTICE of Appearance by Mariam Waigh Tadros on behalf of Cenk Sidar (Tadros, Mariam) (Entered: 05/13/2022) |
| 05/13/2022 | 7 | ORDER granting 4 Motion To File Complaint And Proceed Under A Pseudonym. Signed by Magistrate Judge Theresa Carroll Buchanan on 5/13/2022. (dvanm) (Entered: 05/13/2022) |
| 05/16/2022 | 8 | Summons Issued as to Cenk Sidar, NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Attachments: # 1 Notice)(dvanm) (Entered: 05/16/2022) |
| 05/23/2022 | 9 | ANSWER to Complaint by Cenk Sidar.(Tadros, Mariam) (Entered: 05/23/2022) |
| 05/24/2022 | 10 | MOTION to Strike by Cenk Sidar. (Tadros, Mariam) (Entered: 05/24/2022) |
| 05/24/2022 | 11 | Notice of Hearing Date set for 06/24/2022 re 10 MOTION to Strike (Tadros, Mariam) (Entered: 05/24/2022) |
| 05/24/2022 | 12 | Memorandum in Support re 10 MOTION to Strike filed by Cenk Sidar. (Tadros, Mariam) (Entered: 05/24/2022) |
| 05/24/2022 | | Set Deadlines as to 10 MOTION to Strike . Motion Hearing set for 6/24/2022 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (clar, ) (Entered: 05/25/2022) |
| 05/25/2022 | 13 | NOTICE by Cenk Sidar re 10 MOTION to Strike (Tadros, Mariam) (Entered: 05/25/2022) |

| | | |
|---|---|---|
| 05/31/2022 | 14 | Motion to appear Pro Hac Vice by Walter Earl Steimel Jr. and Certification of Local Counsel Thomas F Urban II Filing fee $ 75, receipt number AVAEDC-8412317. by Jane Doe. (Urban, Thomas) (Entered: 05/31/2022) |
| 06/06/2022 | 16 | ORDER granting 14 Motion for Pro hac vice Appointed Walter Earl Steimel, Jr for Jane Doe. Signed by District Judge Claude M. Hilton on 06/06/2022. (clar, ) (Entered: 06/08/2022) |
| 06/07/2022 | 15 | Opposition to 10 MOTION to Strike filed by Jane Doe. (Urban, Thomas) (Entered: 06/07/2022) |
| 06/13/2022 | 17 | REPLY to Response to Motion re 10 MOTION to Strike filed by Cenk Sidar. (Tadros, Mariam) (Entered: 06/13/2022) |
| 06/23/2022 | | ***Motion Hearing set for 6/24/2022 terminated per AC in CMH Chambers. (kgall) (Entered: 06/23/2022) |
| 06/27/2022 | 18 | NOTICE by Jane Doe re 15 Opposition - *Supplemental Authority* (Attachments: # 1 Exhibit A - Gilmore v Jones, # 2 Exhibit B - Spring v US, # 3 Exhibit C - DuPont v. Kolon Indust)(Urban, Thomas) (Entered: 06/27/2022) |
| 06/27/2022 | 19 | MOTION Remove Pseudonym Designation re 4 MOTION Proceed Under Pseudonym , 7 Order on Motion for Miscellaneous Relief by Cenk Sidar. (Attachments: # 1 Proposed Order Proposed Order)(Tadros, Mariam) (Entered: 06/27/2022) |
| 06/27/2022 | 20 | Memorandum in Support re 19 MOTION Remove Pseudonym Designation re 4 MOTION Proceed Under Pseudonym , 7 Order on Motion for Miscellaneous Relief filed by Cenk Sidar. (Attachments: # 1 Exhibit A)(Tadros, Mariam) (Entered: 06/27/2022) |
| 06/27/2022 | 21 | Notice of Hearing Date *July 22, 2022 at 10:00 AM* re 20 Memorandum in Support, 19 MOTION Remove Pseudonym Designation re 4 MOTION Proceed Under Pseudonym , 7 Order on Motion for Miscellaneous Relief (Tadros, Mariam) (Entered: 06/27/2022) |
| 06/28/2022 | | Set Deadlines as to 19 MOTION Remove Pseudonym Designation re 4 MOTION Proceed Under Pseudonym , 7 Order on Motion for Miscellaneous Relief . Motion Hearing set for 7/22/2022 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (dvanm) (Entered: 06/28/2022) |
| 07/06/2022 | 22 | ORDER denying 10 Defendant's Motion to Strike the Demand for Attorney's Fees and Strike the Request for Punitive Damages in Complaint pursuant to Federal Rule of Civil Procedure 12(f), without any prejudice to be raised after the close of discovery. Signed by District Judge Claude M. Hilton on 7/6/2022. (dvanm) (Entered: 07/06/2022) |
| 07/11/2022 | 23 | Order Rule 16(b) Scheduling Order - Pursuant to the Rule 16(b) Conference it is ordered that Initial Pretrial Conference set for 8/3/2022 at 11:00 AM in Alexandria Courtroom 500 before Magistrate Judge Theresa Carroll Buchanan. Final Pretrial Conference set for 12/15/2022 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. Signed by District Judge Claude M. Hilton on 7/11/2022. (Attachments: # 1 Magistrate Consent Form, # 2 Pretrial Notice)(kgall) |

JA004

| | | (Entered: 07/11/2022) |
|---|---|---|
| 07/11/2022 | 24 | Memorandum in Opposition re 19 MOTION Remove Pseudonym Designation re 4 MOTION Proceed Under Pseudonym , 7 Order on Motion for Miscellaneous Relief filed by Jane Doe. (Attachments: # 1 Exhibit A - Journal Frontiers in Psychology Article, # 2 Exhibit B - Asia Times Article, # 3 Proposed Order)(Urban, Thomas) (Entered: 07/11/2022) |
| 07/11/2022 | 25 | Memorandum in Opposition re 19 MOTION Remove Pseudonym Designation re 4 MOTION Proceed Under Pseudonym , 7 Order on Motion for Miscellaneous Relief *Corrected Version* filed by Jane Doe. (Urban, Thomas) (Entered: 07/11/2022) |
| 07/15/2022 | 26 | MOTION to Produce *Defendant for Examination and DNA Sample* by Jane Doe. (Attachments: # 1 Exhibit A - Notice, # 2 Exhibit B - D'Angelo v Potter, # 3 Exhibit C - McGrath v. Nassau, # 4 Exhibit D - Sidar Motion for Protective Order, # 5 Exhibit E - Ashby v Mortimer, # 6 Proposed Order)(Urban, Thomas) (Entered: 07/15/2022) |
| 07/15/2022 | | Set Deadlines as to 26 MOTION to Produce *Defendant for Examination and DNA Sample*. Motion Hearing set for 8/5/2022 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (clar, ) (Entered: 07/18/2022) |
| 07/16/2022 | 27 | Notice of Hearing Date set for 08/05/2022 re 26 MOTION to Produce *Defendant for Examination and DNA Sample* (Urban, Thomas) (Entered: 07/16/2022) |
| 07/18/2022 | | Reset Deadlines as to 26 MOTION to Produce *Defendant for Examination and DNA Sample*. Motion Hearing set for 8/5/2022 at 10:00 AM in Alexandria Courtroom 500 before Magistrate Judge Theresa Carroll Buchanan. (clar, ) (Entered: 07/18/2022) |
| 07/18/2022 | | MOTIONS REFERRED to Magistrate Judge: Buchanan. 26 MOTION to Produce *Defendant for Examination and DNA Sample* (clar, ) (Entered: 07/18/2022) |
| 07/18/2022 | 28 | RESPONSE in Opposition re 19 MOTION Remove Pseudonym Designation filed by Cenk Sidar. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Tadros, Mariam) Modified on 7/18/2022 (nneb, ). (Entered: 07/18/2022) |
| 07/20/2022 | | Reset Deadlines as to 19 MOTION Remove Pseudonym Designation re 4 MOTION Proceed Under Pseudonym , 7 Order on Motion for Miscellaneous Relief . Motion Hearing set for 7/29/2022 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (Per AC) (clar, ) (Entered: 07/20/2022) |
| 07/22/2022 | 29 | *Proposed Joint* Discovery Plan by Jane Doe.(Urban, Thomas) (Entered: 07/22/2022) |
| 07/25/2022 | 30 | Rule 16(b) Scheduling Order - Pursuant to the Rule 16(b) Conference it is ordered that: Upon consideration of the representations made by the parties in the Proposed Joint Discovery Plan (Dkt. 29) and taking note of the Scheduling Order (Dkt. 23) entered in this case,the Court makes the following rulings:1. All discovery shall be concluded by Friday, December 9, 2022. 2. The Proposed Joint Discovery Plan filed by the parties is approved and shall control discovery to the extent of its application unless further modified by the Court. 3. The pretrial conference scheduled for Wednesday, August 3, 2022 at 11:00 a.m. iscancelled. 4. All Fed. R. Civ. P. 26(a)(1) disclosures shall be completed by Friday, August 5,2022.. No general objection may |

| | | be asserted in response to any discovery demandexcept to preserve the attorney-client privilege and work product protection. (see Order for complete details). Signed by Magistrate Judge Theresa Carroll Buchanan on 7/25/22. (tfitz, ) (Entered: 07/25/2022) |
|---|---|---|
| 07/25/2022 | 31 | NOTICE by Jane Doe re 24 Memorandum in Opposition, (Attachments: # 1 Affidavit of W. Steimel, # 2 Affidavit of Jane Doe)(Urban, Thomas) (Entered: 07/25/2022) |
| 07/25/2022 | 32 | NOTICE by Jane Doe *of Counsel Absence* (Urban, Thomas) (Entered: 07/25/2022) |
| 07/28/2022 | 33 | Objection to 31 NOTICE *of Affidavit of Jane Doe* filed by Cenk Sidar. (Attachments: # 1 Exhibit, # 2 Exhibit)(Tadros, Mariam) (Entered: 07/28/2022) |
| 07/28/2022 | 34 | AFFIDAVIT in Support re 19 MOTION Remove Pseudonym Designation re 4 MOTION Proceed Under Pseudonym , 7 Order on Motion for Miscellaneous Relief filed by Cenk Sidar. (Attachments: # 1 Affidavit)(Tadros, Mariam) (Entered: 07/28/2022) |
| 07/29/2022 | 35 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Motion Hearing held on 7/29/2022. Appearance of counsel. Matter on for Motion to Remove Pseudonym Designation. Motion argued and DENIED. Motion may be renewed at time of trial. Order to follow. (Court Reporter J. Egal)(kgall) (Entered: 07/29/2022) |
| 07/29/2022 | 36 | ORDER denying 19 MOTION Remove Pseudonym Designation. Signed by District Judge Claude M. Hilton on 7/29/2022. (kgall) (Entered: 07/29/2022) |
| 07/29/2022 | 37 | Opposition to 26 MOTION to Produce *Defendant for Examination and DNA Sample* filed by Cenk Sidar. (Attachments: # 1 Exhibit, # 2 Proposed Order)(Tadros, Mariam) (Entered: 07/29/2022) |
| 08/03/2022 | 38 | RESPONSE in Support re 26 MOTION to Produce *Defendant for Examination and DNA Sample* filed by Jane Doe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Urban, Thomas) (Entered: 08/03/2022) |
| 08/05/2022 | 39 | Minute Entry for proceedings held before Magistrate Judge Theresa Carroll Buchanan:Motion Hearing held on 8/5/2022 re 26 MOTION to Produce *Defendant for Examination and DNA Sample* filed by Jane Doe. Appearances of counsel. Motion is argued and GRANTED. Order to follow. (Tape #FTR.)(tfitz, ) (Entered: 08/05/2022) |
| 08/05/2022 | 40 | FOR REASONS stated from the bench, and in accord with specific rulings and instructions thereto, it is hereby ORDERED that Plaintiff Jane Doe's Motion to Obtain Physical Examination of and DNA Sample from Defendant (Dkt. 26) is GRANTED; it is further ORDERED that Defendant Cenk Sidar ("Defendant") shall appear on Monday, August 29, 2022 at 10:00 a.m. at the office of Plaintiffs counsel, Thomas F. Urban II, Esq. at FLETCHER, HEALD & HILDRETH, PLC, 1300 North 17th Street, Suite 1100, Arlington, Virginia 22209 and shall submit to the employee(s) of J and M Paternity Service, LLC for the buccal swab samples; it is further ORDERED that J and M Paternity Service, LLC shall transfer the samples to Eurofins Europe/London Police and Bode Technologies for testing; and it is further ORDERED that Plaintiff shall provide the Court and counsel with the written results of the analysis of this testing within thirty (30) days after the completion of the analysis of the testing or as soon |

| | | |
|---|---|---|
| | | thereafter as such results may be obtained from the laboratory or laboratories. Defendant is advised that failure to comply with this Order may result in the entry of sanctions, including default judgment, pursuant to federal Rule of Civil Procedure 37(b)(2).. Signed by Magistrate Judge Theresa Carroll Buchanan on 8/5/22. (tfitz, ) (Entered: 08/05/2022) |
| 08/15/2022 | | Case Reassigned to Magistrate Judge John F. Anderson. Magistrate Judge Theresa Carroll Buchanan no longer assigned to the case. (jlan) (Entered: 08/15/2022) |
| 08/19/2022 | 41 | Memorandum in Support re 26 MOTION to Produce *Defendant for Examination and DNA Sample* filed by Cenk Sidar. (Attachments: # 1 Proposed Order)(Tadros, Mariam) (Entered: 08/19/2022) |
| 08/19/2022 | 42 | Notice of Hearing Date re 41 Memorandum in Support (Tadros, Mariam) (Entered: 08/19/2022) |
| 08/19/2022 | 43 | Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 40 Order on Motion to Produce,,,,, by Cenk Sidar. (Tadros, Mariam) (Entered: 08/19/2022) |
| 08/19/2022 | 44 | Memorandum in Support re 43 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 40 Order on Motion to Produce,,,,, *CORRECTED* filed by Cenk Sidar. (Attachments: # 1 Proposed Order)(Tadros, Mariam) (Entered: 08/19/2022) |
| 08/19/2022 | 45 | Notice of Hearing Date *Corrected* re 43 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 40 Order on Motion to Produce,,,,, (Tadros, Mariam) (Entered: 08/19/2022) |
| 08/19/2022 | | Set Deadlines as to 43 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 40 Order on Motion to Produce, . Motion Hearing set for 9/9/2022 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (clar, ) (Entered: 08/22/2022) |
| 08/28/2022 | 46 | MOTION to Stay re 40 Order on Motion to Produce,,,,, by Cenk Sidar. (Tadros, Mariam) (Entered: 08/28/2022) |
| 08/28/2022 | 47 | Memorandum in Support re 46 MOTION to Stay re 40 Order on Motion to Produce,,,,, filed by Cenk Sidar. (Attachments: # 1 Proposed Order)(Tadros, Mariam) (Entered: 08/28/2022) |
| 08/28/2022 | 48 | NOTICE by Cenk Sidar re 46 MOTION to Stay re 40 Order on Motion to Produce,,,,, *Waiver of Oral Argument* (Tadros, Mariam) (Entered: 08/28/2022) |
| 09/02/2022 | 49 | MOTION to Continue by Cenk Sidar. (Attachments: # 1 Memo in Support of Motion, # 2 Notice Waive Oral Argument, # 3 Proposed Order Proposed Order)(Tadros, Mariam) (Entered: 09/02/2022) |
| 09/02/2022 | 50 | Memorandum in Opposition re 49 MOTION to Continue *September 9 Hearing* filed by Jane Doe. (Urban, Thomas) (Entered: 09/02/2022) |
| 09/02/2022 | 51 | Memorandum in Opposition re 43 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 40 Order on Motion to Produce,,,,, filed by Jane Doe. (Attachments: # 1 Exhibit A - Redline, # 2 Exhibit B - Corresp between Defendant and |

JA007

| | | London Police, # 3 Exhibit C - Plaintiff Counsel's Email to Defendant's Counsel, # 4 Exhibit D - J and M Paternity Invoice, # 5 Exhibit E - Technical Information about Bode Technologies, J and M Paternity, # 6 Proposed Order)(Urban, Thomas) (Entered: 09/02/2022) |
|---|---|---|
| 09/06/2022 | 52 | REPLY to Response to Motion re 49 MOTION to Continue filed by Cenk Sidar. (Attachments: # 1 Exhibit Email Chain, # 2 Exhibit Email Chain)(Tadros, Mariam) (Entered: 09/06/2022) |
| 09/07/2022 | 53 | Opposition to 46 MOTION to Stay re 40 Order on Motion to Produce,,,,, filed by Jane Doe. (Urban, Thomas) (Entered: 09/07/2022) |
| 09/08/2022 | 54 | REPLY to Response to Motion re 43 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 40 Order on Motion to Produce,,,,, filed by Cenk Sidar. (Attachments: # 1 Exhibit Email Chain)(Tadros, Mariam) (Entered: 09/08/2022) |
| 09/08/2022 | | Motion hearing set Friday, September 9, 2022 is terminated. Ruling will be made based on the papers. (dvanm) (Entered: 09/08/2022) |
| 09/12/2022 | 55 | ORDERED that Magistrate Judge's Order of August 5, 2022 isAFFIRMED in re 43 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation. Signed by District Judge Claude M. Hilton on 09/12/2022. (jlan) (Entered: 09/15/2022) |
| 10/13/2022 | 56 | NOTICE OF APPEAL as to 55 Order on Motion Re: Objections to Magistrate Judge's Ruling or Recommendation by Cenk Sidar. Filing fee $ 505, receipt number AVAEDC-8610584. (Tadros, Mariam) (Entered: 10/13/2022) |
| 10/17/2022 | 57 | Transmission of Notice of Appeal to US Court of Appeals re 56 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov). (dvanm) (Entered: 10/17/2022) |
| 10/17/2022 | 58 | CLERK'S OFFICE ERROR - DOCUMENT REMOVED AND FILED IN PROPER CASE. Rule 45 Notice re 56 Notice of Appeal: Your application to proceed without prepayment of fees under the Prison Litigation Reform Act has not been received. Your Filing fee must be paid to the Clerk, U. S. District Court, or your PLRA-Application to proceed under Prison Litigation Reform Act and PLRA-Consent to payment form must be filed in this Court within 15 days or this appeal will be dismissed. (dvanm) (Main Document 58 replaced on 10/17/2022) (dvanm, ). Modified on 10/17/2022 (dvanm, ). (Entered: 10/17/2022) |
| 10/17/2022 | 59 | USCA Case Number 22-2087 4th CCA, case manager Naeemah Sims, for 56 Notice of Appeal filed by Cenk Sidar. (dvanm) (Entered: 10/17/2022) |
| 11/22/2022 | 60 | MOTION for Extension of Time to Complete Discovery by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 11/22/2022) |
| 11/22/2022 | 61 | Memorandum to 60 MOTION for Extension of Time to Complete Discovery filed by Jane Doe. (Attachments: # 1 Exhibit A - Partial DNA Motion Timeline)(Urban, Thomas) (Entered: 11/22/2022) |
| 11/22/2022 | 62 | Notice of Hearing Date set for December 2, 2022 re 60 MOTION for Extension of Time to Complete Discovery (Urban, Thomas) (Entered: 11/22/2022) |

| 11/23/2022 | 63 | MOTION to Compel *and for Sanctions for failure to Comply with Court Order re DNA Sample* by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 11/23/2022) |
|---|---|---|
| 11/23/2022 | 64 | Memorandum in Support re 63 MOTION to Compel *and for Sanctions for failure to Comply with Court Order re DNA Sample* filed by Jane Doe. (Attachments: # 1 Exhibit A - Sidar Responses to Requests for Admissions, # 2 Exhibit B - Partial DNA Timeline, # 3 Exhibit C - Corresp re Failure to Comply with Order)(Urban, Thomas) (Entered: 11/23/2022) |
| 11/25/2022 | | Set Deadlines as to 63 MOTION to Compel *and for Sanctions for failure to Comply with Court Order re DNA Sample*, 60 MOTION for Extension of Time to Complete Discovery. Motion Hearing set for 12/2/2022 at 10:00 AM in Alexandria Courtroom 501 before Magistrate Judge John F. Anderson. (dvanm) (Entered: 11/25/2022) |
| 11/25/2022 | | MOTIONS REFERRED to Magistrate Judge: Anderson. 60 MOTION for Extension of Time to Complete Discovery , 63 MOTION to Compel *and for Sanctions for failure to Comply with Court Order re DNA Sample* (dvanm) (Entered: 11/25/2022) |
| 11/30/2022 | 65 | Opposition *to Motion for Default* filed by Cenk Sidar. (Attachments: # 1 Proposed Order Proposed Order, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2, # 4 Exhibit Exhibit 3, # 5 Exhibit Exhibit 4, # 6 Exhibit Exhibit 5, # 7 Exhibit Exhibit 6, # 8 Exhibit Exhibit 7)(Tadros, Mariam) (Entered: 11/30/2022) |
| 11/30/2022 | 66 | Opposition *to Plaintiff's Motion to Enlarge the Discovery Period* filed by Cenk Sidar. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Proposed Order) (Tadros, Mariam) (Entered: 11/30/2022) |
| 12/01/2022 | 67 | REPLY to Response to Motion re 63 MOTION to Compel *and for Sanctions for failure to Comply with Court Order re DNA Sample* filed by Jane Doe. (Attachments: # 1 Exhibit A - Smith DNA Order)(Urban, Thomas) (Entered: 12/01/2022) |
| 12/01/2022 | 68 | REPLY to Response to Motion re 60 MOTION for Extension of Time to Complete Discovery filed by Jane Doe. (Urban, Thomas) (Entered: 12/01/2022) |
| 12/02/2022 | 69 | Minute Entry for proceedings held before Magistrate Judge John F. Anderson:Motion Hearing held on 12/2/2022 re 60 MOTION for Extension of Time to Complete Discovery filed by Jane Doe, 63 MOTION to Compel and for Sanctions for failure to Comply with Court Order re DNA Sample filed by Jane Doe. Appearance of counsel for Plaintiff and Defendant. Motions argued and 60 MOTION for Extension of Time - DENIED; 63 MOTION to Compel and for Sanctions - GRANTED. Order to follow. (Tape #FTR.)(nneb) (Entered: 12/02/2022) |
| 12/02/2022 | 70 | ORDER, for the reasons stated during the hearing, the undersigned finds defendant unjustifiably failed to comply with that order and still has not complied with that order as to 63 Motion for sanctions and to further compel compliance; denying 60 Motion for Extension of Time to Complete Discovery. Signed by Magistrate Judge John F. Anderson on 12/2/2022. SEE ORDER FOR FURTHER DETAILS. (nneb) (Entered: 12/02/2022) |

JA009

| 12/06/2022 | 71 | Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 70 Order on Motion for Extension of Time to Complete Discovery,, Order on Motion to Compel, *(Motion re Extension Only)* by Jane Doe. (Attachments: # 1 Proposed Order) (Urban, Thomas) (Entered: 12/06/2022) |
|---|---|---|
| 12/06/2022 | 72 | Memorandum in Support re 71 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 70 Order on Motion for Extension of Time to Complete Discovery,, Order on Motion to Compel, *(Motion re Extension Only)* filed by Jane Doe. (Urban, Thomas) (Entered: 12/06/2022) |
| 12/06/2022 | 73 | Notice of Hearing Date set for 12/15/2022 re 71 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 70 Order on Motion for Extension of Time to Complete Discovery,, Order on Motion to Compel, *(Motion re Extension Only)* (Urban, Thomas) (Entered: 12/06/2022) |
| 12/06/2022 | | Set Deadline as to 71 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 70 Order on Motion for Extension of Time to Complete Discovery,, Order on Motion to Compel, *(Motion re Extension Only)*. Motion Hearing set for 12/15/2022 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (wgar, ) (Entered: 12/06/2022) |
| 12/08/2022 | 74 | Second MOTION to Compel *and for Sanctions for failure to Comply with Court Order re DNA Sample* by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 12/08/2022) |
| 12/08/2022 | 75 | Memorandum in Support re 74 Second MOTION to Compel *and for Sanctions for failure to Comply with Court Order re DNA Sample* filed by Jane Doe. (Attachments: # 1 Exhibit A - Notice for DNA Sampling, # 2 Exhibit B - Objections, # 3 Exhibit C - Email to M Tadros)(Urban, Thomas) (Entered: 12/08/2022) |
| 12/08/2022 | 76 | Notice of Hearing Date set for 12/15/2022 re 74 Second MOTION to Compel *and for Sanctions for failure to Comply with Court Order re DNA Sample* (Urban, Thomas) (Entered: 12/08/2022) |
| 12/08/2022 | 77 | Third MOTION to Compel *and for Sanctions* by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 12/08/2022) |
| 12/08/2022 | 78 | Memorandum in Support re 77 Third MOTION to Compel *and for Sanctions* filed by Jane Doe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Urban, Thomas) (Entered: 12/08/2022) |
| 12/08/2022 | 79 | Notice of Hearing Date set for 12/15/2022 re 77 Third MOTION to Compel *and for Sanctions* (Urban, Thomas) (Entered: 12/08/2022) |
| 12/09/2022 | | Removed per chambers. Modified on 12/9/2022 (dvanm). (Entered: 12/09/2022) |
| 12/12/2022 | 80 | ORDER - ORDERED that plaintiff's second motion for sanctions and to further compel compliance with Judge Buchanan's August 5, 2022 order requiring buccal swab samples and an extension of the discovery period is denied. Signed by Magistrate Judge John F. Anderson on 12/12/2022. SEE ORDER FOR FURTHER DETAILS. (wgar, ) (Entered: 12/12/2022) |

| 12/12/2022 | 81 | ORDER denying 77 third motion for sanctions and to compel. Signed by Magistrate Judge John F. Anderson on 12/12/2022. (wgar, ) (Entered: 12/12/2022) |
| 12/13/2022 | 82 | Opposition *to Plaintiff's Objection to Magistrate Judge Anderson's December 2, 2022 Order Denying Plaintiff's Request to Enlarge the Discovery Period* filed by Cenk Sidar. (Attachments: # 1 Proposed Order Proposed Order)(Tadros, Mariam) (Entered: 12/13/2022) |
| 12/14/2022 | 83 | Rule 26 Disclosure by Cenk Sidar. (Tadros, Mariam) (Entered: 12/14/2022) |
| 12/14/2022 | 84 | Exhibit List by Cenk Sidar.. (Tadros, Mariam) (Entered: 12/14/2022) |
| 12/14/2022 | 85 | Witness List by Cenk Sidar. (Tadros, Mariam) (Entered: 12/14/2022) |
| 12/14/2022 | 86 | Witness List by Jane Doe. (Urban, Thomas) (Entered: 12/14/2022) |
| 12/14/2022 | 87 | Exhibit List by Jane Doe.. (Urban, Thomas) (Entered: 12/14/2022) |
| 12/14/2022 | 88 | Rule 26 Disclosure by Jane Doe. (Urban, Thomas) (Entered: 12/14/2022) |
| 12/15/2022 | | Reset Hearing & Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 70 Order on Motion for Extension of Time to Complete Discovery, Order on Motion to Compel, *(Motion re Extension Only)*. **Final Pretrial Conference and Motion Hearing reset for 12/15/2022 at 11:00 AM** in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (tran) (Entered: 12/15/2022) |
| 12/15/2022 | 89 | Minute Entry for proceedings held before District Judge Claude M. Hilton: Motion Hearing and Final Pretrial Conference held on 12/15/2022 re 71 Motion Re: Objections to Magistrate Judge's Ruling or Recommendation re 70 Order on Motion for Extension of Time to Complete Discovery,, Order on Motion to Compel, *(Motion re Extension Only)* filed by Jane Doe.<br>Walter Steimel, Jr. and Thomas Urban, II appeared on behalf of the plaintiff.<br>Mariam Tadros appeared on behalf of the defendant.<br>Matter argued. COURT affirms 71 Magistrate Judge Anderson's December 2, 2022 Order. **Jury Trial set for 2/27/2023 at 10:00 AM** in Alexandria Courtroom 800 before District Judge Claude M. Hilton.<br>Court Reporter: J. Egal<br>(tran) (Entered: 12/15/2022) |
| 12/15/2022 | 94 | STIPULATED PROTECTIVE ORDER. Signed by District Judge Claude M. Hilton on 12/15/2022. (dvanm) (Entered: 12/19/2022) |
| 12/16/2022 | 90 | MOTION Adopt Magistrate Recommendation re 70 Order on Motion for Extension of Time to Complete Discovery,, Order on Motion to Compel, by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 12/16/2022) |
| 12/16/2022 | 91 | Memorandum in Support re 90 MOTION Adopt Magistrate Recommendation re 70 Order on Motion for Extension of Time to Complete Discovery,, Order on Motion to Compel, filed by Jane Doe. (Urban, Thomas) (Entered: 12/16/2022) |

JA011

| | | |
|---|---|---|
| 12/16/2022 | 92 | NOTICE by Jane Doe re 90 MOTION Adopt Magistrate Recommendation re 70 Order on Motion for Extension of Time to Complete Discovery,, Order on Motion to Compel, *Waiver of Hearing* (Urban, Thomas) (Entered: 12/16/2022) |
| 12/16/2022 | 93 | ORDERED that default judgement is entered against Defendant as to liability and this case shall proceed as to damages. Signed by District Judge Claude M. Hilton on 12/16/2022. (dvanm) (Entered: 12/16/2022) |
| 12/16/2022 | 95 | ORDER of USCA as to 56 Notice of Appeal filed by Cenk Sidar. Upon consideration of the stipulated motion to voluntarily dismiss, the courtdismisses this appeal, upon such terms as have been agreed to by the parties,pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure. (dvanm) (Entered: 12/19/2022) |
| 12/16/2022 | 96 | USCA Mandate re 56 Notice of Appeal. This court's order dismissing this appeal pursuant to Local Rule 42(b) takes effect today. This constitutes the formal mandate of this court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. (dvanm) (Entered: 12/19/2022) |
| 12/23/2022 | 97 | *Objections to Plaintiff's* Exhibit List by Cenk Sidar.. (Tadros, Mariam) (Entered: 12/23/2022) |
| 12/23/2022 | 98 | *Objections to Plaintiff's* Witness List by Cenk Sidar. (Tadros, Mariam) (Entered: 12/23/2022) |
| 12/23/2022 | 99 | Objection to 84 Exhibit List *Filed by Defendant* filed by Jane Doe. (Urban, Thomas) (Entered: 12/23/2022) |
| 12/23/2022 | 100 | Objection to 85 Witness List *filed by Defendant* filed by Jane Doe. (Urban, Thomas) (Entered: 12/23/2022) |
| 12/23/2022 | 101 | MOTION for Reconsideration (Rule 72) re 80 Order on Motion to Compel, by Jane Doe. (Attachments: # 1 Exhibit A - Hearing Transcript Excerpt, # 2 Proposed Order) (Urban, Thomas) (Entered: 12/23/2022) |
| 12/23/2022 | 102 | Notice of Hearing Date set for January 13, 2023 re 101 MOTION for Reconsideration (Rule 72) re 80 Order on Motion to Compel, (Urban, Thomas) (Entered: 12/23/2022) |
| 12/27/2022 | | Set Deadline as to 101 MOTION for Reconsideration (Rule 72) re 80 Order on Motion to Compel. Motion Hearing set for 1/13/2023 at 10:00 AM before District Judge Claude M. Hilton. (jlan) (Entered: 12/27/2022) |
| 12/30/2022 | 103 | MOTION to Strike by Cenk Sidar. (Attachments: # 1 Memo in Support, # 2 Notice of Hearing, # 3 Proposed Order Proposed Order)(Tadros, Mariam) (Entered: 12/30/2022) |
| 12/30/2022 | 104 | MOTION Remove Pseudonym Designation by Cenk Sidar. (Attachments: # 1 Memo in Support of Motion, # 2 Notice of Hearing, # 3 Proposed Order Proposed Order) (Tadros, Mariam) (Entered: 12/30/2022) |
| 01/03/2023 | | Notice of Correction re 104 MOTION Remove Pseudonym Designation, and 103 MOTION to Strike. The filing user has been notified to file a Notice of Hearing or a Notice of Waiver of Oral Argument. (dvanm) (Entered: 01/03/2023) |

JA012

| 01/03/2023 | 105 | Notice of Hearing Date *on Renewed Motion to Remove Pseudonym Designation* set for 01/13/2023 re 104 MOTION Remove Pseudonym Designation (Tadros, Mariam) (Entered: 01/03/2023) |
|---|---|---|
| 01/03/2023 | 106 | Notice of Hearing Date *on Motion to Strike* set for 01/13/2023 re 103 MOTION to Strike (Tadros, Mariam) (Entered: 01/03/2023) |
| 01/05/2023 | | Set Deadlines as to 104 MOTION Remove Pseudonym Designation, 103 MOTION to Strike. Motion Hearing set for 1/13/2023 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (wgar, ) (Entered: 01/05/2023) |
| 01/11/2023 | 107 | Opposition to 101 MOTION for Reconsideration (Rule 72) re 80 Order on Motion to Compel, filed by Cenk Sidar. (Attachments: # 1 Proposed Order)(Tadros, Mariam) (Entered: 01/11/2023) |
| 01/11/2023 | | *** Motion Hearing deadline terminated - Per CMH's chambers motions set for 1/13/23 will be decided on the papers; no oral argument will be heard (tarm, ) (Entered: 01/11/2023) |
| 01/11/2023 | 108 | Memorandum in Opposition re 104 MOTION Remove Pseudonym Designation filed by Jane Doe. (Attachments: # 1 Affidavit of Jane Doe, # 2 Proposed Order)(Urban, Thomas) (Entered: 01/11/2023) |
| 01/11/2023 | 109 | REPLY to Response to Motion re 101 MOTION for Reconsideration (Rule 72) re 80 Order on Motion to Compel, filed by Jane Doe. (Attachments: # 1 Exhibit A - Sidar Objection to 2nd DNA Notice)(Urban, Thomas) (Entered: 01/11/2023) |
| 01/11/2023 | 110 | Memorandum in Opposition re 103 MOTION to Strike filed by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 01/11/2023) |
| 01/12/2023 | 111 | Reply to 108 Memorandum in Opposition *to Defendant's Renewed Motion to Remove Pseudonym Designation* filed by Cenk Sidar. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Tadros, Mariam) (Entered: 01/12/2023) |
| 01/18/2023 | 112 | NOTICE of Appearance by John David Perry on behalf of Cenk Sidar (Perry, John) (Entered: 01/18/2023) |
| 01/18/2023 | 113 | ORDERED that Plaintiff's Objection is OVERRULED and the Magistrate Judge's Order of December 12, 2022 is AFFIRMED. Signed by District Judge Claude M. Hilton on 01/18/2023. (dvanm) (Entered: 01/18/2023) |
| 01/19/2023 | 114 | ORDERED that Defendant's Renewed Motion to Strike is DENIED at this time without prejudice to be raised at the time of trial. Signed by District Judge Claude M. Hilton on 1/19/2023. (swil) (Entered: 01/20/2023) |
| 02/06/2023 | 115 | MOTION for Electronic Device Application by Jane Doe. (Urban, Thomas) (Entered: 02/06/2023) |
| 02/07/2023 | 116 | NOTICE of Appearance by Corinne Marie Bahner on behalf of Cenk Sidar (Bahner, Corinne) (Entered: 02/07/2023) |

| 02/08/2023 | 117 | Statement of Undisputed Facts by Jane Doe. (Attachments: # 1 Exhibit 1 - Redacted Texts)(Urban, Thomas) (Entered: 02/08/2023) |
| 02/08/2023 | 118 | NOTICE OF INTERLOCUTORY APPEAL as to 113 Order by Jane Doe. Filing fee $ 505, receipt number AVAEDC-8793325. (Urban, Thomas) (Entered: 02/08/2023) |
| 02/09/2023 | 119 | Transmission of Notice of Appeal to US Court of Appeals re 118 Notice of Interlocutory Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm) (Entered: 02/09/2023) |
| 02/10/2023 | 120 | MOTION To Provide Pretrial Instruction by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 121 | Memorandum in Support re 120 MOTION To Provide Pretrial Instruction filed by Jane Doe. (Attachments: # 1 Exhibit A - Proposed Instruction)(Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 122 | Notice of Hearing Date set for 2/24/2023 re 120 MOTION To Provide Pretrial Instruction (Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 123 | MOTION for Sanctions *for Spoliation of Evidence* by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 124 | Memorandum in Support re 123 MOTION for Sanctions *for Spoliation of Evidence* filed by Jane Doe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 125 | USCA Case Number 23-1151 4CCA, case manager Ricki Edwards, for 118 Notice of Interlocutory Appeal filed by Jane Doe. (dvanm) (Entered: 02/10/2023) |
| 02/10/2023 | 126 | MOTION in Limine *Prohibit Defendant from Introducing Evidence Contrary to Default Judgment, Scandalous Untrue Hearsay* by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 127 | Memorandum in Support re 126 MOTION in Limine *Prohibit Defendant from Introducing Evidence Contrary to Default Judgment, Scandalous Untrue Hearsay* filed by Jane Doe. (Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 128 | Notice of Hearing Date set for 2/24/2023 re 126 MOTION in Limine *Prohibit Defendant from Introducing Evidence Contrary to Default Judgment, Scandalous Untrue Hearsay* (Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 129 | MOTION in Limine *to Exclude Certain Evidence from Trial* by Cenk Sidar. (Attachments: # 1 Proposed Order)(Perry, John) (Entered: 02/10/2023) |
| 02/10/2023 | 130 | Memorandum in Support re 129 MOTION in Limine *to Exclude Certain Evidence from Trial* filed by Cenk Sidar. (Perry, John) (Entered: 02/10/2023) |
| 02/10/2023 | 131 | Sealed Exhibit 1 re 130 Memorandum in Support. (Perry, John) (Entered: 02/10/2023) |
| 02/10/2023 | 132 | Consent MOTION to Seal by Cenk Sidar. (Attachments: # 1 Proposed Order)(Perry, John) (Entered: 02/10/2023) |

JA014

| 02/10/2023 | 133 | Memorandum in Support re 132 Consent MOTION to Seal filed by Cenk Sidar. (Perry, John) (Entered: 02/10/2023) |
|---|---|---|
| 02/10/2023 | 134 | Notice of Under Seal Filing LCvR5 (B) by Cenk Sidar re 132 Consent MOTION to Seal (Perry, John) (Entered: 02/10/2023) |
| 02/10/2023 | 135 | Notice of Hearing Date re 129 MOTION in Limine *to Exclude Certain Evidence from Trial* (Perry, John) (Entered: 02/10/2023) |
| 02/10/2023 | 136 | Waiver of re 132 Consent MOTION to Seal by Cenk Sidar (Perry, John) (Entered: 02/10/2023) |
| 02/10/2023 | 137 | MOTION in Limine *Due to Defendant Non-compliance with Discovery Obligations* by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 138 | Memorandum in Support re 137 MOTION in Limine *Due to Defendant Non-compliance with Discovery Obligations* filed by Jane Doe. (Attachments: # 1 Exhibit A - Relevant Interrogatory Responses, # 2 Exhibit B - RFP Responses, # 3 Exhibit C-Discvoery Letter)(Urban, Thomas) (Entered: 02/10/2023) |
| 02/10/2023 | 139 | Notice of Hearing Date set for 2/24/2023 re 137 MOTION in Limine *Due to Defendant Non-compliance with Discovery Obligations* (Urban, Thomas) (Entered: 02/10/2023) |
| 02/13/2023 | | Set Deadlines as to 126 MOTION in Limine Prohibit Defendant from Introducing Evidence Contrary to Default Judgment, Scandalous Untrue Hearsay, 137 MOTION in Limine Due to Defendant Non-compliance with Discovery Obligations, 129 MOTION in Limine to Exclude Certain Evidence from Trial, 120 MOTION To Provide Pretrial Instruction. Motion Hearing set for 2/24/2023 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (wgar, ) (Entered: 02/13/2023) |
| 02/13/2023 | 141 | ORDER granting 115 Motion for Electronic Device Application. Signed by District Judge Claude M. Hilton on 02/13/2023. (dvanm) (Entered: 02/14/2023) |
| 02/14/2023 | 140 | Statement of Undisputed Facts by Jane Doe. (Urban, Thomas) (Entered: 02/14/2023) |
| 02/14/2023 | 142 | NOTICE by Cenk Sidar *(Appearance of Alexandros K. Mitrakas as Co-Counsel for Defendant)* (Perry, John) (Entered: 02/14/2023) |
| 02/14/2023 | 143 | NOTICE of Appearance by Alexandros Kosmas Mitrakas on behalf of Cenk Sidar (Mitrakas, Alexandros) (Entered: 02/14/2023) |
| 02/14/2023 | 144 | MOTION for Electronic Device Application by Cenk Sidar. (Perry, John) (Entered: 02/14/2023) |
| 02/15/2023 | 145 | MOTION to Stay re 118 Notice of Interlocutory Appeal by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 02/15/2023) |
| 02/15/2023 | 146 | Memorandum in Support re 145 MOTION to Stay re 118 Notice of Interlocutory Appeal filed by Jane Doe. (Urban, Thomas) (Entered: 02/15/2023) |

JA015

| | | |
|---|---|---|
| 02/15/2023 | 147 | Waiver of re 145 MOTION to Stay re 118 Notice of Interlocutory Appeal *Hearing* by Jane Doe (Urban, Thomas) (Entered: 02/15/2023) |
| 02/16/2023 | 148 | Opposition to 123 MOTION for Sanctions *for Spoliation of Evidence* filed by Cenk Sidar. (Attachments: # 1 Proposed Order Proposed Order)(Perry, John) (Entered: 02/16/2023) |
| 02/16/2023 | 149 | Opposition *to Plaintiff's Motion in Limine Regarding Exclusion of Testimony Prohibited Because of Default Judgment* filed by Cenk Sidar. (Tadros, Mariam) (Entered: 02/16/2023) |
| 02/16/2023 | 150 | Opposition *to Plaintiff's Motion in Limine Regarding Exclusion of Testimony and Argument because of Defendant's Failure to Comply with his Discovery Obligations* filed by Cenk Sidar. (Tadros, Mariam) (Entered: 02/16/2023) |
| 02/16/2023 | 151 | ORDERED that Defendant's Renewed Motion to Remove Pseudonym Designation is GRANTED in re 104 MOTION Remove Pseudonym Designation (see Order for further details). Signed by District Judge Claude M. Hilton on 2/16/2023. (Dest) (Entered: 02/16/2023) |
| 02/16/2023 | 152 | Rule 26 Disclosure by Jane Doe. (Urban, Thomas) (Entered: 02/16/2023) |
| 02/16/2023 | 153 | *Amended* Exhibit List by Jane Doe.. (Urban, Thomas) (Entered: 02/16/2023) |
| 02/16/2023 | 154 | NOTICE OF INTERLOCUTORY APPEAL as to 151 Order on Motion for Miscellaneous Relief by Jane Doe. Filing fee $ 505, receipt number AVAEDC-8807953. (Urban, Thomas) (Entered: 02/16/2023) |
| 02/16/2023 | 155 | MOTION to Stay *Proceedings Pending Interlocutory Appeal* by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 02/16/2023) |
| 02/16/2023 | 156 | Memorandum in Support re 155 MOTION to Stay *Proceedings Pending Interlocutory Appeal* filed by Jane Doe. (Urban, Thomas) (Entered: 02/16/2023) |
| 02/16/2023 | 157 | Waiver of re 155 MOTION to Stay *Proceedings Pending Interlocutory Appeal Hearing* by Jane Doe (Urban, Thomas) (Entered: 02/16/2023) |
| 02/16/2023 | 162 | ORDER granting 144 Motion for Electronic Device Application. Signed by District Judge Claude M. Hilton on 02/16/2023. (dvanm, ) (Entered: 02/17/2023) |
| 02/17/2023 | 158 | Transmission of Notice of Appeal to US Court of Appeals re 154 Notice of Interlocutory Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm) (Entered: 02/17/2023) |
| 02/17/2023 | 159 | ORDER granting 132 Motion to Seal. Signed by Magistrate Judge John F. Anderson on 02/17/2023. (dvanm, ) (Entered: 02/17/2023) |
| 02/17/2023 | 160 | USCA Case Number 23-1177 4CCA, case manager Ricki Edwards, for 154 Notice of Interlocutory Appeal filed by Jane Doe. (dvanm) (Entered: 02/17/2023) |

JA016

| | | |
|---|---|---|
| 02/17/2023 | 161 | ORDER of USCA as to 154 Notice of Interlocutory Appeal filed by Jane Doe.The court consolidates Case No. 23-1177 and Case No. 23-1151. Entry of appearance forms and disclosure statements filed by counsel and parties to the lead case are deemed filed in the secondary case. (dvanm) (Entered: 02/17/2023) |
| 02/17/2023 | 163 | Opposition to 120 MOTION To Provide Pretrial Instruction filed by Cenk Sidar. (Attachments: # 1 Proposed Order)(Perry, John) (Entered: 02/17/2023) |
| 02/17/2023 | 164 | MOTION in Limine *to Preclude Use of Certain Purported Text Messages* by Cenk Sidar. (Attachments: # 1 Proposed Order)(Perry, John) (Entered: 02/17/2023) |
| 02/17/2023 | 165 | Memorandum in Support re 164 MOTION in Limine *to Preclude Use of Certain Purported Text Messages* filed by Cenk Sidar. (Perry, John) (Entered: 02/17/2023) |
| 02/17/2023 | 166 | Notice of Hearing Date re 164 MOTION in Limine *to Preclude Use of Certain Purported Text Messages* (Perry, John) (Entered: 02/17/2023) |
| 02/17/2023 | 167 | Memorandum in Opposition re 129 MOTION in Limine *to Exclude Certain Evidence from Trial* filed by Jane Doe. (Attachments: # 1 Proposed Order)(Urban, Thomas) (Entered: 02/17/2023) |
| 02/17/2023 | 168 | Sealed Attachment/Exhibit(s) re 165 Memorandum in Support. (Perry, John) (Entered: 02/17/2023) |
| 02/17/2023 | 169 | Consent MOTION to Seal by Cenk Sidar. (Attachments: # 1 Proposed Order)(Perry, John) (Entered: 02/17/2023) |
| 02/17/2023 | 170 | Notice of Under Seal Filing LCvR5 (B) by Cenk Sidar re 169 Consent MOTION to Seal (Perry, John) (Entered: 02/17/2023) |
| 02/17/2023 | 171 | Memorandum in Support re 169 Consent MOTION to Seal filed by Cenk Sidar. (Perry, John) (Entered: 02/17/2023) |
| 02/20/2023 | 172 | Proposed Jury Instructions by Jane Doe. (Attachments: # 1 Exhibit A - Pretrial Jury Instruction.clean, # 2 Exhibit B - Pretrial Jury Instruction with authorities, # 3 Exhibit C - Post Trial Instructions clean, # 4 Exhibit D - Post Trial Instructions with authorities)(Urban, Thomas) (Entered: 02/20/2023) |
| 02/20/2023 | 173 | Proposed Voir Dire by Jane Doe. (Urban, Thomas) (Entered: 02/20/2023) |
| 02/20/2023 | 174 | Supplemental MOTION for Electronic Device Application by Jane Doe. (Attachments: # 1 Exhibit A - Urban certification, # 2 Exhibit B - Steimel Certification)(Urban, Thomas) (Entered: 02/20/2023) |
| 02/21/2023 | 175 | Supplemental MOTION for Electronic Device Application *(Corrected)* by Jane Doe. (Urban, Thomas) (Entered: 02/21/2023) |
| 02/21/2023 | 176 | ORDER granting 175 Motion for Electronic Device Application. Signed by District Judge Claude M. Hilton on 02/21/2023. (dvanm) (Entered: 02/21/2023) |
| 02/21/2023 | | Set Deadline as to 164 MOTION in Limine to Preclude Use of Certain Purported Text Messages. Motion Hearing set for 2/24/2023 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (jlan) (Entered: 02/21/2023) |

| | | |
|---|---|---|
| 02/21/2023 | 177 | Proposed Voir Dire by Cenk Sidar. (Bahner, Corinne) (Entered: 02/21/2023) |
| 02/21/2023 | 178 | Objection to 140 Statement of Undisputed Facts filed by Cenk Sidar. (Bahner, Corinne) (Entered: 02/21/2023) |
| 02/21/2023 | 179 | Proposed Jury Instructions by Cenk Sidar. (Perry, John) (Entered: 02/21/2023) |
| 02/22/2023 | 180 | REPLY to Response to Motion re 120 MOTION To Provide Pretrial Instruction filed by Jane Doe. (Urban, Thomas) (Entered: 02/22/2023) |
| 02/22/2023 | 181 | REPLY to Response to Motion re 137 MOTION in Limine *Due to Defendant Non-compliance with Discovery Obligations* filed by Jane Doe. (Attachments: # 1 Exhibit A - Discovery Deficiency Letter, # 2 Exhibit B - Pltf Interrogatories to Defendant, # 3 Exhibit C - Pltf RFPs to Defendant)(Urban, Thomas) (Entered: 02/22/2023) |
| 02/22/2023 | 182 | Memorandum in Opposition re 164 MOTION in Limine *to Preclude Use of Certain Purported Text Messages* filed by Jane Doe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Urban, Thomas) (Entered: 02/22/2023) |
| 02/22/2023 | 183 | REPLY to Response to Motion re 126 MOTION in Limine *Prohibit Defendant from Introducing Evidence Contrary to Default Judgment, Scandalous Untrue Hearsay* filed by Jane Doe. (Urban, Thomas) (Entered: 02/22/2023) |
| 02/22/2023 | 184 | REPLY to Response to Motion re 123 MOTION for Sanctions *for Spoliation of Evidence* filed by Jane Doe. (Urban, Thomas) (Entered: 02/22/2023) |
| 02/22/2023 | 185 | TRANSCRIPT of Motion Hearing held on July 29, 2022, before Judge Claude M. Hilton, Court Reporter/Transcriber Julie Goodwin, Telephone number 571-970-3191. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 3/24/2023. Redacted Transcript Deadline set for 4/24/2023. Release of Transcript Restriction set for 5/23/2023.(egal, julie) (Entered: 02/22/2023)** |
| 02/23/2023 | 186 | REPLY to Response to Motion re 164 MOTION in Limine *to Preclude Use of Certain Purported Text Messages* filed by Cenk Sidar. (Perry, John) (Entered: 02/23/2023) |
| 02/23/2023 | 187 | ORDER of USCA as to 154 Notice of Interlocutory Appeal filed by Jane Doe, 118 Notice of Interlocutory Appeal filed by Jane Doe. Having reviewed the parties' submissions, the Court concludes appellant has made the requisite showing for obtaining relief. The motion is granted and proceedings in the district court are stayed pending further order of this Court. Entered at the direction of Judge Heytens with concurrence of Judge Diaz and Judge Rushing. (dvanm) (Entered: 02/23/2023) |
| 02/23/2023 | 188 | ORDERED that the case is stayed until further order of the Court. Signed by District Judge Claude M. Hilton on 02/23/2023. (tran) (Entered: 02/24/2023) |

JA018

| 02/24/2023 | | ***Motions Hearing set for February 24, 2023 at 10:00 a.m. terminated, as per CMH Chambers. (tran) (Entered: 02/24/2023) |
|---|---|---|
| 02/24/2023 | | ***Jury Trial set for Monday, February 27, 2023 at 10:00 a.m. terminated, as per CMH Chambers. (tran) (Entered: 02/24/2023) |
| 03/06/2023 | 189 | TRANSCRIPT REQUEST by Jane Doe before Judge Hilton, re 118 Notice of Interlocutory Appeal, 154 Notice of Interlocutory Appeal Transcript due by 3/6/2023. (Urban, Thomas) (Entered: 03/06/2023) |
| 03/07/2023 | 190 | Transcript Order Acknowledgment from USCA re 118 Notice of Interlocutory Appeal: Court Reporter/Transcriber Julie Egal. (dvanm) Modified to correct text on 3/9/2023 (dvanm). (Entered: 03/07/2023) |
| 04/21/2023 | 191 | TRANSCRIPT of Motion Hearing for dates of December 2, 2022, before Judge John F. Anderson, re 190 Transcript Order Acknowledgment from USCA Court Reporter/Transcriber Julie Egal, Telephone number 512.689.7587. Tape Number: FTR Gold. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? n* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/22/2023. Redacted Transcript Deadline set for 6/21/2023. Release of Transcript Restriction set for 7/20/2023.(egal, julie) (Entered: 04/21/2023)** |
| 04/21/2023 | 192 | TRANSCRIPT of Motion Hearing for dates of December 15, 2022, before Judge Claude M. Hilton, re 190 Transcript Order Acknowledgment from USCA Court Reporter/Transcriber Julie Egal, Telephone number 512.689.7587. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? n* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/22/2023. Redacted Transcript Deadline set for 6/21/2023. Release of Transcript Restriction set for 7/20/2023.(egal, julie) (Entered: 04/21/2023)** |
| 04/21/2023 | 193 | TRANSCRIPT of Motion Hearing for dates of August 5, 2022, before Judge Theresa Carroll Buchanan, re 190 Transcript Order Acknowledgment from USCA Court Reporter/Transcriber Julie Egal, Telephone number 5126897587. Tape Number: FTR Gold. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of** |

JA019

this transcript. **If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at** www.vaed.uscourts.gov *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/22/2023. Redacted Transcript Deadline set for 6/21/2023. Release of Transcript Restriction set for 7/20/2023.(egal, julie) (Entered: 04/21/2023)**

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/24/2023 14:02:00 | | | |
| **PACER Login:** | waltersteimel | **Client Code:** | Jane Doe 4th Cir. |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00545-CMH-JFA |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| JANE DOE ) | |
|     A Domiciliary of the ) | |
|     Commonwealth of Virginia ) | |
| ) | |
|     Plaintiff, ) | Civil Action No. _____ |
| ) | |
|        v. ) | |
| ) | **JURY TRIAL DEMANDED** |
| CENK SIDAR ) | |
| ) | |
|        Defendant. ) | |

**COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

Plaintiff Jane Doe,[1] by and through her attorneys Fletcher, Heald and Hildreth, PLC and

Steimel Counselors Law Group, PLLC[2], for her Complaint against Defendant Cenk Sidar, avers

upon her personal knowledge as to her own acts and status and upon information and belief and

to all other matters as follows:

## <u>NATURE OF THE ACTION</u>

1.      This suit arises out of Defendant's brutal and criminal sexual assault and battery

of Plaintiff, without her consent, when she was attending a military defense conference in

London.

2.      Plaintiff originally brought this action in the Circuit Court of Fairfax County on

September 13, 2019. Both parties to that action actively participated in the case and discovery on

the merits until November 19, 2021, when Plaintiff filed for non-suit pursuant to Virginia Code §

8.01-380 as to all claims.

3.      While the Fairfax County Court had initially ordered Defendant to provide DNA

and other samples to Plaintiff, subsequent filings by Defendant and rulings of the Circuit Court

frustrated Plaintiff's attempts to obtain Defendant's DNA, even though Defendant voluntarily

provided DNA samples to the Metropolitan Police of London immediately after the sexual

assault, without limitation or qualification.

---

[1]      Contemporaneously with this filing Plaintiff files a Motion to Proceed under a
Pseudonym pursuant to the five-part test set forth in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir.
1993) and Virginia Code § 8.01-15.1, explaining the precise factual and legal basis upon which
Plaintiff seeks to proceed in this case. A similar request was granted by the Fairfax County Court
in the earlier proceeding in this case.

[2] Mr. Steimel of Steimel Counselors Law Group PLLC will file a *pro hac vice* application.

4.      Upon presenting her notice of nonsuit, Plaintiff's counsel noted that the

mechanisms and procedures for obtaining the Defendant's DNA were more established in

Federal Court, and that Plaintiff was exercising her right to file for a nonsuit in the Circuit Court

and move the matter to Federal Court. Plaintiff's counsel will also request cooperation with the

Metropolitan Police of London and judicial authorities in the U.K. under the Hague Convention

and pursuant to applicable mutual assistance treaties in order to obtain DNA and other evidence

in their possession that are relevant to the matters in this case.

5.      This action has been timely filed pursuant to Virginia Code § 8.01-380 and the

statute of limitations has been preserved pursuant to such statute applicable to nonsuits. This

action has been filed within the applicable six (6) month period from the date of nonsuit.

## PARTIES

6.      Plaintiff is a natural person and a domiciliary of the Commonwealth of Virginia.

7.      Defendant, who was born in Turkey, is a natural person and dual national of

Turkey and the United States, and is currently residing in Washington, D.C. Defendant also

resided in Washington, D.C. at the time Plaintiff filed her original Complaint. Defendant is

currently employed by Enquire AI, Inc., a Washington, D.C. based company which is

incorporated in Delaware.  Enquire AI is the successor to GlobalWonks LLC, Defendant's

employer at the time he committed his assault and at all times from then to the present.

## JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction over this dispute pursuant to 29 U.S.C. §

1332(a)(2). Plaintiff is a resident of Virginia and Defendant is a resident of Washington, D.C.,

and the amount in controversy exceeds the sum or value of $75,000.00 excluding interest and

costs.

9.     Venue is proper in this Court under (i) 28 U.S.C. § 1391(b)(1) because the Defendant resided in the Commonwealth at the time that he brutally sexually assaulted Plaintiff in London, even though he is now a resident of the District of Columbia; and (ii) 28 U.S.C. § 1391(b)(2) because Plaintiff's damages from personal harm and trauma from Defendant's brutal sexual assault were sustained and continue to be sustained in her domicile, the Commonwealth.

10.     This Court has personal jurisdiction over Defendant. The Circuit Court previously determined that Defendant was both a resident of the Commonwealth of Virginia at the time he assaulted Plaintiff, and had significant business contacts in the Commonwealth. The Defendant actively participated in the Circuit Court action issuing and responding to discovery on the merits and filing multiple motions in that case, waiving any objection to personal jurisdiction.  Fairfax County Court (J. Bellows) determined, after a hearing and upon an Order entered June 16, 2020, that the Fairfax County Circuit Court had personal jurisdiction over Defendant finding "1) Defendant regularly conducted business in the Commonwealth, 2) Defendant engaged in any other persistent course of conduct in the Commonwealth, or 3) Defendant derived substantial revenue from services rendered in Virginia, any one of which would be sufficient to find jurisdiction."[3]

## FACTS COMMON TO ALL COUNTS

11.     Defendant is a "global risk executive with extensive experience assisting top financial institutions, multinational corporations, risk management firms, and legal firms operating in high-risk regions." On or about September 12, 2017, he was in London, England for business.

---

[3] Judge Bellows' Order is attached as Exhibit 1.

12.     Defendant was (and still is) working for Enquire AI, Inc., a Washington, D.C. based company which is the successor to GlobalWonks LLC, where he was and is Co-Founder and CEO.

13.     Defendant was in London for company business.

14.     At the time, Jane Doe was a 36-year-old domiciliary of the Commonwealth of Virginia who was visiting London for a military defense show.

15.     Both Defendant and Plaintiff had attended the Johns Hopkins' School of International Studies (SAIS) approximately ten (10) years earlier and knew each other casually from that time.  Defendant and Plaintiff had never dated nor were they ever previously romantically involved with each other.

16.     Plaintiff posted on Facebook that she would be in London, England, from September 9 to September 14, 2017, to attend a military defense conference.  Defendant noted that he would be there at the same time, and Plaintiff suggested that they meet for coffee during the week.

17.     Over coffee, Defendant informed Plaintiff that a SAIS alumni reception was taking place in London on September 15, 2017, and that dinner with a mutual friend was taking place on September 16, 2017.  He suggested that she extend her stay to attend both events.

18.     Plaintiff only had housing arrangements in London, however, through September 14, and it was too late to find a reasonably priced hotel room for the weekend given the lateness of the notice.

19.     On or about September 13, 2017, Defendant offered his apartment, in the SoHo area of London, as an alternative and free place to stay for the extra two days. Plaintiff accepted

solely because she trusted Defendant and did not believe that he would make any attempt to take advantage of her.

20.     On or about September 15, 2017, when Plaintiff arrived at Defendant's rented Airbnb apartment at 13 Brewer Street, Soho, London, Plaintiff discovered it was a small studio apartment. Defendant invited Plaintiff to stay in the apartment's bed and stated that he would sleep on the sofa in the living room area. Plaintiff agreed to this arrangement because she trusted Defendant, believed that they had a platonic friendship, and knew that Defendant was married with children.

21.     Plaintiff and Defendant attended the SAIS alumni reception at Leadenhall Market, and each had two or three glasses of wine that evening at the reception. Afterwards, the Plaintiff had one more glass of wine and the Defendant had three more cocktails at a bar two blocks from the apartment. They returned to the apartment at approximately 12:00 a.m. and were not inebriated when they retired to their respective sleeping spaces – Plaintiff in the apartment's bed, Defendant on the sofa.

22.     In the middle of the night of September 15, 2017, Defendant attempted to get into bed with Plaintiff and placed his arm around Plaintiff's torso.

23.     Plaintiff removed his arm and verbally asked Plaintiff to stop. Defendant claimed that he was cold sleeping on the sofa without a blanket. Plaintiff offered to allow Defendant to have her blanket and return to the sofa or that she would sleep on the sofa and he could have the bed. She moved to the far side of the bed to separate herself as far as possible from Defendant and fell back asleep.  Nothing further happened that night.

24.     At lunch the next day, September 16, 2017, Plaintiff specifically told Defendant that he had scared her by his unwanted contact the night before and that he should not "do that"

(make any further similar physical or romantic overtures toward her). Plaintiff stated that she did not know Defendant's wife, but was sure that his wife would not appreciate his behavior. Defendant assured Plaintiff that he was just cold and would not attempt any more romantic or physical advances. Plaintiff repeated her offer to sleep on the sofa, but Defendant refused to accept this offer.

25.    Later that night, Defendant and Plaintiff met some friends for dinner, as planned, including another mutual friend from SAIS, two employees of Defendant, and several friends of Defendant's from Turkey. Plaintiff spent most of dinner talking to a mutual friend.

26.    The group went to a bar after dinner and at approximately 2:00 am London time on September 17, 2017, Defendant and Plaintiff returned to Defendant's apartment.

27.    Plaintiff got into bed and fell asleep. After an undetermined period of time, she felt something touching her between her legs. Plaintiff struggled to orient herself and the origin of the object touching her. Alarmed that it was the Defendant touching her between her legs, she said no and specifically told him to stop.

28.    Instead, Defendant increased his activity between Plaintiff's legs.

29.    Although Plaintiff was wearing pajamas, Defendant had pulled them to the side and entered Plaintiff's vagina with his penis.

30.    At no time did Plaintiff consent to any such vaginal penetration or, in fact, to any other romantic interaction.

31.    Defendant penetrated Plaintiff's vagina without any attempt to use a condom or otherwise protect Plaintiff from any sexually transmitted diseases or potential pregnancy.

32.     At first, Defendant continued his unauthorized penetration of Defendant. Plaintiff had to become very physically aggressive to get Defendant off of her, as Defendant continued to try to continue to rape her despite her protests.

33.     After substantial effort to get Defendant to stop, she was able to push him off of her.  Plaintiff yelled "stop it! what's wrong with you? What the %#&! are you doing?!" As he retreated, Defendant stated that he was "sorry."

34.     Plaintiff grabbed her belongings, put on jeans and a jumper over her pajamas that had been soiled by Defendant, and ran out of the apartment.

35.     Later that morning, Plaintiff reported the attack to a London hospital and a London medical clinic specializing in sexual assault.

36.     Defendant continued to harass Plaintiff through repeated texts and phone calls, during which he admitted that he had raped her without her consent.

37.     Through repeated texts over several days Defendant begged Plaintiff for forgiveness and not to tell anyone what he did because it "would ruin my life fully" and "destroy my life."

38.     Through repeated texts over several days Defendant pleaded with Plaintiff to take no action and remain silent stating "my life would be ruined if anyone hears this;" "starting a legal case or letting everyone know about this incident will kill me;" "I am just asking you not to ruin my reputation and life at this point;" and "I am luck [sic] it happened with you, at least a friend or something."

39.     Through repeated texts over several days Defendant admitted his unwanted and unprovoked attack stating "it wasn't who I am;" "it was a drunken accident;" "it kills me that I did this to you;" "you did not deserve for what happened;" and "I basically acted like an animal."

40.     Plaintiff attaches a copy of the text messages containing harassment, excuses and admissions.[4]

41.     Plaintiff has suffered, and continues to suffer, substantial damages including, but not limited to, extreme and permanent pain and suffering, humiliation, and mental distress.

42.     Plaintiff has suffered, and continues to suffer, emotional distress so severe as to be accompanied by physical manifestations such as anxiety, nausea, sleeplessness, flashbacks, and hyper-vigilance.

43.     Plaintiff has sought and received medical and psychological treatment for these injuries caused by Defendant's action.

44.     Moreover, Plaintiff has incurred substantial medical expenses, therapy costs, and lost wages and revenues as a result of Defendant's actions.

## COUNT I
### (Assault & Punitive Damages)

45.     Plaintiff incorporates by reference all of the allegations of facts contained elsewhere in this Complaint.

46.     Defendant's forced sexual contact and brutal physical assault upon Plaintiff caused Plaintiff to be in reasonable apprehension of imminent bodily harm.

47.     Defendant's forced sexual and physical contact made Plaintiff fear for her life and that he would not only rape her, but do additional physical injury to her.

48.     Defendant acted with the intent and capability to do bodily harm to Plaintiff when he and committed forcible and unwanted vaginal penetration without a condom.

---

[4] A redacted copy of the text messages is attached as Exhibit 2.

49.     Defendant's forced sexual contact would constitute rape under Virginia Code §18.2-61 and criminal sexual battery under Virginia Code §18.2-61 had the attack occurred in Virginia.  Similarly, he violated comparable English criminal and civil laws.

50.     Defendant lacked privilege or permission to engage in these harmful and offensive acts. Defendant knew or should have known he lacked such privilege or permission because Plaintiff physically resisted the Defendant and verbally expressed a lack of consent to the physical and sexual contact at all times.

51.     As a direct and proximate result of Defendant's brutal sexual assault, criminal acts and actions, Plaintiff suffered, and continues to suffer, substantial damages including, but not limited to, extreme and permanent pain, suffering and emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, mental distress, medical expenses, invasion of privacy and lost wages.

52.     Defendant's attack of Plaintiff was willful and outrageous and was characterized by evil motive, intent to injure, ill will, fraud, gross negligence, recklessness and willful indifference and was done with actual malice given her repeated and clear attempts to physically and verbally resist at all times. His actions shock the conscience and are so outrageous as to warrant the award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendant for two million dollars ($2,000,000.00) in compensatory damages and four million dollars ($4,000,000.00) in punitive damages plus interest,  costs, and any other relief this Court deems just and proper.

## COUNT II
### (Battery & Punitive Damages)

53.     Plaintiff fully incorporates by reference the allegations set forth in the preceding paragraphs.

54.     Defendant committed acts that constitute harmful and offensive contact on Plaintiff on November 15, 2017.  Specifically, Defendant took advantage of Plaintiff while she slept and engaged in forcible and unwanted vaginal penetration of Plaintiff while she physically resisted Defendant and verbally expressed a lack of consent to the physical and sexual contact.

55.     Defendant's harmful and offensive vaginal penetration was committed willfully and intentionally and with actual malice in an effort to exercise power and control over Plaintiff, to humiliate her, and to gain sexual gratification without regard to the physical and emotional harm Defendant knew or should have known would result to Plaintiff from his actions.

56.     Defendant's forced sexual contact would constitute rape under Virginia Code §18.2-61 and criminal sexual battery under Virginia Code §18.2-61 had the attack occurred in Virginia. Similarly, he violated comparable English criminal and civil laws.

57.     Defendant lacked privilege or permission to engage in these harmful and offensive acts. Defendant knew or should have known he lacked such privilege or permission because Plaintiff physically resisted the Defendant and verbally expressed a lack of consent to the physical and sexual contact at all times.

58.     As a direct and proximate result of Defendant's brutal sexual assault, criminal acts and actions, Plaintiff suffered, and continues to suffer, substantial damages including, but not limited to, extreme and permanent pain, suffering and emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, mental distress, medical expenses, invasion of privacy and lost wages.

59.     Defendant's attack of Plaintiff was willful and outrageous and was characterized by evil motive, intent to injure, ill will, fraud, gross negligence, recklessness and willful indifference and was done with actual malice given her repeated and clear attempts to physically

and verbally resist at all times. His actions shock the conscience and are so outrageous as to warrant the award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendant for two million dollars ($2,000,000.00) in compensatory damages and four million dollars ($4,000,000.00) in punitive damages plus interest, costs, and any other relief this Court deems just and proper.

## COUNT III
### (Intentional Infliction of Emotional Distress & Punitive Damages)

60.    Plaintiff incorporates by reference all of the allegations of facts contained elsewhere in this Complaint.

61.    On September 15, 2017, Defendant engaged in the brutal attack of Plaintiff who physically resisted Defendant and verbally expressed a lack of consent to the physical and sexual contact.

62.    Defendant's forced vaginal penetration and bodily attack were so outrageous as to shock the conscience and to exceed the bounds of human decency.

63.    Defendant's conduct was willful, outrageous, reckless, and in deliberate disregard of a high degree of probability that emotional distress would result to Plaintiff given her ongoing physical resistance and verbal expressions of her lack of consent to the physical and sexual contact.

64.    Defendant's forced sexual contact would constitute rape under Virginia Code §18.2-61 and criminal sexual battery under Virginia Code §18.2-61 had the attack occurred in Virginia.  Similarly, he violated comparable English criminal and civil laws.

65.    Defendant lacked privilege or permission to engage in these harmful and offensive acts. Defendant knew or should have known he lacked such privilege or permission

because Plaintiff physically resisted the Defendant and verbally expressed a lack of consent to the physical and sexual contact at all times.

66.     As a direct and proximate result of Defendant's forced sexual and physical contact and criminal conduct, Plaintiff has suffered, and continues to suffer substantial damages, emotional distress so severe as to be accompanied by physical manifestations such as nausea, vomiting, sleeplessness, hyper vigilance, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

67.     Defendant's attack of Plaintiff was willful and outrageous and was characterized by evil motive, intent to injure, ill will, fraud, gross negligence, recklessness and willful indifference and was done with actual malice given her repeated and clear attempts to physically and verbally resist at all times. His actions shock the conscience and are so outrageous as to warrant the award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendant for two million dollars ($2,000,000.00) in compensatory damages and four million dollars ($4,000,000.00) in punitive damages plus interest,  costs, and any other relief this Court deems just and proper.


**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests judgment against Defendant, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial; costs of suit; attorneys' fees; injunctive relief; and such other and further relief as the Court may deem just and proper.

JA033

**JURY DEMAND**

Plaintiff Jane Doe respectfully demands trial by jury of all issues so triable in this case.

May 12, 2022                          Respectfully Submitted,

                                      JANE DOE by
                                      THE LAW FIRM OF FLETCHER, HEALD &
                                      HILDRETH, PLC


                                      By:   /s/ Thomas F. Urban II
                                      THOMAS F. URBAN II, VSB #40540
                                      FLETCHER, HEALD & HILDRETH, PLC
                                      1300 17th Street North, Suite 1100
                                      Arlington, Virginia 22209
                                      (703) 812-0462; (703) 812-0486 (f)
                                      urban@fhhlaw.com

                                      Walter E. Steimel, Jr.
                                      STEIMEL COUNSELORS LAW GROUP PLLC
                                      1455 Pennsylvania Ave., N.W., Suite 400
                                      Washington, D.C. 20004
                                      (202) 271-9258; (202) 652-2308
                                      wes@sclgrp.com
                                      Applying for *pro hac vice*

                                      *Counsel for Plaintiff Jane Doe*

**EXHIBIT 1**

**Judge Bellows June 16, 2020 Order**
**Finding Personal Jurisdiction Over Defendant**

**VIRGINIA:**

### IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| **JANE DOE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Case No. 2019 12642** |
| **v.** | * | |
| | * | |
| **CENK SIDAR,** | * | |
| | * | |
| **Defendant.** | * | |

### ORDER REGARDING DEFENDANT'S MOTION TO DISMISS

Upon Motion of Defendant Cenk Sidar to have Plaintiff Jane Doe's Complaint to be

Dismissed for Lack of Jurisdiction, and upon consideration of the filings and the argument of

counsel and evidence presented on June 4, 2020, the Court hereby

FINDS, for the reasons stated on the record on June 4, 2020, that the Motion should be

Denied;

AND FURTHER FINDS that there was no legitimate basis in either fact or law for

Defendant to have brought this Motion initially given the overwhelming evidence that

1) Defendant regularly conducted business in the Commonwealth,
2) Defendant engaged in any other persistent course of conduct in the Commonwealth, ~~and~~ O R 
3) Defendant derived substantial revenue from services rendered in Virginia,

any <u>one</u> of which would be sufficient to find jurisdiction.  Moreover, the facts are similarly

overwhelming that traditional notions of fair play and substantial justice are not offended, and

Defendant's due process rights are not violated, by this Court exercising jurisdiction over

Defendant. Further, Plaintiff gave Defendant written notice demanding Defendant withdraw his

Motion and of her intent to seek sanctions due to there being no legitimate basis in either fact or

law for his Motion on February 6, 2020, and he refused to do so.

For those reasons, the Court hereby ORDERS that:

1) Defendant's Motion to Dismiss is DENIED for the reasons set forth in detail on the

   record on June 4, 2020; and

2) Plaintiff's request for sanctions pursuant to Virginia Code § 8.01-271.1 is

   GRANTED; and

3) Defendant must pay to Plaintiff the amount incurred by Plaintiff in opposing this

   Motion in the amount of $45,596.06; *six months in six equal monthly payments,*

4) This Sanction must be paid within ~~twenty (20) days of the date of this Order or~~ *with the first payment due on 8/1/2020 and last payment due 1/1/2021.*

   ~~Defendant shall be held in Contempt of this Court.~~

Date: ___6/16/___, 2020

_____
Circuit Court Judge Randy Bellows

WE ASK FOR THIS:

_____
Thomas F. Urban II (VSB #40540)
Walter E. Steimel, Jr. (Pro Hac Vice)
Counsel for Plaintiff Jane Doe

Reviewed and _____:

_____
Alexandros Mitrakas
Counsel for Defendant Cenk Sidar,
*See attached objections*

**VIRGINIA:**

**IN THE CIRCUIT COURT FOR FAIRFAX COUNTY**

| | | |
|---|---|---|
| **JANE DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CL2019-12642** |
| | ) | |
| **CENK SIDAR,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OBJECTIONS TO PROPOSED ORDER**
**REGARDING DEFENDANT'S MOTION TO DISMISS**

Defendant objects to the proposed order regarding Defendant's Motion to Dismiss on the following grounds:

1. Defendant objects to the finings of fact for the reasons noted on the record at the hearing.

2. Defendant objects to the awarding of attorney's fees for the reasons stated at the hearing.

3. Defendant objects to the amount of the attorney's fees requested on the grounds that the requested amount is unreasonable for this matter.

4. The factors to be considered in awarding "reasonable attorney's fees" are enumerated well in Swahn v. Hussein, (Va. Cir. 2019) Case No. CL-2016-12933 and CL-2016-15236, Nineteenth Judicial Circuit of Virginia County of Fairfax of Virginia (quoting Manchester Oaks Homeowners Ass'n v. Batt, 284 Va. 409, 732 S.E.2d 690 (2012)): "the time and effort expended by the attorney, the nature of the services rendered, the complexity of the services, the value of the services to the client, the results obtained, whether the fees incurred were consistent with those generally charged for similar services, and whether the services were necessary and appropriate." Id. at 430.

5. Here many of the charges requested are duplicative and the amount of time expended was unnecessary to defend the motion.

6. For example, both Mr. Urban and Mr. Steimel billed for attending the deposition in the matter and for attending the hearing. Given the non-complex nature of this motion two attorneys were not required for the motion nor were two attorneys required for calendar control appearances.

7. Additionally, this matter was first scheduled to be heard on March 5, 2020. No new pleadings or further discovery was exchanged after March 5, 2020. Counsel prepared for that hearing and then it appears conducted the same preparation after that hearing for the June 4, 2020 hearing. These charges are duplicative should therefore not be allowed.

8. In determining the amount of fees, the Court should look to whether the time and effort expended by the attorney and were necessary and appropriate. At the hearing Plaintiff argued there was clearly jurisdiction and based that argument on a few key documents. If this Court is to find that fees should be awarded since jurisdiction was abundantly clear then, counsels need for a second deposition and additional discovery was not necessary to proving the case and therefore unreasonable the fees associated with the deposition and additional discovery should be disallowed.

9. Lastly, the first deposition fee billed in the costs section was before the triggering date on February 7, 2020 and should be disallowed.

10.      For these reasons Defendant objects to Plaintiff's proposed order and requests that if the Court issues fees it makes the appropriate modifications to the amount sought and allow the Defendant at least 90 days to make payment or if the amount exceeds $10,000 allow for monthly payments to be spilt up over the course of 12 months.

Respectfully Submitted,
By Special Appearance

Alexandros K. Mitrakas, VSB 78841
1001 19th Street North
Suite 1200
Arlington, Virginia 22209
(703) 888-5516
amitrakas@mitrakasco.com (email)

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2020 I caused a copy of the foregoing document to be e-mailed and mailed on June 16, 2020 to:

| Thomas F. Urban II, Esq. | Walter Steimel |
| Fletcher Heald and Hildreth | SCLG |
| 1300 North 17th Street | 1455 Pennsylvania Ave., N.W., |
| 11th Floor | Suite 400 |
| Arlington, Virginia 22209 | Washington, D.C. 20004 |
| tom@urbanlawva.com | wes@sclgrp.com |

**EXHIBIT 2**

**Text Messages Between Plaintiff and Defendant**

**[Original Redacted]**

```
9/17/17, 6:48:56 AM: Missed Video Call
9/17/17, 6:49:31 AM: Missed Voice Call
9/17/17, 6:51:11 AM: Missed Voice Call
9/17/17, 7:09:51 AM: Missed Voice Call
9/17/17, 6:53:10 AM: Assailant London: are you safe? where are you?
9/17/17, 7:13:42 AM: Missed Voice Call
9/17/17, 7:14:55 AM: Missed Voice Call
9/17/17, 7:18:12 AM: Assailant London: :(
9/17/17, 7:21:16 AM: Missed Voice Call
9/17/17, 7:22:44 AM: Assailant London: can you please pick it up?
9/17/17, 7:23:43 AM: Me: Fuck you Cenk. Anything I left in the
apartment (like my Moro phone) I will collect later. Just leave it.
9/17/17, 7:24:06 AM: Me: I don't want to speak to you ever again
9/17/17, 7:24:15 AM: Assailant London: Ever?
9/17/17, 7:24:26 AM: Assailant London: what
9/17/17, 7:25:48 AM: Assailant London: i will leave the apartment for
you
9/17/17, 7:25:48 AM: Assailant London: go stay there
9/17/17, 7:25:50 AM: Assailant London: i wont be there in an hour
9/17/17, 7:26:16 AM: Assailant London: go sleep there
9/17/17, 7:27:44 AM: Assailant London: dont say you wont ever speak to
me please :(
9/17/17, 7:28:30 AM: Assailant London: i had amazing 2 days
9/17/17, 7:28:42 AM: Assailant London: :(((((
9/17/17, 7:30:46 AM: Missed Voice Call
9/17/17, 7:35:42 AM: Me: You fucking raped me
9/17/17, 7:35:55 AM: Me: What's wrong with you
9/17/17, 7:36:06 AM: Me: I was saying no
```

**Plaintiff 000004**

9/17/17, 7:36:12 AM: Me: Stop
9/17/17, 7:36:18 AM: Assailant London: Jane
9/17/17, 7:36:20 AM: Me: And you just kept going
9/17/17, 7:36:43 AM: Me: Don't ever speak to me again
9/17/17, 7:36:48 AM: Assailant London: omg
9/17/17, 7:36:57 AM: Assailant London: this is painful
9/17/17, 7:37:21 AM: Me: I was asleep
9/17/17, 7:37:55 AM: Assailant London: where are you now?
9/17/17, 7:38:14 AM: Me: When you get out of the apartment I will
collect my phone and anything else I left there
9/17/17, 7:38:35 AM: Me: But do not ever communicate with me again
9/17/17, 7:38:55 AM: Assailant London: you cant imagine how bad I feel
and I am leaving the apt soon for you
9/17/17, 7:41:51 AM: Assailant London: i dont know whst to say but you
are an amazing and it hurts what you write
9/17/17, 7:54:27 AM: Assailant London: I am leaving the apt for you
9/17/17, 7:54:39 AM: Assailant London: come here in 30
9/17/17, 7:54:54 AM: Assailant London: I will be gone
9/17/17, 8:09:58 AM: Missed Voice Call
9/17/17, 8:14:25 AM: Missed Voice Call
9/17/17, 8:17:01 AM: Missed Voice Call
9/17/17, 8:17:55 AM: Assailant London: i am out. go there pls
9/17/17, 8:19:11 AM: Assailant London: can we pls talk?
9/17/17, 8:22:26 AM: Missed Voice Call
9/17/17, 8:24:01 AM: Assailant London: didnt see a phone
9/17/17, 8:24:12 AM: Assailant London: where was it?
9/17/17, 8:43:51 AM: Assailant London: Jane
9/17/17, 11:15:40 AM: Assailant London: hey, are you at the apt?
9/17/17, 11:19:14 AM: Missed Voice Call
9/17/17, 12:28:50 PM: Missed Voice Call
9/17/17, 6:29:12 PM: Assailant London: I am so upset for what
happened. Can we be friends? I don know how to explain.
9/18/17, 10:37:01 AM: Assailant London: did you get your stuff?
9/18/17, 2:08:21 PM: Assailant London: need to send you your earrings.
how shall i do it?
9/18/17, 2:13:45 PM: Me: You don't know how to explain???Try to.
9/18/17, 2:21:46 PM: Assailant London: no, cant. no excuse. I made so
many mistakes and feel awful about myself about everything. I just
want to say that it wasnt who I am. I adore you as a friend, respect
you as an independent and successful woman a lot. I just apologize for
all this craziness. Please forgive :( No explanation, no excuse. I
felt so bad about myself on the whole flight and cant stop blaming
myself. Please forgive and give me another chance for friendship.
Thats what all I can say
9/18/17, 9:34:46 PM: Assailant London: 2017-09-18-PHOTO-00000174.jpg
<attached>
9/18/17, 9:34:54 PM: Assailant London: 2017-09-18-PHOTO-00000175.jpg
<attached>
9/19/17, 3:31:58 PM: Me: That's not enough Cenk. I need you to explain
what happened and why you did it or why you think you did it. You were

Plaintiff 000005

a friend and I trusted you. I deserve an explanation — not just an apology.
9/19/17, 3:40:00 PM: Assailant London: can I call you?
9/19/17, 3:40:16 PM: Assailant London: I will explain with full sincerety
9/19/17, 3:46:20 PM: Missed Voice Call
9/19/17, 3:47:12 PM: Assailant London: I tried to call you. Please let me talk to you for 5 mins. is there a better number?
9/19/17, 3:59:18 PM: Me: I'm in UAE and whatsapp calls won't work
9/19/17, 3:59:31 PM: Assailant London: cell? what is a cell I can call?
9/19/17, 3:59:37 PM: Me: I will have to give you a landline number later
9/19/17, 3:59:40 PM: Me: Driving now
9/19/17, 3:59:47 PM: Assailant London: ok please do Jane
9/19/17, 4:00:09 PM: Assailant London: it hurts me so much too. couldnt sleep last three days
9/19/17, 4:16:04 PM: Assailant London: what time (uae) you will be able to talk?
9/19/17, 7:40:50 PM: Assailant London: Jane    let me know. I can talk today if you want to. Your friendship is very important for me and I would hate myself to lose it. Just give me a chance to talk 10 minutes
9/19/17, 8:56:59 PM: Me: I am unfortunately at the airport and cannot have this conversation openly. I would be too emotional. We can do it over whatsapp — you can text or send audio files. Or email me. Up to you.
9/19/17, 8:58:19 PM: Assailant London: I understand. Do you want to do it tomorrow or so when you are back home?
9/19/17, 8:58:41 PM: Me: I'd rather get this over with now
9/19/17, 8:58:58 PM: Assailant London: let me call and talk
9/19/17, 8:59:02 PM: Assailant London: you dont need to talk that much
9/19/17, 8:59:05 PM: Assailant London: it is me who needs to talk
9/19/17, 8:59:15 PM: Me: Not possible in an airport
9/19/17, 8:59:35 PM: Me: It seems like it should be a short and direct explanation
9/19/17, 9:01:02 PM: Me: I woke up and you were naked and on top of me
9/19/17, 9:02:09 PM: Assailant London: I am having issues with my life as you understand
9/19/17, 9:02:24 PM: Assailant London: you were amazing. I had one of my best days with you saturday hanging out
9/19/17, 9:02:52 PM: Assailant London: very impressed with your success, humor and personality. kind of weird how I felt
9/19/17, 9:03:51 PM: Assailant London: I think I was sleeping when everything happened and I was shocked too. I swear god I did not plan or anything like that. It was like natural and just happened. I believe it was a second before I fully woke up as well
9/19/17, 9:04:44 PM: Assailant London: it was kind of a sleep move because we both slepts before like 2 hours or so
9/19/17, 9:05:05 PM: Assailant London: but there is no excuse for

Plaintiff 000006

anything or any attempt I made. It was just not me.
9/19/17, 9:06:13 PM: Assailant London: I was fully shocked and did not
understand. I know it looks like I am the worst person now but I swear
god I did not mean to do what happened. I am still so embarrased,
upset and disappointed. I was just not a good person. Not a good man.
9/19/17, 9:06:50 PM: Me: I agree that this behavior is not like he
person I think you are. But I am very disturbed by some of the details
of the event and the night before
9/19/17, 9:07:25 PM: Me: All my clothes were on and the light was on.
Did you know it was me?
9/19/17, 9:08:26 PM: Assailant London: I dont really remember Jane
I kind of realized it just a second ago or something and I wasnt sure
what was going on.
9/19/17, 9:08:54 PM: Me: Do you remember taking your clothes off?
9/19/17, 9:09:03 PM: Assailant London: as I said, I was really
attracted to you (not sexually only) and i think it was just happened.
9/19/17, 9:09:14 PM: Assailant London: no, i think we were both that
way when we slept
9/19/17, 9:09:15 PM: Assailant London: i dont remember
9/19/17, 9:10:00 PM: Me: Cenk, as I was waking up I was saying no and
stop, but you just did it more
9/19/17, 9:09:59 PM: Assailant London: I seriously consider stop
drinking
9/19/17, 9:10:13 PM: Me: When did you wake up?
9/19/17, 9:10:20 PM: Assailant London: i think it was when I woke up
9/19/17, 9:10:22 PM: Assailant London: no idea Jane
9/19/17, 9:10:30 PM: Assailant London: i swear god i am thinking aobut
it last 3 days
9/19/17, 9:10:37 PM: Assailant London: if you even forgive me, i wont
forgive myself
9/19/17, 9:10:42 PM: Assailant London: this is not who i am
9/19/17, 9:10:58 PM: Assailant London: i was so excited to be better
friends and potentially working together
9/19/17, 9:11:07 PM: Assailant London: and i stupidly lost your
friendship
9/19/17, 9:11:25 PM: Me: What scares me is that the night before you
got into bed and put your arm around me. I told you to stop and you
did, and the next day I told you it scared the shit out of me. Then
this happened.
9/19/17, 9:11:50 PM: Me: It is hard for me to believe that this was an
accident
9/19/17, 9:12:07 PM: Assailant London: it was a drunken accident
9/19/17, 9:12:15 PM: Me: What was?
9/19/17, 9:12:23 PM: Me: Night 1 or Night 2?
9/19/17, 9:13:12 PM: Assailant London: the first one was seriously
innocent
9/19/17, 9:13:21 PM: Assailant London: it was a drunk cuddle
9/19/17, 9:13:58 PM: Me: But you are married and we are not close like
that.
9/19/17, 9:14:09 PM: Assailant London: i am having problems home

**Plaintiff 000007**

9/19/17, 9:14:15 PM: Assailant London: i am too independent i thin
9/19/17, 9:14:24 PM: Assailant London: i just liked to be close to you
9/19/17, 9:14:34 PM: Assailant London: it was a drunken cuddle. i dont remember many things from first night
9/19/17, 9:14:45 PM: Assailant London: was shocked that I told you the weird video my friends sent me
9/19/17, 9:15:06 PM: Assailant London: i am not a person who gets crazy when drinks. usually i get funny and fun but i guess it was fucked up
9/19/17, 9:15:52 PM: Me: Cenk do you realize that on the second night I woke up to you doing something between my legs and as I was saying stop you fully penetrated me with no protection? Or consent?
9/19/17, 9:16:31 PM: Me: And as I said no you went harder?
9/19/17, 9:16:38 PM: Assailant London: this is scary i did not mean that as well. remember the last second of it or so.
9/19/17, 9:16:44 PM: Me: I had to throw you into the wall off me
9/19/17, 9:16:43 PM: Assailant London: seriously?
9/19/17, 9:16:50 PM: Assailant London: omg
9/19/17, 9:17:26 PM: Me: This behavior is so completely inappropriate I don't know where to start
9/19/17, 9:17:35 PM: Assailant London: I swear god on my kids that I dont remember I continued when you said no
9/19/17, 9:17:36 PM: Assailant London: i swear god
9/19/17, 9:18:03 PM: Me: Why were the lights on?
9/19/17, 9:18:15 PM: Me: Why did you go to bed naked?
9/19/17, 9:18:13 PM: Assailant London: because they were on i think
9/19/17, 9:18:14 PM: Assailant London: no idea
9/19/17, 9:18:18 PM: Assailant London: i think we never turned them off
9/19/17, 9:18:34 PM: Me: Why didn't you sleep on the sofa?
9/19/17, 9:18:33 PM: Assailant London: it was 5am
9/19/17, 9:18:49 PM: Me: What time did we come back from the club?
9/19/17, 9:18:47 PM: Assailant London: i should have :9
9/19/17, 9:18:49 PM: Assailant London: :(
9/19/17, 9:19:01 PM: Assailant London: i think 3
9/19/17, 9:20:02 PM: Me: Look, it was a fun night amongst old friends and I trusted that I would be safe with you. I even said that you getting into bed kinda scared me. I honestly don't know what to do with this situation.
9/19/17, 9:20:11 PM: Me: It is beyond my comprehension
9/19/17, 9:21:16 PM: Assailant London: mine too. I dont know. I am so embarrassed. I think I cannot handle drinking anymore.
9/19/17, 9:21:55 PM: Me: It can't go left alone as a drunk accident or you just thinking about quitting drinking. This is weird crazy and just wrong
9/19/17, 9:22:50 PM: Me: I'm sorry but I can't trust you anymore so we can't be friends
9/19/17, 9:23:10 PM: Me: I'm very worried about you
9/19/17, 9:23:23 PM: Assailant London: I will take steps in my life to fix myself

Plaintiff 000008

9/19/17, 9:23:27 PM: Me: This isn't normal drunk behavior
9/19/17, 9:23:33 PM: Assailant London: no it is not
9/19/17, 9:23:53 PM: Assailant London: I dont expect us to be best
friends or anything else at this point. But please dont write off my
friendship
9/19/17, 9:27:31 PM: Me: I need to think about this Cenk. I was
vulnerable and you had sex with me while I was asleep. All my pajamas
were on and I was saying no as I woke up. I would never expect this
from you but you did it and it will forever change how I feel about
trusting men
9/19/17, 9:27:30 PM: Assailant London: Please accept my apology. I am
really devastated as well.
9/19/17, 9:27:56 PM: Me: It is much much bigger than a friendship
9/19/17, 9:28:03 PM: Me: And I don't think you get that
9/19/17, 9:28:23 PM: Assailant London: I understand.
9/19/17, 9:28:47 PM: Me: What if someone did this to you wife? What
would you expect — for her to be friends with the guy?
9/19/17, 9:29:46 PM: Me: I don't think an apology is enough but I
don't know what is
9/19/17, 9:31:51 PM: Me: I will think about this and talk to a few
people. I'm really upset that this happened because there is no way to
go back. For you or me.
9/19/17, 9:32:00 PM: Assailant London: I wish I would have an answer :
( but please forgive.
9/19/17, 9:32:16 PM: Assailant London: If you talk to people, I am
fucked.
9/19/17, 9:32:17 PM: Assailant London: i know
9/19/17, 9:32:19 PM: Assailant London: i am so sorry
9/19/17, 9:32:26 PM: Assailant London: but i did not mean what
happened that night
9/19/17, 9:32:45 PM: Assailant London: i had no idea it went that far.
i swear god.
9/19/17, 9:33:32 PM: Me: What do you mean you are fucked?
9/19/17, 9:33:36 PM: Assailant London: just forgive me for our past
friendship. i would do my absolute best to regain your trust and prove
that this is not going to happen.
9/19/17, 9:33:51 PM: Assailant London: if anyone knows how bad it was.
9/19/17, 9:33:56 PM: Assailant London: i would die if people know this
Jane
9/19/17, 9:33:58 PM: Assailant London: it is not me
9/19/17, 9:34:00 PM: Assailant London: i am not this person
9/19/17, 9:34:08 PM: Assailant London: i was super excited or
something i dont know
9/19/17, 9:34:10 PM: Assailant London: this is not who i am
9/19/17, 9:34:18 PM: Assailant London: i should have slept wth you on
the same bed
9/19/17, 9:34:25 PM: Assailant London: i should have gone to another
hotel room. i dont know.
9/19/17, 9:34:35 PM: Assailant London: i cant stop thinking about it
9/19/17, 9:35:09 PM: Assailant London: 1- it kills me i did this to

Plaintiff 000009

you 2– it kills me how bad I am 3– it kills me if anyone learns that would ruin my life fully
9/19/17, 9:35:58 PM: Me: You ask a lot from me Cenk. To ask me to just bury it and forgive you when it fundamentally changes my life and my ability to trust people
9/19/17, 9:36:20 PM: Me: I don't have an answer for you
9/19/17, 9:36:19 PM: Assailant London: I am really freaking out for all these reasons. I did not mean this and I did not even make an attempt.
9/19/17, 9:36:44 PM: Me: I don't want to ruin anyone's life obviously
9/19/17, 9:36:53 PM: Assailant London: Jane please. Dont ruin me. I would lose everything in my life
9/19/17, 9:37:19 PM: Assailant London: everything. more importantly, i lost my own personal respect
9/19/17, 9:39:54 PM: Assailant London: i dont know what I can do but please dont reveal this to anyone.
9/19/17, 9:40:10 PM: Me: It is a very complicated situation Cenk. I did not do anything but I am the one who has to forgive, to forget and to recover. I will not try to destroy your reputation or your life but I don't know what to do.
9/19/17, 9:42:09 PM: Assailant London: I can do everything in my power to help you in this process. Trust me, I wont be able to recover
9/19/17, 9:42:12 PM: Assailant London: i did not sleep last three days
9/19/17, 9:42:13 PM: Assailant London: cant do it
9/19/17, 9:42:35 PM: Assailant London: i cant believe how many mistakes I was able to do. I dont even remember many other things so blurry.
9/19/17, 9:42:48 PM: Assailant London: i think i fought with security at the club too
9/19/17, 9:42:58 PM: Me: Had this happened between you and your wife?
9/19/17, 9:43:05 PM: Assailant London: i got a message from my promoter that he wont work with me anymore because i did not fight
9/19/17, 9:43:16 PM: Assailant London: i did not have sex with my wife over 3 years
9/19/17, 9:43:19 PM: Assailant London: it is fucked up from my end
9/19/17, 9:43:50 PM: Me: I'm sorry to hear that
9/19/17, 9:43:49 PM: Assailant London: she is great. i am just not a settled person i think
9/19/17, 9:44:18 PM: Me: My flight is leaving so we have to postpone the rest of this conversation
9/19/17, 9:44:28 PM: Me: Think some more
9/19/17, 9:44:20 PM: Assailant London: i am not a good husband. but at least i was a good person in life.
9/19/17, 9:44:24 PM: Assailant London: i lost this and fucked me up
9/19/17, 9:44:37 PM: Assailant London: Jane lets work it out together
9/19/17, 9:44:42 PM: Assailant London: i fly there and talk in person if you want me to
9/19/17, 9:44:44 PM: Assailant London: i do everything
9/19/17, 9:44:58 PM: Me: No need to see me

**Plaintiff 000010**

9/19/17, 9:45:20 PM: Me: I need to think some more
9/19/17, 9:45:06 PM: Assailant London: ugh
9/19/17, 9:45:09 PM: Assailant London: ok
9/19/17, 9:45:35 PM: Me: I'm still in shock and not emotionally prepared to choose a path
9/19/17, 9:45:57 PM: Me: Thank you for trying to explain
9/19/17, 9:46:23 PM: Assailant London: I do what you want me to do. I have no excuse for what happened whatever it is. sleep or drunkuness
9/19/17, 9:46:23 PM: Assailant London: whatever
9/19/17, 9:46:52 PM: Assailant London: but i am asking to believe in my sincerity and stupidity here rather than being devilish or something
9/19/17, 9:48:53 PM: Assailant London: i swear god i did not plan or move intentionally for what happened
9/19/17, 9:49:47 PM: Assailant London: trust me on this and please forgive me. and i can work with you in this process for forviging. if you choose any serious path, it would destroy my life even if people hear that
9/19/17, 9:49:58 PM: Assailant London: i am not this person and you did not deserve for what happened.
9/19/17, 10:23:00 PM: Assailant London: Some of the details you shared are mind-blowing.
9/19/17, 10:23:10 PM: Assailant London: i am just shocked.
9/19/17, 10:24:55 PM: Assailant London: I have your earrings. Found them on the floor and took with me. How can I send you them?
9/19/17, 10:26:36 PM: Assailant London: you told me about a phone but I dont think there was one.
9/19/17, 10:26:44 PM: Assailant London: I hope you will be able to find it later?
9/20/17, 3:30:59 AM: Assailant London: since we talked, I have been doing some research on the sleep issue. Would like to talk more when you can.
9/20/17, 3:34:10 AM: Assailant London: I am so devastated. Cant tell you. Even it was "sexomnia", it is not an exuse and I should have prevented it.
9/20/17, 5:37:01 AM: Missed Video Call
9/20/17, 5:37:16 AM: Assailant London: called by mıstake
9/20/17, 1:45:49 PM: Assailant London: I let you alone until you want to talk again. If you decide to give me a chance as a friend, I would do my absolute best to be a trustable friend and navigate through this crazy situation. (just tell me about earring situation, dont want to lose them)
9/20/17, 6:47:54 PM: Me: Cenk you need to take serious action in this matter. Speak to your wife, go to a doctor for diagnosis, and speak to a therapist. I am not prepared to forgive and let this go as suggested. If I am the first, then it will happen again. If I am not the first, then you have failed to resolve the issue. Do you sleep-fuck your wife? What about  other people you've shared a bed with? Guys?
9/20/17, 6:48:18 PM: Me: The evidence doesn't add up

Plaintiff 000011

9/20/17, 6:48:30 PM: Me: I don't think it's sufficient
9/20/17, 6:51:01 PM: Assailant London: i think it was a combination of alchol and the situation I felt towards you as well in addition to everything.
9/20/17, 6:51:08 PM: Assailant London: I will take an action and see a therapist
9/20/17, 6:53:09 PM: Assailant London: i need to fix this. I am not sharing a bed with anyone. Nothing bad will happen again. I am asking you to let me fix this without interference. My life would be ruined if anyone hears this. I will try to fix my marriage as well. If I have a little bit credit in your eyes, please let me fix this by myself. I swear on my kids life that I will be taking immediate steps.
9/20/17, 6:53:33 PM: Assailant London: I am scaref of losing my kids and everything after this incident in addition of self respect loss
9/20/17, 6:55:19 PM: Assailant London: I will take serious action. I must fix this and I will fix this. Please let me handle this.
9/20/17, 6:56:26 PM: Me: Unfortunately Cenk I had no choice but to call people Sunday morning and ask for assistance.
9/20/17, 6:56:33 PM: Me: I'm being honest
9/20/17, 6:56:47 PM: Assailant London: who were these people?
9/20/17, 6:57:29 PM: Me: I'm not sure it's appropriate to disclose
9/20/17, 6:57:46 PM: Assailant London: Jane if anyone knows this allegation, I am finished
9/20/17, 6:57:53 PM: Assailant London: I am begging you for my life
9/20/17, 6:58:08 PM: Assailant London: Everything was a huge mistake and please dont ruin me
9/20/17, 6:58:11 PM: Me: I can't control that Cenk
9/20/17, 6:58:29 PM: Me: But I understand where you are coming from
9/20/17, 6:59:04 PM: Me: I had to call my friends
9/20/17, 6:59:21 PM: Me: And ask for appropriate protocols
9/20/17, 6:59:34 PM: Assailant London: did you report me to police?
9/20/17, 7:00:07 PM: Assailant London: Jane I am asking you to help on this for my kids. My kids` life and my life would be ruined
9/20/17, 7:00:28 PM: Assailant London: I promise you I will fix this.
9/20/17, 7:00:30 PM: Assailant London: Give me a chance in my life
9/20/17, 7:00:34 PM: Assailant London: this is too big
9/20/17, 7:00:37 PM: Me: I understand that, so that's why I asked you to explain
9/20/17, 7:01:05 PM: Assailant London: Please help me on this.
9/20/17, 7:01:15 PM: Me: But it is not enough to let you fix this and for me to just forget it
9/20/17, 7:01:24 PM: Me: I have no idea if you did this before and ignored it
9/20/17, 7:01:27 PM: Assailant London: Dont fuck my life. I am asking as an old friend for 10 years
9/20/17, 7:01:30 PM: Assailant London: no i did not
9/20/17, 7:01:36 PM: Assailant London: i did not share bed w anyone
9/20/17, 7:01:45 PM: Assailant London: it was a combination of alchol, excitement or so
9/20/17, 7:01:46 PM: Assailant London: i dont know

9/20/17, 7:01:53 PM: Me: That's why I ask about your wife
9/20/17, 7:01:52 PM: Assailant London: it happened. and it wont happen
again. i wont create that situation
9/20/17, 7:02:17 PM: Me: You are asking me to absorb all the negative
consequences of this situation
9/20/17, 7:02:23 PM: Assailant London: please
9/20/17, 7:02:25 PM: Me: That's not fair
9/20/17, 7:02:32 PM: Assailant London: the alternative is me being all
finished
9/20/17, 7:02:33 PM: Assailant London: fully finished
9/20/17, 7:02:58 PM: Assailant London: Leave alone the legal sides, I
cannot live with this embarrasment
9/20/17, 7:03:02 PM: Assailant London: i have two boys
9/20/17, 7:03:09 PM: Assailant London: this is too big for me to
handle
9/20/17, 7:03:19 PM: Assailant London: It wont happen again. I swear
god
9/20/17, 7:03:23 PM: Assailant London: I swear on lives of my kids
9/20/17, 7:03:24 PM: Assailant London: with anyone
9/20/17, 7:03:31 PM: Assailant London: It did not happen in the past
9/20/17, 7:03:34 PM: Assailant London: and it wont happen
9/20/17, 7:03:40 PM: Assailant London: just please help me
9/20/17, 7:03:44 PM: Assailant London: dont ruin me
9/20/17, 7:03:50 PM: Assailant London: i do everything you want me to
do
9/20/17, 7:04:03 PM: Me: It's not enough Cenk — your actions
completely change me as a human
9/20/17, 7:04:31 PM: Assailant London: tell me what I can do
9/20/17, 7:04:34 PM: Assailant London: please.
9/20/17, 7:04:43 PM: Assailant London: Jane       me being finished wont
help you at all
9/20/17, 7:04:44 PM: Me: I appreciate what you're saying but it's not
sufficient
9/20/17, 7:04:48 PM: Assailant London: ok tell me
9/20/17, 7:05:02 PM: Assailant London: i will do everything in my
power to save my family and myself
9/20/17, 7:05:03 PM: Assailant London: please
9/20/17, 7:05:04 PM: Me: I don't want to finish you
9/20/17, 7:05:09 PM: Assailant London: you are now
9/20/17, 7:05:17 PM: Me: That's not what justice or fairness is about
9/20/17, 7:05:29 PM: Assailant London: ok tell me about what you want
to do that I can fix this
9/20/17, 7:05:48 PM: Assailant London: starting a legal case or
letting everyone know about this incident will kill me
9/20/17, 7:06:03 PM: Me: I don't have an answer for you Cenk
9/20/17, 7:06:04 PM: Assailant London: i will be just done
9/20/17, 7:06:45 PM: Me: But I'm telling you right now that just
forgive and forget is not enough
9/20/17, 7:07:26 PM: Assailant London: i will also take steps in my
life. Will make sure it wont happen. I can also help you to recover

Plaintiff 000013

from this
9/20/17, 7:07:37 PM: Me: Especially if you don't have a medical diagnosis or prior situations of similar behavior with your wife
9/20/17, 7:07:51 PM: Me: Like what?!
9/20/17, 7:08:07 PM: Me: What are you going to do to make me feel safer with my male friends?!
9/20/17, 7:08:41 PM: Assailant London: Jane help me please.
9/20/17, 7:09:18 PM: Me: You did this to me and no I am supposed to help you. It's messed up. Tell me what you would tell your wife to do in this case if she were me
9/20/17, 7:09:22 PM: Assailant London: I understand the damage I made to you and apologize sincerely. But damage on my end would be basically end of everything I HAVE
9/20/17, 7:09:57 PM: Assailant London: i dont know Jane i am really fucked up.
9/20/17, 7:09:59 PM: Assailant London: i know
9/20/17, 7:10:11 PM: Assailant London: my life got upside down in a day
9/20/17, 7:10:54 PM: Assailant London: I am just asking you not to ruin my reputation and life at this point. I hope you understand that I would lose everything I have including my kids and my kids would lose their future
9/20/17, 7:13:30 PM: Assailant London: let me have another chance Jane
9/20/17, 7:14:09 PM: Assailant London: Just dont do anything that would destroy me. please.
9/20/17, 7:24:55 PM: Assailant London: Jane I am basically begging you. I cannot breathe right now. I will do everything in my hands to fix this. Just dont ruin my life.
9/20/17, 7:25:22 PM: Assailant London: I am not worried about my life this point but for my two kids
9/20/17, 7:25:27 PM: Assailant London: please, dont do this to me.
9/20/17, 7:36:48 PM: Assailant London: Jane please say something.
9/20/17, 7:36:52 PM: Assailant London: i am really fucked up right now\
9/20/17, 7:37:26 PM: Assailant London: I dont understand why you want to ruin my life fully.
9/20/17, 7:58:02 PM: Me: If I wanted to ruin your life Cenk you'd be sitting in a London jail or at least answering very difficult questions. Instead you are in D.C. With your family, completely unbothered. Ruining a life is not the goal of anything on my side.
9/20/17, 7:58:16 PM: Assailant London: I appreciate this.
9/20/17, 7:58:47 PM: Assailant London: I promise on my family`s life. I will fix this myself and will do everything to help you. Let me arrange a therapist for you in JBurg. Let me do anything I can do
9/20/17, 7:58:51 PM: Assailant London: Just give me another chance
9/20/17, 7:59:29 PM: Assailant London: last 4 days, I have not been living. This will damage my life but hopefully help me to become a better person and man
9/20/17, 8:00:13 PM: Me: But do not ask me to bear this burden alone.

Plaintiff 000014

I did nothing wrong and trusted you as a friend. I have no idea what
is the truth regarding your medical conditions and previous actions.
There is a question of fairness, consequence and public interest that
is bigger than you or me.
9/20/17, 8:00:20 PM: Me: I take no decision for now.
9/20/17, 8:01:11 PM: Assailant London: In terms of publci good, I can
guarantee a similar situation will never happen. I will discreetly go
to therapist here in dc
9/20/17, 8:01:27 PM: Assailant London: in terms of fairness, I can do
the same for you as I understand this is not fair to you to burden
everything
9/20/17, 8:02:24 PM: Assailant London: I am begging you to have a
mutually agreed plan for us to handle this between you and I
9/20/17, 8:02:35 PM: Assailant London: I promise I will stick to this
and work with you
9/20/17, 8:02:54 PM: Assailant London: Maybe I am luck it happened
with you, at least a friend or something
9/20/17, 8:03:02 PM: Assailant London: i have been nightmaring same
situation someone I did not know or so
9/20/17, 8:03:21 PM: Me: You really don't get it Cenk. You are sending
pictures and asking about my earrings while I am taking emergency
contraception and getting emergency vaccinations at a huge cost. I am
questioning who I can trust and who my friends really are. You are
only worried about your life from what I read ....
9/20/17, 8:03:53 PM: Assailant London: I must cover those expenses
9/20/17, 8:03:58 PM: Me: You hope our friendship will be enough to
protect you
9/20/17, 8:04:00 PM: Me: It's not
9/20/17, 8:04:11 PM: Me: Again, you don't get it
9/20/17, 8:04:10 PM: Assailant London: no i dont
9/20/17, 8:04:15 PM: Assailant London: i understand Jane
9/20/17, 8:04:16 PM: Assailant London: i do
9/20/17, 8:04:26 PM: Assailant London: i am just saying i was fucked
up
9/20/17, 8:04:36 PM: Assailant London: and I betrayed you
9/20/17, 8:04:39 PM: Assailant London: that killed me
9/20/17, 8:04:42 PM: Me: I don't see that you have any empathy for my
end
9/20/17, 8:04:46 PM: Assailant London: omg
9/20/17, 8:04:54 PM: Me: And I do not trust or believe you anymore
9/20/17, 8:05:04 PM: Me: It is impossible to now
9/20/17, 8:05:05 PM: Assailant London: Jane      I totally understand
what I put you through
9/20/17, 8:05:13 PM: Me: How?
9/20/17, 8:05:13 PM: Assailant London: it is really messed up
9/20/17, 8:05:15 PM: Assailant London: i know
9/20/17, 8:05:28 PM: Me: You did this before to someone else?
9/20/17, 8:05:32 PM: Me: To your wife?
9/20/17, 8:05:36 PM: Me: A girlfriend?
9/20/17, 8:05:41 PM: Assailant London: NO, I SWEAR GOD NO

9/20/17, 8:05:48 PM: Me: A guy friend?
9/20/17, 8:05:57 PM: Me: So you DONT know
9/20/17, 8:05:57 PM: Assailant London: no
9/20/17, 8:06:18 PM: Me: Something is wrong here
9/20/17, 8:06:24 PM: Assailant London: i know
9/20/17, 8:07:39 PM: Me: Who advocates for my kids? Who begs to make
their life or my future husbands life normal? Sexual assault changes
people for life.
9/20/17, 8:07:52 PM: Me: You do not appreciate that
9/20/17, 8:08:02 PM: Me: You just keep asking for forgiveness
9/20/17, 8:08:08 PM: Me: I have no answer for you
9/20/17, 8:08:19 PM: Me: I am trying to find a just solution
9/20/17, 8:08:26 PM: Me: And I don't have one yet
9/20/17, 8:08:37 PM: Assailant London: ok tell me what is it. I need
to help you to navigate this
9/20/17, 8:08:44 PM: Me: No you don't
9/20/17, 8:08:57 PM: Assailant London: why not? it is my fault and I
need to do it
9/20/17, 8:09:06 PM: Me: You have no role to play in this
9/20/17, 8:09:14 PM: Assailant London: it is not fair at all you paid
the emotional and financial cost so far. not air
9/20/17, 8:09:19 PM: Me: And no control
9/20/17, 8:09:26 PM: Me: That's what assault feels like
9/20/17, 8:09:31 PM: Me: No control
9/20/17, 8:10:13 PM: Me: I will think on this for a while and discuss
it with people I trust and respect. They don't know you
9/20/17, 8:10:54 PM: Me: Trust me when I say it is humiliating to
discus
9/20/17, 8:11:13 PM: Me: I loathe the experience.
9/20/17, 8:11:35 PM: Assailant London: if there is anything I can do
please let me know. From my end,  I promise I fix everything in my
life. In your life, if there is anything let me know.
9/20/17, 8:11:46 PM: Assailant London: I appreciate you are not
ruining my life. basically you could.
9/20/17, 8:11:54 PM: Assailant London: and i owe you my life for this
9/20/17, 8:11:57 PM: Me: Start with your wife and a doctor
9/20/17, 8:12:15 PM: Me: If you think it's a medical condition beyond
your control
9/20/17, 8:12:22 PM: Me: They should know
9/20/17, 8:13:39 PM: Assailant London: I am already searching
therapist and sleep disorder center
9/20/17, 8:14:25 PM: Assailant London: Can I at least support with the
financial costs as I cannot do anything with the emotional side?
9/20/17, 8:17:42 PM: Assailant London: I lost my self respect fully
9/20/17, 8:20:18 PM: Assailant London: cant tell you how awful I am
these days. First, I betrayed a friend who trusted me. Second, even
though I did not mean, I basically acted like an animal. I was not
worried about my life at all. I think I may have given up everything
if I would be just my self but cant believe I was involved in
something like that risked the future of my kids.  Even if you forgive

Plaintiff 000016

me, I dont think I will ever forgive myself for this.
9/20/17, 8:21:58 PM: Assailant London: You will never believe me but I
am not this person. It happened and I am embarrased to death.  You and
people you shared this will always believe that I am a monster. And I
cannot change it. It hurts
9/20/17, 8:23:13 PM: Assailant London: (earrings and pictures I sent
because I wanted to trigger a conversation not that you care. I was
also worried about your belongings you asked me to check but I could
not see)
9/20/17, 9:12:46 PM: Assailant London: whatever you decide at the end
of this I want you to believe that I never wanted to hurt you, lose
your friendship (we were never close but I was so excited for the
possibility of colloboration in the future and becoming a closer
friend) and made things this awful. It is too much to ask but I want
you believe that I am not a monster.
9/24/17, 9:46:23 PM: Assailant London: hey Jane       how are you?
9/24/17, 9:49:31 PM: Assailant London: I hope you feel a bit better. I
still feel awful about everything.
9/24/17, 9:59:55 PM: Me: No I don't feel better.
Have you seen a doctor to get a diagnosis?
9/24/17, 10:08:10 PM: Assailant London: I am seeing one on Tuesday
afternoon
9/24/17, 10:08:59 PM: Me: Have you told your wife? She should know if
you have a medical condition that causes you to behave like this.
9/24/17, 10:11:51 PM: Assailant London: I am waiting until wednesday.
I did not yet. there are conflicting reports online bout the
situation.
9/24/17, 10:14:00 PM: Me: Explain
9/24/17, 10:17:40 PM: Assailant London: Some believe there is
something called Sexsomnia but it is like being a sleepwalker. I never
had sleepwalking or any issue like that. - on the other hand, some
believe w alchol and excitement, you can just dream. I never had any
issue like that. I wish I could explain better
9/24/17, 10:19:15 PM: Assailant London: I will discuss the whole
situation tuesday and let you know
9/25/17, 9:17:15 PM: Assailant London: did you call me?
9/25/17, 9:17:47 PM: Me: No
9/25/17, 9:18:20 PM: Assailant London: ok. seeing a missed call but i
think that was a mistake. understood.
9/25/17, 9:40:16 PM: Assailant London: I admit I did not know you well
before London. You are one of the most impressive women I have ever
met and I hate that you hate me now.
9/28/17, 4:43:47 AM: Assailant London: can we talk thursday morning US
time on Whatsapp?
9/28/17, 6:38:29 AM: Me: No.
9/28/17, 6:38:42 AM: Me: You can message me whatever you need to tell
me
9/28/17, 2:42:25 PM: Assailant London: OK.I saw a therapist and sleep
disorder expert. It seems like it was a result of happenings of that
night, stressfull sleeping, alchohol and my issues home. I was asked

Plaintiff 000017

to stop drinking, resolve my marital issues (somehow) and prevent similar accomodation situations until things are normal. Realized that many things that night are ambigious after talking to therapist. I dont know what else I can tell you at this point. I am embarrased, upset and shamed for the situation. I will be fully changing my life. I am a mess.
9/28/17, 2:45:31 PM: Assailant London: They used a word "confusional arousal and NREM" but they agree that this was an occasional situation because of all these factors I explained.
9/28/17, 2:55:07 PM: Me: A result of happenings that night?
9/28/17, 2:57:14 PM: Assailant London: it is the alchohol and partying i guess. overall confusions and excitement triggered the sleep etc.
9/28/17, 2:57:25 PM: Assailant London: dont know Jane        i wish i had clear answers. i am trying hard to understand as well.
9/28/17, 2:58:16 PM: Assailant London: i am not finding excuses. just trying to figure out. there is no excuse even if it was in my hands. i dont remember everything and kills me.
9/28/17, 2:59:04 PM: Assailant London: i am not justifying. as i said, it is my responsibility and I hate my life right now.
10/10/17, 6:54:32 AM: Assailant London: hey how are you?

**Plaintiff 000018**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **JANE DOE**<br>    **A Domiciliary of the**<br>    **Commonwealth of Virginia**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**CENK SIDAR**<br><br>         **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Civil Action No.**

**JURY TRIAL DEMANDED**

**[PROPOSED] ORDER GRANTING MOTION TO MOTION
TO FILE COMPLAINT AND PROCEED UNDER A PSEUDONYM**

Upon consideration of Plaintiff's Motion To File Complaint And Proceed Under A

Pseudonym ("Motion"), and there appearing good cause for granting the relief requested in the

Motion, and for the reasons stated therein; it is, by this United States District Court for the

Eastern District of Virginia, ORDERED

    1.     That the Motion is hereby GRANTED.

    2.     That all references to Plaintiff in all filings and proceedings in this cause shall be

to "Jane Doe" and that Plaintiff's identity shall be redacted in all filings.

_____
Judge,  United States District Court
Eastern District of Virginia

cc:    Thomas F. Urban II, VSB #40540
Fletcher, Heald & Hildreth, PLC
1300 17th Street North, Suite 1100
Arlington, Virginia 22209
(703) 812-0462; (703) 812-0486 (f)
urban@fhhlaw.com

Walter E. Steimel, Jr.
Steimel Counselors Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258; (202) 652-2308
wes@sclgrp.com
Applying for *pro hac vice*

*Counsel for Plaintiff Jane Doe*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **JANE DOE** )<br>    **A Domiciliary of the** )<br>    **Commonwealth of Virginia** )<br>    )<br>    **Plaintiff,** )<br>    )<br>**v.** )<br>    )<br>**CENK SIDAR** )<br>    )<br>    **Defendant.** ) | **Civil Action No.**<br><br>**JURY TRIAL DEMANDED** |

**MOTION TO FILE COMPLAINT AND PROCEED UNDER A PSEUDONYM**

Plaintiff Jane Doe ("Plaintiff"), by and through her attorneys Fletcher, Heald and

Hildreth, PLC and Steimel Counselors Law Group, PLLC[1], hereby files this Motion seeking to

pursue this action under a pseudonym.  In support of this Motion, Plaintiff avers that:

1.    The Federal Rules of Civil Procedure Rule 10(a) requires all parties to be named

to a complaint and federal law carries a presumption of openness of proceedings. In certain

circumstances, however a party may be afforded the protection of anonymity if that party meets

the five-part test set forth in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). This test

evaluates –

> [1] whether the justification asserted by the requesting party is
> merely to avoid the annoyance and criticism that may attend any
> litigation or is to preserve privacy in a matter of sensitive and
> highly personal nature; [2] whether identification poses a risk of
> retaliatory physical or mental harm to the requesting party or even
> more critically, to innocent non-parties; [3] the ages of the persons
> whose privacy interests are sought to be protected; [4] whether the
> action is against a governmental or private party; and [5] the risk of

---

[1] Mr. Steimel of Steimel Counselors Law Group PLLC will file a *pro hac vice* application.

unfairness to the opposing party from allowing an action against it
to proceed anonymously.

2.      Plaintiff has demonstrated through her Complaint the special circumstances permitting the Court to maintain anonymity. Paragraphs 27 through 44 of the Complaint alone reveal the sort of humiliating details that would compel the Court to maintain anonymity. She is the alleged victim of a grievous and outrageous physical attack and rape, which would cause her additional trauma if her name were revealed publicly.

3.      Plaintiff's need and interest in preserving her anonymity is clear from details contained in the Complaint and there is no public interest in knowing the Plaintiff's identity considering the personal details contained in the Complaint.

4.      Defendant violated Plaintiff's privacy with his brutal sexual assault. Rape is inherently a sensitive and extremely personal matter. Plaintiff seeks anonymity to protect her privacy from further assault and protect her privacy regarding details of the assault that will be part of this case. Plaintiff avers that these facts meet the first *James* factor.

5.      Plaintiff works in the defense industry and attends military and defense conferences worldwide. *See generally* Complaint para. 14, 16. Identifying her as a victim of sexual assault and battery would subject her to ridicule and risk, especially when working in certain foreign venues, and undermine her credibility furthering the damage she suffered from Defendant's initial brutal sexual assault. In some foreign environments dominated by men, exposure of her identity could increase the risk of personal attack. Plaintiff does not seek to protect her anonymity to avoid criticism or embarrassment, she does so to protect her business reputation and insulate her from retaliation or harm from other members of the industry. Plaintiff avers that these facts overwhelmingly meet the second *James* factor.

2

6.      Permitting Plaintiff to proceed anonymously will cause Defendant no unfairness, harm or detriment. Plaintiff is clearly known to the Defendant. Plaintiff originally sued Defendant in the Circuit Court of Fairfax County, Case No. 2019 12642, September 13, 2019. After non-suiting she refiled with this Court as permitted under Virginia law. The Fairfax County Circuit Court permitted Plaintiff to proceed anonymously without objection by the Defendant. The parties have engaged in extensive discovery, Defendant has never redacted his name or other identifying information from any pleadings or discovery responses and has appeared in person (via Webex) without requesting anonymity. At all times Defendant and his counsel have referred to Plaintiff as "Jane Doe." Defendant cannot now be harmed by Plaintiff's anonymity request before this Court. Plaintiff's request meets the fifth *James* factor. The third and fourth factors are inapplicable.

7.      The court in *Doe v. Alger* 317 F.R.D. 37, 42 (W.D. Va. 2016) followed *James* and granted specific relief to the plaintiff requesting anonymity. In its analysis, the court weighed a sixth factor, that is, the Plaintiff's identity, if made public, would cause her irreparable harm. Plaintiff's chosen profession exposes her to enough risk – that risk does not need to be amplified by her identity being made public. Plaintiff needs not be victimized further while pursuing a remedy for her sexual assault. This Court should grant her motion.

8.      Further, Code of Virginia § 8.01-15.1 states that "any party may move for an order concerning the propriety of anonymous participation in the proceeding."

9.      As noted above, before the Fairfax County Circuit Court Plaintiff requested anonymity pursuant to Section 8.01-15.1, relying on *James,* adopted by the Virginia Supreme Court in *America Online v. Anonymous Publicly Traded Co.*, 261 Va. 350, 363 (Va. 2001). The Fairfax County Circuit granted Plaintiff's relief.

10.    The anonymity in this case is designed to preserve the Plaintiff's privacy involving a sensitive and highly personal matter, which is precisely what *James,* its progeny and the Virginia statute contemplates. Removing the Plaintiff's anonymity cannot help the defense of the case, as Defendant already knows the Plaintiff's identity. Any removal of anonymity here would have no purpose other than to embarrass, humiliate, and harass Plaintiff. Plaintiff requests the same treatment accorded her by the Fairfax County Circuit Court.

WHEREFORE, Plaintiff Jane Doe moves the Court for permission to participate in this proceeding in an anonymous capacity.

Respectfully Submitted,

Jane Doe, by Counsel
THE LAW FIRM OF FLETCHER, HEALD &
HILDRETH, PLC


By: ____/s/ Thomas F. Urban II_____
THOMAS F. URBAN II, VSB #40540
FLETCHER, HEALD & HILDRETH, PLC
1300 17th Street North, Suite 1100
Arlington, Virginia 22209
(703) 812-0462; (703) 812-0486 (f)
urban@fhhlaw.com

Walter E. Steimel, Jr.
Steimel Counselors Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258; (202) 652-2308
wes@sclgrp.com
Applying for *pro hac vice*

*Counsel for Plaintiff Jane Doe*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **JANE DOE** | ) | |
|    **A Domiciliary of the** | ) | |
|    **Commonwealth of Virginia** | ) | |
| | ) | |
|    **Plaintiff,** | ) | **Civil Action No. 1:22-cv-545 (CMH/TCB)** |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **CENK SIDAR** | ) | |
| | ) | |
|    **Defendant.** | ) | |

**ORDER GRANTING MOTION
TO FILE COMPLAINT AND PROCEED UNDER A PSEUDONYM**

Upon consideration of Plaintiff's Motion To File Complaint And Proceed Under A

Pseudonym ("Motion"), and there appearing good cause for granting the relief requested in the

Motion, and for the reasons stated therein; it is, by this United States District Court for the

Eastern District of Virginia, ORDERED

    1.    That the Motion is hereby GRANTED.

    2.    That all references to Plaintiff in all filings and proceedings in this cause shall be

to "Jane Doe" and that Plaintiff's identity shall be redacted in all filings.

   ENTERED this 13th day of May, 2022.

                                     /s/
                      THERESA CARROLL BUCHANAN
                      UNITED STATES MAGISTRATE JUDGE

Alexandria, Virginia

JA063

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : |
| CENK SIDAR | : |
| | : |
| Defendant. | : |

_____

## ANSWER

Defendant Cenk Sidar, by counsel, submits his answer to the Complaint and Demand for Jury Trial filed by Plaintiff Jane Doe.[1]

## NATURE OF THE ACTION

1.     Denied.

2.     Defendant admits that Plaintiff originally brought this action in the Circuit Court of Fairfax County on September 13, 2019, and that Plaintiff filed for non-suit on November 19, 2021. Defendant denies that Plaintiff "actively participated in the case and discovery" as Plaintiff refused to produce relevant documents, answer interrogatories and non-suited her claim on the morning of Defendant's Motion to Compel hearing, presumably to avoid being sanctioned by the Court due to her failure to comply with her discovery obligations. Any remaining allegations in this paragraph are denied.

---

[1] Defendant will be filing a Motion to Strike the Pseudonym Designation.

3.     Defendant admits that the Fairfax Circuit Court ultimately denied the request to provide DNA and that Defendant initially provided DNA samples, voluntarily, to the Metropolitan Police of London. The remaining allegations in this paragraph are denied.

4.     Defendant admits that, when taking the nonsuit, Plaintiff's counsel stated: "And it's just—we think there's a better chance of getting the DNA in Federal Court. So that – that's – that's where we're going to take it." Defendant is without sufficient information to admit or deny that "Plaintiff's counsel will also request cooperation with the Metropolitan Police of London and judicial authorities in the U.K. under the Hague Convention and pursuant to applicable mutual assistance treaties in order to obtain DNA and other evidence in their possession that are relevant to the matters in this case" and, therefore, denies the same. Any remaining allegations in this paragraph are denied.

5.     The allegations in Paragraph 5 constitute legal conclusions to which no response is required. To the extent that a response is deemed necessary, Defendant denies the allegations.

## PARTIES

6.     Defendant admits that Plaintiff is a natural person. Defendant is without sufficient information to admit or deny the remaining allegations in this paragraph and, therefore, denies the same.

7.     Defendant admits that he was born in Turkey, is a natural person and dual national of Turkey and the United States and that he is currently residing in Washington, D.C. Defendant admits that he resided in Washington, D.C. at the time that Plaintiff filed her original Complaint in Fairfax County Circuit Court. Defendant also admits that he is currently employed by Enquire AI, Inc., a company that has locations in Washington, D.C., and New York, and is

incorporated in Delaware. Any remaining allegations in this paragraph, including that Defendant "committed his assault," are denied.

8.     The allegations in Paragraph 8 constitute legal conclusions to which no response is required. To the extent that a response is deemed necessary, Defendant denies the allegations.

9.     The allegations in Paragraph 9 constitute legal conclusions to which no response is required. To the extent that a response is deemed necessary, Defendant denies the allegations.

10.     The allegations in Paragraph 10 constitute legal conclusions to which no response is required. To the extent that a response is deemed necessary, Defendant denies the allegations.

## **FACTS COMMON TO ALL COUNTS**

11.     Admitted.

12.     Defendant admits that he is currently employed by Enquire AI, Inc. and was a co-founder. Any remaining allegations in this paragraph are denied.

13.     Admitted.

14.     Defendant is without sufficient information to admit or deny the allegations in this paragraph and, therefore, denies the same.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Defendant is without sufficient information to admit or deny the allegations in Paragraph 18 and therefore denies the same.

19.     Defendant admits that "[o]n or about September 13, 2017, Defendant offered his apartment, in the SoHo area of London, as an alternative and free place to stay for the extra two

JA066

days." Defendant is without sufficient information to admit or deny the remaining allegations in this paragraph and, therefore, denies the same.

20.    Defendant admits that on or about September 15, 2017, Plaintiff arrived at Defendant's rented Airbnb apartment at 13 Brewer Street, Soho, London and that the apartment was a studio apartment. Defendant is without sufficient information to admit or deny the allegation that "Plaintiff agreed to this arrangement because she trusted Defendant, believed that they had a platonic friendship, and knew that Defendant was married with children." Any remaining allegations in this paragraph are denied.

21.    Defendant admits that Plaintiff and Defendant attended the SAIS alumni reception at Leadenhall Market, and each had two or three glasses of wine that evening at the reception and that Plaintiff and Defendant returned to the apartment after 12:00am. Any remaining allegations in this paragraph are denied.

22.    Defendant admits that he got into the same bed as Plaintiff. Any remaining allegations in this paragraph are denied.

23.    Defendant admits that he told Plaintiff that he was cold sleeping on the couch without a blanket. Any remaining allegations in this paragraph are denied.

24.    Denied.

25.    Defendant admits that Plaintiff and Defendant met some friends for dinner. Defendant is without sufficient information to admit or deny the remaining allegations in this paragraph and therefore denies the same.

26.    Admitted.

27.    Denied.

28.    Denied.

29.   Denied.

30.   Denied.

31.   Denied.

32.   Denied.

33.   Denied.

34.   Denied.

35.   Defendant is without sufficient information to admit or deny what Plaintiff reported and to whom. Defendant denies that there was an "attack." Any remaining allegations in this paragraph are denied.

36.   Denied.

37.   Defendant is without sufficient information to admit or deny the accuracy of the text messages attached as Exhibit 2, as they appear to have been altered. Any remaining allegations in this paragraph are denied.

38.   Defendant is without sufficient information to admit or deny the accuracy of the text messages attached as Exhibit 2, as they appear to have been altered. Any remaining allegations in this paragraph are denied.

39.   Defendant is without sufficient information to admit or deny the accuracy of the text messages attached as Exhibit 2, as they appear to have been altered. Any remaining allegations in this paragraph are denied.

40.   Defendant is without sufficient information to admit or deny the accuracy of the text messages attached as Exhibit 2, as they appear to have been altered. Any remaining allegations in this paragraph are denied.

41.   Denied.

42.   Denied.

43.   Denied.

44.   Denied.

## COUNT I (Assault & Punitive Damages)

45.   Defendant incorporates the foregoing paragraphs herein by reference.

46.   Denied.

47.   Denied.

48.   Denied.

49.   Denied.

50.   Denied.

51.   Denied.

52.   Denied.

Defendant denies that Plaintiff is entitled to any of the requested relief or judgment in Plaintiff's favor.

## COUNT II (Battery & Punitive Damages)

53.   Defendant incorporates the foregoing paragraphs herein by reference.

54.   Denied.

55.   Denied.

56.   Denied.

57.   Denied.

58.   Denied.

59.   Denied.

Defendant denies that Plaintiff is entitled to any of the requested relief or judgment in Plaintiff's favor.

### COUNT III (Intentional Infliction of Emotional Dismiss & Punitive Damages)

60.    Defendant incorporates the foregoing paragraphs herein by reference.

61.    Denied.

62.    Denied.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

67.    Denied.

Defendant denies that Plaintiff is entitled to any of the requested relief or judgment in Plaintiff's favor.

Defendant denies any allegation or statement set forth in the Complaint which was not specifically admitted herein. Defendant denies that Plaintiff is entitled to any of the requested relief or judgment in Plaintiff's favor, including, without limitation, the relief sought in the "PRAYER FOR RELIEF" section of the Complaint or any count within the Complaint.

### AFFIRMATIVE DEFENSES

1.    Plaintiff fails to state a claim upon which relief can be granted.

2.    Plaintiff has no basis to be awarded attorneys' fees in this matter.

3.    Plaintiff has no basis to be awarded punitive damages in excess of $350,000 in this matter.

JA070

WHEREFORE, Defendant Cenk Sidar requests that the Court dismiss the Complaint filed against him by Plaintiff Jane Doe, with prejudice, and for any further relief that the Court deems just and proper.

Dated: May 23, 2022

/s/ Mariam Tadros
Mariam W. Tadros (VSB #75502)
Abigail S. Reigle (VSB # 92947)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
Tel: (703) 790-1911
Fax: (703) 848-2530
Email:  mtadros@reesbroome.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of May, 2022, I caused a true and accurate copy of the foregoing **ANSWER** to be filed electronically with the Court's CM/ECF system, which will send Notice of Electronic Filing to all counsel of record authorized to receive notice of such filing, including:

Thomas F. Urban, II, VSB #40540
FLETCHER, HEALD & HILDRETH, PLC
1300 17th Street North, Suite 1100
Arlington, VA 22209
Tel: (703) 812-0462
Fax: (703) 340-1450
urban@fhhlaw.com
*Counsel for Plaintiff*

/s/ Mariam Tadros
Mariam W. Tadros (VSB #75502)
Abigail S. Reigle (VSB # 92947)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
Tel: (703) 790-1911
Fax: (703) 848-2530
Email:  mtadros@reesbroome.com
*Counsel for Defendant.*

JA071

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

JANE DOE                                    :
                                            :
      Plaintiff,                           :
                                            :
vs.                                         :        Case No. 2019-12642
                                            :
CENK SIDAR                                  :
                                            :
      Defendant.                           :

## DEFENDANT'S MOTION TO REMOVE PSEUDONYM DESIGNATION

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Motion to

Remove Pseudonym Designation included in Plaintiff Jane Doe's ("Plaintiff") Complaint.

For the reasons set forth in the accompanying memorandum in support, Defendant Cenk

Sidar requests that the Court grant his Motion to Remove Pseudonym Designation, enter an order

requiring that references to Plaintiff Jane Doe in all filings and proceedings in this cause shall be

her true name, that her identity is not to be redacted in all filings, and grant such other and

further relief in favor of Defendant as this Court deems just and proper.


                              CENK SIDAR

                              By Counsel:

_____
Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No. (703) 848-2530
mtadros@reesbroome.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 27, 2022, a copy of the foregoing **DEFENDANT'S MOTION TO REMOVE PSEUDONYM DESIGNATION** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC 20004
wes@sclgrp.com

_____
Mariam W. Tadros

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : |
| CENK SIDAR | : |
| | : |
| Defendant. | : |

---

## ORDER

This matter comes before the Court on Defendant Cenk Sidar's Motion to Remove Pseudonym Designation. Having reviewed the motion, any opposition thereto, and the argument of counsel, it is hereby:

**ORDERED** that Defendant's Motion to Remove Pseudonym Designation is GRANTED; and it is

**ORDERED** that references to Plaintiff Jane Doe in all filings and proceedings in this cause shall be her true name; and it is further

**ORDERED** that Plaintiff's identity is not to be redacted in all filings.

ENTERED this _____ day of _____, 2022.


_____
Theresa Carroll Buchanan
United States Magistrate Judge

JA074

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

JANE DOE         :
             :
   Plaintiff,      :
             :
v.            : Civil Action No. 1:22-cv-00545 (CMH/TCB)
             :
CENK SIDAR       :
             :
   Defendant.     :

---

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO REMOVE
<u>PSEUDONYM DESIGNATION</u>**

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Memorandum in Support of his Motion to Remove the Pseudonym Designation in Plaintiff Jane Doe's ("Plaintiff") Complaint, as well as enter an order requiring that refences to Plaintiff in all filings and proceedings in this matter shall be her true name, and that her name is not to be redacted.

## I.    BACKGROUND.

### A.    Fairfax Circuit Court Proceedings.

On September 13, 2019, Doe filed a three-count Complaint ("Fairfax Complaint") in the Circuit Court of Fairfax County, Virginia, asserting claims against Sidar for Assault & Punitive Damages (Count I), Battery & Punitive Damages (Count II), and Intentional Infliction of Emotional Distress & Punitive Damages (Count III). Doe, a domiciliary of Virginia, alleged in her Complaint that Sidar committed assault and battery against her in the United Kingdom in September 2017. Fairfax Compl. ¶¶ 12-13, 20-25. She asserted that Virginia courts have personal jurisdiction over Sidar pursuant to 8.01-328.1(A)(4). Fairfax Compl. ¶ 3.

On November 15, 2019, counsel for Sidar, by special appearance, filed a Motion to Dismiss for Lack of Personal Jurisdiction. On June 4, 2020, the trial court heard oral argument on Sidar's Motion to Dismiss for Lack of Personal Jurisdiction. On June 16, 2020, the trial court entered the order denying the Motion to Dismiss, granting Doe's request for sanctions pursuant to Virginia Code Section 8.01-271.1, and ordering Sidar to pay Doe "the amount incurred by Plaintiff in opposing this Motion in the amount of $45,596.06." Discovery and other motions practice in this matter continued until, on November 19, 2021, as the parties' counsel were in the trial court for a hearing on Sidar's motion to compel Doe's responses to discovery requests, with Sidar seeking an award of attorneys' fees for Doe's non-compliance with her discovery obligations, Doe presented an order of non-suit pursuant to Virginia Code Section 8.01-380. The

1

order for non-suit was a thinly veiled effort by Doe to avoid her discovery obligations, as she gave almost no substantive discovery responses in the two-year period the case was pending before the Fairfax County Circuit Court. A true and accurate copy of her answers to Interrogatories and Supplemental Answers are attached hereto as **Exhibit A.** When taking the nonsuit, Doe's counsel stated: "And it's just – we think there's a better chance of getting the DNA in Federal Court. So that – that's – that's where we're going to take it."

On December 17, 2021, pursuant to Rule 5:9, Sidar filed his Notice of Appeal from the final order entered November 19, 2021, and the Order entered June 16, 2021. Sidar's Petition for Appeal to the Virginia Supreme Court has been fully briefed and is awaiting oral argument.

**B.      Proceedings in the District Court for the Eastern District of Virginia.**

On May 12, 2022, Plaintiff filed a three-count complaint in this Court, again asserting claims for Assault & Punitive Damages (Count I), Battery & Punitive Damages (Count II), and Intentional Infliction of Emotional Distress & Punitive Damages (Count III). On May 12, 2022, Plaintiff also filed a Motion to File Complaint and Proceed Under a Pseudonym (ECF No. 4).[1] On May 13, 2022, Plaintiff filed a waiver of oral argument (ECF No. 5) on her Motion to File Complaint and Proceed Under a Pseudonym, which the Court granted the same day. Defendant was not given the typical fourteen days to file an opposition to Plaintiff's motion. *See* E.D. Va. Local Civ. R. 7(F)(1) ("[T]he opposing party shall file a response brief and such supporting documents as are appropriate, within fourteen (14) calendar days after service."). In granting the Motion, the Court held that "there appearing to be good cause for granting the relief requested in the Motion . . . all references to Plaintiff in all filings and proceedings in this cause shall be to 'Jane Doe' and that Plaintiff's identity shall be redacted in all filings." (ECF No. 7). After the

---

[1] Plaintiff failed to comply with the local rules which requires a separate motion and written brief. *See* E.D. Va. Local Civ. R. 7(F)(1).

Court's entry of the Order, Defendant entered an appearance and filed responsive pleadings, including a Motion to Strike the $12,000,000 punitive damages request as it exceeds the $350,000 jurisdictional cap (ECF No. 10). Defendant seeks to challenge the use of the pseudonym because under the *Jacobson* factors, as detailed, *infra*, good cause does not exist for permitting Plaintiff to proceed under a pseudonym.

## II.   ARGUMENT.

### A.   Legal Standard.

Federal Rule of Civil Procedure 10(a) requires that "[t]he title of the complaint must name all the parties." Fed. R. Civ. P. 10(a); *see also Doe v. Merten*, 219 F.R.D. 387, 390 (E.D. Va. 2004) (noting that Federal Rule of Civil Procedure 10(a) "embodies the presumption . . . of openness in judicial proceedings," which dates back to the English common law and is supported by the First Amendment's protections of freedom of speech and press). As this Court has noted, "[t]o allow a party to proceed under a pseudonym is a rare dispensation, as pseudonymous litigation 'undermines the public's right of access to judicial proceedings.'" *Doe v. The Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 592 (E.D. Va. 2016) (quoting *Doe v. Public Citizen*, 749 F.3d 246, 273 (4th Cir. 2014)); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) ("First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted."). "Indeed, the right of public access to judicial proceedings has deep constitutional and common law roots." *The Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d at 592; *see also Public Citizen*, 749 F.3d at 265 ("The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to the public.").

3

"[U]se of a pseudonym is, in effect, a partial sealing of a lawsuit that removes from public access certain aspects of the judgment proceeding." *The Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d at 592. "Public access serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness." *Public Citizen*, 749 F.3d at 265 (quoting *Littlejohn v. Bic Corp.*, 851 F.2d 673, 682 (3d Cir. 1988)). "The public has an interest in knowing the names of the litigants, and disclosing the parties' identities furthers openness of judicial proceedings." *Public Citizen*, 749 F.3d at 273 (internal citation omitted). "In short, '[t]he people have a right to know who is using their courts.'" *Candidate No. 452207 v. CFA Inst.*, 42 F. Supp. 3d 804, 807 (E.D. Va. 2012) (quoting *Doe v. Blue Cross & Shield United*, 112 F.3d 869, 872 (7th Cir. 1997)).

Therefore, "a district court has an independent obligation to ensure that extraordinary circumstances support a request [to litigate under a pseudonym] by balancing the party's stated interest in anonymity against the public's interest in openness and prejudice that anonymity would pose to the opposing party." *Public Citizen*, 749 F.3d at 274.

The Fourth Circuit has listed several factors that should be considered when determining whether a request for anonymity should be granted by a court:

> [1] [w]hether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly-personal nature; [2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; [3] the ages of the persons whose privacy interests are sought to be protected; [4] whether the action is against a governmental or private party; and, relatedly, [5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). None of these five factors weighs in favor of Plaintiff being permitted to proceed under a pseudonym.

4

JA079

**B.      Plaintiff is Not Permitted to Proceed Under a Pseudonym Merely to Avoid Criticism and Preserve Her Privacy When She Made the Decision to Initiate This Litigation.**

First, the Court considers, "whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of [a] sensitive and highly personal nature[.]" *Jacobson*, 6 F.3d at 238. The Fourth Circuit has "explained that use of a pseudonym 'merely to avoid the annoyance and criticism that may attend . . . litigation . . .' is impermissible." *Public Citizen*, 749 F.3d at 265 (quoting *Jacobson*, F.3d at 238).

In regard to the first factor, Plaintiff alleges that her Complaint reveals "the sort of humiliating details that would compel the Court to maintain anonymity" and that she is "the alleged victim of a grievous and outrageous physical attack and rape, which would cause her additional trauma if her name were revealed publicly." ECF No. 4 ¶ 2. She asserts that "there is no public interest in knowing the Plaintiff's identity" and that she "seeks anonymity to protect her privacy from further assault and protect her privacy regarding the details of the assault that will be part of this case." ECF No. 4 ¶¶ 3-4. These bald statements fall far short of the types of cases where plaintiffs have been permitted to proceed under pseudonyms in litigation.

In *Doe v. Hallock*, an action brought pursuant to Title VII, "the plaintiff . . . sought to proceed under a pseudonym, 'Jane Doe,' in an effort to retain her anonymity." 119 F.R.D. 640, 641 (S.D. Miss. 1987).[2] The plaintiff, who also asserted state law claims for assault and battery, as well as intentional infliction of emotional distress, alleged that her former employers "sexually harassed her throughout her employment by treating her in a derogatory and humiliating manner

---

[2] *Doe v. Hallock* is cited favorably by the United States District Court for the Eastern District of Virginia in both *James v. Jacobson*, 6 F.3d 233, 239 (E.D. Va. 1993) and *JL v. Polson*, 2017 WL 11500247, at *1 (E.D. Va. 2017). It is also cited in *Doe v. Alger*, 317 F.R.D. 37, 39 (W.D. Va. 2016), a United States District Court for the Western District of Virginia case that Plaintiff relies in her Motion. *See* ECF No. 4 ¶ 7.

5

solely because of her gender, that she was denied a promotion which ultimately went to a male employee because she refused to succumb to sexual advances by defendant Hallock, and that she was involuntarily terminated because of her gender." *Id.* at 641-42. The court noted that "plaintiff seeks to avoid disclosing her true name in order to protect herself against embarrassment and unwanted invasion of her personal privacy since the matters contained in her complaint, she charges, are private matters of an intimate personal nature." *Id.* at 643. The court found that, "while not unsympathetic with plaintiff's pleas for privacy, is not persuaded that the need for anonymity is so compelling as to permit nondisclosure." *Id.* The court noted that "[t]he nature of the claims charged by plaintiff in the case at bar does not involve any admission by plaintiff that she has violated the law or that she desires to engage in illegal conduct, nor does she seek to challenge the validity of any governmental activity" and that "[r]ather she alleges improper conduct toward her by *private* individuals." *Id.* at 643-44.

Similarly, Plaintiff alleges that she seeks to keep private "humiliating details" and that she "seeks anonymity to protect her privacy." ECF No. 4 ¶ 2-4. Similarly to *Hallock*, this is insufficient. Regardless of whether these are private matters of an intimate personal nature, Plaintiff has not made any admissions that she violated the law, does not seek to challenge the validity of government activity, and is alleging improper conduct against her by a private individual.

In *JL v. Polson*, the plaintiff brought a complaint alleging "that a TSA officer struck him in the groin during a security pat-down at Dulles International Airport." *JL v. Polson*, 2017 WL 11500247, at *1 (E.D. Va. Jan. 1, 2017). The Court acknowledged that "[w]hile this incident was perhaps embarrassing to Plaintiff, it does not raise privacy concerns sufficient to warrant pseudonymous litigation." *Id.* Although the conduct underlying the suit could be characterized as

"sexual battery," this did not entitle the plaintiff to proceed anonymously. *Id.* at *1. Similarly,

Plaintiff's allegations do not raise privacy concerns sufficient to warrant pseudonymous

litigation.

### C.    Plaintiff Does Not Establish That Revealing Her Identity Would Pose Harm to Her.

Second, the Court considers "whether information poses a risk of retaliatory physical or

mental harm to the requesting party or even more critically, to innocent non-parties[.]" *Jacobson*

6 F.3d at 238. Regarding the second factor, Plaintiff alleges that she "works in the defense

industry and attends military and defense conferences worldwide" and that "[i]dentifying her as a

victim of sexual assault and battery would subject her to ridicule and risk, especially when

working in certain foreign venues, and undermine her credibility furthering the damage she

suffered from Defendant's initial brutal sexual assault." ECF No. 4 ¶ 5. She alleges that "[s]he

does not seek to protect her anonymity to avoid criticism or embarrassment, she does so to

protect her business reputation and insulate her from retaliation or harm from other members of

the industry," leading her to conclude that "these facts overwhelmingly meet the second *James*

factor." ECF No. 4 ¶ 5. These underwhelming facts do *not* meet the second *James* factor. *See*

*Doe v. Public Citizen*, 749 F.3d 246, 265 (4th Cir. 2014) ("An unsupported claim of reputational

harm falls short of a compelling interest sufficient to overcome the strong First Amendment

presumptive right of public access. The district court erred by concluding otherwise.").

### D.    Both the Third and Fourth Factors Weigh Against Plaintiff, as She is Not a Minor and Defendant is a Private Party.

Plaintiff alleges that the "third and fourth factors" of the *James* test are "inapplicable."

ECF No. 4 ¶ 6. This is inaccurate and misleading – both factors *are* clearly applicable, but just

7

do not play in Plaintiff's favor. The fact that they favor Defendant does not make them inapplicable.

As for the third factor, the Court considers "the ages of the persons whose privacy interests are sought to be protected[.]" *Jacobson*, 6 F.3d at 238. "Courts are more willing to allow parties to proceed anonymously in order to protect the privacy rights of children." *Candidate No. 452207 v. CFA Inst.*, 42 F. Supp. 3d 804, 809 (E.D. Va. 2012) (quoting *Doe v. N.C. Cent. Univ.*, 1999 WL 1939248, at *4 (M.D.N.C. April 15, 1999)).

Plaintiff states that she was thirty-six-years old at the time of the alleged attack, meaning that she is now at least forty years old. ECF No. 1 ¶ 14. This makes her far from a child. Plaintiff is not a child who is entitled to special protection. *See, e.g., Candidate No. 452207,* 42 F. Supp. 3d at 809 (denying the plaintiff's request to proceed under a pseudonym and noting "Plaintiff does not plead that he is an age that would favor allowing him to proceed without disclosing his legal name").

Fourth, the Court considers "whether the action is against a governmental or private party[.]" *Jacobson*, 6 F.3d at 238. This is because "[c]ourts are more likely to grant a plaintiff permission to anonymously bring suit against a governmental entity than a private entity because 'an action against a private party can result in damage to the defendant's reputation as well as economic harm' in ways that do not raise similar concerns in civil actions against the government." *Candidate No. 452207*, 42 F. Supp. 3d at 809  (quoting *Doe v. Merten*, 219 F.R.D. 387, (E.D. Va. 2004)). Here, the action is against a private individual, and not a governmental party so this factor also weighs in favor of Defendant.

8

E.     **Basic Fairness Requires that Plaintiff's Identity Be Revealed in This Matter.**

Fifth, the Court considers "the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously." *Jacobson*, 6 F.3d at 238. Plaintiff asserts that permitting her "to proceed anonymously will cause Defendant no unfairness, harm or detriment." ECF No. 4 ¶ 6.[3] However, this is far from true.

"When parties 'call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials.'" *Doe v. Public Citizen*, 749 F.3d 246, 271 (4th Cir. 2014) (quoting *Union Oil Co. of. Calif. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000)). "[C]ivil actions against private parties expose them to the risk of reputational and economic harms." *Candidate No. 452207,* 42 F. Supp. 3d at810.

In *Doe v. The Rector & Visitors of George Mason University*, Plaintiff Doe brought an action against George Mason University following a disciplinary process that he asserted was constitutionally-inadequate, which resulted in his expulsion after he was found responsible for sexual misconduct." 179 F. Supp. 3d 583, 585 (E.D. Va. 2016). The Court noted that "Plaintiff has been accused of sexual misconduct, the mere accusation of which, if disclosed, can invite harassment and ridicule." *Id.* at 593. The Court noted that "it is possible that plaintiff could be targeted for 'retaliatory physical or mental harm' based on the accusations alone." *Id.* (quoting *James*, 6 F.3d at 238). The Court recognized that "most litigation entails embarrassment of some form for one or both parties." *Id.* The Court noted that "some potential for embarrassment or criticism may result . . . does not justify removing litigation materials from public access." *Id.* The Court stated, "[W]hat justifies the use of pseudonyms here is plaintiff's status as an accused

---

[3] Plaintiff also states that the "Fairfax County Circuit Court permitted Plaintiff to proceed anonymously without objection by the Defendant." ECF No. 4 ¶ 6. However, Defendant never had an opportunity to oppose this motion, as it was granted before he was served with the Complaint, similar to the present Motion.

9

perpetrator of sexual misconduct—a rapist." *Id.* The Court that continued that "[i]f plaintiff is ultimately found not responsible" as to the sexual misconduct allegations, "then he should not have his name forever associated in the public mind with an accusation that carries a significant social stigma." *Id.* at 594. The Court concluded that "this is a case in which the nature of the accusations against plaintiff are sufficiently severe that they rise to the level of an extraordinary circumstance in support of the use of a pseudonym." *Id.* (internal quotation and citation omitted). Defendant has been accused of sexual misconduct—the mere accusation of which can invite harassment and ridicule. The Court permitted the accused rapist to proceed under a pseudonym because of the potential harm of the label of "accused rapist." As such, Defendant's reputation is clearly at stake; if Plaintiff did not afford him the opportunity to proceed under a pseudonym, she should not be permitted to.

In *Southern Methodist University Association of Women Law Students v. Wynne & Jaffe*, four female lawyers, seeking to proceed anonymously, brought Title VII sex discrimination cases. 599 F.2d 707, 708-09 (5th Cir. 1979).[4] The court began by noting that "[t]he mere filing of a civil action against other private parties may cause damage to their good names and reputation and may also result in economic harm." *Id.* at 713. The law firms that were defendants in the matter stood "publicly accused of serious violations of federal law," so "[b]asic fairness dictates that those among the defendants' accusers who wish to participate in this suit as individual party plaintiffs must do so under their real names." *Id.* The court found that the plaintiffs faced "no greater threat of retaliation that the typical plaintiff alleging Title VII violations, including the other women who, under their real names and not anonymously, have filed sex discrimination

---

[4] *Southern Methodist University Association of Women Law Students v. Wynne & Jaffe* is cited favorably by the United States District Court for the Eastern District of Virginia in *James v. Jacobson*, 6 F.3d 233, 239 (E.D. Va. 1993).

suits against large law firms." *Id.* Therefore, the court concluded that the Title VII plaintiffs

could not sue under fictious names. *Id.* So too does basic fairness require Plaintiff to proceed

under her real name if she wishes to lodge serious allegations against Defendant.

In *Candidate No. 452207 v. CFA Institute*, a candidate for chartered financial analyst

("CFA") certification brought an action for monetary, injunctive, and declaratory relief against

the organization that developed and administered the exam, claiming that the organization falsely

determined that he had cheated on his exam; the candidate sought to proceed anonymously. 42 F.

Supp. 3d 804, 805-06 (E.D. Va. 2012). The Court denied the motion, determining that "Plaintiff

does not plead a substantial privacy right or a substantial risk of openness in judicial

proceedings." *Id.* at 807. Going through the *Jacobson* factors, the Court noted that the plaintiff

merely had "an interest in avoiding the embarrassment and exposure to public scrutiny that

commonly attend litigation," that the plaintiff was an adult, and that the plaintiff's suit "is against

a private party and poses a risk to that party's reputation such that basic fairness requires the

disclosure of Plaintiff's identity in connection with the suit." *Id.* at 812. The Court noted that

"[g]iven the risks Plaintiff's suit poses to CFA Institute's reputation, basic fairness dictates that

Plaintiff JA, as the Institute's accuser, advance its suit under his real and full legal name." *Id.* at

810. Furthermore, "permitting Plaintiff to assert his claims against the Institute without having to

disclose his name would invite meritless lawsuits from other CFA candidates against whom the

Institute has taken disciplinary action, offering them a forum to tarnish the reputation of the

Institute without risk of harm to their own reputation." *Id.* Given the risks that Plaintiff's suit

poses to Defendant's reputation, particularly since she made a baseless $12,000,000 punitive

damages claim and failed to provide even basic discovery for years, basic fairness requires the

disclosure of Plaintiff's identity in connection with this suit.

11

In *Doe v. Hallock*, outlined in Part II.B, *supra*, the court noted that it "does not wish to minimize the significance of the plaintiff's fears of humiliation, embarrassment, and reprisal, but nevertheless concludes that plaintiff, if she desires to proceed with this lawsuit, must reveal her true identity as a matter of basic fairness and consistent with the policy of disclosure of parties' identities." 119 F.R.D. 640, 644 (S.D. Miss. 1987).

Given the risks that Plaintiff's suit poses to Defendant's reputation, basic fairness requires the disclosure of Plaintiff's identity in connection with this suit.

**F.      Plaintiff Has Not Demonstrated That She is Risking Irreparable Harm by Removing the Pseudonym Designation.**

Plaintiff finally alleges that in *Doe v. Alger*, a Western District of Virginia case, "the court weighed a sixth factor, that is, the Plaintiff's identity, if made public, would cause her irreparable harm." ECF No. 4 ¶ 7. Plaintiff continues that her "chosen profession exposes her to enough risk—that risk does not need to be amplified by her identity being made public" and she "needs not be victimized further while pursuing a remedy for her sexual assault." ECF No. 4 ¶ 7.

In *Doe v. Alger*, a male student brought a § 1983 action against a university and university officials, alleging that his suspension for five and a half years for sexual misconduct with a female student violated his rights under the Due Process Clause. 317 F.R.D. 37, 38 (W.D. Va. 2016). The male student moved for leave to proceed under a pseudonym and for a protective order prohibiting the use of his real name. *Id.* at 39. After proceeding through the *James* factors, the court noted "Doe argues that there is another factor relevant to this case that weighs in favor of anonymity—irreparable harm to his name." *Id.* at 42. The Court concluded that after weighing all of the factors, "Doe's privacy interest outweighs the presumption of openness in judicial proceedings and that he may thus proceed anonymously in this case" and found "good cause to protect Roe and the other students involved in the disciplinary proceedings, and so the use of

12

JA087

their real names will be prohibited as well." *Id.* Again, this was a matter in which both parties were permitted to proceed anonymously—Plaintiff in the present matter did not provide Defendant with that opportunity and, furthermore, has failed to demonstrate that she would suffer from irreparable harm from removing the pseudonym in this case.

## III.   CONCLUSION.

For the reasons set forth herein, Defendant Cenk Sidar requests that the Court grant his Motion to Remove Pseudonym Designation, enter an order requiring that references to Plaintiff Jane Doe's in all filings and proceedings in this cause shall be her true name, that her identity is not to be redacted in all filings, and grant such other and further relief in favor of Defendant as this Court deems just and proper.

Dated: June 27, 2022

<div style="text-align: right;">

CENK SIDAR
By Counsel:

</div>

Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com
*Counsel for Plaintiff*

13

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 27, 2022, a copy of the foregoing **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO REMOVE PSEUDONYM DESIGNATION** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

Mariam W. Tadros

14

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | |
|---|---|
| **JANE DOE,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2019 12642** |
| **CENK SIDAR,** | |
| **Defendant.** | |

### PLAINTIFF'S RESPONSES TO
### DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned counsel, hereby provides the following Responses to the First Set of Interrogatories submitted by Defendant Cenk Sidar ("Sidar" or "Defendant").

### GENERAL OBJECTIONS AND COMMENTS

A.  Plaintiff objects to Defendants' Interrogatories and their Definition of Terms to the extent that they seek to impose upon Plaintiff obligations greater than, or in contradiction to, those imposed by the Supreme Court of Virginia Rules and the Orders of this Court.

B.  Plaintiff objects to Defendant's Interrogatories to the extent that such requests call for information that represents or contains statements, correspondence, memoranda, or other communications between or among Plaintiff, her agents, and/or representatives, and her legal counsel because such documents are attorney/client privileged and protected from discovery by the Supreme Court of Virginia Rules and the rules and Orders of this Court.

C.  Plaintiff objects to these Interrogatories to the extent they invade the exemption for attorney work product.

D.  Plaintiff objects to these Interrogatories to the extent that such requests call for information that represents or contains the views, beliefs, mental impressions, and/or opinions of Plaintiff's legal counsel or other persons working in concert with Plaintiff's legal counsel with respect to the matters at issue in this cause or any other matter in which litigation or agency action may have been anticipated, because such information is covered by the work product doctrine and protected from discovery by the Supreme Court of Virginia and the rules and Orders of this Court.

E.  The phrasing of these Answers is not necessarily that of the Plaintiff or her agents, but is,



1

in some cases, the phrasing of Plaintiff's attorney.

F.    The following answers are given without prejudice to Plaintiff's right to produce evidence of any subsequently discovered fact or contention that Plaintiff may later uncover.

G.    **Plaintiff objects to these Interrogatories to the extent that they exceed thirty written interrogatories, including all parts and sub-parts, as permitted by Rule 4:8 of the Supreme Court of Virginia Rules.  In total, Defendant has requested the response to over  subparts, in gross violation of and disregard for the Rule.  Plaintiff will answer the first 30 interrogatories and subparts propounded by Defendant.**

## ANSWERS TO INTERROGATORIES

**INTERROGATORY  NO.  1:**       Identify every person with knowledge of the facts set forth in the Complaint, and for each person, provide their address, telephone number and a summary of the knowledge each is believed to possess.

**ANSWER:**    Plaintiff discussed this issue with counsel, the London Metropolitan Police and with personnel at The Havens. Plaintiff is compiling a list of the persons addressed by this interrogatory and their contact information and will provide it when compiled. Defendant is already in possession of the contact information for Plaintiff's counsel and the London Police.

Among those persons responsive to this request are the following:

Christopher West 2250AW
Police Constable – SOIT, Metropolitan Police Service l Area West Safeguarding
Team 4, B Strand
Address: Charing Cross Police Station,Floor 2, Agar Street, WC2N 4JP
Telephone: 07787263273
Email: Christopher.west@met.pnn.police.uk
Information regarding the rape and its investigation.

Mark Papasavva, DC
CE – CU Sapphire
07917 883434
Email: Mark.Papasavva@met.police.uk
Information regarding the rape and its investigation.

Detective Constable Juliette Long
Metropolitan Police Service
Central East BCU (Hackney & Tower Hamlets)
p: 0207 275 4604 (Ext: 754604)
m: 07776668359
a: Bethnal Green Police Station, 12 Victoria Park Square

2

London E2 9NZ
w: www.met.police.uk
e: Juliette.A.Long@met.pnn.police.uk
Information regarding the rape and its investigation.

Nurse Dawn
The Havens
Intake and examination.

Dr. Bernadette Butler
The Havens Camberwell Clinic
Kings College Hospital
Dr Butler took written notes on Ms Guthrie's account of the rape. Ms Guthrie authorized Dr
Butler to proceed with a medical examination, forensic evidence collection and the collection of
evidence from the pajamas she had been wearing while she had been sleeping.

**INTERROGATORY NO. 2:**     Identify each expert witness you intend to call at the
trial of this matter, and provide the information required by Rule 4:1(b)(4)(A)(i).

**ANSWER:**   Plaintiff has not yet determined what experts she will call at trial and will respond
to this request when this is determined.

**INTERROGATORY NO. 3:**     Describe in detail any and all communications
between yourself and Defendant from September 17, 2017 to the present.

**OBJECTION:**      Defendant requests information already in the possession of Defendant.

**ANSWER:**   All communications between Plaintiff and Defendant are, by definition, already in
Defendant's possession. Notwithstanding her objections, Plaintiff responds that she and
Defendant had extensive WhatsApp text message exchanges immediately after she was raped by
him on September 17 and 18, 2017. Defendant attempted to call Plaintiff numerous times and
she refused his calls. Defendant and Plaintiff continued to communicate by social media through
at least September 28, 2017, after which time Plaintiff blocked Defendant on social media due to
his continued harassment and at the specific request of the London Police.

In these communications Defendant repeatedly admitted raping Plaintiff but offered a variety of
excuses for his behavior, including "sexsomnia" and his alcohol abuse. He repeatedly begged
Plaintiff to keep the rape a secret as it would damage his professional reputation, his marriage
and jeopardize everything he had. He also discussed conversations that he had with a therapist he
reported he was seeing.

Plaintiff will timely supplement her response. Pursuant to Rule 4:8(f), documents will be
produced by Plaintiff from which portions of the answer to this Interrogatory may be
derived.

**INTERROGATORY NO. 4:**     Identify and describe in detail every communication

3

you or your agents have had with Defendant or his agents regarding the facts giving rise to the Complaint from September 17, 2017 to the present, and in so doing, include the method of communication, the date of that communication, the substance of the communication.

**OBJECTION:**   Defendant requests information already in the possession of Defendant.

**ANSWER:**   All communications between Plaintiff or her agents, on the one hand, and Defendant and his agents, on the other hand, are, by definition, already in Defendant's possession. These include multiple text and other written exchanges between the Plaintiff and Defendant, and conversations between them as detailed in the Complaint.

Counsel for Plaintiff had several communications with Defendant in an attempt to settle this matter prior to filing the Complaint. Plaintiff believes that her DNA and blood sample medical representatives may have contacted Defendant in an attempt to collect his DNA and blood samples.

Notwithstanding her objections, Plaintiff will timely supplement her response.  Pursuant to Rule 4:8(f), documents will be produced by Plaintiff from which portions of the answer to this Interrogatory may be derived.

**INTERROGATORY NO. 5:**   Identify and describe in detail every communication regarding the facts giving rise to the Complaint that you had with the London hospital and London medical clinic as alleged in paragraph 28 of the Complaint, and in so doing, include the method of communication, the approximate time of the communication, and the substance of the communication.

**OBJECTION:**   Defendant's request involves sensitive and personal information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   The communications and timing of those communications are plain from the language of the Complaint. Notwithstanding this fact and all objections, Plaintiff will timely supplement her response once an appropriate protective order is in place.  Pursuant to Rule 4:8(f), documents will be produced by Plaintiff from which portions of the answer to this Interrogatory may be derived.

**INTERROGATORY NO. 6:**   Describe in detail every communication you or your agents have had with any and all third parties regarding the facts giving rise to the Complaint from September 17, 2017 to the present, and in so doing, include the method of communication, the date of that communication, and the substance of the communication.

**OBJECTION:**   Defendant's request is overly broad and requests communications that may be attorney client or attorney work product communications.

**ANSWER:**   Many of Plaintiff's communications are detailed in her Complaint, and this request is redundant to her prior disclosures. Notwithstanding her objections, Plaintiff will timely

4

supplement her response. Pursuant to Rule 4:8(f), documents will be produced by Plaintiff from which portions of the answer to this Interrogatory may be derived.

**INTERROGATORY NO. 7:**    If you contend that Defendant has made any admission of liability or admission against interest, please state it/them.

**ANSWER:**    Defendant made multiple admissions of liability and admissions against interest directly to Plaintiff. While some were verbal, many of them were in writing and made the day Defendant raped Plaintiff and in the days immediately following Defendant's unprovoked attack. Defendant apologized for raping Plaintiff. Defendant admitted that he had serious substance abuse problems and attempted to blame his rape of Plaintiff on these issues. Defendant promised to seek medical help and begged Plaintiff multiple times not to tell anyone about it because it would ruin his life. Defendant stated that he was seeing a therapist to address his issues. Plaintiff will timely supplement this response with additional information as necessary.

Pursuant to Rule 4:8(f), documents will be produced by Plaintiff from which portions of the answer to this Interrogatory may be derived.

**INTERROGATORY NO. 8:**    Identify all the medical and psychological treatments you have had since September 17, 2017, as alleged in paragraph 32 of the Complaint. Include in your answer each of your health providers and each provider's business name and address.

**OBJECTION:**    Defendant's request involves sensitive and personal information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**    Plaintiff will respond with relevant non-privileged information once an appropriate protective order is in place.

**INTERROGATORY NO. 9:**    State any and all facts which support your contention that you "fear[ed] for your life" and "additional physical injury" as alleged in paragraph 36 of the Complaint.

**ANSWER:**    Plaintiff is aware of the fact that Defendant provides background and undercover investigations of individuals and appears to have a network of undercover and nefarious international business partners providing these services. Defendant made statements to Plaintiff that Plaintiff interpreted as threatening, and Plaintiff is intimidated by Defendant's international and shady connections. Further, Defendant raped Plaintiff while she was asleep and she was required to fight with Defendant. Being raped while asleep and fighting off an assailant caused Plaintiff to fear for her life and physical injuries beyond what Defendant caused.

**INTERROGATORY NO. 10:**    Describe in detail all injuries sustained by you as a result of the alleged incident, including but not limited to the nature, extent and duration of such injuries.

**OBJECTION:**    Defendant's request involves sensitive and personal information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Beyond what is described in detail in Plaintiff's Complaint, Plaintiff has suffered extensive physical, emotional, psychological and other injuries. Plaintiff will supplement when an appropriate protective order is in place.

**INTERROGATORY NO. 11:**   State your employment, business, profession, or occupation on the date of the incident giving rise to this litigation, for the five-year period prior to the occurrence, and for the period of time between the occurrence and present-day; the name and address of any employer, or your place of employment at all such times; your job classification, description of specialty, rate, or amount of your compensation or earnings at all such times.

**OBJECTION:**   Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and will timely supplement her response once an appropriate protective order is in place.

**INTERROGATORY NO. 12:**   State whether you claim any loss of income, earnings, or loss of earning capacity, and if so, the dates and time lost in each date and the total time claimed to have been lost from gainful employment; the monetary amount of loss of wages, income, or earnings claimed and the manner or method used to determine same, or the amount of lost earning capacity and the amount lost as a result.

**OBJECTION:**   Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 13:**   State the nature, extent, symptoms, and complaints of injuries claimed by you to have been suffered as a result of the occurrence giving rise to this litigation and as reflected by the history, examination, diagnosis, treatment, and prognosis of all doctors, practitioners, or physicians consulted.

**OBJECTION:**   Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 14:**   If it is claimed that any of said injuries are permanent, set forth, in detail, the nature of such permanency, the disability claimed to result there from, and the name or names of the physician or physicians making such prognosis.

**OBJECTION:**   Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

6

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 15:**   State what physical or mental complaints, symptoms, injuries, or disabilities you claim to suffer at the present time as a result of the occurrence giving rise to this litigation, and the effect, if any, on your normal activities.

**OBJECTION:**   Defendant's request involves sensitive and personal medical and financial information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 16:**   State the names and addresses of all doctors, practitioners, nurses, health care providers, clinics, hospitals, or others who consulted with, diagnosed, examined, treated, or cared for you for injuries allegedly occurring as a result of the occurrence giving rise to this litigation and charged to be the responsibility of the defendant in this case; the date of such consultations, examinations, or treatments, and the itemized charges for such services. Please attach any and all statements for services rendered and reports which you or your attorney have received from such practitioners, nurses, or others.

**OBJECTION:**   Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 17:**   Identify by full name and address all health care providers, family physicians, hospitals, clinics, chiropractors, or other providers of the healing arts who have examined, treated, diagnosed, or evaluated you in the past five (5) years.

**OBJECTION:**   Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 18:**   Identify each item of damage you claim you sustained as a result of the alleged conduct of Defendant; and further state the dollar amount you are claiming for each item of damage; including all monetary and non-monetary items and the manner in which you have calculated the dollar amount of each such item of damages; the date(s), time, place and circumstance under which the loss occurred; identify all individuals who have knowledge of the facts and circumstances of these alleged damages; and identify all documents which may support, concern or

7

reference your alleged damages.

**OBJECTION:**     Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond once an appropriate protective order is in place. Plaintiff objects to the extent that this request is directed to attorney work product.

**ANSWER:**    Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response. Plaintiff is compiling this information for trial or dispositive motions and will timely supplement when this process is complete.

**INTERROGATORY NO. 19:**     If you ever suffered from mental anguish, emotional distress, or other similar or related conditions before the actions of Defendant as described in the Complaint, describe each such condition including the dates during which you suffered from it.

**OBJECTION:**     Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**    Plaintiff currently suffers from extensive mental anguish, emotional distress and other similar and related conditions. These have interfered with her professional and personal life. Plaintiff has experienced these beginning immediately after the rape, and continuously through the present. Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response. Plaintiff is compiling this information for trial or dispositive motions and will timely supplement when this process is complete.

**INTERROGATORY NO. 20:**     Identify, by full name and address, all pharmacies where you have filled prescriptions for the past five years.

**OBJECTION:**     Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**    Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

<div align="center">Respectfully Submitted,</div>

/s/ Thomas F. Urban II                          .
Thomas F. Urban II, Virginia Bar No. 40540
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
(703) 861-5235 FAX (703) 812-0486
Urban@fhhlaw.com

8

Walter Steimel, Jr. (*pro hac* vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com

*Counsel for Plaintiff*

9

**CERTIFICATE OF SERVICE**

       I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via email and/or U.S. First Class Mail to
Anna Dvorchik, Esq.
The Law Office of Anna K. Dvorchik, PLLC
3970 Chain Bridge Road
Fairfax, VA 22030

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209
*Counsel for Defendant*

on this the 1st day of October, 2020.

                               /s/ Thomas F. Urban II
                               Thomas F. Urban II

10

VIRGINIA:
### IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| **JANE DOE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Case No. 2019 12642** |
| **v.** | * | |
| | * | |
| **CENK SIDAR,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

### PLAINTIFF'S RESPONSES TO
### DEFENDANT'S FIRST SET OF REQUESTS FOR DOCUMENTS TO PLAINTIFF

Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned counsel, pursuant to Rule 4:9 of the Rules of the Supreme Court of Virginia, hereby serves the following Responses to the First Set of Requests for Production submitted by Defendant Cenk Sidar ("Sidar" or "Defendant").

### GENERAL OBJECTIONS

A.     Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek to impose upon Plaintiff obligations greater than, or in contradiction to, those imposed by the Supreme Court of Virginia Rules and the rules and Orders of this Court.

B.     Plaintiff objects to Sidar's Requests for Production of Documents to the extent that the requests seek documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

C.     Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek information protected by the attorney-client privilege, work product doctrine, or any other privilege or protection.

D.     Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek evidence within its possession, custody, or control, are already in Sidar's possession, custody, or control, or are in the possession, custody, or control of third parties.

E.     Plaintiff objects to Sidar's Requests for Production to the extent that the requests are overly broad as they fail to specify a time period for which documents are requested.

F.     Plaintiff's agreement that she will produce any responsive non-privileged documents in her possession in response to any Request is not an admission that such documents exist.

G.     Plaintiff is willing to meet and confer regarding any objectionable Requests.

H.     In responding to Sidar's Requests for Production, Plaintiff expressly reserves her right to object to the admission into evidence of any and all information made available in response to any Request for Production on any ground including, but not limited to, the ground that the information or request is irrelevant and immaterial to the issues in this action.  Nothing in Plaintiff's responses to any Request for Production should be construed as an admission respecting the admissibility or relevance of any fact or document or the truth or accuracy of any characterization of any kind contained in the Requests for Production.

## MANNER OF COMPLIANCE

Subject to her objections, Plaintiff will produce responsive, non-privileged, and non-protected documents by providing Sidar's counsel with copies of such documents at a mutually acceptable time, place and/or manner.  Plaintiff's investigation is ongoing; Plaintiff reserves the right to supplement her production of documents if and when additional responsive documents are located.

Subject to and without waiver of the foregoing General Objections, Plaintiff responds and objects as follow:

## SPECIFIC RESPONSES AND OBJECTIONS TO
## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** Any document identified in your Answers to the First Set of Interrogatories which is currently in your possession, custody, or control.

**RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 2:** Excluding communications between you and your attorney(s), any document relied on in crafting your Answers to the First Set of Interrogatories.

**RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 3:** All documents to or from any expert witness you intend to call at the trial (or evidentiary hearing) in this matter.

**RESPONSE:** Plaintiff objects to this Request on the grounds that such requests are not authorized in Rule 4:1(b)(4)(A) and a litigant cannot use a request for production of documents (under the guise of an interrogatory) under Rule 4:9 to circumvent the exclusive method established in Rule 4:1(b)(4) for discovering expert opinions, as set out in <u>Flora v. Shulmister</u>,

2

262 Va. 215, 222 (2001). Plaintiff will negotiate with Defendant regarding a mutually acceptable arrangement regarding expert witnesses, but at the present time, Plaintiff has no such documents and, when such documents are created, will not produce any documents in response to this Request absent such an agreement.

**REQUEST NO. 4:** All documents received as a result of a subpoena filed in this action.

**RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 5:** All exhibits you intend to use at the trial (or evidentiary hearing) in this matter.

**RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents in violation of the attorney work product doctrine. Plaintiff further objects to the extent that this Request seeks legal opinions. Notwithstanding and without waiving these objections and the General Objections, Plaintiff will produce documents otherwise responsive to this Request to the extent that they are in Plaintiff's possession, custody or control and not otherwise protected or privileged.

**REQUEST NO. 6:** All written communications between you and the Defendant from September1, 2016 to the present.

**RESPONSE:** Plaintiff objects to this Request to the extent that these documents should already be in the possession of Defendant unless he has engaged in document destruction. Notwithstanding and without waiving this objection and the General Objections, Plaintiff will produce documents responsive to this Request to the extent that they are in Plaintiff's possession, custody or control.

**REQUEST NO. 7:** All written communications between you and anyone other than your attorney relating to the incident which gave rise to the Complaint.

**RESPONSE:** Plaintiff objects to this Request to the extent that it is vague regarding the term "relating" as it is a subjective term, inappropriate for a request for production. Notwithstanding and without waiving this objection and the General Objections, Plaintiff will produce written communications regarding the incident which gave rise to the Complaint to the extent that they are in Plaintiff's possession, custody or control and not otherwise protected or privileged.

**REQUEST NO. 8:** All written communications between you and anyone other than your attorney regarding Defendant from September 1, 2016 to the present.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad and includes documents not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request to the extent that it seeks documents that may be

3

privileged or protected.  Notwithstanding and without waiving these objections and the General Objections, Plaintiff will produce documents otherwise responsive to this Request to the extent that they involve any aspect of Plaintiff's Complaint, are in Plaintiff's possession, custody or control, and are not otherwise protected or privileged.

**REQUEST NO. 9:**  All documents regarding the care and treatment rendered to you as a result of the incident which gave rise to the Complaint, and as described in your Answers to Interrogatories.

**RESPONSE:**  Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 10:**  All documents concerning the care, treatment, hospital care, physical therapy, or any other medical or health care rendered to you from January 1, 2013 to the present.

**RESPONSE:**  Plaintiff objects to this Request on the grounds that it is overly broad and includes documents (and time periods) not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to this Request to the extent that it seeks documents that may be privileged or protected.  Notwithstanding and without waiving these objections and the General Objections, Plaintiff will produce documents otherwise responsive to this Request to the extent that they involve any aspect of Plaintiff's Complaint, are in Plaintiff's possession, custody or control, and are not otherwise protected or privileged.

**REQUEST NO. 11:**  All documents which tend to show evidence of the nature, amount, and degree of injury complained of in your Complaint.

**RESPONSE:**  Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 12:**  All documents showing lost wages which you claim were the result of the  incident complained of in the Complaint.

**RESPONSE:**  Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 13:**  All documents relating to witness statements which relate to the matters complained of in the Complaint.

**RESPONSE:**  Plaintiff objects to this Request to the extent that it is vague regarding the terms "relating" and "relate" as they are subjective terms, inappropriate for a request for production.  Notwithstanding and without waiving this objection and the General Objections, Plaintiff will produce witness statements which involve the matter complained of in the Complaint to the extent that they are in Plaintiff's possession and not otherwise protected or privileged.

4

**REQUEST NO. 14:** All documents relating to prior injuries, illnesses, disease, or disabilities from January 1, 2013 to the present.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad and includes documents (and time periods) not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request to the extent that it seeks documents that may be privileged or protected. Notwithstanding and without waiving these objections and the General Objections, Plaintiff will produce documents otherwise responsive to this Request to the extent that they involve any aspect of Plaintiff's Complaint, are in Plaintiff's possession, and are not otherwise protected or privileged.

**REQUEST NO. 15:** All documents evidencing the amount of damages or losses you claim resulted from the incident complained of in the Complaint.

**RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 16:** Any diaries or logs reflecting notes or information about the incident giving rise to the Complaint.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably limited in scope. Notwithstanding and without waiving these objections and the General Objections, Plaintiff will provide any diaries or logs that specifically mention the incident giving rise to the Complaint, properly redacted to protect other personal information, to the extent that there are any such documents in her possession.

**REQUEST NO. 17:** Any diaries or logs reflecting notes or information about medical treatment, pain complaints, or lost wages.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably limited in scope. Notwithstanding and without waiving these objections and the General Objections, Plaintiff will provide any diaries or logs that specifically mention the incident giving rise to the Complaint, properly redacted to protect other personal information, to the extent that there are any such documents in her possession.

**REQUEST NO. 18:** If you are or have been involved in any other litigation as a plaintiff in the past ten (10) years, provide copies of the Complaints, your discovery responses, and transcripts from any deposition taken of you.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving this objection and the General Objections, Plaintiff states there are no such documents.

**REQUEST NO. 19:** Copies of any and all Facebook postings, Twitter messages, or

5

other social media messages regarding the incident in question or the injuries and damages claimed in this case.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 20:** Invoices for all attorney's fees claimed in this case.

**RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents protected by the attorney-client privilege and the work product doctrine. Notwithstanding and without waiving this objection and the General Objections, Plaintiff agrees that, if the jury finds Defendant liable for Plaintiff's attorneys' fees (other than those already paid for by Defendant), Plaintiff will produce properly redacted attorneys' fees invoices.

Respectfully Submitted,

/s/ Thomas F. Urban II
Thomas F. Urban II, Virginia Bar No. 40540
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
(703) 861-5235 FAX (703) 812-0486
Urban@fhhlaw.com

Walter Steimel, Jr. (*pro hac* vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com

*Counsel for Plaintiff*

6

JA105

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via email and/or U.S. First Class Mail to

Anna Dvorchik, Esq.
The Law Office of Anna K. Dvorchik, PLLC
3970 Chain Bridge Road
Fairfax, VA 22030

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209
*Counsel for Defendant*

on this the 1st day of October 2020.

/s/ Thomas F. Urban II
Thomas F. Urban II

7

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

|  |  |  |
|---|---|---|
| **JANE DOE** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | **Case No. 2019 12642** |
| | * | |
| **CENK SIDAR,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

## PLAINTIFF'S SETTLEMENTAL RESPONSES TO DEFENDANT'S FIRST SET OF REQUESTS FOR DOCUMENTS TO PLAINTIFF

Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned counsel, pursuant to Rule 4:9 of the Rules of the Supreme Court of Virginia, hereby serves the following Supplemental Responses to the First Set of Requests for Production submitted by Defendant Cenk Sidar ("Sidar" or "Defendant").

## GENERAL OBJECTIONS

A.      Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek to impose upon Plaintiff obligations greater than, or in contradiction to, those imposed by the Supreme Court of Virginia Rules and the rules and Orders of this Court.  To the extent that Plaintiff withholds or fails to produce any documents on this basis, Plaintiff will identify such withholding in response to each Request.

B.      Plaintiff objects to Sidar's Requests for Production of Documents to the extent that the requests seek documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

C.      Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek information protected by the attorney-client privilege or the work product doctrine.

D.      Plaintiff's agreement that she will produce any responsive non-privileged documents in her possession in response to any Request is not an admission that such documents exist.

E.      If Plaintiff withholds any documents based upon an assertion of any objection, other than communications with her counsel in this matter, Plaintiff will provide the information required under Rule 4:9(b)(ii) and Rule 4:1(b)(6).

F.     In responding to Sidar's Requests for Production, Plaintiff expressly reserves her right to object to the admission into evidence of any and all information made available in response to any Request for Production on any ground including, but not limited to, the ground that the information or request is irrelevant and immaterial to the issues in this action. Nothing in Plaintiff's responses to any Request for Production should be construed as an admission respecting the admissibility or relevance of any fact or document or the truth or accuracy of any characterization of any kind contained in the Requests for Production.

## MANNER OF COMPLIANCE

Subject to her objections, Plaintiff will produce responsive, non-privileged, and non-protected documents by providing Sidar's counsel with copies of such documents at a mutually acceptable time, place and/or manner. Plaintiff's investigation is ongoing; Plaintiff reserves the right to supplement her production of documents if and when additional responsive documents are located.

Subject to and without waiver of the foregoing General Objections, Plaintiff responds and objects as follow:

## SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** Any document identified in your Answers to the First Set of Interrogatories which is currently in your possession, custody, or control.

**SUPPLEMENTAL RESPONSE:** Please see Bates Nos. P Prod 501-18. Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 2:** Excluding communications between you and your attorney(s), any document relied on in crafting your Answers to the First Set of Interrogatories.

**SUPPLEMENTAL RESPONSE:** Please see Bates Nos. P Prod 501-18. Plaintiff is aware of no such documents other than those produced in response to Request No. 1.

**REQUEST NO. 3:** All documents to or from any expert witness you intend to call at t h e  trial (or evidentiary hearing) in this matter.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request on the grounds that such requests are not authorized in Rule 4:1(b)(4)(A) and a litigant cannot use a request for production of documents (under the guise of an interrogatory) under Rule 4:9 to circumvent the exclusive method established in Rule 4:1(b)(4) for discovering expert opinions, as set out in Flora v. Shulmister, 262 Va. 215, 222 (2001). Plaintiff will negotiate with Defendant regarding a mutually acceptable arrangement regarding expert witnesses, but at the present time, Plaintiff has no such documents and, when such documents are created, will not produce any documents in response to this Request absent such an agreement.

2

**REQUEST NO. 4:** All documents received as a result of a subpoena filed in this action.

**SUPPLEMENTAL RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 5:** All exhibits you intend to use at the trial (or evidentiary hearing)in this matter.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents in violation of the attorney work product doctrine. Notwithstanding and without waiving this objection and the General Objections, please see Bates Nos. P Prod 501-18. Plaintiff will produce additional documents otherwise responsive to this Request to the extent that they are in Plaintiff's possession, custody or control and not otherwise protected or privileged.

**REQUEST NO. 6:** All written communications between you and the Defendant from September 1, 2016 to the present.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that these documents should already be in the possession of Defendant unless he has engaged in document destruction. Notwithstanding this objection and the General Objections, please see Bates Nos. P Prod 501-18. Plaintiff will produce additional documents responsive to this Request to the extent that they are in Plaintiff's possession, custody or control.

**REQUEST NO. 7:**   All written communications between you and anyone other than your attorney relating to the incident which gave rise to the Complaint.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it is vague regarding the term "relating" as it is a subjective term, inappropriate for a request for production. Plaintiff will use the definition for the term "relating" that is included as Instruction J to Plaintiff's First Set of Requests for Production issued to Defendant. Notwithstanding and without waiving this objection and the General Objections, please see Bates Nos. P Prod 501-18. Plaintiff will produce additional written communications regarding the incident which gave rise to the Complaint to the extent that they are in Plaintiff's possession, custody or control and not otherwise protected or privileged.

**REQUEST NO. 8:** All written communications between you and anyone other than your attorney regarding Defendant from September 1, 2016 to the present.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents that may be privileged or protected. Notwithstanding and without waiving these objections and the General Objections, please see Bates Nos. P Prod 501-18. Plaintiff will produce additional documents otherwise responsive to this Request to the extent that they involve any aspect of Plaintiff's Complaint, are in Plaintiff's possession, custody or control, and are not otherwise protected or privileged.

**REQUEST NO. 9:** All documents regarding the care and treatment rendered to you as a

3

result of the incident which gave rise to the Complaint, and as described in your Answers to Interrogatories.

**SUPPLEMENTAL RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 10:** All documents concerning the care, treatment, hospital care, physical therapy, or any other medical or health care rendered to you from January 1, 2013 to the present.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request on the grounds that it seeks sensitive and personal medical information. Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 11:** All documents which tend to show evidence of the nature,amount, amount, and degree of injury complained of in your Complaint.

**SUPPLEMENTAL RESPONSE:** Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 12:** All documents showing lost wages which you claim were the result of the incident complained of in the Complaint.

**SUPPLEMENTAL RESPONSE:** Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 13:** All documents relating to witness statements which relate tothe matters complained of in the Complaint.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it is vague regarding the terms "relating" and "relate" as they are subjective terms, inappropriate for a request for production. Plaintiff will use the definition for the term "relating" that is included as Instruction J to Plaintiff's First Set of Requests for Production issued to Defendant. Notwithstanding and without waiving this objection and the General Objections, Plaintiff will produce witness statements which involve the matter complained of in the Complaint to the extent that they are in Plaintiff's possession and not otherwise protected or privileged.

**REQUEST NO. 14:** All documents relating to prior injuries, illnesses, disease, ordisabilities from January 1, 2013 to the present.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it is vague regarding the term "relating" as it is a subjective term, inappropriate for a request for production. Plaintiff will use the definition for the term "relating" that is included as Instruction J to

Plaintiff's First Set of Requests for Production issued to Defendant. Plaintiff further objects to this Request to the extent that it seeks documents that may be privileged or protected. Defendant's request involves sensitive and personal medical information. Notwithstanding and without waiving this objection and the General Objections, Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 15:** All documents evidencing the amount of damages or losses you claim resulted from the incident complained of in the Complaint.

**SUPPLEMENTAL RESPONSE:** Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 16:** Any diaries or logs reflecting notes or information about the incident giving rise to the Complaint.

**SUPPLEMENTAL RESPONSE:** Plaintiff will provide any diaries or logs that specifically mention the incident giving rise to the Complaint, properly redacted to protect other personal information, to the extent that there are any such documents in her possession.

**REQUEST NO. 17:** Any diaries or logs reflecting notes or information about medical treatment, pain complaints, or lost wages.

**SUPPLEMENTAL RESPONSE:** Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 18:** If you are or have been involved in any other litigation as a plaintiff in the past ten (10) years, provide copies of the Complaints, your discovery responses, and transcripts from any deposition taken of you.

**SUPPLEMENTAL RESPONSE:** Plaintiff states there are no such documents.

**REQUEST NO. 19:** Copies of any and all Facebook postings, Twitter messages, or other social media messages regarding the incident in question or the injuries and damages claimed in this case.

**SUPPLEMENTAL RESPONSE:** Plaintiff will produce documents regarding social media content (to the extent that she understands the term "social media") to the extent that there are any such documents in her possession.

**REQUEST NO. 20:** Invoices for all attorney's fees claimed in this case.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents protected by the attorney-client privilege and the work product doctrine.

5

Notwithstanding and without waiving this objection and the General Objections, Plaintiff agrees that Plaintiff will supplement this information with proper redactions if Plaintiff continues to pursue its attorneys' fee claim after December 3, 2021.

Respectfully Submitted,

_Thomas F. Urban II_

Thomas F. Urban II, Virginia Bar No. 40540
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
Urban@fhhlaw.com

Walter Steimel, Jr. (*pro hac* vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was hand delivered to

Mariam W. Tadros, Esq.
Rees Broome, PC
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182

And sent by electronic mail to

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209

*Counsel for Defendant*

on this the 18th day of November, 2021.

_Thomas F. Urban II_

Thomas F. Urban II

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **JANE DOE**           )<br>    **A Domiciliary of the**    )<br>    **Commonwealth of Virginia**   )<br>                    )<br>    **Plaintiff,**           )<br>                    )<br>**v.**                  )<br>                    )<br>**CENK SIDAR**        )<br>                    )<br>    **Defendant.**      ) | **Civil Action No. 1:22-cv-00545**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO REMOVE
PSEUDONYM DESIGNATION**

Plaintiff Jane Doe ("Plaintiff"), by and through her attorneys Fletcher, Heald and
Hildreth, PLC and Steimel Counselors Law Group, PLLC, hereby files this Opposition to
Defendant's Motion to Remove Pseudonym Designation ("Motion"). *ECF No. 20.*

I.      **Introduction.**

Defendant's Motion mischaracterizes the prior proceedings before the Fairfax County
Circuit Court and Plaintiff's actions, casting baseless aspersions as to the timing of Plaintiff's
motion for non-suit and the conduct of discovery. These issues are irrelevant to the Motion.
Plaintiff can respond to each of these mischaracterizations but believes that it is more important
to focus on Defendant's Motion.

Plaintiff filed her case in Fairfax County Circuit Court on September 13, 2019. Prior to
her filing, she undertook extensive discussions with Defendant's counsel in efforts to avoid
litigation. At no time during any of those discussions did Defendant request confidentiality or
anonymity. At no time during the pendency of the prior case in Fairfax County did Defendant

move to remove Plaintiff's pseudonym designation. In only one instance did Defendant move for a protective order, and that was to block the sharing of DNA results with the London Metropolitan Police if Defendant eventually submitted himself for a test. Defendant's motion was denied by Judge Smith on September 4, 2020, with Judge Smith noting on the record that he would decline Defendant's request to interfere with a criminal investigation in another country. Defendant proposed a new protective order to Plaintiff before Plaintiff filed for a non-suit, but no drafts of the protective orders circulated among counsel contained any provision for removing the pseudonym designation.

Defendant took few, if any, steps to protect his identity or that of third parties. During discovery on his motion to dismiss for lack of jurisdiction, he redacted no personal details from discovery responses or filings with the Court. In his discovery responses, Defendant disclosed the identities of numerous third parties, including friends and girlfriends, with whom he discussed the case details. None of these parties had an attorney-client or other privilege with Defendant nor did Defendant mark this information "Confidential."

Plaintiff went directly to the London Metropolitan Police within minutes of Defendant raping her. She then proceeded to The Havens as directed for rape kit testing. During her interview with the London Metropolitan Police, she turned over her text messages with Defendant. She took care to substitute Defendant's name in her contacts directory with the designation "Assailant London" to avoid publicizing Defendant's name immediately after the attack, beyond disclosing his name to the police. Plaintiff's change of name in her contacts directory is reflected in the text message printout attached to the Complaint (*ECF No. 1-2*) in which Defendant admits raping Plaintiff. (e.g., Complaint, *ECF. No. 1*, para.39; Exh. 2., *ECF No. 1-2*, pp. 7, 11)

Defendant met with the London Metropolitan Police after the rape and voluntarily provided a DNA sample. That sample was accidentally lost or destroyed by the police testing lab and Defendant has rebuffed all attempts to obtain a new DNA sample. Defendant's only attempts to conceal his identity or the fact he raped Plaintiff are his early attempts to convince Plaintiff not to pursue any action against him because it would ruin his life – with no regard to the harm that he caused Plaintiff. Complaint, *ECF No. 1*, para. 38; Exh. 2, 1-2, pp. 9-10.

Even after Plaintiff non-suited her case in Fairfax County state court and informed Defendant that she would be re-filing the case in federal court, Defendant's Counsel never requested that Defendant's name be withheld from the complaint in federal court, despite nearly six months that expired between the non-suit and refiling.

On the other hand, Plaintiff has assiduously protected her identity. She filed both actions under a pseudonym. She has redacted her name from all publicly available filings. Other than law enforcement, medical personnel, a potential witness the London police asked her to contact and who was interviewed by the police, and her attorneys, she has discussed this matter with no-one, including family. Defendant's rape has caused her great physical, emotional, and financial harm and continues to do so. Complaint, *ECF No. 1*, paras. 41-43, 51, 58, 66. Plaintiff is also concerned for her personal safety if her identity is revealed. She currently works in government and defense sectors worldwide, with many of those projects based in the Middle East. As is demonstrated below, female rape victims are harassed and subject to severe legal and other sanctions when identified in certain Middle East countries. Revealing her identity will subject her to great risk of personal harm and will serve no purpose other than to cause her additional emotional harm from having to discuss this matter with family and friends and physical harm of reprisals in the Middle East.

II.     **Standard and Balance of Interests**

A.     **General Standard; Five Part Test**

While the Federal Rules of Civil Procedure requires identification of parties, in certain circumstances a party may be afforded the protection of anonymity if that party meets the five-part test set forth in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). After a review of various criteria discussed in other circuits, the *James* court chose the following five criteria that "have relevance to this case…." *Id*.

> [1] whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; [2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; [3] the ages of the persons whose privacy interests are sought to be protected; [4] whether the action is against a governmental or private party; and [5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id*.

Numerous courts have applied the *James* test to either grant or deny requests for anonymity. The cases cited by Defendant are inapposite. They do not address the anonymity of rape victims. The cases cited by Defendant, for example, relate to Title VII claims (*Doe v. Hallock*, 119 F.R.D. 640 (S.D. Miss. 1987); *Southern Methodist Univ Ass'n v. Wynne & Jaffe*, 599 F.2d 707 (5th Cir. 1979)); Section 1983 claims (*Doe v. Alger*, 317 F.R.D. 37 (W.D. Va. 2016)); a TSA pat-down (*JL v. Polson*, 2017 WL 11500247 (E.D. Va. Jan. 1, 2017)); risk of harm to a company related to an infant death from a defective product (*Co. Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014)(*criticized in Roe v. Doe*, Civil Action No. 18-666 (CKK) (D.D.C. Aug. 9, 2018)); public interests in government litigation or challenging laws or regulations (*Doe v. Merten*, 219 F.R.D. 387 (E.D. Va. 2004) (*cited in contradiction by Opinion*

*No. GA-0699* (Ops. Tex. Atty. Gen. Mar. 19, 2009), at fn. 2); and cheating on exams (*Candidate # 452207 v. CFA Institute*, 42 F. Supp. 3d 804 (E.D. Va. 2012)).

The closest case to the instant one cited by Defendant is *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583 (E.D. Va. 2016) in which the court *granted* Plaintiff's request for pseudonymity specifically citing that sexual misconduct carries a stigma, is a "matter of sensitive and highly personal nature" and is likely to result in "'retaliatory physical or mental harm' based on the accusations alone." *Rector*, 179 F. Supp. 3d at 593, *citing James*, 6 F.3d at 238. The instant case is a rape case, and cases which address rape and sexual misconduct are the only ones relevant to Defendant's Motion. The legal standard is the application of the *James* factors to rape cases.

### B.   Balancing of Factors

Besides the five-factor test in *James*, there is another consideration. Counterbalancing the public's right to know the identity of persons availing themselves of the court system is the public interest in protecting rape victims. In *Cabrera*, the Court recognized that "[c]ourts generally allow a plaintiff to litigate under a pseudonym in cases containing allegations of sexual assault because they concern highly sensitive and personal subjects." *Cabrera*, 307 F.R.D. at 5 (*citations omitted*). The court continued to observe "a strong [public] interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes.'" *De Amigos*, No. 11-cv-1755, at *6 (*quoting Doe No. 2 v. Kolko*, 242 F.R.D. 193, 195-96 (E.D.N.Y. 2006))." *Cabrera*, 307 F.R.D. at 6. In *Kolko,* the court observed "[a]dditionally, the public generally has a strong interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes. *See Doe v. Evans*, 202 F.R.D. 173, 176 (E.D.Pa.2001) (granting anonymity to sexual assault victim)." *Kolko*, 242 F.R.D. at 195-96.

In the instant case, Plaintiff is a rape victim. If rape victims like her are required to disclose their anonymity it will serve as a caution note to other rape victims and be viewed as another tool of retaliation by Defendants. This Court should not let that happen. Next, we discuss the *James* factors considering the general test, and the admonition in *Cabrera, Evans and Kolko*.

## III.   Factors

### A.   Avoidance of Annoyance and Criticism versus Preservation of Privacy in a Matter of Sensitive and Highly Personal Nature

Plaintiff details throughout her Complaint the mental harm and emotional anguish the rape caused her. Complaint, *ECF No. 1*, paras. 41-43, 51, 58, 66. The harm to her mental health is real and exposing her name publicly will only add to her anguish and suffering. It is not hard to imagine the mental anguish of publicizing that she was a victim of rape, especially given that her family does not even know about this rape.

The Court in *Doe No. 2 v. Kolko* outlines the scope of protection afforded rape victims in the various circuits citing opinions including *James*. The court noted that even the 7th Circuit, which hews strongly against the use of fictitious names, recognizes that sexual assault victims are commonly accorded anonymity. *Kolko*, 242 F.R.D. at 195, *citing Doe v. Blue Cross & Blue Shield United of Wisc.*, 112 F.3d 869, 872 (7th Cir. 1997) (recognizing that rape victims are entitled to anonymity) (" fictitious names are allowed when necessary to protect the privacy of ... rape victims, and other particularly vulnerable parties or witnesses"), 112 F. 3d at 872; *see also Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004).

The *Kolko* court also noted that the U.S. Supreme Court has recognized the seriousness of rape. *See Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861 (1977) ("Short of homicide, [rape] is the ultimate violation of self") *cited in Kolko*, 242 F.R.D. at 196. Although written into the criminal code, Virginia also recognizes crime victim rights, affording them protections of

6

privacy and protection from intimidation, and avenues for restitution. *See*, Va. Code Section

19.2-11.01, A., A.1. and A.2. Although addressing victim rights in a criminal law context, this

section clearly sets forth the Commonwealth's policy of protection of rape victims.

In the current case, Plaintiff is seeking restitution for her rape. Rape victims are still

punished and criticized. Defendant sent text messages over several days trying to paint himself

as the victim and begging Plaintiff not to take any action that will harm him, disregarding the

harm he caused Plaintiff. Throughout the proceedings in Fairfax County Circuit Court, he sought

to avoid jurisdiction and attempts to collect his DNA. In one instance, he requested a protective

order limited to prohibiting Plaintiff from sharing DNA results with the London Metropolitan

Police. The Court wisely declined noting that it would not be a party to suppressing evidence in a

criminal investigation in another country.

The strong public policy to protect rape victims hews strongly in favor of Plaintiff

retaining anonymity

B.     **Risk of Retaliatory Physical or Mental Harm to the Requesting Party or even
        more critically, to innocent non-parties**

Another deciding factor in favor of anonymity is the risk of retaliatory physical or mental

harm. "Related to the third factor is the concern "'whether identification poses a risk of

retaliatory physical or mental harm to the requesting party or even more critically, to innocent

non-parties . . . .' *James*, 6 F.3d at 238." *Kolko*, 242 F.R.D. at 195.

Plaintiff has been subjected to numerous baseless motions by Defendant in his attempts

to delay her efforts to seek redress. One instance is the baseless personal jurisdiction motion

pressed by Defendant, leading to Judge Bellows in Fairfax County finding personal jurisdiction

and levying attorneys' fees due to the baseless nature of Defendant's claim. Another is his

numerous attempts to avoid having to produce a DNA sample even though he voluntarily

7

provided one to the London Metropolitan Police.

Beyond Defendant's continued assault on Plaintiff is a more important issue. As noted above, the Plaintiff works in governmental and military contracting worldwide, including in the Middle East. It is a well-documented fact that women who have been raped are subjected to ridicule, abuse, arrest, and prosecution in the Middle East. In January 2019, Frontiers in Psychology published a paper entitled *Blaming the Victim of Acquaintance Rape: Individual, Situational, and Sociocultural Factors*. A copy is attached as Exhibit A. In that study the authors stated --

> Victims of sexual assault in many Middle Eastern communities are punished, even outcast by their families, or must marry their rapists in order to restore honor to their families (Ruggi, 1998).

*Id*. at 15. In an article published in Asia Times, the authors note that "[i]n some countries such as the United Arab Emirates, rapists can face the death penalty, but sex outside marriage, or *zina*, is also a serious crime, and women who have reported sexual assaults have then been arrested themselves." Asia Times online, *Arab countries struggle with the stigma associated with rape*, Ghazal, R., Jan. 1, 2019. Exhibit B.

Plaintiff is rightfully afraid of the consequences if the fact that she was raped becomes publicized, especially in countries where she works and visits regularly. In light of her own personal experiences and well documented research and reporting, this fear is fully justified. Plaintiff should not have to suffer personal physical and legal risk in her work locations because she is pursuing her rights in the court system.

**C.    Ages of the Persons Whose Privacy Interests are Sought to be Protected**

Both parties to this case are of majority age. As in *Va. Polytechnic* this factor is neutral. *Doe v. Va. Polytechnic Inst*., Civil Action 7:21-CV-378 (W.D. Va. Mar. 29, 2022), at 4-5. That

court noted that some of the James factors may be relevant to a case where others are not. *Id*. at 3. In the case of the Plaintiff in *Va. Polytechnic,* the Court determined that the third *James* factor is crucial when a party is underage but otherwise neutral when they are not. *Id*. at 4-5. The court determined that this factor weighed neither in favor or against anonymity. *Id*. Given the fact neither party is a minor and considering the severe effect Defendant's rape of Plaintiff has had on Plaintiff's mental, emotional, and financial state, and significant risk of causing additional physical, legal and financial harm if her identity is unmasked, this factor is at best neutral.

>   **D.**     **Whether the Action is Against a Governmental or Private Party**

This action is between private parties, and not against a government or other public entity. This factor would only weigh against Plaintiff if there was any risk of harm to the Defendant's reputation that would offset Plaintiff's need for anonymity. *See, generally, Va. Polytechnic* at 6. It is neutral in this case because Defendant has taken no steps, from the time of the rape until now, to conceal his identity, redact personal information from his discovery responses, request lifting of anonymity, or raise any risk of prejudicial harm to him. Plaintiff, on the other hand, has consistently and carefully worked to preserve her anonymity, and unlike the situation in *Cabrera*, further has taken no actions to publicly humiliate Defendant, even going so far as to mask his name in her contact list when first approaching the London Police. Lifting the veil of anonymity only harms Plaintiff, extends and amplifies the emotional toll this has taken on her, adds an additional layer of financial burden in responding to Defendant's motion at this late stage in their litigation history and risks exposing her to new physical, mental and financial harm. At best, this factor is neutral in the analysis of the *James* factors.

>   **E.**     **Risk of Unfairness to the Opposing Party**

As set forth in the Introduction, there is no risk of unfairness to the Defendant. The

Defendant has known the identity of the Plaintiff from the time he raped her. In fact, he had known her through an academic program many years before the rape. He sent her extensive text messages over several days beginning within minutes of raping her in attempts to get her to stay quiet and not report the rape to the police or take other actions. He voluntarily met with the London Police and provided a DNA sample. He has known her identity from the beginning of the case. As is noted in numerous cases where the defendant knows the plaintiff's identity, there can be no prejudice to the defendant by maintaining pseudonymity. Defendant has described no unfairness to him in maintaining Plaintiff's anonymity. *See Doe v. Va. Polytechnic Inst*., Civil Action 7:21-CV-378 (W.D. Va. Mar. 29, 2022), at 6; *W. M. v. Braskem Am., Inc*., Civil Action No. 3:20-cv-00141 (S.D.W. Va. Mar. 26, 2020).

## IV.    Waiver or Laches; No Prior Request

Prior to filing suit, counsel for the Plaintiff and Defendant engaged in extensive discussions. In none of those discussions did Defendant request anonymity, even when Plaintiff made clear that she would be filing an action. Plaintiff proceeded under a pseudonym in Fairfax County from the time she filed suit, in September of 2019 until she filed a nonsuit in November of 2022. At no time in those proceedings did Defendant request a lifting of the pseudonym designation. Defendant's filing is the first time he has raised this issue.

Plaintiff believes that Defendant has waived any right to relief on his motion, and that his motion is filed solely to create additional angst and emotional harm on Plaintiff. Like Defendant's untimely petition of appeal of an attorneys' fee award to the Virginia Supreme Court (Petition filed February 17, 2022), filed after Plaintiff non-suited and almost two years after the June 16, 2020 Order awarding attorneys' fees, Plaintiff believes Defendant is on a crusade to bankrupt Plaintiff, rather than address the merits of her case. Plaintiff also notes that

Defendant's appeal of attorneys' fees is not "fully briefed," the Virginia Supreme Court has not yet agreed to hear the discretionary appeal, much less set a briefing cycle. It is only the petition requesting that court to hear the appeal that has been briefed.

WHEREFORE, Plaintiff Jane Doe moves the Court to deny Defendant's Motion to Remove Pseudonym Designation and award any other relief this Court deems necessary and proper.

Respectfully Submitted,

Jane Doe, by Counsel
THE LAW FIRM OF FLETCHER, HEALD &
HILDRETH, PLC


By: _____
THOMAS F. URBAN II, VSB #40540
FLETCHER, HEALD & HILDRETH, PLC
1300 17th Street North, Suite 1100
Arlington, Virginia 22209
(703) 812-0462; (703) 812-0486 (f)
urban@fhhlaw.com

Walter E. Steimel, Jr. (P*ro hac vice*)
Steimel Counselors Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258; (202) 652-2308
wes@sclgrp.com
*Counsel for Plaintiff Jane Doe*

11

JA123

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 11th day of July, 2022, he electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Thomas F. Urban II* _____
Thomas F. Urban II

JA124



**frontiers**
in Psychology

REVIEW
published: 21 January 2019
doi: 10.3389/fpsyg.2018.02422

**EXHIBIT A**

# Blaming the Victim of Acquaintance Rape: Individual, Situational, and Sociocultural Factors

*Claire R. Gravelin[1]\*, Monica Biernat[2] and Caroline E. Bucher[3]*

*[1] Division of Social and Behavioral Sciences, Franklin Pierce University, Rindge, NH, United States, [2] Department of Psychology, The University of Kansas, Lawrence, KS, United States, [3] Department of Psychology, SUNY Geneseo, Geneseo, NY, United States*

Victims of rape are uniquely vulnerable for being blamed for their assault relative to victims of other interpersonal crimes and thus much research has been conducted to understand why this is the case. But the study of victim blaming in acquaintance rape cases is hindered by contradictory empirical results. Early investigations in victim blaming often treated acquaintance rapes and stranger rapes as synonymous and thus much of these data are suspect for drawing conclusions particular to acquaintance rape. This paper provides a comprehensive review of the research literature on victim blame in acquaintance rape cases, highlighting inconsistencies and drawing particular attention to areas of research in need of further exploration. Specifically, we review the commonly studied individual (perceiver) factors that influence victim blaming, as well as common situational (target) factors included or manipulated within sexual assault scenarios. Our review reveals many inconsistent findings and interactions between perceiver and scenario factors. In an effort to make sense of these complex interactions and inconsistent findings, we suggest a need for more transparency in describing the scenarios used in research on victim blaming in sexual assault cases and greater empirical attention to sociocultural factors that may influence blaming tendencies.

Keywords: acquaintance rape, blame, responsibility, sexual assault, sexual violence, victim blame

**OPEN ACCESS**

**Edited by:**
*Alice H. Eagly,*
*Northwestern University,*
*United States*

**Reviewed by:**
*Barbara Krahé,*
*Universität Potsdam, Germany*
*Guillermo B. Willis,*
*University of Granada, Spain*

**\*Correspondence:**
*Claire R. Gravelin*
*gravelinc@franklinpierce.edu*

**Specialty section:**
*This article was submitted to*
*Personality and Social Psychology,*
*a section of the journal*
*Frontiers in Psychology*

**Received:** 04 April 2018
**Accepted:** 19 November 2018
**Published:** 21 January 2019

**Citation:**
*Gravelin CR, Biernat M and*
*Bucher CE (2019) Blaming the Victim*
*of Acquaintance Rape: Individual,*
*Situational, and Sociocultural Factors.*
*Front. Psychol. 9:2422.*
*doi: 10.3389/fpsyg.2018.02422*

## INTRODUCTION

> For anybody whose once normal everyday life was suddenly shattered by an act of sexual violence– the trauma, the terror, can shatter you long after one horrible attack. It lingers. You don't know where to go or who to turn to. . .and people are more suspicious of what you were wearing or what you were drinking, as if it's your fault, not the fault of the person who assaulted you. . .We still don't condemn sexual assault as loudly as we should. We make excuses, we look the other way. . .[Laws] won't be enough unless we change the culture that allows assault to happen in the first place.
>
> - President Barack Obama, September 2014

Sexual assault is a pressing and prevalent concern in our society with estimates that nearly 1 in 5 women in the United States will be sexually assaulted in her lifetime. Of those women who have been sexually assaulted, 41% have been assaulted by an acquaintance (Black et al., 2011). These numbers likely underestimate prevalence, as sexual assaults are one of the most under-reported crimes (Fisher et al., 2000, 2003; Rennison, 2002). In the unveiling of the "It's On Us" campaign to end sexual assault on college campuses, President

JA125

Barack Obama highlighted not only the trauma experienced by rape victims due to their assault, but also the secondary victimization many victims experience due to the negative reactions of those around them (see also Williams, 1984; Ulman, 1996). Of these negative reactions, perhaps the most harmful is the frequent tendency to blame the victim for their assault.

Unlike many other interpersonal crimes such as robberies or muggings, victims of sexual assault are particularly vulnerable to being blamed for their attack (Bieneck and Krahé, 2011; Gordon and Riger, 2011), and thus victim blaming in sexual assault cases has been the focus of many empirical investigations. However, despite the extensive amount of research performed on this topic, there is little consensus of when victim blaming will or will not occur in sexual assault cases (see Grubb and Harrower, 2008 and Grubb and Turner, 2012, for a review).

Adding to the confusion, existing reviews on victim blaming often combine the findings across various types of sexual assault (Langley et al., 1991; Pollard, 1992; Whatley, 1996; Grubb and Harrower, 2008; Grubb and Turner, 2012). For instance, Grubb and Harrower (2008) reviewed differences in victim blaming between stranger and acquaintance rape, but then combined these types of sexual assault when discussing the influence of gender and perceived similarity on victim blame. As different factors may matter for victim blaming, combining findings across sexual assault types may be problematic. The goal of this paper is to highlight what we know (and do not know) about victim blaming in acquaintance rape.

The opening statement by President Obama also highlights another important and often ignored element that contributes to the continued tendency to blame victims of sexual assault – the role of cultural structures, beliefs, and practices. Research on sexual assault and victim blame typically focuses on one of two perspectives. The first considers features of the observer as they influence victim blaming tendencies, which we refer to as *individual factors*. Often discussed as the "rape perception framework," the second perspective focuses on aspects of the victim, perpetrator, or characteristics of the assault as they influence victim blame (Pollard, 1992). We refer to these elements as *situational factors*. Neither of these perspectives, however, addresses a third critical factor affecting victim blame: societal and institutional factors. Institutional and societal level factors refer to broader cultural influences such as gender roles, media, and rhetoric surrounding sexual assault that contribute to an overall environment promoting victim blame. The current review will consider both individual-level and situational-level variables as they affect victim blaming in acquaintance rape cases but will also discuss the role of institutional and societal-level factors. Further, we consider how all three elements may influence one another (see **Figure 1**).

This paper is intended to provide a comprehensive review of the research literature on victim blaming in acquaintance rape and the conditions under which victim blaming is influenced by individual and situational factors. We begin by briefly defining what we mean by sexual assault, acquaintance rape, and victim blaming. We then review the research literature and propose a broader framework that includes attention to societal and institutional factors as important contributors to victim blame.

## SEXUAL ASSAULT

Current conceptions of rape and sexual assault typically include penetration, whether it be genital, oral, or anal, by part of the perpetrator's body or object through the use of force or without the victim's consent. While not discounting the victimization of men, sexual assault is a gendered crime, with women much more likely to be victimized then men (Brownmiller, 1975; Koss et al., 1987; Koss and Harvey, 1991; Hayes et al., 2013). Indeed, compared to one in five American women, one in 71 men will be assaulted in his lifetime (Black et al., 2011). Thus, while male victimization is indeed problematic, given the highly gendered nature of this crime, the current work focuses exclusively on female victims.

Researchers investigating the prevalence and consequences of sexual assault typically distinguish among three types of sexual assault: stranger rape, date/acquaintance rape, and marital rape. Stranger rape refers to a sexual assault in which the victim and assailant have no prior relationship or acquaintance with one another. When an individual has been sexually assaulted by someone she knows – for instance a friend, classmate, or someone she has gone on a few dates with – it is classified as an acquaintance or date rape (Calhoun et al., 1976; Check and Malamuth, 1983; Estrich, 1987; Johnson and Jackson, 1988; Quackenbush, 1989), but "date rape" is also used to describe assaults that occur in established relationships (Shultz et al., 2000). Finally, sexual assault that occurs within a marriage has been deemed a legal form of rape, with the first successful marital rape conviction occurring in the United States in 1979 (Pagelow, 1988). These distinctions may not provide as much clarity as desired. For example, assault by one's unmarried romantic partner may have more in common with marital rape than acquaintance rape; assault while on a first date may differ considerably from assault by a classmate to whom one has never spoken. The current review will focus on sexual assaults classified as acquaintance rape, and we will note distinctions between dating-related and non-dating related acquaintance rape where relevant. Gaining a greater understanding of victim blaming in acquaintance rape is particularly important given that the majority of rapes are perpetrated by someone known to the victim (Russell, 1984; Koss et al., 1988; Pfeiffer, 1990), and that acquaintance rape cases have a lower probability of conviction in the courts than those that fit with a stranger rape script (Estrich, 1987; Larcombe, 2002).

## BLAMING THE VICTIM

Blaming the victim refers to the tendency to hold victims of negative events responsible for those outcomes (Ryan, 1971; Eigenberg and Garland, 2008). While victim blaming can occur in a variety of situations, it appears to be particularly likely in cases of sexual assault (Bieneck and Krahé, 2011). Assailants do tend to be found as more culpable for sexual assault than victims (see Grubb and Harrower, 2008), but victims are blamed as well, to a degree that varies substantially depending on features of the assault, the victim, and the perceiver.

JA126

Gravelin et al.                                                                                                    Blaming the Victim



**FIGURE 1 |** Conceptual model of the levels in which victim blame in sexual assault has been examined. Arrows serve to remind readers that these levels interact with one another and are not mutually exclusive.

There is currently little consensus about the predictors of victim blaming (see Grubb and Harrower, 2008; Grubb and Turner, 2012). In fact, the sexual assault literature appears to offer only one clear conclusion: Victims of stranger rape are the least likely to be blamed for their assault; victims of marital rape are much more likely to be found culpable (Ewoldt et al., 2000; Monson et al., 2000). Direct comparisons between stranger rape and acquaintance rape typically find less blame in the former case (Amir, 1971; Calhoun et al., 1976; Donnerstein and Berkowitz, 1981; L'Armand and Pepitone, 1982; Janoff-Bulman et al., 1985; Tetreault and Barnett, 1987; Muehlenhard and Hollabaugh, 1988; Bridges and McGrail, 1989; Quackenbush, 1989; Pollard, 1992; Hammock and Richardson, 1997; Sinclair and Bourne, 1998; Krahé et al., 2007; Grubb and Harrower, 2008; Bieneck and Krahé, 2011; Droogendyk and Wright, 2014; McKimmie et al.,

2014; Ayala et al., 2015; Stuart et al., 2016, but see Persson et al., 2018). Further, acquaintance rape victims are blamed less than marital rape victims (Ferro et al., 2008). In short, as the victim and assailant become increasingly familiar and romantically involved, victim blame increases (Bridges, 1991; Simonson and Subich, 1999; Krahé et al., 2007; Bieneck and Krahé, 2011; Pederson and Strömwall, 2013, but see McCaul et al., 1990, and Klippenstine et al., 2007).

## MEASURING BLAME

The measurement of "blaming the victim" may seem straightforward, but it varies substantially in the literature. Researchers typically present participants with a scenario of a

JA127

sexual assault case, then some researchers assess *blame*, others assess perceived *responsibility*, others utilize a combination of both blame and responsibility, and still others assess related constructs. *Blame* is typically defined as a value judgment of the extent to which one should be held accountable for (and perhaps suffer from) a negative event (Bradbury and Fincham, 1990; Calhoun and Townsley, 1991; Stormo et al., 1997) and is typically measured using a rating scale (e.g., How much is the victim to blame for her assault?). *Responsibility*, defined as the extent to which victims' choices or actions contributed to their assault (Stormo et al., 1997), is typically assessed by asking participants to assign a percentage of responsibility to the involved parties. Thus, blame may be a harsher assessment than responsibility and perceivers may therefore be more comfortable in attributing responsibility than blame.

Some researchers have argued that blame and responsibility measures can be used interchangeably (Bradbury and Fincham, 1990; Calhoun and Townsley, 1991); others argue that they are distinct constructs and should be treated as such (Richardson and Campbell, 1980, 1982; Critchlow, 1985; Shaver and Drown, 1986; Richardson and Hammock, 1991). The data are inconsistent on these points. For example, Stormo et al. (1997) found their measures of responsibility and blame to be highly positively correlated (see also Krulewitz and Nash, 1979; McCaul et al., 1990), and the two measures were similarly responsive to variations of victim intoxication in sexual assault scenarios. In contrast, Richardson and Campbell (1982) found that victim *blaming* was unaffected by level of victim intoxication, but drunk victims were judged more *responsible* for assault than sober victims. Relatedly, in assessing how dating scripts influence victim culpability, Basow and Minieri (2011) found men were more likely to *blame* victims for their assault than women, while no differences emerged in their separate measure of victim *responsibility*. Of course, non-significant effects on either measure could be due to floor/ceiling effects, particularly given the high degree of correlation between the constructs (Krulewitz and Nash, 1979; McCaul et al., 1990; Stormo et al., 1997).

Victim blame has also been assessed using other related constructs, including assessments of "fault" (Jones and Aronson, 1973; Kahn et al., 1977; Ford et al., 1998) and the extent to which the victim is perceived to have "enjoyed" the experience (Simonson and Subich, 1999). Others claim that simply failing to label a rape as a rape is a form of victim blaming (Lonsway and Fitzgerald, 1994), although labeling is more commonly used as a manipulation check to ensure that participants perceive scenarios as assaults (see Maurer and Robinson, 2008). Other more general markers of victim blame that are not answered in response to a specific case include rape myth endorsement (the extent to which participants endorse "prejudicial, stereotyped, or false beliefs" about sexual assault, victims, and assailants, pp. 217; Burt, 1980) and the Attitudes Toward Rape Victims Scale (Ward, 1988). However, these assessments often reflect beliefs surrounding stranger rapes (e.g., "Rapes only occur in dark alleys;" Payne et al., 1999; Dupuis and Clay, 2013) and thus should not be used as a measure of victim blame in acquaintance or marital rape situations. We view rape myth endorsement as a

potential predictor of blame in acquaintance rape, but not as an appropriate measure of victim blame itself.

This review will consider the most common conceptualizations of victim blame (blame, responsibility, and fault) that are specific to a particular victim depicted in a scenario rather than rape myth acceptance, perceived enjoyment, or labeling of an event as rape (see **Table 1** for a comprehensive listing of measures used in the reviewed studies).

## METHODS

To identify the extant research literature, our search strategy included combinations of the keywords *rape* or *sexual assault* with *victim blame*, and limited to *date* or *acquaintance* rape in electronic databases including PsycINFO, and Proquest Dissertation and Theses published through December 2017 (inclusive). Additional articles were found by conducting forward and backward searches utilizing reference sections of retrieved articles and earlier reviews through Google Scholar. This approach yielded 137 articles, which were then assessed for fit according to our inclusion criteria. The review was restricted to studies of lay observers (e.g., studies of therapists' tendency to victim blame and personal accounts by victims and perpetrators were excluded). In addition, only studies of victim blame in cases involving a female victim and male assailant, most often depicted via a written or visual scenario, were included. The typical study exposed participants to a vignette/scenario/description of an acquaintance rape, then assessed victim blaming. Following these exclusions, 102 empirical studies on acquaintance rape that used at least one measure of victim blame, as defined above, were located. Our goal was to identify key factors that have been considered as predictors of victim blaming in these studies, to review what has been learned about each, and to highlight inconsistencies and gaps in the literature. These factors generally fall into two categories: features of the perceiver (individual level factors) and features of the acquaintance rape itself (situational factors). We offer a narrative rather than empirical review: Meta-analysis was not appropriate to our goals given the large number of disparate predictors we considered, the often small number of cases of each type, the myriad of moderators (often unique to particular subsets of studies) that point to nuanced patterns rather than main effects.

## RESULTS

## Individual Level Factors as Predictors of Victim Blaming

### Gender

Given the gendered nature of sexual assault, it is unsurprising that many studies have examined how participant gender may influence evaluations of blame in sexual assault (see Grubb and Harrower, 2008 for a review). There are two contradictory hypotheses one might have about how gender affects victim blaming. On the one hand, because rape is mainly a concern of women, they might be expected to blame less as a function

**TABLE 1 |** Measurement type used to assess victim blame and situational components featured in studies included in review.

| Study | Blame measure | Situational components |
|---|---|---|
| *Abrams et al. (2003) study 1 | Blame and fault | F, R |
| *Abrams et al. (2003) study 2 | Blame and fault | F, R |
| *Abrams et al. (2003) study 3 | Blame and fault | F, R |
| *Ayala et al. (2015) | Blame and responsibility | F, R |
| *Bell et al. (1994) | Blame and responsibility | Assailant occupation |
| Ben-David and Schneider (2005) | Responsibility | F, R |
| Bieneck and Krahé (2011) | Blame | A, F, R |
| *Black and Gold (2008) | Responsibility | F, R, assailant occupation |
| Blumberg and Lester (1991) | Blame | F, R |
| *Bongiorno et al. (2016) | Blame | F, R, RA |
| Branscombe et al. (1996), study 1 | Blame | F, R |
| Branscombe et al. (1996), study 2 | Blame | F, R |
| *Calhoun et al. (1976) | Fault | SH |
| Cameron and Stritzke (2003) | Blame and responsibility | A, R |
| *Casarella-Espinoza (2015) | Blame and responsibility | A, RA |
| *Cassidy and Hurrell (1995) | Responsibility | AP, R |
| *Coller and Resick (1987) | Blame and responsibility | A, R |
| *D'Cruz and Kanekar (1992) | Fault | Victim willingness to go to police |
| Droogendyk and Wright (2014) | Blame and responsibility | AB |
| Dupuis and Clay (2013) | Responsibility | SH, F, R, RA |
| *Ferrão et al. (2016) | Responsibility | AP, F, R |
| *Frese et al. (2004) | Responsibility | A, AP, F |
| *Ford et al. (1998) | Blame and responsibility | A, SH, F, R |
| George and Martinez (2002) | Blame and responsibility | F, R |
| Gerdes et al. (1988) | Blame | AP, F, R |
| *Gilmartin-Zena (1983) | Responsibility | SH, R |
| Girard and Senn (2008) study 1 | Blame | A, D |
| Girard and Senn (2008) study 2 | Blame | A, D |
| *Gravelin et al. (2017) study 2 | Blame | A |
| Hammock and Richardson (1997) | Responsibility | A, F, R |
| *Hammond et al. (2011) | Responsibility | SH, F, R |
| *Harbottle (2015) | Responsibility | SH, F, R |
| *Howells et al. (1984) | Blame | SH |
| *Idsis and Edoute (2017) | Responsibility | A, SH, F, R |
| *Janoff-Bulman et al. (1985) study 2 | Blame | A |
| Johnson (1994) | Responsibility | SH |
| *Johnson (1995) | Blame | SH |
| Johnson and Jackson (1988) | Responsibility | F, R |
| *Johnson et al. (1995) study 2 | Responsibility | F, R |
| Johnson et al. (1989) | Responsibility | F, R |
| *Johnson et al. (2016) | Responsibility | A, F, R, SH |
| Kanekar and Nazareth (1988) | Fault | SH, physical harm and emotional disturbance after the assault |

*(Continued)*

**TABLE 1 |** Continued

| Study | Blame measure | Situational components |
|---|---|---|
| *Kanekar and Seksaria (1993) | Fault | SH, F, R |
| Kanekar et al. (1991) study 1 | Fault | Assailant and victim occupation, victim's willingness to go to police |
| Kanekar et al. (1991) study 3 | Fault | Victim's marital status |
| Kanekar et al. (1991) study 5 | Fault | F, R |
| Kerr and Kurtz (1977) | Blame | SH, F, R |
| Klippenstine et al. (2007) | Blame and responsibility | A, F, R, SH |
| Kopper (1996) | Blame and responsibility | F, R |
| Krahé et al. (2007) study 1 | Blame | F, R |
| Krahé et al. (2007) study 2 | Blame | A, F, R |
| *Lambert and Raichle (2000) study 1 | Blame and responsibility | A, R |
| *Lambert and Raichle (2000) study 2 | Blame and responsibility | A, R |
| Landström et al. (2016) | Blame, fault, and responsibility | A, F, R |
| Masser et al. (2010) | Blame and fault | F, R |
| *Maurer and Robinson (2008) | Responsibility | F, R |
| *McCaul et al. (1990) study 1 | Blame | F |
| *McCaul et al. (1990) study 2 | Blame and responsibility | F |
| McKimmie et al., 2014 | Blame | F, R |
| Miller et al. (2012) | Blame and responsibility | A, AP |
| Muehlenhard and MacNaughton (1988) | Responsibility | AP, SH, F, R |
| *Munsch and Willer (2012) | Responsibility | A, R |
| Nario-Redmond and Branscombe (1996), study 1 | Blame | F, R |
| Nario-Redmond and Branscombe (1996), study 2 | Blame | F, R |
| Ong and Ward (1999) | Fault | F, R |
| Pederson and Strömwall (2013) | Blame | F, R |
| *Persson et al. (2018) | Blame | F, R |
| Pugh (1983) | Blame | A, AP, SH, F, R |
| Qi et al. (2016) | Fault | A, D, F, R |
| Richardson and Campbell (1982) | Blame and responsibility | A, R |
| Root (1993) | Blame | AB |
| *Romero-Sánchez et al. (2012) Study 1 | Blame | A, F, R |
| *Romero-Sánchez et al. (2012) Study 2 | Blame | A, F, R, victim sexual attraction |

*(Continued)*

JA129

Gravelin et al.                                                                                                                    Blaming the Victim

**TABLE 1** | Continued

| Study | Blame measure | Situational components |
|---|---|---|
| Schuller et al. (2010) | Blame | F, R, Victim emotionality, gender stereotypicality |
| *Schuller and Wall (1998) | Blame and responsibility | A, F, R |
| Sconce and Corcoran (1995) | Responsibility | A, F, R, attempted or completed rape |
| *Shotland and Goodstein (1983) | Blame and responsibility | AP, F, R |
| *Simonson and Subich (1999) | Responsibility | F, R |
| *Sims et al. (2007) | Responsibility | A, R |
| Sommer et al. (2016) | Blame and responsibility | F, R, SH |
| *Smith et al. (1976) | Responsibility | SH, F, R |
| *Spencer (2016) | Blame | F, R, victim occupation |
| *Stahl et al. (2010) study 1 | Blame | A, AP, F, R |
| *Stahl et al. (2010) study 2 | Blame | A, AP, F, R |
| Starfelt et al. (2015) | Blame | A, F, R |
| Stormo et al. (1997) | Blame and responsibility | A, F, R |
| Strömwall et al. (2013) | Blame | F, R |
| *Stuart et al. (2016) | Blame and fault | F, R, victim emotionality |
| *Tetreault and Barnett (1987) | Responsibility | F, R |
| Van Den Bos and Maas (2009) study 1 | Blame | AB |
| Varelas and Foley (1998) | Responsibility | F, R, RA |
| Viki and Abrams (2002) | Blame | SH |
| *Wall and Schuller (2002) | Blame and responsibility | A, F, R |
| *Whatley and Riggio (1992) | Responsibility | A, AP |
| *Wiener and Vodanovich (1986) | Responsibility | F, R, assailant criminal history |
| Willis (1992) | Responsibility | RA |
| *Wooten (1980) | Responsibility | R |
| *Workman and Orr (1996) | Responsibility | AP, F, R |
| Wyer et al. (1985) | Responsibility | F, R |
| *Yamawaki (2007) | Blame | F, R |
| *Yamawaki and Tschanz (2005) | Blame | F, R |
| *Yamawaki et al. (2007) | Blame | F, R, assailant occupation |

*\* = full scenarios obtained. Blame is typically measured as how much the victim is to blame for her assault (rated on a scale with endpoints such as "not at all" to "to a great extent/completely;" responsibility is typically measured as a percentage of responsibility assigned to the involved parties; fault is typically measured as how much the victim is at fault for what happened rated on a scale with endpoints such as "not at all" to "very much/extremely). Abbreviations used to depict which of the following components were present and/or manipulated in scenario(s) for each study; A, Alcohol; D, Drugs; AP, Appearance; SH, Sexual history/actions; F, Force; R, Resistance; RA, victim and/or assailant race/ethnicity; AB, Scenario details absent.*

of ingroup solidarity. On the other hand, "just world" ideology (Lerner, 1970, 1980; Hafer, 2000) might suggest that might blame more: Precisely because of the greater threat that sexual assault poses to women, victim blaming may help women distance themselves from the reality that they could be victimized themselves.

Many studies have found that women are less likely to blame victims of acquaintance rape than men (Basow and Minieri, 2011, although gender differences only emerged in their assessment of victim *blame*, and not in their separate measure of victim *responsibility*; Calhoun et al., 1976; Selby et al., 1977; Gerdes et al., 1988; Johnson and Jackson, 1988; Kanekar and Nazareth, 1988; Johnson et al., 1989; Bell et al., 1994; Schuller and Wall, 1998; Varelas and Foley, 1998; Lambert and Raichle, 2000; Geiger et al., 2004; Klippenstine et al., 2007; Krahé et al., 2007; Yamawaki et al., 2007; Black and Gold, 2008; Hammond et al., 2011; Casarella-Espinoza, 2015; Ferrão et al., 2016). A number of studies, however, have produced null effects of gender on victim blaming (Gilmartin-Zena, 1983; Howells et al., 1984; Krahé, 1988; McCaul et al., 1990; Kanekar et al., 1991; Kanekar and Seksaria, 1993; Branscombe et al., 1996; Nario-Redmond and Branscombe, 1996; Hammock and Richardson, 1997; Abrams et al., 2003; Frese et al., 2004; Girard and Senn, 2008; Bieneck and Krahé, 2011; Romero-Sánchez et al., 2012; Loughnan et al., 2013; Pederson and Strömwall, 2013; Bongiorno et al., 2016; Landström et al., 2016; Qi et al., 2016; Persson et al., 2018; although these studies assessed victim culpability for being "sexually touched" at a bar and thus it is unclear if a rape has occured; Sconce and Corcoran, 1995; Stormo et al., 1997; Sims et al., 2007; Strömwall et al., 2013). No studies have found that women engaged in greater victim blaming than men. Thus, the just world prediction currently does not receive support.

A meta-analysis conducted by Whatley (1996) on victim blaming failed to find significant moderation of blame by participant gender. It is problematic to draw any conclusions from this meta-analysis, however, as it combined studies of acquaintance rape with stranger rape. Meta-analyses on rape myth endorsement do indicate men are more accepting of rape myths than women (Anderson et al., 1997; Suarez and Gadalla, 2010). However, as previously noted, rape myths are a problematic marker of victim blaming in acquaintance rape since rape myths more closely reflect stranger rape situations.

We suspect that the inconsistent findings regarding the role of participant gender on blame are likely due to varying components of the scenarios used in victim blaming studies. For instance, Bell et al. (1994) failed to find gender differences, but the scenarios used were brief and vague (only two sentences long). Hammond et al. (2011) exposed participants to a lengthy scenario, several paragraphs long and rich in detail including background information about both the victim and assailant and information about behavior prior to the assault (heavy drinking and flirting). In this study, women were found to blame the victim significantly less than men.

## Race/Ethnicity/Nationality

Very little research has examined the effect of participant race or ethnicity on victim blaming in acquaintance (or stranger)

JA130

rape. Of those studies that have done so, the findings are inconsistent. Bell et al. (1994) study of undergraduates' reactions to a "typical" date rape scenario (victim assaulted after a date), found no effect of participant race (African American, Asian, and Caucasian participants) on victim blaming. Casarella-Espinoza (2015), however, found greater victim blaming among Hispanic participants compared to their Caucasian counterparts. While both of these studies examined blame within a scenario that was likely interpreted as involving a White victim and White assailant, Varelas and Foley (1998) examined how participant race might interact with race of perpetrator or victim. White and Black participants were randomly assigned to read an acquaintance rape scenario that depicted a Black or White female victim and a Black or White male assailant. In general, White participants were less likely to blame victims than Black participants. This main effect, however, was qualified by a significant three-way interaction with victim and assailant race: White participants blamed victims the least when the victim was White and the assailant was Black, while Black participants blamed victims the most when the victim was Black and the assailant was White.

The discrepancies between these two studies could be due to the differing scenarios used (assault after a date versus assault after accepting a ride home from a customer), or to the differing ways in which blame was evaluated (blame versus responsibility), or to the important moderating feature of assailant and victim ethnicity. In any case, related literature provides some support for the argument that, at least in the United States, minority group members may blame sexual assault victims more than ethnic majority members (Caucasians; cf. Feild, 1978; see also Lonsway and Fitzgerald, 1994). Several studies assessing general attitudes toward rape victims and endorsement of rape myths have found less favorable reactions and greater endorsement of rape myths among African-American samples (Williams and Holmes, 1981; Giacopassi and Dull, 1986; Dull and Giacopassi, 1987), Asian-American samples (Mori et al., 1995), and Hispanic-American samples (Fischer, 1987; Jimenez, 2002; Jimenez and Abreu, 2003) in comparison to their Caucasian counterparts (see Suarez and Gadalla, 2010, for a review). Future research should continue to explore the effect of participant race and ethnicity on victim blaming in acquaintance rape cases, especially in combination with race/ethnicity of victim and assailant.

Relatively few studies have compared participants from differing racial/ethnic groups outside of a North American context. Exceptions include Pederson and Strömwall (2013), who compared British and Swedish non-student participants' victim blaming in an acquaintance rape scenario and found no differences. Yamawaki and Tschanz (2005) compared Japanese and American undergraduate students and found higher victim blaming by Japanese than American students (this was true for stranger, acquaintance, and marital rape depictions). In an Australian sample, Bongiorno et al. (2016) found that a non-resisting victim was seen as more blameworthy when her perpetrator was characterized as being culturally similar (Western) to the participant, but cultural similarity had no effect when the victim physically resisted the assault.

## Rape Myth Endorsement (RME)

As previously stated, some researchers have used RME as an indicator of victim blame. This is problematic because rape myth scales focus on stranger rape and assesses beliefs about rape at a general rather than specific level. Nonetheless, RME may matter for assessing blame in particular acquaintance rape cases. Those high in RME tend to believe that only stranger rape is "real rape." Given that acquaintance rapes deviate from stranger rape both in recognition as rape as well as perceived severity (e.g., L'Armand and Pepitone, 1982; Tetreault and Barnett, 1987; Gerdes et al., 1988; Bridges, 1991), endorsement of rape myths may predict even greater victim blaming in acquaintance rape as these do not fit typical conceptualizations of a "real" rape.

Research clearly supports a positive relationship between endorsement of rape myths and victim blaming in acquaintance rape cases (Lonsway and Fitzgerald, 1994; Stormo et al., 1997; Schuller and Wall, 1998; Varelas and Foley, 1998; Frese et al., 2004; Hayes-Smith and Levett, 2010; Masser et al., 2010; Basow and Minieri, 2011; Hammond et al., 2011; Romero-Sánchez et al., 2012; McKimmie et al., 2014; Starfelt et al., 2015; Qi et al., 2016; Persson et al., 2018). Additionally, the relationship between rape myth endorsement and greater victim blame tends to be strongest among men (Lonsway and Fitzgerald, 1994; Hayes-Smith and Levett, 2010; Hammond et al., 2011). Using a related construct, the Perceived Causes of Rape scale (Cowan and Quinton, 1997), Krahé et al. (2007) found that some subscales of this instrument showed the strongest positive associations with victim blaming: beliefs that rape is due to female teasing and to male pathology, and that men lack control over their sexual urges.

## Gender Role Attitudes and Identity

Rape Myth Endorsement is significantly correlated with restrictive beliefs about women's roles and rights (see Suarez and Gadalla, 2010). Studies of victim blame in acquaintance rape have also documented a positive relationship between blame and endorsement of traditional gender roles (Howells et al., 1984; Stormo et al., 1997; Simonson and Subich, 1999; Yamawaki and Tschanz, 2005; Sims et al., 2007, but see Hammond et al., 2011). In fact, Simonson and Subich (1999) found that after controlling for gender role endorsement, their finding that men blamed the victim more than women was eliminated; gender role attitudes may be a stronger predictor of blame than participant gender. In one study that manipulated the gender traditionality of the date that preceded an acquaintance rape, victim responsibility and perceived justifiability of the assault were highest in the traditional case (when the man exclusively paid for an expensive date) compared to other scenarios (shared payment, inexpensive date; Basow and Minieri, 2011).

Others have examined the effects of hostile and benevolent sexism (Glick and Fiske, 2001) on victim blame. Several researchers have documented a positive relationship between benevolent sexism and victim blame (Abrams et al., 2003; Masser et al., 2010, although this effect was only present among victims perceived to violate victim and gender stereotypes; Viki and Abrams, 2002; Yamawaki et al., 2007; Pederson and Strömwall, 2013; Persson et al., 2018). The relationship between hostile sexism and victim blaming, however, is more complex. For

JA131

instance, Pederson and Strömwall (2013) found no relationship, while others have found hostile sexism (Masser et al., 2010; Persson et al., 2018) to predict greater victim blame (Yamawaki et al., 2007; Masser et al., 2010; Persson et al., 2018).

Both benevolent and hostile sexism reflect concerns about maintaining an unequal power differential between men and women: Benevolently sexist attitudes suggest women are lower in status and in need of men's protection, and hostile sexist attitudes suggest that women are trying to usurp men's greater power. Feminist perspectives point to power as a motivation for committing sexual assault (Brownmiller, 1975; Burt, 1980; Lonsway and Fitzgerald, 1994; Ward, 1995) and the effects of these attitudes on victim blame may be construed as legitimizing the current power hierarchy and maintaining gender differentiation. Indeed, research on "precarious manhood" demonstrates that masculinity, unlike femininity, is tenuous and requires continual social validation and defense (Vandello et al., 2008; Vandello and Bosson, 2013). The importance of power dynamics for victim blaming points to the need to consider the societal power structure. For example, victim blaming may increase in settings in which men perceive power threats by women (e.g., in patriarchal versus egalitarian settings).

Gender identification and threats to masculinity/femininity have also been shown to influence victim blaming. In one study, for example, participants received bogus feedback on a "gender identity survey" which either confirmed or threatened their gender identity and then were asked to evaluate a case of acquaintance rape (Munsch and Willer, 2012). Men whose masculinity was threatened blamed the victim more than those whose masculinity was confirmed. Conversely, women whose femininity was threatened blamed the victim less than non-threatened women. Thus, threats to one's gender identity may heighten the dominant response among men and women resulting in greater blame among men and lesser blame among women, especially among men who derive a large component of their self-concept from their masculinity.

### Political Attitudes

People who endorse more politically conservative views are also more likely to blame victims of sexual assault (see Anderson et al., 1997 for a review). For example, Lambert and Raichle (2000) found this relationship using three distinct measures of conservatism [self-rating of conservatism, social dominance orientation (Sidanius et al., 1996) and Protestant work ethic beliefs (Katz and Hass, 1988)]. Across all three measures, the more politically conservative the participants were, the more they blamed the victim.

### Belief in a Just World (BJW)

It is commonly thought that individuals blame victims in order to restore their belief that "good things happen to good people, and bad things happen to bad people" (Lerner, 1970, 1980; Hafer, 2000). The theory of BJW describes victim blaming as a bias that enables people to maintain their beliefs in a predictable and stable environment (Lerner, 1970, 1980; Rubin and Peplau, 1973; Lerner and Miller, 1978) and therefore victim blame should increase to the extent that situations threaten BJW (Hafer, 2000).

But there is little empirical support for the association between just world beliefs and victim blaming in acquaintance rape cases (see Lambert and Raichle, 2000; Hammond et al., 2011; Pederson and Strömwall, 2013; Strömwall et al., 2013; for an exception, see Landström et al., 2016). One study did find that endorsement of BJW predicted blame for victims of sexual assault, but this was only the case among participants placed in a rationalistic mindset (defined as deliberate and effortful processing; Van Den Bos and Maas, 2009). This finding points to a potential reason behind the relative lack of effects of BJW beliefs on victim blaming: Researchers who stress that participants respond with their first, "gut-level," reaction may be bypassing more effortful thought which allows the effect of BJW to influence victim evaluations. It is also possible that BJW more strongly impacts assessments of stranger rape, with high BJW endorsers more likely to blame the victim (Kleinke and Meyer, 1990; Strömwall et al., 2013). In their assessment of belief in a just world on victim assessment across varying relationship types, Strömwall et al. (2013) found BJW to be meaningfully related only to assessments of stranger rape. Specifically, women high in belief in a just world were significantly more likely to blame the victim than women low in belief in a just world, while BJW had no impact on male evaluations of victims.

### Perceived Similarity and Prior Victimization

The degree to which individuals identify with a victim, either at a superficial level such as similar occupation or attitudes, or at a personal level due to their own experience with victimization, may play a role in evaluations of victim culpability. Perceived similarity to a victim may increase empathy for her experience, resulting in lesser blame (Krebs, 1975). However, it is also possible that greater feelings of similarity, particularly among female observers, heighten feelings of personal threat and distancing through victim blaming. Unfortunately, we found only three studies which assess the role of similarity on victim blaming in acquaintance rape; their findings are inconsistent. Johnson (1995) found no effect of similarity (measured as the extent to which participants felt the victim was "like them") on victim blaming, while Bell et al. (1994) and Harbottle (2015) found that the more similar participants felt to the victim (measured with "how similar do you feel to the woman in this scenario?"), the less they blamed her. In studies of stranger rape, there is also no clear indication of the role that similarity plays on victim evaluation (see Fulero and DeLara, 1976; Kahn et al., 1977; Thornton, 1984).

Participants' prior sexual victimization may also serve as an important contributor to perceived similarity to victims. There is little evidence that prior victimization influences victim blame in acquaintance rape (Coller and Resick, 1987; Bieneck and Krahé, 2011; Harbottle, 2015; Gravelin et al., 2017). Unfortunately, the one study located which did mention a difference in blame assessments between victims and non-victims failed to disclose *how* they differed (Johnson, 1995).

## Summary of the Effects of Individual Factors on Victim Blame

Myriad individual factors have been examined in studies of victim blame in acquaintance rape, but only a few of these factors have

JA132

produced consistent findings. Developing a demographic profile of what "type" of participant is most likely to blame victims is limited by a lack of research examining racial/ethnic and national differences, and a focus on college-aged students in Western settings. It does seem to be the case that men endorse rape myths more than women (Lonsway and Fitzgerald, 1994; Hayes-Smith and Levett, 2010; Suarez and Gadalla, 2010; Hammond et al., 2011), but the effect of gender on blame in specific cases of acquaintance rape is less clear-cut.

Furthermore, any effects of participant gender may be due more to endorsement of gender roles and identification with one's gender identity than participant gender itself. Those who endorse traditional gender roles tend to blame victims more, and controlling for gender role endorsement may eliminate effects of gender (Simonson and Subich, 1999). Further, threats to one's masculinity/femininity appear to heighten the prototypical gendered response to victim blaming; men blame victims more and women blame victims less when their gender identity is threatened. Also interacting with gender is RME: Men generally endorse rape myths more than women, and individuals who endorse rape myths engage in more victim blaming. Similarly, men tend to be more politically conservative than women (Pratto et al., 1997; Eagly et al., 2004), and political conservatism predicts victim blaming (Anderson et al., 1997, though only one study has examined this relationship in acquaintance rape scenarios; Lambert and Raichle, 2000).

Some findings also hint at the role of social power in evaluations of victim blame. Both benevolent sexism and the power relations subcomponent of the hostile sexism scale are concerned with maintaining an unequal power differential between men and women. Endorsement of these attitudes predicts greater victim blaming (Viki and Abrams, 2002; Abrams et al., 2003; Yamawaki et al., 2007; Pederson and Strömwall, 2013). Though not described above, one set of studies in which participants' feelings of power and powerlessness were manipulated suggest that powerless men blame victims less than men in a control condition and powerful women tend to blame the victim more than those in a control condition (Gravelin et al., 2017). These findings suggest a need to further consider patriarchal power differentials, a topic we discuss later in the paper.

Despite its direct relevance to issues of victim blame, few studies have examined the association between BJW and victim blaming, and little supportive evidence has been found. Relatedly, examinations of the effects of perceived similarity to the victim have found some, though limited evidence that those who feel more similar to the victim blame her less for her assault (Bell et al., 1994; Harbottle, 2015). No research establishes a link between prior victimization and subsequent blame of a victim in an acquaintance rape scenario.

As discussed when we reviewed each factor, some of the inconsistencies in the literature may be due to the large variety of scenarios that have been used in the victim blaming literature. Much about victim blaming may have to do with the specifics of the scenario itself, as we know, for example, from the finding that blame is greater in acquaintance rape than stranger rape cases overall. And rather than main effects of demographic

and attitudinal factors, these factors may differentially matter depending on the specifics of the scenarios or cases participants are asked to consider. In the section that follows we will detail the different aspects of acquaintance rape vignettes that have been implemented or manipulated in the set of studies under review and will highlight instances in which these situational factors interact with individual factors to influence victim blame.

## Situation Level Factors as Predictors of Victim Blaming

Studies of victim blaming in acquaintance rape cases typically assess participant responses to a provided vignette. These vignettes typically consist of a third-person written account of a sexual assault (but see Janoff-Bulman et al., 1985; Tetreault and Barnett, 1987; Willis, 1992; Dupuis and Clay, 2013), in which various components of the case, the victim, and/or the assailant are manipulated. Below we review the most common elements included and/or manipulated in acquaintance rape scenarios and corresponding findings for these elements. However, of the 102 studies evaluated, only 50 included the full scenarios in their published accounts. After attempting to contact all of the authors with missing vignettes, we were able to obtain the full scenarios of an additional 2 studies, resulting in a total of 52 full scenarios for evaluation. The remaining studies were coded and evaluated based on the available information described by the authors (see **Table 1** for a comprehensive list of components found within scenarios).

### Presence of Drugs/Alcohol

Drugs and alcohol are common elements of acquaintance rape cases, particularly those that occur on college campuses (Abbey et al., 1996; Benson et al., 2007; Kilpatrick et al., 2007; Krebs et al., 2009). Much research has established a link between alcohol consumption and sexually aggressive behavior (Muehlenhard and Linton, 1987; Koss and Gaines, 1993; Ullman et al., 1999; Locke and Mahalik, 2005). As seen in **Table 1**, 34 of the 102 acquaintance rape vignettes in the identified literature mention alcohol. This does not include not the widely used Abrams et al. (2003) scenario, which does not explicitly mention alcohol but implies it by describing the victim as flirting and dancing all night at a party, then inviting the perpetrator home for coffee. Only sixteen of these studies experimentally manipulated the presence/absence of alcohol or varying degrees of intoxication; the remaining vignettes simply indicated alcohol use as a stable characteristic in the scenario.

Eleven of the sixteen studies that manipulated intoxication level found that intoxicated victims were blamed more for an acquaintance rape than sober victims (Richardson and Campbell, 1982; Stormo et al., 1997; Wall and Schuller, 2002; Cameron and Stritzke, 2003; Krahé et al., 2007; Sims et al., 2007; Bieneck and Krahé, 2011; Romero-Sánchez et al., 2012; Landström et al., 2016; Qi et al., 2016), and another found a linear increase in victim blame with level of victim intoxication (Stormo et al., 1997). The opposite effect of intoxication emerged for evaluations of the perpetrator: the more drunk the perpetrator, the more participants excused his behavior (see also Richardson and Campbell, 1982; Cameron and Stritzke, 2003; Johnson et al., 2016;

Qi et al., 2016). Using adapted versions of the Stormo et al. (1997) vignettes, Girard and Senn (2008) found that only when the victim was depicted as having received drinks that were stronger than those of her date without her knowledge was she seen as less responsible. Research by Scronce and Corcoran (1995) suggests that women may be more critical of intoxicated victims; female participants found victims of completed or attempted stranger or acquaintance rape as more responsible for their assault if they had been drinking. Examining the combined effects of assailant and victim intoxication further complicates assessments of culpability; research by Klippenstine et al. (2007) found the typical gender effect on victim blame was nullified when both parties were depicted as intoxicated. Further, women blamed victims more than men when the victim was depicted as sober and the assailant as intoxicated.

These studies indicate both that alcohol use is a common feature of acquaintance rape scenarios used in research and that it matters for victim blaming. We suspect that many of the studies for which we could not identify precise scenario content also included alcohol use, a reflection of the common image of acquaintance rape. A more comprehensive understanding of alcohol's role will require that researchers provide complete details about their case scenarios and that this feature be systematically manipulated.

In addition to alcohol use, there is increased societal concern about the use of "date rape drugs" in sexual assaults. Despite this concern, only one study has investigated the effect of date rape drugs on victim blame in acquaintance rape (Girard and Senn, 2008), and these researchers found that the voluntariness of drug use was crucial: Only when the victim voluntarily consumed gamma-hydroxybutric acid (GHB), an intoxicating sedative, prior to an assault was she seen as more blameworthy than a sober victim. Interestingly, a victim who was slipped GHB unknowingly was *not* seen as less blameworthy than a sober victim assaulted by a sober perpetrator. Marijuana use was examined in one study, with results mirroring the common trend found with alcohol consumption. Victims intoxicated by marijuana or alcohol are perceived as more blameworthy for their assault, while perpetrators intoxicated by the same substances are perceived as less blameworthy (Qi et al., 2016).

## Appearance and Sexual History

Factors related to a victim's appearance (physical attractiveness, style of dress) and sexual history (sexual orientation, previous sexual partners) are often described or manipulated in research using acquaintance rape scenarios, though less so than in studies of stranger rape. As can be seen in **Table 1**, 32 studies included some mention of victim attractiveness, appearance, or sexual history, and 15 of these studies manipulated some component of this information. Understanding how these elements may influence victim blaming tendencies is important given their ties to many rape myths (e.g., "It is usually only women that are dressed suggestively that are raped," "A lot of women lead men on and then cry rape"; Payne et al., 1999).

A common misconception is that the act of rape is based on sexual desire and therefore attractive victims "ask for it" by being desirable. In domains outside of sexual assault, however,

researchers often find that attractive individuals are seen as more responsible for good outcomes than for bad, while unattractive individuals are seen as more responsible for bad outcomes (Dion et al., 1972; Seligman et al., 1974; Stephan and Tully, 1977). Using a manipulation of victim attractiveness through accompanying photographs, two studies on acquaintance rape supported this pattern (Gerdes et al., 1988; Ferrão et al., 2016), though Gerdes et al. (1988) found no effect of assailant attractiveness. However, in both of these studies, the scenarios used were markedly different from the traditional account of an acquaintance rape: in one, the victim was accosted in a dark stairwell (Gerdes et al., 1988) and in the other, the victim was a married mother of two children (Ferrão et al., 2016). These features make it difficult to draw definitive conclusions about the effect of victim attractiveness on victim blame. While it is unclear whether the assault was a stranger or acquaintance rape, research conducted by Kanekar and Nazareth (1988) also failed to find a main effect of victim attractiveness on attribution of victim fault for their assault. Attractiveness was found to produce more blame only among female participants when the victim was also described as physically unharmed from the assault and not emotionally disturbed as a result of the assault. Further, female participants also judged unattractive victims as more blameworthy compared to their male counterparts when the victim was also described as unharmed and emotionally disturbed from the assault.

A more frequently studied aspect of appearance is the clothing "revealingness" or provocativeness of the victim. A scenario used by Muehlenhard and MacNaughton (1988); see also Workman and Orr (1996) described the victim as either dressing and acting provocatively (low-cut blouse, mini skirt, heels, kissing the assailant) or conservatively (high necked blouse, pleated woolen skirt, keeping a distance). Perhaps unsurprisingly, the more revealing or suggestively dressed the victim, the more the victim was blamed for her assault (Gilmartin-Zena, 1983; Cassidy and Hurrell, 1995, although these results are confounded as the conservatively dressed victim was attacked by a stranger; Muehlenhard and MacNaughton, 1988; Kanekar and Seksaria, 1993; Workman and Orr, 1996; Loughnan et al., 2013). Similarly, a victim described as wearing a body-hugging dress and high heels, compared to a more conservatively dressed victim, was viewed as having "led the perpetrator on," leading to less perpetrator blame (but no effect on victim responsibility; Johnson et al., 2016). Using similar scenarios, Whatley and Riggio (1992) found a significant interaction between clothing style and participant gender: Men, but not women, attributed less responsibility to a conservatively dressed victim than a provocatively dressed victim.

Two other studies found null effects of provocativeness on victim blame, but the scenarios and measures used in these studies were quite different from those described above. Smith et al. (1976) manipulated provocativeness via the victim's occupation (she was either a topless/bottomless dancer, social worker, or nun) and the scenario itself was prototypical of a stranger rape: the assault occurred while the victim was walking alone at night and a knife was used. Johnson (1995) also used an occupational manipulation of victim provocativeness, but asked only if the victim was *more* responsible than the perpetrator. This

JA134

measure of victim blame is problematic given that participants generally indicate greater blame to the perpetrator than the victim (see Pollard, 1992; Grubb and Harrower, 2008; Landström et al., 2016).

The sexual history and experience of victims have also been considered as important contributors to victim blame (Whatley, 1996). This information is often manipulated via scenario descriptions of previous relationships or relationship status. Pugh (1983) manipulated the victim's past sexual history via the victim's testimony that she had or had not met other men in a bar and had sex with some of them prior to her alleged assault. When the victim was portrayed as more sexually promiscuous, she was blamed more for her assault (see also Kanekar and Seksaria, 1993; Idsis and Edoute, 2017). A "married mother of three" who went to a party and met a man who subsequently raped her (compared to a woman about whom no relationship information given), was found more to blame for her assault (Viki and Abrams, 2002). However, this manipulation may have less to do with sexual experience than with the perceived immorality of a married mother being at a party and flirting with a strange man.

Howells et al. (1984) found no differences in victim blame across their two levels of victim relationship status (single or engaged). However, in this scenario the victim was a family's regular babysitter who was assaulted by her employer as he gave her a ride home. Participants' schemas for babysitters as relatively young may have reduced overall victim blame in this case, as she was accosted by an older man in a position of power, which may have over-ridden any influence of relationship status on victim blaming tendencies.

Finally, only one study has manipulated the extent to which the victim's sexual orientation influenced victim blaming (Ford et al., 1998). In this research a heterosexual female victim was found to be more at fault than a lesbian victim when assaulted by a male. This finding may speak to the "rape as sexual desire" myth mentioned previously, in that a heterosexual female may be seen as sexually enticing to the heterosexual male assailant (more likely to have "asked for it") and therefore seen as more blameworthy than the lesbian victim.

## Force and Resistance

The legal definition of rape includes mention of force, and thus, it is unsurprising that a majority of studies on acquaintance rape often include mention of force and/or victim resistance (80 of 102, see **Table 1**). For example, Shotland and Goodstein (1983) manipulated the amount of force the perpetrator used (verbal, or verbal and physical), the degree of victim resistance (verbal, or verbal and physical), and the onset timing of the victim's resistance (immediately after a French kiss, after he begins to caress her below the waist, or after they are undressed). The type of resistance by the victim did not influence perceptions of victim blame (see also Sims et al., 2007), but perpetrator force in combination with onset of protest mattered. When low force was used, the victim was blamed regardless of when she began to protest. When the assailant was depicted as using both verbal and physical force, the victim was only blamed when she delayed protest until the point of undress. Similarly, Idsis and Edoute (2017) found victims were judged

less responsible when they physically, rather than verbally, resisted, and when their resistance was depicted as strong, rather than weak. Other research indicates that victims are blamed less when the perpetrator uses physical force (e.g., see Bieneck and Krahé, 2011, although this study combined results across stranger, acquaintance, and ex-partner assaults). Victim resistance also appears to decrease victim blaming (Gilmartin-Zena, 1983; Black and Gold, 2008; Bongiorno et al., 2016, although these results are confounded as the more resistant victim was attacked by a stranger compared to a non-resisting acquaintance rape; dressed victim was attacked by a stranger; Kanekar and Seksaria, 1993; Masser et al., 2010, although this effect only occurred among those high in benevolent sexism that read about a victim who left her children unattended at home; McKimmie et al., 2014), especially when resistance occurs earlier in the encounter (Kopper, 1996). Perpetrator use of physical force also results in less victim blame in a case in which the victim is unable to resist due to intoxication (Krahé et al., 2007). While lacking an assessment of victim culpability, Branscombe and Weir (1992) found that *assailant* blame was highest when the victim strongly resisted physically (kicking him in the shin and fighting during the entire encounter compared to simply attempting to stand up). Degree of verbal resistance of the victim did not influence perceptions of perpetrator blame.

But some researchers have found different patterns. Wooten (1980) found greater victim blame when the perpetrator was depicted as using moderate force, compared to low or high force. However, this manipulation of force was confounded with victim resistance: In both the low force and high force conditions, victim resistance was both verbal and physical, but the moderate force condition depicted only verbal resistance. Still, this research suggests that victim resistance in combination with degree of force used by the assailant may be important for understanding blame (see also Shotland and Goodstein, 1983). The role of victim resistance may be particularly important among those who believe that rape is a sexually motivated crime (Ong and Ward, 1999). Compared to those who believed rape is motivated by power, participants who endorsed the belief that rape is sexually motivated blamed the victim more when she was described as not resisting the attack. When the victim did resist, however, these beliefs had no effect on victim blaming.

A meta-analysis on attribution of responsibility for accidents (not related to sexual assault) found that accident severity increased the tendency to blame the perpetrator (Burger, 1981). Therefore, an important component of force and resistance that should be assessed in future work is the severity of the assault in terms of both physical and emotional outcomes experienced by the victim. We located one study that manipulated whether the victim was physically hurt following the assault. There was no difference in blame, but participants did recommend longer prison sentences for the perpetrator when the victim was physically hurt (Kanekar et al., 1991; note: the impact of victim injury on sentencing was examined in two studies and was only significant in one). While the above findings on assault severity on blame appear to support the conclusions of the meta-analysis on blame for accidents, more

JA135

research manipulating the severity of injury to the victim is needed.

## Victim and Perpetrator Race

As noted in the discussion of race in the "individual factors" section, very little research has examined the role of victim and assailant race on blame in acquaintance rape cases; only five studies have investigated the role of victim/assailant race/ethnicity in victim blaming in acquaintance rape cases (see **Table 1**). This omission is problematic, given that most non-White women are victimized compared to White women (Black et al., 2011). Further, many myths surrounding sexual assault depict a Black male assailant and a White female victim (Davis, 1983; Epstein and Langenbahn, 1994). While lacking an assessment of victim blame, prior research manipulating both victim and perpetrator race in an acquaintance rape found that White victims were more likely than Black victims to prompt beliefs that the assailant should be held legally responsible and that his actions could be defined as criminal (Foley et al., 1995). Counter to the myth of the Black rapist, however, this research did not find any significant differences in blame based on assailant race. Willis (1992) found that regardless of race, victims were rated as less truthful in their reports of a sexual assault if they were depicted as being in a prior or current relationship with their Black assailant, compared to when he was depicted as White or as a Black stranger. Some evidence suggests greater victim blame in intra-racial compared to inter-racial rapes (George and Martinez, 2002), but this study collapsed across stranger and acquaintance rape scenarios (despite a main effect in which victims of acquaintance rape were blamed more than victims of stranger rape).

As discussed previously, cultural similarity to the perpetrator increased victim blaming among an Australian sample, but only if the victim was depicted as not resisting the attack (Bongiorno et al., 2016). Dupuis and Clay (2013) found that victim blame was a function of both the victim's race and her perceived respectability, manipulated via the defendant's testimony that the victim was either a "party girl" who often picked up men at bars or a "sweet girl" who didn't date much or go to bars. While respectability did not matter for blame of White victims, it affected blame of Black victims: Respectable Black victims were blamed less than "party girl" Black victims. Furthermore, respectable Black victims were blamed less than respectable White victims, while "party girl" Black victims were blamed more than comparable White victims. Perpetrator race mattered only in one case– the non-respectable victim was seen as more blameworthy than the respectable victim when the perpetrator was Black.

These patterns may be complicated further by consideration of participant race. As described earlier, Varelas and Foley (1998) found that White participants blamed victims less than Black participants and that less blame was attributed to victims when the assailant was Black. White participants also blamed White victims assaulted by Black men less than Black victims assaulted by Black men, while Black participants attributed the most blame

to a Black woman assaulted by a White man. One other study manipulated victim and assailant race (Willis, 1992) but did not report comparisons relevant comparisons.

Research on race effects has been limited by the singular focus on Black and White victims and perpetrators (but see Bell et al., 1994, for an exception). More research is needed on how other victim/assailant races (e.g., Asian, Hispanic) may influence blame, as well as potential interactions with participant demographics.

## Socioeconomic Status

Sexual assault may be motivated by need for power (Brownmiller, 1975; Burt, 1980; Lonsway and Fitzgerald, 1994; Ward, 1995) and therefore power differentials within a rape scenario, defined by socioeconomic status, may influence evaluations of blame. Black and Gold (2008) manipulated socioeconomic status of the perpetrator by describing him as either a bus driver or doctor. Women, but not men, held the victim more responsible when she was assaulted by the bus driver than the doctor. In another study in which the victim was portrayed as either a cashier or accountant, both male and female participants rated the cashier as more promiscuous and more blameworthy (Spencer, 2016).

Blame may be more affected by the *relative status* of the perpetrator compared to the female victim. Using a sample of students at the University of Bombay, Kanekar et al. (1991) manipulated the assailant's occupational status to be higher than, the same as, or lower than the status of the female victim, along with an additional manipulation of whether the victim filed a complaint or not against her aggressor. These researchers found a greater tendency for men to blame the victim when the assailant had higher status (or comparable status) relative to the victim, but only if she did not file a complaint. Relatedly, Yamawaki et al. (2007) manipulated whether the victim or assailant held a high status position or not (well-respected CEO versus student from a local university). When the assailant was in the more powerful position, those who believe women use sex to gain power from men blamed the victim more.

Drawing definitive conclusions from these studies about the effect of socioeconomic status on victim blame is difficult. Black and Gold (2008) did not provide information about the victim's occupation and thus it is unclear whether participants assumed she held a better job than the bus driver, thus changing the power dynamic between the two. Yamawaki et al. (2007) did not include a control condition whereby the victim and assailant held equal power status. Finally, while Kanekar et al. (1991) found gender differences in blame due to relative status of the assailant, this only emerged in the conditions in which the victim chose not to file a complaint. Clearly more research is needed on socioeconomic status and other power differential cues to better determine their effects on victim blame.

## Summary of Situation Level Factors

Alcohol use is common in sexual assault cases and not surprisingly, a large number of sexual assault scenarios used in research include this feature. However, few studies have examined how changes in intoxication and alcohol use levels impact victim blame. Among those that have, the evidence largely

JA136

suggests that alcohol use by the victim increases victim blaming, while alcohol use by the defendant reduces his level of blame (Richardson and Campbell, 1982; Stormo et al., 1997; Cameron and Stritzke, 2003; Bieneck and Krahé, 2011; but see Girard and Senn, 2008).

Research considering victim physical characteristics clearly indicates that the more revealing the clothing worn by the victim and the more suggestive her behavior or occupation, the more likely the victim is to be blamed for her assault (Muehlenhard and MacNaughton, 1988; Kanekar and Seksaria, 1993; Cassidy and Hurrell, 1995; Workman and Orr, 1996; Loughnan et al., 2013). Victims with an apparently promiscuous sexual history are also found to be more blameworthy (Pugh, 1983). Provocativeness may also interact with participant gender, such that men, but not women blame provocatively dressed victims more than conservatively dressed victims (Whatley and Riggio, 1992). In one study on victim sexual orientation, heterosexual victims were blamed more than lesbian victims (Ford et al., 1998). Many of these findings are consistent with the belief that physical enticement—based on dress, history, or sexual orientation — triggers assault, but one exception to this pattern is the finding that unattractive victims are blamed more than attractive victims (Gerdes et al., 1988). The latter finding may have more to do with a general halo effect favoring attractive individuals (e.g., Dion et al., 1972).

Another common factor considered in sexual assault vignettes is the degree of force and resistance used by the perpetrator and victim. These appear to play an important role in perceptions of victim culpability. Victims who resist their attackers are seen as less blameworthy than those who do not (particularly when they resist early in the interaction; Shotland and Goodstein, 1983; Kanekar and Seksaria, 1993; Kopper, 1996; Black and Gold, 2008). Less victim blaming also occurs when the perpetrator is depicted as using a great degree of force (Bieneck and Krahé, 2011) and when the victim is portrayed as having been injured from the attack (Kanekar et al., 1991).

Despite evidence that non-White women are more likely to be victimized (Black et al., 2011), there is currently relatively little research that manipulates victim and perpetrator race. The work that has been done, however, indicates a more complex interaction with other individual and situational factors. For instance, White participants blamed White victims assaulted by Black men less than Black victims assaulted by Black men, while Black participants attributed the most blame to a Black woman assaulted by a White man (Varelas and Foley, 1998). Further, respectability mattered for blame of Black victims, but not White victims.

Finally, research on the impact of socioeconomic status and power differences between victim and assailant is currently too limited and inconsistent to draw definitive conclusions. However, some research points to the importance of power differentials in influencing blame (Kanekar et al., 1991), and of participants' beliefs that women use sex to gain power from men (Yamawaki et al., 2007).

One difficulty in assessing the impact of situational factors on victim blame is that many published studies do not include full descriptions of the scenarios used. For instance, the sexual assault scenario used by Janoff-Bulman et al. (1985) is simply described as a "first person account of a rape and the events preceding it (pp. 164)." After having received the full scenario by Dr. Janoff-Bulman, however, it is clear that alcohol intoxication played a central role in this scenario ("I had more than I could handle. Bob got drunk too. . .I had a lot to drink. . .I insisted we stay until we had. . .something to get more sober"). Given the role alcohol plays in evaluations of sexual assault, it is important to be aware that this sexual assault scenario centers around a night of heavy drinking. Thus, before we can draw firm conclusions about the effects of various situational factors on victim blame, access to the full scenarios used in research is necessary.

## DISCUSSION

We have reviewed a variety of individual and situational factors that influence victim blaming, but in order to fully understand victim blame we must take into account broader institutional and societal factors that may dictate how perceivers view any given sexual assault scenario. Indeed, it has been suggested that the only way to truly prevent rape is to address the problem of rape at the societal level (Allison and Wrightsman, 1993), considering broader cultural factors that both contribute to sexual assaults and promote rape myths and victim blaming.

As depicted in **Figure 1**, we view individual, situational, and institutional factors as influencing one another. Interactions within individual level factors (e.g., participant gender and rape myth endorsement), situational level factors (e.g., perpetrator force and assailant resistance) and the interaction between individual and situation level factors (e.g., participant race and victim/assailant race) have received some consideration in the research literature. What has yet to be accounted for, however, is how these elements may also be influenced by the cultural context in which they are studied. In the following sections we identify institutional-level factors that may contribute to both sexual assault and victim blaming and then discuss how these factors may interact with individual and situation level factors.

### Institutional/Societal Level Factors
#### Gender Dynamics
Patriarchy is widespread across many cultures (Pratto, 1996; Eagly and Wood, 1999; World Economic Forum, 2017) and feminist scholars have long proposed that sexual assault is motivated by power, with violence against women a function of gendered sex roles that support male domination and female exploitation (Brownmiller, 1975; Burt, 1980; Lonsway and Fitzgerald, 1994; Ward, 1995). Societies that have more egalitarian gender roles tend to have lower rates of sexual assault (Sanday, 1981; White et al., 1997). Interestingly, recent work has found that priming men to feel lower in power increases their ability to take others' perspective, thereby decreasing their tendency to blame victims of acquaintance rape (Gravelin et al., 2017).

Socialization into gender roles may make women more prone to the dangers of sexual assault, but also communicates victim blaming as normative. For instance, Warshaw (1994) argues

JA137

that communal roles teach women from a young age to avoid embarrassing a man by rejecting his advances and to not resist a physically aggressive man. Male gender roles may also justify and promote sexually aggressive behavior among men (Griffin, 1971; Sanday, 1981; Beneke, 1982; Warshaw, 1994; O'Toole, 2007) and legitimize victim blaming (Griffin, 1971; Check and Malamuth, 1983; Margolin et al., 1989; Feltey et al., 1991). For example, men may be taught to dissociate themselves from responsibility for their sexual actions, thereby reinforcing myths that once a man is sexually aroused he cannot stop himself (Warshaw, 1994).

Stereotypes and sexual scripts communicated to men and women further complicate sexual relations. Considerable research documents a sexual double standard, whereby men are more free than women to express their sexual desires (Sprecher et al., 1987; Muehlenhard and Hollabaugh, 1988; Muehlenhard and McCoy, 1991; Muehlenhard and Quackenbush, 1998). This pattern reinforces a common belief in token resistance, whereby it is thought that many women say no to sex even when they would like to say yes since it is "unladylike" to desire sex (Gagnon and Simon, 1973; Check and Malamuth, 1983; Schur, 1983; Muehlenhard and Hollabaugh, 1988; Warshaw, 1994). This belief appears to influence approaches to sexual behavior; Muehlenhard and Hollabaugh (1988) found that over 39% of their sample of undergraduate women reported engaging in token resistance at least once, and those who had were more likely to endorse traditional gender roles than women who were sexually active but did not engage in token resistance.

Men are socialized to be the sexual initiators, and, given the belief in, and practice of, token resistance, may be encouraged not to take a woman's reluctance seriously. Thus, sex is often viewed as a challenge, and women become sexualized objects to conquer (Warshaw, 1994). These sexual scripts dictating token resistance from women and persistence by men abrogate what is viewed as sexual foreplay and what is sexual assault. Acceptance of such scripts may also influence perceivers' evaluation of acquaintance rape victims who resist sexual advances from the assailant. Indeed, research has established that endorsement of gender inequality and traditional gender roles (which includes the practice of token resistance; Muehlenhard and Hollabaugh, 1988) is associated with greater RME and victim blaming (Brownmiller, 1975; Burt, 1980; Deitz et al., 1982; Whatley, 2005; Edwards et al., 2011).

Another strong cultural force that dictates what is considered proper gender role and sexual behavior is religion. A variety of religions, such as Christian evangelism and Islam promote a gender hierarchy that values female submission (see Flood and Pease, 2009); other religious affiliations may convey more or less conservatism regarding appropriate sexual behavior. Using 20 years of data from the General Social Survey, Hoffman and Miller (1997) found that more conservative religions promote traditional female roles while liberal religions promote egalitarianism. Further, the strength of gender norms in a given culture may interact with individual level factors to influence evaluations of victim blame. For example, the extent to which sexually promiscuous victims

are blamed may be exacerbated in conservative religious cultures. More generally, to the extent that institutions promote a gendered hierarchy, men possessing lower social power than women are likely to feel threatened, which in turn may lead to more victim blame (e.g., Munsch and Willer, 2012).

## Media and Sexual Objectification

The hypersexualization and sexual objectification of women in society also leads to greater acceptance of violence against women and victim blame (Malamuth and Check, 1981; Ohbuchi et al., 1994; Lanis and Covell, 1995; MacKay and Covell, 1997; Kalof, 1999). Hypersexualization and sexual objectification refer to the extreme sexuality ascribed to women, often depicting them as purely sexual objects for men's desires. This sexualized representation of women exists in a variety of domains, including pornography, non-pornographic film and television, and print advertising (see Stankiewicz and Rosselli, 2008).

Not only do media outlets often depict women as sexualized objects, but sexual aggression is portrayed as normative behavior in pornography (Longino, 1980; MacKinnon, 1985), films (Donnerstein and Linz, 1986), and music (Schur, 1988; hooks, 1994). While victims of non-sexual aggression are often shown as having suffered from their assault, sexual assault victims are often depicted as initially refusing a man's sexual advances and then become aroused as he ignores her resistance (Smith, 1976; Zilbergeld, 1978; Malamuth and Check, 1981). Eroticizing sexual dominance in the media legitimizes violence against women and may contribute to victim blaming (see Schur, 1988).

In the context of sexual assault, the media also tend to focus on stranger rape (Soothill, 1991), thus influencing how perceivers determine what constitutes a "real rape," and to portray rapists as strangers with solely sexual motivations to assault attractive young females (Allison and Wrightsman, 1993). Deviations from this image to one depicting an acquaintance rape may be less likely to be seen as a sexual assault, resulting in increased victim blaming. Soothill (1991) documented changes in reporting on sexual assaults in major newspapers from 1973 to 1985. Despite an increase in the number of single assailant-single victim sexual assault crimes in the courts across this period, reporting on these types of crimes decreased, with a shift in focus to multiple offender gang rapes instead. This shift may have increased readers' beliefs that gang rapes and stranger rapes are more prevalent and concerning than acquaintance rape. A more recent review of two major newspapers' reporting on sexual assault indicates that gang and stranger rapes are still over-reported relative to acquaintance rapes and to actual prevalence data (Gravelin, 2017).

When media outlets do discuss acquaintance rape, how it is discussed can also contribute to victim blaming. Highlighting rape myths or focusing on ways that acquaintance rapes may resemble prototypical stranger rapes may have negative consequences for victims of assaults that do not include these prototypical features. For example, Franiuk et al. (2008) exposed participants to headlines about an acquaintance rape case against basketball star Kobe Bryant. These headlines were modeled after

JA138

actual headlines used in newspaper accounts of Bryant's case and either contained rape myths (e.g., "Defense attorneys in sexual assault case say accuser had motive to lie") or not ("Hearing set for man accused of sexual assault"). Participants tended to see Bryant as less guilty after reading headlines containing rape myths than neutral headlines, and this was particularly true among men. Men exposed to the rape myth headlines also endorsed rape-supportive attitudes more so than men in the control condition. In short, the media may exacerbate endorsement of rape myths, which in turn promotes greater victim blaming.

## Legal and Empirical Rhetoric

The definition of rape has changed throughout American history and therefore what constitutes rape is dependent on the time and state in which the assault has occurred (Freedman, 2013). It was not until 2012 that the FBI broadened the definition of rape to include *non-forcible* rape of women *and men*. In 2014, both California and New York altered their definitions of sexual assault such that rape is not defined by the victim saying "no," but by failing to say "yes." Such a definition acknowledges the role of the assailant in obtaining affirmative consent, rather than the victim in saying no. Branscombe et al. (1996); see also Nario-Redmond and Branscombe (1996) found that focusing participants on how the victim's behavior could have altered a rape outcome produced the greatest amount of victim blame, while focusing on how the assailant's behavior could have prevented an assault generally increased the relative blame assigned to him. Others have found that defining sexual assault as an act of intergroup (a "hate crime"), rather than interpersonal violence (a personal assault) reduced victim blaming in both stranger and acquaintance rape cases (Droogendyk and Wright, 2014).

Despite these recent efforts to broaden the definition of rape and incorporate definitions more closely aligned with non-stranger rape, earlier constructions of rape promoted through rape myths remain deeply embedded in our culture. These myths make it difficult for individuals to recognize rape, particularly non-stranger rape. This difficulty may encourage perceivers to look to situational factors such as the victim's attractiveness and promiscuity to explain the assault in acquaintance rape cases (Weis and Borges, 1973). Given that the working definition of what constitutes a rape varies as a function of time and location, comparing studies conducted in different settings at different times may not be appropriate.

## Rape Culture

Much research on acquaintance rape asserts that certain settings foster beliefs conducive to rape, often referred to as "rape culture" (Buchwald et al., 1993). Some have suggested that individuals within the United States as a whole view rape as normative and a condoned behavior (Rozée, 1993; Koss et al., 1994), but rape culture is most often associated with college campuses, particularly athletic groups and fraternities. Rape cultures exist outside of the college environment, as well; both high school and

professional-level athletics and the military have been studied as rape cultures (see O'Toole, 2007).

Researchers suggest that male-dominated environments such as those mentioned above are particularly likely to promote sexist attitudes and behaviors and may facilitate greater risk of sexual assault as well as victim-blaming myths (Sanday, 1990; Melnick, 1992; Koss and Gaines, 1993; Boeringer, 1996, 1999; Boswell and Spade, 1996; Bleecker and Murnen, 2005; McCray, 2014). Rape cultures are typically defined as hypermasculinized environments that glorify coercive sexual behavior as central to their group identity (O'Toole, 2007). For example, all-male housing units such as fraternities have a higher risk of sexual assaults than co-ed housing (Hinch and Thomas, 1999). Sexual aggression is also particularly likely among the newest members of an all-male group: Fraternity pledges are the most likely of all college males to commit a sexual assault on campus (see Bohmer and Parrot, 1993). Individual level factors such as threats to power or status may be particularly problematic within all-male groups, increasing the likelihood of sexual assault, rape myth endorsement, and victim blaming.

Rape culture is maintained by the norm of silencing victims of rape (Burnett et al., 2009). Particularly in cultures where rape myths are promoted and accepted, victims may question their behavior and be uncertain whether to label their experience as a rape or not (Adams-Curtis and Forbes, 2004; Harned, 2004). Failure to report rape not only protects perpetrators from punishment but also communicates a tolerance for sexual assault that delegitimizes victims' experiences and perpetuates victim blaming.

Rape culture frameworks tend to focus on localized settings that contribute to sexual assault and victim blaming, but broader cultural contexts—including national and regional contexts—have differing historical experience with violence and differing flexibility or rigidity of gender roles which may contribute to differing levels of victim blame (Sanchez-Hucles and Dutton, 1999). A qualitative study on community norms and expectations concerning intimate violence by Sorenson (1996) found that compared to Asian American participants, Mexican American participants described a greater cultural value on male sexual prowess. Victims of sexual assault in many Middle Eastern communities are punished, even outcast by their families, or must marry their rapists in order to restore honor to their families (Ruggi, 1998). Conversely, many African cultures promote flexible gender roles and pride in having strong, independent women, thus potentially reducing blame ascribed to female victims who deviate from traditional gender roles (Hill, 1972; Young, 1986; Boyd-Franklin, 1989, see also Sanchez-Hucles and Dutton, 1999). Finally, Ho (1990), see also Sorenson (1996) noted that Asian values of harmony and close family ties may not promote lesser sexual violence, but may support minimizing or concealing violence.

These cultural differences may contribute both to differences in sexual assault rates and differing levels of victim blame. A report by the World Health Organization [WHO] (2005) compiled cross-national data from surveys on female

victimization from 1992 through 1997 and found considerable variability in reported victimization. For instance, Asian countries (China, India, Indonesia, and Philippines) had the lowest rate of reported sexual assault as well as the lowest variability within-continent, with incidence of sexual assault ranging from 0.3% in the Philippines, to 2.7% in Indonesia, while the data surveyed from countries in Latin America (Argentina, Bolivia, Brazil, Columbia, Costa Rica, and Paraguay) had the largest variability, with incidences ranging from ranging from 1.4% in Bolivia to 8.0% in Brazil. It is important to note that, while informative, these data do not distinguish between types of sexual assault, and sample sizes varied considerably across studies. Respondents were only asked about sexual assaults that had occurred within the last 5 years and thus does not account incidents outside of this window. There is no national data base on victim blaming, but differing cultural tendencies to minimize or silence sexual assault may communicate greater victim blame by way of trivializing experiences of sexual assault.

Another element varying across regional/ethnic cultures that may contribute to differential evaluations of victims of sexual assault is religiosity; cultures vary in the extent to which they are influenced by religious doctrines. While limited to a sample of undergraduates living in the United States, a study on the role of cultural and religious influences on endorsement of traditional gender roles found more conservative sexual attitudes among Asians (South and East Asians) compared to their Hispanic (South American, Central American, and Mexican) and European American (Caucasian) counterparts (Ahrold and Meston, 2010). Across all three groups, greater intrinsic religiosity and religious fundamentalism predicted more conservative sexual attitudes (endorsement of traditional gender roles). Thus, religiosity and traditional gender role endorsement attitudes may interact with situational elements to contribute to differential degrees of victim blaming. For example, a victim who deviates from a traditional submissive role by behaving promiscuously or fighting her attacker may be seen as more blameworthy by more religious and conservative observers.

## FINAL REMARKS

Research on sexual assault and victim blaming is burgeoning, yet much more needs to be done to understand the individual, situational, and cultural factors that contribute to victim blaming, particularly in the case of acquaintance rape. The current paper identified the most commonly studied aspects of victim blaming in acquaintance rape within the two primary approaches: individual level factors and situation level factors. A review of this literature reveals many inconsistent findings and interactions across both levels. In an effort to make sense of these complex interactions and inconsistent findings, we suggest greater consideration be given to the role of institutional factors on evaluations of victim blame. The final sections of this paper then outlined various institutional factors that we believe should be given greater attention in

future research on victim blaming in acquaintance rape and provided evidence to support why these factors may interact with the more commonly studied individual and situational factors.

Acquaintance rapes differ in many ways and therefore researchers cannot use a "standardized" single vignette to study victim blame. However, knowing which details are present or absent in the scenarios used by researchers will help in drawing more accurate and appropriate comparisons and conclusions. Further, despite obvious differences between acquaintance and stranger rape, many researchers still use findings gathered from one type of assault interchangeably with the other when discussing patterns in sexual assault research (Whatley, 1996; Grubb and Harrower, 2008; Grubb and Turner, 2012). As previously highlighted, a substantial number of the papers considered in this review failed to provide full details of the scenarios used in their research. As elements such as the presence/absence of alcohol, victim's clothing and promiscuity, and prior relationship with the assailant all influence how perceivers evaluate cases of sexual assault, it is important to be aware of the full characterization of the sexual assault before drawing conclusions across studies. Therefore, in addition to accounting for institutional factors in future examinations of victim blaming, greater transparency about and open sharing of the scenarios used is needed.

Our narrative review allowed for a wide-ranging overview of research on victim blame in acquaintance rape cases but was limited by a reliance on study significance levels, without taking into account study power (i.e., low $N$ and high $N$ studies received equal weight in our review). This limitation can be redressed by the use of meta-analysis to better quantify the effects of individual, situational, and cultural factors on victim blaming. We hope this review motivates such meta-analytic research, as well as additional original research in these areas. The #MeToo movement has brought recent heightened public attention to the problem of sexual assault; this cultural focus may further spur social scientific efforts toward understanding perceptions and treatment of sexual assault.

## AUTHOR CONTRIBUTIONS

CG served as primary investigator, responsible for conception of analysis and review, literature collection, synthesis, critique and write up. MB provided substantial contributions to synthesis and critique and assisted in multiple revisions of manuscript document. CB assisted in literature collection and synthesis/coding and aided in final revisions of manuscript.

## ACKNOWLEDGMENTS

Some of the content within this manuscript originally appeared in the first author's dissertation, which is archived online. All content from the dissertation is cited throughout the manuscript and referenced accordingly in the reference list.

JA140

# REFERENCES

Abbey, A., Ross, L. T., McDuffie, D., and McAuslan, P. (1996). Alcohol and dating risk factors for sexual assault among college women. *Psychol. Women Q.* 20, 147–169. doi: 10.1111/j.1471-6402.1996.tb00669.x

Abrams, D., Viki, G. T., Masser, B., and Bohner, G. (2003). Perceptions of stranger and acquaintance rape: the role of benevolent and hostile sexism in victim blame and rape proclivity. *J. Pers. Soc. Psychol.* 84, 111–125. doi: 10.1037/0022-3514.84.1.111

Adams-Curtis, L. E., and Forbes, G. B. (2004). College women's experiences of sexual coercion: a review of cultural, perpetrator, victim, and situational variables. *Trauma Violence Abuse* 5, 91–122. doi: 10.1177/1524838003262331

Ahrold, T. K., and Meston, C. M. (2010). Ethnic differences in sexual attitudes of U.S. college students: gender, acculturation, and religiosity factors. *Arch. Sex. Behav.* 39, 190–202. doi: 10.1007/s10508-008-9406-1

Allison, J. A., and Wrightsman, L. S. (1993). *Rape: The Misunderstood Crime*. Thousand Oaks, CA: Sage Publications.

Amir, M. (1971). *Patterns in Forcible Rape*. Chicago, IL: University of Chicago Press.

Anderson, K. B., Cooper, H., and Okamura, L. (1997). Individual differences and attitudes toward rape: a meta-analytic review. *Pers. Soc. Psychol. Bull.* 23, 295–315. doi: 10.1177/0146167297233008

Ayala, E. E., Kotary, B., and Hetz, M. (2015). Blame attributions of victims and perpetrators: effects of victim gender, perpetrator gender, and relationship. *J. Interpers. Violence* 33, 94–116. doi: 10.1177/0886260515599160

Basow, S. A., and Minieri, A. (2011). "You owe me": effects of date cost, who pays, participant gender, and rape myth beliefs on perceptions of rape. *J. Interpers. Violence* 26, 479–497. doi: 10.1177/0886260510363421

Bell, S. T., Kuriloff, P. J., and Lottes, I. (1994). Understanding attributions of blame in stranger rape and date rape situations: an examination of gender, race, identification, and students' social perceptions of rape victims. *J. Appl. Soc. Psychol.* 24, 1719–1734. doi: 10.1111/j.1559-1816.1994.tb01571.x

Ben-David, S., and Schneider, O. (2005). Rape perceptions, gender role attitudes, and victim-perpetrator acquaintance. *Sex Roles* 53, 385–399. doi: 10.1007/s11199-005-6761-4

Beneke, T. (1982). *Men on Rape*. New York, NY: St. Martin's Press.

Benson, B. J., Gohm, C. L., and Gross, A. M. (2007). College women and sexual assault: the role of sex-related alcohol expectancies. *J. Fam. Violence* 22, 341–351. doi: 10.1007/s10896-007-9085-z

Bieneck, S., and Krahé, B. (2011). Blaming the victim and exonerating the perpetrator in cases of rape and robbery: is there a double standard? *J. Interpers. Violence* 26, 1785–1797. doi: 10.1177/0886260510372945

Black, K. A., and Gold, D. J. (2008). Gender differences and socioeconomic status biases in judgments about blame in date rape scenarios. *Violence Vict.* 23, 115–128. doi: 10.1891/0886-6708.23.1.115

Black, M. C., Basile, K. C., Breiding, M. J., Smith, S. G., Walters, M. L., Merrick, M. T., et al. (2011). *The National Intimate Partner and Sexual Violence Survey (NISVS): 2010 Summary Report*. Atlanta, GA: Centers for Disease Control and Prevention.

Bleecker, E. T., and Murnen, S. K. (2005). Fraternity membership, the display of degrading sexual images of women, and rape myth acceptance. *Sex Roles* 53, 487–493. doi: 10.1007/s11199-005-7136-6

Blumberg, M. L., and Lester, D. (1991). High school and college students' attitudes toward rape. *Adolescence* 26, 727–729.

Boeringer, S. B. (1996). Influences of fraternity membership, athletics, and male living arrangements on sexual aggression. *Violence Against Women* 2, 134–147. doi: 10.1177/1077801296002002002

Boeringer, S. B. (1999). Associations of rape-supportive attitudes with fraternal and athletic participation. *Violence Against Women* 5, 81–90. doi: 10.1177/10778019922181167

Bohmer, C., and Parrot, A. (1993). *Sexual Assault on Campus: The Problem and the Solution*. New York, NY: Lexington Books.

Bongiorno, R., McKimmie, B. M., and Masser, B. M. (2016). The selective use of rape-victim stereotypes to protect culturally similar perpetrators. *Psychol. Women Q.* 40, 398–413. doi: 10.1177/0361684316631932

Boswell, A. A., and Spade, J. Z. (1996). Fraternities and collegiate rape culture: why are some fraternities more dangerous places for women? *Gend. Soc.* 10, 133–147. doi: 10.1177/089124396010002003

Boyd-Franklin, N. (1989). *Black Families in Therapy: A Multisystems Approach*. New York, NY: Guilford Press.

Bradbury, T. N., and Fincham, F. D. (1990). Attributions in marriage: review and critique. *Psychol. Bull.* 107, 3–33. doi: 10.1037/0033-2909.107.1.3

Branscombe, N. R., Owen, S., Garstka, T. A., and Coleman, J. (1996). Rape and accident counterfactuals: who might have done otherwise and would it have changed the outcome? *J. Appl. Soc. Psychol.* 26, 1042–1067. doi: 10.1111/j.1559-1816.1996.tb01124.x

Branscombe, N. R., and Weir, J. A. (1992). Resistance as stereotype-inconsistency: consequences for judgments of rape victims. *J. Soc. Clin. Psychol.* 11, 80–102. doi: 10.1521/jscp.1992.11.1.80

Bridges, J. S. (1991). Perceptions of date and stranger rape: a difference in sex-role expectations and rape-supportive beliefs. *Sex Roles* 24, 291–307. doi: 10.1007/BF00288303

Bridges, J. S., and McGrail, C. A. (1989). Attributions of responsibility for date and stranger rape. *Sex Roles* 21, 273–286. doi: 10.1007/BF00289907

Brownmiller, S. (1975). *Against Our Will: Men, Women and Rape*. New York, NY: Simon & Schuster.

Buchwald, E., Fletcher, P., and Roth, M. (1993). "Are we really living in a rape culture," in *Transforming a Rape Culture*, eds E. Buchwald, P. Fletcher, and M. Roth (Minneapolis, MN: Milkweed Editions), 7–10.

Burger, J. M. (1981). Motivational biases in the attribution of responsibility for an accident: a meta-analysis of the defensive-attribution hypothesis. *Psychol. Bull.* 90, 496–512. doi: 10.1037/0033-2909.90.3.496

Burnett, A., Mattern, J. L., Herakova, L. L., Kahl, D. H., Tobola, C., and Bornsen, S. E. (2009). Communicating/muting date rape: a co-cultural theoretical analysis of communication factors related to rape culture on a college campus. *J. Appl. Commun. Res.* 37, 465–485. doi: 10.1080/00909880903233150

Burt, M. B. (1980). Cultural myths and supports for rape. *J. Pers. Soc. Psychol.* 38, 217–230. doi: 10.1037/0022-3514.38.2.217

Calhoun, K. S., and Townsley, R. M. (1991). "Attributions of responsibility for acquaintance rape," in *Acquaintance Rape: The Hidden Crime*, eds A. Parrot and L. Bechhofer (New York, NY: John Wiley), 57–69.

Calhoun, L. G., Selby, J. W., and Warring, L. J. (1976). Social perception of the victim's causal role in rape: an exploratory examination of four factors. *Hum. Relat.* 29, 517–526. doi: 10.1177/001872677602900602

Cameron, C., and Stritzke, W. G. K. (2003). Alcohol and acquaintance rape in Australia: testing the presupposition detail of attributions about responsibility and blame. *J. Appl. Soc. Psychol.* 33, 983–1008. doi: 10.1111/j.1559-1816.2003.tb01935.x

Casarella-Espinoza, M. (2015). *Whose Fault is it Anyway? Comparison of Victim Blaming Attitudes Towards Sex Trafficking and Sexual Assault Across Gender and Two Ethnic Groups (Order No. AAI3639712)*. Available at: http://search.proquest.com/docview/1705044617?accountid=14556

Cassidy, L., and Hurrell, R. M. (1995). The influence of victim's attire on adolescents' judgments of date rape. *Adolescence* 30, 319–323.

Check, J. V., and Malamuth, N. M. (1983). Sex role stereotyping and reactions to depicting stranger versus acquaintance rape. *J. Pers. Soc. Psychol.* 45, 344–356. doi: 10.1037/0022-3514.45.2.344

Coller, S. A., and Resick, P. A. (1987). Women's attributions of responsibility for date rape" The influence of empathy and sex-role stereotyping. *Violence Vict.* 2, 115–125. doi: 10.1891/0886-6708.2.2.115

Cowan, G., and Quinton, W. (1997). Cognitive style and attitudinal correlates of the perceived causes of rape scale. *Psychol. Women Q.* 21, 227–245. doi: 10.1111/j.1471-6402.1997.tb00110.x

Critchlow, B. (1985). The blame in the bottle: attributions about drunken behavior. *Pers. Soc. Psychol. Bull.* 11, 258–274. doi: 10.1177/01416167285113003

Davis, A. Y. (1983). *Rape, Racism, and the Myth of the Black Rapist. Women, Race, and Class*. New York, NY: Vintage Books, 151–175.

D'Cruz, J., and Kanekar, S. (1992). Attribution of fault to a rape victim as a function of the attributor's celibate or married lifestyle. *Ir. J. Psychol.* 13, 283–294. doi: 10.1080/03033910.1992.10557888

Deitz, S. R., Blackwell, K. T., Daley, P. C., and Bentley, B. J. (1982). Measurement of empathy toward rape victims and rapists. *J. Pers. Soc. Psychol.* 43, 372–384. doi: 10.1037/0022-3514.43.2.372

Dion, K., Berscheid, E., and Walster, E. (1972). What is beautiful is good. *J. Pers. Soc. Psychol.* 24, 285–290. doi: 10.1037/h0033731

JA141

Donnerstein, E., and Berkowitz, L. (1981). Victim reactions in aggressive erotic films as a factor in violence against women. *J. Pers. Soc. Psychol.* 41, 710–724. doi: 10.1037/0022-3514.41.4.710

Donnerstein, E., and Linz, D. (1986). Mass media sexual violence and male viewers current theory and research. *Am. Behav. Sci.* 29, 601–618. doi: 10.1177/000276486029005007

Droogendyk, L., and Wright, S. C. (2014). Perceptions of interpersonal versus intergroup violence: the case of sexual assault. *PLoS One* 9:e112365. doi: 10.1371/journal.pone.0112365

Dull, R. T., and Giacopassi, D. J. (1987). Demographic correlates of sexual and dating attitudes: a study of date rape. *Crim. Justice Behav.* 14, 191–212. doi: 10.1177/0093854887014002004

Dupuis, E. C., and Clay, J. A. (2013). The role of race and respectability in attributions of responsibility for acquaintance rape. *Violence Vict.* 28, 1085–1095. doi: 10.1891/0886-6708.VV-D-12-00013

Eagly, A. H., Diekman, A. B., Johannesen-Schmidt, M. C., and Koenig, A. M. (2004). Gender gaps in sociopolitical attitudes: a social psychological analysis. *J. Pers. Soc. Psychol.* 87, 796–816. doi: 10.1037/0022-3514.87.6.796

Eagly, A. H., and Wood, W. (1999). The origins of sex differences in human behavior: evolved dispositions versus social roles. *Am. Psychol.* 54, 408–423. doi: 10.1037/0003-066X.54.6.408

Edwards, K. M., Turchik, J. A., Dardis, C. M., Reynolds, N., and Gidycz, C. A. (2011). Rape myths: history, individual and institutional-level presence, and implications for change. *Sex Roles* 65, 761–773. doi: 10.1007/s11199-011-9943-2

Eigenberg, H., and Garland, R. (2008). "Victim blaming," in *Controversies in Victimology*, ed. L. J. Moriarty (Newark, NJ: Elsevier Press), 21–36.

Epstein, J., and Langenbahn, S. (1994). *Criminal Justice & Community Response to Rape.* Washington, DC: DIANE Publishing.

Estrich, S. (1987). *Real Rape.* Cambridge, MA: Harvard University Press.

Ewoldt, C. A., Monson, C. M., and Langhinrichsen-Rohling, J. (2000). Attributions about rape in a continuum of dissolving marital relationships. *J. Interpers. Violence* 15, 1175–1182. doi: 10.1177/088626000015011004

Feild, H. S. (1978). Attitudes toward rape: a comparative analysis of police, rapists, crisis counselors, and citizens. *J. Pers. Soc. Psychol.* 36, 156–179. doi: 10.1037/0022-3514.36.2.156

Feltey, K. M., Ainslie, J. J., and Geib, A. (1991). Sexual coercion attitudes among high school students: the influence of gender and rape education. *Youth Soc.* 23, 229–250. doi: 10.1177/0044118X91023002004

Ferrão, M. C., Gonçalves, G., Giger, J., and Parreira, T. (2016). Judge me, judge me not: the role of eye size and observer gender on acquaintance rape. *An. Psicol.* 32, 241–249. doi: 10.6018/analesps.32.1.185701

Ferro, C., Cermele, J., and Saltzman, A. (2008). Current perceptions of marital rape: some good and not-so-good news. *J. Interpers. Violence* 23, 764–779. doi: 10.1177/0886260507313947

Fischer, G. J. (1987). Hispanic and majority student attitudes toward forcible date rape as a function of differences in attitudes toward women. *Sex Roles* 17, 93–101. doi: 10.1007/BF00287902

Fisher, B. S., Cullen, F. T., and Turner, M. G. (2000). *The Sexual Victimization of College Women.* Washington, DC: National Institute of Justice, doi: 10.1037/e377652004-001

Fisher, B. S., Daigle, L. E., Cullen, F. T., and Turner, M. G. (2003). Acknowledging sexual victimization as rape: results from a national–level study. *Justice Q.* 20, 535–570. doi: 10.1080/07418820300095611

Flood, M., and Pease, B. (2009). Factors influencing attitudes to violence against women. *Trauma Violence Abuse* 10, 125–142. doi: 10.1177/1524838009334413

Foley, L. A., Evancic, C., Karnik, K., King, J., and Parks, A. (1995). Date rape: effects of race of assailant and victim and gender of subjects on perceptions. *J. Black Psychol.* 21, 6–18. doi: 10.1177/00957984950211002

Ford, T. M., Liwag-McLamb, M. G., and Foley, L. A. (1998). Perceptions of rape based on sex and sexual orientation of victim. *J. Soc. Behav. Pers.* 13, 253–263.

Franiuk, R., Seefelt, J. L., and Vandello, J. A. (2008). Prevalence of rape myths in headlines and their effects on attitudes toward rape. *Sex Roles* 58, 790–801. doi: 10.1007/s11199-007-9372-4

Freedman, E. B. (2013). *Redefining Rape: Sexual Violence in the Era of Suffrage and Segregation.* Cambridge, MA: Harvard University Press.

Frese, B., Moya, M., and Megias, J. L. (2004). Social perception of rape: how rape myth acceptance modulates the influence of situational factors. *J. Interpers. Violence* 19, 143–161. doi: 10.1177/0886260503260245

Fulero, S. M., and DeLara, C. (1976). Rape victims and attributed responsibility: a defensive attribution approach. *Victimology* 1, 551–563.

Gagnon, J. H., and Simon, W. (1973). "Youth, sex, and the future," in *Youth in Contemporary Society*, ed. D. Gottlieb (Oxford: Sage).

Geiger, B., Fischer, M., and Eshet, Y. (2004). Date-rape supporting and victim-blaming attitudes among high school students in a multiethnic society: Israel. *J. Interpers. Violence* 19, 406–426. doi: 10.1177/0886260503262080

George, W. H., and Martinez, L. J. (2002). Victim blaming in rape: effects of victim and perpetrator race, type of rape, and participant racism. *Psychol. Women Q.* 26, 110–119. doi: 10.1111/1471-6402.00049

Gerdes, E., Dammann, E., and Heilig, K. (1988). Perceptions of rape victims and assailants: effects of physical attractiveness, acquaintance, and subject gender. *Sex Roles* 19, 141–153. doi: 10.1007/BF00290151

Giacopassi, D. J., and Dull, R. T. (1986). Gender and racial differences in the acceptance of rape myths within a college population. *Sex Roles* 15, 63–75. doi: 10.1007/BF00287532

Gilmartin-Zena, P. (1983). Attribution theory and rape victim responsibility. *Deviant Behav.* 4, 357–374. doi: 10.1080/01639625.1983.9967622

Girard, A. L., and Senn, C. Y. (2008). The role of the new "date rape drugs" in attributions about date rape. *J. Interpers. Violence* 23, 3–20. doi: 10.1177/0886260507307648

Glick, P., and Fiske, S. T. (2001). An ambivalent alliance: hostile and benevolent sexism as complementary justifications for gender inequality. *Am. Psychol.* 56, 109–118. doi: 10.1037//0003-066X.56.2.109

Gordon, M. T., and Riger, S. (2011). *The Female Fear.* New York, NY: The Free Press.

Gravelin, C. R. (2017). *Assessing the Impact of Media on Blaming the Victim of Acquaintance Rape.* Doctoral Dissertation, University of Kansas, Lawrence, KS.

Gravelin, C. R., Baldwin, M. W., and Biernat, M. (2017). The impact of power and powerlessness on blaming the victim of sexual assault. *Group Process. Intergroup Relat.* 22, 98–110. doi: 10.1177/1368430217706741

Griffin, S. (1971). Rape: the all-American crime. *Ramparts* 10, 26–35.

Grubb, A., and Harrower, J. (2008). Attribution of blame in cases of rape: an analysis of participant gender, type of rape and perceived similarity to the victim. *Aggress. Violent Behav.* 13, 396–405. doi: 10.1016/j.avb.2008.06.006

Grubb, A., and Turner, E. (2012). Attribution of blame in rape cases: a review of the impact of rape myth acceptance, gender role conformity and substance use on victim blaming. *Aggress. Violent Behav.* 17, 443–452. doi: 10.1016/j.avb.2012.06.002

Hafer, C. L. (2000). Do innocent victims threaten the belief in a just world? Evidence from a modified stroop task. *J. Pers. Soc. Psychol.* 79, 165–173. doi: 10.1037/0022-3514.79.2.165

Hammock, G. S., and Richardson, D. R. (1997). Perceptions of rape: the influence of closeness of relationship, intoxication and sex of participant. *Violence Vict.* 12, 237–246. doi: 10.1891/0886-6708.12.3.237

Hammond, E. M., Berry, M. A., and Rodriquez, D. N. (2011). The influence of rape myth acceptance, sexual attitudes, and belief in a just world on attributions of responsibility in a date rape scenario. *Legal Criminol. Psychol.* 16, 242–252. doi: 10.1348/135532510X499887

Harbottle, S. (2015). *Predictor Variables for Blame of Victims of Sexual Assault (Order No. AAI3581498).* Available at: http://search.proquest.com/docview/1689320148?accountid=14556

Harned, M. S. (2004). Does It Matter What You Call It? The relationship between labeling unwanted sexual experiences and distress. *J. Consult. Clin. Psychol.* 72, 1090–1099. doi: 10.1037/0022-006X.72.6.1090

Hayes, R. M., Lorenz, K., and Bell, K. A. (2013). Victim blaming others: rape myth acceptance and the just world belief. *Fem. Criminol.* 8, 202–220. doi: 10.1177/1557085113484788

Hayes-Smith, R. M., and Levett, L. M. (2010). Student perceptions of sexual assault resources and prevalence of rape myth attitudes. *Fem. Criminol.* 5, 335–354. doi: 10.1177/1557085110387350

Hill, R. (1972). *The Strengths of Black Families.* New York, NY: Emerson-Hall.

Hinch, S., and Thomas, R. W. (1999). Rape myth acceptance and college students: how far we have come. *Sex Roles* 40, 815–832. doi: 10.1023/A:1018816920168

JA142

Ho, C. K. (1990). An analysis of domestic violence in Asian American communities: a multicultural approach to counseling. *Women Ther.* 9, 129–150. doi: 10.1300/J015v09n01_08

Hoffman, H. P., and Miller, A. S. (1997). Social and political attitudes among religious groups: convergence and Divergence over time. *J. Sci. Study Relig.* 36, 52–70. doi: 10.2307/1387882

hooks, B. (1994). *Sexism and Misogyny: Who Takes the Rap? Misogyny, Gangsta Rap, and the Piano.* Hull, MA: Z Magazine.

Howells, K., Shaw, E., Greasley, M., Robertson, J., Gloster, D., and Metcalfe, N. (1984). Perceptions of rape in a British sample: effects of relationship, victim status, sex, and attitudes to women. *Br. J. Soc. Psychol.* 23, 35–40. doi: 10.1111/j.2044-8309.1984.tb00606.x

Idsis, Y., and Edoute, A. (2017). Attribution of blame to rape victims and offenders, and attribution of severity in rape cases: non-therapists and survivor and offender therapists. *Int. Rev. Victimol.* 23, 257–274. doi: 10.1177/0269758017711980

Janoff-Bulman, R., Timko, C., and Carli, L. L. (1985). Cognitive biases in blaming the victim. *J. Exp. Soc. Psychol.* 21, 161–177. doi: 10.1016/0022-1031(85)90013-7

Jimenez, J. A. (2002). *The Effects of Race and Gender on Respondent Attitudinal Perceptions of Acquaintance Rape (Order No. AAI3041473).* Available at: http://search.proquest.com/docview/619952494?accountid=14556

Jimenez, J. A., and Abreu, J. M. (2003). Race and sex effects on attitudinal perceptions of acquaintance rape. *J. Couns. Psychol.* 50, 252–256. doi: 10.1037/0022-0167.50.2.252

Johnson, J. D. (1994). The effect of rape type and information admissibility on perceptions of rape victims. *Sex Roles* 30, 781–792. doi: 10.1007/BF01544231

Johnson, J. D., and Jackson, L. A. Jr. (1988). Assessing the effects of factors that might underlie the differential perception of acquaintance and stranger rape. *Sex Roles* 19, 37–45. doi: 10.1007/BF00292462

Johnson, J. D., Jackson, L. A., Gatto, L., and Nowak, A. (1995). Differential male and female responses to inadmissible sexual history information regarding a rape victim. *Basic Appl. Soc. Psychol.* 16, 503–513. doi: 10.1207/s15324834basp1604_7

Johnson, J. D., Jackson, L. A., and Smith, G. J. (1989). The role of ambiguity and gender in mediating the effects of salient cognitions. *Pers. Soc. Psychol. Bull.* 15, 52–60. doi: 10.1177/0146167289151005

Johnson, K. K. P. (1995). Attributions about date rape: impact of clothing, sex, money spent, date type, and perceived similarity. *Fam. Consumer Sci. Res. J.* 23, 292–310. doi: 10.1177/1077727X95233004

Johnson, K. P., Ju, H. W., and Wu, J. (2016). Young adults' inferences surrounding an alleged sexual assault: alcohol consumption, gender, dress, and appearance schematicity. *Cloth. Textiles Res. J.* 34, 127–142. doi: 10.1177/0887302X15624550

Jones, C., and Aronson, E. (1973). Attribution of fault to a rape victim as a function of respectability of the victim. *J. Pers. Soc. Psychol.* 26, 415–419. doi: 10.1037/h0034463

Kahn, A., Gilbert, L. A., Latta, R. M., Deutsch, C., Hagen, R., Hill, M., et al. (1977). Attribution of fault to a rape victim as a function of respectability of the victim: a failure to replicate or extend. *Represent. Res. Soc. Psychol.* 8, 98–107.

Kalof, L. (1999). The effects of gender and music video imagery on sexual attitudes. *J. Soc. Psychol.* 139, 378–385. doi: 10.1080/00224549909598393

Kanekar, S., and Nazareth, A. M. (1988). Attributed rape victim's fault as a function of her attractiveness, physical hurt, and emotional disturbance. *Soc. Behav.* 3, 37–40.

Kanekar, S., and Seksaria, V. (1993). Acquaintance versus stranger rape: testing the ambiguity reduction hypothesis. *Eur. J. Soc. Psychol.* 23, 485–494. doi: 10.1002/ejsp.2420230506

Kanekar, S., Shaherwalla, A., Franco, B., Kunju, T., and Pinto, A. J. (1991). The acquaintance predicament of a rape victim. *J. Appl. Soc. Psychol.* 21, 1524–1544. doi: 10.1111/j.1559-1816.1991.tb00486.x

Katz, I., and Hass, R. G. (1988). Racial ambivalence and American value conflict: correlational and priming studies of dual cognitive structures. *J. Pers. Soc. Psychol.* 55, 893–905. doi: 10.1037/0022-3514.55.6.893

Kerr, N. L., and Kurtz, S. T. (1977). Effects of a victim's suffering and respectability on mock juror judgments: further evidence for the just world theory. *Represent. Res. Soc. Psychol.* 8, 42–56.

Kilpatrick, D. G., Resnick, H. S., Ruggiero, K. J., Conoscenti, L. M., and McCauley, J. (2007). *Drug Facilitated, Incapacitated, and Forcible Rape: A National Study (NCJ 219181).* Charleston, SC: Medical University of South Carolina.

Kleinke, C. L., and Meyer, C. (1990). Evaluation of rape victims by men and women with high and low belief in a just world. *Psychol. Women Q.* 14, 343–353. doi: 10.1111/j.1471-6402.1990.tb00024.x

Klippenstine, M. A., Schuller, R. A., and Wall, A. (2007). Perceptions of sexual assault: the expression of gender differences and the impact of target alcohol consumption. *J. Appl. Soc. Psychol.* 37, 2620–2641. doi: 10.1111/j.1559-1816.2007.00273.x

Kopper, B. A. (1996). Gender, gender identity, rape myth acceptance, and time of initial resistance on the perception of acquaintance rape blame and avoidability. *Sex Roles* 34, 81–93. doi: 10.1007/BF01544797

Koss, M. P., Dinero, T. E., Seibel, C. A., and Cox, S. L. (1988). Stranger and acquaintance rape: are there differences in the victim's experience? *Psychol. Women Q.* 12, 1–24. doi: 10.1111/j.1471-6402.1988.tb00924.x

Koss, M. P., and Gaines, J. A. (1993). The prediction of sexual aggression by alcohol use, athletic participation, and fraternity affiliation. *J. Interpers. Violence* 8, 94–108. doi: 10.1177/088626093008001007

Koss, M. P., Gidycz, C. A., and Wisniewski, N. (1987). The scope of rape: incidence and prevalence of sexual aggression and victimization in a national sample of higher education students. *J. Consult. Clin. Psychol.* 55, 162–170. doi: 10.1037/0022-006X.55.2.162

Koss, M. P., and Harvey, M. R. (1991). *The Rape Victim: Clinical and Community Interventions,* 2nd Edn. Thousand Oaks, CA: Sage Publications.

Koss, M. P., Heise, L., and Russo, N. F. (1994). The global health burden of rape. *Psychol. Women Q.* 18, 509–537. doi: 10.1111/j.1471-6402.1994.tb01046.x

Krahé, B. (1988). Victim and observer characteristics as determinants of responsibility attributions to victims of rape. *J. Appl. Soc. Psychol.* 18, 50–58. doi: 10.1111/j.1559-1816.1988.tb00004.x

Krahé, B., Temkin, J., and Bieneck, S. (2007). Schema-driven information processing in judgements about rape. *Appl. Cogn. Psychol.* 21, 602–619. doi: 10.1002/acp.1297

Krebs, C. P., Lindquist, C. H., Warner, T. D., Fisher, B. S., and Martin, S. L. (2009). College women's experiences with physically forced, alcohol or other drug-enabled, and drug-facilitated sexual assault before and since entering college. *J. Am. Coll. Health* 57, 639–647. doi: 10.3200/JACH.57.6.639-649

Krebs, D. (1975). Empathy and altruism. *J. Pers. Soc. Psychol.* 32, 1134–1146. doi: 10.1037/0022-3514.32.6.1134

Krulewitz, J. E., and Nash, J. E. (1979). Effects of rape victim resistance, assault outcome, and sex of observer on attributions of rape. *J. Pers.* 47, 557–574. doi: 10.1111/j.1467-6494.1979.tb00209.x

Lambert, A. J., and Raichle, K. (2000). The role of political ideology in mediating judgments of blame in rape victims and their assailants: a test of the just world, personal responsibility and legitimization hypotheses. *Pers. Soc. Psychol. Bull.* 26, 853–863. doi: 10.1177/0146167200269010

Landström, S., Strömwall, L. A., and Alfredsson, H. (2016). Blame attributions in sexual crimes: effects of belief in a just world and victim behavior. *Nord. Psychol.* 68, 2–11. doi: 10.1080/19012276.2015.1026921

Langley, T., Yost, E. A., O'Neal, E. C., Taylor, S. L., Frankel, P. I., and Craig, K. M. (1991). Models of rape judgment: attributions concerning event, perpetrator, and victim. *J. Offender Rehabil.* 17, 43–54. doi: 10.1300/J076v17n01_04

Lanis, K., and Covell, K. (1995). Images of women in advertisements: effects on attitudes related to sexual aggression. *Sex Roles* 32, 639–649. doi: 10.1007/BF01544216

Larcombe, W. (2002). The 'ideal' victim v successful rape complainants: not what you might expect. *Fem. Legal Stud.* 10, 131–148. doi: 10.1023/A:1016060424945

L'Armand, K., and Pepitone, A. (1982). Judgments of rape: a study of victim–rapist relationship and victim sexual history. *Pers. Soc. Psychol. Bull.* 8, 134–139. doi: 10.1177/014616728281021

Lerner, M. J. (1970). "The desire for justice and reactions to victims," in *Altruism and Helping Behavior,* eds J. Macaulay and L. Berkowitz (New York, NY: Academic Press).

Lerner, M. J. (1980). *The Belief in a Just World: A Fundamental Delusion.* New York, NY: Springer, 9–30. doi: 10.1007/978-1-4899-0448-5_2

JA143

Lerner, M. J., and Miller, D. T. (1978). Just world research and the attribution process: looking back and ahead. *Psychol. Bull.* 85, 1030–1051. doi: 10.1037/0033-2909.85.5.1030

Locke, B. D., and Mahalik, J. R. (2005). Examining masculinity norms, problem drinking, and athletic involvement as predictors of sexual aggression in college men. *J. Couns. Psychol.* 52, 279–283. doi: 10.1037/0022-0167.52.3.279

Longino, H. (1980). "Pornography, oppression and freedom: a closer look," in *Take Back the Night*, ed. L. Lederer (New York, NY: William Morrow Co).

Lonsway, K. A., and Fitzgerald, L. F. (1994). Rape myths in review. *Psychol. Women Q.* 18, 133–164. doi: 10.1111/j.1471-6402.1994.tb00448.x

Loughnan, S., Pina, A., Vasquez, E. A., and Puvia, E. (2013). Sexual objectification increases rape victim blame and decreases perceived suffering. *Psychol. Women Q.* 37, 455–461. doi: 10.1177/0361684313485718

MacKinnon, C. A. (1985). Pornography, civil rights, and speech. *Harv. CR-CLL Rev.* 20, 1.

MacKay, N. J., and Covell, K. (1997). The impact of women in advertisements on attitudes toward women. *Sex Roles* 36, 573–583. doi: 10.1023/A:1025613923786

Malamuth, N. M., and Check, J. V. (1981). The effects of mass media exposure on acceptance of violence against women: a field experiment. *J. Res. Pers.* 15, 436–446. doi: 10.1016/0092-6566(81)90040-4

Margolin, L., Miller, M., and Moran, P. B. (1989). When a kiss is not just a kiss: relating violations of consent in kissing to rape myth acceptance. *Sex Roles* 20, 231–243. doi: 10.1007/BF00287721

Masser, B., Lee, K., and McKimmie, B. M. (2010). Bad woman, bad victim? Disentangling the effects of victim stereotypicality, gender stereotypicality and benevolent sexism on acquaintance rape victim blame. *Sex Roles* 62, 494–504. doi: 10.1007/s11199-009-9648-y

Maurer, T. W., and Robinson, D. W. (2008). Effects of attire, alcohol, and gender on perceptions of date rape. *Sex Roles* 58, 423–434. doi: 10.1007/s11199-007-9343-9

McCaul, K. D., Veltum, L. G., Boyechko, V., and Crawford, J. J. (1990). Understanding attributions of victim blame for rape: sex, violence, and foreseeability. *J. Appl. Soc. Psychol.* 20, 1–26. doi: 10.1111/j.1559-1816.1990.tb00375.x

McCray, K. L. (2014). Intercollegiate athletes and sexual violence: a review of literature and recommendations for future study. *Trauma Violence Abuse* 16, 438–443. doi: 10.1177/1524838014537907

McKimmie, B. M., Masser, B. M., and Bongiorno, R. (2014). What counts as rape? The effect of offense prototypes, victim stereotypes, and participant gender on how the complainant and defendant are perceived. *J. Interpers. Violence* 9, 2273–2303. doi: 10.1177/0886260513518843

Melnick, M. (1992). Male athletes and sexual assault. *J. Phys. Ther. Educ. Recreation Dance* 63, 32–36. doi: 10.1080/07303084.1992.10604186

Miller, A. K., Markman, K. D., Amacker, A. M., and Menaker, T. A. (2012). Expressed sexual assault legal context and victim culpability attributions. *J. Interpers. Violence* 27, 1023–1039. doi: 10.1177/0886260511424493

Monson, C. M., Langhinrichsen-Rohling, J., and Binderup, T. (2000). Does "no" really mean "no" after you say "yes"? Attributions about date and marital rape. *J. Interpers. Violence* 15, 1156–1174. doi: 10.1177/088626000015011003

Mori, L., Bernat, J. A., Glenn, P. A., Selle, L. L., and Zarate, M. G. (1995). Attitudes toward rape: gender and ethnic differences across Asian and Caucasian college students. *Sex Roles* 32, 457–467. doi: 10.1007/BF01544182

Muehlenhard, C. L., and Hollabaugh, L. C. (1988). Do women sometimes say no when they mean yes? The prevalence and correlates of women's token resistance to sex. *J. Pers. Soc. Psychol.* 54, 872–879. doi: 10.1037/0022-3514.54.5.872

Muehlenhard, C. L., and Linton, M. A. (1987). Date rape and sexual aggression in dating situations: incidence and risk factors. *J. Couns. Psychol.* 34, 186–196. doi: 10.1037/0022-0167.34.2.186

Muehlenhard, C. L., and MacNaughton, J. S. (1988). Women's beliefs about women who "lead men on." *J. Soc. Clin. Psychol.* 7, 65–79. doi: 10.1521/jscp.1988.7.1.65

Muehlenhard, C. L., and McCoy, M. L. (1991). Double standard/double bind: the sexual double standard and women's communication about sex. *Psychol. Women Q.* 15, 447–461. doi: 10.1111/j.1471-6402.1991.tb00420.x

Muehlenhard, C. L., and Quackenbush, D. M. (1998). "Sexual double standard scale," in *Handbook of Sexuality-Related Measures*, eds C. M. Davis, W. L. Yarber, R. Bauserman, G. Schreer, and S. L. Davis (Thousand Oaks, CA: Sage), 186–188.

Munsch, C. L., and Willer, R. (2012). The role of gender identity threat in perceptions of date rape and sexual coercion. *Violence Against Women* 18, 1125–1146. doi: 10.1177/1077801212465151

Nario-Redmond, M. R., and Branscombe, N. R. (1996). It could have been better or it might have been worse: implications for blame assignment in rape cases. *Basic Appl. Soc. Psychol.* 18, 347–366. doi: 10.1207/s15324834basp1803_6

Ohbuchi, K., Ikeda, T., and Takeuchi, K. (1994). Effects of violent pornography upon viewers' rape myth beliefs: a study of Japanese males. *Psychol. Crime Law* 1, 71–81. doi: 10.1080/10683169408411937

Ong, A. S. J., and Ward, C. A. (1999). The effects of sex and power schemas, attitudes toward women, and victim resistance on rape attributions. *J. Appl. Soc. Psychol.* 29, 362–376. doi: 10.1111/j.1559-1816.1999.tb01391.x

O'Toole, L. L. (2007). "Subcultural theory of rape revisited," in *Gender Violence: Interdisciplinary Perspectives*, 2nd Edn, eds L. L. O'Toole, J. R. Schiffman, and M. L. K. Edwards (New York, NY: New York University Press), 214–222.

Pagelow, M. D. (1988). "Marital rape," in *Handbook of Family Violence*, eds V. B. Van Hasselt, R. L. Morrison, A. S. Bellack, and M. Hersen (New York, NY: Springer), 207–232. doi: 10.1007/978-1-4757-5360-8_9

Payne, D. L., Lonsway, K. A., and Fitzgerald, L. F. (1999). Rape myth acceptance: exploration of its structure and its measurement using the Illinois Rape Myth Acceptance Scale. *J. Res. Pers.* 33, 27–68. doi: 10.1006/jrpe.1998.2238

Pederson, S. H., and Strömwall, L. A. (2013). Victim blame, sexism, and just-world beliefs: a cross-cultural comparison. *Psychiatry Psychol. Law* 20, 932–941. doi: 10.1080/13218719.2013.770715

Persson, S., Dhingra, K., and Grogan, S. (2018). Attributions of victim blame in stranger and acquaintance rape: a quantitative study. *J. Clin. Nurs.* 27, 1–10. doi: 10.1111/jocn.14351

Pfeiffer, M. G. (1990). Date rape: the reality. *South. Univ. Law Rev.* 17, 283–295.

Pollard, P. (1992). Judgments about victims and attackers in depicted rapes: a review. *Br. J. Soc. Psychol.* 31, 309–326. doi: 10.1111/j.2044-8309.1992.tb00975.x

Pratto, F. (1996). "Sexual politics: the gender gap in the bedroom, the cupboard, and the cabinet," in *Sex, Power, Conflict: Evolutionary and Feminist Perspectives*, eds D. M. Buss and N. M. Malamuth (New York, NY: Oxford University Press), 179–230.

Pratto, F., Stallworth, L. M., and Sidanius, J. (1997). The gender gap: differences in political attitudes and social dominance orientation. *Br. J. Soc. Psychol.* 36, 49–68. doi: 10.1111/j.2044-8309.1997.tb01118.x

Pugh, M. D. (1983). Contributory fault and rape convictions: loglinear models for blaming the victim. *Soc. Psychol.* Q. 46, 233–242. doi: 10.2307/3033794

Qi, S. J., Starfelt, L. C., and White, K. M. (2016). Attributions of responsibility, blame and justifiability to a perpetrator and victim in an acquaintance rape scenario: the influence of Marijuana intoxication. *J. Sex. Aggress.* 22, 20–35. doi: 10.1080/13552600.2015.1025868

Quackenbush, R. L. (1989). A comparison of androgynous, masculine sex-typed and undifferentiated males on dimensions of attitudes toward rape. *J. Res. Pers.* 23, 318–342. doi: 10.1016/0092-6566(89)90005-6

Rennison, M. (2002). *Rape and Sexual Assault: Reporting to Police and Medical Attention, 1992-2000*. Washington, DC: U.S. Department of Justice.

Richardson, D. C., and Campbell, L. (1980). Alcohol and wife abuse: the effect of alcohol on attributions of blame for wife abuse. *Pers. Soc. Psychol. Bull.* 6, 51–56. doi: 10.1177/014616728061007

Richardson, D. C., and Campbell, L. (1982). Alcohol and rape: the effect of alcohol on attributions of blame for rape. *Pers. Soc. Psychol. Bull.* 8, 468–476. doi: 10.1177/0146167282083013

Richardson, D. R., and Hammock, G. S. (1991). "Alcohol and acquaintance rape," in *Acquaintance Rape: The Hidden Crime*, eds A. Parrot and L. Bechofer (New York, NY: Wiley), 83–95.

Romero-Sánchez, M., Megías, J. L., and Krahé, B. (2012). The role of alcohol and victim sexual interest in Spanish students' perceptions of sexual assault. *J. Interpers. Violence* 27, 2230–2258. doi: 10.1177/0886260511432149

Root, L. P. A. (1993). Reactions to stranger and acquaintance rape: a study of causal attributions and behavioral intentions toward victims (University of Mississippi). *Diss. Abstr. Int.* 48:2106B.

Rózée, P. D. (1993). Forbidden or forgiven? Rape in cross-cultural perspective. *Psychol. Women Q.* 17, 499–514. doi: 10.1111/j.1471-6402.1993.tb00658.x

JA144

Rubin, Z., and Peplau, A. (1973). Belief in a just world and reactions to another's lot: a study of participants in the national draft lottery. *J. Soc. Issues* 29, 73–93. doi: 10.1111/j.1540-4560.1973.tb00104.x

Ruggi, S. (1998). Commodifying honor in female sexuality: honor killings in palestine. *Middle East Rep.* 206, 12–15. doi: 10.2307/3012473

Russell, D. E. H. (1984). *Sexual Exploitation: Rape, Child Sexual Abuse, and Workplace Harassment*. Beverly Hills, CA: Sage.

Ryan, W. (1971). *Blaming the Victim*. New York, NY: Pantheon.

Sanchez-Hucles, J., and Dutton, M. A. (1999). "The interaction between societal violence and domestic violence: racial and cultural factors," in *What Causes Men's Violence Against Women?*, eds M. Harway and J. M. O'Neil (Thousand Oaks, CA: Sage Publications), 183–203. doi: 10.4135/9781452231921.n11

Sanday, P. R. (1981). The socio-cultural context of rape: a cross-cultural study. *J. Soc. Issues* 37, 5–27. doi: 10.1111/j.1540-4560.1981.tb01068.x

Sanday, P. R. (1990). *Fraternity Gang Rape: Sex, Brotherhood, and Privilege on Campus*. New York, NY: New York University Press.

Schuller, R. A., McKimmie, B. M., Masser, B. M., and Klipenstine, M. A. (2010). Judgements of sexual assault: the impact of complainant emotional demeanor, gender, and victim stereotypes. *New Crim. Law Rev.* 13, 759–780. doi: 10.1525/nclr.2010.13.4.759

Schuller, R. A., and Wall, A. (1998). The effects of defendant and complainant intoxication on mock jurors' judgements of sexual assault. *Psychol. Women Q.* 22, 555–573. doi: 10.1111/j.1471-6402.1998.tb00177.x

Schur, E. (1988). *The Americanization of Sex*. Philadelphia, PA: Temple University Press.

Schur, E. M. (1983). *Labeling Women Deviant: Gender, Stigma, and Social Control*. Philadelphia, PA: Temple University Press.

Scronce, C. A., and Corcoran, K. J. (1995). The influence of the victim's consumption of alcohol on perceptions of stranger and acquaintance rape. *Violence Against Women* 1, 241–253. doi: 10.1177/1077801295001003004

Selby, J. W., Calhoun, L. G., and Brock, T. A. (1977). Sex differences in the social perception of rape victims. *Pers. Soc. Psychol. Bull.* 3, 412–415. doi: 10.1177/014616727700300310

Seligman, C., Paschall, N., and Takata, G. (1974). Effects of physical attractiveness on attribution of responsibility. *Can. J. Behav. Sci.* 6, 290–296. doi: 10.1037/h0081875

Shaver, K. G., and Drown, D. (1986). On causality, responsibility, and self-blame: a theoretical note. *J. Pers. Soc. Psychol.* 50, 697–702. doi: 10.1037/0022-3514.50.4.697

Shotland, R. L., and Goodstein, L. (1983). Just because she doesn't want to doesn't mean it's rape: an experimentally based causal model of the perception of rape in a dating situation. *Soc. Psychol. Q.* 46, 220–232. doi: 10.2307/3033793

Shultz, S. K., Scherman, A., and Marshall, L. J. (2000). Evaluation of a university-based date rape prevention program: effect on attitudes and behavior related to rape. *J. Coll. Stud. Dev.* 41, 193–201.

Sidanius, J., Pratto, F., and Bobo, L. (1996). Racism, conservatism, affirmative action, and intellectual sophistication: a matter of principled conservatism or group dominance? *J. Pers. Soc. Psychol.* 70, 476–490. doi: 10.1037/0022-3514.70.3.476

Simonson, K., and Subich, L. M. (1999). Rape perceptions as a function of gender-role traditionality and victim-perpetrator association. *Sex Roles* 40, 617–634. doi: 10.1023/A:1018844231555

Sims, C. M., Noel, N. E., and Maisto, S. A. (2007). Rape blame as a function of alcohol presence and resistance type. *Addict. Behav.* 32, 2766–2775. doi: 10.1016/j.addbeh.2007.04.013

Sinclair, H. C., and Bourne, L. E. Jr. (1998). Cycle of blame or just world: effects of legal verdicts on gender patterns in rape-myth acceptance and victim empathy. *Psychol. Women Q.* 22, 575–588. doi: 10.1111/j.1471-6402.1998.tb00178.x

Smith, D. D. (1976). The social content of pornography. *J. Commun.* 26, 16–24. doi: 10.1111/j.1460-2466.1976.tb01351.x

Smith, R. E., Keating, J. P., Hester, R. K., and Mitchell, E. M. (1976). Role and justice considerations in the attribution of responsibility to a rape victim. *J. Res. Pers.* 10, 346–357. doi: 10.1016/0092-6566(76)90024-6

Sommer, S., Reynolds, J. J., and Kehn, A. (2016). Mock juror perceptions of rape victims: impact of case characteristics and individual differences. *J. Interpers. Violence* 31, 2847–2866. doi: 10.1177/0886260515581907

Soothill, K. (1991). The changing face of rape? *Br. J. Criminol.* 31, 383–392. doi: 10.1093/oxfordjournals.bjc.a048136

Sorenson, S. B. (1996). Violence against women: examining ethnic differences and commonalities. *Eval. Rev.* 20, 123–145. doi: 10.1177/0193841X9602000201

Spencer, B. (2016). The impact of class and sexuality-based stereotyping on rape blame. *Sexualization Media Soc.* 2, 1–8. doi: 10.1177/2374623816643282

Sprecher, S., McKinney, K., and Orbuch, T. L. (1987). Has the double standard disappeared? An experimental test. *Soc. Psychol. Q.* 50, 24–31. doi: 10.2307/2786887

Stahl, T., Eek, D., and Kazemi, A. (2010). Rape victim blaming as system justification: the role of gender and activation of complementary stereotypes. *Soc. Justice Res.* 23, 239–258. doi: 10.1007/s11211-010-0117-0

Stankiewicz, J. M., and Rosselli, F. (2008). Women as sex objects and victims in print advertisements. *Sex Roles* 58, 579–589. doi: 10.1007/s11199-007-9359-1

Starfelt, L. C., Young, R. M., White, K. M., and Palk, G. M. (2015). Explicating the role of sexual coercion and alcohol expectancies in rape attributions. *J. Interpers. Violence* 30, 1965–1981. doi: 10.1177/0886260514549466

Stephan, C., and Tully, J. C. (1977). The influence of physical attractiveness on a plaintiff on the decisions of simulated jurors. *J. Soc. Psychol.* 101, 149–150. doi: 10.1080/00224545.1977.9923997

Stormo, K. J., Lang, A. R., and Stritzke, W. G. K. (1997). Attributions about acquaintance rape: the role of alcohol and individual differences. *J. Appl. Soc. Psychol.* 27, 279–305. doi: 10.1111/j.1559-1816.1997.tb00633.x

Strömwall, L. A., Alfredson, H., and Landstrom, S. (2013). Blame attributions and rape: effects of belief in a just world and relationship level. *Legal Criminol. Psychol.* 18, 254–261. doi: 10.1111/j.2044-8333.2012.02044.x

Stuart, S. M., McKimmie, B. M., and Masser, B. M. (2016). Rape perpetrators on trial: the effect of sexual assault-related schemas on attributions of blame. *J. Interpers. Violence* 34, 310–336. doi: 10.1177/0886260516640777

Suarez, E., and Gadalla, T. M. (2010). Stop blaming the victim: a meta-analysis on rape myths. *J. Interpers. Violence* 25, 2010–2035. doi: 10.1177/0886260509354503

Tetreault, P. A., and Barnett, M. A. (1987). Reactions to stranger and acquaintance rape. *Psychol. Women Q.* 11, 353–358. doi: 10.1111/j.1471-6402.1987.tb00909.x

Thornton, B. (1984). Defensive attribution of responsibility: evidence for an arousal-based motivational bias. *J. Pers. Soc. Psychol.* 46, 721–734. doi: 10.1037/0022-3514.46.4.721

Ullman, S. E., Karabatsos, G., and Koss, M. P. (1999). Alcohol and sexual assault in a national sample of college women. *J. Interpers. Violence* 14, 603–625. doi: 10.1177/088626099014006003

Ulman, S. E. (1996). Social reactions, coping strategies, and self-blame attributions in adjustment to sexual assault. *Psychol. Women Q.* 20, 505–526. doi: 10.1111/j.1471-6402.1996.tb00319.x

Van Den Bos, K., and Maas, M. (2009). On the psychology of the belief in a just world: exploring experiential and rationalistic path to victim blaming. *Pers. Soc. Psychol. Bull.* 35, 1567–1578. doi: 10.1177/0146167209344628

Vandello, J. A., and Bosson, J. K. (2013). Hard won and easily lost: a review and synthesis of theory and research on precarious manhood. *Psychol. Men Masc.* 14, 101–113. doi: 10.1037/a0029826

Vandello, J. A., Bosson, J. K., Cohen, D., Burnaford, R. M., and Weaver, J. R. (2008). Precarious manhood. *J. Pers. Soc. Psychol.* 95, 1325–1339. doi: 10.1037/a0012453

Varelas, N., and Foley, L. A. (1998). Blacks' and Whites' perceptions of interracial an intraracial date rape. *J. Soc. Psychol.* 138, 392–400. doi: 10.1080/00224549809600391

Viki, G. T., and Abrams, D. (2002). But she was unfaithful: benevolent sexism and reactions to rape victims who violate traditional gender role expectations. *Sex Roles* 47, 289–293. doi: 10.1023/A:1021342912248

Wall, A., and Schuller, R. A. (2002). Sexual assault and defendant/victim intoxication: jurors' perceptions of guilt. *J. Appl. Psychol.* 30, 253–274. doi: 10.1111/j.1559-1816.2000.tb02315.x

Ward, C. (1988). The attitudes toward rape victims scale: construction, validation, and cross-cultural applicability. *Psychol. Women Q.* 12, 127–146. doi: 10.1111/j.1471-6402.1988.tb00932.x

Ward, C. (1995). *Attitudes Toward Rape: Feminist and Social Psychological Perspectives*. London: Sage.

JA145

Warshaw, R. (1994). *I Never Called it Rape*, 2nd Edn. New York, NY: Harper & Row.

Weis, K., and Borges, S. S. (1973). Victimology and rape: the case of the legitimate victim. *Issues Criminol.* 8, 71–115.

Whatley, M. A. (1996). Victim characteristics influencing attributions of responsibility to rape victims: a meta-analysis. *Aggress. Violent Behav.* 1, 81–95. doi: 10.1016/1359-1789(95)00011-9

Whatley, M. A. (2005). The effect of participant sex, victim dress, and traditional attitudes on causal judgments for marital rape victims. *J. Fam. Violence* 20, 191–200. doi: 10.1007/s10896-005-3655-8

Whatley, M. A., and Riggio, R. E. (1992). Attributions of blame for female and male victims. *Fam. Violence Sex. Assault Bull.* 8, 16–18.

White, A. M., Potgieter, C. A., Strube, M. J., Fisher, S., and Umana, E. (1997). An African-centered, Black feminist approach to understanding attitudes that counter social dominance. *J. Black Psychol.* 23, 398–420. doi: 10.1177/00957984970234007

Wiener, R. L., and Vodanovich, S. J. (1986). The evaluation of culpability for rape: a model of legal decision making. *J. Psychol.* 120, 489–500. doi: 10.1080/00223980.1986.9915481

Williams, J. E. (1984). Secondary victimization: confronting public attitudes about rape. *Victimology* 9, 66–81.

Williams, J. E., and Holmes, K. A. (1981). *The Second Assault: Rape and Public Attitudes*. Westport, CT: Greenwood Press.

Willis, C. E. (1992). The effect of sex role stereotype, victim and defendant race, and prior relationship on rape culpability attributions. *Sex Roles* 26, 213–226. doi: 10.1007/BF00289708

Wooten, J. N. (1980). The effects of victim/assailant familiarity and victim resistance on attitudes toward rape among law enforcement personnel and college students (Texas A & M University). *Diss. Abstr. Int.* 41:1487B.

Workman, J. E., and Orr, R. L. (1996). Clothing, sex of subject, and rape myth acceptance as factors affecting attributions about an incident of acquaintance rape. *Cloth. Textiles Res. J.* 14, 276–284. doi: 10.1177/0887302X9601400407

World Economic Forum (2017). *The Global Gender Gap Report*. Cologny: World Economic Forum.

World Health Organization [WHO] (2005). *Multi-Country Study on Women's Health and Domestic Violence Against Women: Summary Report of Initial Results on Prevalence, Health Outcomes and Women's Responses*. Geneva: World Health Organization.

Wyer, R. S. Jr., Bodenhausen, G. V., and Gorman, T. F. (1985). Cognitive mediators of reactions to rape. *J. Pers. Soc. Psychol.* 48, 324–338. doi: 10.1037/0022-3514.48.2.324

Yamawaki, N. (2007). Rape perception and the function of ambivalent sexism and gender-role traditionality. *J. Interpers. Violence* 22, 406–422. doi: 10.1177/0886260506297210

Yamawaki, N., Darby, R., and Queiroz, A. (2007). The moderating role of ambivalent sexism: the influence of power status on perception of rape victim and rapist. *J. Soc. Psychol.* 147, 41–56. doi: 10.3200/SOCP.147.1.41-56

Yamawaki, N., and Tschanz, B. T. (2005). Rape perception differences between Japanese and American college students: on the mediating influence of gender-role traditionality. *Sex Roles* 52, 379–392. doi: 10.1007/s11199-005-2680-7

Young, C. (1986). "Afro-American family: contemporary issues and implications for social policy," in *On Being Black: An in-Group Analysis*, ed. D. Pilgrim (Bristol, IN: Wyndham Hall), 58–75.

Zilbergeld, B. (1978). *Male Sexuality: A Guide to Sexual Fulfillment*. New York, NY: Bantam Books.

**Conflict of Interest Statement:** The authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

*Copyright © 2019 Gravelin, Biernat and Bucher. This is an open-access article distributed under the terms of the Creative Commons Attribution License (CC BY). The use, distribution or reproduction in other forums is permitted, provided the original author(s) and the copyright owner(s) are credited and that the original publication in this journal is cited, in accordance with accepted academic practice. No use, distribution or reproduction is permitted which does not comply with these terms.*

JA146

Case 1:22-cv-00545-CMH-TCB   Document 24-2   Filed 07/11/22   Page 1 of 4 PageID# 244

EXHIBIT B



**EGYPT, INDIA, JORDAN, LEBANON, MIDDLE EAST, NORTHEAST ASIA, SOUTH ASIA, SYRIA, WORLD**

# *Arab countries struggle with the stigma associated with rape*

**By RYM TINA GHAZAL**
JANUARY 1, 2019



Photo: iStock

"Help! I've been raped!" Manal Issa uttered those words as she stumbled down a Beirut street, desperately appealing to people around her. According to a news report on CNN's website, a crowd gathered, with some people telling her to calm

down and even to just be quiet. One person even chastised her for wearing a miniskirt, while yet another accused her of being a drug addict, according to the report. Not a single person called the police.

Fortunately, Issa had not really been raped — her public appeal was an experiment by the Lebanese women's rights group ABAAD to highlight the public's lack of awareness when it comes to rape and sexual assault.

The rights group had conducted a weeks-long campaign, #ShameOnWho, addressing social stigma and how victims are often accused of being "loose" and responsible for sexual assaults. "We're trying to encourage women who are survivors of rape to speak up, to get out of the cycle and culture of victim-blaming," the group's founder, Ghida Anani, told CNN.

While this incident was staged, I have seen the real thing before. When I was a reporter based in Beirut more than 10 years ago, I saw a woman running down one of the city's busier streets in the middle of the night, yelling that she had been robbed and sexually assaulted.

There was a group of people sitting outdoors at a restaurant, but they did not have much of a reaction, with some people shaking their heads and looking away. Two women shouted at the woman, telling her to be quiet because there were children in the area. However, I was with a group of journalists and we ran to the woman and tried to help. A colleague was instantly on his mobile phone telling police that there was a woman in distress, but he was struggling to persuade them to come to the scene.

"Yes, she is walking and standing up, but she needs help. She needs an ambulance and to file a report, right?" he said. In the end, the police didn't come. When we offered to take the woman to the police station, she refused and asked us to take her home and not to report the assault. Left with little option, we did as she asked, and the attack ultimately went unaddressed.

In that context, the United Nations Entity for Gender Equality and the Empowerment of Women (UN Women) statistics for Arab and North African countries come as no surprise, showing that more than six of 10 female survivors of violence remain silent and do not ask for support or protection. The agency also

JA148

found that one in three women has experienced physical or sexual violence at least once in her life — mostly perpetrated by their partners.

Last summer, the Thomson Reuters Foundation released a poll concluding that India was the most dangerous country in the world for women because of sexual violence, human trafficking for domestic work, forced labor, forced marriage and sexual slavery and other factors.

In the "sexual violence" category — which included rape as a weapon of war, domestic rape, rape by a stranger, the lack of access to justice in rape cases and sexual harassment and coercion to have sex as a form of corruption — India ranked first, followed by the Democratic Republic of Congo and Syria. Egypt also ranked high on the list at No 10.

Fortunately, there has been progress. One of the issues in the Arab world is that rapists who marry their victims are often shown leniency or even acquitted. This is changing in some countries, such as Morocco, where Article 475 of the penal code, which previously allowed rapists to avoid prosecution if they married their victims, was repealed in 2014 after a victim's suicide after she was forced to marry her rapist. Lebanon and Jordan similarly reformed their legal codes in 2017.

Other crimes against women have also begun to spur reforms. For example, the Jordanian government reported 36 "justified" honor killings in 2017, which led to an amendment of the penal code that had specified less severe penalties for crimes committed in "fits of fury" — typically when male family members killed their sisters or daughters because they had brought "dishonor" upon the family.

Tunisia's legislative reform implemented last year is the most progressive in the region, mandating compensation and follow-up support for survivors, while recognizing that men and boys can also be victims of rape.

In some countries such as the United Arab Emirates, rapists can face the death penalty, but sex outside marriage, or *zina*, is also a serious crime, and women who have reported sexual assaults have then been arrested themselves.

It appears to have been more clear-cut in the past. An often-repeated story relates

how a woman living in the time of the Prophet Muhammad was raped when she left her house to pray. When she reported the assault, people caught the perpetrator and brought him to Prophet Muhammad, who condemned him to death. The woman was not shamed or held accountable for being a victim.

In the present day, we know that some victims may know their attackers, who may even be family members. In those cases, social pressure not to report the crime is reinforced by warped family influence to protect the rapist and "family name." But a failure to report the crime, especially when linked to shaming and punishing the victim, is never the right answer and will only lead to continued sexual assaults.

*This article was provided to Asia Times by* [Syndication Bureau](#)*, which holds copyright.*

## Reva Tox

January 3, 2019 at 6:15 AM

When a society regresses into desperation like in South Asia and the Arab-Muslim Ummah, then the rape problem will become prevalent as those dudes there will use violence on their women and weaker members of society to assert their manliness.

## Reva Tox

January 3, 2019 at 6:15 AM

When a society regresses into desperation like in South Asia and the Arab-Muslim Ummah, then the rape problem will become prevalent as those dudes there will use violence on their women and weaker members of society to assert their manliness.

## Comments are closed.

© 2022 COVERING GEO-POLITICAL NEWS AND CURRENT AFFAIRS ACROSS ASIA.

PROUDLY POWERED BY NEWSPACK BY AUTOMATTIC

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **JANE DOE** | ) |
|     **A Domiciliary of the** | ) |
|     **Commonwealth of Virginia** | ) |
| | ) |
|     **Plaintiff,** | )     **Civil Action No. 1:22-cv-00545** |
| | ) |
| **v.** | ) |
| | ) |
| **CENK SIDAR** | ) |
| | ) |
|     **Defendant.** | ) |

**[PROPOSED] ORDER DENYING
MOTION TO REMOVE PSEUDONYM DESIGNATION**

Upon consideration of Defendant's Motion To Remove Pseudonym Designation

("Motion"), the briefs filed by the Parties, and any argument regarding the Motion, it is hereby

ORDERED:

1.    That the Motion is hereby DENIED.

2.    That all references to Plaintiff in all filings and proceedings in this cause shall

continue to be to "Jane Doe" and that Plaintiff's identity shall continue to be redacted in all

filings.

_____
Judge,  United States District Court
Eastern District of Virginia

cc:

Thomas F. Urban II, VSB #40540
Fletcher, Heald & Hildreth, PLC
1300 17th Street North, Suite 1100
Arlington, Virginia 22209

Walter E. Steimel, Jr. (PRO HAC VICE)
Steimel Counselors Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004

*Counsel for Plaintiff Jane Doe*

Mariam W. Tadros, Esq.
Rees Broome, PC
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209

*Counsel for Defendant Cenk Sidar*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **JANE DOE** ) | |
| **A Domiciliary of the** ) | |
| **Commonwealth of Virginia** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. 1:22-cv-00545** |
| ) | |
| **v.** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **CENK SIDAR** ) | |
| ) | |
| **Defendant.** ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO REMOVE**
**PSEUDONYM DESIGNATION**

Plaintiff Jane Doe ("Plaintiff"), by and through her attorneys Fletcher, Heald and

Hildreth, PLC and Steimel Counselors Law Group, PLLC, hereby files this Opposition to

Defendant's Motion to Remove Pseudonym Designation ("Motion"). *ECF No. 20.*

**I.     Introduction.**

Defendant's Motion mischaracterizes the prior proceedings before the Fairfax County

Circuit Court and Plaintiff's actions, casting baseless aspersions as to the timing of Plaintiff's

motion for non-suit and the conduct of discovery. These issues are irrelevant to the Motion.

Plaintiff can respond to each of these mischaracterizations but believes that it is more important

to focus on Defendant's Motion.

Plaintiff filed her case in Fairfax County Circuit Court on September 13, 2019. Prior to

her filing, she undertook extensive discussions with Defendant's counsel in efforts to avoid

litigation. At no time during any of those discussions did Defendant request confidentiality or

anonymity. At no time during the pendency of the prior case in Fairfax County did Defendant

move to remove Plaintiff's pseudonym designation. In only one instance did Defendant move for a protective order, and that was to block the sharing of DNA results with the London Metropolitan Police if Defendant eventually submitted himself for a test. Defendant's motion was denied by Judge Smith on September 4, 2020, with Judge Smith noting on the record that he would decline Defendant's request to interfere with a criminal investigation in another country. Defendant proposed a new protective order to Plaintiff before Plaintiff filed for a non-suit, but no drafts of the protective orders circulated among counsel contained any provision for removing the pseudonym designation.

Defendant took few, if any, steps to protect his identity or that of third parties. During discovery on his motion to dismiss for lack of jurisdiction, he redacted no personal details from discovery responses or filings with the Court. In his discovery responses, Defendant disclosed the identities of numerous third parties, including friends and girlfriends, with whom he discussed the case details. None of these parties had an attorney-client or other privilege with Defendant nor did Defendant mark this information "Confidential."

Plaintiff went directly to the London Metropolitan Police within minutes of Defendant raping her. She then proceeded to The Havens as directed for rape kit testing. During her interview with the London Metropolitan Police, she turned over her text messages with Defendant. She took care to substitute Defendant's name in her contacts directory with the designation "Assailant London" to avoid publicizing Defendant's name immediately after the attack, beyond disclosing his name to the police. Plaintiff's change of name in her contacts directory is reflected in the text message printout attached to the Complaint (*ECF No. 1-2*) in which Defendant admits raping Plaintiff. (e.g., Complaint, *ECF. No. 1*, para.39; Exh. 2., *ECF No. 1-2*, pp. 7, 11)

Defendant met with the London Metropolitan Police after the rape and voluntarily provided a DNA sample. That sample was accidentally lost or destroyed by the police testing lab and Defendant has rebuffed all attempts to obtain a new DNA sample. Defendant's only attempts to conceal his identity or the fact he raped Plaintiff are his early attempts to convince Plaintiff not to pursue any action against him because it would ruin his life – with no regard to the harm that he caused Plaintiff. Complaint, *ECF No. 1*, para. 38; Exh. 2, 1-2, pp. 9-10.

Even after Plaintiff non-suited her case in Fairfax County state court and informed Defendant that she would be re-filing the case in federal court, Defendant's Counsel never requested that Defendant's name be withheld from the complaint in federal court, despite nearly six months that expired between the non-suit and refiling.

On the other hand, Plaintiff has assiduously protected her identity. She filed both actions under a pseudonym. She has redacted her name from all publicly available filings. Other than law enforcement, medical personnel, a potential witness the London police asked her to contact and who was interviewed by the police, and her attorneys, she has discussed this matter with no-one, including family. Defendant's rape has caused her great physical, emotional, and financial harm and continues to do so. Complaint, *ECF No. 1*, paras. 41-43, 51, 58, 66. Plaintiff is also concerned for her personal safety if her identity is revealed. She currently works in government and defense sectors worldwide, with many of those projects based in the Middle East. As is demonstrated below, female rape victims are harassed and subject to severe legal and other sanctions when identified in certain Middle East countries. Revealing her identity will subject her to great risk of personal harm and will serve no purpose other than to cause her additional emotional harm from having to discuss this matter with family and friends and physical harm of reprisals in the Middle East.

3

## II.      Standard and Balance of Interests

### A.      General Standard; Five Part Test

While the Federal Rules of Civil Procedure requires identification of parties, in certain circumstances a party may be afforded the protection of anonymity if that party meets the five-part test set forth in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). After a review of various criteria discussed in other circuits, the *James* court chose the following five criteria that "have relevance to this case…." *Id*.

> [1] whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; [2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; [3] the ages of the persons whose privacy interests are sought to be protected; [4] whether the action is against a governmental or private party; and [5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id*.

Numerous courts have applied the *James* test to either grant or deny requests for anonymity. The cases cited by Defendant are inapposite. They do not address the anonymity of rape victims. The cases cited by Defendant, for example, relate to Title VII claims (*Doe v. Hallock*, 119 F.R.D. 640 (S.D. Miss. 1987); *Southern Methodist Univ Ass'n v. Wynne & Jaffe*, 599 F.2d 707 (5th Cir. 1979)); Section 1983 claims (*Doe v. Alger*, 317 F.R.D. 37 (W.D. Va. 2016)); a TSA pat-down (*JL v. Polson*, 2017 WL 11500247 (E.D. Va. Jan. 1, 2017)); risk of harm to a company related to an infant death from a defective product (*Co. Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014)(*criticized in Roe v. Doe*, Civil Action No. 18-666 (CKK) (D.D.C. Aug. 9, 2018)); public interests in government litigation or challenging laws or regulations (*Doe v. Merten*, 219 F.R.D. 387 (E.D. Va. 2004) (*cited in contradiction by Opinion*

4

*No. GA-0699* (Ops. Tex. Atty. Gen. Mar. 19, 2009), at fn. 2); and cheating on exams (*Candidate # 452207 v. CFA Institute*, 42 F. Supp. 3d 804 (E.D. Va. 2012)).

The closest case to the instant one cited by Defendant is *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583 (E.D. Va. 2016) in which the court *granted* Plaintiff's request for pseudonymity specifically citing that sexual misconduct carries a stigma, is a "matter of sensitive and highly personal nature" and is likely to result in "'retaliatory physical or mental harm' based on the accusations alone." *Rector*, 179 F. Supp. 3d at 593, *citing James*, 6 F.3d at 238. The instant case is a rape case, and cases which address rape and sexual misconduct are the only ones relevant to Defendant's Motion. The legal standard is the application of the *James* factors to rape cases.

### B.    Balancing of Factors

Besides the five-factor test in *James*, there is another consideration. Counterbalancing the public's right to know the identity of persons availing themselves of the court system is the public interest in protecting rape victims. In *Cabrera*, the Court recognized that "[c]ourts generally allow a plaintiff to litigate under a pseudonym in cases containing allegations of sexual assault because they concern highly sensitive and personal subjects." *Cabrera*, 307 F.R.D. at 5 (*citations omitted*). The court continued to observe "a strong [public] interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes.'" *De Amigos*, No. 11-cv-1755, at *6 (*quoting Doe No. 2 v. Kolko*, 242 F.R.D. 193, 195-96 (E.D.N.Y. 2006))." *Cabrera*, 307 F.R.D. at 6. In *Kolko,* the court observed "[a]dditionally, the public generally has a strong interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes. *See Doe v. Evans*, 202 F.R.D. 173, 176 (E.D.Pa.2001) (granting anonymity to sexual assault victim)." *Kolko*, 242 F.R.D. at 195-96.

In the instant case, Plaintiff is a rape victim. If rape victims like her are required to disclose their anonymity it will serve as a caution note to other rape victims and be viewed as another tool of retaliation by Defendants. This Court should not let that happen. Next, we discuss the *James* factors considering the general test, and the admonition in *Cabrera, Evans and Kolko*.

### III.    Factors

#### A.    Avoidance of Annoyance and Criticism versus Preservation of Privacy in a Matter of Sensitive and Highly Personal Nature

Plaintiff details throughout her Complaint the mental harm and emotional anguish the rape caused her. Complaint, *ECF No. 1*, paras. 41-43, 51, 58, 66. The harm to her mental health is real and exposing her name publicly will only add to her anguish and suffering. It is not hard to imagine the mental anguish of publicizing that she was a victim of rape, especially given that her family does not even know about this rape.

The Court in *Doe No. 2 v. Kolko* outlines the scope of protection afforded rape victims in the various circuits citing opinions including *James*. The court noted that even the 7th Circuit, which hews strongly against the use of fictitious names, recognizes that sexual assault victims are commonly accorded anonymity. *Kolko*, 242 F.R.D. at 195, *citing Doe v. Blue Cross & Blue Shield United of Wisc.*, 112 F.3d 869, 872 (7th Cir. 1997) (recognizing that rape victims are entitled to anonymity) (" fictitious names are allowed when necessary to protect the privacy of ... rape victims, and other particularly vulnerable parties or witnesses"), 112 F. 3d at 872; *see also Doe v. City of Chicago*,360 F.3d 667, 669 (7th Cir.2004).

The *Kolko* court also noted that the U.S. Supreme Court has recognized the seriousness of rape. *See Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861 (1977) ("Short of homicide, [rape] is the ultimate violation of self") *cited in Kolko*, 242 F.R.D. at 196. Although written into the criminal code, Virginia also recognizes crime victim rights, affording them protections of

6

privacy and protection from intimidation, and avenues for restitution. *See*, Va. Code Section 19.2-11.01, A., A.1. and A.2. Although addressing victim rights in a criminal law context, this section clearly sets forth the Commonwealth's policy of protection of rape victims.

In the current case, Plaintiff is seeking restitution for her rape. Rape victims are still punished and criticized. Defendant sent text messages over several days trying to paint himself as the victim and begging Plaintiff not to take any action that will harm him, disregarding the harm he caused Plaintiff. Throughout the proceedings in Fairfax County Circuit Court, he sought to avoid jurisdiction and attempts to collect his DNA. In one instance, he requested a protective order limited to prohibiting Plaintiff from sharing DNA results with the London Metropolitan Police. The Court wisely declined noting that it would not be a party to suppressing evidence in a criminal investigation in another country.

The strong public policy to protect rape victims hews strongly in favor of Plaintiff retaining anonymity

### B. Risk of Retaliatory Physical or Mental Harm to the Requesting Party or even more critically, to innocent non-parties

Another deciding factor in favor of anonymity is the risk of retaliatory physical or mental harm. "Related to the third factor is the concern "'whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties . . . .' *James*, 6 F.3d at 238." *Kolko*, 242 F.R.D. at 195.

Plaintiff has been subjected to numerous baseless motions by Defendant in his attempts to delay her efforts to seek redress. One instance is the baseless personal jurisdiction motion pressed by Defendant, leading to Judge Bellows in Fairfax County finding personal jurisdiction and levying attorneys' fees due to the baseless nature of Defendant's claim. Another is his numerous attempts to avoid having to produce a DNA sample even though he voluntarily

provided one to the London Metropolitan Police.

Beyond Defendant's continued assault on Plaintiff is a more important issue. As noted above, the Plaintiff works in governmental and military contracting worldwide, including in the Middle East. It is a well-documented fact that women who have been raped are subjected to ridicule, abuse, arrest, and prosecution in the Middle East. In January 2019, Frontiers in Psychology published a paper entitled *Blaming the Victim of Acquaintance Rape: Individual, Situational, and Sociocultural Factors*. A copy is attached as Exhibit A. In that study the authors stated --

> Victims of sexual assault in many Middle Eastern communities are punished, even outcast by their families, or must marry their rapists in order to restore honor to their families (Ruggi, 1998).

*Id*. at 15. In an article published in Asia Times, the authors note that "[i]n some countries such as the United Arab Emirates, rapists can face the death penalty, but sex outside marriage, or *zina*, is also a serious crime, and women who have reported sexual assaults have then been arrested themselves." Asia Times online, *Arab countries struggle with the stigma associated with rape*, Ghazal, R., Jan. 1, 2019. Exhibit B.

Plaintiff is rightfully afraid of the consequences if the fact that she was raped becomes publicized, especially in countries where she works and visits regularly. In light of her own personal experiences and well documented research and reporting, this fear is fully justified. Plaintiff should not have to suffer personal physical and legal risk in her work locations because she is pursuing her rights in the court system.

### C.   Ages of the Persons Whose Privacy Interests are Sought to be Protected

Both parties to this case are of majority age. As in *Va. Polytechnic* this factor is neutral. *Doe v. Va. Polytechnic Inst*., Civil Action 7:21-CV-378 (W.D. Va. Mar. 29, 2022), at 4-5. That

court noted that some of the James factors may be relevant to a case where others are not. *Id.* at

3. In the case of the Plaintiff in *Va. Polytechnic,* the Court determined that the third *James* factor

is crucial when a party is underage but otherwise neutral when they are not. *Id.* at 4-5. The court

determined that this factor weighed neither in favor or against anonymity. *Id.* Given the fact

neither party is a minor and considering the severe effect Defendant's rape of Plaintiff has had on

Plaintiff's mental, emotional, and financial state, and significant risk of causing additional

physical, legal and financial harm if her identity is unmasked, this factor is at best neutral.

> **D.     Whether the Action is Against a Governmental or Private Party**

This action is between private parties, and not against a government or other public

entity. This factor would only weigh against Plaintiff if there was any risk of harm to the

Defendant's reputation that would offset Plaintiff's need for anonymity. *See, generally, Va.*

*Polytechnic* at 6. It is neutral in this case because Defendant has taken no steps, from the time of

the rape until now, to conceal his identity, redact personal information from his discovery

responses, request lifting of anonymity, or raise any risk of prejudicial harm to him. Plaintiff, on

the other hand, has consistently and carefully worked to preserve her anonymity, and unlike the

situation in *Cabrera*, further has taken no actions to publicly humiliate Defendant, even going so

far as to mask his name in her contact list when first approaching the London Police. Lifting the

veil of anonymity only harms Plaintiff, extends and amplifies the emotional toll this has taken on

her, adds an additional layer of financial burden in responding to Defendant's motion at this late

stage in their litigation history and risks exposing her to new physical, mental and financial

harm. At best, this factor is neutral in the analysis of the *James* factors.

> **E.     Risk of Unfairness to the Opposing Party**

As set forth in the Introduction, there is no risk of unfairness to the Defendant. The

Defendant has known the identity of the Plaintiff from the time he raped her. In fact, he had known her through an academic program many years before the rape. He sent her extensive text messages over several days beginning within minutes of raping her in attempts to get her to stay quiet and not report the rape to the police or take other actions. He voluntarily met with the London Police and provided a DNA sample. He has known her identity from the beginning of the case. As is noted in numerous cases where the defendant knows the plaintiff's identity, there can be no prejudice to the defendant by maintaining pseudonymity. Defendant has described no unfairness to him in maintaining Plaintiff's anonymity. *See Doe v. Va. Polytechnic Inst.*, Civil Action 7:21-CV-378 (W.D. Va. Mar. 29, 2022), at 6; *W. M. v. Braskem Am., Inc*., Civil Action No. 3:20-cv-00141 (S.D.W. Va. Mar. 26, 2020).

## IV.   Waiver or Laches; No Prior Request

Prior to filing suit, counsel for the Plaintiff and Defendant engaged in extensive discussions. In none of those discussions did Defendant request anonymity, even when Plaintiff made clear that she would be filing an action. Plaintiff proceeded under a pseudonym in Fairfax County from the time she filed suit, in September of 2019 until she filed a nonsuit in November of 2022. At no time in those proceedings did Defendant request a lifting of the pseudonym designation. Defendant's filing is the first time he has raised this issue.

Plaintiff believes that Defendant has waived any right to relief on his motion, and that his motion is filed solely to create additional angst and emotional harm on Plaintiff. Like Defendant's untimely petition of appeal of an attorneys' fee award to the Virginia Supreme Court (Petition filed February 17, 2022), filed after Plaintiff non-suited and almost two years after the June 16, 2020 Order awarding attorneys' fees, Plaintiff believes Defendant is on a crusade to bankrupt Plaintiff, rather than address the merits of her case. Plaintiff also notes that

Defendant's appeal of attorneys' fees is not "fully briefed," the Virginia Supreme Court has not yet agreed to hear the discretionary appeal, much less set a briefing cycle. It is only the petition requesting that court to hear the appeal that has been briefed.

WHEREFORE, Plaintiff Jane Doe moves the Court to deny Defendant's Motion to Remove Pseudonym Designation and award any other relief this Court deems necessary and proper.

Respectfully Submitted,

Jane Doe, by Counsel
THE LAW FIRM OF FLETCHER, HEALD &
HILDRETH, PLC


By: ___/s/ Thomas F. Urban II_____
THOMAS F. URBAN II, VSB #40540
FLETCHER, HEALD & HILDRETH, PLC
1300 17th Street North, Suite 1100
Arlington, Virginia 22209
(703) 812-0462; (703) 812-0486 (f)
urban@fhhlaw.com

Walter E. Steimel, Jr. (P*ro hac vice*)
Steimel Counselors Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258; (202) 652-2308
wes@sclgrp.com
*Counsel for Plaintiff Jane Doe*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 11th day of July, 2022, he electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Thomas F. Urban II*_____
Thomas F. Urban II

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **JANE DOE**    )<br>    **A Domiciliary of the**    )<br>    **Commonwealth of Virginia**    )<br>                 )<br>    **Plaintiff,**    )<br>                 )<br>**v.**    )<br>                 )<br>**CENK SIDAR**    )<br>                 )<br>    **Defendant.**    ) | **Civil Action No. 1:22-cv-00545** |

**PLAINTIFF'S MOTION TO OBTAIN
PHYSICAL EXAMINATION OF AND DNA SAMPLE FROM DEFENDANT**

Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned

counsel, pursuant to Rules 34 and 35 of the Federal Rules of Civil Procedure, moves for an

Order Compelling a Physical Examination of Defendant Cenk Sidar ("Defendant").  In support

of this Motion, Plaintiff states:

1.      Plaintiff filed a Complaint that alleges, among other things, that Defendant,

without consent, pulled aside Plaintiff's pajamas (Complaint at ¶ 29) and "penetrated Plaintiff's

vagina without any attempt to use a condom or otherwise protect Plaintiff from any sexually

transmitted diseases or potential pregnancy." Complaint at ¶ 31.  Soon after that attack, Plaintiff

"reported the attack to a London hospital and a London medical clinic specializing in sexual

assault" (Complaint at ¶ 35) and DNA was obtained on the clothes of Plaintiff, as well as part of

a rape kit taken by the medical clinic, The Havens. Complaint at ¶ 3.

2.      Plaintiff seeks samples of Defendant's blood, hair, skin, urine, and a saliva swab

for purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff

and in Plaintiff's rape kit.  These tests will be analyzed by one or more independent laboratories of Plaintiff's choosing.

3.      Plaintiff seeks to have Defendant present himself for the taking of these samples at the office of Plaintiff's Counsel, Thomas F. Urban II, Esq. at FLETCHER, HEALD & HILDRETH, PLC, 1300 North 17th Street, Suite 1100, Arlington, VA 22209, on August 29. 2022, at 10:00 a.m.

4.      The inspection will be for the purpose, among other things, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by The Havens.  This information will further be relevant to Plaintiff's claim for punitive damages.

5.      The evaluation shall be limited to the inspection and sampling requested of Defendant.

6.      Plaintiff shall provide the Court and counsel with the written results of the analysis of this testing within thirty (30) days after the completion of the analysis of the testing, or as soon thereafter as such results can be obtained from the laboratory or laboratories.

7.      Plaintiff believes that the need for these DNA samples is well within the parameters of discovery permitted pursuant to the Federal Rules of Civil Procedure and that she has shown good cause for the need for such discovery.

8.      Plaintiff has complied with all of the requirements of Rules 34 and 35, by providing herein and by previous notice to Defendant, the person to be examined and to all parties, that specified "the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made, and [] the time for filing the report and furnishing the copies," as well as "describing in reasonable particularity each item . . . to be inspected."  Plaintiff has provided notice to all Parties and the person to be examined (through counsel).

9.      Plaintiff has provided the attached Notice to Defendant, who has refused to consent

to a request to voluntarily comply with the Notice.  Exhibit A.  Therefore, Plaintiff has been forced

to file this Motion to seek that the Court order such compliance.

**Argument**

10.      Under Rule 34,

A party may serve on any other party a request within the scope of Rule 26(b):

(1) to produce and permit the requesting party or its representative to inspect, copy, test,
or sample the following items in the responding party's possession, custody, or control:

(B) any designated tangible things.

11.      Under Rule 35,

The court where the action is pending may order a party whose mental or physical
condition—including blood group—is in controversy to submit to a physical or mental
examination by a suitably licensed or certified examiner.

12.      There is authority under the Federal Rules for ordering a DNA sample.  *See*

*D'Angelo v. Potter,* 224 F.R.D. 300, 302-304 (D. Mass. 2004) [Exhibit B]; *McGrath v. Nassau*

*Health Care Corp.*, 209 F.R.D. 55, 61 (E.D.N.Y. 2002) [Exhibit C].

13.      Good cause exists for obtaining a DNA sample because if the DNA sample

collected from Sidar matches either the samples on Plaintiff's clothing or the samples derived

from the Plaintiff's rape kit, this match would be dispositive of sexual activity, and/or

penetration. The existence of a DNA match would also constitute an important element for

punitive damages.

14.      Plaintiff has provided good cause and an explanation of the conditions that are at

controversy in the present action for which this physical examination will seek to examine.

Plaintiff has complied with all other requirements of Rules 34 and 35.  Moreover, good cause

supports ordering a DNA sample because Defendant has denied sexually penetrating Plaintiff

and has asserted that his clothes stayed on the entire time of the assault, both of which are

contested facts, and there is no other means to establish the veracity of Plaintiff's claims of

penetration and Defendant's denial thereof.  *See Schlagenhauf v. Holder*, 379 U.S. 104, 119, 85

S.Ct. 234, 13 L.Ed.2d 152 (1964) (the "good cause" determination requires the court to consider

the movant's ability to obtain requested information by other means).

14.     Defendant has previously admitted the alleged rape occurred in London and was

reported to the London Police Department. Motion for Protective Order [Exhibit D], paras. 2, 3.[1]

Defendant has admitted that the London Police Department is in possession of a sample obtained

from Plaintiff's upper vaginal region. *Id*. Defendant has admitted he made a statement to the

police in February 2018 and voluntarily provided a sample of his DNA to the London Police

which apparently was "lost." *Id*. at para. 4.

15.     Defendant's admissions fall squarely within the ruling in *Ashby v. Mortimer*, 329

F.R.D. 650 (D. Idaho 2019) [Exhibit E]. In *Ashby,* the Defendant doctor opposed plaintiff's

request for a DNA sample. Dr. Mortimer had previously, however, voluntarily submitted his

DNA to Ancestry.com. The court found that DNA testing was a "minimal" invasion of privacy

in light of the fact that Dr. Mortimer had already voluntarily provided his DNA to Ancestry.com.

*Id*. at 656. Clearly, the voluntary provision of DNA once constitutes a waiver of any argument

against providing DNA evidence. The instant case goes a step further – not only had Defendant

voluntarily provided his DNA, he is seeking a protective order to prevent the sharing of his DNA

with the exact same entity with whom he had shared his DNA in the past without objection.

---

[1] Defendant's request for a protective order to prevent a DNA sample being shared with the
London Police was denied by Judge Smith in Fairfax County with him noting on the record that
he declined to suppress evidence that might be relevant to a criminal investigation in another
jurisdiction.

Defendant has already waived his objection; he cannot interpose it now.

16.     Defendant's opposition to this Motion interferes with Plaintiff developing her case. Defendant has admitted Plaintiff's rape kit is in the possession of the London Police at The Havens. If Plaintiff is prohibited from sharing Defendant's DNA with The Havens or otherwise comparing the DNA samples, Defendant could argue at trial that (1) the comparison was invalid as it was not made against the actual samples; (2) that one or other of the facilities either did not use the proper test, or used different tests; (3) that defects in processing by The Havens or a U.S. lab resulted in inconclusive results; or (4) that there were mix-ups in tests performed in different countries by different agencies. These precise issues were identified as problems in *Ashby. Id.* at 655. The court in *Ashby* ordered defendant to provide DNA for direct comparison to commercial test results, as opposed to Ancestry.com's DNA database. *Id.* Any attempt to bar Plaintiff from obtaining DNA and performing a test against the rape kit in the possession of The Havens and the London Police could prevent her from proving that the DNA samples were identical.

17.     The DNA sample is relevant because it bears directly on the issue of liability. Further, because there is a previous DNA sample against which it can be compared that was taken from Plaintiff's clothing soon after the rape.  Given the temporal proximity between the time of the alleged rape and the testing, there is a likelihood that there will be a match between the two DNA samples. Any intrusion to Defendant's privacy will be *de minimus* given that he previously voluntarily provided a DNA sample to the London Police (which was later lost) and, even if he had not previously provided such sample, the interests of justice in providing this evidence to resolve this crucial factual question outweigh any alleged imposition. *See McGrath,* 209 F.R.D. at 61 (finding that a DNA buccal swab represents "only a minimal intrusion") (*quoting Hargrave v. Brown*, 783 So. 2d 497, 500 (La. Ct. App. 2001)).

WHEREFORE Plaintiff Jane Doe respectfully requests that the Court enter an Order compelling Defendant to submit to the Physical Inspection and Examination, including the taking of samples for DNA testing, described in this Motion and the attached Notice.

Respectfully Submitted,

/s/ Thomas F. Urban II
Thomas F. Urban II, Virginia Bar No. 40540
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
(703) 861-5235 FAX (703) 812-0486
Urban@fhhlaw.com

Walter Steimel, Jr. (*pro hac* vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com
*Counsel for Plaintiff Jane Doe*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via email and/or U.S. First Class Mail to

Mariam W. Tadros, Esq.
Rees Broome, PC
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209
*Counsel for Defendant*

on this the 15th day of July, 2022.

/s/ Thomas F. Urban II
Thomas F. Urban II

6

EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | | |
|---|---|---|
| **JANE DOE** | ) | |
| **A Domiciliary of the** | ) | |
| **Commonwealth of Virginia** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 1:22-cv-00545** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CENK SIDAR** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S NOTICE OF
## PHYSICAL EXAMINATION AND DNA SAMPLING OF DEFENDANT

PLEASE TAKE NOTICE that, pursuant to the Rules 34 and 35 of the Federal Rules of Civil Procedure, Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned counsel and a suitably certified health care provider, will conduct an Physical Examination of Defendant Cenk Sidar ("Defendant"), which will include the taking of a sample of Defendant's Deoxyribonucleic acid (DNA):

- Plaintiff hereby sets August 29, 2022, at 10:00 a.m., for the taking of samples of Defendant's DNA for the purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit. These tests will be analyzed by one or more independent laboratories of Plaintiff's choosing.

- Defendant will present himself for the taking of these samples at the office of Plaintiff's Counsel, Thomas F. Urban II, Esq., at FLETCHER, HEALD & HILDRETH, PLC, 1300 North 17th Street, Suite 1100, Arlington, VA 22209, at that time.

- The inspection and taking of the DNA sample will be for the purpose, among other things, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by The Havens. This information will further be relevant to Plaintiff's claim for punitive damages.

- The evaluation shall be limited to the testing and sampling requested of Defendant.

- Plaintiff shall provide the Court and counsel with the written results of this testing within thirty (30) days after the completion of the analysis of the testing, or as soon thereafter as such results can be obtained from the laboratory.

Respectfully Submitted,

/s/ Thomas F. Urban II
Thomas F. Urban II, Virginia Bar No. 40540
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
(703) 861-5235 FAX (703) 812-0486
Urban@fhhlaw.com

Walter Steimel, Jr. (*pro hac* vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via

email and/or U.S. First Class Mail to

Mariam W. Tadros, Esq.
Rees Broome, PC
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209
*Counsel for Defendant*

on this the 15th day of July, 2022.

/s/ Thomas F. Urban II
Thomas F. Urban II

**EXHIBIT B**

224 F.R.D. 300
United States District Court, D. Massachusetts.

Karen M. D'ANGELO,

Carol I. Mansani, Plaintiffs,

v.

John E. POTTER, etc.,

John R. Kelley, Defendants.

Civ.A. No. 01–12227–RBC.
|
Oct. 14, 2004.

**Synopsis**

**Background:** Two female postal employees sued their male supervisor, alleging sex discrimination, harassment, and assault. One plaintiff filed motion to compel supervisor to give a DNA sample.

**[Holding:]** The District Court, Collings, United States Magistrate Judge, held that plaintiff who brought assault claim against male supervisor based on allegation that supervisor raped her in boiler room of postal station was entitled to order compelling supervisor to provide samples of his DNA for testing whether supervisor's DNA matched semen specimen found in boiler room.

Motion allowed.

West Headnotes (2)

**[1]    Federal Civil Procedure** 🔑 Grounds and objections

For an order to issue for a party to give a blood sample or a DNA sample, the blood group or the DNA must be "in controversy" as the term is used in rule governing orders for examination and there must be good cause for the issuance

of the order. Fed.Rules Civ.Proc.Rule 35(a), 28 U.S.C.A.

7 Cases that cite this headnote

**[2]    Federal Civil Procedure** 🔑 Grounds and objections

Female postal worker who brought assault claim against male supervisor based on allegation that supervisor raped her in boiler room of postal station was entitled to order compelling supervisor to provide samples of his DNA for testing to determine whether his DNA matched semen specimen found in boiler room; such evidence was clearly relevant to assault claim, and intrusion on supervisor's privacy in providing sample was minimal, as it consisted of allowing technician to swab inside of his cheek to obtain sample. Fed.Rules Civ.Proc.Rule 35(a), 28 U.S.C.A.

5 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*300**  Barbara Smith Healy, United States Attorney's Office, Boston, MA, for John E. Potter, Defendant.

Gerald F. Blair, Walpole, MA, Richard Heavey, Heavey, Houlihan, Kraft & Cardinal, Brookline, MA, for Karen M. D'Angelo, Carol I. Mansani, Plaintiffs.

Herbert D. Lewis, Lewis & Lewis, Boston, MA, for John R. Kelley, Defendant.

Jeremy M. Sternberg, United States Attorney's Office, Boston, MA, for United States Postal Service, Defendant.

*OPINION AND ORDER ON PLAINTIFF KAREN D'ANGELO'S MOTION TO COMPEL DEFENDANT JOHN R. KELLEY TO SUBMIT [SIC] OR PROVIDE SAMPLES OF HIS DNA FOR TESTING BY DNA ANALYSIS SPECIALISTS AND TO SHOW CAUSE FOR FAILURE TO COMPLY WITH SUBPOENA (# 39)*

COLLINGS, United States Magistrate Judge.

JA173

## I. Factual Background

In Count Two of her Second Amended Complaint (# 21), plaintiff Karen D'Angelo ("D'Angelo"), a Postal Service employee, alleges that on September 7, 2000, defendant John R. Kelley ("Kelley"), her supervisor, raped her in the boiler room of the Dorchester Center Postal Station. In her deposition, D'Angelo testified that Kelley demanded that she go with him into the boiler room, she told him that she was not going to, and he told her that if she did not accompany him, she would lose her job. (# 46, Exh. B) She testified **\*301** further that once they were in the boiler room, he told her that she had a choice—she must either let him have sex with her or she must perform fellatio on him. She said that she noticed a stool in the boiler room which used to be in the women's rest room but had disappeared sometime earlier. D'Angelo testified that she permitted Kelley to have sex with her because she feared that otherwise she would lose her job; she declined to perform fellatio on him. She testified at her deposition that Kelley ejaculated inside of her.

Kelley denies that he ever had sexual relations with D'Angelo, consensual or otherwise. He further denies that any rape occurred on September 7, 2000. (# 46, Exh. C)

On October 3, 2000, Stephanie L. Smith, a Senior Forensic Chemist with the Postal Inspection Service, took swabs from the boiler room, two of which proved positive for the presence of semen. (# 46, Exh. A) Counsel avers that "[o]ne sampled [sic] was recovered from the stool and one sample was recovered from the floor at the location where Plaintiff stated that the rape occurred." (# 46, p. 1)

## II. Procedural History

Kelley never answered the summons which was served on him on May 22, 2002. A Notice of Default issued on May 20, 2003. *See* # 28. As of the time Kelley was defaulted, the other defendant in the case, Potter, had filed an answer, and the case against him was proceeding. Since the claims against Potter were based on Kelley's acts as a supervisor employed by the Post Service, the plaintiffs needed discovery from Kelley. On September 29, 2003, Kelley was served with a deposition subpoena at his home at 4 Crescent Terrace, Saugus.[1] He appeared for his deposition on October 2, 2003 at the U.S. Attorney's Office at the John Joseph Moakley United States Courthouse but other than giving his name, invoked his Fifth Amendment privilege as to all questions. *See* # 45.

The subpoena with which Kelley was served on September 29, 2003 also commanded him to appear at a certain location at 1:00 P.M. on October 2, 2003, after the completion of his deposition, to give a "buccal swab, also known as a cheek swab and a blood sample." *See* # 40, Exh. 1. Kelley did not appear at the location.

Thereafter, plaintiff D'Angelo filed the instant motion to compel Kelley to give a DNA sample and to show cause for the failure to comply with the subpoena (# 39). A copy of the pleading was served on Kelley by mail at 4 Crescent Terrace, Saugus. *Id.* On November 17, 2004, the Court issued a Procedural Order (# 41) directing Kelley to file and serve an opposition to D'Angelo's motion by November 26, 2004 if he, in fact, opposed it. A copy of the Procedural Order was mailed to Kelley at 4 Crescent Terrace, Saugus by the Clerk by both regular mail and certified mail, return receipt requested. The copy sent by regular mail was not returned. However, the copy sent by certified mail was returned with the notation that, despite notices to the addressee on November 19, 2003, November 24, 2003 and December 4, 2003, the certified mail had been "unclaimed."

Kelley did not file any pleading in response to the Procedural Order. On December 17, 2003, the Court issued an Order to Show Cause (# 47) directing Kelley to appear before the Court on December 23, 2003 to show cause why he should not be held in contempt for failure to comply with the subpoena. The Order to Show Cause was mailed to Kelley at 4 Crescent Terrace, Saugus by the Clerk by both regular mail and certified mail, return receipt requested. As happened with the Procedural Order, the copy which was sent by regular mail was not returned by the Post Office. However, the copy sent by certified mail was returned with the notation that, despite notices to the addressee on December 20, 2003, December 25, 2003 and January 4, 2004, the certified mail had been "unclaimed."

Nevertheless, Kelley appeared on December 23, 2003 and, in response to the directive that he show cause, asserted that he had consulted a lawyer, Herbert Lewis, Esquire, who advised him not to obey the subpoena. The Court ordered Kelley to return to Court with Attorney Lewis on January 7, 2004.

**\*302** On January 7, both Kelley and Attorney Lewis appeared. Attorney Lewis filed an appearance for Kelley

JA174

and moved to remove the default which was allowed in a Memorandum and Order dated May 17, 2004. *D'Angelo v. Potter,* 221 F.R.D. 289 (D.Mass., 2004). In a separate Memorandum and Order issued the same day, i.e., May 17, 2004, the Court noted that the motion to compel the DNA sample (# 39) was still pending and wrote that:

> ...the Court is of the view that the defendant has waived any objection he may have had to the motion. The Court, in a Procedural Order (# 41) entered on November 17, 2004, gave him the opportunity to file an opposition to the motion. A copy of the procedural order was mailed to him and was not returned by the Post Office.[2] The defendant filed nothing in response to the procedural order. Further, any motion for protective order with respect to the subpoena would be manifestly untimely.

There is only one basis on which the Court will allow further briefing. If the defendant is of the view that the Court has no *power* to issue an order compelling the DNA sample given the facts of this case, he shall file and serve a memorandum of law in opposition to the motion on that basis *on or before the close of business on Monday, June 7, 2004.* The defendant shall file and serve a memorandum *only* directed to the issue of the Court's power and *only* if counsel for the defendant, consonant with the provisions of Rule 11(b)(2), Fed.R.Civ.P., can make an argument that the Court has no power to compel the defendant to submit to the giving of a DNA sample. The Court will not entertain any arguments that, in its discretion, it should not order the defendant to provide a DNA sample. The memorandum shall contain citations to caselaw which support counsel's position.

Attorney Lewis filed a Memorandum, Etc. (# 66) on June 4, 2004 and counsel for D'Angelo filed a Memorandum, Etc. (# 70) on June 16, 2004.

### III. Discussion

Kelley's argument is that the only basis which the Court would have to order him to provide a DNA sample is found in Rule 35(a) of the Federal Rules of Civil Procedure. That Rule provides, in pertinent part:

> **(a) Order for Examination.** When the mental or physical condition (including the blood group) of a party...is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner...

The order may be made only on motion for good cause shown and upon notice to the party to be examined and all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.

Kelley argues, based on the case of *Schlagenhauf v. Holder,* 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), that his DNA is not "in controversy" as that phrase is used in the Rule, and that "good cause" has not been "shown" for an examination of his DNA.

**[1]** It is difficult to apply the *Schlagenhauf* holding to the instant case because it dealt with medical and physical examinations, not the taking of samples of bodily fluids or buccal swabs.[3] However, it seems plain that for an order to issue for a party to give a blood sample or a DNA sample, the "blood group" or the "DNA" must be "in controversy" as the term is used in the Rule and that there must be good cause for the issuance of the order. As the Court in *Schlagenhauf* wrote, these requirements

> ...are not met by mere conclusory allegations of the pleadings—nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination.

*Schlagenhauf,* 379 U.S. at 118, 85 S.Ct. 234.

The most comprehensive review of the law as to whether a litigant in a civil case can be **\*303** compelled to provide a sample for DNA testing can be found in the case of *McGrath v. Nassau Health Care Corp.,* 209 F.R.D. 55 (E.D.N.Y., 2002). I agree with Magistrate Judge Wall's analysis and will apply the standards he employed to the facts in the instant case.

**[2]** First, evidence as to whether or not Kelley's DNA matches the DNA of the semen specimen found in the boiler room is clearly "relevant" to D'Angelo's "claim" that Kelley raped her. Rule 26(b)(1), Fed.R.Civ.P.; *McGrath,* 209 F.R.D. at 61.

Second, I find that the intrusion on Kelley's privacy in providing the sample is "minimal" consisting of allowing a technician to swab the inside of his cheek to obtain the sample. *McGrath,* 209 F.R.D. at 61 citing *Hargrave v. Brown,* 783 So.2d 497 at 500 (La.Ct.App.2001). In addition, "...the imposition of appropriate protections that limit the use of the

DNA information [will] sufficiently address[ ][any] privacy concerns." *McGrath,* 209 F.R.D. at 61.

Judge Wall discounts Magistrate Judge Swartwood's statement in the case of *Harris v. Athol–Royalston Regional School Dist. Comm.,* 206 F.R.D. 30, 35 (D.Mass.2002) that "DNA testing is an extreme discovery tool which is very intrusive to the targets of such discovery." *McGrath,* 209 F.R.D. at 61. I do not think Judge Swartwood was referring to the manner of taking the sample. Rather, he was saying that it is an "extreme *discovery* tool" in that it is only in a very few cases where, as a matter of discovery in a civil suit, litigants are required to provide such a sample.

Indeed, that seems to be the case. An example is Magistrate Judge Bowler's decision in the case of *Sacramona v. Bridgestone/Firestone, Inc.,* 152 F.R.D. 428 (D.Mass.1993) in which Judge Bowler denied a request for a compelled blood test to determine if a plaintiff had AIDS which, if he did, would have given the defendant a basis on which to argue that future damages should be less because of plaintiff's shortened life expectancy. Judge Bowler found that "...the relevance of the blood test to plaintiff's cause of action [was] too attenuated." *Sacramona,* 152 F.R.D. at 431. Providing samples of bodily fluids or cells in civil litigation is so unusual that, indeed, the parties to civil litigation would very well feel that being required to give such samples is "very intrusive."

Third, D'Angelo "...has made a prima facie showing of a reasonable possibility of a match." *McGrath,* 209 F.R.D. at 61. Two of the swabs that the forensic chemist took from the boiler room proved positive for semen. Further, based on her testimony as to what occurred in the boiler room less than a month before the swabs were taken, she has shown a reasonable possibility of a match. *McGrath,* 209 F.R.D. at 62. There is nothing in the record in the instant case to indicate that other persons used the room for sex during the interval, or that the boiler room was commonly used for such purposes.

The showing which D'Angelo made in this case contrasts with the type of showing which was deemed insufficient in the *Harris* case. In that case, the plaintiff wanted a DNA sample from the defendants to compare with the DNA of a strand of hair found on an envelope in which certain of plaintiff's personnel records had been sent to a newspaper. Judge Swartwood allowed a motion for an order that the defendants be fingerprinted and provide handwriting

exemplars "...because Plaintiffs were able establish to [his] satisfaction, in each case, that it is likely that such individuals may have produced the handwriting/fingerprints which were or may be found on the packet." *Harris,* 206 F.R.D. at 35. However, as to the DNA sample to compare to the hair, Judge Swartwood wrote:

> No such showing has been made as to the hair or other matter found on the packet, that is, other than mere speculation. Plaintiffs have not proffered any basis for concluding that such hair and/or matter belonged to the person who sent the packet, rather than someone who opened the packet, or one of the several individuals who has touched it thereafter.

*Harris,* 206 F.R.D. at 35.

In the instant case, D'Angelo has proffered an evidentiary basis for concluding that the semen belonged to Kelley.

**\*304** Fourth, on the basis of what the Court has already recited, "good cause" has been shown. In addition, there is no other means by which D'Angelo can prove that the semen is that of Kelley. *Johnson v. City of Ecorse,* 137 F.Supp.2d 886, 894 (E.D.Mich.2001). The evidence, unlike that in the *Sacramona* case discussed, *ante,* goes directly to the question of liability and is not just relevant on the question of the extent of damages. Lastly, the evidence is not being sought solely for purposes of impeachment. *McGrath,* 209 F.R.D. at 63–64.

### IV. Conclusion and Order

The Court finds that D'Angelo has established that she is entitled to an order requiring Kelley to provide the sample and that the Court has the power to issue such an order. Thus, it is ORDERED that Plaintiff Karen D'Angelo's Motion to Compel Defendant John R. Kelley to Submit [sic] or Provide Samples of his DNA for Testing by DNA Specialists and to Show Cause for Failure to Comply with the Subpoena (# 39) be, and the same hereby is, ALLOWED to the extent that a separate Order as sought by D'Angelo shall issue. Kelley faces prosecution for criminal contempt if he fails to obey the Order after it is issued.

### All Citations

224 F.R.D. 300

JA176

Footnotes

1       In his Affidavit, Etc. (# 51), Kelley acknowledges service of the subpoena.

2       The copy sent by certified mail, return receipt requested, was returned "unclaimed" after three separate notices were left
        at the defendant's correct home address.

3       The addition of the phrase "including the blood group" did not occur until 1970.

---

**End of Document**                                                      © 2022 Thomson Reuters. No claim to original U.S.
                                                                                            Government Works.

**EXHIBIT C**

209 F.R.D. 55
United States District Court,
E.D. New York.

Sally Pistorio MCGRATH
and John McGrath, Plaintiffs,

v.

NASSAU HEALTH CARE CORP.
and Eric S. Rosenblum, Defendants.

No. CV 00–6454(TCP)(WDW).
|
June 25, 2002.

**Synopsis**

Female hospital employee brought sexual harassment suit against hospital and male employee. Female employee moved for protective order precluding any use in the litigation of a blanket that was purportedly stained with her menstrual blood when she and the male employee allegedly engaged in consensual intercourse. Male employee cross-moved for an order directing female employee to produce a DNA sample. The District Court, Wall, United States Magistrate Judge, held that male employee was entitled to order requiring female employee to provide DNA sample.

Ordered accordingly.

West Headnotes (8)

**[1]**    **Federal Civil Procedure** 🔑 Particular
Subject Matters

Sample of female employee's DNA, which male employee whom she was suing for sexual harassment sought so that it could be compared to DNA profile on blanket that was purportedly stained with her menstrual blood when they allegedly engaged in consensual sexual intercourse, would be relevant, as required under discovery rule, where the female employee denied several times under oath that

she had any sexual contact with the male employee. Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

**[2]**    **Federal Civil Procedure** 🔑 Particular
Subject Matters

For purpose of motion of male employee being sued by female employee for sexual harassment for an order directing female employee to produce a DNA sample, taking of DNA sample, which could be obtained either in a blood test or a cheek swab, would not unduly affect her privacy rights, which were outweighed by (1) the right of the male employee, with whom she denied having any sexual contact, to impeach her veracity by obtaining the sample to compare against DNA profile on blanket that was purportedly stained with her menstrual blood when they allegedly engaged in consensual sexual intercourse, and by (2) the judiciary's interests in providing a forum for dispute resolution and in regulating litigation in the courts. Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

7 Cases that cite this headnote

**[3]**    **Federal Civil Procedure** 🔑 Particular
Subject Matters

For purpose of motion of male employee being sued by female employee for sexual harassment for an order directing female employee to produce a DNA sample so that it could be compared against DNA profile on blanket that was purportedly stained with her menstrual blood when they allegedly engaged in consensual sexual intercourse, so that he could impeach her veracity in view of her denial of having any sexual contact with him, he met his burden of showing a reasonable possibility that the DNA testing was likely to yield a match, by showing that the blanket contained a male and a female DNA profile that could be tested against individual DNA samples. Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

9 Cases that cite this headnote

JA178

McGrath v. Nassau Health Care Corp., 209 F.R.D. 55 (2002)

**[4]**   **Federal Civil Procedure** 🔑 Particular Subject Matters

Male employee being sued by female employee for sexual harassment did not have to show chain of custody of blanket that was purportedly stained with her menstrual blood when they allegedly engaged in consensual sexual intercourse, in order to obtain order directing female employee to produce a DNA sample so that it could be compared against DNA profile on the blanket, so that he could impeach her veracity in view of her denial of having any sexual contact with him. Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

2 Cases that cite this headnote

**[5]**   **Federal Civil Procedure** 🔑 Particular Subject Matters

Male employee being sued by female employee for sexual harassment did not have to set forth evidence to corroborate his allegation that the two were involved in a consensual sexual relationship, in order to obtain order directing female employee to produce a DNA sample so that it could be compared against DNA profile on blanket that was purportedly stained with her menstrual blood when they allegedly engaged in consensual sexual intercourse, so that he could impeach her veracity in view of her denial of having any sexual contact with him. Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

**[6]**   **Federal Civil Procedure** 🔑 Failure to Comply; Sanctions

Failure of male employee, who was being sued by female employee for sexual harassment, to produce as part of his initial discovery disclosure, blanket in his possession that was purportedly stained with her menstrual blood when they allegedly engaged in consensual sexual intercourse, did not require denial of his motion for an order directing the female employee to produce a DNA sample so that it could be compared against the DNA profile on the blanket, where he intended to use the blanket for impeachment purposes only, as evidenced by

fact that he did not mention the blanket until after she had several times denied a consensual relationship. Fed.Rules Civ.Proc.Rules 26(a)(1)(B), 37(c)(1), 28 U.S.C.A.

**[7]**   **Federal Civil Procedure** 🔑 Failure to Comply; Sanctions

Failure of male employee, who was being sued by female employee for sexual harassment, to produce as part of his initial discovery disclosure, his correspondence with laboratory to whom he sent for preliminary testing a blanket in his possession that was purportedly stained with the female employee's menstrual blood when they allegedly engaged in consensual sexual intercourse, did not require denial of his motion for an order directing the female employee to produce a DNA sample so that it could be compared against the DNA profile on the blanket, where he intended to use the blanket for impeachment purposes only. Fed.Rules Civ.Proc.Rules 26(a)(1)(B), 37(c)(1), 28 U.S.C.A.

**[8]**   **Federal Civil Procedure** 🔑 Work Product Privilege; Trial Preparation Materials

Correspondence between attorneys for male employee who was being sued by female employee for sexual harassment, and laboratory to whom they sent, for preliminary testing, a blanket in his possession that was purportedly stained with the female employee's menstrual blood when he and the female employee allegedly engaged in consensual sexual intercourse, was protected by the work product doctrine absent any argument that the female employee had substantial need of the materials and faced undue hardship in obtaining the substantial equivalent of the materials. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

JA179

**Attorneys and Law Firms**

 **\*56**  Steven Ian Locke, Carabba, Locke & Olsen, LLP, New York City, for Plaintiffs.

Brian Joseph Clark, Clifton, Budd & Demaria, LLP, New York City, for Nassau Health Care Corp.

Peter L. Altieri, Ann L. Moscow, Epstein, Becker & Green, PC, New York City, for Eric S. Rosenblum.

**ORDER**

WALL, United States Magistrate Judge.

By letter dated May 6, 2002, the plaintiffs moved for a protective order precluding any use of a blanket purportedly stained with the **\*57** menstrual blood of plaintiff Sally McGrath ("McGrath"). By letter dated May 9, 2002, the individual defendant, Eric Rosenblum, cross-moved for an order directing McGrath to produce a DNA sample. By letter dated May 9, 2002, the hospital defendant, Nassau Health Care Corp. ("NHCC"), supported Rosenblum's motion and presented its position on the issues.

In an order dated May 22, 2002, the undersigned set the matter down for a hearing on June 11, 2002, and directed the parties to submit affidavits and memoranda of law in support of their arguments. The parties submitted the appropriate supporting papers and appeared for oral argument and a hearing on June 11.

As ordered on the record at the conclusion of the hearing on June 11, and for the reasons set forth herein, the undersigned grants the defendant's cross-motion and denies the plaintiffs' motion.

**BACKGROUND**

This lawsuit, in which the plaintiffs claim that Rosenblum sexually harassed Sally McGrath in the workplace during 1999 and 2000, was commenced in October 2000. The blanket at issue on these motions was first mentioned at McGrath's deposition on April 30, 2002. Rosenblum claims that the blanket was stained with McGrath's menstrual blood when he and McGrath engaged in consensual sexual intercourse on it, and that it will provide a basis for impeaching McGrath's testimony that she and Rosenblum never had a consensual sexual relationship.

On February 22, 2002, McGrath responded to a question in Rosenblum's Second Set of Interrogatories by stating that "Plaintiff never engaged in sexual relations with Defendant Rosenblum." Locke Letter, 5/6/02, Exh. B at 4. During her deposition on March 7, 2002, McGrath was asked whether she "at any time ha [d] any consensual sexual contact of any kind with Eric Rosenblum," and she answered, "No, I did not." See Def. NHCC'S Mem. of Law in Supp. of App. for DNA Testing, Exh. C at 154, ll. 23–25. That same day, Rosenblum's lawyers, who allegedly had been in possession of the blanket for some undetermined period of time, sent it to Laboratory Corporation of America (LabCorp.) for preliminary testing. See Moscow Aff. in Supp., at ¶ 5.

At his deposition on March 25, 2002, Rosenblum stated, apparently for the first time in the litigation record, that he and McGrath had engaged in consensual sex. Locke Letter, 5/6/02, Exh. D at 131. He testified that the affair lasted for two to three weeks in late November and early December of 2000, and that he broke it off. Id. at 150–52. All of their sexual encounters, Rosenblum claimed, took place in a building on the hospital's property known as the "CEO House." Id. at 150.

At the June 11th hearing, Rosenblum testified at length about one of the alleged sexual encounters that occurred in the CEO House. On an unspecified date, he claims[1], he and McGrath went to the house intending to have sexual intercourse, and McGrath told him she was menstruating. See Tr. of Hearing on 6/11/02 at 13–15. Because they were in the habit of lying on the rug in the dining room of the house during their sexual encounters, and Rosenblum did not want to stain the rug, he went out to his car and got a blanket from the trunk. He put the blanket on the dining room floor and they engaged in intercourse. After the encounter, he noticed that the blanket was stained. He put the blanket in a kitchen cabinet, retrieved it at some later, unspecified date, and returned it to the trunk of his car. They used the blanket only one time, and, according to Rosenblum, he broke off the affair in mid-December. Rosenblum further claims that he gave the blanket to his attorneys after the lawsuit commenced, and his attorney, Ms. Moscow, states that the blanket remained in the offices of Epstein, Becker & Green, P.C., Rosenblum's lawyers, **\*58** until it was sent to LabCorp for testing. Moscow Aff. at ¶ 5.

At her continued deposition on April 30, 2002, McGrath reiterated her denial that she had ever had "any sexual

contact with Eric Rosenblum of any kind, consensual or nonconsensual, in any place." See NHCC'S Mem. of Law in Supp., Exh. C at 251, ll. 17–23. On that same date, she related, for the first time, an incident that allegedly occurred in the CEO House. She claimed that she and Rosenblum, who is an attorney, went to the house to discuss a custody dispute he was helping her with, and that as she was leaving the bathroom in the house, he appeared before her naked and ejaculated. See Moscow Letter, May 9, 2002, Exh. B, at 229–30. She said that she pushed him away, got her coat, and left. See NHCC'S Mem. of Law in Supp., Exh. C at 251.

During the April 30 deposition, McGrath acknowledged that she had not related the CEO House incident in any court filings, at her 50–h hearing, or on the first day of her deposition, and explained that she had not previously told anyone but her psychologist about the incident because it was "personally so horrible." See Moscow Letter, May 9, 2002, Exh. B, at 264. Rosenblum's attorney questioned McGrath about whether McGrath knew that, after the first day of McGrath's deposition, Rosenblum had testified at his own deposition that they had had a consensual sexual relationship. Id. at 267. McGrath testified that, although she "had heard that he was going to say that ... I don't know for sure what he said at all during his deposition." Id. She also acknowledged that, between her first and second days of deposition, she had learned that her psychologist's records had been subpoenaed, and that she knew the details of her version of the event in the CEO house "was going to come out."[2] Id. at 265.

Later during the April 30th deposition, Rosenblum's counsel, Ms. Moscow, told McGrath's counsel, Mr. Locke, that she was "going to request a DNA sample" from McGrath. See Moscow Aff. in Supp., Exh. A at 274. Ms. Moscow explained, "I have reason to believe that there is evidence available that contains her DNA obtained in a fashion that's inconsistent with her testimony and consistent with other testimony." Id. When McGrath's counsel sought fuller explanation, the two attorneys spoke off the record, and when they returned to the record, Ms. Moscow stated that "I have a blanket that my client—which I have been advised that has—my client testified that there was a consensual relationship between plaintiff and himself." Id.

As noted above, subsequent to the demand for a DNA sample from McGrath, the plaintiffs moved for a protective order precluding the use of the blanket in the litigation. Rosenblum opposed the motion and cross-moved to compel the DNA sample. The Hospital supported the demand for a DNA

sample, and set forth its position on the issues. On May 22, 2002, the undersigned issued an order directing the parties to appear for an evidentiary hearing on June 11, 2002. The May 22nd order reviewed the scant law on the issue of whether the production of a DNA sample can be compelled as part of discovery in a civil lawsuit, and adopted the requirement, discussed in more detail *infra,* that the movant must make a prima facie showing that the DNA sample is warranted, through the introduction of sworn statements and other evidence.

To that end, Rosenblum was ordered to serve and file a memorandum of law, with supporting affidavits, setting forth the necessary proof that a DNA sample should be ordered, and the plaintiff was ordered to submit a memorandum of law in opposition, along with supporting affidavits. Rosenblum was directed, at the very least, to make a credible showing of how the blanket came to be in his possession, why he believes it is stained with Ms. McGrath's blood, and how it will impeach her testimony that they did not have a consensual sexual relationship. Rosenblum submitted, as an exhibit to Moscow's affidavit in support of the motion, a letter from LabCorp stating that preliminary **\*59** testing of the blanket revealed the presence of "a major DNA profile consistent with a male source" and "a major DNA profile consistent with a female source." See Moscow Aff., Exh. B. The female DNA profile apparently "revealed positive indications for blood." Id. The lab also stated that the DNA profiles present on the blanket "can be compared to any reference sample submitted," that is, DNA samples from McGrath and Rosenblum. Id.

## DISCUSSION

### 1.) Standards applicable to orders to compel DNA samples in federal civil discovery:

The issue of what standards should apply in determining a motion to compel the production of a DNA sample as part of discovery in a civil lawsuit does not appear to have been addressed in a published opinion from a court in the Second Circuit. A review of the few relevant cases in other jurisdictions does, however, yield insight into the factors that courts should consider in making such determinations.

A Louisiana appellate court upheld an order requiring the defendant to produce a DNA sample, and allowed DNA testing in a sexual harassment suit, where the plaintiff had alleged that the defendant had ejaculated on her skirt in an act of sexual harassment, and she made a prima facie showing of

a reasonable possibility that defendant's semen was present on her skirt. *See Hargrave v. Brown,* 783 So.2d 497, 499, 501 (La.Ct.App.2001). The *Hargrave* court looked at three factors in reaching its decision. First, the court determined that authority existed under state law for ordering the DNA sample, inasmuch as a state statute authorized the discovery of "any matter not privileged which is relevant to the subject matter involved in the pending action," and found that the proposed DNA comparison was highly relevant. *Id.* at 500.

Next, the court considered whether "the competing interests weigh in favor of permitting the test," and found that they did. *Id.* Specifically, the court weighed the defendant's privacy rights against "the State's interest in providing a reasonable means or forum for its citizens to resolve disputes, in regulating litigation in the courts, and in protecting its citizens from discrimination in the workplace." *Id.* The court found that the sample, which could be obtained in a blood test or a cheek swab, represented only a minimal intrusion on the defendant's privacy rights, and concluded that the State's interests outweighed that minimal intrusion. *Id.* at 500.

Finally, the *Hargrave* court considered the protection of the defendant's due process rights, noting that a peremptory order would not provide the necessary safeguards, and requiring, instead, that the "the party seeking to compel the [DNA] test must establish a prima facie showing of the reasonable possibility of a match ... before obtaining the requested order." *Id.* at 500–01. Applying that standard, the court found that the production of plaintiff's skirt with the alleged semen on it, coupled with plaintiff's sworn detailed statements, witnesses' names and verifiable police reports, provided a sufficient showing to meet her burden of making out a prima facie case before obtaining the requested order. *Id.* at 501.

A federal District Court in Massachusetts recently considered whether to order the production of DNA samples in civil discovery, phrasing the issue as whether ordering the samples would be "beyond the scope of the applicable discovery rules." *Harris v. Athol–Royalston Regional Sch. Dist. Comm.,* 206 F.R.D. 30, 34 (D.Mass.2002). In *Harris,* a civil rights action, the plaintiff sought DNA samples from both the defendants and non-parties to determine who anonymously sent a packet containing the plaintiff's personnel records to a local newspaper, after a handwriting expert who examined the packet found "hair and ... biological matter clinging to one of the envelopes." *Id.* at 34. The court declined to order the DNA samples, finding that under the circumstances of the *Harris* case, DNA testing was beyond the scope of discovery

for several reasons, including findings that "DNA testing is an extreme discovery tool which is very intrusive to the targets of such discovery," and that the party seeking the production in *Harris* **\*60** failed to show a "direct connection linking" the potential DNA samples and the evidence to be tested. *Id.* at 35. The court also based its ruling on the speculative nature of the application, noting that the plaintiff had not "proffered any basis for concluding" that the hair and other matter on the envelope "belonged to the person who sent the packet, rather than someone who opened the packet," or to someone who touched it thereafter. *Id.* The implication of the findings is that if a direct connection had been established, the samples might have been ordered, the alleged intrusiveness notwithstanding.

A New York state court has also addressed and denied an application for a DNA sample in a civil lawsuit, finding that the application was "premature and speculative." *LaVallee v. State of New York Office of Children and Family Svces.,* 182 Misc.2d 58, 60, 696 N.Y.S.2d 670 (Sup.Ct. Dutchess Cty.1999). In *LaVallee,* a sexual harassment action, the plaintiff sought a DNA sample from the defendant, alleging that he had ejaculated on her clothing and shoe and that, after the incident, she had wiped her stained shoe on carpeting in a nearby room. She had thrown away her stained clothing, but sought the sample based on her "strong belief" that the carpet and her shoe contained traces of the defendant's semen. *Id.* at 59, 696 N.Y.S.2d 670.

The court decided the application pursuant to N.Y. C.P.L.R. § 3101(a), "which requires a showing that the desired disclosure be 'material and necessary in the prosecution of an action.' " *Id.* at 59–60, 696 N.Y.S.2d 670. Assuming for purposes of the motion that any semen recovered from the shoe and carpet would be "material and necessary in the prosecution" of the action, the *LaVallee* court nonetheless denied the motion. The court held that, "upon balancing plaintiff's speculative and unsupported 'strong belief' that semen will be recovered from her shoe and in the room into which she fled more than 15 months before, against the invasive nature of the application, the court denies the application as premature and speculative." *Id.* at 60, 696 N.Y.S.2d 670. The court noted, however, that the denial was "without prejudice to reapplication upon expert proof that semen was recovered from the shoe or the carpet, and in such a quantity and of such quality to allow for accurate DNA analysis of the recovered sample(s). This will ensure that the granting of the application as to [the defendant] if the court were to be so inclined upon reapplication, will not be an academic exercise and an unnecessary invasion of [the defendant's]

privacy interests." *Id.* Thus, although the court recognized the potentially "invasive nature" of an order to produce a DNA sample, the denial was based on the plaintiff's failure to demonstrate that a semen sample existed to which the defendant's DNA could be compared, not a blanket rule about DNA samples.

Some general principles regarding the standards applicable to demands for a DNA sample can be elicited from these cases. All three courts look, as a threshold matter, for general authority in the jurisdiction to order a DNA sample and testing. Each of the courts also considers the privacy interests of the party from whom the DNA sample would come. Finally, each court seeks a sufficient factual basis for finding that production of a DNA sample is warranted. Thus, the courts seem to agree that a showing of a "reasonable possibility of a match," to use the language from *Hargrave, must be made.* 783 So.2d at 501. The *Hargrave* court found that a sufficient showing had been made where the plaintiff made out a prima facie case, based on the plaintiff's verified petition, sworn testimony and the names of other potential witnesses. *Id.* The court in *Harris* phrased the requirement as a "direct connection" between the parties from whom the DNA samples were sought and the evidence to be tested. 206 F.R.D. at 35. The court in *LaVallee* required a connection between the potential sample and the evidence against which it would be tested, denying the request without prejudice to renewal if the plaintiff established that the evidence against which the DNA sample would be tested did in fact contain semen. 182 Misc.2d at 60, 696 N.Y.S.2d 670. Both *Harris* and *LaVallee* denied the motions where the requisite factual basis was not demonstrated.

**\*61** Implicit in each ruling, of course, is the understanding that a DNA sample is meaningless in a vacuum—the sample must be compared to something to determine if the two DNA profiles match, and there must be some demonstrable possibility that a match will be found. As the court in *LaVallee* noted, parties should not be permitted to engage in fishing expeditions, hoping that some useful evidence might be gleaned from obtaining the DNA sample, nor should they be allowed to use demands for DNA evidence to pressure or intimidate other parties. But, where the party seeking the sample makes the appropriate showing, DNA samples should be available. Applying these principles to this case, the undersigned finds that the defendant has met his burden.

**2.) Application of the standards to the facts of this case:**

**a.) There is authority under the federal rules for ordering a DNA sample.**

**[1]** As a threshold issue, the court finds that there is authority in the Federal Rules for an order compelling a DNA sample. The federal rules allow a broad scope of discovery, providing that parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, and "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *See* Fed.R.Civ.P. 26(b)(1). There is no doubt that a comparison of Rosenblum's and McGrath's DNA samples to the DNA profiles on the blanket is relevant to the subject matter involved in this lawsuit, where Rosenblum claims that they had a consensual sexual relationship and McGrath has denied it several times under oath. For reasons explained in detail *infra,* the fact that the results of the DNA comparison will be used for impeachment purposes only does not alter the relevance of the testing, or require a denial of the order under the federal rules of discovery.

**b.) The plaintiff's privacy rights will not be unduly affected.**

**[2]** This court finds that the right of the defendant to impeach the plaintiff's veracity and/or the judiciary's interests "in providing a forum for dispute resolution, [and] in regulating litigation in the courts," outweigh the plaintiff's privacy rights under the circumstances presented. *See Hargrave,* 783 So.2d at 500. In reaching this conclusion, the court notes that it does not agree with the *Harris* court's finding that "DNA is an extreme discovery tool which is very intrusive to the targets of such discovery." 206 F.R.D. at 35. It is not clear from the decision in *Harris* whether that court was referring to the method by which the sample is taken, or to the larger, non-physical, ramifications of a person's being ordered to produce such intimate information about themselves, but this court would not express the level of intrusiveness in such strong language. As to the taking of the sample, this court agrees with the *Hargrave* court that the sample, which can be obtained either in a blood test or a cheek swab, is "only a minimal intrusion on the party's privacy rights." 783 So.2d at 500.

There are, no doubt, privacy issues inherent in the DNA context that go beyond the actual taking of the sample. Nonetheless, such samples can be extremely relevant to the lawsuit, and the imposition of appropriate protections that

limit the use of the DNA information sufficiently addresses those privacy concerns.

### c.) The defendant has made a prima facie showing of a reasonable possibility of a match.

[3]  Rosenblum has met his burden of showing a reasonable possibility that the DNA testing is likely to yield a match. First, he has shown that the evidence to be tested—the blanket —actually contains a male and a female DNA profile that can be tested against individual DNA samples.[3] **\*62** The letter submitted by Rosenblum from LabCorp states that preliminary testing of the blanket revealed the presence of blood, and the presence of a "major DNA profile consistent with a male source" and "a major DNA profile consistent with a female source." See Moscow Aff., Exh. B. The lab also stated that the DNA profiles "can be compared to any reference sample submitted."

The defendant has shown not only that there is something to test McGrath's DNA sample against, but also that there is some factual basis for believing that a match may be made. As noted *supra,* Rosenblum testified at the hearing as to the specific incident that allegedly resulted in the semen and blood stains on the blanket. Although certain details of his account strike the court as odd, his account was, on its face, credible for the purposes of his motion. McGrath did not take the stand to refute any of the details that Rosenblum presented. Thus, without finding that the story the defendant told is true, and noting that the actual testing may or may not reveal a match of the blood on the blanket with McGrath's DNA, the court finds that the defendant has shown, through his affidavit and testimony at the hearing, a reasonable possibility that such a match may be found.

In making this finding, the court rejects the plaintiffs' arguments that the defendants have failed to present sufficient credible evidence to corroborate Rosenblum's claim, and that the motion must be denied because the supporting allegations are uncorroborated. See Pl. Mem. of Law in Opp. at 14–17. Each of the plaintiffs' arguments is addressed *infra.*

### i.) Rosenblum's evidence is sufficient.

The plaintiffs argue that "Rosenblum's letter from Labcorp is insufficient to warrant DNA testing." Id. at 14. The court does not agree. Although the letter from the lab fails to answer several of the questions raised by the plaintiffs, for example, whether the blood was menstrual blood or other blood,[4]

whether the semen and blood were deposited on the blanket at the same time, and whether the semen on the blanket is Rosenblum's, it is sufficient for the purposes of this discovery motion.

### ii.) The defendant need not establish a chain of custody of the blanket for purposes of this motion.

[4]  The court also finds the plaintiffs' claim that the defendant's failure to establish a sufficient chain of custody for the blanket provides a basis for denying the motion to be without merit. In making this argument, the plaintiffs rely on *People v. Rokita,* 316 Ill.App.3d 292, 249 Ill.Dec. 363, 736 N.E.2d 205 (2000). In *Rokita,* the defendant, who was convicted of rape, had petitioned for post-conviction DNA testing using a technique not available when he was first tested. The trial court denied the request, and Rokita appealed. The plaintiffs state that *Rokita* cites to "725 ILCS 5/116–3 recognizing that in order to make a 'prima facie' showing in support of DNA testing in post-conviction proceedings, the chain of custody of the DNA must be established and identity must be central to the criminal conviction." Pet. Mem. in Supp. at 12. The relevance of that finding to the motion before this court is not readily apparent. In any event, this court finds that, on the facts before it, a chain of custody need not be established for the blanket. The plaintiffs have not suggested any concrete ways in which the DNA evidence might have been tampered with to lead to inaccurate results. And, any challenges to the chain of custody of the blanket can be raised in the context of whether the blanket can be admitted as evidence, a determination to be made by the trial judge. The court does hold, however, that the defendant will have to establish a chain of custody for the DNA samples to be submitted by Rosenblum and McGrath, in order to insure the integrity of the testing results. See Conclusion, *infra.*

### \*63  iii.) Corroborative evidence of the sort suggested by the plaintiffs is not required to make out a prima facie showing of a reasonable possibility of a match.

[5]  Nor does the court agree with plaintiffs that the defendant's motion must be denied because there is no evidence to corroborate Rosenblum's allegation that he and McGrath were involved in a consensual sexual relationship. Id. at 15. Plaintiffs base this argument on, *inter alia,* Rosenblum's failure to tell Amy Ventry, the outside counsel hired by NHCC to investigate McGrath's sexual harassment claims, about the affair. This does not strike the court as evidence that Rosenblum is necessarily lying. Indeed, it is altogether possible that the Hospital had rules prohibiting

McGrath v. Nassau Health Care Corp., 209 F.R.D. 55 (2002)

such activity between its Chairman of the Board and a hospital employee, and it was in Rosenblum's best interests at the time to conceal the affair. In any event, his failure to reveal it to Ms. Ventry does not make the allegation so suspect as to require a denial of the motion.

Moreover, the cases on which the plaintiffs rely, notably *Hargrave,* do not require corroborative evidence, as suggested by plaintiffs. The court in *Hargrave* found that the plaintiff there had made a prima facie showing of a reasonable possibility of a DNA match, based on the plaintiff's verified petition, sworn testimony and the names of other potential witnesses. 783 So.2d at 501. It did not, however *require* corroborative evidence or the names of witnesses who could corroborate the plaintiff's claim. Although such evidence might well enhance a movant's showing, requiring such evidence would impose too heavy a burden.

**iv.) Results of DNA testing need not be limited to use in establishing liability.**

Finally, the plaintiffs argue that the relevant caselaw stands for the proposition that, in order to make a prima facie showing, the party seeking the DNA must intend to use it to demonstrate liability, not for impeachment purposes. See P. Mem. of Law in Supp. at 11–13. This court does not agree that the cases stand for that proposition, and, even if they did, this court would reject such a rule.

The plaintiffs cite to *Hargrave* as "ordering that a DNA sample be produced where the sample ... would be used to prove liability." P. Mem. of Law in Supp. at 12. While it is true that the plaintiff in *Hargrave* intended to use the result of the DNA test to prove liability, nothing in the decision suggests that such a use was essential to the holding. The same is true as to *Harris* and *LaVallee.* The plaintiffs also rely on *Sacramona v. Bridgestone/Firestone, Inc.,* 152 F.R.D. 428 (D.Ma.1993), a cased cited to in *Harris.*

In *Sacramona,* a personal injury action, the defendants learned during discovery that the plaintiff was a former drug abuser and was bisexual, and was arguably at high risk for HIV or AIDS. The defendants sought a blood sample from the plaintiff to determine his HIV status, arguing that his HIV status had a bearing on his life expectancy, which in turn was relevant to his claims for damages. 152 F.R.D. at 430. In denying the request, the court analogized the demand for a blood sample to a physical examination under Fed.R.Civ.P. 35(a), and noted that, pursuant to that rule, the movant had to "make an affirmative showing that the [party's physical]

condition is genuinely in controversy and that good cause exists for ordering a particular examination." *Id.* at 431. The court found that, on the record before it, "the relevance of the results from a compelled blood test to plaintiff's cause of action is too attenuated," and the defendants sought to engage in " 'wholly exploratory operations in the vague hope that something helpful will turn up.' " *Id.* (quoting *Mack v. Great Atlantic & Pacific Tea Co.,* 871 F.2d 179, 187 (1st Cir.1989)). Thus, the court reasoned, the information the defendants sought was not relevant under Rule 26, and the court would exercise its discretion to limit defendants' discovery. *Id.*

The *Sacramona* court also held that the plaintiff had not placed his life expectancy "in controversy," as required by Rule 35, and distinguished other cases where blood tests were ordered to determine causation. "In contrast," the court held, "in the instant action **\*64** defendants seek the blood test to determine future damages, not liability." *Id.* The *Sacramona* court's holding that the plaintiff in that personal injury action had not placed his HIV status in controversy for purposes of Rule 35 is a far cry from holding that an HIV blood test, or, by extension, a DNA sample, can never be ordered where it will be put to any use other than to prove liability. This court finds that *Sacramona* does not stand for the proposition advanced by the plaintiffs and is inapposite to the facts presented by the Rosenblum motion.

Thus, the court finds that Rosenblum has made a prima facie showing of a reasonable possibility of a match.

**3.) Rosenblum's alleged discovery violations:**

**a.) Rosenblum's failure to produce the blanket as part of his initial disclosure does not require the denial of his motion.**

 **[6]**    The plaintiffs argue that, even if Rosenblum is found to have made a prima facie showing, he should be precluded from using the blanket for any purpose, because he failed to disclose it as part of his Rule 26(a)(1)(B) disclosure obligation and cannot be permitted to conduct a "trial by ambush." See P. Mem. of Law in Opp. at Pts. II & III & 5/6/02 Locke Letter. Fed.R.Civ.P. 26(a)(1)(B) requires, *inter alia,* the disclosure of "all ... tangible things that are in the possession, custody or control of the party and that the party may use to support its claims or defenses, unless solely for impeachment." Rule 37(c)(1) provides that a party who, "without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2),

JA185

McGrath v. Nassau Health Care Corp., 209 F.R.D. 55 (2002)

is not, unless such failure is harmless, permitted to use as evidence ... any witness or information not so disclosed." McGrath argues that Rosenblum was required to disclose the blanket pursuant to Rule 26, and that his failure to do so automatically invokes the preclusion sanction of Rule 37. Rosenblum claims that the blanket was exempted from mandatory disclosure under Rule 26, because he intends to use it solely for impeachment purposes, in light of McGrath's denial of a consensual sexual relationship. McGrath argues that such a claim is disingenuous, and that Rosenblum, of necessity, will use the blanket to support his defense to the sexual harassment charge.

As a threshold matter, this court notes that introduction of the blanket as evidence at trial is an issue for the trial judge to determine, and that this order considers only whether the DNA sample should be produced as part of the discovery process. In the May 22nd order, this court found that if the blanket "did contain some evidence of a sexual relationship between Rosenblum and McGrath, it could be used to impeach her statement that no such relationship existed." The court further noted that the existence of a consensual sexual relationship is not a per se defense to the harassment claim, a position expressly adopted by Rosenblum's counsel at the hearing. In other words, Rosenblum acknowledges that the fact of a consensual relationship between himself and McGrath does not prove that the sexual harassment did not occur, and adheres to his claim that he will use the results of the DNA testing only to impeach.

The court finds that the circumstances surrounding the revelation of the blanket, which was not mentioned until after McGrath had several times denied a consensual relationship, support the defendant's claim that the blanket will be used by Rosenblum for impeachment purposes only, and the court grants the motion compelling the production of the DNA sample on the assumption that Rosenblum will indeed be limited to that use at trial, if the trial judge allows the evidence in. The ultimate determination of that issue, will, however, as noted above, be made by the trial judge. In any event, given the defendant's claim that the blanket will be used only for impeachment purposes, the preclusion set forth in Rule 37(c)(1) does not apply, because Rule 26(a)(1)(B) expressly excludes evidence that will be used only for impeachment purposes from the mandatory disclosure requirements.

The NHCC argues that, even if the blanket were precluded from use by Rosenblum, such a sanction could not apply to the hospital, because it was unaware of the blanket's

**\*65**  existence until it was mentioned at McGrath's recent deposition, and the hospital was under no obligation to produce it. The NHCC further argues that the DNA evidence would be relevant for both impeachment purposes and "for establishing a defense that any complained of conduct by Rosenblum was not 'unwelcome' sexual harassment." NHCC Mem. of Law in Supp. at 4. At the hearing, Rosenblum's counsel argued that the hospital cannot enter a defense on behalf of the individual defendant, and thus could not use the DNA evidence to support this claim. This court need not decide the issue however, because the use to which the NHCC may or may not put the DNA evidence will be determined by the trial judge.

### b.) Rosenblum's failure to produce his correspondence with LabCorp is not sanctionable.

[7]  [8]  The plaintiffs also argue that Rosenblum's failure to produce the correspondence between himself and LabCorp should be sanctioned by preclusion of the blanket as evidence, pursuant to Rules 34 and 37. P. Mem. of Law in Opp. at 19–20. The court disagrees. As Rosenblum's attorney argued at the hearing on June 11th, he did not have to identify LabCorp as a witness because it is being used for impeachment purposes. See Rule 26(a)(1)(B) & Tr. at 5. And, any correspondence between LabCorp and Rosenblum's attorneys is protected by the work product doctrine (see Tr. at 5), unless the plaintiffs make an argument that they have substantial need of the materials and face undue hardship in obtaining the substantial equivalent of the materials, an argument the plaintiffs have not made. See Fed.R.Civ.P. 26(b)(3).

### CONCLUSION

The court finds that the defendant has met his burden of establishing a prima facie showing of a reasonable possibility of a match between the DNA profiles on the blanket and his and McGrath's DNA profiles. Thus, both Rosenblum and McGrath shall submit DNA samples for testing. The defendant has noted that the sample can be taken "at a location that minimizes the [in]convenience to McGrath, such as her home or office, so long as a qualified medical person takes the sample." Def. Mem. of Law in Supp. at 6, n. 1. The parties shall determine whether they prefer to give a blood sample or a cheek swab, and the court directs that the samples be taken by a "qualified medical person," for example, a LabCorp representative, in a manner that will safeguard the integrity of the samples and will guarantee that the samples

JA186

submitted to LabCorp are, in fact, the samples taken from Rosenblum and McGrath. In this regard, prior to taking the samples, the parties are to submit a joint proposed order that outlines the procedures to be followed, to be So Ordered by the undersigned, within ten days of the date of this order, or, if the plaintiffs appeal this order, within ten days of the date of disposition of that appeal by the trial judge.

Pursuant to the plaintiffs' request at the hearing, this order is stayed for ten days from the date of the order, to give the plaintiffs time to appeal it to Judge Platt, if they choose to do so. If the plaintiffs do appeal this order within the ten days,

the stay is extended to ten days from the date of disposition of the appeal by the trial judge.

The parties are also reminded that a settlement conference has been scheduled for **July 2, 2002 at 2:00 p.m.**

**SO ORDERED.**

**All Citations**

209 F.R.D. 55

Footnotes

1    The court here summarizes Rosenblum's testimony at the June 11th hearing. As explained *infra,* his testimony represented, for the purposes of his motion to compel, a credible enough account of how his semen and McGrath's menstrual blood could have come to be on the blanket, especially in light of the fact that McGrath did not take the stand at the hearing to refute his testimony. The court does not, however, make any finding as to the actual truth of Rosenblum's claim, a matter for the jury if the issue is raised at trial.

2    Indeed, McGrath's psychologist's notes dated July 27, 2000 do recount the incident. See Moscow Letter, May 9, 2002, Exh. A.

3    This is the showing that was absent in *LaVallee,* and which led to the denial of the motion by that court. The court in *Hargrave* granted the motion absent such a showing, apparently finding that the plaintiff's evidence was sufficiently strong even without this showing.

4    At the hearing, the defendant informed the court that the DNA testing could not demonstrate that the blood on the blanket is menstrual blood, only whether the DNA profile of the blood matched McGrath's DNA profile. In the event that a match is found, the plaintiffs will be free to offer argument as to how any sample of McGrath's blood came to be on a blanket in Rosenblum's possession.

End of Document                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT D

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

| | | |
|---|---|---|
| **JANE DOE,** | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CL2019-12642** |
| | ) | |
| **CENK SIDAR,** | ) | |
|     **Defendant.** | ) | |

### MOTION FOR PROTECTIVE ORDER

**COMES NOW** the Defendant and moves this Court for a protective order for certain DNA and Blood Samples (collectively "Defendant's Samples") that were ordered disclosed through the course of this litigation, and in support thereof, states as follows:

1.    This Court Ordered that Defendant give a sample of his blood and DNA on February 21, 2020. Defendant was unable to oppose that motion or request a protective order at that time since a general appearance had not been filed in the case. This Court denied Defendant's request to reconsider that Order on August 7, 2020 (order pending).

2.    The instant matter is one of civil assault, battery, and intentional infliction of emotional distress brought against Defendant which alleges that Defendant sexually assaulted and battered Plaintiff in the United Kingdom in September of 2017.

3.    The underlying incident was reported to the London Police Department. As a part of its investigation the London Police are in possession of a sample obtained from Plaintiff's upper vaginal region.

4.    Defendant made a statement to the police in February of 2018 and provided a sample of his DNA. Upon information and belief, Defendant's sample was lost.

1

JA188

5.      While the London Police's investigation is still open, no criminal charges have been filed against Defendant.

6.      Upon consultation with Defendant's London attorneys it was discovered that Defendant cannot be compelled by the police in the U.K. to provide the police in the U.K. with a DNA sample. It was also discovered that the police in the U.K. will not move forward with a prosecution of Defendant without a sample of Defendant's DNA.

7.      Plaintiff's own documents show that Plaintiff is working with the London Police in order to obtain a DNA sample in the instant litigation to simply transfer that sample to London Police.  Exhibit A.

8.      Virginia appellate courts have not addressed the issue of the use of DNA and blood samples in civil discovery. However, Louisiana has addressed this matter in *Hargrave v. Brown*, 783 So.2d 497 (La. App. 5th Cir. 2001). In *Hargrave*, the court found that a protective order "limiting the use of the DNA information to this case only and ordering it filed under seal" was appropriate to protect the defendant's privacy interests. *See Id.* at 501. While the case is not binding upon this Court, it is persuasive to support the proposition that Defendant's privacy rights are substantial in a criminal prosecution unless he is protected by the issuance of the protective order limiting the use of a DNA and blood sample.

9.      Rule 4:1(c)(2) allows this Court to issue a protective order "... on specified terms and conditions..."

10.      During the hearing regarding the Motion to Reconsider this Court's Order that he provide his DNA and blood samples, Plaintiff's counsel represented that they had no interest in

2

Defendant's prosecution and stated as part of their argument that Defendant had not requested a protective order. Defendant requests such a protective order now.

11.     Counsel for Plaintiff indicated that Plaintiff opposes this Motion as Defendant has no expectation of privacy and that they will not agree to a limitation that prevents the DNA comparison. *See* Exhibit B: E-mail from Walter Steimel to counsel for Defendant. *See Exhibit B.* In that same e-mail, they also accuse defense counsel of obstructing justice in the U.K. presumably by filing this protective order to limit the dissemination of Defendant's DNA and blood samples and in a familiar refrain, threaten counsel with sanctions and other counts. Defendant could find no authority to support Plaintiff's counsel's position.

12.     Defendant requests that this Court protect his privacy rights while still allowing Plaintiff to obtain discovery by issuing a protective order preventing the transferring of Defendant's Samples outside of the United States and to be handled only by laboratories that contract with either of the parties in this litigation. At the conclusion of the litigation, the samples and the results should be destroyed and not disseminated outside of the participants in the litigation.

3

WHEREFORE, upon the premises considered, the Defendant prays this Court enter an appropriate protective order and such other relief this Court deems proper.

Respectfully Submitted,
Cenk Sidar
By Counsel

Anna K. Dvorchik, VSB 65679
The Law Office of Anna K. Dvorchik, PLLC
3970 Chain Bridge Road
Fairfax, VA 22030
571-839-2301
anna@advofirm.com
Counsel for Defendant

Alexandros K. Mitrakas, VSB 78841
Mitrakas and Company, P.C.
1001 19th Street North
Suite 1200
Arlington, Virginia 22209
(703) 888-5516
amitrakas@mitrakasco.com (email)
Co-Counsel for Defendant

4

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2020 I caused a copy of the foregoing document to be e-mailed and mailed to:

| | |
|---|---|
| Thomas F. Urban II, Esq.<br>Fletcher Heald and Hildreth<br>1300 North 17th Street<br>11th Floor<br>Arlington, Virginia 22209<br>urban@fhhlaw.com | Walter Steimel<br>SCLG<br>1455 Pennsylvania Ave., N.W.,<br>Suite 400<br>Washington, D.C. 20004<br>wes@sclgrp.com |

Anna K. Dvorchik

5

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

| | | |
|---|---|---|
| **JANE DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CL2019-12642** |
| | ) | |
| **CENK SIDAR,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PROTECTIVE ORDER

**CAME THIS DAY** this _____ day of _____2020, **the** Defendant, Cenk Sidar, and requested entry of this protective order pursuant to Rule 4:1(c) of the Rules of the Supreme Court of Virginia.

**IT APPEARING TO THE COURT** that there is good cause and that this Order should be entered it is therefore,

**ADJUDGED, ORERED AND DECREED** as follows:

1.    This Order governs the handling of all DNA and Blood Samples (collectively "Defendant's Samples") produced, given, or filed by Defendant by order of this Court.

2.    All Defendant's Samples shall be used solely for the purposes of preparing for and conducting this proceeding and shall not be disseminated, or the results of testing, shall not be disseminated or revealed for any other purpose to any third party;

3.    All Defendant's Samples shall be designated as "confidential" and may only be disclosed by the party receiving such information to qualified persons, who are defined to consist exclusively of:

    a.    The parties and counsel for the parties to this proceeding, and such regular employees of counsel as are required to assist in conducting this proceeding;

    b.    Independent bona fide experts or consultants employed by counsel for either party;

    c.    The Court as provided herein;

    d.    Trial preparation of witnesses;

    e.    Such other persons upon whom counsel for all parties agree.

4.    Excluded from the definitions above are the Metropolitan Police Services in the United Kingdom, the Havens, and any police department or police service by any name in the United Kingdom;

5.    Each person other than counsel and his/her regular employees given access to Defendant's Samples pursuant to the terms hereof shall be advised that the confidential materials, or other information are being disclosed pursuant to and subject to terms of this Order and may not be disclosed other than pursuant to the terms hereof and shall sign a copy of this Order indicating his or her acceptance of the terms hereof;

6.    At the conclusion of these proceedings, the samples must be destroyed;

7.    The obligations of this Order shall continue after the conclusion of this proceeding unless modified by further Order of this Court.

**ENTERED** this ____ day of _____, 2020.

_____

JUDGE
FAIRFAX COUNTY CIRCUIT COURT

# EXHIBIT A

*PJ HEARING 000412*

# FLETCHER, HEALD & HILDRETH, P.L.C.
## ATTORNEYS AT LAW
### 11TH FLOOR, 1300 NORTH 17TH STREET
### ARLINGTON, VIRGINIA 22209

(703) 812-0400      FAX: (703) 812-0486      E-MAIL: office@fhhlaw.com      TAX I.D. NUMBER 53-0185297

JANE DOE                                              Mar 31, 2020      PAGE      2
FILE NUMBER:  40777-01
INVOICE NO.:  218189

Professional Services Rendered Re: JANE DOE                          Value

03/02/20 Review correspondence re: deposition of Sidar
         OF COUNSEL: TFU   .10 hours at  .00 per hour.              NO CHARGE

03/04/20 Arrange for preparation of exhibits for
         hearing; review WES attorneys fees; call with
         WES re: same; meet with WES to discuss hearing
         on 3/5; review 2nd day of Sidar depositions
         transcripts; review corrected Opposition (N/C
         .70).
         OF COUNSEL: TFU   1.40 hours at 325.00 per hour.          455.00

03/05/20 Attend scheduling hearing for Motion to Dismiss
         on Jurisdictional grounds; discuss various
         issues with Mitrakas, WES (N/C .70)
         OF COUNSEL: TFU   1.40 hours at 325.00 per hour.          455.00

03/16/20 Call with WES re: blood tests, DNA; review
         court order re scheduling
         OF COUNSEL: TFU   .40 hours at 325.00 per hour.           130.00

03/17/20 Review email from WES re: Order, Motion re:
         Alias; call to Fairfax Court and obtain signed
         copy of Order; review correspondence re:
         testing; review WES email to London police
         OF COUNSEL: TFU   .70 hours at 325.00 per hour.           227.50

03/18/20 Review draft email to London police; edit and
         forward to WES; discuss London police testing;
         other issues WES
         OF COUNSEL: TFU   .50 hours at 325.00 per hour.           162.50

```
EXHIBIT
   A
```
tabbies

**PLEASE SEND REMITTANCE IN U.S. DOLLARS**
***PLEASE INCLUDE CLIENT AND/OR INVOICE NUMBER ON REMITTANCE***

PJ HEARING 000413

### FLETCHER, HEALD & HILDRETH, P.L.C.
### ATTORNEYS AT LAW
### 11TH FLOOR, 1300 NORTH 17TH STREET
### ARLINGTON, VIRGINIA 22209

(703) 812-0400      FAX: (703) 812-0488      E-MAIL: office@fhhlaw.com      TAX I.D. NUMBER 53-0188297

JANE DOE                                    Mar 31, 2020      PAGE      3
FILE NUMBER:  40777-01
INVOICE NO.:  218189

| | | |
|---|---|---|
| 03/19/20 | Review email from WES re: LMP buckle for testing; review WES email to LMP | |
| | OF COUNSEL: TFU    .20 hours at  .00 per hour. | NO CHARGE |
| 03/20/20 | Review WES correspondence with Bode Tech; review email canceling 3/25 hearing; forward to WES | |
| | OF COUNSEL: TFU    .30 hours at  325.00 per hour. | 97.50 |
| 03/23/20 | Review WES email to Mitrakas re: compliance with testing and discovery orders; correspondence with WES re: Mitrakas response; review WES reply to Mitrakas | |
| | OF COUNSEL: TFU    .40 hours at  325.00 per hour. | 130.00 |
| 03/24/20 | Correspondence with Mitrakas and WES re: testing | |
| | OF COUNSEL: TFU    .20 hours at  .00 per hour. | NO CHARGE |
| 03/26/20 | Correspondence with Mitrakas re: status call; call with WES | |
| | OF COUNSEL: TFU    .20 hours at  325.00 per hour. | 65.00 |
| 03/27/20 | Call with WES; call with WES, Mitrakas; correspondence with Mitrakas | |
| | OF COUNSEL: TFU    .30 hours at  325.00 per hour. | 97.50 |

Total Hours        6.10      Total Services      1820.00

Disbursements:

Parking                                                2.50
                                                  ----------
      Total Disbursements                              2.50

**\*\*PLEASE SEND REMITTANCE IN U.S. DOLLARS\*\***
**\*\*\*PLEASE INCLUDE CLIENT AND/OR INVOICE NUMBER ON REMITTANCE\*\*\***

PJ HEARING 000416

# FLETCHER, HEALD & HILDRETH, P.L.C.
## ATTORNEYS AT LAW
## 11TH FLOOR, 1300 NORTH 17TH STREET
## ARLINGTON, VIRGINIA 22209

(703) 812-0400      FAX: (703) 812-0486      E-MAIL: office@fhhlaw.com      TAX I.D. NUMBER 53-0185297

JANE DOE                                      Apr 30, 2020      PAGE      2
FILE NUMBER:  40777-01
INVOICE NO.:  219390

Professional Services Rendered Re: JANE DOE                    Value

04/10/20 Review WES email to Mitrakas re: various issues
         OF COUNSEL: TFU    .20 hours at  .00 per hour.         NO CHARGE

04/11/20 Correspondence with WES re: DNA test kit from
         London (N/C - .2)
         OF COUNSEL: TFU    .20 hours at 325.00 per hour.        65.00

04/13/20 Review WES correspondence with Mitrakas re:
         various issues; Mitrakas response; WES reply;
         further Mitrakas correspondence; draft and
         send email to Mitrakas; review response
         OF COUNSEL: TFU    .40 hours at 325.00 per hour.       130.00


            Total Hours        0.80    Total Services        195.00

            Disbursements:

   Parking                                                      10.00
                                                            -----------
                     Total Disbursements                       10.00

         Total for this matter:
                                    Prior balance          12762.20
                                    Payments                   0.00
                                    Current Charges         205.00
                                    Service Charges         108.83
                                                        --------------
                                    Balance Due           13076.03


              **PLEASE SEND REMITTANCE IN U.S. DOLLARS**
        ***PLEASE INCLUDE CLIENT AND/OR INVOICE NUMBER ON REMITTANCE***

JA198

EXHIBIT B

 **Gmail**

**Anna Dvorchik <anna@advofirm.com>**

## Re: DNA and Blood Testing Schedule; Demand

1 message

**Walter Steimel <wes@sclgrp.com>**                                                     Sun, Aug 16, 2020 at 12:06 PM
To: Alex Mitrakas <amitrakas@mitrakasco.com>
Cc: Thomas Urban <urban@fhhlaw.com>, Anna Dvorchik <anna@advofirm.com>

Alex,

Thank you for sending the blood test results that you provided, but the test tells only part of the story. The test results are insufficient as Defendant was not tested for HPV, herpes, hepatitis B or syphilis. Why was he not tested for these? The hepatic function test was interesting but irrelevant to STDs – that test would primarily be relevant to screen for alcohol or drug abuse. We still require a blood test for a full disease profile.

Your characterization of my remarks at last week's hearing has no basis in fact. I stated that proceedings in London were irrelevant to me, and nothing more. Please highlight the passage you reference because I simply do not see that in the transcript.

We cannot agree to your request. We cannot and will not agree to any protective order that interferes with our pursuit of this case and of Plaintiff's rights. We will not be placed in a situation where any DNA comparison we seek to introduce is opposed because of alleged defects in the process. If the experts we consult require comparison of samples in London, we cannot be in a position where we have agreed to a limitation that prevents that comparison.

Further, we have found no cases or legal principles that would support a request for protective order as you suggest. We know Defendant voluntarily provided a DNA sample to the London Police sometime after he raped Plaintiff. He can have no reasonable expectation of privacy in that DNA, and we doubt any judge would grant a protective order along the lines you suggest. If you attempt to move for such a protective order we will not only oppose it, but will request sanctions under Virginia Code §8.01-271.1 as it is clear to me that not only is there no case law that would support such a request, the jurisprudence is just the opposite and the motion would constitute another attempt to delay this case and frustrate Plaintiff's ability to obtain relevant and admissible evidence.

Finally, as members of the Bar, we have a duty to cooperate with the police if asked, and cannot waive our duties as officers of the court.  I'd be hesitant to violate my duties as an attorney and officer of the court just to help the opposing party suppress evidence of a crime. Wouldn't you?

One final observation. We have been informed that Defendant has legal representation in London, that Defendant's solicitor has been attempting to obtain information from the authorities about discussions that we, as Plaintiff's counsel, have had with the authorities, and making inquiries about the status of this civil case and strategies or thoughts shared by us. This conduct, if true, is blatantly improper and must cease immediately. We will aggressively pursue not only Defendant but counsel for improper interference in this case and may add new counts to our complaint depending upon what my further investigation yields.

Please conduct yourself accordingly.

Walt

Walter E. Steimel, Jr.
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W. Suite 400
Washington, D.C. 20004

JA200

202-271-9258
wes@sclgrp.com

On Aug 13, 2020, at 4:59 PM, Alex Mitrakas <amitrakas@mitrakasco.com> wrote:

Walt,

At last week's hearing, you indicated that you had no intention of sharing Mr. Sidar's DNA with London Metropolitan Police Service or Crown Prosecution.  You are merely working with them in order to test Mr. Sidar's sample.  We are therefore requesting that you agree to a protective order, keeping Mr. Sidar's DNA sample and results here in the United States and that this sample and any results of testing will be used for this court proceeding only and will be destroyed at the conclusion of this civil case.

Also, as a gesture of goodwill we attach Mr. Sidar's test results from when he was tested for hiv, gonorrhea and chlamydia in June where he was found to be negative for those particular diseases.

We would like Mr. Sidar to be in compliance with this Order as soon as possible. Please let us know if you are comfortable with signing such an Order and we will draft it and provide it you for edit and comments.

Alex

Alex Mitrakas
Attorney at Law
 Shareholder
1001 19th Street North
Suite 1200
Arlington, VA 22209
703-888-5517 Direct

**From:** Walter Steimel <wes@sclgrp.com>
**Sent:** Monday, August 10, 2020 1:20 PM
**To:** Anna Dvorchik <anna@advofirm.com>; Alex Mitrakas <amitrakas@mitrakasco.com>
**Cc:** Chantal Lewis <info@mymednovations.com>; Thomas Urban <urban@fhhlaw.com>
**Subject:** DNA and Blood Testing Schedule; Demand

Review and act accordingly. We expect this to be completed within a week.


Walter E. Steimel, Jr.
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W. Suite 400
Washington, D.C. 20004
202-271-9258
wes@sclgrp.com

<Document-12937475-complete.pdf>

**EXHIBIT E**

329 F.R.D. 650
United States District Court, D. Idaho.

Sally ASHBY, an Individual, and
Howard Fowler, an Individual, Plaintiffs,

v.

Gerald MORTIMER, M.D., and Obtestrics and
Gynecology Associates of Idaho Falls, P.A., an
Idaho Professional Corporation, Defendants.

Case No. 4:18-cv-00143-DCN
|
Signed 01/22/2019

**Synopsis**

**Background:** Biological mother and her former husband, whose daughter was born during their marriage via artificial insemination, brought medical malpractice action against medical practice and treating obstetrician, who allegedly used his own sperm to impregnate mother and did not disclose this information. Plaintiffs moved to compel a paternity test.

**Holdings:** The District Court, David C. Nye, Chief Judge, held that:

[1] obstetrician's DNA met the "in controversy" requirement;

[2] good cause supported ordering paternity test; and

[3] ordering obstetrician to undergo paternity test would not have been cumulative and distracting to jury.

Motion granted.

West Headnotes (11)

**[1]   Federal Civil Procedure** 🔑 **Grounds and objections**

An order requiring an examination under the rule governing physical and mental examinations may be issued only: (1) when the mental or physical condition of the party or person in the party's custody is in controversy, and (2) good cause supports the order. Fed. R. Civ. P. 35(a).

**[2]   Federal Civil Procedure** 🔑 **Grounds and objections**

A party's mental or physical condition is "in controversy," for purposes of the rule governing orders for physical or mental examinations, when such condition is the subject of the litigation. Fed. R. Civ. P. 35(a).

1 Cases that cite this headnote

**[3]   Federal Civil Procedure** 🔑 **Grounds and objections**

Whether good cause is established, for purposes of the rule governing orders for physical or mental examinations, depends on both relevance and need. Fed. R. Civ. P. 35(a).

**[4]   Federal Civil Procedure** 🔑 **Grounds and objections**

In determining whether there is need for a physical or mental examination, for purposes of the rule governing orders for such examinations, the court must examine the ability of the movant to obtain the desired information by other means. Fed. R. Civ. P. 35(a).

**[5]   Federal Civil Procedure** 🔑 **Grounds and objections**

The party seeking a mental or physical examination must generally establish the controversy and good cause requirements of the rule governing orders for such examinations. Fed. R. Civ. P. 35(a).

1 Cases that cite this headnote

**[6]   Federal Civil Procedure** 🔑 **Physical or Mental Examination of Person**

Granting or denying a motion for a physical examination rests in the sound discretion of the trial court. Fed. R. Civ. P. 35(a).

1 Cases that cite this headnote

**[7]**   Federal Civil Procedure 🔑 Physical or Mental Examination of Person

Federal Civil Procedure 🔑 Grounds and objections

Like other rules of discovery, the rule governing mental and physical examinations should be construed liberally in favor of examination, but the district court must balance the right of the party to be examined to avoid personal invasion against the moving party's right to a fair trial. Fed. R. Civ. P. 35.

1 Cases that cite this headnote

**[8]**   Federal Civil Procedure 🔑 Grounds and objections

Treating obstetrician's DNA met the "in controversy" requirement of the rule governing orders for physical examinations, so as to support grant of motion to compel obstetrician to undergo buccal swab paternity test, in medical malpractice action under Idaho law against obstetrician and medical clinic, brought by biological mother and her former husband, whose daughter was born during their marriage via artificial insemination, arising from obstetrician allegedly using his own sperm to impregnate mother without disclosing this information; the very core of obstetrician's defense, that he was not daughter's biological father because he did not inseminate mother with his own sperm, required an analysis of his DNA to be proven. Fed. R. Civ. P. 35(a).

**[9]**   Federal Civil Procedure 🔑 Grounds and objections

Good cause supported ordering obstetrician to undergo buccal swab paternity test, in medical malpractice action under Idaho law against obstetrician and medical clinic brought by biological mother and her former husband, whose daughter was born during their marriage via artificial insemination, arising from obstetrician allegedly using his own sperm

to impregnate mother without disclosing this information, even though the alleged relationship was shown by commercial DNA test taken by daughter; obstetrician's relation to daughter not available through other means, and commercial test did not provide conclusive proof of paternity because, inter alia, there was no documented chain of custody. Fed. R. Civ. P. 35(a).

**[10]**   Federal Civil Procedure 🔑 Grounds and objections

Ordering obstetrician to undergo paternity test would not have been cumulative and distracting to jury, as would weigh against order, in medical malpractice action under Idaho law against obstetrician and medical clinic brought by biological mother and former husband, whose daughter was born via artificial insemination, arising from obstetrician allegedly using his own sperm to impregnate mother without disclosing this information, which daughter discovered after taking commercial DNA test; obstetrician did not offer to stipulate to either paternity or to reliability of commercial test results, question of whether commercial test results were reliable would have created far greater distraction for jury than second DNA test, and if DNA test established obstetrician was not daughter's biological father there would be no need for trial. Fed. R. Civ. P. 35(a).

**[11]**   Federal Civil Procedure 🔑 Grounds and objections

Allowing obstetrician to avoid conclusive paternity test and build doubt as to accuracy of commercial DNA test results would have unfairly prejudiced biological mother and her former husband, and could have materially affected outcome of trial, so as to support ordering obstetrician to undergo buccal swab paternity test, in mother and husband's medical malpractice action under Idaho law against obstetrician and medical clinic, arising from obstetrician allegedly using his own sperm to impregnate mother during artificial insemination without disclosing this information, which

daughter discovered after taking commercial DNA test; in contrast, allowing technician to swab inside of obstetrician's cheek to obtain DNA sample was minimal invasion of privacy, considering his unsolicited willingness to share DNA with commercial DNA testing company. Fed. R. Civ. P. 35(a).

**Attorneys and Law Firms**

**\*652** Mathew M. Purcell, Pro Hac Vice, Purcell Law, PLLC, Shea C. Meehan, Jillian A. Harlington, Pro Hac Vice, Walker Heye Meehan & Eisinger, PLLC, Richland, WA, for Plaintiffs.

Raymond D. Powers, Portia L. Rauer, Powers Tolman Farley, PLLC, Boise, ID, J. Michael Wheiler, Richard R. Friess, Thomsen Holman Wheiler, PLLC, Idaho Falls, ID, for Defendants.

**MEMORANDUM DECISION AND ORDER**

David C. Nye, Chief U.S. District Court Judge

**I. INTRODUCTION**

The Court has before it Plaintiffs' Motion to Compel a Paternity Test pursuant to Federal Rule of Civil Procedure 35. Dkt. 34. Having reviewed the parties' briefs and the record, the Court finds good cause to GRANT Plaintiffs' Motion, and orders Defendant Gerald Mortimer ("Dr. Mortimer") to submit to a buccal swab paternity test.

**II. BACKGROUND**

The facts of this case are set forth in this Court's Order dismissing various parties and granting in part and denying in part Dr. Mortimer's Motion to Dismiss. Dkt. 40. In brief, Plaintiffs Ashby and Fowler are a formerly married couple who became patients of Defendant Obstetrics and Gynecology Associates of Idaho Falls ("OGA"), under the care of Dr. Mortimer, an OB/GYN, when they struggled to conceive. Upon examination, Dr. Mortimer diagnosed Ashby and Fowler with various fertility issues and recommended that the couple undergo a form of artificial insemination in

which donor sperm from an anonymous donor would be mixed with Fowler's sperm in a lab prior to insemination to **\*653** increase the chances of conception. The couple agreed, and Dr. Mortimer performed the artificial insemination procedure on various occasions in June, July, and August of 1980. In August 1980, Ashby discovered she was pregnant. Ashby gave birth to daughter Kelli Rowlette on May 20, 1980.

Many years later, Rowlette received notification from Ancestry.com that a DNA sample she had submitted matched a sample submitted by Dr. Mortimer. Ancestry.com predicted there was a parent-child relationship between the two individuals based upon the samples it reviewed. Rowlette did not know Dr. Mortimer and was completely unaware that her parents had undergone artificial insemination to help them conceive. Rowlette confronted her parents regarding the Ancestry.com results, and the three ultimately brought the instant suit alleging that instead of using sperm from an anonymous donor, Dr. Mortimer used his own sperm to inseminate Ashby.[1]

While denying Plaintiffs' allegations, Dr. Mortimer has refused Plaintiffs' request that he submit to a DNA test to prove (or disprove) his paternity of Rowlette. Plaintiffs filed the instant motion to compel Dr. Mortimer's submission to a buccal (cheek) swab DNA test.

**III. LEGAL STANDARD**

**[1]** Under the Federal Rules of Civil Procedure, a court "may order a party whose mental or physical condition ... is in controversy to submit to a physical or mental examination by a suitably licensed examiner" upon a showing of good cause. Fed. R. Civ. P. 35(a). An order requiring an examination under Rule 35 may be issued only (1) when the mental or physical condition of the party or person in the party's custody is "in controversy" and (2) good cause supports the order. *Schlagenhauf v. Holder*, 379 U.S. 104, 119, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964) ).

**[2]   [3]   [4]** A party's mental or physical condition is "in controversy" when such condition is the subject of the litigation. *Robinson v. Jacksonville Shipyards, Inc.*, 118 F.R.D. 525, 531 (M.D. Florida 1988). "Whether good cause is established depends on both relevance and need." *Pearson v. Norfolk-Southern Ry., Co., Inc.*, 178 F.R.D. 580, 582 (M.D. Alabama 1998) (citations omitted). In determining whether there is need, the court must examine the ability of the movant

to obtain the desired information by other means. *Id.* (citing *Schlagenhauf*, 379 U.S. at 118, 85 S.Ct. 234).

**[5]**   While the party seeking the examination must generally establish the "controversy" and "good cause" requirements:

> [T]here are situations where the pleadings alone are sufficient to meet these requirements. A plaintiff in a negligence action who asserts mental or physical injury ... places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury. This is not only true as to a plaintiff, but applies equally to a defendant who asserts his mental or physical condition as a defense to a claim, such as, for example, where insanity is asserted as a defense to a divorce action.

*Schlagenhauf*, 379 U.S. at 119, 85 S.Ct. 234.

**[6]**   **[7]**   Granting or denying a motion for a physical examination "rests in the sound discretion of the trial court." *Coca-Cola Bottling Co. of Puerto Rico v. Negron Torres*, 255 F.2d 149, 153 (1st Cir. 1958) (citing *Bucher v. Krause*, 200 F.2d 576, 584 (7th Cir. 1952) ). Like other rules of discovery, Rule 35 should be "construed liberally in favor of examination, but the Court must balance the right of the party to be examined to avoid personal invasion against the moving party's right to a **\*654** fair trial." *Does I-XIX v. Boy Scouts of Am.*, 2017 WL 4226401 (D. Idaho 2017) (quoting *Franco v. Boston Scientific Corp.*, 2006 WL 3065580, at \*1 (N.D. Cal. Oct. 27, 2006) ).

## IV. ANALYSIS

In their Motion to Compel, Plaintiffs contend the pleadings alone establish the biological relation between Rowlette and Mortimer is in controversy because, in his Answer to Plaintiffs' Complaint, Mortimer stated he had no recollection of having utilized his sperm in the artificial insemination process of Ashby, and therefore denied that he used his own genetic material in the insemination. Dkt. 34-1, p. 2 (citing *Answer*, Dkt. 13, p. 4). Plaintiffs argue the fact that Dr. Mortimer "must rely on his lack of recall in order to deny the allegation, rather than providing an outright denial or outright admission, reveals that a paternity test is the only reliable way to obtain evidence that Mortimer and Rowlette are father and daughter." Dkt. 34-1, p. 5. Plaintiffs also suggest the pleadings establish good cause because "the single most important fact

in this lawsuit is the allegation that Dr. Mortimer is Rowlette's father, if this allegation proves false, each cause of action alleged by the plaintiffs must necessary fail." *Id.* As such, Plaintiffs maintain there is good cause to order a paternity test because if it is true that Dr. Mortimer did not father Rowlette, the parties should be able to discover that fact before this lawsuit proceeds any further.

Dr. Mortimer responds that the pleadings alone are not sufficient to establish he put his DNA at issue, and that Plaintiffs have not satisfied the "fact intensive" standard required to support good cause. Dkt. 37, pp. 5-8. Dr. Mortimer suggests Plaintiffs put his DNA at issue through the allegations in their Complaint, and that Dr. Mortimer's mere denial of Plaintiffs' allegations does not mean he put his DNA at issue. In addition, Dr. Mortimer contends good cause cannot be established because Plaintiffs can simply rely on the Ancestry.com test. Because the Ancestry.com test is already available, Dr. Mortimer argues forcing him to submit to a cheek swab test would be futile, redundant, and unnecessarily invasive.

In their Reply, Plaintiffs continue to maintain that the pleadings alone meet the "controversy" and "good cause" requirements of Rule 35, but also present facts to establish good cause exists for the DNA test even if Dr. Mortimer's Answer to the Complaint didn't place his biological relation to Rowlette in question by denying paternity. Plaintiffs argue there is good cause to order Dr. Mortimer to submit to a DNA test because the Ancestry.com test could not serve as conclusive evidence of paternity at trial for several reasons. Specifically, the Ancestry.com test is inadmissible evidence of paternity under Idaho law, there is no documented chain of custody for either Mortimer or Rowlette's DNA samples, and there is no way for an expert to evaluate Ancestry.com's results in light of the chain of custody issue. Dkt. 39, pp. 5-6 (citing Idaho Code § 7-1101 *et seq.*). Plaintiffs filed the declaration of Dr. Lee W. Parsons in support of their contention that the Ancestry.com test is inadequate evidence to confirm paternity at trial. Dkt. 39-1.

**[8]**   After spending half of his Response brief arguing he did not place his paternity "in controversy" simply by denying the allegations of Plaintiffs' Complaint, Dr. Mortimer admits, in his Sur-Reply, that his DNA is central to this dispute and therefore meets the "controversy" element of Rule 35. Dkt. 42, pp. 2-3. The Court agrees Dr. Mortimer's DNA meets the "controversy" element of Rule 35. The very core of Dr. Mortimer's defense—that he is not Rowlette's

biological father because he did not inseminate Ashby with his own sperm—requires an analysis of his DNA to be proven. The "in controversy" requirement is thus satisfied. *See, e.g., Schlagenhauf*, 379 U.S. at 119, 85 S.Ct. 234 (when a Defendant asserts a physical condition—or lack thereof —as a defense to a claim, the pleadings are sufficient to meet the "in controversy" requirement). Having found the "in controversy" element satisfied, the Court proceeds to consider whether there is good **\*655** cause to order a DNA test.[2]

 **[9]**   Good cause supports a DNA test because Dr. Mortimer's relation to Rowlette is not, contrary to Dr. Mortimer's contention, available through other means. *Schlagenhauf*, 379 U.S. at 118, 85 S.Ct. 234 (the "good cause" determination requires the court to consider the movant's ability to obtain requested information by other means); *Pearson*, 178 F.R.D. at 582 (to establish good cause for an examination, the moving party must demonstrate the examination is necessary by showing that the information it seeks is not available by other means); *D'Angelo v. Potter*, 224 F.R.D. 300, 304 (D. Mass. 2004) (finding good cause to order a DNA examination where plaintiff lacked alternative forms of discovery which would allow her to prove her allegations at trial). Here, the Ancestry.com test does not provide conclusive proof of paternity because, *inter alia*, there is no documented chain of custody. As such, Dr. Mortimer could launch a variety of attacks on the competency of the Ancestry.com results at trial, including: (1) that someone else may have produced the saliva in the sample submitted under his name or in the sample submitted under Rowlette's name; (2) that he (or Rowlette) did not follow the appropriate procedures for giving a sample; (3) that excessive heat, cold, age of test, or some other defect before processing by Ancestry.com degraded the accuracy of the results; or (4) that mix-ups at Ancestry.com rendered the results inconclusive.[3] Notably, while Dr. Mortimer argues the Motion to Compel should be denied because "the Ancestry DNA test is identical to the DNA test Plaintiffs now request," he denies paternity despite the Ancestry.com result identifying a parent child relationship between him and Rowlette. Dkt. 37, p. 3. Due to the potential inadequacy of the Ancestry.com test to establish paternity, Plaintiffs cannot obtain conclusive evidence of paternity absent a DNA test.

 **[10]**    **[11]**   Dr. Mortimer also argues additional testing would be cumulative and would "distract a juror from the more critical issues regarding whether Dr. Mortimer violated the applicable standard of care and what damages the Plaintiffs

actually suffered, if any." Dkt. 42, p. 5. However, Dr. Mortimer does not offer to stipulate to either paternity or to the reliability of the Ancestry.com results and could dispute the accuracy of the results at trial. The question of whether the Ancestry.com results are reliable would create a far greater distraction for the jury than would a second DNA test confirming Dr. Mortimer's paternity.[4] As Plaintiffs note "[a]llowing Mortimer to avoid a conclusive paternity test and build doubt as to the accuracy of the results in the juror's eyes would unfairly prejudice the Plaintiffs and could materially affect the outcome of any trial." Dkt. 43, p. 5. By contrast, allowing a technician **\*656** to swab the inside of his cheek to obtain a DNA sample is a "minimal" invasion of Dr. Mortimer's privacy, particularly considering Dr. Mortimer's past unsolicited willingness to share his DNA with Acenstry.com. *McGrath v. Nassau Health Care Corp.*, 209 F.R.D. 55, 61 (E.D.N.Y. 2002) (a sample which can be obtained by a cheek swab is "only a minimal intrusion on [a] party's privacy rights.") (citing *Hargrave v. Brown*, 783 So.2d 497, 500 (La. Ct. App. 2001) ).[5] Moreover, if the DNA test instead established Dr. Mortimer is not Rowlette's biological father, there would be no need for a trial in the first place.

Dr. Mortimer's paternity of Rowlette is fundamental to this case and cannot be conclusively established absent a DNA test untainted by the chain of custody issue inherent in the mail-in DNA testing model. As such, Dr. Mortimer's paternity is "in controversy" and cannot be confirmed by the Ancestry.com results or other alternative means. Good cause thus supports granting Plaintiffs' motion.

## V. ORDER

**IT IS ORDERED:**

1. Plaintiff's Motion to Compel a Rule 35 Paternity Test (Dkt. 34) is **GRANTED**. Dr. Mortimer is ordered to submit to a buccal swab paternity test at Wienhoff Drug Testing Services, 461 May Street, Idaho Falls, ID 83401 at a time and date agreed to by the parties.

2. Dr. Mortimer has 30 days to comply with this order.

**All Citations**

329 F.R.D. 650

JA206

Footnotes

1     In its Order granting in part and denying in part Dr. Mortimer's Motion to Dismiss, this Court dismissed Rowlette as a plaintiff in this suit, and also dismissed eight of the nine causes of action originally alleged by Plaintiffs. Dkt. 40. The Court also dismissed Dr. Mortimer's wife, Linda Mortimer, as an improper party to this action. *Id.* The only cause of action that remains at issue in this suit is Fowler and Ashby's medical malpractice claim against Dr. Mortimer and OGA.

2     Plaintiffs suggest if Dr. Mortimer "has placed his non-paternity at issue as a complete defense to the claims against him, the Rule 35 exam is supported by good cause *per se.*" Dkt. 43, p. 3. There is some debate over whether the party seeking examination must also establish good cause even where the party opposing examination has placed a mental or physical condition at issue in the pleadings. "A few courts, without explanation, elide the 'in controversy' and 'good cause' requirements by granting a Rule 35 request where mental or physical health is a significant issue in the case. While recognizing the two requirements 'are necessarily related,' the Court in *Schlagenhauf* made clear that showing 'good cause' requires more than just showing that ... health is 'in controversy.' The movant must show good cause exists 'for each particular examination[.]' " *Riel v. Ayers,* 2010 WL 1980251, at *1 (E.D. Cal. 2010) (citations omitted). The Court need not resolve the issue here because it finds good cause supports ordering a DNA test independent from consideration of the pleadings.

3     The parties spend a portion of their briefs arguing about whether Ancestry.com has a policy that prevents disclosure of its methods or processes in examining DNA matches. Such a policy is immaterial considering the chain of custody issue associated with Dr. Mortimer and Rowlette's samples.

4     Further, as Plaintiffs contend "[i]rrespective of whether admitting both pieces of evidence at trial is unnecessarily cumulative under F.R.E. 403, the issue before the Court is whether Plaintiffs are entitled to the opportunity to obtain the competent and reliable evidence of a paternity test through discovery, not whether both tests would be admissible as evidence of paternity." Dkt. 43, p. 5 (emphasis added).

5     Although there are privacy issues beyond the actual taking of the sample that are inherent in the DNA context, such sample is crucial to this suit, and "the imposition of appropriate protections that limit the use of ... DNA information sufficiently addresses such privacy concerns." *McGrath,* 209 F.R.D. at 61.

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **JANE DOE** | ) | |
|     **A Domiciliary of the** | ) | |
|     **Commonwealth of Virginia** | ) | |
| | ) | |
|     **Plaintiff,** | ) | **Civil Action No. 1:22—cv-00545** |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **CENK SIDAR** | ) | |
| | ) | |
|     **Defendant.** | ) | |

**[PROPOSED] ORDER REGARDING MOTION TO OBTAIN PHYSICAL**
**EXAMINATION OF AND DNA SAMPLE FROM DEFENDANT**

Upon consideration of Plaintiff's Motion to Obtain Physical Examination of and DNA Sample from Defendant ("Motion"), the briefs filed by the Parties, and any argument regarding the Motion, it is hereby ORDERED:

1.    That the Motion is hereby GRANTED;

2.    That Defendant shall present himself for the examination and taking of these samples at the office of Plaintiff's Counsel, Thomas F. Urban II, Esq. at FLETCHER, HEALD & HILDRETH, PLC, 1300 North 17th Street, Suite 1100, Arlington, VA 22209, on August 29. 2022, at 10:00 a.m.; and

3.    Plaintiff shall provide the Court and counsel with the written results of the analysis of this testing within thirty (30) days after the completion of the analysis of the testing, or as soon thereafter as such results can be obtained from the laboratory or laboratories.

_____
Judge,  United States District Court
Eastern District of Virginia

cc:

Thomas F. Urban II, VSB #40540
Fletcher, Heald & Hildreth, PLC
1300 17th Street North, Suite 1100
Arlington, Virginia 22209

Walter E. Steimel, Jr. (PRO HAC VICE)
Steimel Counselors Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004

*Counsel for Plaintiff Jane Doe*

Mariam W. Tadros, Esq.
Rees Broome, PC
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209

*Counsel for Defendant Cenk Sidar*

2

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

JANE DOE                                      :
                                              :
      Plaintiff,                        :
                                              :
v.                                            :   Civil Action No. 1:22-cv-00545 (CMH/TCB)
                                              :
CENK SIDAR                                    :
                                              :
      Defendant.                        :

_____

## DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S <u>MOTION TO REMOVE PSEUDONYM DESIGNATION</u>

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Reply to Plaintiff Jane Doe's ("Plaintiff) Opposition ("Opposition") to Defendant's Motion to Remove Pseudonym Designation.

### A.      The Doctrines of Waiver and Laches Do Not Apply.

As a threshold matter, Plaintiff makes the bald and unsupported allegations that "[t]here can be no prejudice to the defendant by maintaining pseudonymity" and that "Plaintiff . . . has taken no actions to publicly humiliate Defendant . . . ." ECF No. 25, at 9-10. This is simply untrue. Plaintiff's allegations submit Defendant to reputational harm, including in relation to his profession. **Exhibit 1**, Sidar Decl. ¶ 8. For example, Plaintiff's counsel has already sent correspondence to the Chief Administrative Officer of Defendant's employer outlining the baseless allegations made by Plaintiff in this matter. Sidar Decl. ¶ 9.

Plaintiff also takes issue with the fact that Defendant did not seek to remove the pseudonym designation in Fairfax Circuit Court. ECF No. 25 at 1-2. However, the same ease for widespread dissemination of the allegations was not present in Fairfax Circuit Court as it is in the District Court. Fairfax does not have an electronic public access system to court records like PACER. The only electronic system that Fairfax has is CPAN, which is a subscription-based service that allows users to view the docket itself and not the pleadings and documents filed in a matter, as well as the allegations contained therein.[1] PACER allows anyone to view full pleadings and documents filed in a matter without having to physically go to the courthouse to retrieve those documents, which is the case in Fairfax Circuit Court.

---

[1] Specifically, for civil cases, the information available online in CPAN is limited to "the case number, date filed, status, plaintiff(s), defendant(s), case subtype, attorney(s), and a register of actions with the most recent activities shown first." **Exhibit 2,** Fairfax Circuit Court, Court's Public Access Network Information Package, at 3.

Plaintiff also asserts that prior to filing her case in Fairfax Circuit Court, "she undertook extensive discussions with Defendant's counsel in efforts to avoid litigation" and that Defendant did not request confidentiality or anonymity. ECF No. 25 at 1. However, Plaintiff fails to mention that her counsel threatened to ruin Defendant's reputation in what can be charitably called extortion to try to force some sort of settlement. Sidar Decl. ¶¶ 3-7. Additionally, Defendant did not have counsel at that time. Sidar Decl. ¶¶ 4, 7. Plaintiff concludes that "Plaintiff believes that Defendant has waived any right to relief on his motion, and that his motion is filed solely to create additional angst and emotional harm on Plaintiff." ECF No. 25 at 10. However, Plaintiff cites no support for her arguments that Defendant waived any rights or that the doctrine of laches is in any way applicable.[2]

"Laches is one of the affirmative defenses generally allowable under Fed. R. Civ. P. 8(c), although it is properly relevant only where the claims presented may be characterized as equitable, rather than legal." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990). Laches imposes on the defendant (or, rather, Plaintiff, under the theory that she is advancing) the burden of proving "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Constello v. United States*, 365 U.S. 265, 282 (1961). The first element, lack of diligence, exists where "the plaintiff delayed inexcusably or unreasonably in filing suit." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 318 (D.C. Cir. 1987). Prejudice to the defendant, the second element, "is demonstrated by a disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's

---

[2] Plaintiff also stresses that "Defendant took few, if any, steps to protect his identity . . . ." ECF No. 25 at 2. Besides being untrue, this is also irrelevant to the analysis of revealing Plaintiffs' identity.

conduct." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990). Obviously neither of these elements, and, by extension the doctrine of laches itself, applies to the present motion.

**B.      Plaintiff Fails to Rely on Case Law that is Binding on this Court.**

Plaintiff begins her Opposition arguing that the "cases cited by Defendant are inapposite" and "do not address the anonymity of rape victims." ECF No. 25 at 4.  Plaintiff asserts that "[t]he instant case is a rape case, and cases which address rape and sexual misconduct are the only ones relevant to Defendant's Motion." ECF No. 25 at 5. However, as detailed below, Plaintiff does not point to any binding case law in this circuit, or really cases in the Fourth Circuit generally, to rely on her claims. While there may be no "rape victim" cases in the Fourth Circuit, there are plenty of cases, as discussed throughout Defendant's Memorandum, that discuss the principles behind the *James* factors. The application of the principles that the Fourth Circuit has elaborated upon is much more applicable to the present case in the Eastern District of Virginia as opposed to "rape victim" cases in other jurisdictions with different standards.[3] Regardless, the cases that Plaintiff relies upon do not support her claims.

The first case that Plaintiff attempts to rely upon in her Opposition is *Doe v. Cabrera*, a United States District Court for the District of Columbia opinion. ECF No. 25 at 5. In *Cabrera*, a plaintiff brought a civil action against the defendant for allegations of assault, battery, and intentional infliction of emotional distress and sought to proceed under a pseudonym. 307 F.R.D. 1, 2 (D.D.C. 2014). The court found that "the public disclosure of the plaintiff's true identity is very likely to result in psychological trauma," a finding, based in part, by the plaintiff's submission

---

[3] Plaintiff insinuates that this Court should give less weight to the Fourth Circuit case *Doe v. Public Citizen* because it was *criticized* in a *District of Columbia Circuit Court*, which is completely separate from the Fourth Circuit. ECF No. 25 at 4. Plaintiff further brings attention to the fact that *Doe v. Merten*, an Eastern District of Virginia case, was cited in contradiction by an opinion issued by the *Attorney General of Texas*. ECF No. 25 at 4. Defendant is not going to waste this Court's time by distinguishing this clearly irrelevant District of Columbia Circuit Court case and completely inapplicable opinion issued by the Attorney General of Texas.

of a detailed affidavit describing her trauma and, as a result, subjecting herself to perjury charges if her allegations were later determined to be untrue. *Id.* at 6. Plaintiff in the present matter did not submit an affidavit with her Opposition. Even more importantly, the plaintiff in *Cabrera* submitted an affidavit confirming her concerns "by a licensed clinical social worker, with over ten years of experience, who has evaluated the plaintiff." *Id.* at 7 n.10. The Plaintiff here did not submit any such evidence.

Finally, Plaintiff fails to note that the *Cabrera* court held that if the matter proceeded to trial, the plaintiff would not be allowed to use a pseudonym. *Id.* at 10 n. 15 ("It is not difficult to appreciate that jurors may infer that the Court has an opinion about the harm the plaintiff has allegedly suffered by its decision to permit the plaintiff to conceal her true identity. The Court cannot afford the plaintiff that potential advantage at the expense of the defendant, who like the plaintiff is also entitled to a fair trial."). It is telling that the Plaintiff omitted this very crucial fact.

Next, Plaintiff relies upon *Doe v. De Amigos, LLC*, another case from the United States District Court for the District of Columbia. In *De Amigos*, the plaintiff alleged that she was sexually assaulted after being served underage at a venue owned and operated by the defendant. *Doe v. De Amigos*, 2012 WL 13047579, at *1 (D.D.C. April 30, 2012). In that case, the reputational concerns against the defendant were different because the defendant was merely accused of serving alcohol to an underage individual, not of committing rape. *See id.* at *3 ("Here, the defendant challenging plaintiff's motion is not the alleged attacker, but the venue that allegedly served her alcohol. Thus, the stigma that the courts feared would attach to the defendants in those cases is not of particular concern here."). Plaintiff also relies on *Doe v. Evans*, an Eastern District of Pennsylvania case in which alleged sexual assault victims brought civil rights claims against the Commissioner of the

4

Pennsylvania State Police. 202 F.R.D. 173, 175 (E.D. Pa. 2001). The *Evans* plaintiff brought claims against the government, as opposed to a private entity.

Plaintiff concedes *Doe v. Rector & Visitors of Georgia Mason University* is the closest to the instant case, and that the Court "*granted* Plaintiff's request for pseudonymity." ECF No. 25 at 5. However, Plaintiff fails to mention that the *plaintiff* was the alleged rapist, not the victim, in that case. As detailed in Defendant's Memorandum in Support, in *Rector & Visitors of George Mason University*, Plaintiff Doe brought an action against George Mason University following a disciplinary process that he asserted was constitutionally-inadequate, which resulted in his expulsion after he was found responsible for sexual misconduct." 179 F. Supp. 3d 583, 585 (E.D. Va. 2016). The Court noted that "Plaintiff has been accused of sexual misconduct, the mere accusation of which, if disclosed, can invite harassment and ridicule." *Id.* at 593. The Court noted that "it is possible that plaintiff could be targeted for 'retaliatory physical or mental harm' based on the accusations alone." *Id.* (quoting *James*, 6 F.3d at 238). The Court concluded that "what justifies the use of pseudonyms here is plaintiff's status as an accused perpetrator of sexual misconduct—a rapist." *Id.* The Court then continued that "[i]f plaintiff is ultimately found not responsible" as to the sexual misconduct allegations, "then he should not have his name forever associated in the public mind with an accusation that carries a significant social stigma." *Id.* at 594. The right to use a pseudonym was given to the plaintiff because of the potential harm of the label of "accused rapist," not to a defendant who is alleging she is a "rape victim." This fully supports Defendant's position that he has been harmed by having his name in the public, relating to accusations that he denies, and that Plaintiff should not be given anonymity when he is not afforded the same privileges.

5

In *Doe v. University of Rhode Island*, a matter in which a plaintiff alleged that she was sexually assaulted and sought to proceed under a pseudonym, the court noted that:

> While I am sympathetic to plaintiff's quest for privacy, I do not find her situation is so compelling that nondisclosure is appropriate. It must be remembered that plaintiff is a victim and not the perpetrator of a violent, abusive and criminal act. The nature of plaintiff's claim does not involve any admission on her part that she has or will be engaged in any illegal activity, that she has violated the law or that she willingly engages in unaccepted sexual practices.

*Doe v. Univ. of R.I.*, 1993 WL 667341, at *3 (D.R.I. Dec. 28, 1993). In sum, unlike the cases, which are not binding authority, regardless, that Plaintiff relies upon, she offered no actual support for her claims from anyone who has knowledge of the facts giving rise to this case, instead relying upon two inapplicable "articles," as detailed further, below. She has accused a private individual of being a rapist and has not made any admissions on her own part that she has engaged in any illegal activity or that she violated the law. She has no basis upon which to proceed under a pseudonym.

### C.     Plaintiff is Not Permitted to Proceed Under a Pseudonym Merely to Avoid Criticism and Preserve Her Privacy.

Plaintiff cites to a Seventh Circuit Court case for the proposition "that rape victims are entitled to anonymity." ECF No. 25 at 6 (citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997)). However, the Seventh Circuit which is, again, not binding precedent in this Circuit in any manner, stated that "fictious names *are allowed* when necessary to protect the privacy of children, rape victims, and other particularly vulnerable parties or witnesses." *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997) (emphasis added). The court also noted that "[t]he use of fictitious names is disfavored, and the judge has an independent duty to determine whether exceptional circumstances justify such a

departure from the normal method of proceeding in federal courts." *Id.* at 872. Clearly such use is permissive, not a blanket entitlement.

The next case that Plaintiff heavily relies upon is from the United States District Court for the Eastern District of New York in which the plaintiff brought claims that he was sexually abused by a rabbi at a Jewish school when he was a child. *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 194 (E.D.N.Y. 2006). The plaintiff alleged that Rabbi Kolko sexually abused him while he was a minor student at Yeshiva, where Kolko was employed. *Id.* at 194. The plaintiff sought to procced anonymously in the litigation. In support, the plaintiff stated that he had been diagnosed with several psychiatric disorders, including post traumatic stress disorder, and that he would experience psychological harm if his identity was revealed in this case, "a claim supported by his treating psychiatrist," who submitted a declaration in support of the plaintiff's motion. *Id.* at 194-95. In *Kolko*, the court also noted that there were two other plaintiffs who publicly disclosed their identities, so this balanced out the fact that the rabbi's reputation was at stake and better gave him "a public forum to defend the charges of abuse." *Id.* at 196; *see also id.* at 198 ("[S]ince there are two other plaintiffs in this Court alleging similar conduct who will be proceeding under their real names, defendants will have an unfettered opportunity to present their defenses and to challenge the credibility of their accusers."). This is not similar to the present case, where Plaintiff has not even provided an affidavit subjecting herself to perjury.

Citing to the United States Supreme Court opinion *Coker v. Georgia*, Plaintiff asserts that "the U.S. Supreme Court has recognized the seriousness of rape." ECF No. 25 at 6. Defendant does not disagree. In fact, in *Coker*, the Supreme Court noted that it did "not discount the seriousness of rape as a crime" and that "[i]t is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim and for the

latter's privilege of choosing those with whom intimate relationships are to be established."

*Coker v. Georgia*, 433 U.S. 584, 597 (1977). This speaks to how the public would perceive an

accused rapist, not a rape victim.

Plaintiff also attempts to rely on the Seventh Circuit case of *Doe v. City of Chicago*. In

*City of Chicago*, the plaintiff brought suit against a Chicago police officer, including claims for

sexual harassment. 360 F.3d 667, 668 (7th Cir. 2004). The matter was on appeal related to the

district court's grant of summary judgment, but the court noted that: "[a]s an aside, we express

our concern about the plaintiff's litigating under a pseudonym." *Id.* In raising the issue *sua*

*sponte*, the court continued that plaintiff:

> merely filed the complaint anonymously, there was no objection,
> and the judge conducted no inquiry into the propriety of anonymity.
> The judge's failure to make an independent determination of the
> appropriateness of the plaintiff's concealing her name was error
> because, as we have explained, "the use of fictious names is
> disfavored, and the judge has an independent duty to determine
> whether exceptional circumstances justify such a departure from the
> normal method of proceeding in federal courts."

*Id.* at 669-70 (quoting *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872

(D.R.I. Dec. 28, 1993)). The court remanded the matter back to the district court to determine

whether the plaintiff could anonymously litigate the matter, even though such designation was

not being challenged by the defendant. *Id.* at 674. It is unclear why Plaintiff thinks that this

opinion supports her Opposition.

Plaintiff also cites to the Virginia statute concerning crime victim and witness rights for

the proposition that "Virginia also recognizes crime victim rights, affording them protections of

privacy and protection from intimidation, and avenues for restitution." ECF No. 25 at 6-7.

Relying on this statute, Plaintiff also asserts that "[t]he strong public policy to protect rape

victims hews strongly in favor of Plaintiff retaining anonymity." ECF No. 25 at 7.

This statute, which, importantly, is within the *criminal* procedure title of the Virginia Code, says that victims and witnesses *to any crime* should be afforded certain rights, including that "their privacy is protected to the extent permissible under law." Va. Code § 19.2-11.01(A). This statute applies to *any* crime victim or witness and does not expound any policy to specifically protect rape victims. Regardless, again, this does not confer any *right* upon Plaintiff to proceed anonymously and any right to protection would be limited to the extent permissible under law, including under the *James* factors. *See also Doe v. Bell Atl. Bus. Sys. Servs., Inc.*, 162 F.R.D. 418, 422 (D. Mass. 1995) ("[T]he criminal statutes cited by plaintiff apply to situations where the government chooses to prosecute a case, and offers anonymity to a victim who does not have a choice in or control over the prosecution. In the civil context, the plaintiff instigates the action, and, except in the most exceptional cases, must be prepared to proceed on the public record. The Court is cognizant of the defendants' concerns, and finds that it would be fundamentally unfair to allow plaintiff to make sure serious allegations against them without standing, as they must, in a public forum".).

### D.   Plaintiff Does Not Establish That Revealing Her Identity Would Pose Harm to Her.

Plaintiff's Opposition asserts:

> Plaintiff is also concerned for her personal safety if her identity is revealed. She currently works in government and defense sectors worldwide, with many of those projects based in the Middle East. As is demonstrated below, female rape victims are harassed and subject to severe legal and other sanctions when identified in certain Middle Eastern countries. Revealing her identity will subject her to great risk of personal harm and will serve no purpose other than to cause her additional emotional harm from having to discuss this matter with family and friends and physical harm of reprisals in the Middle East.

ECF No. 25 at 3. She further asserts that she "works in governmental and military contracting worldwide, including in the Middle East" and that "[i]t is a well-documented fact that women who have been raped are subjected to ridicule, abuse, arrest, and prosecution in the Middle East." ECF No. 25 at 8.

In support of this proposition, Plaintiff cites to a January 2019 *Frontiers in Psychology* article, specifically quoting the language: "Victims of sexual assault in many Middle Eastern communities are punished even outcast by their families, or must marry their rapists in order to restore honor to their families." ECF No. 25 at 8 (quoting ECF No. 21-1 at 15). However, she does not allege that she lives in the Middle East or that she has a Middle Eastern family. *See, e.g.,* ECF No. 1 ¶ 6 ("Plaintiff is a natural person and a domiciliary of the Commonwealth of Virginia."). Furthermore, the *Frontiers in Psychology* article generally is not focused on sexual assault in Middle Eastern countries. Instead:

> This paper provides a comprehensive review of the research literature on victim blame in acquaintance rape cases, highlighting inconsistencies and drawing particular attention to area of research in need of further exploration. Specifically, we review the commonly studied individual (perceiver) facts that influence victim blaming, as well as common situational (target) factors included or manipulated within sexual assault scenarios. Our review reveals many inconsistent findings and interactions between perceiver and scenario factors. In an effort to make sense of these complex interactions and inconsistent findings, we suggest a need for more transparency in describing the scenarios used in research on victim blaming in sexual assault cases and greater empirical attention to sociocultural factors that may influence blaming tendencies.

ECF No. 24-1 at 1. Instead Plaintiff cites to the single sentence in the article that refers to sexual assault in Middle Eastern communities, which is a one-sentence summary of a 1998 article, in the background portion of the article on "Rape Culture." Plaintiff did not even take the time to cite to, or probably even review, the article that actually discussed this topic.

Plaintiff also cites to an *Asia Times Online* article, quoting the portion that reads: "in some countries such as the United Arab Emirates, rapists can face the death penalty, but sex outside marriage, or *zena*, is also a serious crime, and women who have reported sexual assaults have then been arrested themselves." ECF No. 25 at 8 (quoting ECF No. 24-2). This article is referring to people who report their sexual assault to Middle Eastern authorities after the sexual assault happens in the Middle East. Plaintiff did not report any sexual assaults in the Middle East or to any Middle Eastern authorities. Rather, she reported to London authorities that she was allegedly sexually assaulted in London and then brought claims in the United States.

Regardless of the inapplicability of these articles, they are an improper attempt to admit expert testimony as hearsay and lack any foundation. "Under Virginia law, issues 'beyond the realm of common knowledge and experience of a lay jury' generally require expert testimony" and "[t]he expert testimony rule applies in diverse settings." *Benedict v. Hankook Tire Co. Ltd.*, 286 F. Supp. 3d 785, 791 (E.D. Va. 2018) (quoting *Beverly Enters.-Va., Inc. v. Nichols*, 441 S.E.2d 1, 3 (Va. 1994). "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. The evidence that Plaintiff is attempting to introduce—that victims of sexual assault in the Middle East are subject to assault and arrest in the Middle East—is beyond the realm of common knowledge and would require expert testimony. However, the articles she attempts to introduce are hearsay that, *inter alia*, lack any sort of foundation. Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Plaintiff is attempting to rely on the articles, written by authors who are not submitting affidavits

and who presumably do not even know who Plaintiff is, for the truth that women in the Middle East who are sexually assaulted can be arrested themselves. Somehow, she also makes the leap that women who are sexually assaulted in London and pursuing civil claims against the purported assailant in the United States will also be subject to arrest in the Middle East if they happen to travel there. This is quite a leap.

Plaintiff concludes that she "is rightfully afraid of the consequences if the fact that she was raped becomes publicized, especially in countries where she works and visits regularly," and that "[i]n light of her own personal experiences and well documented research and reporting, this fear is fully justified." ECF No. 25 at 8. The scintilla of support that Plaintiff cobbled together after a quick internet search is a far cry from "well documented research and reporting."

### E.     Both the Third and Fourth Factors Weigh Against Plaintiff.

Plaintiff asserts that in *Doe v. Virginia Polytechnic Institute & State University*, "the Court determined that the third *James* factor is crucial when a party is underage but otherwise neutral when they are not." ECF No. 25 at 9. However, this is certainly not what the Western District of Virginia Court held. This is another case in which the plaintiff who sought to proceed anonymously was the *alleged sexual assailant. See Doe v. Va. Polytechnic Inst. & State Univ.*, 2022 WL 972629, at *1 (W.D. Va. March 30, 2022). Plaintiff was a student at the university and a female accused him of sexual assault. *Id.* A student conduct hearing was held and the plaintiff was dismissed from the university. *Id.* He brought claims against the university, as well as some of the people involved in the disciplinary process, for violations of his procedural due process rights. *Id.* Regarding the third factor, the court noted that "the age of the female student who made the accusation against Doe is unknown" and that "identifying Doe increases the chances that the female student also will be identified and if she was a minor or very young adult when

she filed her complaint against Doe, identifying him could bring unwanted attention to her." *Id.* at 3. Therefore, "[o]n balance, the court finds Doe's age to be a neutral factor in deciding whether he should proceed under a pseudonym." *Id.* It is undisputed that both Plaintiff and Defendant in the present matter are adults so this case weighs against Plaintiff proceeding with a pseudonym.

In *Cabrera*, a case heavily relied upon by Plaintiff in her Opposition, the court noted that "[w]here victims are not minors, courts are generally less inclined to let the alleged victim proceed in litigation under a pseudonym" and that "[h]ere, the plaintiff was not a minor at the time of the incident . . . so *this factor weighs against allowing the plaintiff to proceed anonymously.*" *Doe v. Cabrera*, 307 F.R.D. 1, 7-8 (D.D.C. 2014) (emphasis added); *see also W.M. v. Braskem Am., Inc.*, 2020 WL 1492544, at *2 (S.D. W. Va. Mar. 26, 2020) ("Plaintiff's age tips in favor against anonymity; while the Complaint and instant Motion are silent as to the issue, it appears he is an adult who had been employed since at least 2013."); *Doe v. De Amigos*, 2012 WL 13047579, at *2 (D.D.C. April 30, 2012) ("Plaintiff was eighteen at the time of the alleged sexual assault and at least eighteen at the time she filed the complaint in this action, so she was an adult under District of Columbia law. This weighs against anonymity.") (internal citation omitted).

In regard to the fourth factor, plaintiff admits that "[t]his action is between private parties, and not against a government or public entity." ECF No. 25 at 9. This is where the analysis should end. However, for some reason, Plaintiff thinks that "[t]his factor would only weigh against Plaintiff if there was any risk of harm to the Defendant's reputation that would offset Plaintiff's need for anonymity." ECF No. 25 at 9. Relying again on *Virginia Polytechnic Institute & State University*, Plaintiff argues that this factor is "neutral in this case." ECF No. 25 at 9. The

*Virginia Polytechnic Institute* court did find that the fourth factor "weighs neither in favor nor against allowing Doe to proceed anonymously," but that was because "although Doe names individual defendants, he is suing them only in their official capacities." *Doe v. Va. Polytechnic Inst. & State Univ.*, 2022 WL 972629, at *3 (W.D. Va. March 30, 2022). This somehow led Plaintiff to conclude that "[l]ifting the veil of anonymity only harms Plaintiff, extends and amplifies the emotional toll this has taken on her, adds an additional layer of financial burden in responding to Defendant's motion at this late stage in their litigation history and risks exposing her to new physical, mental and financial harm." ECF No. 25 at 9.

Also in relation to the fourth factor, the *Cabrera* court, again, noted that "[i]n assessing whether pseudonymous litigation is appropriate, courts must also consider whether an accused defendant is a governmental entity or a private party" and, as a result, "[t]his factor weighs against allowing the plaintiff to use a pseudonym because the defendant is a private litigant, who undoubtedly has concerns about his reputation." *Id.* at 8; *see also W.M. v. Braskem Am., Inc.*, 2020 WL 1492544, at *2 (S.D. W. Va. Mar. 26, 2020) ("The fourth factor also weighs against anonymity, as this action is brought against a private party and not a governmental entity."); *Doe v. De Amigos*, 2012 WL 13047579, at *3 (D.D.C. April 30, 2012) ("Defendant challenging the use of pseudonym in this action is a private corporation . . . . This factor also weighs against anonymity.").

Despite Plaintiff's attempts to muddy the waters and conflate issues with baseless allegations and inflammatory language, it is crystal clear that both the third and fourth *James* factors weigh in favor of Plaintiff not being to proceed anonymously because both Plaintiff and Defendant are adults and they are both private parties.

**F.    Fairness Requires that Plaintiff's Identity Be Public.**

Plaintiff asserts that "Defendant has described no unfairness to him in maintaining Plaintiff's anonymity." ECF No. 25, at 10. This could not be further from the truth. These issues are addressed in a case from the District Court for the Southern District of New York.[4] In *Doe v. Shakur*, the District Court for the Southern District of New York addressed the "difficult question of whether the victim of a sexual assault may prosecute a civil suit for damages under a pseudonym." 164 F.R.D. 359, 360 (S.D.N.Y. 1996). The court ultimately held:

> The present case is a difficult one. If the allegations of the complaint are true, plaintiff was the victim of a brutal sexual assault. Quite understandably, she does not want to be publicly identified and she has very legitimate privacy concerns. On balance, however, these concerns are outweighed by the following considerations.
>
> First, plaintiff has chosen to bring this lawsuit. She has made serious charges and has put her credibly in issue. Fairness requires that she be prepared to stand behind her charges publicly.
>
> Second, this is a civil suit for damages, where plaintiff is seeking to vindicate primarily her own interests. This is not a criminal case where rape shield laws might provide some anonymity to encourage victims to testify to vindicate the public's interest in enforcement of our laws . . . .
>
> Third, [defendant] has been publicly accused. If plaintiff were permitted to prosecute this case anonymously, [defendant] would be placed at a serious disadvantage, for he would be required to defend himself publicly while plaintiff could make her accusations from behind a cloak of anonymity.

*Id.* at 361. Plaintiff asserts that she "is a rape victim" and "if rape victims like her are required to disclose their anonymity it will serve as a caution note [sic] to other rape victims and be viewed as another tool of retaliation by Defendants [sic]." ECF No. 25 at 6.[5] The *Shakur* court also noted

---

[4] Throughout her opposition, and as detailed, *infra*, Plaintiff relies heavily upon the Eastern District of New York case *Doe No. 2. v. Kolko*. Utilizing her logic, a Southern District of New York Case should be equally persuasive.

[5] Plaintiff also relies on the Southern District of West Virginia case of *W.M. v. Braskem America, Inc.*, 2020 WL 1492544 (S.D. W. Va. Mar. 26, 2020). In *W.M.*, the plaintiff sought to proceed using his initials to keep private the results of a drug test that he alleged was improperly disclosed. *Id.* at 2. Importantly, the court noted that "Defendant has not even opposed Plaintiff's motion." *Id.* at 2. In the present matter, Defendant is opposing Plaintiff's use of a pseudonym.

15

that "[i]t may be, as plaintiff suggests, that victims of sexual assault will be deterred from seeking relief through civil suits if they are not permitted to proceed under a pseudonym" and "[t]hat would be an unfortunate result . . . however, plaintiff and others like her must seek vindication of their rights publicly. *Id* at 362; *see also Doe v. Hartz*, 52 F. Supp. 2d 1027, 1048 (N.D. Iowa 1999) (noting, in the context of a sexual assault case, that the "court considers it appropriate here to weigh the speculative nature of the potential harm to Doe from revealing her identity against the very real embarrassment her accusations have already caused the defendants").

## III.    <u>CONCLUSION.</u>

For the reasons set forth herein, Defendant Cenk Sidar requests that the Court grant his Motion to Remove Pseudonym Designation, enter an order requiring that references to Plaintiff Jane Doe in all filings and proceedings in this cause shall be her true name, that her identity is not to be redacted in all filings, and grant such other and further relief in favor of Defendant as this Court deems just and proper.

Dated: July 18, 2022

CENK SIDAR

By Counsel:


_____

Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com
*Counsel for Plaintiff*

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 18, 2022, a copy of the foregoing **DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO REMOVE PSEUDONYM DESIGNATION** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
|       Plaintiff, | : |
| | : |
| v. | :   Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : |
| CENK SIDAR | : |
| | : |
|       Defendant. | : |

_____

**<u>DECLARATION</u>**

The undersigned, Cenk Sidar, pursuant to 28 U.S. Code § 1746, submits the following declaration in connection with Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Remove Pseudonym Designation.

1.     I am over the age of 18 and competent to testify.

2.     I have personal knowledge of the facts relevant to this matter.

3.     Prior to Plaintiff's counsel, Thomas Urban, filing the Fairfax Circuit Court case in this matter, Plaintiff's counsel contacted me.

4.     I did not have counsel at the time.

5.     He attempted to both settle claims Plaintiff made against me and obtain my consent to providing a DNA sample.

6.     Mr. Urban said to me: "You are a businessman, you are married, and have kids, and don't want this to be a major issue for you, so why don't you just do what we ask you to do and provide DNA?"

1

7.      The statement in Plaintiff's Opposition that "[p]rior to her filing, she undertook extensive discissions with Defendant's counsel in efforts to avoid litigation" is false, as I was not represented by counsel at the time.

8.      Plaintiff's allegations subject me to reputational harm, including in relation to my profession.

9.      For example, Walter Steimel, Plaintiff's other attorney in this matter, sent the correspondence, attached to this declaration as **<u>Exhibit A</u>**, to the Chief Administrative Officer of my employer, Enquire AI, Inc.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2022.

_____

Cenk Sidar



**STEINEL COUNSELORS LAW GROUP**
A PROFESSIONAL LIMITED LIABILITY CORPORATION

Walter E. Steinel
Managing Member

May 25, 2022

VIA US MAIL

Mr. Fatih Orhan
Chief Administrative Officer
Enspire AI, Inc.
1701 Rhode Island Ave., N.W.
Washington, D.C. 20036

Re:      Jane Doe v. Cenk Sidar
         Case No. 1:22-cv-00545-CMH-TCB
         Eastern District of Virginia
         Litigation Hold Letter

Dear Mr. Orhan:

We are counsel to Jane Doe in the matter of *Jane Doe v. Cenk Sidar*, Case No. 1:22-cv-00545-CMH-TCB, filed May 12, 2022, in the Federal District Court for the Eastern District of Virginia. As her counsel, we issue this litigation hold request requiring Enspire AI, Inc., its affiliates, members and subsidiaries, including but not limited to Global Wonks, (collectively "Enspire") to preserve all documents, records and recordings, as more fully described below.

**PLEASE NOTE that Jane Doe's identity is protected by Court Orders entered by the Fairfax County Circuit Court and Federal District Court for the Eastern District of Virginia and is not to be publicly revealed in any manner.**

The Complaint is based upon allegations that Mr. Sidar assaulted Jane Doe in London during business travel and meetings on and around September 17, 2017. Mr. Sidar has admitted that he was in London for business at least as early as September 12, 2017. Communications and documents that may be relevant to the proceeding cover a period of August 14, 2017, to present, and include but are not limited to e-mails, text messages, phone calls, Air BnB rental records, transportation records, restaurant and business reimbursement records and police and related interviews, in addition to other documents or records we may seek in discovery.

At the time of the alleged offense giving rise to the Complaint and through the present, Mr. Sidar was and is co-founder and CEO of Global Wonks, Inc., now rebranded as Enspire AI, Inc. During prior proceedings before the Circuit Court of the Fairfax County, we sent Mr. Sidar a litigation hold letter demanding preservation of many of the records addressed herein. As he was at that time and still is an officer and co-founder of the predecessor of Enspire, we expect that

STEINEL COUNSELORS LAW GROUP, PLLC
1455 Pennsylvania Avenue NW, Suite 400, Washington DC 20004
Telephone: 202-271-6299                               E-mail: wes@wscgllp.com



**STEIMEL COUNSELORS LAW GROUP**
A PROFESSIONAL LIMITED LIABILITY CORPORATION

Mr. Fatih Orhan
Chief Administrative Officer
Enquire AI, Inc.
May 25, 2022
Page 3

founders, investors or owners, including but not limited to policies addressing harassment, sexual conduct, business conduct, discrimination, or similar policies.

The scope of this notification relates to Discoverable Data owned, accessed, maintained, or used by, or within the possession, custody or control of, Enquire, both as a company and by any officers, directors, founders, investors, owners or employees in both their personal and professional or business capacity generated, stored or created on or after September 1, 2017, through the present date.

Electronic documents and the storage media on which they reside contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we seek retention of all documents in their electronic form along with meta data or information about those documents contained on the media. We demand preservation of all meta data, document property fields (unchanged), statistics, version data, author and commenter data and any other digital data associated with any documents, regardless of the data field or document type. We seek retention of paper printouts of only those documents that contain unique information created after they were printed (e.g. paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting and redactions) along with any paper documents for which corresponding electronic files exist. In any event, we seek retention of all electronic versions of such documents and all meta data and other statistics related to each and all versions of such documents.

The laws and rules prohibiting destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified or corrupted. Accordingly, Enquire must take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies, retrieving equipment in the possession of others and limiting access to files and systems to prevent deletion or destruction of Discoverable Data. We ask Enquire to maintain the highest vigilance to maintain all Discoverable Data.

In addition to previously created documents, with regard to electronic data created subsequent to the date of delivery of this letter, relevant evidence should not be destroyed and your company is to take the appropriate steps required to avoid destruction of such evidence.

In responding to this letter, please retain, including but not limited to, all Discoverable Data including but not limited to each and every file and record over which Enquire, prior counsel, advisors, officers, investors, third parties or others, have control which pertain to the subject matter of this Notice. The following list is not comprehensive but is intended to provide

STEIMEL COUNSELORS LAW GROUP, PLLC
1455 PENNSYLVANIA AVENUE NW, SUITE 400, WASHINGTON DC 20004
TELEPHONE: 202-271-9258                                                           E-MAIL: WES@SCLGRP.COM





# Fairfax Circuit Court
## COURT'S PUBLIC ACCESS NETWORK
### Information Package



https://ccr.fairfaxcounty.gov/cpan/

## Introduction

This package describes the information accessible through the Court's Public Access Network (CPAN). It also describes the software your organization will need as well as your responsibilities.

If you wish to become a CPAN subscriber, complete the **CPAN Entity Agreement** and have all users listed on **page 7** complete the **CPAN User Agreement**. Please also include your **first quarterly payment of $150 per user** with the forms. Upon receipt of your completed agreements, we will initiate the enrollment process. Original, notarized documents are required before the enrollment process can get started. Both of the agreements must be completed in their entirety.

The forms required for access to CPAN (listed above) are found here:
https://www.fairfaxcounty.gov/circuit/online-services/court-public-access-network

If you have questions, you may call the Circuit Court Information Systems staff at (703) 246-2366 or send email inquiries to ccrhelp@fairfaxcounty.gov .

Thank you for your interest in CPAN.

## OS/Browser requirements

In order to participate in the Court's Public Access Network (CPAN), the subscriber must own a Windows-compatible personal computer (PC). At a minimum, the organization's PC configuration must include the following:

Software

1. Windows 8 (or later) with Internet Explorer 11.0 (or later).

2. Internet Explorer,Microsoft Edge and Chrome are the only supported browsers at this time.

Anything less than the above listed software will make participation in CPAN difficult. It is the subscriber organization's responsibility to obtain personal computer equipment that sufficiently matches the list above.

## CPAN login site

Fairfax County will grant permission for the subscriber to access and connect to CPAN through https://ccr.fairfaxcounty.gov/cpan/ .

## Customer Support

Fairfax Circuit Court will provide limited customer support in the following areas:

CPAN Info v8
Revised 01/28/2022

2

JA236

1. Assistance in initial connection to CPAN.

2. Questions regarding system availability.

3. Questions about adding additional users.

4. Limited search questions.

5. Revoked and/or locked out UserIDs.

## Information Available Through CPAN

### Circuit Court Civil/Criminal Case Information

CPAN information on pending and concluded Circuit Court Civil and Criminal cases is available through two search applications. The FullCourt search includes case activity information from October 18, 2004 to the present and the Legacy search includes case information prior to October 18, 2004, from our old mainframe-based case management systems.

- Cases can be accessed via the FullCourt search using the Case Number, Attorney, Judge, or Party
- Civil and Criminal case information retrieved from the FullCourt search includes the case number, date filed, status, plaintiff(s), defendant(s), case subtype, attorney(s), and a register of actions with the most recent activities shown first.
- Information on Circuit Court Civil and Criminal case activity prior to October 18, 2004, including Civil and Criminal Service Information, may be found in the Legacy search. This search provides users read only access to historical data about Circuit Cases.
- In compliance with the Code of Virginia, Adoption cases and Juvenile Appeals cases are not available on CPAN.

### Real Estate Assessments (managed by the Department of Tax Administration)

The iCare system consists of real estate information (land description, assessment information, improvement characteristics, and ownership data) for all properties in Fairfax County. This information can be accessed by street address number, owner name, or tax map number. Real Estate Accounts Receivable information is also available.

### Delinquent Real Estate Tax Information (managed by the Department of Tax Administration)

The iCare system contains delinquent real estate tax records searchable by owner or street address.  Information includes up to 20 years of delinquent real estate tax information (owner name, address, map reference number, property description, tax year, and tax due), and payment history information.

### Zoning and Land Development

LDSNet provides information on zoning applications and land development plans and their related documents. LDSnet is comprised of two systems: the Zoning Case Search System (ZAPS) and the Plan and Waiver System (PAWS). Through LDSnet, it is possible to search for individual zoning applications and/or plans and studies submitted to the County to perform land-disturbing activities. In addition, the LDS database can be searched for zoning applications or construction plan submissions meeting any combination of the thirty-one search criteria.

## Information Available Through CPAN

**CARS** (Courts Automated Recording System) includes the following:

| Record Type | Index Data/Images | Date Range | Book # |
|---|---|---|---|
| Land Records | Document Images | 1742 - Present | All |
| Land Records | Index Data | 1980 - Present | 5391 and up |
| Land Records | Index Book Images | 1742 - 1979 | A1 - 5390 |
| | | | |
| Judgments | Document Images | 1967-1984; Sept 18, 2000 - Present | 1-36; 75 and up |
| Judgments | Index Data | July 1967 - June 1979; 1985 - Present | 1-21; 37 and up |
| | | | |
| Charters | Document Images | 1934 - 1978 | 1 - 173 |
| Charters | Document Images | 1991 - Present | 397 and up |
| Charters | Index Book Images | 1934 - 1978 | 1 - 173 |
| Charters | Index Data | 1979 - Present | 174 and up |
| | | | |
| Financing Statements | Document Images | 1983 - Present | |
| Financing Statements | Index Data | 1979 - Present | |
| | | | |
| Marriage License | Document Images | 1853 - Present | All |
| Marriage License | Index Book Images | 1853 - 1983 | 1 - 62 |
| Marriage License | Index Data | 1984 - Present | 63 and up |
| | | | |
| Trade Names* | Document Images | 1934 - Present | All |
| Trade Names | Index Book Images | 1934 - 1978 | 1 - 38 |
| Trade Names | Index Data | 1979 - Present | 39 and up |
| | | | |
| Notaries | Document Images | Apr 2000 - Present | |
| Notaries | Index Data | July 1980 - Present | |
| | | | |
| Probate (Wills) | Document Images | 1742 - Present | All |
| Probate (Wills) | Index Book Images | 1742 - 1978 | A1 - 252 |
| Probate (Wills) | Index Data | 1979 - Present | 253 and up |
| | | | |
| Bonds | Document Images | Nov 2004 - Present | 320 and up |
| Bonds | Index Data | 1979 - Present | 154 and up |
| | | | |

*Trade Names are also known as Fictitious Names.

CPAN Info v8
Revised 01/28/2022

4

JA238

## Summary of Requirements

The following is a summary of the responsibilities of the subscriber and the County.

**Your responsibility:**

1. To apply for access from the Circuit Court. **A separate UserID is required for each individual person accessing CPAN**.

2. Payment should be made payable to the "Clerk of the Court" and due at the time of submission. For example, if you apply for access for one user, attach a payment of $150.00 ($50.00 per month for the first quarter).

3. To purchase and/or upgrade all equipment necessary to sufficiently match the PC configuration listed in the OS/Browser requirements section.

4. To acquire Internet Service and establish connection to the provider's home page.

5. If you are an existing subscriber and your company experiences a name change, you will be required to execute the **CPAN Entity Agreement** under the new company name. You also need to have your authorized users execute the **CPAN User Agreement** under the new name of the company.

6. If you are an existing subscriber and have new user(s) that require access, you must execute an **CPAN User Agreement** along with a request to add the new user(s) written on company letterhead.

**County's responsibility:**

1. To provide USERID access code and password.

2. To provide online CPAN user documentation

NOTE:
> Before being granted access to CPAN, your organization must complete a CPAN Entity Agreement. For each person listed as an "Authorized User" on Page 7 of the CPAN Entity Agreement, a CPAN User Agreement is required. Original notarized documents are required. Additional responsibilities will be listed therein.

JA239

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

JANE DOE                                          :
                                                  :
         Plaintiff,                               :
                                                  :
v.                                                : Civil Action No. 1:22-cv-00545 (CMH/TCB)
                                                  :
CENK SIDAR                                        :
                                                  :
         Defendant.                               :
_____

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL EVIDENCE**

Plaintiff Jane Doe ("Plaintiff") submits this Notice of Supplemental Evidence in support

of her Opposition (ECF No. 25) and in reply to Defendant's Motion to Remove Pseudonym

Designation (ECF. No. 19), for consideration at this Court's hearing scheduled for Friday

morning, July 29, 2022. The Court has indicated that it will take additional evidence at the

hearing but will not permit live testimony. To provide this Court and Defendant with

advance notice of some of Plaintiff's additional evidence, Plaintiff files two affidavits.

Concerning Defendant's assertion in paragraph 6 of his Declaration (ECF No. 28-1,

p. 1) Plaintiff submits an Affidavit by *pro hac vice* Counsel for Plaintiff, Walter Steimel.

Exhibit A.[1]

Concerning Defendant's allegation that Plaintiff did not supply a supporting affidavit

"subjecting herself to perjury" (ECF. 28, p. 7) and complaint that Plaintiff does not allege

_____

[1]       In compliance with the Local Rules, Plaintiff has redacted personal information of
several persons, including Defendant, Defense Counsel, and Plaintiff's Counsel.  None of these
redactions go to the substance of this Affidavit.  An unredacted copy of the Affidavit and
Exhibits will be provided at the hearing to the Court and will be sent by electronic email to
Defense Counsel.

she lives in the Middle East (ECF No. 28, p. 10) Plaintiff submits an Affidavit by Plaintiff Jane Doe. Exhibit B.

We file these with the Court today to provide advance notice to Defendant to assist them in their preparation for the hearing.

Respectfully Submitted,

/s/ Thomas F. Urban II
Thomas F. Urban II, Virginia Bar No. 40540
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
(703) 861-5235 FAX (703) 812-0486
Urban@fhhlaw.com

Walter Steimel, Jr. (*pro hac* vice)
Steimel Counselors Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com
*Counsel for Plaintiff Jane Doe*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via

electronic service and electronic mail to

Mariam W. Tadros, Esq.
Rees Broome, PC
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209
*Counsel for Defendant*

on this the 25th day of July, 2022.

/s/ Thomas F. Urban II
Thomas F. Urban II

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

JANE DOE                                    :
                                            :
        Plaintiff,                          :
                                            :
v.                                          :   Civil Action No. 1:22-cv-00545 (CMH/TCB)
                                            :
CENK SIDAR                                  :
                                            :
        Defendant.                          :
_____   :

### AFFIDAVIT REGARDING PSEUDONYM REPLY ALLEGATIONS

I, Walter Earl Steimel, Jr., state as follows:

1.      I am an attorney at law, licensed in D.C. and Texas, admitted to the U.S. Supreme

Court, five Federal District Courts and all but one of the U.S. Courts of Appeals. I am also a

C.P.A. (Texas). I currently serve as the managing member of Steimel Counselors Law Group

PLLC, a Washington, D.C. firm located at 1455 Pennsylvania Ave., N.W., Suite 400. I have

practiced law for over 40 years. My CV is attached.

2.      I represent Plaintiff Jane Doe as *pro hac vice* counsel. I have personal knowledge

of the facts stated herein. I attest to the accuracy of the exhibits and attachments to this Affidavit.

3.      My habit, in 40 plus years of practicing law, has been to take extensive hand-

written notes of every meeting and phone call I attend. I learned this practice from my father who

was also a lawyer. It has served me well in the past.

4.      I can unequivocally state that the allegation contained in paragraph six (6) of

Cenk Sidar's Declaration, ECF No. 28-1, is categorically false.

5.      Thomas Urban and I drafted the original Complaint we filed in Fairfax County

Circuit Court. We filed that Complaint on September 13, 2019. At the time we knew that the

1

Defendant worked in Fairfax County, Virginia, but did not have personal contact information for him.

6.      As a courtesy, we decided to call Mr. Sidar and inform him that we had filed a Complaint against him, our purpose being to inform him of the suit, determine whether he had counsel, discuss the matter with him and arrange for service, if necessary.

7.      Mr. Urban and I tried to call Mr. Sidar on September 16, 2019, using a number that we located. We tried calling a landline number but there was no answer. We made this first call on September 16, 2019 at 15:13. See, Exhibit A, Text, September 16, 2019 at 15:13.

8.      Having not reached Mr. Sidar, I texted Mr. Urban on September 17, 2019, to tell him that Plaintiff had no contact information for him. This text was on September 17, 2019, at 17:33. Exhibit A, Text, September 17, 2019, at 17:33.

9.      Mr. Urban replied that he would try calling Jonathan Phillips, former counsel for Mr. Sidar, to see if he had a number. Exhibit A, Text, September 17, 2019, at 17:35.

10.     I sent Mr. Urban a contact card for Mr. Sidar on September 17th, at 18:12. Exhibit A, Text, September 17th, at 18:12. Until this time, we still did not have correct contact information for Mr. Sidar and could not (and did not) contact him.

11.     Mr. Urban and I jointly reached Mr. Sidar at 6:36 p.m. on September 17, 2019, and we spoke with him until 6:51 p.m. I have my hand-written contemporaneous notes and my Affidavit is based upon those notes and my recollection. I attach a copy of my notes to this Affidavit and will bring the original to the upcoming hearing. Exhibit B.

12.     My notes reflect that we informed Mr. Sidar that we had filed suit and explained the basis of the suit. His response was that "this is not fair."

2

AFFIDAVIT REGARDING PSEUDONYM REPLY ALLEGATIONS

13.     We first asked him not to contact our client and warned him that we would have to obtain a stalking or similar order if he attempted to contact her. We also told him that we would be requesting a DNA sample.

14.     Mr. Sidar replied, "I was on top of her, don't really know what happened, don't think I penetrated her." He said, "we were close and made out all night." He said that they were both drunk and making out all night.

15.     We told Mr. Sidar that there was DNA on Jane Doe's pajamas and Mr. Sidar replied that he thought Jane Doe slept naked. He told us that he was divorced and going through difficult financial times.

16.     Mr. Sidar then suggested that we meet in person to discuss the case. He suggested that we meet at his offices in DC on September 25th at 3 p.m. He asked us what else was in our Complaint. We told him that we were asking for damages and attorneys' fees and reiterated would be requesting a DNA sample. Mr. Sidar gave us his email address, Redact and asked if we could send him a copy of the Complaint for his review. He told us that he lives in D.C. and admitted that he had a company with a physical address in Fairfax County, registered with the Va. State Corporation Commission. He also offered the address Redact Redact

17.     We then terminated the call exactly fifteen (15) minutes later. This was the only call we had with Mr. Sidar. I categorically deny that the quoted statement by Mr. Sidar in his Affidavit was made at any time during this sole call, or at any other time.

18.     The following day, on September 18 at 2:15 p.m., Mr. Urban sent me a text stating that he received a voicemail from Alex Mitrakas who represented himself as representing Mr. Sidar. Exhibit A, Text, September 18 at 2:15 p.m. Since then, Mr. Sidar has been always

AFFIDAVIT REGARDING PSEUDONYM REPLY ALLEGATIONS

3

represented in this matter by various counsel.  As a result, Plaintiff's Counsel has never had another conversation with Mr. Sidar without his counsel present.

19.    Besides the initial fifteen (15) minute courtesy call we had with Defendant the day prior to his retaining counsel, we have had no other contacts with Defendant outside of the presence of counsel and never threatened Defendant in any manner.

20.    To the best of my recollection, the only other personal interactions we have had with Defendant were either in hearings in the Fairfax County case, in the hallway outside of a hearing room and during two personal jurisdiction depositions at Mr. Urban's office; in all Mr. Mitrakas was present.

21.    I certify under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and ability.

_____
Walter Earl Steimel, Jr.

<u>July 25, 2022</u>
Date

AFFIDAVIT REGARDING PSEUDONYM REPLY ALLEGATIONS

4

Attachment to Affidavit
Curriculum Vitae

# Walter Steimel, Jr.

**PRINCIPAL AREAS OF PRACTICE**

> State and federal court litigation; administrative agency practice
> Communications and internet/cyberlaw; cybersecurity
> Corporate and business consulting
> Data/information privacy and value
> Federal agency practice (FCC, FTC, BIS, OFAC, FBAR, CBP)
> International business transactions, trade and compliance
> Trademark, copyright and unfair competition
> Trade secret and trade dress

**PROFESSIONAL EMPLOYMENT EXPERIENCE**

- Founding Member, Manager, Steimel Counselors Law Group, 2017-Present
  - State and Federal Court litigation; Administrative litigation
  - Technology, Internet (SIP/VoIP), communications, cybersecurity, data ownership and privacy
  - International business trade and sanctions, intellectual property
- Principal, Steimel Law Group, 2015-17
  - State and Federal Court litigation; Administrative litigation
  - International business, trade and sanctions, Internet, communications, privacy and data security, intellectual property, international business
  - International business trade and sanctions, intellectual property
- Partner, Loeb & Loeb, Washington, D.C., 2010-2015
  - Communications contract negotiation, regulation and related litigation
  - International business, trademark, administrative and court litigation
- Shareholder, Greenberg Traurig, Washington, D.C., 2000-10
  - Practice group leader in telecommunications
  - Telecommunications, intellectual property, international business and litigation
  - State and Federal Court litigation; Administrative litigation
- Partner, Hunton & Williams, Washington, D.C., 1996-99
  - Head of Communications Practice Group, telecommunications, intellectual property, export controls and litigation
- Partner/Principal, Fish & Richardson, Washington, D.C., 1991-96
  - Head of Trademark and Telecommunications Practice Groups in D.C. Office
- Associate, Bell, Boyd & Lloyd, Washington, D.C., 1989-91
- Attorney, Federal Communications Commission, Common Carrier Bureau, Washington, D.C., 1988-89
- Counsel to the Commissioner and Chair, Public Utility Commission of Texas, Austin, Texas, 1983-87

**Walter Steimel, Jr.**

- Communications, Electric and Water Utility regulatory work
- Legislative Counsel & Senior Aide to State Senator, Austin, Texas, 1982-83
  - Drafted enacted versions of the Texas Public Utility Regulatory Act and legislation expanding admissibility of evidence in prosecution of sex crimes
  - Seconded Special Prosecutor for sex crimes
- Associate, Bracewell & Patterson, Houston, Texas, 1981-82

**SELECTED PROFESSIONAL INVOLVEMENT**

- Catholic University of America, Graduate School of Engineering:
  - Adjunct Professor, Privacy and Information Security, CSC EE 526 (2017-present)
  - Adjunct Professor, Cybersecurity and Network Security, CSC EE 565 (2017-19)
- Texas Christian University, Neeley School of Business:
  - Visiting Scholar/Adjunct, Texas Christian University, Entrepreneurship in Emerging Economies, MANA 30703, Intercession (2014-19)
  - Judge, TCU Values and Ventures Business Plan Competition (2013, 2017)

**EDUCATION**

- LL.M. program, (partial completion), Georgetown University Law Center, 1997-98
  - International and comparative law, international communications
- J.D., University of Texas School of Law, 1981
  - Notes and Comments Editor, *Texas International Law Journal*
  - Honors: Phi Delta Phi
- B.B.A., *cum laude*, Accounting, Texas Christian University, 1978
  - University Honors; Honors in Accounting, Economics and Business

**PROFESSIONAL LICENSES AND ADMISSIONS TO PRACTICE**

- Supreme Court of Texas, Bar Number 19127500
- District of Columbia, Bar Number 446262
- Certified Public Accountant, Texas, Certificate Number 34497
- National Football Players Association, Contract Advisor (2003-04)
- Supreme Court; US Courts of Appeals for the 1st, 2nd, 3rd, 4th, 5th, 6th, 8th, 9th, 10th, 11th, D.C., and Federal Circuits; US District Courts of D.C., Maryland, New Mexico, N.D. Texas and S.D. Texas

**CONTACT INFORMATION**

Walter Steimel, Esq.
Steimel Counselors Law Group, P.L.L.C.
1455 Pennsylvania Avenue NW, Suite 400
Washington DC 20004
Direct:  202-271-9258
wes@sclgrp.com

**EXHIBIT A**

Text Messages

September 16, 2019 at 15:13

September 17, 2021, at 17:33

September 17, 2019, at 17:35

September 17th, at 18:12

September 18 at 2:15 p.m.

**Messages with Tom Urban (+Redact )**

Received on Sep 16, 2019 3:13:50 PM

TU Do you have a phone number for Cenk Sidar?  The one I have is a landline that gets no answer.

Sent on Sep 17, 2019 5:33:31 PM

Redact doesn't have his current number. Redact   Redact

Received on Sep 17, 2019 5:35:14 PM

TU We can also call Jonathan Phillips and see if he can get in touch with Cenk.

Sent on Sep 17, 2019 6:12:46 PM



Sent on Sep 17, 2019 6:12:46 PM

Do you have these numbers?

Received on Sep 18, 2019 2:15:19 PM

TU I think that Cenk hired this guy.  Got a voicemail but am in cle.

Received on Sep 18, 2019 2:15:20 PM

TU https://www.linkedin.com/in/alex-mitrakas Redact

JA250

**EXHIBIT B**

Handwritten Notes

1/17/19  Call w/ Cenk Sidar / Urban  6:39p - 6:57p

- Not fair
- Not to contact client
        — Stalling waiting on order
- DNA sample
- On top of her → don't remember what happened —
        don't think I penetrated her
- Close & make-out all night
- Both naked ? ⇒ [Pajama ?]          — Both drunk
        - DNA on pajama
        - She was naked study
        - She slept naked
        - Naked — making out all night
        - Divorced
                - difficult financial times
- Next Wednesday
        - September 25th - Wash. D.C.  [Bldg. conf. room
        300#, · 3p.m.                    on 14th St. ]
                · Friday - Fairfax Co. Circuit Ct.
                · Damage & atty fees
                · DNA sample
· CenkSidar @ gmail.com
        → Send a copy
        → Willing to
· Live in Wash. D.C.
        · Copy in Fairfax → physical address in Va.
                - State corp. commission in Va —Yes

Redact

JA252

EXHIBIT B

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
|      Plaintiff, | : |
| | : |
| v. | : Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : |
| CENK SIDAR | : |
| | : |
|      Defendant. | : |

_____

### AFFADIVIT OF PLAINTIFF JANE DOE
### REGARDING DEFENSE MOTION TO LIFT PSEUDONYM

I, Jane Doe, by pseudonym, being duly sworn, hereby states as follows:

1.     I am the Plaintiff in the above-captioned case. I am over twenty-one years of age and all of my statements herein are based upon my personal knowledge.

2.     Although a domiciliary of the Commonwealth of Virginia I work internationally in military and government contracting. In 2012 and 2013 I was employed in the UAE by the Abu Dhabi government. I developed an expertise in an arcane area of government contracting work in the Middle East. As a result, my work is principally based in Dubai and the United Arab Emirates. I spend much of my time there and in other locations in the Middle East in conjunction with my work.

3.     My specialty focuses on government and military contracting. I deal with US and other private contractors and their Middle East counterparts daily. My work requires me to stay in the Middle East for weeks at a time negotiating business arrangements, attending meetings, inspecting locations and similar work. I have to attend meetings all day every day in person. Most people I work with are men – there are very few females in my line of work. These

industries are male-dominated industries. Many of the people I work with were born and grew up in the Middle East. My work and my life are dominated by their laws, culture and social norms. I am thankful for the opportunity to work here but am cognizant of the risks and demands.

4.      The Middle East can be a challenging place for professional women to work in these industries. I am deeply concerned that if the details in this case or my identity were to be revealed in any of the communities in which I work it would cause me to be ostracized and subjected to legal inquiry or discriminatory treatment. I'm afraid of what could happen to me both professionally and personally, and that identification of me as the Plaintiff in this case could ruin the work prospects and business relationships I have worked so hard to develop since Defendant raped me.

5.      Defendant's rape of me has been deeply disturbing, causing me personal emotional pain, psychological harm, and professional damage. I went to the sexual assault clinic for forensic evidence collection immediately after Defendant raped me, and have continued to work with the London Police virtually and in-person to investigate this case over a nearly five (5) year period.

6.      Prior to when Defendant raped me, when he and I were talking, he asked me about my professional life. I told him what I do and that I'm based in the Middle East. He only cares about himself as is evident from the text messages he sent me after he raped me.

7.      I sought counseling with a professional in South Africa soon after Defendant raped me. We only had one or two sessions – I felt that having to recount the events and work through them was more painful than trying to deal with the pain and anguish myself.

8.      I still struggle with the memory of Defendant raping me – being attacked while asleep by someone I knew, who I knew to be married with children – someone that I assumed

2

AFFADIVIT OF PLAINTIFF JANE DOE
REGARDING DEFENDSE MOTION TO LIFT PSEUDONYM

could be trusted. The experience haunts me, interrupting my ability to focus, and my ability to trust others and to establish a new relationship.

9.      Trying to get restarted is difficult enough. If my identity were revealed I would be required to divulge these painful memories before I am prepared to do so. I have a difficult enough time dealing with the psychological burden now. If confronted with the facts of this case by friends, co-workers and others before I know that I can trust them will cause me to withdraw more and likely cause additional emotional damage.

10.     I press forward with this case hoping that my trust in the judicial process will be validated, that I can believe reporting my assault was not in vain, and knowing that Defendant may have previously done this or could do this again to someone else, especially if he is able to walk away from this as he has been able to walk away from the London police by refusing to work with them.

11.     My text exchanges from the night Defendant raped me and attached to the Complaint give a window into the severe distress his rape caused me. And then after the rape, his only concern was to protect himself and make excuses, Defendant had no concern about the physical, emotional and mental harm he caused me.

12.     Defendant texted "I am luck [sic] this happened with you." Defendant texted "I basically acted like an animal." I have no words to describe the intense pain and suffering Defendant's rape of me has caused, Defendant's excuses and pleadings after raping me has caused, and Defendant's efforts to avoid responsibility have caused. I want to avoid having to relive the pain and suffering over and over, and from having the whole world know the details of my assault.

3

AFFADIVIT OF PLAINTIFF JANE DOE
REGARDING DEFENDSE MOTION TO LIFT PSEUDONYM

13.     Because of the emotional harm that this rape has caused to me and the stigma associated with this rape, I have not told any of my relatives including my parents or any of my friends, other than those who have helped me investigate and litigate this case, about the rape.

I declare under penalty of perjury that the foregoing is true and correct, and all statements are based upon personal knowledge.

_____

Jane Doe

Dated:  July 19, 2022

AFFADIVIT OF PLAINTIFF JANE DOE
REGARDING DEFENDSE MOTION TO LIFT PSEUDONYM

4

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
|  Plaintiff, | : |
| | : |
| v. | : Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : |
| CENK SIDAR | : |
| | : |
|  Defendant. | : |

_____

**DEFENDANT'S OBJECTION TO AFFIDAVIT OF PLAINTIFF JANE DOE**
**REGARDING DEFENSE MOTION TO LIFT PSEUDONYM**

Defendant, Cenk Sidar ("Defendant"), by counsel, submits his objection to the consideration of the Affidavit ("Affidavit") of Plaintiff Jane Doe ("Plaintiff") Regarding Defense Motion to Lift Pseudonym (ECF No. 31-2).

On July 19, 2022, Plaintiff's counsel contacted undersigned counsel asking if counsel would accept a subpoena for Defendant to attend the hearing on July 29, 2022. Plaintiff's counsel noted that "[w]e want to be able to cross-examine him about his Declaration attached to his Reply, specifically about his alleged conversation with Plaintiff's counsel and what was specifically said during that conversation." *See* **Exhibit 1**, at 2-3.

On July 20, 2022, undersigned counsel indicated that she was "happy to accept service assuming the court is accepting testimony on that date." She inquired whether Plaintiff's counsel confirmed that the Court was hearing testimony on that date and that "[i]f it is, please note that I will be questioning counsel as well." Ex. 1 at 2. Plaintiff's counsel responded later that day stating, in relevant part: "If you are in agreement, I will send an email to Judge Hilton's clerk and confirm that the judge will be willing to take testimony at the hearing" and noted that "after Mr.

Sidar testifies, we will present ourselves for questioning, subject to applicable privileges, if the Court considers it appropriate and necessary." Ex. 1 at 1. As noted in Plaintiff's Notice of Supplemental Evidence, "[t]he Court has indicated that it will take additional evidence at the hearing but will not permit live testimony." ECF No. 31 at 1. Plaintiff submitted a purported "Notice of Supplemental Evidence" on July 25, 2022, and attached two affidavits—one from Mr. Steimel and one from Plaintiff herself. Defendant has no objection to Mr. Steimel's affidavit because this was testimony that the parties previously discussed.

However, there was never any discussion regarding Jane Doe testifying at the hearing. There was only discussion regarding Defendant, and Plaintiff's counsel, testifying. All of the assertions made in Plaintiff's affidavit could have been already submitted in support of her Opposition. Instead, she only submitted an affidavit after Defendant noted in his Reply that she failed to include one. Essentially, she tailored her affidavit to Defendant's Reply.

Her affidavit asserts that she "deal[s] with US and other private contractors and their Middle East counterparts daily." ECF No. 31-2. ¶ 3 This was already discussed in her Opposition, to which she did not append an affidavit. *See* ECF No. 25 at 3 ("Plaintiff is also concerned for her personal safety if her identity is revealed. She currently works in government and defense sectors worldwide, with many of those projects based in the Middle East."). She also states, "I have not told any of my relatives including my parents or any of my friends, other than those who have helped me investigate and litigate this case, about the rape." ECF No. 31-2 ¶ 13. Again, this sentiment was included in her Opposition. *See* ECF No. 25 at 3 ("Other than law enforcement, medical personnel, a potential witness the London police asked her to contact and who was interviewed by the police, and her attorneys, she has discussed this matter with no-one, including family."). Plaintiff also alleges in her affidavit that "Defendant's rape of me has been

deeply disturbing, causing me personal emotional pain, psychological harm, and professional damage." ECF No. 31-2 ¶ 5. Once again, this is a statement Plaintiff already addressed in her Opposition and should have included an affidavit at that point if she wished to offer support for her allegations. *See* ECF No. 25 at 3 ("Defendant's rape has caused her great physical, emotional, and financial harm and continues to do so."). If Plaintiff included her affidavit in her Opposition, Defendant would have had the opportunity to include, in his Reply, evidence to correspond to her statements, including an affidavit from an appropriate expert regarding the validity of her description of the Middle East and her specific concerns with her identity being disclosed in a lawsuit brought in the United States.

Further, it is inequitable for Plaintiff, who has refused to provide any discovery substantiating her claims and fails to even list her current employer in response to discovery requests, to make sure bald statements without providing any underlying support. *See* **Exhibit 2**, Plaintiff's Fairfax Circuit Court Discovery Responses. This puts Defendant in a position where he is blindly responding to allegations of alleged harm.

For these reasons, Defendant Cenk Sidar objects to the consideration of Plaintiff's Affidavit in connection with his Motion to Remove Pseudonym Designation.

CENK SIDAR

By Counsel:

_____
Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530

mtadros@reesbroome.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 28, 2022, a copy of the foregoing **DEFENDANT'S OBJECTION TO AFFIDAVIT OF PLAINTIFF JANE DOE REGARDING DEFENSE MOTION TO LIFT PSEUDONYM** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

| | |
|---|---|
| **From:** | Mariam Tadros |
| **To:** | Thomas Urban |
| **Cc:** | Abigail S. Reigle; Walter Steimel |
| **Subject:** | Re: Subpoena for Mr. Sidar |
| **Date:** | Wednesday, July 20, 2022 1:03:09 PM |
| **Attachments:** | Signed Subpoena for Sidar.pdf |

I'm in agreement.

Sent from my iPhone

On Jul 20, 2022, at 12:55 PM, Thomas Urban <urban@fhhlaw.com> wrote:

Ms. Tadros –

Attached please find the signed subpoena.

If you are in agreement, I will send an email to Judge Hilton's clerk and confirm that the judge will be willing to take testimony at the hearing.  It has been my experience that federal judges do not have the same distinction between hearings with and without evidence as do Virginia state court judges.

As for questioning counsel, after Mr. Sidar testifies, we will present ourselves for questioning, subject to applicable privileges, if the Court considers it appropriate and necessary.

Thank you,

Tom

Thomas F. Urban II
Member
Fletcher, Heald & Hildreth, PLC
Licensed to practice law in the Virginia, District of Columbia, and Texas.
1300 N. 17th Street, Suite 1100 | Arlington, VA 22209
Tel: 703.812.0462 | Fax: 703.812.0486 | Mobile: 703-861-5235
urban@fhhlaw.com| www.fhhlaw.com |www.commlawblog.com

**From:** Mariam Tadros [mailto:MTadros@reesbroome.com]
**Sent:** Wednesday, July 20, 2022 11:50 AM
**To:** Thomas Urban <urban@fhhlaw.com>
**Cc:** Abigail S. Reigle <AReigle@reesbroome.com>; Walter Steimel <wes@sclgrp.com>

**Subject:** Re: Subpoena for Mr. Sidar

Counsel – I'm happy to accept service assuming the court is accepting testimony on that date. Have you confirmed the court is hearing testimony? If it is, please note that I will be questioning counsel as well.

Mariam Tadros

> On Jul 20, 2022, at 10:59 AM, Thomas Urban <urban@fhhlaw.com> wrote:
>
> Ms. Tadros –
>
> I just wanted to check with you again on this subpoena.
>
> Please let me know if you will accept service.
>
> Thank you,
>
> Tom
>
> Thomas F. Urban II
> Member
> Fletcher, Heald & Hildreth, PLC
> Licensed to practice law in the Virginia, District of Columbia, and Texas.
> 1300 N. 17th Street, Suite 1100 | Arlington, VA 22209
> Tel: 703.812.0462 | Fax: 703.812.0486 | Mobile: 703-861-5235
> urban@fhhlaw.com | www.fhhlaw.com |www.commlawblog.com
>
> **From:** Thomas Urban
> **Sent:** Tuesday, July 19, 2022 3:45 PM
> **To:** Mariam Tadros <MTadros@reesbroome.com>; Abigail S. Reigle <AReigle@reesbroome.com>
> **Cc:** Walter Steimel <wes@sclgrp.com>
> **Subject:** Subpoena for Mr. Sidar
>
> Ms. Tadros –
>
> Please let me know whether you will accept the attached subpoena for Mr. Sidar to attend the hearing on July 29, 2022 before Judge Hilton.  We want to be able to cross-examine him about his Declaration attached to

his Reply, specifically about his alleged conversation with Plaintiff's
counsel and what was specifically said during that conversation.

Thank you,

Tom Urban

Thomas F. Urban II
Member
Fletcher, Heald & Hildreth, PLC
Licensed to practice law in the Virginia, District of Columbia, and Texas.
1300 N. 17th Street, Suite 1100 | Arlington, VA 22209
Tel: 703.812.0462 | Fax: 703.812.0486 | Mobile: 703-861-5235
urban@fhhlaw.com| www.fhhlaw.com |www.commlawblog.com

**VIRGINIA:**
## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | |
|---|---|
| **JANE DOE,** | * |
| **Plaintiff,** | * |
| | * **Case No. 2019 12642** |
| **v.** | * |
| **CENK SIDAR,** | * |
| **Defendant.** | * |

## PLAINTIFF'S RESPONSES TO
## DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

      Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned counsel, hereby provides the following Responses to the First Set of Interrogatories submitted by Defendant Cenk Sidar ("Sidar" or "Defendant").

### GENERAL OBJECTIONS AND COMMENTS

A.    Plaintiff objects to Defendants' Interrogatories and their Definition of Terms to the extent that they seek to impose upon Plaintiff obligations greater than, or in contradiction to, those imposed by the Supreme Court of Virginia Rules and the Orders of this Court.

B.    Plaintiff objects to Defendant's Interrogatories to the extent that such requests call for information that represents or contains statements, correspondence, memoranda, or other communications between or among Plaintiff, her agents, and/or representatives, and her legal counsel because such documents are attorney/client privileged and protected from discovery by the Supreme Court of Virginia Rules and the rules and Orders of this Court.

C.    Plaintiff objects to these Interrogatories to the extent they invade the exemption for attorney work product.

D.    Plaintiff objects to these Interrogatories to the extent that such requests call for information that represents or contains the views, beliefs, mental impressions, and/or opinions of Plaintiff's legal counsel or other persons working in concert with Plaintiff's legal counsel with respect to the matters at issue in this cause or any other matter in which litigation or agency action may have been anticipated, because such information is covered by the work product doctrine and protected from discovery by the Supreme Court of Virginia and the rules and Orders of this Court.

E.    The phrasing of these Answers is not necessarily that of the Plaintiff or her agents, but is,



1

JA264

in some cases, the phrasing of Plaintiff's attorney.

F.    The following answers are given without prejudice to Plaintiff's right to produce evidence of any subsequently discovered fact or contention that Plaintiff may later uncover.

G.    **Plaintiff objects to these Interrogatories to the extent that they exceed thirty written interrogatories, including all parts and sub-parts, as permitted by Rule 4:8 of the Supreme Court of Virginia Rules. In total, Defendant has requested the response to over  subparts, in gross violation of and disregard for the Rule. Plaintiff will answer the first 30 interrogatories and subparts propounded by Defendant.**

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**        Identify every person with knowledge of the facts set forth in the Complaint, and for each person, provide their address, telephone number and a summary of the knowledge each is believed to possess.

**ANSWER:**    Plaintiff discussed this issue with counsel, the London Metropolitan Police and with personnel at The Havens. Plaintiff is compiling a list of the persons addressed by this interrogatory and their contact information and will provide it when compiled. Defendant is already in possession of the contact information for Plaintiff's counsel and the London Police.

Among those persons responsive to this request are the following:

Christopher West 2250AW
Police Constable – SOIT, Metropolitan Police Service l Area West Safeguarding
Team 4, B Strand
Address: Charing Cross Police Station, Floor 2, Agar Street, WC2N 4JP
Telephone: 07787263273
Email: Christopher.west@met.pnn.police.uk
Information regarding the rape and its investigation.

Mark Papasavva, DC
CE – CU Sapphire
07917 883434
Email: Mark.Papasavva@met.police.uk
Information regarding the rape and its investigation.

Detective Constable Juliette Long
Metropolitan Police Service
Central East BCU (Hackney & Tower Hamlets)
p: 0207 275 4604 (Ext: 754604)
m: 07776668359
a: Bethnal Green Police Station, 12 Victoria Park Square

2

London E2 9NZ
w: www.met.police.uk
e: Juliette.A.Long@met.pnn.police.uk
Information regarding the rape and its investigation.

Nurse Dawn
The Havens
Intake and examination.

Dr. Bernadette Butler
The Havens Camberwell Clinic
Kings College Hospital
Dr Butler took written notes on Ms Guthrie's account of the rape. Ms Guthrie authorized Dr
Butler to proceed with a medical examination, forensic evidence collection and the collection of
evidence from the pajamas she had been wearing while she had been sleeping.

**INTERROGATORY  NO.  2:**      Identify each expert witness you intend to call at the
trial of this matter, and provide the information required by Rule 4:1(b)(4)(A)(i).

**ANSWER:**   Plaintiff has not yet determined what experts she will call at trial and will respond
to this request when this is determined.

**INTERROGATORY  NO.  3:**      Describe in detail any and all communications
between yourself and Defendant from September 17, 2017 to the present.

**OBJECTION:**       Defendant requests information already in the possession of Defendant.

**ANSWER:**   All communications between Plaintiff and Defendant are, by definition, already in
Defendant's possession. Notwithstanding her objections, Plaintiff responds that she and
Defendant had extensive WhatsApp text message exchanges immediately after she was raped by
him on September 17 and 18, 2017.  Defendant attempted to call Plaintiff numerous times and
she refused his calls. Defendant and Plaintiff continued to communicate by social media through
at least September 28, 2017, after which time Plaintiff blocked Defendant on social media due to
his continued harassment and at the specific request of the London Police.

In these communications Defendant repeatedly admitted raping Plaintiff but offered a variety of
excuses for his behavior, including "sexsomnia" and his alcohol abuse. He repeatedly begged
Plaintiff to keep the rape a secret as it would damage his professional reputation, his marriage
and jeopardize everything he had. He also discussed conversations that he had with a therapist he
reported he was seeing.

Plaintiff will timely supplement her response. Pursuant to Rule 4:8(f), documents  will be
produced by Plaintiff from which portions of the answer to this Interrogatory may be
derived.

**INTERROGATORY  NO. 4:**      Identify and describe in detail every communication

3

you or your agents have had with Defendant or his agents regarding the facts giving rise to the Complaint from September 17, 2017 to the present, and in so doing, include the method of communication, the date of that communication, the substance of the communication.

**OBJECTION:**     Defendant requests information already in the possession of Defendant.

**ANSWER:**   All communications between Plaintiff or her agents, on the one hand, and Defendant and his agents, on the other hand, are, by definition, already in Defendant's possession. These include multiple text and other written exchanges between the Plaintiff and Defendant, and conversations between them as detailed in the Complaint.

Counsel for Plaintiff had several communications with Defendant in an attempt to settle this matter prior to filing the Complaint. Plaintiff believes that her DNA and blood sample medical representatives may have contacted Defendant in an attempt to collect his DNA and blood samples.

Notwithstanding her objections, Plaintiff will timely supplement her response.  Pursuant to Rule 4:8(f), documents will be produced by Plaintiff from which portions of the answer to this Interrogatory may be derived.

**INTERROGATORY NO. 5:**     Identify and describe in detail every communication regarding the facts giving rise to the Complaint that you had with the London hospital and London medical clinic as alleged in paragraph 28 of the Complaint, and in so doing, include the method of communication, the approximate time of the communication, and the substance of the communication.

**OBJECTION:**     Defendant's request involves sensitive and personal information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   The communications and timing of those communications are plain from the language of the Complaint. Notwithstanding this fact and all objections, Plaintiff will timely supplement her response once an appropriate protective order is in place.  Pursuant to Rule 4:8(f), documents will be produced by Plaintiff from which portions of the answer to this Interrogatory may be derived.

**INTERROGATORY NO. 6:**     Describe in detail every communication you or your agents have had with any and all third parties regarding the facts giving rise to the Complaint from September 17, 2017 to the present, and in so doing, include the method of communication, the date of that communication, and the substance of the communication.

**OBJECTION:**     Defendant's request is overly broad and requests communications that may be attorney client or attorney work product communications.

**ANSWER:**   Many of Plaintiff's communications are detailed in her Complaint, and this request is redundant to her prior disclosures. Notwithstanding her objections, Plaintiff will timely

4

supplement her response. Pursuant to Rule 4:8(f), documents will be produced by Plaintiff from which portions of the answer to this Interrogatory may be derived.

**INTERROGATORY NO. 7:**     If you contend that Defendant has made any admission of liability or admission against interest, please state it/them.

**ANSWER:**   Defendant made multiple admissions of liability and admissions against interest directly to Plaintiff. While some were verbal, many of them were in writing and made the day Defendant raped Plaintiff and in the days immediately following Defendant's unprovoked attack. Defendant apologized for raping Plaintiff. Defendant admitted that he had serious substance abuse problems and attempted to blame his rape of Plaintiff on these issues. Defendant promised to seek medical help and begged Plaintiff multiple times not to tell anyone about it because it would ruin his life. Defendant stated that he was seeing a therapist to address his issues. Plaintiff will timely supplement this response with additional information as necessary.

Pursuant to Rule 4:8(f), documents will be produced by Plaintiff from which portions of the answer to this Interrogatory may be derived.

**INTERROGATORY NO. 8:**     Identify all the medical and psychological treatments you have had since September 17, 2017, as alleged in paragraph 32 of the Complaint. Include in your answer each of your health providers and each provider's business name and address.

**OBJECTION:**     Defendant's request involves sensitive and personal information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff will respond with relevant non-privileged information once an appropriate protective order is in place.

**INTERROGATORY NO. 9:**     State any and all facts which support your contention that you "fear[ed] for your life" and "additional physical injury" as alleged in paragraph 36 of the Complaint.

**ANSWER:**   Plaintiff is aware of the fact that Defendant provides background and undercover investigations of individuals and appears to have a network of undercover and nefarious international business partners providing these services. Defendant made statements to Plaintiff that Plaintiff interpreted as threatening, and Plaintiff is intimidated by Defendant's international and shady connections. Further, Defendant raped Plaintiff while she was asleep and she was required to fight with Defendant. Being raped while asleep and fighting off an assailant caused Plaintiff to fear for her life and physical injuries beyond what Defendant caused.

**INTERROGATORY NO. 10:**     Describe in detail all injuries sustained by you as a result of the alleged incident, including but not limited to the nature, extent and duration of such injuries.

**OBJECTION:**     Defendant's request involves sensitive and personal information. Plaintiff will timely respond once an appropriate protective order is in place.

5

**ANSWER:**   Beyond what is described in detail in Plaintiff's Complaint, Plaintiff has suffered extensive physical, emotional, psychological and other injuries. Plaintiff will supplement when an appropriate protective order is in place.

**INTERROGATORY NO. 11:**   State your employment, business, profession, or occupation on the date of the incident giving rise to this litigation, for the five-year period prior to the occurrence, and for the period of time between the occurrence and present-day; the name and address of any employer, or your place of employment at all such times; your job classification, description of specialty, rate, or amount of your compensation or earnings at all such times.

**OBJECTION:**   Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and will timely supplement her response once an appropriate protective order is in place.

**INTERROGATORY NO. 12:**   State whether you claim any loss of income, earnings, or loss of earning capacity, and if so, the dates and time lost in each date and the total time claimed to have been lost from gainful employment; the monetary amount of loss of wages, income, or earnings claimed and the manner or method used to determine same, or the amount of lost earning capacity and the amount lost as a result.

**OBJECTION:**   Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 13:**   State the nature, extent, symptoms, and complaints of injuries claimed by you to have been suffered as a result of the occurrence giving rise to this litigation and as reflected by the history, examination, diagnosis, treatment, and prognosis of all doctors, practitioners, or physicians consulted.

**OBJECTION:**   Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 14:**   If it is claimed that any of said injuries are permanent, set forth, in detail, the nature of such permanency, the disability claimed to result there from, and the name or names of the physician or physicians making such prognosis.

**OBJECTION:**   Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

6

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 15:**   State what physical or mental complaints, symptoms, injuries, or disabilities you claim to suffer at the present time as a result of the occurrence giving rise to this litigation, and the effect, if any, on your normal activities.

**OBJECTION:**   Defendant's request involves sensitive and personal medical and financial information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 16:**   State the names and addresses of all doctors, practitioners, nurses, health care providers, clinics, hospitals, or others who consulted with, diagnosed, examined, treated, or cared for you for injuries allegedly occurring as a result of the occurrence giving rise to this litigation and charged to be the responsibility of the defendant in this case; the date of such consultations, examinations, or treatments, and the itemized charges for such services. Please attach any and all statements for services rendered and reports which you or your attorney have received from such practitioners, nurses, or others.

**OBJECTION:**   Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 17:**   Identify by full name and address all health care providers, family physicians, hospitals, clinics, chiropractors, or other providers of the healing arts who have examined, treated, diagnosed, or evaluated you in the past five (5) years.

**OBJECTION:**   Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

**INTERROGATORY NO. 18:**   Identify each item of damage you claim you sustained as a result of the alleged conduct of Defendant; and further state the dollar amount you are claiming for each item of damage; including all monetary and non-monetary items and the manner in which you have calculated the dollar amount of each such item of damages; the date(s), time, place and circumstance under which the loss occurred; identify all individuals who have knowledge of the facts and circumstances of these alleged damages; and identify all documents which may support, concern or

7

reference your alleged damages.

**OBJECTION:**     Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond once an appropriate protective order is in place. Plaintiff objects to the extent that this request is directed to attorney work product.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response. Plaintiff is compiling this information for trial or dispositive motions and will timely supplement when this process is complete.

**INTERROGATORY NO. 19:**     If you ever suffered from mental anguish, emotional distress, or other similar or related conditions before the actions of Defendant as described in the Complaint, describe each such condition including the dates during which you suffered from it.

**OBJECTION:**     Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff currently suffers from extensive mental anguish, emotional distress and other similar and related conditions. These have interfered with her professional and personal life. Plaintiff has experienced these beginning immediately after the rape, and continuously through the present. Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response. Plaintiff is compiling this information for trial or dispositive motions and will timely supplement when this process is complete.

**INTERROGATORY NO. 20:**     Identify, by full name and address, all pharmacies where you have filled prescriptions for the past five years.

**OBJECTION:**     Defendant's request involves sensitive and personal medical information. Plaintiff will timely respond once an appropriate protective order is in place.

**ANSWER:**   Plaintiff is compiling this information and, subject to her objections and entry of an appropriate protective order, will timely supplement her response.

Respectfully Submitted,


 /s/ Thomas F. Urban II                                  .
Thomas F. Urban II, Virginia Bar No. 40540
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
(703) 861-5235 FAX (703) 812-0486
Urban@fhhlaw.com

8

Walter Steimel, Jr. (*pro hac* vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com

*Counsel for Plaintiff*

9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via email and/or U.S. First Class Mail to
Anna Dvorchik, Esq.
The Law Office of Anna K. Dvorchik, PLLC
3970 Chain Bridge Road
Fairfax, VA 22030

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209
*Counsel for Defendant*

on this the 1st day of October, 2020.

__/s/ Thomas F. Urban II_____
Thomas F. Urban II

10

VIRGINIA:

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| JANE DOE, | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Case No. 2019 12642** |
| v. | * | |
| | * | |
| CENK SIDAR, | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

## PLAINTIFF'S RESPONSES TO
## DEFENDANT'S FIRST SET OF REQUESTS FOR DOCUMENTS TO PLAINTIFF

Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned counsel, pursuant to Rule 4:9 of the Rules of the Supreme Court of Virginia, hereby serves the following Responses to the First Set of Requests for Production submitted by Defendant Cenk Sidar ("Sidar" or "Defendant").

## GENERAL OBJECTIONS

A.      Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek to impose upon Plaintiff obligations greater than, or in contradiction to, those imposed by the Supreme Court of Virginia Rules and the rules and Orders of this Court.

B.      Plaintiff objects to Sidar's Requests for Production of Documents to the extent that the requests seek documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

C.      Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek information protected by the attorney-client privilege, work product doctrine, or any other privilege or protection.

D.      Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek evidence within its possession, custody, or control, are already in Sidar's possession, custody, or control, or are in the possession, custody, or control of third parties.

E.      Plaintiff objects to Sidar's Requests for Production to the extent that the requests are overly broad as they fail to specify a time period for which documents are requested.

F.      Plaintiff's agreement that she will produce any responsive non-privileged documents in her possession in response to any Request is not an admission that such documents exist.

G.     Plaintiff is willing to meet and confer regarding any objectionable Requests.

H.     In responding to Sidar's Requests for Production, Plaintiff expressly reserves her right to object to the admission into evidence of any and all information made available in response to any Request for Production on any ground including, but not limited to, the ground that the information or request is irrelevant and immaterial to the issues in this action.  Nothing in Plaintiff's responses to any Request for Production should be construed as an admission respecting the admissibility or relevance of any fact or document or the truth or accuracy of any characterization of any kind contained in the Requests for Production.

## MANNER OF COMPLIANCE

Subject to her objections, Plaintiff will produce responsive, non-privileged, and non-protected documents by providing Sidar's counsel with copies of such documents at a mutually acceptable time, place and/or manner.  Plaintiff's investigation is ongoing; Plaintiff reserves the right to supplement her production of documents if and when additional responsive documents are located.

Subject to and without waiver of the foregoing General Objections, Plaintiff responds and objects as follow:

## SPECIFIC RESPONSES AND OBJECTIONS TO
## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** Any document identified in your Answers to the First Set of Interrogatories which is currently in your possession, custody, or control.

**RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 2:** Excluding communications between you and your attorney(s), any document relied on in crafting your Answers to the First Set of Interrogatories.

**RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 3:** All documents to or from any expert witness you intend to call at the trial (or evidentiary hearing) in this matter.

**RESPONSE:** Plaintiff objects to this Request on the grounds that such requests are not authorized in Rule 4:1(b)(4)(A) and a litigant cannot use a request for production of documents (under the guise of an interrogatory) under Rule 4:9 to circumvent the exclusive method established in Rule 4:1(b)(4) for discovering expert opinions, as set out in Flora v. Shulmister,

2

262 Va. 215, 222 (2001). Plaintiff will negotiate with Defendant regarding a mutually acceptable arrangement regarding expert witnesses, but at the present time, Plaintiff has no such documents and, when such documents are created, will not produce any documents in response to this Request absent such an agreement.

**REQUEST NO. 4:** All documents received as a result of a subpoena filed in this action.

**RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 5:** All exhibits you intend to use at the trial (or evidentiary hearing) in this matter.

**RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents in violation of the attorney work product doctrine. Plaintiff further objects to the extent that this Request seeks legal opinions. Notwithstanding and without waiving these objections and the General Objections, Plaintiff will produce documents otherwise responsive to this Request to the extent that they are in Plaintiff's possession, custody or control and not otherwise protected or privileged.

**REQUEST NO. 6:** All written communications between you and the Defendant from September1, 2016 to the present.

**RESPONSE:** Plaintiff objects to this Request to the extent that these documents should already be in the possession of Defendant unless he has engaged in document destruction. Notwithstanding and without waiving this objection and the General Objections, Plaintiff will produce documents responsive to this Request to the extent that they are in Plaintiff's possession, custody or control.

**REQUEST NO. 7:**   All written communications between you and anyone other than your attorney relating to the incident which gave rise to the Complaint.

**RESPONSE:** Plaintiff objects to this Request to the extent that it is vague regarding the term "relating" as it is a subjective term, inappropriate for a request for production. Notwithstanding and without waiving this objection and the General Objections, Plaintiff will produce written communications regarding the incident which gave rise to the Complaint to the extent that they are in Plaintiff's possession, custody or control and not otherwise protected or privileged.

**REQUEST NO. 8:** All written communications between you and anyone other than your attorney regarding Defendant from September 1, 2016 to the present.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad and includes documents not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request to the extent that it seeks documents that may be

3

privileged or protected.  Notwithstanding and without waiving these objections and the General Objections, Plaintiff will produce documents otherwise responsive to this Request to the extent that they involve any aspect of Plaintiff's Complaint, are in Plaintiff's possession, custody or control, and are not otherwise protected or privileged.

**REQUEST NO. 9:**  All documents regarding the care and treatment rendered to you as a result of the incident which gave rise to the Complaint, and as described in your Answers to Interrogatories.

**RESPONSE:**  Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 10:**  All documents concerning the care, treatment, hospital care, physical therapy, or any other medical or health care rendered to you from January 1, 2013 to the present.

**RESPONSE:**  Plaintiff objects to this Request on the grounds that it is overly broad and includes documents (and time periods) not reasonably calculated to lead to the discovery of admissible evidence.  Plaintiff further objects to this Request to the extent that it seeks documents that may be privileged or protected.  Notwithstanding and without waiving these objections and the General Objections, Plaintiff will produce documents otherwise responsive to this Request to the extent that they involve any aspect of Plaintiff's Complaint, are in Plaintiff's possession, custody or control, and are not otherwise protected or privileged.

**REQUEST NO. 11:**  All documents which tend to show evidence of the nature, amount, and degree of injury complained of in your Complaint.

**RESPONSE:**  Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 12:**  All documents showing lost wages which you claim were the result of the  incident complained of in the Complaint.

**RESPONSE:**  Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 13:**  All documents relating to witness statements which relate to the matters complained of in the Complaint.

**RESPONSE:**  Plaintiff objects to this Request to the extent that it is vague regarding the terms "relating" and "relate" as they are subjective terms, inappropriate for a request for production.  Notwithstanding and without waiving this objection and the General Objections, Plaintiff will produce witness statements which involve the matter complained of in the Complaint to the extent that they are in Plaintiff's possession and not otherwise protected or privileged.

4

**REQUEST NO. 14:** All documents relating to prior injuries, illnesses, disease, or disabilities from January 1, 2013 to the present.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad and includes documents (and time periods) not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request to the extent that it seeks documents that may be privileged or protected. Notwithstanding and without waiving these objections and the General Objections, Plaintiff will produce documents otherwise responsive to this Request to the extent that they involve any aspect of Plaintiff's Complaint, are in Plaintiff's possession, and are not otherwise protected or privileged.

**REQUEST NO. 15:** All documents evidencing the amount of damages or losses you claim resulted from the incident complained of in the Complaint.

**RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 16:** Any diaries or logs reflecting notes or information about the incident giving rise to the Complaint.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably limited in scope. Notwithstanding and without waiving these objections and the General Objections, Plaintiff will provide any diaries or logs that specifically mention the incident giving rise to the Complaint, properly redacted to protect other personal information, to the extent that there are any such documents in her possession.

**REQUEST NO. 17:** Any diaries or logs reflecting notes or information about medical treatment, pain complaints, or lost wages.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably limited in scope. Notwithstanding and without waiving these objections and the General Objections, Plaintiff will provide any diaries or logs that specifically mention the incident giving rise to the Complaint, properly redacted to protect other personal information, to the extent that there are any such documents in her possession.

**REQUEST NO. 18:** If you are or have been involved in any other litigation as a plaintiff in the past ten (10) years, provide copies of the Complaints, your discovery responses, and transcripts from any deposition taken of you.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving this objection and the General Objections, Plaintiff states there are no such documents.

**REQUEST NO. 19:** Copies of any and all Facebook postings, Twitter messages, or

5

other social media messages regarding the incident in question or the injuries and damages claimed in this case.

**RESPONSE:** Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 20:** Invoices for all attorney's fees claimed in this case.

**RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents protected by the attorney-client privilege and the work product doctrine. Notwithstanding and without waiving this objection and the General Objections, Plaintiff agrees that, if the jury finds Defendant liable for Plaintiff's attorneys' fees (other than those already paid for by Defendant), Plaintiff will produce properly redacted attorneys' fees invoices.

Respectfully Submitted,

 /s/ Thomas F. Urban II
Thomas F. Urban II, Virginia Bar No. 40540
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
(703) 861-5235 FAX (703) 812-0486
Urban@fhhlaw.com

Walter Steimel, Jr. (*pro hac* vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com

*Counsel for Plaintiff*

6

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via email and/or U.S. First Class Mail to

Anna Dvorchik, Esq.
The Law Office of Anna K. Dvorchik, PLLC
3970 Chain Bridge Road
Fairfax, VA 22030

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209
*Counsel for Defendant*

on this the 1st day of October 2020.

/s/ Thomas F. Urban II
Thomas F. Urban II

7

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

|  |  |  |
|---|---|---|
| | * | |
| **JANE DOE** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | **Case No. 2019 12642** |
| | * | |
| **CENK SIDAR,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |

## PLAINTIFF'S SETTLEMENTAL RESPONSES TO DEFENDANT'S FIRST SET OF REQUESTS FOR DOCUMENTS TO PLAINTIFF

Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned counsel, pursuant to Rule 4:9 of the Rules of the Supreme Court of Virginia, hereby serves the following Supplemental Responses to the First Set of Requests for Production submitted by Defendant Cenk Sidar ("Sidar" or "Defendant").

## GENERAL OBJECTIONS

A.      Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek to impose upon Plaintiff obligations greater than, or in contradiction to, those imposed by the Supreme Court of Virginia Rules and the rules and Orders of this Court.  To the extent that Plaintiff withholds or fails to produce any documents on this basis, Plaintiff will identify such withholding in response to each Request.

B.      Plaintiff objects to Sidar's Requests for Production of Documents to the extent that the requests seek documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

C.      Plaintiff objects to Sidar's Requests for Production to the extent that the requests seek information protected by the attorney-client privilege or the work product doctrine.

D.      Plaintiff's agreement that she will produce any responsive non-privileged documents in her possession in response to any Request is not an admission that such documents exist.

E.      If Plaintiff withholds any documents based upon an assertion of any objection, other than communications with her counsel in this matter, Plaintiff will provide the information required under Rule 4:9(b)(ii) and Rule 4:1(b)(6).

F.      In responding to Sidar's Requests for Production, Plaintiff expressly reserves her right to object to the admission into evidence of any and all information made available in response to any Request for Production on any ground including, but not limited to, the ground that the information or request is irrelevant and immaterial to the issues in this action. Nothing in Plaintiff's responses to any Request for Production should be construed as an admission respecting the admissibility or relevance of any fact or document or the truth or accuracy of any characterization of any kind contained in the Requests for Production.

## MANNER OF COMPLIANCE

Subject to her objections, Plaintiff will produce responsive, non-privileged, and non-protected documents by providing Sidar's counsel with copies of such documents at a mutually acceptable time, place and/or manner. Plaintiff's investigation is ongoing; Plaintiff reserves the right to supplement her production of documents if and when additional responsive documents are located.

Subject to and without waiver of the foregoing General Objections, Plaintiff responds and objects as follow:

## SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** Any document identified in your Answers to the First Set of Interrogatories which is currently in your possession, custody, or control.

**SUPPLEMENTAL RESPONSE:** Please see Bates Nos. P Prod 501-18. Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 2:** Excluding communications between you and your attorney(s), any document relied on in crafting your Answers to the First Set of Interrogatories.

**SUPPLEMENTAL RESPONSE:** Please see Bates Nos. P Prod 501-18. Plaintiff is aware of no such documents other than those produced in response to Request No. 1.

**REQUEST NO. 3:** All documents to or from any expert witness you intend to call at the trial (or evidentiary hearing) in this matter.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request on the grounds that such requests are not authorized in Rule 4:1(b)(4)(A) and a litigant cannot use a request for production of documents (under the guise of an interrogatory) under Rule 4:9 to circumvent the exclusive method established in Rule 4:1(b)(4) for discovering expert opinions, as set out in Flora v. Shulmister, 262 Va. 215, 222 (2001). Plaintiff will negotiate with Defendant regarding a mutually acceptable arrangement regarding expert witnesses, but at the present time, Plaintiff has no such documents and, when such documents are created, will not produce any documents in response to this Request absent such an agreement.

2

**REQUEST NO. 4:** All documents received as a result of a subpoena filed in this action.

**SUPPLEMENTAL RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 5:** All exhibits you intend to use at the trial (or evidentiary hearing)in this matter.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents in violation of the attorney work product doctrine. Notwithstanding and without waiving this objection and the General Objections, please see Bates Nos. P Prod 501-18. Plaintiff will produce additional documents otherwise responsive to this Request to the extent that they are in Plaintiff's possession, custody or control and not otherwise protected or privileged.

**REQUEST NO. 6:** All written communications between you and the Defendant from September 1, 2016 to the present.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that these documents should already be in the possession of Defendant unless he has engaged in document destruction. Notwithstanding this objection and the General Objections, please see Bates Nos. P Prod 501-18. Plaintiff will produce additional documents responsive to this Request to the extent that they are in Plaintiff's possession, custody or control.

**REQUEST NO. 7:**   All written communications between you and anyone other than your attorney relating to the incident which gave rise to the Complaint.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it is vague regarding the term "relating" as it is a subjective term, inappropriate for a request for production. Plaintiff will use the definition for the term "relating" that is included as Instruction J to Plaintiff's First Set of Requests for Production issued to Defendant. Notwithstanding and without waiving this objection and the General Objections, please see Bates Nos. P Prod 501-18. Plaintiff will produce additional written communications regarding the incident which gave rise to the Complaint to the extent that they are in Plaintiff's possession, custody or control and not otherwise protected or privileged.

**REQUEST NO. 8:** All written communications between you and anyone other than your attorney regarding Defendant from September 1, 2016 to the present.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents that may be privileged or protected. Notwithstanding and without waiving these objections and the General Objections, please see Bates Nos. P Prod 501-18. Plaintiff will produce additional documents otherwise responsive to this Request to the extent that they involve any aspect of Plaintiff's Complaint, are in Plaintiff's possession, custody or control, and are not otherwise protected or privileged.

**REQUEST NO. 9:** All documents regarding the care and treatment rendered to you as a

3

JA283

result of the incident which gave rise to the Complaint, and as described in your Answers to Interrogatories.

**SUPPLEMENTAL RESPONSE:** Plaintiff will produce all non-privileged documents in her possession that are responsive to this request.

**REQUEST NO. 10:** All documents concerning the care, treatment, hospital care, physical therapy, or any other medical or health care rendered to you from January 1, 2013 to the present.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request on the grounds that it seeks sensitive and personal medical information. Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 11:** All documents which tend to show evidence of the nature,amount, amount, and degree of injury complained of in your Complaint.

**SUPPLEMENTAL RESPONSE:** Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 12:** All documents showing lost wages which you claim were the result of the incident complained of in the Complaint.

**SUPPLEMENTAL RESPONSE:** Defendant's request involves sensitive and personal financial information. Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 13:** All documents relating to witness statements which relate tothe matters complained of in the Complaint.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it is vague regarding the terms "relating" and "relate" as they are subjective terms, inappropriate for a request for production. Plaintiff will use the definition for the term "relating" that is included as Instruction J to Plaintiff's First Set of Requests for Production issued to Defendant. Notwithstanding and without waiving this objection and the General Objections, Plaintiff will produce witness statements which involve the matter complained of in the Complaint to the extent that they are in Plaintiff's possession and not otherwise protected or privileged.

**REQUEST NO. 14:** All documents relating to prior injuries, illnesses, disease, ordisabilities from January 1, 2013 to the present.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it is vague regarding the term "relating" as it is a subjective term, inappropriate for a request for production. Plaintiff will use the definition for the term "relating" that is included as Instruction J to

4

Plaintiff's First Set of Requests for Production issued to Defendant.  Plaintiff further objects to this Request to the extent that it seeks documents that may be privileged or protected. Defendant's request involves sensitive and personal medical information.  Notwithstanding and without waiving this objection and the General Objections, Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 15:** All documents evidencing the amount of damages or losses you claim resulted from the incident complained of in the Complaint.

**SUPPLEMENTAL RESPONSE:** Defendant's request involves sensitive and personal financial information.  Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 16:** Any diaries or logs reflecting notes or information about the incident giving rise to the Complaint.

**SUPPLEMENTAL RESPONSE:** Plaintiff will provide any diaries or logs that specifically mention the incident giving rise to the Complaint, properly redacted to protect other personal information, to the extent that there are any such documents in her possession.

**REQUEST NO. 17:** Any diaries or logs reflecting notes or information about medical treatment, pain complaints, or lost wages.

**SUPPLEMENTAL RESPONSE:** Defendant's request involves sensitive and personal financial information.  Plaintiff will timely respond and produced all non-privileged documents that are responsive to this request once an appropriate protective order is in place.

**REQUEST NO. 18:** If you are or have been involved in any other litigation as a plaintiff in the past ten (10) years, provide copies of the Complaints, your discovery responses, and transcripts from any deposition taken of you.

**SUPPLEMENTAL RESPONSE:** Plaintiff states there are no such documents.

**REQUEST NO. 19:** Copies of any and all Facebook postings, Twitter messages, or other social media messages regarding the incident in question or the injuries and damages claimed in this case.

**SUPPLEMENTAL RESPONSE:** Plaintiff will produce documents regarding social media content (to the extent that she understands the term "social media") to the extent that there are any such documents in her possession.

**REQUEST NO. 20:** Invoices for all attorney's fees claimed in this case.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request to the extent that it seeks documents protected by the attorney-client privilege and the work product doctrine.

5

Notwithstanding and without waiving this objection and the General Objections, Plaintiff agrees that Plaintiff will supplement this information with proper redactions if Plaintiff continues to pursue its attorneys' fee claim after December 3, 2021.

Respectfully Submitted,

Thomas F. Urban II, Virginia Bar No. 40540
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA 22209
Urban@fhhlaw.com

Walter Steimel, Jr. (*pro hac* vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was hand delivered to

Mariam W. Tadros, Esq.
Rees Broome, PC
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182

And sent by electronic mail to

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209

*Counsel for Defendant*

on this the 18th day of November, 2021.

Thomas F. Urban II

6

JA286

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : | |
| CENK SIDAR | : | |
| | : | |
| Defendant. | : | |

_____

## DEFENDANT'S NOTICE OF SUPPLEMENTAL EVIDENCE

Defendant, Cenk Sidar ("Defendant"), by counsel, submits this Notice of Supplemental

Evidence in further support of his Motion to Remove to Remove Pseudonym Designation and his

Reply to Plaintiff Jane Doe's Opposition thereto for consideration at this Court's hearing on

Friday July 29, 2022, on Defendant's Motion. The Court has indicated that it will take additional

evidence at the hearing. Specifically, Defendant attaches a declaration to address the assertions

made by Walter Steimel, Jr. in his Affidavit Regarding Pseudonym Reply Allegations (ECF No.

31-1).

CENK SIDAR

By Counsel:

_____
Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 28, 2022, a copy of the foregoing **DEFENDANT'S NOTICE OF SUPPLEMENTAL EVIDENCE** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

JA288

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : | |
| CENK SIDAR | : | |
| | : | |
| Defendant. | : | |

_____

### DECLARATION

The undersigned, Cenk Sidar, pursuant to 28 U.S. Code § 1746, submits the following declaration in response to Walter Steimel, Jr.'s Affidavit Regarding Pseudonym Allegations (ECF No. 31-1).

1.    I am over the age of 18 and competent to testify.

2.    I have personal knowledge of the facts relevant to this matter.

3.    I have reviewed Mr. Steimel's affidavit (ECF No. 31-1) and am familiar with its contents.

4.    Even though it is disputed by Mr. Steimel, but notably not Mr. Urban, upon whom I attribute it to, I stand by my statement that Mr. Urban said to me: "You are a businessman, you are married, and have kids, and don't want this to be a major issue for you, so why don't you just do what we ask you to do and provide DNA?"

5.    I was also reminded that I was a "married man with kids," so I should "work with" them.

1

6.      Despite Mr. Steimel's assertion in Paragraph 14 of his Affidavit, I did not say "don't think I penetrated her;" rather I stated I *didn't* penetrate her.

7.      Despite Mr. Steimel's assertion in Paragraph 15 of his Affidavit, I was not told "that there was DNA on Jane Doe's pajamas."

8.      It is unclear why Plaintiff's counsel did not have contact information for me, as stated in Paragraph 5 of Mr. Steimel's affidavit, as I have had the same phone number for over fifteen years and Plaintiff was in possession of my phone number.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 28, 2022.

_____
Cenk Sidar

2

JA290

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JANE DOE                              )
                                      )
                                      )
        VS.                           )    1:22-CV-545  CMH
                                      )
                                      )    ALEXANDRIA, VIRGINIA
                                      )      JULY 29, 2022
                                      )
CENK SIDAR                            )
_____)

_____

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE CLAUDE M. HILTON**
**UNITED STATES DISTRICT JUDGE**
_____

**Proceedings reported by stenotype, transcript produced by**

**Julie A. Goodwin.**

Julie A. Goodwin, CSR, RPR

1                    **A P P E A R A N C E S**

2

3  FOR THE PLAINTIFF:
        THE LAW FIRM OF FLETCHER, HEALD & HILDRETH, PLC
4        By:  MR. THOMAS F. URBAN II
        1300 17th Street North
5        Suite 1100
        Arlington, Virginia  22209
6        703.812.0462
        urban@fhhlaw.com
7
        STEIMEL COUNSELORS LAW GROUP PLLC
8        By:  MR. WALTER E. STEIMEL, JR.
        1455 Pennsylvania Avenue, N.W.
9        Suite 400
        Washington, D.C.  20004
10       202.271.9258
        wes@sclgrp.com
11

12

13  FOR THE DEFENDANT:
14       REES BROOME, PC
        By:  MS. MARIAM W. TADROS
15       1900 Gallows Road
        Suite 700
16       Tysons Corner, Virginia  22182
        703.790.1911
17       mtadros@reesbroome.com

18

19

20  OFFICIAL U.S. COURT REPORTER:
        MS. JULIE A. GOODWIN, RPR
21       United States District Court
        401 Courthouse Square
22       Eighth Floor
        Alexandria, Virginia  22314
23       512.689.7587

24

25

1  (JULY 29, 2022, 10:29 A.M., OPEN COURT.)

2       THE COURTROOM DEPUTY:  Civil Action Number 22-545, *Doe*

3  *versus Sidar*.

4       Will counsel please note your appearances for the

5  record.

6       MS. TADROS:  Mariam Tadros here on behalf of Defendant

7  James Sidar.

8       THE COURT:  Good morning.

9       MR. URBAN:  Your Honor, Tom Urban on behalf of

10 Plaintiff Jane Doe.  I'm a member of the Virginia Bar, and I

11 would like to introduce Mr. Walter Steimel.  Although he's a

12 resident of Alexandria, he's a member of the Texas and DC Bars.

13 He'll be doing the argument today.

14      THE COURT:  All right.  Good morning.

15      MR. STEIMEL:  Good morning.

16      MS. TADROS:  Your Honor, today this comes on the

17 defendant's motion to remove the pseudonym designation of

18 Ms. Doe, the plaintiff in this matter.  The Court is familiar

19 with the facts of this case that has had a life before it got

20 to this court.  This case was originally filed in Fairfax in

21 September of 2019, and subsequently nonsuited over two years

22 later and is now on appeal with a rick (phonetic) panel

23 argument on September 1.

24      We had filed an objection to the affidavit that was

25 provided by Ms. Doe.  However, I do want to go through the

1  affidavit with the Court.

2         Several cases that we have cited have relied on

3  affidavits, including the Jason -- *Jacobson* case, the *Cabrera*

4  case that was cited by the plaintiffs, and I believe the *Kolko*

5  case.  And those cases had detailed affidavits, some of whom,

6  including the *Cabrera* case, from social workers or someone who

7  is qualified to give an opinion about the mental state and the

8  trauma endured by a plaintiff, and therefore the necessity of a

9  pseudonym designation.

10        MR. URBAN:  Your Honor, may I just have a

11  clarification?  Does this mean that Ms. Tadros is withdrawing

12  her objection to the affidavit and going to argue the

13  affidavit?  I'm just unclear here because it sounds like

14  she's --

15        THE COURT:  Well, let's listen.  Maybe she'll clear it

16  up for us.

17        MR. URBAN:  Okay.  Thank you.

18        MS. TADROS:  Your Honor, we do stand on our objection.

19  If the Court is considering the affidavit, I do want to address

20  it, so it depends on whether the Court would like to hear my

21  view on the merits of the affidavit itself.

22        THE COURT:  Well, I can't -- you tell me what you want

23  to tell me --

24        MS. TADROS:  Yes.  Well --

25        THE COURT:  -- and I'll -- and I'll rule.  We're not

1   going to do this piecemeal, now back and forth.

2   MS. TADROS:  Your Honor, we stand on our objection,

3   which I'm sure the Court has reviewed, which this should have

4   been filed in the opposition.  It's not raising anything that

5   wasn't raised in the opposition and shouldn't be considered.

6   If the Court is inclined to consider the affidavit, it is

7   woefully insufficient.

8   Going through paragraph 2, Ms. Doe tells us that

9   her work is principally based in Dubai and the United Arab

10  Emirates.  I spend much of my time there and in other locations

11  in the Middle East in conjunction with my work.

12  Well, what that doesn't tell us is what Ms. Doe

13  actually does for a living.

14  I came into this case late in Fairfax, but standing

15  here today the case has been pending since September 2019.  I

16  don't know what she does or where she works.  And this all

17  really depends on where she's spending time in the Middle East,

18  which she doesn't identify.  If she's in Afghanistan, that's a

19  different environment than being in the UAE, or where I'm from,

20  Egypt.

21  So, without giving us details of what country she's

22  in, we don't know what specific risk is there for her.  We

23  don't know how much time she spends in the Middle East.  Is it

24  two days as a contractor because she's working at CACI, or is

25  it, you know, six months at a time?  Those details are not

1  contained in the affidavit because she doesn't even tell us
2  where she works.

3        She says, I have to attend meetings all day, every
4  day in person.

5        She doesn't state whether that's in the United
6  States.  She doesn't state whether that's in the Middle East,
7  and she doesn't explain why her having to attend meetings has
8  an impact on this particular motion.

9        She states that the rape has been disturbing,
10 causing her personal, emotional pain, psychological harm,
11 professional damage.

12        Again, there was no expert affidavit that was
13 brought up.  And having her name public does not change the
14 fact that she is going to have to publicize these details in
15 this case.

16        As she claims that she is talking to the London
17 police and she has been in contact with them -- again, that
18 doesn't really tell us much.

19        And I'll note that she has not told us the doctors
20 that she has seen.  That discovery was never turned over in the
21 Fairfax litigation.  I don't know what medicines she's taking.
22 Plaintiff herself took the position that the pharmacy that she
23 goes to is somehow confidential, so the Walgreens or the Giant
24 or wherever it is that she gets her medicine, she believes --
25 or at least in the Fairfax case, that we weren't entitled to

1  that information.  So the affidavit provides none of the

2  details that you would get from an affidavit that a court had

3  found to be supportable.

4  So in the *Cabrera* case -- and this is a case cited

5  by the plaintiffs where someone was allowed to proceed with a

6  pseudonym designation during the discovery period but not at

7  trial, the affidavit listed a social worker's credentials and

8  periods of treatment, saying that she's been in constant

9  treatment since the assault.  And based upon that social

10  worker's training and experience, public disclosure of the name

11  and address would result in additional injury.  We don't have

12  any of that information here.

13  And *Cabrera* itself was a different story.  That was

14  an allegation of rape by a major league baseball player with

15  the Cincinnati Reds.  It was in the media.

16  We don't have any of those concerns here.  So, we

17  would ask that the Court, if it is going to consider the

18  affidavit, see it for what it is and give it very little

19  weight.

20  But turning to the *Jacobson* factors themselves, the

21  Court looks at is the request merely to avoid annoyance and

22  criticism that may attend litigation or is it to preserve a

23  matter of sensitive and highly personal nature; whether

24  identification poses a risk of retaliatory physical or mental

25  harm; the ages of the person; whether this is a government or a

private party; and lastly, the risk of unfairness to the
opposing party.

So, looking at the issue of is this a matter of
sensitive and highly personal nature?  Yes, the allegation, if
true, would be a matter that is sensitive and highly personal.
But the Court does not have to examine that in a vacuum because
the Court can look at the claims brought by Ms. Doe, the
history of the case.  We've attached the interrogatory answers,
and so there are a lot of reasons to doubt the credibility of
some of these allegations that are now over or about five years
old.

Going to the risk of retaliatory physical or mental
harm, we don't have any evidence of that being here except a
couple of articles that were cited by Times of Asia and another
publication, which I don't believe that the Court should
consider.  These aren't treatises.  You know, the *Asia Times*
article looks like it was just a standard newspaper online
article.  And again, we don't know where or what Ms. Doe does
for work.

And when the Court has found that there is harm,
one of the cases cited by the plaintiff, the *Kolko* case,
dealing with a rabbi, there was significantly more retaliation
and threats of harm.  And in that case, there was a heightened
public interest, and there were threats about what would happen
if someone came public against this rabbi.

1          And there, you know, you would be shunned from the

2    community.  The kids would be shunned from the community.  All

3    of these terrible things were happening, and the Court

4    considered that.  That's not what we have here.

5          The age of the persons weighs against the claim for

6    a pseudonym.  These are both adults.  Ms. Doe is in her 30s, so

7    there's no risk to children like there were with *Jacobson*.  And

8    in the *Jacobson* case, the kids were going to find out that Dad

9    is not really my biological dad.  It's the doctor that Mom and

10   Dad had gone to.  Used his semen in order to, you know,

11   impregnate Mom.  That was a significant risk, and that's when

12   you look at the age of the children.

13         And then going to whether this is a government or

14   private party, that factor weighs against the plaintiff.  When

15   it's a private party, you have to be more circumspect in giving

16   a pseudonym designation because you don't suffer the same risks

17   with the government.

18         And for, you know, again the *Kolko* case says that

19   that was a quasi-government entity, and that would be a case

20   where it would be more appropriate to have a pseudonym.

21         Mr. Sidar is a private individual who has been sued

22   for millions of dollars and still doesn't even fully understand

23   the evidence that is against him, but he has serious risks of

24   harm as a private individual.

25         And lastly, the risk of unfairness to an opposing

1  party.  Again, he has been sued.  His name has been dragged

2  through the mud.  It is now a matter of being in the public

3  record because we're now in federal court where anybody can get

4  on Pacer and look this up, as opposed to when we were in

5  Fairfax, you can't really look anything up.  You can't -- at

6  the time there's no electronic filing in Fairfax, so you would

7  have to go to the courthouse, know that there's a pending suit,

8  go to the courthouse and get a copy of the complaint.

9         Anybody with a Pacer account or really an ability

10  to google is going to be able to find this.  So, the risks to

11  him is significant.

12         This is similar to the *George Mason* case where, you

13  know, the plaintiff, the male who was accused by the female, he

14  was the one who filed suit.  And the Court thought it proper to

15  give him a pseudonym designation because George Mason had

16  screwed up the disciplinary proceeding.  He was the one that

17  was the victim in all of this.  But he was the one who was

18  accused of things that would inspire retaliation and contempt,

19  like rape, and there was a significant risk of unfairness to

20  him.

21         So here, what we have is all five of these factors

22  really weigh against the pseudonym designation, and for those

23  reasons we would request that the Court strike that

24  designation.

25         Thank you, Your Honor.

1          THE COURT:  All right.

2          MR. STEIMEL:  Good morning, Your Honor.

3          Your Honor, in reviewing the pleadings, defendant

4    spends a lot of time of her argument attacking Ms. Doe and

5    counsel, but very little addressing the merits of this motion,

6    although she did address those in more detail today.  But this

7    is not an academic exercise.  These are real people and real

8    people's lives.

9          Two of the key issues that we believe apply are,

10   one, is the issue of waiver.  Mr. Sidar, the defendant,

11   permitted Ms. Doe to use a pseudonym for over two years in

12   Fairfax County Court, from September of 2019 to November of

13   2021.  At no point in time did they ask for us to lift the

14   pseudonym or file a motion to that effect.  Even when this case

15   was nonsuited and current counsel was representing defendant,

16   they still did not ask us to list -- lift the pseudonym, even

17   though we told them on the record at that time that we would be

18   refiling the case.

19         They did not request that we use a pseudonym for

20   Sidar, for the defendant, for the last six months before we

21   filed this case.  Now they're raising objection for the first

22   time.  We wonder why they're doing that and why they're trying

23   to harm the plaintiff who has been traumatized even more.

24         As to the merits, we would like to move away from

25   some of the irrelevant items that have been filed in this case

1  and just talk about the merits.  *Doe v. Rector* is an important

2  case where plaintiff, a student accused a student of

3  misconduct, but had strong arguments to the contrary, was

4  allowed to -- allowed to use the pseudonym Doe.

5          Here, there's substantial evidence that Ms. Doe was

6  a victim of a sexual attack.  And she -- she should be provided

7  the same courtesy and protection.

8          We attached to the complaint the text messages

9  between the parties.  Both parties were interviewed by the

10  police.  The defendant willingly spoke to London police after

11  the attack and provided his DNA without objection and without

12  qualification to the London police.

13          The prejudice to plaintiff is detailed -- is

14  detailed in her affidavit.  And while we could have provided or

15  probably should have provided an affidavit earlier, when the --

16  when whether or not our arguments were supported was called out

17  by counsel for defendant, we decided that we should go ahead

18  and supply the affidavit to this Court, provide a complete

19  record, especially following the guidance in *Doe v. Smith* in

20  New York where on a rehearing the party seeking pseudonymity

21  came back with an affidavit to support the allegations in order

22  to complete a full record for the -- for the Court.

23          We also took care to file this with the Court and

24  provide a copy to defendant on Monday, so they would have

25  sufficient time to consider the affidavit and prepare.  We're

1  not trying to hide anything. We're trying to make sure the

2  record is complete as -- as possible.

3        Turning to the James factors -- the *Jacobson*

4  factors, *Cabrera*, *De Amigos*, *Evans*, and *Kolko* all stand for

5  permitting anonymity for sexual assault victims. Rape clearly

6  falls within this factor, therefore, it falls in favor of

7  plaintiff. And we believe that's been consented to by

8  defendant. And we believe that looking at *Doe v. Rector*, the

9  victim should have the same rights as an accused when it comes

10  to sexual assault cases.

11        In retaliatory physical or mental harm, there have

12  been local delays in this case by defendant. The defendant

13  contested personal jurisdiction in Fairfax County, although I

14  doubt and I question why anything that happened before the

15  Fairfax County Court is now relevant in this case. We're

16  engaged in discovery. We'll be providing -- we've already

17  provided our objections. We'll be providing full discovery

18  responses in two weeks.

19        In -- but in Fairfax County, the defendant

20  contested personal jurisdiction. That ate up an entire year,

21  even though he already -- he had been living in Virginia in the

22  Commonwealth, and he had a company that was registered and

23  active in Virginia.

24        The Court, Judge Bellows, rightfully found there

25  was personal jurisdiction. That created a delay for a year.

1 Then we filed -- we filed our responses to -- they didn't serve
2 us with any discovery at all until September 10 of 2020. And
3 this is in a case that we filed September of 2019.

4         We filed responses October 1, in less than -- less
5 than 30 days. Defendant first objected a year later in October
6 of 2021. It wasn't like anyone was really burned up by our
7 initial responses. And this case was not moving at a very
8 rapid rate, which is another reason why we decided to move from
9 Fairfax County this case to get a more expeditious resolution
10 of the case.

11        The risk of harm to plaintiff is very real. She's
12 subject to harassment in the Middle East. She lives and works
13 in the Middle East. If it interests the Court, and this will
14 come out in discovery, she's an offsets -- military offsets
15 expert. Did that for two years for Abu Dhabi government and
16 now represents contractors in the Middle East seeking military
17 contracts and in arranging the offsets.

18        It's kind of an arcane area of military
19 provisioning that we didn't see any reason to go into at this
20 stage of the game. I don't believe it's relevant, but we can
21 go to the expense of getting a doctor's evaluation if it would
22 help fill the record, fill out the record of this case. We
23 would like to move on to the merits of the case and put this
24 particular motion that we see as a distraction behind us.

25        Therefore, we believe that with the support of the

1  affidavit supplied by Jane Doe and the fact she works in the
2  Middle East, she's worked very hard to keep this quiet.  It's
3  not for anybody, including her parents, and she has -- in her
4  affidavit she's detailed the fact she's suffering emotional and
5  psychological harm, as is also set forth in the complaint, we
6  believe weighs in her favor.
7           We concede that the age of the -- that both of the
8  parties are majority age, and therefore the third criteria
9  doesn't have much relevance, although in Virginia -- in the
10 *Virginia Polytechnic*, the Court found this -- this factor to be
11 neutral.
12          As to whether this government or private party, we
13 recognize it's a private party, and this factor weighs slightly
14 against anonymity.
15          The fifth one is the risk of unfairness.  There is
16 no risk of unfairness to defendant.  Defendant has never raised
17 this before, from September 2019 to present.  The plaintiff --
18 unlike in *Cabrera*, the plaintiff has avoided any publicity.
19 We've made no attempt to publicize this action or engage in any
20 communications not absolutely necessary for the prosecution of
21 this case.
22          We did send a litigation hold letter to -- to the
23 defendant's company for -- to make sure they preserve
24 electronic records and e-mails, because below he had stated
25 that he did not retain those himself.

1    We believe that this was -- this practice

2  essentially codified a Virginia Code Section 801-390 -- 379 dot

3  2 1A, requiring the party on notice to -- to put a party on

4  notice to preserve evidence.

5    In fact, some courts have gone so far to find that

6  nonissuance of litigation hold letter constitutes gross

7  negligence.  See *Pension Committee of University of Montreal*

8  *versus Banc of America Securities*, 685 F.Supp. 2d 456.  And we

9  certainly want to avoid any -- any argument in the future that

10 we'd not put parties in hold, they should preserve evidence

11 that we might be asking for in this case and is directly

12 relevant in the case.  So we don't see where litigation hold

13 letter has any relevance to this factor of unfairness.  In

14 fact, we're required to do it.

15    The defendant had admitted in -- in his

16 interrogatory responses in Fairfax County that he has told

17 multiple people, not under privilege, about this case and about

18 the facts of this case.  He told his girlfriend at the time.

19 He told several friends.

20    I've got his interrogatory responses with me, if

21 anyone cares to see them.  I'm not sure that we need to clutter

22 the record with a lot of additional paper on this issue.

23    Third, we -- we seriously question Mr. Sidar's

24 affidavit.  I've supplied an affidavit, along with my extensive

25 handwritten notes, and I've brought all my handwritten notes

1  and all e-mail correspondence from that time with me in case
2  the Court wants to -- to look at those.

3        I've also brought an affidavit from Mr. Urban that
4  says the exact same thing I said.  I was taking notes.  We were
5  together in the meeting.  It was the only call that he was on.
6  We think this is large and irrelevant, but it simply did not
7  happen.

8        The -- I will offer to this Court that there was
9  one instance that he may be recalling in error, and that was
10 during depositions on personal jurisdiction in which Mr.
11 Mitrakas was with the defendant.  And in a break before the
12 court reporter, which was not recorded by the court reporter
13 because we were on break, but the defendant was trying to get
14 sympathy from us, and in kind of a settlement discussion, which
15 is another reason why I didn't bring this up before because it
16 is a settlement discussion that -- that this would ruin his
17 life.  He was going through a divorce.  And -- and Mr. Urban
18 observed that the fact that he had raped someone while he was
19 married, he was causing the problems for his own divorce.  And
20 it wasn't us; and therefore, we didn't have any sympathy.

21       That's the closest thing that I can recall in any
22 conversation I've been in.  And I believe I've been in every
23 conversation that involves this case, and -- and Mr. Urban.

24       The plaintiff's identity is well-known to
25 defendant, so there's no prejudice.  He's known from the

1    beginning who she is.  In fact, they went to Johns Hopkins SAIS
2    (phonetic) together; have known each other for years.  They
3    both went to the London police.  There's no question that he
4    knows who she is.

5            As I said, defendant voluntarily met with the
6    London police and gave a DNA sample without reservation.
7    Defendant's expressed no interest in unmasking the plaintiff
8    until now.  He made no attempt to request to protect his own
9    anonymity or request revealing Jane Doe's identity.  He clearly
10   knows Jane Doe.

11           I would also note that in Pacer, in order to look
12   something up in Pacer, as we all know, you have to know the
13   name of the case and -- before you can get into it, and the
14   defendant has filed an appeal of attorney's fees in the
15   Virginia Supreme Court, which you can also see online.  I don't
16   see where the arguments having to do with the -- with the
17   online system -- I can't remember what it's called in Fairfax
18   County -- how that's relevant, but I think that there's no risk
19   of unfairness here.  And therefore, the fifth factor leans
20   heavily towards pseudonymity.

21           So look at the five factors.  We've got three that
22   lean heavily toward protecting the plaintiff, one that's
23   neutral and one that weighs slightly against.  I think we've
24   clearly met the *James versus Jacobson* factors.

25           I believe that's all I have unless you have more

1   questions for me.

2          THE COURT:  All right.

3          MS. TADROS:  Your Honor, counsel notes that they can

4   get a doctor's note to fill the record.  The record is before

5   you.  This has been fully briefed.  It should not continue past

6   today, past the Court's ruling, because they had every

7   opportunity to do that and have not done that.  And the fact

8   that we're raising it in our pleadings and I'm raising it today

9   should not give the plaintiff an opportunity to go out and find

10  a note that supports her position.

11         As to the waiver argument, I cannot see how

12  proceeding in Fairfax with a pseudonym somehow waives something

13  in a new case in a different court.  I don't know any case that

14  would stand for the proposition that we would have waived this

15  in this instance.

16         As for the CPAN system, it's unique to Fairfax.

17  You can't pull pleadings.  And if you appeal a case in the

18  Virginia Supreme Court, there's still no system to pull

19  pleadings.  You would have to go down to the court in Richmond

20  or go to Lex Group or one of these other services that can go

21  get a pleading for you.  I am not aware of any system that was

22  operational in Fairfax at the time this case was pending that

23  would have allowed you to pull pleadings.

24         Fairfax now has some pilot system.  I don't know if

25  it's up yet where you can E-file, but it certainly was not

1 there.  So, I cannot see how waiver would be any type of

2 argument.

3        The plaintiff also cites the substantial evidence.

4 I haven't seen it, and I have been counsel in this case since

5 October of 2021 or around that time.

6        He did speak to the London police.  He did

7 voluntarily give a DNA sample.  And the London police -- we

8 have this motion next week -- either lost or destroyed his

9 sample.  The witness interview will speak for itself, but he

10 denies the allegations by plaintiff.

11        As far as the text messages, I don't know if

12 they're accurate or not.  She had put WhatsApp messages

13 attached to the motion, a motion in Fairfax, where she had

14 renamed him "London Assailant" in the messages because it was a

15 transcription, so I have no idea what else may or may not have

16 been changed.

17        But getting back to the merits of this case,

18 counsel has cited the *Cabrera* case, the *Kolko* case, and the

19 *De Amigos* case.  And I know we've touched on them, but I would

20 like to just briefly hit on why none of them would apply to

21 what is going on here.

22        The *De Amigos* case is a case where there was a

23 lawsuit against the venue that was serving the plaintiff

24 alcohol.  And the Court granted the motion finding that the

25 stigma that the Court feared would attach to defendants in

1 the -- in other cases is not a particular concern here because

2 the bar is not the alleged attacker.  And significantly in that

3 case the Court will -- stated the defendants will not be barred

4 from revealing plaintiff's identity during discovery because

5 there was no court ordered -- court-issued protective order

6 precluding defendant from revealing her identity.

7      So that case does not support the proposition at

8 all.  This is not where you're suing a bar that served you

9 drinks.  You're suing someone who you're claiming is a rapist,

10 that you have now sued for $12 million in a public filing.

11 $8 million is punitive damages when a statutory cap is

12 $350,000.

13      I understand Your Honor said that motion is denied,

14 and we would bring it at the close of discovery, but -- and we

15 respect the Court's ruling, but I do want to just point out

16 that they've sought $8 million in punitive damages.

17      THE COURT:  All right.  I understand.

18      MS. TADROS:  As of --

19      THE COURT:  You don't need to run through the law for

20 me.

21      MS. TADROS:  All right.  I -- I would just note that

22 last thing in *Cabrera* is that it was not -- that there was a

23 pseudonym designation, but it was not applicable at trial, so

24 she would have to proceed publicly.  So those are two cases

25 where they have to proceed publicly.

1        So, we would ask that the Court grant the motion

2   and remove the pseudonym designation.

3        Thank you, Your Honor.

4        THE COURT:  All right.  Well, this is a matter of

5   personal nature and obviously it involves private parties here,

6   but there is a showing that there can be retaliation or

7   difficulties or mental anguish or harm related to this case in

8   the employment that she has in the area of the world where she

9   is working.  And as to the fairness of the -- to the parties, I

10  don't see that there's any fairness to the defendant to leave

11  this designation in effect, at least for now, through --

12  through discovery.

13       You can renew this at the time of trial, and I

14  will -- I'll not make any determination at the moment as to

15  whether or not she ought to be able to continue this

16  designation at the time of trial, but I think at the present

17  time your motion to remove the designation should be denied

18  there.

19       While I'm not going to consider the issue of

20  waiver, it's obvious that it hasn't been so unfair so far

21  because the designation has been pending there for a couple of

22  years and had no problem.  So, at this time your motion is

23  denied, but if this goes to trial, I'll entertain it again.

24       MS. TADROS:  Thank you, Your Honor.

25       MR. STEIMEL:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2              All right.  We'll adjourn until Monday morning at

3    10:00 o'clock.

4          THE LAW CLERK:  All rise.

5              (PROCEEDINGS CONCLUDED AT 10:58 A.M.)

6                          -oOo-

7

8

9

10

11

12   UNITED STATES DISTRICT COURT    )
     EASTERN DISTRICT OF VIRGINIA    )

13
              I, JULIE A. GOODWIN, Official Court Reporter for
14   the United States District Court, Eastern District of Virginia,
     do hereby certify that the foregoing is a correct transcript
15   from the record of proceedings in the above matter, to the best
     of my ability.
16            I further certify that I am neither counsel for,
     related to, nor employed by any of the parties to the action in
17   which this proceeding was taken, and further that I am not
     financially nor otherwise interested in the outcome of the
18   action.
              Certified to by me this 22ND day of FEBRUARY, 2023.
19

20

21

22            __/s/_____
              JULIE A. GOODWIN, RPR
23            Official U.S. Court Reporter
              401 Courthouse Square
24            Eighth Floor
              Alexandria, Virginia  22314
25

**$**

**$12** [1] - 21:10
**$350,000** [1] - 21:12

**/**

**/s** [1] - 23:22

**1**

**1** [2] - 3:23, 14:4
**10** [1] - 14:2
**10:00** [1] - 23:3
**10:29** [1] - 3:1
**10:58** [1] - 23:5
**1100** [1] - 2:5
**1300** [1] - 2:4
**1455** [1] - 2:8
**17th** [1] - 2:4
**1900** [1] - 2:15
**1:22-CV-545** [1] - 1:5
**1A** [1] - 16:3

**2**

**2** [2] - 5:8, 16:3
**20004** [1] - 2:9
**2019** [5] - 3:21, 5:15, 11:12, 14:3, 15:17
**202.271.9258** [1] - 2:10
**2020** [1] - 14:2
**2021** [3] - 11:13, 14:6, 20:5
**2022** [2] - 1:7, 3:1
**2023** [1] - 23:18
**22-545** [1] - 3:2
**22182** [1] - 2:16
**22209** [1] - 2:5
**22314** [2] - 2:22, 23:24
**22ND** [1] - 23:18
**29** [2] - 1:7, 3:1
**2d** [1] - 16:8

**3**

**30** [1] - 14:5
**30s** [1] - 9:6
**379** [1] - 16:2

**4**

**400** [1] - 2:9
**401** [2] - 2:21, 23:23
**456** [1] - 16:8

**5**

**512.689.7587** [1] - 2:23

**6**

**685** [1] - 16:8

**7**

**700** [1] - 2:15
**703.790.1911** [1] - 2:16
**703.812.0462** [1] - 2:6

**8**

**8** [2] - 21:11, 21:16
**801-390** [1] - 16:2

**A**

**A.M** [2] - 3:1, 23:5
**ability** [2] - 10:9, 23:15
**able** [2] - 10:10, 22:15
**absolutely** [1] - 15:20
**Abu** [1] - 14:15
**academic** [1] - 11:7
**account** [1] - 10:9
**accurate** [1] - 20:12
**accused** [4] - 10:13, 10:18, 12:2, 13:9
**Action** [1] - 3:2
**action** [2] - 15:19, 23:16, 23:18
**active** [1] - 13:23
**additional** [2] - 7:11, 16:22
**address** [3] - 4:19, 7:11, 11:6
**addressing** [1] - 11:5
**adjourn** [1] - 23:2
**admitted** [1] - 16:24
**adults** [1] - 9:6
**affidavit** [23] - 3:24, 4:1, 4:12, 4:13, 4:19, 4:21, 5:6, 6:1, 6:12, 7:1, 7:2, 7:7, 7:18, 12:14, 12:15, 12:18, 12:21, 12:25, 15:1, 15:4, 16:24, 17:3
**affidavits** [2] - 4:3, 4:5
**Afghanistan** [1] - 5:18
**age** [4] - 9:5, 9:12, 15:7, 15:8
**ages** [1] - 7:25
**ahead** [1] - 12:17
**alcohol** [1] - 20:24
**Alexandria** [3] - 2:22, 3:12, 23:24
**ALEXANDRIA** [2] - 1:2, 1:6
**allegation** [2] - 7:14, 8:4
**allegations** [3] - 8:10,

12:21, 20:10
**alleged** [1] - 21:2
**allowed** [4] - 7:5, 12:4, 19:23
**America** [1] - 16:8
**Amigos** [3] - 13:4, 20:19, 20:22
**anguish** [1] - 22:7
**annoyance** [1] - 7:21
**anonymity** [3] - 13:5, 15:14, 18:9
**answers** [1] - 8:8
**appeal** [3] - 3:22, 18:14, 19:17
**appearances** [1] - 3:4
**applicable** [1] - 21:23
**apply** [2] - 11:9, 20:20
**appropriate** [1] - 9:20
**Arab** [1] - 5:9
**arcane** [1] - 14:18
**area** [2] - 14:18, 22:8
**argue** [1] - 4:12
**argument** [6] - 3:13, 3:23, 11:4, 16:9, 19:11, 20:2
**arguments** [3] - 12:3, 12:16, 18:16
**Arlington** [1] - 2:5
**arranging** [1] - 14:17
**article** [2] - 8:17, 8:18
**articles** [1] - 8:14
**Asia** [2] - 8:14, 8:16
**Assailant** [1] - 13:10
**assault** [3] - 7:9, 13:5, 13:10
**AT** [1] - 23:5
**ate** [1] - 13:20
**attach** [1] - 20:25
**attached** [3] - 8:8, 12:8, 20:13
**attack** [2] - 12:6, 12:11
**attacker** [1] - 21:2
**attacking** [1] - 11:4
**attempt** [2] - 15:19, 18:8
**attend** [3] - 6:3, 6:7, 7:22
**attorney's** [1] - 18:14
**Avenue** [1] - 2:8
**avoid** [2] - 7:21, 16:9
**avoided** [1] - 15:18
**aware** [1] - 19:21

**B**

**Banc** [1] - 16:8
**Bar** [1] - 3:10
**bar** [2] - 21:2, 21:8
**barred** [1] - 21:3
**Bars** [1] - 3:12

**baseball** [1] - 7:14
**based** [2] - 5:9, 7:9
**BEFORE** [1] - 1:15
**beginning** [1] - 18:1
**behalf** [2] - 3:6, 3:9
**behind** [1] - 14:24
**believes** [1] - 6:24
**Bellows** [1] - 13:24
**below** [1] - 15:24
**best** [1] - 23:15
**between** [1] - 12:9
**biological** [1] - 9:9
**break** [2] - 17:11, 17:13
**briefed** [1] - 19:5
**briefly** [1] - 20:20
**bring** [2] - 17:15, 20:20
**BROOME** [1] - 2:14
**brought** [4] - 6:13, 8:7, 16:25, 17:3
**burned** [1] - 14:6

**C**

**Cabrera** [8] - 4:3, 4:6, 7:4, 7:13, 13:4, 15:18, 20:18, 21:22
**CACI** [1] - 5:24
**cannot** [2] - 19:11, 20:1
**cap** [1] - 21:11
**care** [1] - 12:23
**cares** [1] - 16:21
**case** [54] - 3:19, 3:20, 4:3, 4:4, 4:5, 4:6, 5:14, 5:15, 6:15, 6:25, 7:4, 8:8, 8:21, 8:23, 9:8, 9:18, 9:19, 10:12, 11:14, 11:18, 11:21, 11:25, 12:2, 12:12, 13:15, 14:3, 14:7, 14:9, 14:10, 14:22, 14:23, 15:21, 16:11, 16:12, 16:17, 16:18, 17:1, 17:23, 18:13, 19:13, 19:17, 19:22, 20:4, 20:17, 20:18, 20:19, 20:22, 21:3, 21:7, 22:7
**cases** [6] - 4:2, 4:5, 8:21, 13:10, 21:1, 21:24
**causing** [2] - 6:10, 17:19
**CENK** [1] - 1:8
**certainly** [2] - 16:9, 19:25
**Certified** [1] - 23:18
**certify** [2] - 23:14,

23:16
**change** [1] - 6:13
**changed** [1] - 20:16
**children** [2] - 9:7, 9:12
**Cincinnati** [1] - 7:15
**circumspect** [1] - 9:15
**cited** [6] - 4:2, 4:4, 7:4, 8:14, 8:21, 20:18
**cites** [1] - 20:3
**Civil** [1] - 3:2
**claim** [1] - 9:5
**claiming** [1] - 21:9
**claims** [2] - 6:16, 8:7
**clarification** [1] - 4:11
**CLAUDE** [1] - 1:15
**clear** [1] - 4:15
**clearly** [3] - 13:5, 18:9, 18:24
**CLERK** [1] - 23:4
**close** [1] - 21:14
**closest** [1] - 17:21
**clutter** [1] - 16:21
**CMH** [1] - 1:5
**Code** [1] - 16:2
**codified** [1] - 16:2
**Committee** [1] - 16:7
**Commonwealth** [1] - 13:22
**communications** [1] - 15:20
**community** [2] - 9:2
**company** [2] - 13:22, 15:23
**complaint** [3] - 10:8, 12:8, 15:5
**complete** [3] - 12:18, 12:22, 13:2
**concede** [1] - 15:7
**concern** [1] - 21:1
**concerns** [1] - 7:16
**CONCLUDED** [1] - 23:5
**confidential** [1] - 6:23
**conjunction** [1] - 5:11
**consented** [1] - 13:7
**consider** [5] - 5:6, 7:17, 8:16, 12:25, 22:19
**considered** [2] - 5:5, 9:4
**considering** [1] - 4:19
**constant** [1] - 7:8
**constitutes** [1] - 16:6
**contact** [1] - 6:17
**contained** [1] - 6:1
**contempt** [1] - 10:18
**contested** [2] - 13:13, 13:20
**continue** [2] - 19:5,

22:15
**contractor** [1] - 5:24
**contractors** [1] - 14:16
**contracts** [1] - 14:17
**contrary** [1] - 12:3
**conversation** [2] - 17:22, 17:23
**copy** [2] - 10:8, 12:24
**Corner** [1] - 2:16
**correct** [1] - 23:14
**correspondence** [1] - 17:1
**counsel** [8] - 3:4, 11:5, 11:15, 12:17, 19:3, 20:4, 20:18, 23:16
**COUNSELORS** [1] - 2:7
**country** [1] - 5:21
**County** [7] - 11:12, 13:13, 13:15, 13:19, 14:9, 16:16, 18:18
**couple** [2] - 8:14, 22:21
**court** [9] - 3:20, 7:2, 10:3, 17:12, 19:13, 19:19, 21:5
**Court** [35] - 2:21, 3:18, 4:1, 4:19, 4:20, 5:3, 5:6, 7:17, 7:21, 8:6, 8:7, 8:15, 8:20, 9:3, 10:14, 10:23, 11:12, 12:18, 12:22, 12:23, 13:15, 13:24, 14:13, 15:10, 17:2, 17:8, 18:15, 19:18, 20:24, 20:25, 21:3, 22:1, 23:13, 23:14, 23:23
**COURT** [15] - 1:1, 2:20, 3:1, 3:8, 3:14, 4:15, 4:22, 4:25, 11:1, 19:2, 21:17, 21:19, 22:4, 23:1, 23:12
**Court's** [2] - 19:6, 21:15
**court-issued** [1] - 21:5
**courtesy** [1] - 12:7
**courthouse** [2] - 10:7, 10:8
**Courthouse** [2] - 2:21, 23:23
**COURTROOM** [1] - 3:2
**courts** [1] - 16:5
**CPAN** [1] - 19:16
**created** [1] - 13:25
**credentials** [1] - 7:7

**credibility** [1] - 8:9
**criteria** [1] - 15:8
**criticism** [1] - 7:22
**current** [1] - 11:15

# D

**D.C** [1] - 2:9
**Dad** [2] - 9:8, 9:10
**dad** [1] - 9:9
**damage** [1] - 6:11
**damages** [2] - 21:11, 21:16
**days** [2] - 5:24, 14:5
**DC** [1] - 3:12
**De** [3] - 13:4, 20:19, 20:22
**dealing** [1] - 8:22
**decided** [2] - 12:17, 14:8
**defendant** [22] - 11:3, 11:10, 11:15, 11:20, 12:10, 12:17, 12:24, 13:8, 13:12, 13:19, 14:5, 15:16, 16:15, 17:11, 17:13, 17:25, 18:5, 18:14, 21:6, 22:10
**DEFENDANT** [1] - 2:13
**Defendant** [1] - 3:6
**defendant's** [3] - 3:17, 15:23, 18:7
**defendants** [2] - 20:25, 21:3
**delay** [1] - 13:25
**delays** [1] - 13:12
**denied** [3] - 21:13, 22:17, 22:23
**denies** [1] - 20:10
**depositions** [1] - 17:10
**DEPUTY** [1] - 3:2
**designation** [13] - 3:17, 4:9, 7:6, 9:16, 10:15, 10:22, 10:24, 21:23, 22:2, 22:11, 22:16, 22:17, 22:21
**destroyed** [1] - 20:8
**detail** [1] - 11:6
**detailed** [4] - 4:5, 12:13, 12:14, 15:4
**details** [4] - 5:21, 5:25, 6:14, 7:2
**determination** [1] - 22:14
**Dhabi** [1] - 5:9
**different** [3] - 5:19, 7:13, 19:13
**difficulties** [1] - 22:7

**directly** [1] - 16:11
**disciplinary** [1] - 10:16
**disclosure** [1] - 7:10
**discovery** [9] - 6:20, 7:6, 13:16, 13:17, 14:2, 14:14, 21:4, 21:14, 22:12
**discussion** [2] - 17:14, 17:16
**distraction** [1] - 14:24
**DISTRICT** [5] - 1:1, 1:1, 1:15, 23:12, 23:12
**District** [3] - 2:21, 23:14
**disturbing** [1] - 6:9
**DIVISION** [1] - 1:2
**divorce** [2] - 17:17, 17:19
**DNA** [3] - 12:11, 18:6, 20:7
**doctor** [1] - 9:9
**doctor's** [2] - 14:21, 19:4
**doctors** [1] - 6:19
**DOE** [1] - 1:4
**Doe** [18] - 3:2, 3:10, 3:18, 3:25, 5:8, 5:12, 8:7, 8:18, 9:6, 11:4, 11:11, 12:1, 12:4, 12:5, 12:19, 13:8, 15:1, 18:10
**Doe's** [1] - 18:9
**dollars** [1] - 9:22
**done** [1] - 19:7
**dot** [1] - 16:2
**doubt** [2] - 8:9, 13:14
**down** [1] - 19:19
**dragged** [1] - 21:9
**drinks** [1] - 21:9
**Dubai** [1] - 5:9
**during** [3] - 7:6, 17:10, 21:4

# E

**E-file** [1] - 19:25
**e-mail** [1] - 17:1
**e-mails** [1] - 15:24
**East** [8] - 5:11, 5:17, 5:23, 6:6, 14:12, 14:13, 14:16, 15:2
**eASTERN** [1] - 23:12
**EASTERN** [1] - 1:1
**Eastern** [1] - 23:14
**effect** [2] - 11:14, 22:11
**Egypt** [1] - 5:20
**Eighth** [2] - 2:22,

23:24
**either** [1] - 20:8
**electronic** [2] - 10:6, 15:24
**Emirates** [1] - 5:10
**emotional** [2] - 6:10, 15:4
**employed** [1] - 23:16
**employment** [1] - 22:8
**endured** [1] - 4:8
**engage** [1] - 15:19
**engaged** [1] - 13:16
**entertain** [1] - 22:23
**entire** [1] - 13:20
**entitled** [1] - 6:25
**entity** [1] - 9:19
**error** [1] - 17:9
**especially** [1] - 12:19
**essentially** [1] - 16:2
**evaluation** [1] - 14:21
**Evans** [1] - 13:4
**evidence** [6] - 8:13, 9:23, 12:5, 16:4, 16:10, 20:3
**exact** [1] - 17:4
**examine** [1] - 8:6
**except** [1] - 8:13
**exercise** [1] - 11:7
**expeditious** [1] - 14:21
**expense** [1] - 14:21
**experience** [1] - 7:10
**expert** [2] - 6:12, 14:15
**explain** [1] - 6:7
**expressed** [1] - 18:7
**extensive** [1] - 16:24

# F

**F.Supp** [1] - 16:8
**fact** [8] - 6:14, 15:1, 15:4, 16:5, 16:14, 17:18, 18:1, 19:7
**factor** [6] - 9:14, 13:6, 15:10, 15:13, 16:13, 18:19
**factors** [6] - 7:20, 10:21, 13:3, 13:4, 18:21, 18:24
**facts** [2] - 3:19, 16:18
**Fairfax** [18] - 3:20, 5:14, 6:21, 6:25, 10:5, 10:6, 11:12, 13:13, 13:15, 13:19, 14:9, 16:16, 18:17, 19:12, 19:16, 19:22, 19:24, 20:13
**fairness** [2] - 22:9, 22:10

**falls** [2] - 13:6
**familiar** [1] - 3:18
**far** [3] - 16:5, 20:11, 22:20
**favor** [2] - 13:6, 15:6
**feared** [1] - 20:25
**FEBRUARY** [1] - 23:18
**federal** [1] - 10:3
**fees** [1] - 18:14
**female** [1] - 10:13
**fifth** [2] - 15:15, 18:19
**file** [3] - 11:14, 12:23, 19:25
**filed** [8] - 3:20, 3:24, 5:4, 10:14, 11:21, 11:25, 14:1, 14:3, 14:4, 18:14
**filing** [2] - 10:6, 21:10
**fill** [3] - 14:22, 19:4
**financially** [1] - 23:17
**FIRM** [1] - 2:3
**first** [2] - 11:21, 14:5
**five** [3] - 8:10, 10:21, 18:21
**FLETCHER** [1] - 2:3
**Floor** [2] - 2:22, 23:24
**following** [1] - 12:19
**FOR** [2] - 2:3, 2:13
**foregoing** [1] - 23:14
**forth** [2] - 5:1, 15:5
**friends** [1] - 16:19
**full** [2] - 12:22, 13:17
**fully** [2] - 9:22, 19:5
**future** [1] - 16:9

# G

**Gallows** [1] - 2:15
**game** [1] - 14:20
**George** [2] - 10:12, 10:15
**Giant** [1] - 6:23
**girlfriend** [1] - 16:18
**GOODWIN** [3] - 2:20, 23:13, 23:22
**Goodwin** [1] - 1:25
**google** [1] - 10:10
**government** [6] - 7:25, 9:13, 9:17, 9:19, 14:15, 15:12
**grant** [1] - 22:1
**granted** [1] - 20:24
**gross** [1] - 16:6
**GROUP** [1] - 2:7
**Group** [1] - 19:20
**guidance** [1] - 12:19

## H

**handwritten** [2] - 16:25
**harassment** [1] - 14:12
**hard** [1] - 15:2
**harm** [11] - 6:10, 7:25, 8:13, 8:20, 8:23, 9:24, 11:23, 13:11, 14:11, 15:5, 22:7
**HEALD** [1] - 2:3
**hear** [1] - 4:20
**HEARING** [1] - 1:14
**heavily** [2] - 18:20, 18:22
**heightened** [1] - 8:23
**help** [1] - 14:22
**hereby** [1] - 23:14
**herself** [1] - 6:22
**hide** [1] - 13:1
**highly** [3] - 7:23, 8:4, 8:5
**HILDRETH** [1] - 2:3
**HILTON** [1] - 1:15
**himself** [1] - 15:25
**history** [1] - 8:8
**hit** [1] - 20:20
**hold** [4] - 15:22, 16:6, 16:10, 16:12
**Honor** [13] - 3:9, 3:16, 4:10, 4:18, 5:2, 10:25, 11:2, 11:3, 19:3, 21:13, 22:3, 22:24, 22:25
**HONORABLE** [1] - 1:15
**Hopkins** [1] - 18:1

## I

**idea** [1] - 20:15
**identification** [1] - 7:24
**identify** [1] - 5:18
**identity** [4] - 17:24, 18:9, 21:4, 21:6
**II** [1] - 2:4
**impact** [1] - 6:8
**important** [1] - 12:1
**impregnate** [1] - 9:11
**inclined** [1] - 5:6
**including** [3] - 4:3, 4:6, 15:3
**individual** [2] - 9:21, 9:24
**information** [2] - 7:1, 7:12
**initial** [1] - 14:7
**injury** [1] - 7:11

**inspire** [1] - 10:18
**instance** [2] - 17:9, 19:15
**insufficient** [1] - 5:7
**interest** [2] - 8:24, 18:7
**interested** [1] - 23:17
**interests** [1] - 14:13
**interrogatory** [3] - 8:8, 16:16, 16:20
**interview** [1] - 20:9
**interviewed** [1] - 12:9
**introduce** [1] - 3:11
**involves** [2] - 17:23, 22:5
**irrelevant** [2] - 11:25, 17:6
**issue** [4] - 8:3, 11:10, 16:22, 22:19
**issued** [1] - 21:5
**issues** [1] - 11:9
**items** [1] - 11:25
**itself** [3] - 4:21, 7:13, 20:9

## J

**Jacobson** [6] - 4:3, 7:20, 9:7, 9:8, 13:3, 18:24
**James** [3] - 3:7, 13:3, 18:24
**JANE** [1] - 1:4
**Jane** [4] - 3:10, 15:1, 18:9, 18:10
**Jason** [1] - 4:3
**Johns** [1] - 18:1
**JR** [1] - 2:8
**Judge** [1] - 13:24
**JUDGE** [1] - 1:15
**JULIE** [3] - 2:20, 23:13, 23:22
**Julie** [1] - 1:25
**JULY** [2] - 1:7, 3:1
**jurisdiction** [4] - 13:13, 13:20, 13:25, 17:10

## K

**keep** [1] - 15:2
**key** [1] - 11:9
**kids** [2] - 9:2, 9:8
**kind** [2] - 14:18, 17:14
**known** [3] - 17:24, 17:25, 18:2
**knows** [2] - 18:4, 18:10
**Kolko** [5] - 4:4, 8:21, 9:18, 13:4, 20:18

## L

**large** [1] - 17:6
**last** [2] - 11:20, 21:22
**lastly** [2] - 8:1, 9:25
**late** [1] - 5:14
**law** [1] - 21:19
**LAW** [3] - 2:3, 2:7, 23:4
**lawsuit** [1] - 20:23
**league** [1] - 7:14
**lean** [1] - 18:22
**leans** [1] - 18:19
**least** [2] - 6:25, 22:11
**leave** [1] - 22:10
**less** [1] - 14:4
**letter** [4] - 15:22, 16:6, 16:13
**Lex** [1] - 19:20
**life** [2] - 3:19, 17:17
**lift** [2] - 11:13, 11:16
**list** [1] - 11:16
**listed** [1] - 7:7
**listen** [1] - 4:15
**litigation** [5] - 6:21, 7:22, 15:22, 16:6, 16:12
**lives** [2] - 11:8, 14:12
**living** [2] - 5:13, 13:21
**local** [1] - 13:12
**locations** [1] - 5:10
**London** [8] - 6:16, 12:10, 12:12, 18:3, 18:6, 20:6, 20:7, 20:14
**look** [7] - 8:7, 9:12, 10:4, 10:5, 17:2, 18:11, 18:21
**looking** [2] - 8:3, 13:8
**looks** [2] - 7:21, 8:17
**lost** [1] - 20:8

## M

**mail** [1] - 17:1
**mails** [1] - 15:24
**major** [1] - 7:14
**majority** [1] - 15:8
**male** [1] - 10:13
**MARIAM** [1] - 2:14
**Mariam** [1] - 3:6
**married** [1] - 17:19
**Mason** [2] - 10:12, 10:15
**matter** [7] - 3:18, 7:23, 8:3, 8:5, 10:2, 22:4, 23:15
**mean** [1] - 4:11
**media** [1] - 7:15
**medicine** [1] - 6:24

**medicines** [1] - 6:21
**meeting** [1] - 17:5
**meetings** [2] - 6:3, 6:7
**member** [2] - 3:10, 3:12
**mental** [5] - 4:7, 7:24, 8:12, 13:11, 22:7
**merely** [1] - 7:21
**merits** [6] - 4:21, 11:5, 11:24, 12:1, 14:23, 20:17
**messages** [4] - 12:8, 20:11, 20:12, 20:14
**met** [2] - 18:5, 18:24
**Middle** [8] - 5:11, 5:17, 5:23, 6:6, 14:12, 14:13, 14:16, 15:2
**might** [1] - 16:21
**military** [3] - 14:14, 14:16, 14:18
**million** [3] - 21:10, 21:11, 21:16
**millions** [1] - 9:22
**misconduct** [1] - 12:3
**Mitrakas** [1] - 7:6
**Mom** [2] - 9:9, 9:11
**moment** [1] - 22:14
**Monday** [2] - 12:24, 23:2
**months** [2] - 5:25, 11:20
**Montreal** [1] - 16:7
**morning** [5] - 3:8, 3:14, 3:15, 11:2, 23:2
**MOTION** [1] - 1:14
**motion** [13] - 3:17, 6:8, 11:5, 11:14, 14:24, 20:8, 20:13, 20:24, 21:13, 22:1, 22:17, 22:22
**move** [3] - 11:24, 14:8, 14:23
**moving** [1] - 14:7
**MR** [8] - 2:4, 2:8, 3:9, 3:15, 4:10, 4:17, 11:2, 22:25
**MS** [11] - 2:14, 2:20, 3:6, 3:16, 4:18, 4:24, 5:2, 19:3, 21:18, 21:21, 22:24
**mtadros@ reesbroome.com** [1] - 2:17
**mud** [1] - 10:2
**multiple** [1] - 16:17

## N

**N.W** [1] - 2:8

**name** [4] - 6:13, 7:10, 10:1, 18:13
**nature** [3] - 7:23, 8:4, 22:5
**necessary** [1] - 15:20
**necessity** [1] - 4:8
**need** [2] - 16:21, 21:19
**negligence** [1] - 16:7
**neutral** [2] - 15:11, 18:23
**never** [2] - 6:20, 15:16
**new** [1] - 19:13
**New** [1] - 12:20
**newspaper** [1] - 8:17
**next** [1] - 20:8
**none** [2] - 7:1, 20:20
**nonissuance** [1] - 16:6
**nonsuited** [2] - 3:21, 11:15
**North** [1] - 2:4
**note** [6] - 3:4, 6:19, 18:11, 19:4, 19:10, 21:21
**notes** [2] - 16:25, 17:4, 19:3
**notice** [2] - 16:3, 16:4
**November** [1] - 11:12
**Number** [1] - 3:2

## O

**o'clock** [1] - 23:3
**objected** [1] - 14:5
**objection** [6] - 3:24, 4:12, 4:18, 5:2, 11:21, 12:11
**objections** [1] - 13:17
**observed** [1] - 17:18
**obvious** [1] - 22:20
**obviously** [1] - 22:5
**October** [3] - 14:4, 14:5, 20:5
**OF** [4] - 1:1, 1:14, 2:3, 23:12
**offer** [1] - 17:8
**OFFICIAL** [1] - 2:20
**Official** [2] - 23:13, 23:23
**offsets** [1] - 14:14, 14:17
**old** [1] - 8:11
**one** [10] - 8:21, 10:14, 10:16, 10:17, 11:10, 15:15, 17:9, 18:22, 18:23, 19:20
**online** [3] - 8:17, 18:15, 18:17
**oOo** [1] - 23:6
**OPEN** [1] - 3:1

operational [1] - 19:22
opinion [1] - 4:7
opportunity [2] - 19:7, 19:9
opposed [1] - 10:4
opposing [2] - 8:2, 9:25
opposition [2] - 5:4, 5:5
order [4] - 9:10, 12:21, 18:11, 21:5
ordered [1] - 21:5
originally [1] - 3:20
otherwise [1] - 23:17
ought [1] - 22:15
outcome [1] - 23:17
own [2] - 17:19, 18:8

**P**

Pacer [4] - 10:4, 10:9, 18:11, 18:12
pain [1] - 6:10
panel [1] - 3:22
paper [1] - 16:22
paragraph [1] - 5:8
parents [1] - 15:3
particular [3] - 6:8, 14:24, 21:1
parties [7] - 12:9, 15:8, 16:10, 22:5, 22:9, 23:16
party [10] - 8:1, 8:2, 9:14, 9:15, 10:1, 12:20, 15:12, 15:13, 16:3
past [2] - 19:5, 19:6
PC [1] - 2:14
pending [4] - 5:15, 10:7, 19:22, 22:21
Pennsylvania [1] - 2:8
Pension [1] - 16:7
people [2] - 11:7, 16:17
people's [1] - 11:8
period [1] - 7:6
periods [1] - 7:8
permitted [1] - 11:11
permitting [1] - 13:5
person [2] - 6:4, 7:25
personal [9] - 6:10, 7:23, 8:4, 8:5, 13:13, 13:20, 13:25, 17:10, 22:5
persons [1] - 9:5
pharmacy [1] - 6:22
phonetic [2] - 3:22, 18:2
physical [3] - 7:24, 8:12, 13:11

piecemeal [1] - 5:1
pilot [1] - 19:24
PLAINTIFF [1] - 2:3
Plaintiff [1] - 3:10
plaintiff [19] - 3:18, 4:8, 6:22, 8:21, 9:14, 10:13, 11:23, 12:2, 12:13, 13:7, 14:11, 15:17, 15:18, 18:7, 18:22, 19:9, 20:3, 20:10, 20:23
plaintiff's [2] - 17:24, 21:4
plaintiffs [2] - 4:4, 7:5
player [1] - 7:14
PLC [1] - 2:3
pleading [1] - 19:21
pleadings [5] - 11:3, 19:8, 19:17, 19:19, 19:23
PLLC [1] - 2:7
point [2] - 11:13, 21:15
police [8] - 6:17, 12:10, 12:12, 18:3, 18:6, 20:6, 20:7
Polytechnic [1] - 15:10
poses [1] - 7:24
position [2] - 6:22, 19:10
possible [1] - 13:2
practice [1] - 16:1
precluding [1] - 21:6
prejudice [2] - 12:13, 17:25
prepare [1] - 12:25
present [2] - 15:17, 22:16
preserve [4] - 7:22, 15:23, 16:4, 16:10
principally [1] - 5:9
private [8] - 8:1, 9:14, 9:15, 9:21, 9:24, 15:12, 15:13, 22:5
privilege [1] - 16:17
problem [1] - 22:22
problems [1] - 17:19
proceed [3] - 7:5, 21:24, 21:25
proceeding [3] - 10:16, 19:12, 23:17
PROCEEDINGS [1] - 23:5
Proceedings [1] - 1:24
proceedings [1] - 23:15
produced [1] - 1:24
professional [1] - 6:11

proper [1] - 10:14
proposition [2] - 19:14, 21:17
prosecution [1] - 15:20
protect [1] - 18:8
protecting [1] - 18:22
protection [1] - 12:7
protective [1] - 21:5
provide [2] - 12:18, 12:24
provided [6] - 3:25, 12:6, 12:11, 12:14, 12:15, 13:17
provides [1] - 7:1
providing [2] - 13:16, 13:17
provisioning [1] - 14:19
pseudonym [16] - 3:17, 4:9, 7:6, 9:6, 9:16, 9:20, 10:15, 10:22, 11:11, 11:14, 11:16, 11:19, 12:4, 19:12, 21:23, 22:2
pseudonymity [2] - 12:20, 18:20
psychological [2] - 6:10, 15:5
public [6] - 6:13, 7:10, 8:24, 8:25, 10:2, 21:10
publication [1] - 8:15
publicity [1] - 15:18
publicize [2] - 6:14, 15:19
publicly [2] - 21:24, 21:25
pull [3] - 19:17, 19:18, 19:23
punitive [2] - 21:11, 21:16
put [4] - 14:23, 16:3, 16:10, 20:12

**Q**

qualification [1] - 12:12
qualified [1] - 4:7
quasi [1] - 9:19
quasi-government [1] - 9:19
questions [1] - 19:1
quiet [1] - 15:2

**R**

rabbi [2] - 8:22, 8:25
raised [2] - 5:5, 15:16

raising [4] - 5:4, 11:21, 19:8
rape [4] - 6:9, 7:14, 10:19, 13:5
raped [1] - 17:18
rapid [1] - 14:8
rapist [1] - 21:9
rate [1] - 14:8
real [3] - 11:7, 14:11
really [5] - 5:17, 6:18, 9:9, 10:5, 10:9, 10:22, 14:6
reason [3] - 14:8, 14:19, 17:15
reasons [2] - 8:9, 10:23
recalling [1] - 17:9
recognize [1] - 15:13
record [12] - 3:5, 10:3, 11:17, 12:19, 12:22, 13:2, 14:22, 16:22, 19:4, 23:15
recorded [1] - 17:12
records [1] - 15:24
Rector [2] - 12:1, 13:8
Reds [1] - 7:15
REES [1] - 2:14
refiling [1] - 11:18
registered [1] - 13:22
rehearing [1] - 12:20
related [2] - 22:7, 23:16
relevance [2] - 15:9, 16:13
relevant [4] - 13:15, 14:20, 16:12, 18:18
relied [1] - 4:2
remember [1] - 18:17
remove [3] - 3:17, 22:2, 22:17
renamed [1] - 20:14
renew [1] - 22:13
reported [1] - 1:24
reporter [2] - 17:12
Reporter [2] - 23:13, 23:23
REPORTER [1] - 2:20
representing [1] - 11:15
represents [1] - 14:16
request [5] - 7:21, 10:23, 11:19, 18:8, 18:9
required [1] - 16:14
requiring [1] - 16:3
reservation [1] - 18:6
resident [1] - 3:12
resolution [1] - 14:9
respect [1] - 21:15

responses [6] - 13:18, 14:1, 14:4, 14:7, 16:16, 16:20
result [1] - 7:11
retain [1] - 15:25
retaliation [3] - 8:22, 10:18, 22:6
retaliatory [3] - 7:24, 8:12, 13:11
revealing [2] - 18:9, 21:4, 21:6
reviewed [1] - 5:3
reviewing [1] - 11:3
Richmond [1] - 19:19
rick [1] - 3:22
rightfully [1] - 13:24
rights [1] - 13:9
rise [1] - 23:4
risk [12] - 5:22, 7:24, 8:1, 8:12, 9:7, 9:11, 9:25, 10:19, 14:11, 15:15, 15:16, 18:18
risks [3] - 9:16, 9:23, 10:10
Road [1] - 2:15
RPR [2] - 2:20, 23:22
ruin [1] - 17:16
rule [1] - 4:25
ruling [2] - 19:6, 21:15
run [1] - 21:19

**S**

SAIS [1] - 18:1
sample [3] - 18:6, 20:7, 20:9
screwed [1] - 10:16
Section [1] - 16:2
Securities [1] - 16:8
see [7] - 7:18, 14:19, 14:24, 16:7, 16:12, 16:21, 18:15, 18:16, 19:11, 20:1, 22:10
seeking [2] - 12:20, 14:16
semen [1] - 9:10
send [1] - 15:22
sensitive [3] - 7:23, 8:4, 8:5
September [7] - 3:21, 3:23, 5:15, 11:12, 14:2, 14:3, 15:17
serious [1] - 9:23
seriously [1] - 16:23
serve [1] - 14:1
served [1] - 21:8
services [1] - 19:20
serving [1] - 20:23
set [1] - 15:5
settlement [2] - 17:14,

17:16
**several** [2] - 4:2, 16:19
**sexual** [3] - 12:6, 13:5, 13:10
**showing** [1] - 22:6
**shunned** [2] - 9:1, 9:2
**SIDAR** [1] - 1:8
**Sidar** [5] - 3:3, 3:7, 9:21, 11:10, 11:20
**Sidar's** [1] - 16:23
**significant** [2] - 9:11, 10:11, 10:19
**significantly** [2] - 8:22, 21:2
**similar** [1] - 10:12
**simply** [1] - 17:6
**six** [2] - 5:25, 11:20
**slightly** [2] - 15:13, 18:23
**Smith** [1] - 12:19
**social** [3] - 4:6, 7:7, 7:9
**someone** [5] - 4:6, 7:5, 8:25, 17:18, 21:9
**sought** [1] - 21:16
**sounds** [1] - 4:13
**specific** [1] - 5:22
**spend** [1] - 5:10
**spending** [1] - 5:17
**spends** [2] - 5:23, 11:4
**Square** [2] - 2:21, 23:23
**stage** [1] - 14:20
**stand** [4] - 4:18, 5:2, 13:4, 19:14
**standard** [1] - 8:17
**standing** [1] - 5:14
**state** [3] - 4:7, 6:5, 6:6
**STATES** [3] - 1:1, 1:15, 23:12
**states** [1] - 6:9
**States** [3] - 2:21, 6:6, 23:14
**statutory** [1] - 21:11
**Steimel** [1] - 3:11
**STEIMEL** [5] - 2:7, 2:8, 3:15, 11:2, 22:25
**stenotype** [1] - 1:24
**stigma** [1] - 20:25
**still** [3] - 9:22, 11:16, 19:18
**story** [1] - 7:13
**Street** [1] - 2:4
**strike** [1] - 10:23
**strong** [1] - 12:3
**student** [2] - 12:2

**subject** [1] - 14:12
**subsequently** [1] - 3:21
**substantial** [2] - 12:5, 20:3
**sued** [3] - 9:21, 10:1, 21:10
**suffer** [1] - 9:16
**suffering** [1] - 15:4
**sufficient** [1] - 12:25
**suing** [2] - 21:8, 21:9
**suit** [2] - 10:7, 10:14
**Suite** [3] - 2:5, 2:9, 2:15
**supplied** [2] - 15:1, 16:24
**supply** [1] - 12:18
**support** [3] - 12:21, 14:25, 21:7
**supportable** [1] - 7:3
**supported** [1] - 12:16
**supports** [1] - 19:10
**Supreme** [2] - 18:15, 19:18
**sympathy** [2] - 17:14, 17:20
**system** [5] - 18:17, 19:16, 19:18, 19:21, 19:24

**T**

**TADROS** [10] - 2:14, 3:6, 3:16, 4:18, 4:24, 5:2, 19:3, 21:18, 21:21, 22:24
**Tadros** [2] - 3:6, 4:11
**terrible** [1] - 9:3
**Texas** [1] - 3:12
**text** [2] - 12:8, 20:11
**THE** [17] - 1:15, 2:3, 2:3, 2:13, 3:2, 3:8, 3:14, 4:15, 4:22, 4:25, 11:1, 19:2, 21:17, 21:19, 22:4, 23:1, 23:4
**themselves** [1] - 7:20
**therefore** [6] - 4:8, 13:6, 14:25, 15:8, 17:20, 18:19
**they've** [1] - 21:16
**third** [2] - 15:8, 16:23
**THOMAS** [1] - 2:4
**threats** [2] - 8:23, 8:24
**three** [1] - 18:21
**today** [6] - 3:13, 3:16, 5:15, 11:6, 19:6, 19:8
**together** [2] - 17:5, 18:2

**Tom** [1] - 3:9
**took** [2] - 6:22, 12:23
**touched** [1] - 20:19
**toward** [1] - 18:22
**towards** [1] - 18:20
**training** [1] - 7:10
**TRANSCRIPT** [1] - 1:14
**transcript** [2] - 1:24, 23:14
**transcription** [1] - 20:15
**trauma** [1] - 4:8
**traumatized** [1] - 11:23
**treatises** [1] - 8:16
**treatment** [2] - 7:8, 7:9
**trial** [5] - 7:7, 21:23, 22:13, 22:16, 22:23
**true** [1] - 8:5
**trying** [4] - 11:22, 13:1, 17:13
**turned** [1] - 6:20
**turning** [2] - 7:20, 13:3
**two** [7] - 3:21, 5:24, 11:9, 11:11, 13:18, 14:15, 21:24
**type** [1] - 20:1
**Tysons** [1] - 2:16

**U**

**U.S** [2] - 2:20, 23:23
**UAE** [1] - 5:19
**unclear** [1] - 4:13
**under** [1] - 16:17
**unfair** [1] - 22:20
**unfairness** [7] - 8:1, 9:25, 10:19, 15:15, 15:16, 16:13, 18:19
**unique** [1] - 19:16
**United** [4] - 2:21, 5:9, 6:5, 23:14
**UNITED** [2] - 1:1, 1:15
**uNITED** [1] - 23:12
**University** [1] - 16:7
**unless** [1] - 18:25
**unlike** [1] - 15:18
**unmasking** [1] - 18:7
**up** [10] - 4:16, 6:13, 10:4, 10:5, 10:16, 13:20, 14:6, 17:15, 18:12, 19:25
**urban** [2] - 17:3, 17:17
**Urban** [2] - 3:9, 17:23
**URBAN** [4] - 2:4, 3:9, 4:10, 4:17
**urban@fhhlaw.com** [1] - 2:6

**V**

**vacuum** [1] - 8:6
**venue** [1] - 20:23
**versus** [3] - 3:3, 16:8, 18:24
**victim** [3] - 10:17, 12:6, 13:9
**victims** [1] - 13:5
**view** [1] - 4:21
**VIRGINIA** [3] - 1:1, 1:6, 23:12
**Virginia** [12] - 2:5, 2:16, 2:22, 3:10, 13:21, 13:23, 15:9, 15:10, 16:2, 18:15, 19:18, 23:14, 23:24
**voluntarily** [2] - 18:5, 20:7
**VS** [1] - 1:5

**W**

**waived** [1] - 19:14
**waiver** [4] - 11:10, 19:11, 20:1, 22:20
**waives** [1] - 19:12
**Walgreens** [1] - 6:23
**WALTER** [1] - 2:8
**Walter** [1] - 3:11
**wants** [1] - 17:2
**Washington** [1] - 2:9
**week** [1] - 20:8
**weeks** [1] - 13:18
**weigh** [1] - 10:22
**weighs** [5] - 9:5, 9:14, 15:6, 15:13, 18:23
**weight** [1] - 7:19
**well-known** [1] - 17:24
**wes@sclgrp.com** [1] - 2:10
**WhatsApp** [1] - 20:12
**willingly** [1] - 12:10
**withdrawing** [1] - 4:11
**witness** [1] - 20:9
**woefully** [1] - 5:7
**wonder** [1] - 11:22
**worker's** [2] - 7:7, 7:10
**workers** [1] - 4:6
**works** [4] - 5:16, 6:2, 14:12, 15:1
**world** [1] - 22:8

**Y**

**year** [3] - 13:20, 13:25, 14:5
**years** [6] - 3:21, 8:10, 11:11, 14:15, 18:2,

22:22
**York** [1] - 12:20

## ** CIVIL MINUTES **

Date: <u>7/29/2022</u>                                  Judge: <u>Hilton</u>
Time: <u>10:29 am to 10:59 am</u>
Reporter: <u>J.Egal</u>

Civil Action Number:   <u>1:22cv545</u>

Doe v. Sidar

| Counsel for Plaintiff: | Counsel for Defendant: |
|---|---|
| Walter Steimel , Jr.<br>Thomas Urban, II | Mariam Tadros |

Appearance of counsel

Matter on for Motion to Remove Pseudonym Designation

Motion argued and DENIED

Order to follow

JA319

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| JANE DOE | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:22-cv-00545 |
| | ) |
| | ) |
| CENK SIDAR, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ORDER

THIS MATTER comes before the Court on Defendant's Motion to Remove Pseudonym Designation. For the aforementioned reasons stated from the bench, it is hereby

ORDERED that the motion is DENIED.

*Claude M. Hilton*
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
July 29, 2022

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : Civil Action No. 1:22-cv-00545 (CMH/TCB) | |
| | : | |
| CENK SIDAR | : | |
| | : | |
| Defendant. | : | |

_____

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO OBTAIN PHYSICAL**
**EXAMINATION OF AND DNA SAMPLE FROM DEFENDANT**

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Opposition to Plaintiff Jane Doe's ("Plaintiff) Motion to Obtain Physical Examination of and DNA Sample from Defendant ("Motion").

Plaintiff's Motion should be denied, as a threshold matter, on the grounds that she failed to comply with this Court's Local Rules, including the requirement of a meaningful meet-and-confer. Additionally, Plaintiff fails to demonstrate that a DNA sample from Defendant is relevant to any party's claim or defense because Plaintiff fails to explain how she intends to compare a DNA sample compelled from Defendant to anything. Plaintiff also falls far short of her burden of establishing a prima facie showing of a reasonable possibility of a match between the alleged DNA sample from her and one from Defendant. Additionally, Plaintiff's grossly overbroad and vague request fails to comply with Rule 35 by omitting, *inter alia*, the manner, conditions, and scope of the examination, as well as the person(s) who will perform it. In sum, Plaintiff is making a request for unprecedented "relief" with little more than the unverified general allegations in her complaint as support. As such, her request should be denied and Defendant should be granted a protective order.

## I.   **BACKGROUND.**

On May 12, 2022, Plaintiff Jane Doe filed a Complaint against Defendant for assault (Count I), battery (Count II), and intentional infliction of emotional distress (Count III) resulting from an alleged rape. On July 15, 2022, Plaintiff served to Defendant Plaintiff's Notice of Physical Examination and DNA Sampling of Defendant ("Notice") (ECF No. 26-1). The Notice provides that Plaintiff "will conduct an [sic] Physical Examination of Defendant . . . which will include the taking of a sample of Defendant's Deoxyribonucleic acid (DNA)." ECF No. 26-1 at 1. The Notice is "for the taking of samples of Defendant's DNA for the purposes of DNA testing

1

and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit." ECF No. 26-1 at 1.

Plaintiff continues that "[t]hese tests will be analyzed by one or more independent laboratories of Plaintiff's choosing" and that "Defendant will present himself for the taking of these samples at the office of Plaintiff's Counsel . . . ." ECF No. 26-1 at 1. The Notice provides that "[t]he inspection and taking of the DNA sample will be for the purpose, *among other things*, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by The Havens." ECF No. 26-1 at 1 (emphasis added). Plaintiff asserts that "[t]his information will further be relevant to Plaintiff's claim for punitive damages." ECF No. 26-1 at 1. As detailed in Part II.B, *infra*, Plaintiff failed to make any meaningful effort to meet and confer regarding the compulsion of a DNA sample, essentially just requesting Defendant's counsel's availability for a hearing; the first of the two dates offered would not have even permitted a full briefing schedule.

A few hours after serving her Notice, also on July 15, 2022, Plaintiff filed her Motion to Obtain Physical Examination of and DNA Sample from Defendant ("Motion").[1] In her Motion, "Plaintiff seeks samples of Defendant's blood, hair, skin, urine, and a saliva swab for purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit" and asserts that "[t]hese tests will be analyzed by one or more independent laboratories of Plaintiff's choosing." ECF No. 26 ¶ 2. Plaintiff reiterates that she "seeks to have Defendant present himself for the taking of these samples **at the office of Plaintiff's Counsel**" and that "[t]he inspection will be for the purpose, *among other things*, of determining whether

---

[1] Plaintiff failed once again to comply with the local rules which require a separate motion and written brief. *See* Local Civ. R. 7(F)(1); Local Civ. R. 37(A) (noting that a motion to compel "must be accompanied by a brief").

Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by the Havens." ECF No. 26 ¶¶ 3-4 (emphasis added).

In accordance with Local Rule 26(C), simultaneously with this Opposition, Defendant serves his objections to the Notice. *See* **Exhibit A**, Defendant's Objections to Plaintiff's Notice of Physical Examination and DNA Sampling of Defendant.

## II.      ARGUMENT.

### A.      Legal Standard.

Rule 35 provides that a court "may order a party whose mental or physical condition—including blood group—is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1). An order "may be made only on motion for good cause." Fed. R. Civ. P. 35(a)(2)(A). The Fourth Circuit has held that "[u]nder Rule 35, the invasion of the individual's privacy by a physical or mental examination is so serious that a strict standard of good cause, supervised by the district courts, is manifestly appropriate." *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962); *see also Petition of Trinidad Corp.*, 238 F. Supp. 928, 936 (E.D. Va. 1965) (relying on the United States Supreme Court opinion *Schlagenhauf v. Holder* and stating "[i]t is plain" that the good cause requirement under Rule 35 "is not to be treated lightly").

The United States Supreme Court has discussed the "in controversy" and "good cause" requirements applicable to Rule 35, stating that these requirements "are not met by mere conclusory allegations of the pleadings—nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). Therefore, the Court noted,

Rule 35 "requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations had adequately demonstrated the existence of the Rule's requirements of 'in controversy' and 'good cause.'" *Id.* at 118-19. "[T]he movant must produce sufficient information, by whatever means, so that the district judge can fulfill his function mandated by the Rule." *Id.* at 119. Furthermore, even if a party shows good cause, the court still has discretion as to whether to order an examination under Rule 35. *See, e.g., Curtis v. Express, Inc.,* 868 F. Supp. 467, 468 (N.D.N.Y. 1994) ("Even if good cause is shown, it is still within the court's discretion to determine whether to order an examination."); *Great W. Life Assurance Co. v. Levithan*, 153 F.R.D. 74, 76 (E.D. Pa. 1994) ("Thus, an order for the physical or mental examination of a party is not granted as of right and when the matter is contested, it is addressed to the sound discretion of the trial court."); *Peters v. Nelson*, 153 F.R.D. 635, 638 (N.D. Iowa 1994) ("Rather, even when good cause is shown, whether to order a proposed examination is committed to the discretion of the court."); *Stinchcomb v. U.S.*, 132 F.R.D. 29, 30 (E.D. Pa. 1990) ("Even when good cause is shown, whether to order a proposed examination is committed to the discretion of the court."); *Hardy v. Riser*, 309 F. Supp. 1234, 1241 (N.D. Miss. 1970) ("Even when the 'good cause' and 'in controversy' requirements are met, it is still in the sound discretion of the trial court whether to order the examination.").

### B. Plaintiff Failed to Make Any Meaningful Effort to Meet and Confer.

As a threshold matter, Plaintiff, through her counsel, failed to make any meaningful effort to meet and confer before filing the present Motion, in derogation of the Local Rules. Local Civil Rule 37, relating to Motions to Compel and Sanctions, provides:

> Counsel shall confer to decrease, in every way possible the filing of
> unnecessary discovery motions. No motion concerning discovery

4

> matters may be filed until counsel shall have conferred in person or by telephone to explore with opposing counsel the possibility of resolving the discovery matters in controversy. The Court will not consider any motion concerning discovery matters unless the motion is accompanied by a statement of counsel that a good faith effort has been made between counsel to resolve the discovery matters at issue.

Local Civ. R. 37(E). Plaintiff merely alleges in her Motion that "Plaintiff has provided the attached Notice to Defendant, who has refused to consent to a request to voluntarily comply with the Notice" and "[t]herefore, Plaintiff has been forced to file this Motion to seek that the Court order such compliance." ECF No. 26 ¶ 9. In fact, Plaintiff's counsel emailed Defendant's counsel on July 14, 2022, stating: "[W]e will be filing a motion to have a DNA sample taken from your client. Please let us know if you will consent to providing that DNA sample. If not, please let us know if you are available on July 29 or August 5 to have that motion heard by the Court." Defendant's counsel indicated that Defendant did not consent and that she was available August 5 for the motion. The next day, July 15, 2022, Plaintiff's counsel sent Defendant's counsel the Notice and a few hours later filed the instant Motion. There was neither a conference in person or by telephone, nor had Plaintiff's counsel requested either.

Additionally, the time for Defendant to lodge an objection to the Notice had not even passed. Pursuant to the Local Rules, "an objection to any . . . application under Fed. R. Civ. P. 26 through 37, shall be served within fifteen (15) days after the service of the . . . application." Local Civ. R. 26(C). Defendant is permitted fifteen days from the date of service, alone, to object to the Notice. Plaintiff's filing of a Motion to Compel a few hours after serving the Notice is akin to asking a party if they would provide responses to discovery, even before serving the actual discovery requests themselves upon that party, then serving discovery on the party, and then, within the same day, filing a motion to compel, all before the fifteen-day deadline for filing

<div align="center">5</div>

objections has even passed, let alone the actual deadline for providing responses. This improper behavior and failure to comply with this Court's Local Rules, alone, is sufficient to deny the Motion.

### C.    The Request is Not Relevant to Any Party's Claim or Defenses.

Plaintiff's request is not relevant to any party's claim or defense because a DNA sample is meaningless in a vacuum.[2]

Plaintiff fails to explain, nor can she, how she intends to compare a sample compelled from Defendant to anything. Plaintiff asserts that her "counsel will also request cooperation with the Metropolitan Police of London and judicial authorities in the U.K. under the Hague Convention and pursuant to applicable mutual assistance treaties in order to obtain DNA and other evidence in their possession that are relevant to the matters in this case." ECF No. 1 ¶ 4.  However, Plaintiff's counsel has not actually done so or provided any sort of correspondence or affidavit from the London Police stating that they would provide the sample to Plaintiff and her counsel or even whether such sample still exists.   Plaintiff admits that the London Police have already lost a previously-provided DNA sample. *See* ECF No. 26 ¶ 17; *see also* ECF No. 25 at 3 (noting that the London Metropolitan Police's testing lab "accidentally lost or destroyed" the DNA sample). Additionally, Plaintiff fails to allege that there is a DNA sample at The Havens that is of such a quantity and of such a quality as to allow for accurate DNA analysis. She has also not established

---

[2] Plaintiff also alleges that "DNA was obtained on the clothes of Plaintiff, as well as part of a rape kit taken by the medical clinic, The Havens." ECF No. 26 ¶ 1. She states that "[t]he DNA sample is relevant because . . . there is a previous DNA sample against which it can be compared that was taken from Plaintiff's clothing soon after the rape." ECF No. 26 ¶ 17. Firstly, Plaintiff fails to establish how DNA found on Plaintiff's clothing would establish a rape. Defendant's DNA on Plaintiff's clothes would not be surprising, as Plaintiff admitted in her Complaint that she agreed to stay with Defendant for two nights. *See* ECF No. 1 ¶ 19 ("Defendant offered his apartment, in the SoHo area of London, as an alternative and free place to stay for the extra two days. Plaintiff accepted . . . ."); ECF No. 1 ¶ 20 ("Defendant invited Plaintiff to stay in the apartment's bed and stated he would sleep on the sofa in the living room area. Plaintiff agreed to this arrangement . . . ."); ¶ 21 (noting that Plaintiff was sleeping "in the apartment's bed").

that the integrity of The Havens sample has been preserved or that it even still exists. As Plaintiff has failed to establish that she will be able to compare a sample obtained from Defendant to anything, she is not entitled to such a sample.

**B.      Plaintiff Has Not Established Good Cause.**

1.      "Good Cause" Requires More than Mere Relevancy.

The United States Supreme Court has held that physical and mental examinations of parties under Rule 35 are "limited by Rule 26(b)'s provision that 'the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . .'" *Schlagenhauf v. Holder*, 379 U.S. 104, 117 (1964) (citing Fed. R. Civ. P. 26(b)). However, "[t]he scope of Rule 35, Federal Rules of Civil Procedure, is not coextensive with that of Rule 26, Federal Rules of Civil Procedure." *In re Mitchell*, 563 F.2d 143, 143 (5th Cir. 1977)

As the Fourth Circuit has noted, "[t]he specific requirement of good cause would be meaningless if good cause could be sufficiently established by merely showing that the desired materials are relevant, for the relevancy standard had already been imposed by Rule 26(b)." *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962). The court concluded that the addition of the "good cause" requirement indicated that there must be "greater showing of need" than under other discovery rules. *Id.* Therefore, in order to establish that she is entitled to a DNA sample pursuant to Rule 35, Plaintiff has a much higher burden than mere relevancy, which is not met by her general allegations, as detailed below.

2.      Plaintiff Has Failed to Make a Prima Facie Showing of a Reasonable Possibility of a Match.

In *Schlagenhauf v. Holder*, the United Supreme Court addressed the compulsion of mental and physical examinations under Rule 35.[3] 379 U.S. 104 (1964). The matter was a mandamus proceeding challenging the district court's order requiring a defendant to submit to mental and physical examinations. *Id.* at 106. The Court held that "the movant must produce sufficient information, by whatever means, so that the district judge can fulfill his function mandated by the Rule." *Id.* at 119. The Court concluded that "[m]ental and physical examinations are only to be ordered upon a discriminating application by the district judge of the limitations prescribed by the Rule." *Id.* at 120. Plaintiff has fallen far short of her duty to provide sufficient information, instead generally asserting that "[t]here is authority under the Federal Rules for ordering a DNA sample" and cites to the cases of *D'Angelo v. Potter* and *McGrath v. Nassan Health Care Corporation.* ECF No. 26 ¶ 12. However, neither of these cases that Plaintiff relies upon offers any support for her and are easily distinguishable.

In *D'Angelo v. Potter*, the plaintiff brought a sexual assault claim against a male supervisor, alleging that he raped her in the boiler room of a postal station. 224 F.R.D. 300 (D. Mass. 2004). She sought an order compelling the defendant to provide samples of his DNA for testing whether his DNA matched semen found in the boiler room. *Id.* at 301. The plaintiff had testified at her deposition that the defendant had raped her, but the defendant denied that he ever had sexual relations with her, consensual or otherwise. *Id*. A senior forensic chemist with the Postal Inspection Service had taken swabs from the boiler room and two tested positive for the presence of semen. *Id.*

---

[3] While this case did not involve the actual taking of a DNA sample, many of the district courts ruling on the issues of compelling a DNA sample look to this case for guidance and apply the principles mandated by the United States Supreme Court when interpreting Rule 35.

The defendant argued that his DNA was not "in controversy" and that "good cause" had not been "shown" for an examination of his DNA. The court began by noting that DNA testing "is an 'extreme discovery tool' in that it is only in a very few cases where, as a matter of discovery in a civil suit, litigants are required to provide such a sample." *Id.* at 303. The court next determined that the plaintiff had made "a prima facie showing of a reasonable possibility of a match" because two of the swabs that the forensic chemist took from the boiler room tested positive for semen and that the plaintiff testified as to what occurred in the boiler room and had, therefore, shown a reasonable possibility of a match. *Id.* The court held that in the instant case, the plaintiff had offered an evidentiary basis for concluding that the semen belonged to defendant. Unlike in *D'Angelo*, Plaintiff has not established that a useable sample was recovered by the London Police or that such sample still exists or that its integrity has been maintained. Absent an affidavit or other verification from the London Police that they can test Defendant's DNA against an uncompromised, useable sample, Defendant should not be forced to provide his DNA. Plaintiff's bare, unverified allegations in a complaint are woefully insufficient to require Defendant to submit his DNA.

In *McGrath v. Nassau Health Care Corporation,* the other case relied upon by Plaintiff, a female hospital employee brought a sexual harassment suit against a hospital and its male employee. 209 F.R.D. 55, 57 (E.D.N.Y. 2002). The plaintiff moved for a protective order precluding the use of a blanket purportedly stained with her menstrual blood. *Id.* at 56-57. The individual defendant cross-moved for an order directing plaintiff to produce a DNA sample. *Id.* at 57. The defendant claimed that the blanket was stained with plaintiff's blood when he and she engaged in consensual sexual intercourse on it and that it would provide a basis for impeaching the plaintiff's testimony that she and the defendant never had a consensual sexual relationship

9

(which she testified to at deposition and in her responses to interrogatories). *Id.* at 57. The court adopted the requirement "that the movant must make a prima facie showing that the DNA sample is warranted, through the introduction of sworn statements and other evidence." *Id.* at 58.

The court noted "the understanding that a DNA sample is meaningless in a vacuum—the sample must be compared to something to determine if the two DNA profiles match, and there must be some demonstrable possibility that a match will be found." *Id.* at 61. The court continued that "parties should not be permitted to engage in fishing expeditions, hoping that some useful evidence might be gleaned from obtaining the DNA sample, nor should they be allowed to use demands for DNA evidence to pressure or intimidate other parties." *Id.*

The court granted the motion to compel the DNA sample, noting that the defendant "has met his burden of showing a reasonable possibility that the DNA testing is likely to yield a match." *Id.* at 61. First, he had "shown that the evidence to be tested—the blanket—actually contains a male and a female DNA profile that can be tested against individual DNA samples" and that the "letter submitted by [the defendant] from LabCorp states that preliminary testing of the blanket revealed the presence of blood, and the presence of 'a major DNA profile consistent with a male source' and 'a major DNA profile consistent with a female source.'" *Id.* at 61-62. The court continued that "[t]he lab also stated that the DNA profiles 'can be compared to any reference sample submitted.'" *Id.* at 62. The court concluded that the defendant "has shown not only that there is something to test [the plaintiff]'s DNA sample against, but also that there is some factual basis for believing that a match may be made" and the defendant "testified at the hearing as to the specific incident that allegedly resulted in the semen and blood stains on the blanket." *Id.* at 62. Ultimately, the court found "that the defendant has shown, through his

affidavit and testimony at the hearing, a reasonable possibility that such a match may be found." *Id.* at 62.

Conversely, Plaintiff has offered no testimony in support of the bald allegations in her unverified complaint. She has not testified in a deposition. She has also not provided any evidence, much less a letter appended to an affidavit, from the entity that allegedly took the sample in London, that such a sample still exists, that it contains a DNA profile that can be tested against a DNA sample, or even that Plaintiff could be provided with the sample. Clearly, Plaintiff has fallen far short of her burden of establishing a prima facie showing of a reasonable possibility of a match.

> 2.   Plaintiff's Reliance on *Ashby v. Mortimer* is Befuddling and Misplaced.

Plaintiff places much reliance on the case of *Ashby v. Mortimer*. In *Ashby*, a biological mother and her former husband, whose daughter was born during their marriage via artificial insemination, brought a medical malpractice action against a medical practice and her treating obstetrician, alleging that he fraudulently used his own sperm to impregnate her. *Ashby v. Mortimer*, 329 F.R.D. 650, 652-53 (D. Idaho 2019). Many years after her birth, the daughter received a notification from Ancestry.com that a DNA sample that she had submitted matched a sample submitted by the defendant. *Id.* at 653. The website predicted that there was a parent-child relationship between the two based on the samples. *Id.* This eventually led to the medical malpractice action, where the plaintiffs filed a motion to compel the defendant's "submission to a buccal (cheek) swab DNA test." *Id.*

The defendant argued that good cause could not "be established because Plaintiffs can simply rely on the Ancestry.com test." *Id.* at 654. The plaintiffs argued that there was good cause to order the defendant "to submit to a DNA test because the Ancestry.com test could not serve as conclusive evidence of paternity at trial" as "the Ancestry.com test is inadmissible evidence of

paternity under Idaho law, there is no documented chain of custody for either [the defendant]'s

or [the daughter]'s DNA samples, and there is no way for an expert to evaluate Ancestry.com's

results in light of the chain of custody issue." *Id.*

The court ultimately concluded that "[g]ood cause supports a DNA test because [the

defendant]'s relation to [the daughter] is not, contrary to [the defendant]'s contention, available

through other means." *Id.* at 655. The court elaborated:

> **Here, the Ancestry.com test does not provide conclusive proof**
> **of paternity because, *inter alia*, there is no documented chain of**
> **custody**. As such, [the defendant] could launch a variety of attacks
> on the competency of the Ancestry.com results at trial, including:
> (1) that someone else may have produced the saliva in the sample
> submitted under his name or in the sample submitted under [the
> daughter]'s name; (2) that he (or [the daughter]) did not follow the
> appropriate procedures for giving a sample; (3) that excessive heat,
> cold, age of test, or some other defect before processing by
> Ancestry.com degraded the accuracy of the results; or (4) that mix-
> ups at Ancestry.com rendered the results inconclusive.

*Id.* at 655 (emphasis added).[4] Plaintiff asserts that "[t]he instant case goes a step further—not

only had Defendant voluntarily provided his DNA, he is seeking a protective order to prevent the

sharing of his DNA with the exact same entity with whom he had shared his DNA in the past

without objection." ECF No. 26 ¶ 15. Plaintiff continues that:

> If Plaintiff is prohibited from sharing Defendant's DNA with The
> Havens or otherwise comparing the DNA samples, Defendant could
> argue at trial that (1) the comparison was invalid as it was not made
> against the actual samples; (2) that one or other of the facilities either
> did not use the proper test, or used different tests; (3) that defects in
> processing by The Havens or a U.S. lab resulted in inconclusive
> results; or (4) that there were mix-ups in tests performed in different
> countries by different agencies. These precise issues were identified
> as problems in *Ashby*. *Id.* at 655. The court in *Ashby* ordered

---

[4] Plaintiff also relies on *Ashby* to support her proposition that "[c]learly, the voluntary provision of DNA once constitutes a waiver of any argument against providing DNA evidence." ECF No. 26 ¶ 15. Under this logic, any time law enforcement wants to obtain a DNA sample, they would merely have to establish that the person previously provided DNA in any context, such as a 23 and Me DNA Ancestry Test or even routine blood work.

> defendant to provide DNA for direct comparison to commercial test
> results, as opposed to Ancestry.com's DNA database. *Id.* Any
> attempt to bar Plaintiff from obtaining DNA and performing a test
> against the rape kit in the possession of The Havens and the London
> Police could prevent her from proving that the DNA samples were
> identical.

ECF No. 26 ¶ 16. Plaintiff's argument lacks any logical consistency and is painstakingly

irrelevant. This logic would apply if Defendant was trying to get Plaintiff to rely upon a prior

specimen as opposed to providing one. Plaintiff is putting the proverbial cart before the horse.

Firstly, Defendant is not seeking a protective order to prevent the sharing of his DNA with the

London Police—he is opposing Plaintiff's Motion in full and seeking a protective order

prohibiting her from attempting to obtain his DNA at all. Secondly, Defendant is not attempting

to argue that Plaintiff should rely upon a prior DNA specimen—he is asserting, correctly, that

she is not entitled to a DNA sample at all. Regardless, applying the general principles of *Ashby*

to this case, the tests would still be performed in different countries by different agencies. As

Plaintiff's Notice and Motion are woefully deficient, it is unclear what test was used in London

and what test would be used in the present matter or how the sample in London was processed or

how the sample Plaintiff seeks to compel would be processed.

        3.    <u>Potential Support for Punitive Damages is Not a Proper Ground for a DNA Request.</u>

     Plaintiff alleges that "[t]he existence of a DNA match would also constitute an important

element for punitive damages." ECF No. 26 ¶ 13. Plaintiff fails to specify *how* the existence of a

DNA match would constitute an element for punitive damages, much less an "important" one.

Regardless, a DNA sample is not to be ordered pursuant to Rule 35 merely for the issue of

damages. *See, e.g., Sacramona v. Bridgestone/Firestone, Inc.*, 152 F.R.D. 428, 431-32 (D. Mass.

1993) (noting, in denying a Rule 35 motion, that "defendants seek the blood test to determine

future damages, not liability").

**D.      Plaintiff Failed to Comply with the Requirements of Rule 35.**

Rule 35(a)(2) provides the requirements for an order issued pursuant to Rule 35, stating that an order: "(A) may be made only on motion for good cause and on notice to all parties and the person to be examined; and (B) must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." Fed. R. Civ. P. 35(a)(2). In her Motion, Plaintiff baldly asserts that she:

> has complied with all of the requirements of Rules 34 and 35, by providing herein and by previous notice to Defendant, the person to be examined and to all parties, that specified "the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made, and [] the time for filing the report and furnishing the copies," as well as "describing in reasonable particularity each item . . . to be inspected."

ECF No. 26 ¶ 8. However, this is demonstrably false. Plaintiff asks, "that the Court enter an Order compelling Defendant to submit to the Physical Inspection and Examination, including the taking of samples for DNA testing, described in this Motion and the attached Notice." ECF No. 26 at 6. Furthermore, Plaintiff's proposed order merely provides that the Motion is granted, and that "Defendant shall present himself for the examination and taking of these samples at the office of Plaintiff's Counsel . . . on August 29. [sic] 2022, at 10:00 a.m." ECF No. 26-6 ¶¶ 1-2.

The Notice states that it is made "by and through the undersigned counsel and a suitably certified health care provider," and provides that Plaintiff "will conduct an [sic] Physical Examination of Defendant . . . *which will include* the taking of a sample of Defendant's Deoxyribonucleic acid (DNA)." ECF No. 26-1 at 1 (emphasis added). The Notice does not specify in what manner the DNA is to be taken, but only that the Notice is "for the taking of samples of Defendant's DNA for the purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit." ECF No. 26-1 at 1. She also fails

to specify what other purposes a physical examination would be used for other than the taking of a sample of DNA. In her Motion, she does clarify somewhat that she "seeks samples of Defendant's blood, hair, skin, urine, and a saliva swab for purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit." ECF No. 26 ¶ 2. Plaintiff still does not specify how these samples would be procured, who specifically would take them, or what a "skin" sample would even consist of. She also does not specify why she needs five different methods of collecting DNA. Defendant was not able to locate any case law where a Defendant was compelled to provide a skin sample, or even a urine or hair sample and Plaintiff provides no such authority, as is her burden.

Also very problematically, the Notice provides that "[t]he inspection and taking of the DNA sample will be for the purpose, *among other things*, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by The Havens." ECF No. 26-1 at 1 (emphasis added). Similarly, the Motion provides that "[t]he inspection will be for the purpose, *among other things*, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by the Havens." ECF No. 26 ¶¶ 3-4. Plaintiff does not specify what these "other things" may be, falling desperately short of the well-established "in controversy" and "good cause" requirements.

The Notice further provides that "[t]hese tests will be analyzed by one or more independent laboratories of Plaintiff's choosing." ECF No. 26-1 at 1. The Motion also similarly provides that "[t]hese tests will be analyzed by one or more independent laboratories of Plaintiff's choosing." ECF No. 26 ¶ 2. Again, Plaintiff does not specify what laboratory that she intends to use or that she has even found a laboratory that will perform the comparison that she is seeking. *See Marroni v. Matey*, 82 F.R.D. 371, 372 (E.D. Pa. 1979) ("[W]e do not believe that

their motion, as presented, could be granted. Rule 35(a) requires that an order for examination 'specify the time, place, manner, conditions, and scope of the examination.' Plaintiffs' general request for 'psychological testing' provides little guidance for determining the scope of any eventual examination. Furthermore, it is unclear from plaintiffs' motion who should conduct the desired examination.") (internal citation omitted). Plaintiff also improperly "seeks to have Defendant present himself for the taking of these samples at the office of Plaintiff's Counsel," as opposed to a medical office. ECF No. 26 ¶¶ 3-4. *See Smith v. Café Asia*, 724 F. Supp. 2d 125, 126-27 (D.D.C. 2010) (granting a Rule 35 motion after noting that the motion identified the doctor who would conduct the examination, his medical specialty, a proposed date for the examination, the length of the examination, and the type of examination and, additionally, that the party seeking the examination "submitted with their motion an affidavit by [the doctor] that described the nature of the examination" and that the "motion agreed to 'a neutral location to be determined by the parties'").

### E.     Defendant is Entitled to a Protective Order.

The United States Supreme Court has noted that physical and mental examinations of parties under Rule 35 are limited by the provisions of the Federal Rules "permitting the district court, upon motion, to limit, terminate, or otherwise control the use of discovery devices so as to prevent either their use in bad faith or undue 'annoyance, embarrassment, or oppression.'" *Schlagenhauf v. Holder*, 379 U.S. 104, 117 (1964). Rule 26(c) provides:

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . [T]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one of more of the following: (A) forbidding the disclosure or discovery.

Fed. R. Civ. P. 26(c)(1)(A). This provision "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rinehart*, 467 U.S. 20, 36 (1984).

As noted *supra,* "DNA testing is an extreme discovery tool which is very intrusive to the targets of such discovery" and should not be used as a "fishing expedition." *Harris v. Athol-Royalston Reg'l Sch. Dist. Comm.*, 206 F.R.D. 30, 35 (D. Mass. 2002); *see also McGrath v. Nassau Health Care Corp.*, 209 F.R.D. 55 (E.D.N.Y. 2002) (directing that "parties should not be permitted to engage in fishing expeditions, hoping that some useful evidence might be gleaned from obtaining the DNA sample, nor should they be allowed to use demands for DNA evidence to pressure or intimidate other parties"). In her Motion, "Plaintiff seeks samples of Defendant's blood, hair, skin, urine, and a saliva swab for purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit." ECF No. 26 ¶ 2.[5] Yet, she made shockingly little effort to show why she is entitled to such extreme relief. The conclusion is that, at best, she has no support or, at worst, that she brought the motion in an attempt to use a discovery device in bad faith. This can best be demonstrated by the fact that she is seeking to compel Defendant to provide five different DNA samples in the office of Plaintiff's counsel. This can simply be for no other purpose than to embarrass Defendant, a theme throughout the litigation of this matter. There is no reason that Plaintiff would need five samples from Defendant—blood, hair, skin, urine, and a saliva swab and it is clearly improper to compel Defendant to provide such samples in the law office of Plaintiff's counsel. Plaintiff's

---

[5] Plaintiff asserts that "a DNA buccal swab represents 'only a minimal intrusion.'" ECF No. 26 ¶ 17 (citing *McGrath*, 209 F.R.D. at 61). However, Plaintiff seeks samples of Defendant's blood, hair, skin, and urine in addition to a saliva swab, so this assertion is meaningless

misuse of Rule 35 should not be rewarded; Defendant is entitled to be protective order prohibiting her from obtaining a DNA sample from him.

## III.   **CONCLUSION.**

For the reasons set forth herein, Defendant Cenk Sidar requests that the Court deny Plaintiff's Motion to Obtain Physical Examination of and DNA Sample from Defendant, enter a protective order prohibiting Plaintiff from seeking a DNA sample from Defendant, award Defendant his costs and attorneys' fees, pursuant to Local Civil Rule 37(G)-(H), incurred in opposing Plaintiff's Motion, and grant such other and further relief in favor of Defendant as this Court deems just and proper.

Dated: July 29, 2022

CENK SIDAR

By Counsel:

Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com

*Counsel for Plaintiff*

18

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 29, 2022, a copy of the foregoing **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO OBTAIN PHYSICAL EXAMINATION OF AND DNA SAMPLE FROM DEFENDANT** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
|       Plaintiff, | : |
| | : |
| v. | :   Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : |
| CENK SIDAR | : |
| | : |
|       Defendant. | : |

**DEFENDANT'S OBJECTIONS TO PLAINTIFF'S NOTICE OF PHYSICAL**
**EXAMINATION AND DNA SAMPLING OF DEFENDANT**

Defendant, Cenk Sidar ("Defendant"), by counsel, objects to Plaintiff Jane Doe's

("Plaintiff") Notice of Physical Examination and DNA Sampling of Defendant ("Notice") on the

following grounds:[1]

    1.    Plaintiff's Notice fails to establish that "good cause" exists for the taking of a

DNA sample pursuant to Rule 35.

    2.    Plaintiff's Notice fails to establish the "in controversy" requirement for the

compulsion of a DNA sample pursuant to Rule 35.

    3.    Plaintiff's Notice fails to explain how Plaintiff intends to compare a DNA sample

compelled from Defendant to anything.

    4.    Plaintiff's Notice fails to allege that there is a DNA sample at The Havens that is

of such a quantity and of such a quality as to allow for accurate DNA analysis.

---

[1] Defendant also incorporates by reference the arguments made, and authority relied upon, in his Opposition to the Motion to Obtain Physical Examination of and DNA Sample from Defendant.

1

5.      Plaintiff's Notice fails to establish that the integrity of a DNA sample at The Havens has been preserved or that it even still exists.

6.      Plaintiff's Notice fails to establish a prima facie showing of a reasonable possibility of a match between the alleged DNA sample from her and a DNA sample from Defendant.

7.      Plaintiff's Notice fails to comply with the requirements imposed by Rule 35 of specifying the manner, conditions, and scope of the examination, as well as the person(s) who will perform it.

8.      Plaintiff's Notice improperly designates Plaintiff's counsel's office, as opposed to a medical facility, for the taking of the DNA samples.

9.      Plaintiff's Notice does not specify how the DNA samples will be collected, including which type of samples will be taken and the methods used to take those samples.

10.      Plaintiff's Notice fails to specify where and how the DNA will be analyzed, stating only that "[t]hese tests will be analyzed by one or more independent laboratories of Plaintiff's choosing." It is also unclear what "tests" Plaintiff's Notice is referring to.

11.      Plaintiff's Notice states that the DNA collected will be compared "with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit." Plaintiff fails to establish where these items currently are and what the chain of custody for these items has been.

12.      Plaintiff's Notice is overly broad as it states that the inspection and taking of the sample "will be for the purpose, *among other things*, . . . ." (emphasis added).

13.      Plaintiff's Notice asserts that the information "will further be relevant to Plaintiff's claim for punitive damages." Examinations pursuant to Rule 35 are not permissible to establish damages.

14.     Plaintiff has failed to make a prima facie showing of a reasonable possibility of a match and has failed to offer an evidentiary basis for concluding that any alleged DNA that she is in possession of belongs to Defendant.

Dated: July 29, 2022                      /s/ Mariam Tadros
                                          Mariam W. Tadros (VSB #75502)
                                          Abigail S. Reigle (VSB # 92947)
                                          REES BROOME, PC
                                          1900 Gallows Road, Suite 700
                                          Tysons Corner, VA 22182
                                          Tel: (703) 790-1911
                                          Fax: (703) 848-2530
                                          Email:  mtadros@reesbroome.com
                                          *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 29, 2022, a copy of the foregoing **DEFENDANT'S OBJECTION TO PLAINTIFF'S NOTICE OF PHYSICAL EXAMINATION AND DNA SAMPLING OF DEFENDANT** was served via email to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

                                          /s/ Mariam Tadros
                                          Mariam W. Tadros

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : |
| CENK SIDAR | : |
| | : |
| Defendant. | : |

_____

**<u>ORDER</u>**

This matter comes before the Court on Plaintiff's Motion to Obtain Physical Examination

of and DNA Sample from Defendant. Having reviewed the motion, the opposition thereto, and

the argument of counsel, if it, it is hereby:

**ORDERED** that Plaintiff's Motion to Obtain Physical Examination of and DNA Sample

from Defendant is **DENIED**; and it is

**ORDERED** that Defendant is granted a protective order prohibiting Plaintiff from

seeking a DNA sample from him; and it is further

**ORDERED** that Defendant shall submit attorney's fees affidavits within ten days of

entry of this Order.

ENTERED this _____ day of _____, 2022.

_____
Theresa Carroll Buchanan
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| **JANE DOE** | ) | |
|    **A Domiciliary of the** | ) | |
|    **Commonwealth of Virginia** | ) | |
| | ) | |
|    **Plaintiff,** | ) | **Civil Action No. 1:22-cv-00545** |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **CENK SIDAR** | ) | |
| | ) | |
|    **Defendant.** | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
TO OBTAIN PHYSICAL EXAMINATION OF DNA SAMPLE FROM DEFENDANT**

Plaintiff Jane Doe ("Plaintiff"), by and through her attorneys, files this Reply to

Defendant's Opposition (*ECF No. 37*) to Plaintiff's Motion to Obtain Physical Examination of

DNA Sample From Defendant ("Motion"). *ECF No. 26.*

### I.      Introduction

Contrary to the implication in the Opposition, DNA collection from the Defendant has

been repeatedly argued between the parties since September of 2019. Plaintiff requested DNA

sampling at the beginning of the precursor case before Fairfax County Circuit Court. Plaintiff has

demanded and moved for a DNA sample multiple times, each time attempting to negotiate an

agreement for Defendant to supply the DNA voluntarily, and it has been the subject of at least

five fully briefed hearings in Fairfax County Circuit Court, with the Defendant ardently pleading

not to have his DNA taken. In order not to burden the file with this history Plaintiff provides an

illustrative chart of the fully briefed motions and rulings regarding DNA through late 2020, plus

copies of some of Plaintiff's relevant motions, with exhibits omitted. Exhibit A. At one point the

Defendant requested from Fairfax County Circuit Court a protective order to block provision of any DNA samples or results from disclosure to the London Police. Judge Smith denied observing that he would not be a party to obstructing a foreign criminal investigation. *See* Exhibit B.

When the Fairfax County Circuit Court ruled that the Defendant must submit to DNA testing, he refused to appear. Plaintiff arranged for licensed medical professionals to collect Defendant's buccal swab and to perform testing, and Defendant has been informed of these preparations throughout this tortured process. *See*, examples of correspondence, Exhibit C.

The London Metropolitan Police sent the rape kit collection sample to its outside labs, including Eurofins Europe, for testing after The Havens collected the sample within an hour of Defendant raping Plaintiff. The London Police, who the Defendant also has been in contact with, has told us that Eurofins profiled the DNA using ESI-17 profiling chemistry for standard DNA profiling, and that if YSTR work is required (not performed routinely) it would be Y-23. Plaintiff has engaged Bode Technologies to perform the profiling of Defendant's sample and has discussed this case extensively with Joan Gullickson, a leading expert on DNA profiling and forensics, at Bode Technologies. Plaintiff has engaged J and M Paternity Service, LLC to take the swabs, and they have indicated that they are willing to do so at Mr. Urban's office, Mr. Sidar's home or office, or any other place ordered by this Court or requested by the parties. Bode has supplied Plaintiff with two kits – one for Bode and one to submit to Eurofins Europe/London Police – to compare not only DNA profiles but also any direct comparisons that may be necessary. Plaintiff's counsel will have those kits at the hearing on August 5 and is expecting new kits from the London Metropolitan Police within the next few days, long before the sample collection occurs.

2

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO OBTAIN
PHYSICAL EXAMINATION OF DNA SAMPLE FROM DEFENDANT

JA346

Pursuant to previous Orders of the Fairfax County Circuit Court, Plaintiff has attempted to obtain these DNA samples multiple times before the pandemic, engaging both J and M Paternity Service LLC and Mednovations LLC to take samples, with Bode always being designated as the primary US testing lab. Mednovations even charged Plaintiff a "No Show Fee" when Defendant did not appear as instructed after receiving an order from Fairfax County. *See*, Court Order and No-Show Fee Invoice, Exhibit D.

## II.      Good Cause

Plaintiff's request is supported by good cause. Defendant has denied that he penetrated or raped the Defendant. Defendant denied that he sexually assaulted Defendant when he was interviewed by the London Police. Defendant further denied that his penis was ever removed from his pajamas during the attack.  We have attached the relevant portion of that questioning as Exhibit E. We note that in the transcript of the police interview Defendant acknowledged the text messages that Plaintiff attached to her Complaint. Defendant also denied he penetrated Plaintiff in his responses to interrogatories in Fairfax County Circuit Court. Exhibit F.

Semen was found by the London Police in their examination of the rape kit. The best evidence to prove Defendant raped Plaintiff is to compare the DNA of semen that was found on Plaintiff's underwear, close to her crotch, with a current DNA sample from Defendant. Unless Defendant is prepared to admit that he raped Plaintiff or at least that he exposed his penis while attacking her, then matching his DNA to the semen in the rape kit is the best evidence of his actions.

## III.     Meet and Confer

Plaintiff's Motion is not Plaintiff's first request to obtain DNA from Defendant. Plaintiff has requested Defendant's DNA at least 20 times, held multiple face-to-face meetings with

3

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO OBTAIN
PHYSICAL EXAMINATION OF DNA SAMPLE FROM DEFENDANT

JA347

Defendant's counsel (both current and past), engaged in extensive email correspondence, and participated in five or more hearings.

Exhibit A shows only a partial history of Plaintiff's requests for Defendant's DNA. Immediately behind that chart we have attached selected pleadings filed by the parties addressing DNA collection. Exhibit C provides only a sample of the extensive correspondence between the parties. Counsel for Plaintiff has asked for DNA and attempted to resolve this issue multiple times. Even before filing the instant motion, Plaintiff reached out to Defense counsel, and she flatly refused to engage on the DNA issue. As is often misattributed to Albert Einstein: "The definition of insanity is doing the same thing over and over and expecting different results." Regardless, in preparation for this hearing, Plaintiff again called Defendant's counsel this Tuesday to attempt a resolution of this matter. As of this filing we still have not heard back from Defendant. The issue of DNA collection has been argued to death – meet and confer obligations have been taken to the extreme. There is no merit to Defendant's argument that Plaintiff has not engaged in "meet and confer" and Defendant's suggestions otherwise is meritless.

## IV.    Caselaw

Defendant has denied that the DNA recovered in the rape kit could be his. He has stated that he never took off his underwear during the assault. Similar to *D'Angelo v. Potter,* 224 F.R.D. 300, 302-04 (D. Mass. 2004), the presence of his DNA in the sperm found on or in Plaintiff or on her underwear would establish a *prima facia* case that Defendant raped Plaintiff. The London Police have already confirmed that they had a usable profiled DNA sample. The caselaw cited in Plaintiff's Motion fully supports Plaintiff's request and we will address that as necessary at the hearing rather than burden the record here.

4

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO OBTAIN
PHYSICAL EXAMINATION OF DNA SAMPLE FROM DEFENDANT

JA348

And as in *Ashby v. Mortimer*, 329 F.R.D. 650 (D. Idaho 2019), Defendant has already voluntarily provided a DNA sample, waiving any argument against providing DNA evidence. In addition to voluntarily providing his DNA to the London Police, on August 13, 2020, Defendant voluntarily emailed to Plaintiff a LabCorp report dated June 21, 2020. This LabCorp report detailed Defendant's biological sample that contained a Hepatic Function Panel, Chlamydia/GC Amplification and HIV Ag/Ab with Reflex screens. This report, without redactions, was provided without any request for confidentiality or protective order. We do not attach this report to our Reply due to its sensitive nature but will bring a copy to the hearing on Friday. Considering Defendant's prior unrestricted submissions of DNA to the London Police and biological data directly to Plaintiff it seems Defendant only objects to providing DNA to Plaintiff in order to obstruct Plaintiff's case.

### V.    Rule 35

Defendant argues for the application of a legal standard that is too high. Plaintiff's burden is not proof beyond a reasonable doubt, which is a criminal standard, but is only the elements required under Rule 35 – (A) good cause, and (B) the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it. Fed. R. Civ. App. 35(a)(2)(A) and (B). We have shown good cause, above.

Plaintiff has previously disclosed all the remaining details to Defendant multiple times over the past three years. Plaintiff has engaged Bode Technology to perform the analysis of the sample in the U.S. *See* Exhibit G. Plaintiff has engaged J and M Paternity, LLC to collect the samples. Previously Plaintiff had hired Mednovations LLC to take the samples, and unsuccessfully attempted to coordinate this collection with Defendant when J and M was

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO OBTAIN
PHYSICAL EXAMINATION OF DNA SAMPLE FROM DEFENDANT

unavailable. Plaintiff has again engaged J and M for the current collection due to their availability.

## VI.    Attorneys' Fees

Defendant has articulated no basis for his demand for attorneys' fees, and Plaintiff requests that Defendant's demand for fees be denied.

## VII.    Conclusion.

WHEREFORE, Plaintiff Jane Doe moves the Court to grant Plaintiff's Motion to Obtain Physical Examination of DNA Sample from Defendant, deny Defendant's demand for attorneys' fees, Order Defendant to appear at the offices of Plaintiff's counsel Mr. Urban or such other place as this Court may designate for the purposes of the collection of buccal swab samples, and award any other relief this Court deems necessary and proper.

Respectfully Submitted,

Jane Doe, by Counsel
THE LAW FIRM OF FLETCHER, HEALD &
HILDRETH, PLC


By: __/s/ Thomas F. Urban II_____
THOMAS F. URBAN II, VSB #40540
FLETCHER, HEALD & HILDRETH, PLC
1300 17th Street North, Suite 1100
Arlington, Virginia 22209
(703) 812-0462; (703) 812-0486 (f)
urban@fhhlaw.com

Walter E. Steimel, Jr. (P*ro hac vice*)
Steimel Counselors Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258; (202) 652-2308
wes@sclgrp.com
*Counsel for Plaintiff Jane Doe*

6

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO OBTAIN
PHYSICAL EXAMINATION OF DNA SAMPLE FROM DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 3rd day of August, 2022, he electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Thomas F. Urban II*
Thomas F. Urban II

7

PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO OBTAIN
PHYSICAL EXAMINATION OF DNA SAMPLE FROM DEFENDANT

JA351

**EXHIBIT A**

**PARTIAL DNA TIMELINE**
**COPIES OF REPRESENTATIVE MOTIONS**

EXHIBIT A
PARTIAL DNA TIMELINE

| Event | Description | Date |
|-------|-------------|------|
| | | |
| Original Case Filed, Fairfax County | | September 13, 2019 |
| Merits and DNA Discovery Served on Defendant | Served directly on Sidar | January 6, 2020 |
| Motions to Compel on all Discovery Including DNA | Served on Defendant and counsel for Defendant | January 31, 2020 |
| Order on Motion to Compel DNA | Hearing and Order signed Before SMITH GRANTING COMPEL | February 21, 2020 |
| Plaintiff email to Defendant arranging tests to be performed at home or in office; demanding submission for DNA and blood testing | | March 23, 2020 |
| Plaintiff demand letter for DNA, blood and other discovery | | May 20, 2020 |
| Plaintiff email to Defendant inquiring for a response to prior requests for DNA and discovery | | May 21, 2020 |
| Plaintiff follow up demand letter for DNA, blood and other discovery | | June 5, 2020 |
| Plaintiff's warning letter to Defendant that attempt to request reconsideration of DNA discovery order would lead to sanctions demand. | | June 12, 2020 |

1

| | | |
|---|---|---|
| Plaintiff second email to demanding tests and that we would send tester to collect samples | | June 12, 2020 |
| Plaintiff files Motion for Contempt Order, Arrest and Sanctions for Failure to Provide DNA | | June 24, 2020 |
| Defendant served Objections to Rogs, RFDs and DNA/blood sample | | July 8, 2020 |
| Motion to Reconsider DNA Order | Defendant's Motion | July 9, 2020 |
| Order denying without prejudice motion for criminal contempt for failure to provide DNA | Order signed by OBLON | July 24, 2020 |
| Order Denying Defendant's Motion to Reconsider on DNA | Bench ruling by SMITH | August 7, 2020 |
| Plaintiff sends letter to Defendant demanding compliance with court's DNA order | | August 10, 2020 |
| Defendant sends partial insufficient blood exam | | August 13, 2020 |
| Plaintiff sends email and letter to Defendant rejecting partial blood screen and demanding compliance with court's DNA order, and demanding cease and desist from outside interference | | August 16, 2020 |
| Plaintiff letter regarding production deficiencies, lack of DNA and Defendant's response | | August 16, 2020 |
| Plaintiff meet and confer to request hearing date for Motion for Contempt or in Alternative Show Cause for DNA | | August 20, 2020 |

| | | |
|---|---|---|
| Defendant files motion for protective order after the meet and confer, without notice | (Later denied by Judge Smith on September 4, 2020) | August 20, 2020 |
| Plaintiff files Motion for Civil Contempt or in Alternative Rule to Show Cause | | August 21, 2020 |
| Plaintiff files Affidavit in Support of Motion for Civil Contempt | | September 3, 2020 |
| Hearing on Plaintiff second motion for contempt; Defendant's first mention of protective order | Request for protective order denied, Rule to Show Cause Issued | September 4, 2020 |
| Court issues Rule to Show Cause | | October 7, 2020 |
| Rule to Show Cause personally served on Defendant | | October 28, 2020 |
| Service copy of Rule filed with Court | Service filed with Court by process server | November 2, 2020 |
| Hearing on Rule to Show Cause | | November 12, 2020 |
| Hearing on Rule 4:10 examination | | January 21, 2021 |

3

VIRGINIA:

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

Jane Doe,
   Plaintiff )
                 )
                 )
v.              )    Case No. CL 2019 - 12612
                 )
Cenk Sidar        )
   Defendant.        )

## ORDER

This matter came to be heard on the 21st day of _February_ 2020 on the Plaintiff(s)/~~Complainant(s)/Defendant(s)~~'s motion _to Compel Samples_ _for DNA and other Blood Tests from Defendant._

Upon the matters presented to the Court it is hereby

ORDERED as follows:

_The Motion is GRANTED. Defendant Cenk_
_Sidar shall submit to DNA and blood testing_
_at a facility of the Plaintiff's choosing no_
_later than thirty (30) days after the_
_date of the signing of this Order._

ENTERED this 21 day of Feb , 2020.

                              _[signature]_
                             JUDGE

SEEN and _Agreed_              SEEN and ___ ~~Endorsement~~ Waived
                                       Per Rule 1:13
_[signature] IV_
Counsel for Plaintiff/Complainant     Counsel for Defendant
  Va Bar # 40540

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| **JANE DOE,** | * | |
| **Plaintiff,** | * | |
| | * | **Case No. 2019 12642** |
| **v.** | * | |
| **CENK SIDAR,** | * | |
| **Defendant.** | * | |

### MOTION FOR CONTEMPT ORDER, ARREST, AND SANCTIONS

By Counsel, and pursuant to Virginia Code Section 18.2-456(A)(5), Plaintiff Jane Doe ("Plaintiff") moves for punishment of Defendant Cenk Sidar ("Defendant") by contempt for failure to comply with an order of this Court, and for sanctions, for refusal to submit to Court-ordered DNA and blood testing.

### MEMORANDUM

1.  Plaintiff instituted this action for assault, battery, intentional infliction of emotional distress and punitive damages on September 13, 2019. Defendant disputed jurisdiction. On June 4, 2020, the court denied Defendant's motion, found personal jurisdiction over Defendant, and awarded sanctions, noting that Defendant's motion was frivolous and without basis in law or fact. Exhibit A (Order, Bellows, J.).

2.  On January 6, 2020, Plaintiff personally served on Defendant requests to obtain samples for DNA and other blood tests from Defendant. Exhibit B.

3.  Defendant failed to make himself available for such testing. Noting Rule 4:1(d)(2) of the Supreme Court of Virginia, and Defendant's failure to request a stay of

MOTION FOR CONTEMPT ORDER, ARREST, AND SANCTIONS                    1

general discovery, Plaintiff moved (Exhibit C) for and was granted an Order dated February 21, 2020 (Exhibit D), compelling Defendant to submit to DNA and blood testing.

4.      Despite multiple demands, both oral and written, Defendant has failed and refused to comply with the Court's Order and submit for testing. Plaintiff attempted to arrange for testing with Defendant's counsel by email March 23. Plaintiff demanded compliance with Court Orders, payments of fees and submission of testing by letter dated May 20, 2020 and followed up by email the next day. Defendant's counsel promised to "get to it soon" by email May 21, 2020 but did not. Plaintiff wrote another letter to Defendant's counsel on June 5, 2020, immediately after Judge Bellows denied Defendant's baseless challenge to personal jurisdiction, again demanding compliance with Court Orders and submission for testing, and warning of Plaintiff's intent to seek sanctions if Defendant did not comply by June 10. Defendant's counsel promised to respond substantively by June 8. Plaintiff received no response. After a call on June 12 with Defendant's current counsel and new additional counsel Plaintiff again inquired about testing. Plaintiff's request was met with silence from Defendant until June 22 when Defendant's counsel stated one of them would respond to Plaintiff about testing by June 23. Not having received a response or compliance, Plaintiff resorts to filing this motion to prevent further delays by Defendant. *See* Letters and Electronic mail, Exhibit E.

5.      Defendant continues to refuse to honor any of the orders of this Court, including orders to compel responses to discovery and to pay attorneys' fees awards. Defendant's non-compliance has required Plaintiff to file three new motions for additional sanctions with this Court. *See,* Motions and Orders, Exhibit F.

6.      Plaintiff is entitled to DNA samples to compare to her rape kit and is entitled to his blood and other samples to determine whether Defendant potentially exposed Plaintiff to sexually transmitted diseases when he raped her.

MOTION FOR CONTEMPT ORDER, ARREST, AND SANCTIONS                    2

7.     Plaintiff should not have to repeatedly ask this Court to order Defendant to comply with the rules and orders of this Court and is entitled to sanctions and attorneys fees for these additional efforts.

8.     Due to Defendant's refusal to comply with this Court's Order for payment of money, Defendant should be jailed for a period up to ten (10) days and imposed a fine of $250. Virginia Code Section 18.2-457.

9.     Plaintiff requests that this Court impanel a jury in order to assess a longer prison sentence and higher fine for his continued brazen violations of orders of this Court. *Id.*

10.     Plaintiff further requests attorneys' fees for her continued attempts to obtain Defendant's compliance and bringing this motion, and other sanctions and attorneys' fees this Court may award hereunder.

## PRAYER

For the foregoing reasons, Plaintiff asks this Court to issue an order to (i) imprison Defendant for up to ten (10) days; (ii) fine Defendant $250.00; (iii) impanel a jury to set a longer prison term and higher fine for non-compliance; and (iv) award Plaintiff additional attorneys' fees and sanctions in an amount to be demonstrated at the hearing on this matter.

Respectfully submitted:

> JANE DOE by
> Fletcher, Heald & Hildreth, PLC
>
> By: _Thomas F. Urban II (was by permission)_
> THOMAS F. URBAN II, VSB#40540
> 1300 N. 17th Street, Suite 1100
> Arlington, VA 22209
> (703) 812-0462
> FAX (703) 812-0486
> urban@fhhlaw.com
>
> Walter Steimel, Jr. (*pro hac* vice)

MOTION FOR CONTEMPT ORDER, ARREST, AND SANCTIONS                    3

Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com

*Counsel for Plaintiff*

Dated: June 24, 2020

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via

email and U.S. First Class Mail to

Cenk Sidar
1441 U Street, Apt 411
Washington, D.C. 20009

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, VA 22209

*Counsel for Defendant*

on this the 24th day of June 2020.


Thomas F. Urban II

MOTION FOR CONTEMPT ORDER, ARREST, AND SANCTIONS                    5

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| JANE DOE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No. 2019 12642 |
| v. | * | |
| | * | |
| CENK SIDAR, | * | |
| | * | |
| Defendant. | * | |

### PLAINTIFF'S FIRST SET OF REQUESTS TO OBTAIN SAMPLES FOR DNA AND OTHER BLOOD TEST FROM DEFENDANT

Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned counsel, pursuant to Rule 4:9 of the Rules of the Supreme Court of Virginia, hereby requests that Defendant Cenk Sidar ("Sidar" or "Defendant") "permit the party making the request (Jane Doe) . . . to inspect, copy, test, or sample . . . designated tangible things . . . which are in the possession, custody or control of the party upon whom the request is served," Cenk Sidar. Specifically, Plaintiff requests Cenk Sidar to submit to a DNA test and a sexually transmitted disease test at a laboratory of Plaintiff's choosing no later than twenty-one (21) days of receipt of this Request by Defendant.  Counsel for Defendant can arrange this testing in conjunction with Counsel for Plaintiff, Thomas F. Urban II, Esq. at the Law Firm of URBAN & FALK, PLLC, 6066 Leesburg Pike, Fourth Floor, Falls Church, Virginia 22041, (703) 861-5235.  Defendant should file a response to this Request within the twenty-one (21) days called for under Rule 4:9 and "shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, including an objection to the requested form or forms for producing electronically stored information, stating the reasons for

the objection. If objection is made to part of an item or category, the part shall be specified and production shall be permitted as to the remaining parts." Rule 4:9(b)(ii).

## SPECIFIC REQUESTS FOR TESTING OR SAMPLES

1. Please permit Plaintiff to take samples of Defendant's blood, saliva, hair, and urine for purposes of a DNA test to be conducted by an independent laboratory of Plaintiff's choosing.

   RESPONSE:

2. Please permit Plaintiff to take samples of Defendant's blood, urine, and a skin swab for purposes of a sexually transmitted disease test to be conducted by an independent laboratory of Plaintiff's choosing.

   RESPONSE:

Respectfully submitted,

JANE DOE by
THE LAW FIRM OF URBAN & FALK, PLLC

By: _____
THOMAS F. URBAN II, VSB #40540
6066 Leesburg Pike
Falls Church, VA 22041
(703) 861-5235     FAX (703) 340-1450
Urban_law@yahoo.com
*Counsel for Plaintiff*

2

PLAINTIFF'S FIRST SET OF REQUESTS FOR SAMPLES FROM DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via U.S. First Class Mail to

Cenk Sidar
Sidar Global, Inc.
4311 Thomas Brigade Bridge
Fairfax, VA 22033

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
3033 Wilson Blvd., Suite 700
Arlington, Virginia  22201
*Counsel for Defendant*

on this the 31st day of October, 2019.

Thomas F. Urban II

3

PLAINTIFF'S FIRST SET OF REQUESTS FOR SAMPLES FROM DEFENDANT

**SERVICE OTHER THAN BY VIRGINIA SHERIFF**
COMMONWEALTH OF VIRGINIA
VA. CODE §§ 8.01-293, 8.01-320, 8.01-325

| | | |
|---|---|---|
| Case No. | 2019 12642 | |
| Service No. | | (Clerk's use only) |

FILED
CIVIL INTAKE

| | | |
|---|---|---|
| | Fairfax County | Circuit Court |
| Jane Doe | 2020 JAN -6 PM 12: 44 | Cenk Sidar |
| Cenk Sidar, 1875 Connecticut Ave NW 10th Floor, Washington, DC 20009 | | |

CLERK. CIRCUIT COURT
FAIRFAX, VA

Is the name and address of the person upon whom service of the following is to be made:

- [ ] **Summons and Complaint**
- [X] Plaintiff's First Set of Requests for Document Production to Defendant; Plaintiff's First Set of Interrogatories to Defendant; Plaintiff's First Set of Requests for Admissions to Defendant; Plaintiff's First Set of Requests to Obtain Samples for DNA and Other Blood Test from Defendant

I, the undersigned, swear/affirm that

1. [ ] I am an official or an employee of an official who is authorized to serve process of the type described in the attached Proof of Service and my title and bailiwick are as follows:

   [X] I am a private process server (list name, address and telephone number below).

   Benjy Gomez Reyes, Served by Elite, LLC 1340 Old Chain Bridge Rd Suite 107, McLean, VA 22101, (703) 556-5656

2. I am not a party to, or otherwise interested in, the subject matter in controversy in this case.
3. I am 18 years of age or older.
4. I served, as shown below, the above-named person upon whom service of process was to be made with copies described above.
   - Date and time of service: Jan 6, 2020, 9:38 am EST
   - Place of service: 1875 Connecticut Ave NW 10th Floor, Washington, DC 20009
     STREET ADDRESS, CITY AND STATE
   - Method of service:

| | | |
|---|---|---|
| [X] Personal Service | | [ ] Not Found |

[ ] Being unable to make personal service, a copy was delivered in the following manner:

[ ] Delivery to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of person to be served after giving information of its purport. List name, age of recipient, and relation of recipient to party

[ ] Posted on front door or such other door as appears to be the main entrance of usual place of abode (other authorized recipient not found).

[ ] (Garnishment Summons Only, § 8.01-511) Copy mailed to judgment debtor after serving the garnishee on date of service below unless a different date of mailing is shown.

DATE OF MAILING

| | |
|---|---|
| 01/06/2020 | |
| DATE | SIGNATURE |

Name (Print or Type)  Benjy Gomez Reyes
State/Commonwealth of  Virginia       , [ ] City [X] County of  Fairfax
Subscribed and sworn to/affirmed before this  January 6, 2020
by   Benjy Gomez Reyes                         Process Server
     PRINT NAME OF SIGNATORY                    TITLE

1/6/20
DATE          NOTARY PUBLIC (My commission expires    April 30, 2021
              Registration No.                         350096

MATTHEW M. DRURY
NOTARY PUBLIC
REGISTRATION # 350096
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
APRIL 30, 2021

FORM CC-1407 MASTER 11/15

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | |
|---|---|
| **JANE DOE,** | * |
| | * |
| | * |
| **Plaintiff,** | * |
| | *     **Case No. 2019 12642** |
| **v.** | * |
| | * |
| **CENK SIDAR,** | * |
| | * |
| **Defendant.** | * |
| | * |

## PLAINTIFF'S MOTION TO COMPEL SAMPLES
## FOR DNA AND OTHER BLOOD TESTS FROM DEFENDANT

JANE DOE ("Plaintiff"), pursuant to Rules 4:9 and 4:12 of the Supreme Court of Virginia, moves to compel samples from Defendant Cenk Sidar ("Defendant") of DNA and other blood tests. In support of this Motion, Plaintiff states:

1.    On or about January 6, 2020, Plaintiff served her First Set of Requests to Obtain Samples for DNA and Other Blood Tests from Defendant [Exhibit A]. This Request was hand delivered by a private process server, Exhibit B, on January 6, 2020, and a courtesy copy was sent to his counsel, Alexandros Mitrakas, Esq., of Mitrakas and Company, PC.

2.    In accordance with the Rules of the Supreme Court of Virginia, Defendant's Response to this Request was due on or before January 27, 2020 (twenty-one [21] days after service).

3.    To date, Plaintiff has received no responses whatsoever, either substantive or procedural, to her Request from Defendant.

### Argument

4.      Under Rule 4:9 of the Supreme Court of Virginia, a response to this Request was due within twenty-four (24) days after service was perfected by Counsel for Plaintiff by private process server. Defendant's response deadline was January 27, 2020.

5.      Pursuant to Rule 4:12 of the Supreme Court of Virginia, a party may apply for an order compelling discovery if an opponent fails to respond to discovery requests.

6.      Rule 4:1(d)(2) clearly states that "[d]iscovery shall continue after a demurrer, plea, or dispositive motion addressing one or more claims or counter-claims has been filed and while such motion is pending decision – unless the court in its discretion orders that discovery on some or all issues in the action should be suspended." Defendant did not seek or obtain any such Order from this Court, yet gave himself an impermissible extension for the deadline to this discovery.

7.      This discovery is necessary to establish that Defendant sexually assaulted Plaintiff on or about September 17, 2017, which Defendant denies.

8.      Rule 4:12(a)(4) provides that: "[i]f the motion is granted, the court shall, after opportunity for hearing, require the party. . . whose conduct necessitated the motion . . . to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees . . . ."

9.      Counsel for Plaintiff certifies that he has attempted to resolve the subject matter of this Motion in good faith.

WHEREFORE Plaintiff Jane Doe respectfully requests that the Court enter an Order compelling Defendant to submit to DNA testing and other blood tests without any further objection at a location to be designated by Plaintiff's Counsel within five (5) days and for such further relief as the Court may deem appropriate, including an award of attorney's fees.

Respectfully Submitted,

JANE DOE by
THE LAW FIRM OF URBAN & FALK, PLLC

By: _____

THOMAS F. URBAN II, VSB #40540
6066 Leesburg Pike, Suite 400
Falls Church, VA 22041
(703) 861-5235      FAX (703) 340-1450
Urban_law@yahoo.com

Walter Steimel, Jr. (pro hac vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com

*Counsel for Plaintiff Jane Doe*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was served by private process server on

Cenk Sidar
Sidar Global, Inc.
4311 Thomas Brigade Bridge
Fairfax, VA 22033

And was sent via U.S. First Class Mail to

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
3033 Wilson Blvd., Suite 700
Arlington, Virginia 22201
*Counsel for Defendant*

on this the 31st day of January, 2020.
on about
TFu

_____
Thomas F. Urban II

3

COPY

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| **JANE DOE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Case No. 2019 12642** |
| **v.** | * | |
| | * | |
| **CENK SIDAR,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

## PLAINTIFF'S FIRST SET OF REQUESTS TO OBTAIN SAMPLES FOR DNA AND OTHER BLOOD TEST FROM DEFENDANT

Plaintiff Jane Doe (hereinafter, "Doe" or "Plaintiff"), by and through the undersigned counsel, pursuant to Rule 4:9 of the Rules of the Supreme Court of Virginia, hereby requests that Defendant Cenk Sidar ("Sidar" or "Defendant") "permit the party making the request (Jane Doe) . . . to inspect, copy, test, or sample . . . designated tangible things . . . which are in the possession, custody or control of the party upon whom the request is served," Cenk Sidar. Specifically, Plaintiff requests Cenk Sidar to submit to a DNA test and a sexually transmitted disease test at a laboratory of Plaintiff's choosing no later than 21 days of receipt of this Request by Defendant. Counsel for Defendant can arrange this testing in conjunction with Counsel for Plaintiff, Thomas F. Urban II, Esq. at the Law Firm of URBAN & FALK, PLLC, 6066 Leesburg Pike, Fourth Floor, Falls Church, Virginia 22041, (703) 861-5235. Defendant should file a response to this Request within the 21 days called for under Rule 4:9 and "shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, including an objection to the requested form or forms for producing electronically stored information, stating the reasons for the objection. If objection

JA369

is made to part of an item or category, the part shall be specified and production shall be permitted as to the remaining parts." Rule 4:9(b)(ii).

## SPECIFIC REQUESTS FOR TESTING OR SAMPLES

1. Please permit Plaintiff to take a sample of Defendant's blood, saliva, hair, and urine for purposes of a DNA test to be conducted by an independent laboratory of Plaintiff's choosing.

   RESPONSE:

2. Please permit Plaintiff to take a sample of Defendant's blood, urine, and a skin swab for purposes of a sexually transmitted disease test to be conducted by an independent laboratory of Plaintiff's choosing.

   RESPONSE:

Respectfully submitted,

JANE DOE by
THE LAW FIRM OF URBAN & FALK, PLLC

COPY

By: _____
THOMAS F. URBAN II, VSB #40540
6066 Leesburg Pike
Falls Church, VA 22041
(703) 861-5235     FAX (703) 340-1450
Urban_law@yahoo.com
*Counsel for Plaintiff*

2

PLAINTIFF'S FIRST SET OF REQUEST FOR SAMPLES FROM DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was served via private process server to

Cenk Sidar
Sidar Global, Inc.
4311 Thomas Brigade Bridge
Fairfax, VA 22033   -or-

2112 8th St NW, Apt 920
Washington, DC 20001

or at any other address at which he may be found

on or about this the 19th day of December, 2019.

COPY

_____
Thomas F. Urban II

3

PLAINTIFF'S FIRST SET OF REQUEST FOR SAMPLES FROM DEFENDANT

**SERVICE OTHER THAN BY VIRGINIA SHERIFF**
**COMMONWEALTH OF VIRGINIA**
VA. CODE §§ 8.01-293, 8.01-320, 8.01-325

Case No.  2019 12642
Service No. _____  (Clerk's use only)

~~FILED~~
CIVIL INTAKE

| Fairfax County | | Circuit Court |
|---|---|---|
| Jane Doe | 2020 JAN -6  PM 12: 44 | Cenk Sidar |
| Cenk Sidar, 1875 Connecticut Ave NW 10th Floor , Washington, DC 20009 | | |

CLERK, CIRCUIT COURT

is the name and address of the person upon whom service of the following is to be made:

- ☐ Summons and Complaint
- ☒ Plaintiff's First Set of Requests for Document Production to Defendant; Plaintiff's First Set of Interrogatories to Defendant; Plaintiff's First Set of Requests for Admissions to Defendant; Plaintiff's First Set of Requests to Obtain Samples for DNA and Other Blood Test from Defendant

I, the undersigned, swear/affirm that
1. ☐ I am an official or an employee of an official who is authorized to serve process of the type described in the attached Proof of Service and my title and bailiwick are as follows:

   ☒ I am a private process server (list name, address and telephone number below).
   Benjy Gomez Reyes, Served by Elite, LLC 1340 Old Chain Bridge Rd Suite 107, McLean, VA 22101, (703) 556-5656
2. I am not a party to, or otherwise interested in, the subject matter in controversy in this case.
3. I am 18 years of age or older.
4. I served, as shown below, the above-named person upon whom service of process was to be made with copies described above.
   — Date and time of service:  Jan 6, 2020, 9:38 am EST
   — Place of service:  1875 Connecticut Ave NW 10th Floor , Washington, DC 20009
   STREET ADDRESS, CITY AND STATE
   — Method of service:

| ☒ Personal Service | ☐ Not Found |
|---|---|

Being unable to make personal service, a copy was delivered in the following manner:
- ☐ Delivery to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of person to be served after giving information of its purport. List name, age of recipient, and relation of recipient to party
- ☐ Posted on front door or such other door as appears to be the main entrance of usual place of abode (other authorized recipient not found).
- ☐ (Garnishment Summons Only, § 8.01-511) Copy mailed to judgment debtor after serving the garnishee on date of service below unless a different date of mailing is shown.

DATE OF MAILING

01/06/2020
DATE

SIGNATURE

Name (Print or Type)  Benjy Gomez Reyes
State/Commonwealth of  Virginia                         ☐ City  ☒ County of  Fairfax
Subscribed and sworn to/affirmed before this  January 6, 2020
by        Benjy Gomez Reyes
PRINT NAME OF SIGNATORY

1/6/20
DATE

NOTARY PUBLIC (My commission expires
Registration No.

Process Server
TITLE

April 30, 2021
356096

MATTHEW M. DRURY
NOTARY PUBLIC
REGISTRATION # 356096
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
APRIL 30, 2021

FORM CC-1407 MASTER 11/15

From: **Tom Urban** urban_law@yahoo.com
Subject: Fw: [ServeManager] Job #4246697 Served
Date: January 31, 2020 at 2:58 PM
To: Walter Steimel wes@sclgrp.com

*Thomas F. Urban II, Esq.*
*Law Firm of Urban & Falk, PLLC*
*P.O. Box 321043*
*Alexandria, Virginia 22320*

*(703) 861-5235*
*(703) 340-1450 (fax)*

*CONFIDENTIAL*
*The information contained in this electronic mail message is attorney privileged and/or confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address.*

----- Forwarded Message -----
**From:** Matthew Drury <notifications@mail.servemanager.com>
**To:** Thomas Urban <urban_law@yahoo.com>
**Sent:** Friday, January 31, 2020, 02:38:10 PM EST
**Subject:** [ServeManager] Job #4246697 Served

# Served

Matthew Drury shared a service notification with you:

## Details

**Process Server:** Benjy Gomez Reyes Process Server

**Date & Time:** Jan 31, 2020, 2:33 pm EST

**Service Type:** Personal/Individual

**Description of Service:**

The documents were personally served to Cenk Sidar

## Recipient

Recipient: Cenk Sidar
Age:        45
Ethnicity:  Caucasian
Gender:    Male

Weight:     220
Height:     5'9"
Hair:       Gray
Eyes:       Blue

**Description of Recipient:**

**Service Address**

1875 Connecticut Ave NW 10th Floor, Washington, DC 20009

**GPS Data**

**Mobile Device:** Android 10

**GPS Coordinates:** 38.915737, -77.0455441

**GPS Timestamp:** 1580499203303

# Job & Case

**Job:** 4246697

**Priority: Rush**

**Recipient:** Cenk Sidar

**Case:** CL 2019-12642

**Plaintiff:** Jane Doe

**Defendant:** Cenk Sidar

**Court:** Fairfax County Circuit Court

**County:** Fairfax

**Documents:** Friday Motions Day - Praecipe/Notice; Plaintiff's Motion to Compel Responses to First Set of Interrogatories and Requests for Production; Friday Motions Day - Praecipe/Notice; Plaintiff's Motion to Compel Samples for DNA and Other Blood Tests from Defendant; Friday Motions Day - Praecipe/Notice; Plaintiff's Motion to Have Unanswered Requests for Admissions Deemed Admitted

## Shared with you by:

Matthew Drury
Served By Elite, LLC
mdrury@servedbyelite.com
(703) 556-5656

VIRGINIA:

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

Jane Doe,
   Plaintiff

v.

Cenk Sidar
Defendant.

)
)
)
)
)
)
)
)

Case No. _CL 2019 - 12642_

### ORDER

This matter came to be heard on the _21st_ day of _February_ 2020 on the Plaintiff(s)/~~Complainant(s)/Defendant(s)~~'s motion _to Compel Samples for DNA and other Blood Tests from Defendant._

Upon the matters presented to the Court it is hereby

ORDERED as follows:

_The Motion is GRANTED. Defendant Cenk Sidar shall submit to DNA and blood testing at a facility of the Plaintiff's choosing no later than thirty (30) days after the date of the signing of this Order._

ENTERED this _21_ day of _Feb_, 2020.

_____
JUDGE

SEEN and _Agreed_
_____
Counsel for Plaintiff/Complainant
_Va Bar # 40540_

SEEN and ___ ~~Endorsement~~ Waived
            Per Rule 1:13
_____
Counsel for Defendant

JA375

**VIRGINIA:**

### IN THE CIRCUIT COURT OF FAIRFAX COUNTY

|  |  |  |
|---|---|---|
| | * | |
| JANE DOE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No. 2019 12642 |
| v. | * | |
| | * | |
| CENK SIDAR, | * | |
| | * | |
| Defendant. | * | |
| | * | |

### MOTION FOR CIVIL CONTEMPT OR, IN THE ALTERNATIVE, MOTION TO SHOW CAUSE WHY DEFENDANT SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR FAILING TO COMPLY WITH THIS COURT'S FEBRUARY 21, 2020 ORDER

By Counsel, and pursuant to Virginia Rule 4:12 and the inherent power of this Court, Plaintiff Jane Doe ("Plaintiff") respectfully moves for an Order holding Defendant Cenk Sidar ("Defendant") in civil contempt for failure to comply with an order of this Court. In the alternative, if the Court deems it required, Plaintiff seeks a Rule to Show Cause for why such civil contempt should not be imposed.

### MEMORANDUM

1.      On January 6, 2020, Plaintiff served on Defendant requests to obtain samples for DNA and other blood tests from Defendant. Exhibit A.

2.      Defendant failed to make himself available for such testing. Plaintiff moved for and was granted an Order on February 21, 2020, to compel. Exhibit B.

3.      Despite many requests over the past six months, Defendant has refused or failed to make himself available for testing, as required by the Court's Order. Despite multiple demands, both oral and written, Defendant has failed and refused to comply with the Court's Order and submit for testing. *See* Letters, Exhibit C.

MOTION FOR CIVIL CONTEMPT                                                                    1

4.      Plaintiff instituted this action for assault, battery, intentional infliction of emotional distress and punitive damages on September 13, 2019. Defendant disputed jurisdiction. On June 4, 2020, the court denied Defendant's motion, found personal jurisdiction over Defendant, and awarded sanctions, noting that Defendant's motion was frivolous and without basis in law or fact. Exhibit D (Order, Bellows, J.).

5.      Defendant continues to refuse to honor any of the orders of this Court, including orders to provide full and complete responses to discovery. Defendant's non-compliance has required Plaintiff to file multiple motions with this Court. Exhibit E.

6.      Plaintiff is entitled to DNA samples to compare to her rape kit and is entitled to his blood and other samples to determine whether Defendant exposed Plaintiff to sexually transmitted diseases when he raped her.

7.      Plaintiff should not have to repeatedly ask this Court to order Defendant to comply with the rules and orders of this Court and is entitled to sanctions and attorneys fees for these additional efforts.

8.      Due to Defendant's refusal to comply with this Court's Order for payment of money, Defendant should be forced to pay the fees incurred for having to file this motion, and a fine of a certain amount per day (preferably $1,000 per day) until such time as he complies with the Order.

9.      If the Court believes that a Rule to Show Cause is required in order to force the Defendant to comply with the Order, Plaintiff further requests that the Court issue such a Rule to Show Cause for why Defendant should not be held in contempt for failing to comply with its February 21, 2020 Order, in addition to the relief that she seeks pursuant to Rule 4:12 and the Court's inherent power.

## PRAYER

For the foregoing reasons, Plaintiff asks this Court to issue an order under Rule 4:12 to compel Defendant to comply with this Court's February 21, 2020 Order, hold Defendant in civil contempt, fine Defendant for every day which he refuses to comply with the Court's Order, and award Plaintiff additional attorneys' fees for having to bring this Motion.  In the alternative, if the Court does not believe that it can grant a daily civil fine without a Rule to Show Cause, Plaintiff respectfully requests that the Court issue such a Rule.

Respectfully submitted:

JANE DOE by
Fletcher, Heald & Hildreth, PLC

By: _____
THOMAS F. URBAN II, VSB #40540
1300 N. 17th Street, Suite 1100
Arlington, VA 22209
(703) 812-0462
FAX (703) 812-0486
urban@fhhlaw.com

Walter Steimel, Jr. (*pro hac* vice)
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
(202) 271-9258
wes@sclgrp.com

*Counsel for Plaintiff*

August 21, 2020

MOTION FOR CIVIL CONTEMPT                                          3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT a true and accurate copy of the foregoing was sent via

email and/or U.S. First Class Mail to

Cenk Sidar
1441 U Street, Apt 411
Washington, D.C. 20009

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
3033 Wilson Blvd., Suite 700
Arlington, Virginia  22201
*Counsel for Defendant*

on this the 21st day of August, 2020.

_____
Thomas F. Urban II

MOTION FOR CIVIL CONTEMPT                                                      4

**EXHIBIT B**

**JUDGE SMITH REMARKS**
**"Court of record saying criminal evidence can't be passed on to the law enforcement investigating agency"**
**Pages 23-31 of Hearing Transcript**

# In The Matter Of:

*JANE DOE v.*

*CENK SIDAR*

---

*HEARING*

*September 4, 2020*

---



9408 Grant Avenue, Suite 403
Manassas, Virginia 20110
(703) 331-0212
office@icrdepos.com
www.icrdepos.com

*Min-U-Script® with Word Index*

1

1    V I R G I N I A

2      IN THE CIRCUIT COURT OF FAIRFAX COUNTY

3    -------------------------X

4    JANE DOE,                    :

5      Plaintiff,                 :

6    v.                           :   Case No. CL 2019-12642

7    CENK SIDAR,                  :

8      Defendant.                 :

9    -------------------------X

10                                      Fairfax, Virginia

11                                    Remote via Webex

12                               Friday, September 4, 2020

13         The above action came on to be heard

14   before the Honorable Robert J. Smith, a Judge in and

15   for the Circuit Court of Fairfax County, 4110 Chain

16   Bridge Road, Fairfax, Virginia 22030, beginning at

17   12:34 p.m.

18

19

20

21

22

2

1            A P P E A R A N C E S

2

3     For the Plaintiff:

4

5          THOMAS F. URBAN, ESQUIRE

6          Fletcher, Heald & Hildreth

7          1300 North 17th Street, 11th Floor

8          Arlington, Virginia 22209

9          (703) 812-0462

10          urban@fhhlaw.com

11

12          and

13

14          WALTER STEIMEL, ESQUIRE

15          S/C/L/G PLLC

16          1455 Pennsylvania Ave., N.W. Suite 400

17          Washington, D.C. 20004

18          202-271-9258

19          wes@sclgrp.com

20

21

22

3

1        A P P E A R A N C E S   (Continued)

2

3    For the Defendant:

4          ALEXANDROS K.  MITRAKAS, ESQUIRE

5          Mitrakas and Company

6          1001 19th Street North, Suite 1200

7          Arlington, Virginia 22209

8          (703) 888-5517

9          amitrakas@mitrakasco.com

10

11         and

12

13         ANNA K. DVORCHIK, ESQUIRE

14         The Law Offices of Anna K. Dvorchik

15         3970 Chain Bridge Road

16         Fairfax, Virginia 22030

17         anna@advofirm.com

18         (571) 839-2301

19

20

21

22

23

1    custody orders or those types of things, the

2    sanction isn't -- and child support is -- that

3    people do go to jail, but in child custody you do

4    see a lot of monetary, you know, you have to pay

5    attorney's fees, you have to do this, these are the

6    things that you have to do.

7            So I'm illustrating only that those

8    sanctions are available to the Court because

9    sanctions are supposed to be remedial.  But, Your

10   Honor, I absolutely -- I absolutely understand the

11   importance of Court orders.  And that is why we

12   filed the motion -- filed a motion for a protective

13   order in this case.

14           THE COURT:  Let's go on to the protective

15   order.  You want -- as I understand it, you said you

16   will comply if I -- if this protective order is

17   signed?

18           MS. DVORCHIK:  Yes.

19           THE COURT:  Now, the problem I have with

20   that is it seems to me you are asking the Court to

21   suppress evidence in a possible criminal trial.  I'm

22   not sure I should do that.

28

1  share this DNA with London because we don't want the

2  London police to know it, it looks like that we're

3  helping to suppress evidence in a criminal trial in

4  another country.  And I think they probably wouldn't

5  look too kindly on that.  And so I think there's

6  some risk there.

7           THE COURT:  Ms. -- I can say, Ms.

8  Dvorchik, your solution is attractive in the sense

9  that it gets us over this impasse.  But I really

10 have trouble as a Court of record saying criminal

11 evidence can't be passed on to the law enforcement

12 investigating agency, the investigating law

13 enforcement agency.  I just don't think I have that

14 authority.  And it doesn't -- it doesn't pass the --

15 it doesn't pass the appearance.  The optics aren't

16 good.

17           MS. DVORCHIK:  Your Honor, if I could

18 address those things.  We obviously -- if this was

19 in the United States, everything was in United

20 States, it would be a very different case.  The

21 cases that Mr. Steimel talked about would be much

22 more applicable.  He actually has privacy rights in

29

1  that country because of the fact that he voluntarily

2  give something before it got lost.

3       But I understand the Court's concern about

4  (inaudible).  But here in the United States if you

5  -- if Mr. -- if Mr. Sidar is sued for sexual battery

6  while there is an ongoing case here, they believe

7  that he has waived the Fifth.  If he pleads the

8  Fifth, he doesn't give the DNA sample, he pleads the

9  Fifth, he pleads the Fourth Amendment.  Both

10  amendments are available to him.

11       Those -- those would -- they would have a

12  similar issue if they're dealing with United States.

13  Now, in United States, it probably would have been

14  going forward and other than the statute of

15  limitations there would be no civil case until the

16  criminal case is over.

17       Because they're dealing with a foreign

18  country and the foreign country has both party's

19  statements and is not willing to move forward

20  without the DNA testing --

21       What the Court does know and what Mr.

22  Steimel hasn't shared with you, and we certainly

30

```
 1    haven't yet asked for in discovery, is if he sends

 2    Mr. Sidar's DNA to London and they do a comparative

 3    testing, how does that evidence -- how does Mr. --

 4    how does -- The Haven -- the London police are not

 5    an agent of the plaintiff.  How does this

 6    information come back to United States?  We have

 7    shared with them that when our counsel in London

 8    looked at our stuff with their solicitor there, they

 9    didn't have any idea as to how the sample would be

10    --

11           MR. URBAN:  Your Honor, I'm going to

12    object this is wrank hearsay.  I mean, you know,

13    what a solicitor in the UK said to Ms. Dvorchik -- I

14    mean, you know, at some point --

15           THE COURT:  It's only argument.  I

16    overrule the objection.  Continue, Ms. Dvorchik.

17           MS. DVORCHIK:  But the bottom line is, we

18    don't know if they send it to London if they get it

19    back in a usable form for going into trial here, but

20    -- the natural course, they can use to put evidence

21    in because they're -- we're not dealing with a

22    private lab that they've contracted with.  There is
```

31

```
 1   no kind of protection if the London police
 2   investigates.  So any of the things that happened,
 3   we have access to it.
 4         But the issue -- the issue is Mr. Sidar is
 5   also faced with do I put myself in a position to be
 6   prosecuted somewhere where it said it's not going to
 7   prosecute it without a DNA and without the
 8   protective order, when we don't have any information
 9   other than Mr. Steimel's statement that London won't
10   send the rape kit here for testing?  But the bottom
11   line is this isn't -- this is -- Mr. Sidar's rights
12   there aren't insignificant.
13         THE COURT:  All right.  The motion for
14   protective order was the easier of the two.  That's
15   denied.
16         The motion for these sanctions, such as
17   have been requested, is also denied until there's a
18   rule to show cause in the file somewhere.  I don't
19   see it.  When I sign it -- when I find it, I'll
20   check it out and probably sign that.  It depends on
21   what you've asked for on the rule to show cause.
22         MR. URBAN:  Your Honor, could we at least
```

32

1    get attorney's fees and -- for today's motion, as

2    well as an order to compel them to provide the blood

3    and DNA sample?

4              THE COURT:  Well, I've already done the

5    order to compel to provide the DNA sample.  That has

6    been done.  That was February 21st.

7              MR. URBAN:  I understand, Your Honor, and

8    we're asking you again to reiterate and provide

9    additional sanctions under 12(b) and (d).

10             THE COURT:  Like I just said, I'll

11   consider a rule to show cause for not complying with

12   the February 21st order.

13             MR. URBAN:  And that's in our alternative

14   argument in our motion.

15             THE COURT:  When I find it, I'll sign it

16   and let you know.

17             MR. URBAN:  All right.  Thank you, Your

18   Honor.

19             MR. STEIMEL:  Thank you, Your Honor.

20             MS. DVORCHIK:  Thank you.

21             (The hearing was concluded at 1:04 p.m.)

22

33

1                    CERTIFICATE OF REPORTER

2           I, Linda M. Kia, the Verbatim Reporter who

3    was duly sworn to well and truly report the

4    foregoing proceedings, do hereby certify that they

5    are true and correct to the best of my knowledge and

6    ability; and that I have no interest in said

7    proceedings, financial or otherwise, nor through

8    relationship with any of the parties in interest or

9    their counsel.

10          IN WITNESS WHEREOF, I have hereunto set my

11   hand this 11th day of January, 2021.

12

13

14                   _____

15                        Linda Marie Kia

16                    Verbatim Court Reporter

17

18

19

20

21

22

**EXHIBIT C**

**EXEMPLAR DNA CORRESPONDENCE BETWEEN COUNSEL**

## Steimel Conner Law Group

**Walter E. Steimel**
Managing Member

June 5, 2020

Via Electronic Mail
amitrakas@mitrakasco.com

Alex Mitrakas, Esq.
1001 19th Street North, Suite 1200
Arlington, Virginia 22209

      Re:    Second Request; Demand
             Outstanding Court-Ordered Fee Payments
             DNA and Blood Samples

Dear Alex:

With yesterday's determination of personal jurisdiction, I wanted to follow on my May 20 letter to you. Neither you nor your client have responded, even though your May 21, 2020, email stated that you had "not had a chance to review the letter yet but, hope to get to it soon."

Defendant failed to make two Court-ordered payments of attorneys' fees. *See* May 20 letter. Defendant has also failed to respond to our demand for compliance with his Court-ordered DNA and STD testing. We demand immediate compliance with all of these obligations, and intend to seek a contempt and enforcement order, attorneys' fees and costs, and sanctions if these are not resolved by close of business Wednesday, June 10, 2020.

To repeat our May 20th letter, Defendant's obligations are --

    **A.**    **Attorney Fees, $1,710.00, Order dated 2/28/20**

The due date for this payment was May 22, 2020. We have not received payment.

    **B.**    **Attorney Fees, $2,749.00, Order dated 3/5/20**

The due date for this payment was May 29, 2020. We have not received payment.

We repeat our payment instruction --

Wire instructions:
John Marshall Bank
640 Franklin Street, Alexandria, VA 22314
703.289.5950
ABA Routing: 056009356
Account #: 1000014801

Steimel Conner Law Group
1455 Pennsylvania Avenue NW, Suite 400, Washington DC 20004
Telephone: 202-271-9258                                  E-mail: wes@sclgrp.com

JA393

## Steimel Conner Law Group

Alex Mitrakas, Esq.
June 5, 2020
Page 2

FBO: Steimel Conner Law Group, IOLTA

Administrative Office Mailing Address:
Walter Steimel
401 North Saint Asaph
Alexandria, Virginia 22314

### C.    DNA and Blood Samples

MedNovations will take the DNA buccal swabs and samples for the STD screens. I have
instructed them to contact both you and Defendant to set up a collection time. MedNovations
charges a $75.00 no-show fee for each missed appointment. We will seek enforcement from the
Court if we do not have definitive plans, no later than close of business Wednesday, June 10,
2020, for testing to be completed no later than Wednesday, June 17, 2020.

To be clear, we intend to petition the Court for contempt, enforcement, attorneys' fees and
sanctions if these matters are not resolved by close of business Wednesday, June 10, 2020.

Finally, as I noted in my May 20th letter, and near the end of yesterday's hearing, I never
received reimbursement for the Appearance Fee of $772.50. As this expense was incurred due to
an agreement between counsel we expect immediate reimbursement.

When Defendant pays the Court-ordered attorneys' fees from yesterday we will reimburse you
for this payment in order to avoid double-recovery of the expense.

Very truly yours,

Walter E. Steimel, Jr.

CC:    Thomas F. Urban, II, Esq.

Steimel Conner Law Group
1455 Pennsylvania Avenue NW, Suite 400, Washington DC 20004
Telephone: 202-271-9258                                        E-mail: wes@sclgrp.com

JA394

**Steimel Conner Law Group**

**Walter E. Steimel**
Managing Member

August 10, 2020

Via Electronic Mail
anna@advofirm.com
amitrakas@mitrakasco.com

Anna Dvorchik, Esq.
The Law Office of Anna K. Dvorchik, PLLC
3970 Chain Bridge Road
Fairfax, VA 22030

Alexandros Mitrakas, Esq.
Mitrakas and Company, PC.
1001 19th Street North, Suite 1200
Arlington, Virginia  22209

       Re:    DNA and Blood Testing of Defendant

Counsel:

Following on Judge Smith's Order denying reconsideration, dated August 7, 2020, we demand that Defendant make himself available for DNA and blood testing no later than five (5) p.m. August 17, 2020, one week from today. Judge Smith's February 21, 2020, Order provided that DNA and blood testing would take place at a facility of Plaintiff's choosing.

Our demand reiterates and incorporates our letters to you of May 20, 2020, and June 5, 2020, both of which have not been answered except for a vague reference by Mr. Mitrakas that "he will get to it soon." We have arranged for the samples to be drawn by Mednovations LLC. We've provided this information to you several times before, but its contact person is Chantal and her contact information is --

Mednovations LLC
4196 Merchant Plaza
Woodbridge, VA, 22192
chantal@mymednovations.com

I have copied Chantal on this communication. She can arrange to meet Defendant at a location convenient to him, but will let Chantal address those specifics.

Should Defendant fail to make himself available by 5 p.m., August 17, 2020, we will file contempt motions in accordance with the procedures recently outlined by Judge Oblon during our hearing in front of him, and we will seek attorneys' fees and sanctions for Defendant's

Steimel Conner Law Group
1455 Pennsylvania Avenue NW, Suite 400, Washington DC 20004
Telephone:  202-271-9258      E-mail:  wes@sclgrp.com

JA395

## Steimel Conner Law Group

Anna Dvorchik, Esq.
Alex Mitrakas, Esq.
August 10, 2020
 Page 2

continued violation of the Orders of the Court. If necessary, we will proceed with the two-step roadmap outlined by Judge Oblon to reach criminal as well as civil sanctions.

While our timeline might seem short, we remind you that the Defendant has been avoiding his obligations since February.

Please coordinate directly with Chantal and keep us in the loop.

Very truly yours,

Walter E. Steimel, Jr.

Cc:     Thomas F. Urban II
        Mednovations LLC

Steimel Conner Law Group
1455 Pennsylvania Avenue NW, Suite 400, Washington DC 20004
Telephone:  202-271-9258                          E-mail:  wes@sclgrp.com

JA396



**From:** **Walter Steimel** wes@sclgrp.com
**Subject:** Re: DNA and Blood Testing Schedule; Demand
**Date:** August 16, 2020 at 12:06 PM
**To:** Alex Mitrakas amitrakas@mitrakasco.com
**Cc:** Thomas Urban urban@fhhlaw.com, Anna Dvorchik anna@advofirm.com
**Bcc:** Walter Steimel, Jr. wes@sclgrp.com

Alex,

Thank you for sending the blood test results that you provided, but the test tells only part of the story. The test results are insufficient as Defendant was not tested for HPV, herpes, hepatitis B or syphilis. Why was he not tested for these? The hepatic function test was interesting but irrelevant to STDs – that test would primarily be relevant to screen for alcohol or drug abuse. We still require a blood test for a full disease profile.

Your characterization of my remarks at last week's hearing has no basis in fact. I stated that proceedings in London were irrelevant to me, and nothing more. Please highlight the passage you reference because I simply do not see that in the transcript.

We cannot agree to your request. We cannot and will not agree to any protective order that interferes with our pursuit of this case and of Plaintiff's rights. We will not be placed in a situation where any DNA comparison we seek to introduce is opposed because of alleged defects in the process. If the experts we consult require comparison of samples in London, we cannot be in a position where we have agreed to a limitation that prevents that comparison.

Further, we have found no cases or legal principles that would support a request for protective order as you suggest. We know Defendant voluntarily provided a DNA sample to the London Police sometime after he raped Plaintiff. He can have no reasonable expectation of privacy in that DNA, and we doubt any judge would grant a protective order along the lines you suggest. If you attempt to move for such a protective order we will not only oppose it, but will request sanctions under Virginia Code §8.01-271.1 as it is clear to me that not only is there no case law that would support such a request, the jurisprudence is just the opposite and the motion would constitute another attempt to delay this case and frustrate Plaintiff's ability to obtain relevant and admissible evidence.

Finally, as members of the Bar, we have a duty to cooperate with the police if asked, and cannot waive our duties as officers of the court.  I'd be hesitant to violate my duties as an attorney and officer of the court just to help the opposing party suppress evidence of a crime. Wouldn't you?

One final observation. We have been informed that Defendant has legal representation in London, that Defendant's solicitor has been attempting to obtain information from the authorities about discussions that we, as Plaintiff's counsel, have had with the authorities, including inquiries about the status of this civil case and strategies or thoughts shared by us. This conduct, if true, is blatantly improper and must cease immediately. We will aggressively pursue not only Defendant but counsel for improper interference in this case and may add new counts to our complaint depending upon what my further investigation yields.

Please conduct yourself accordingly.

Walt

Walter E. Steimel, Jr.
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W. Suite 400
Washington, D.C. 20004
202-271-9258
wes@sclgrp.com

On Aug 13, 2020, at 4:59 PM, Alex Mitrakas <amitrakas@mitrakasco.com> wrote:

Walt,

At last week's hearing, you indicated that you had no intention of sharing Mr. Sidar's DNA with London Metropolitan Police Service or Crown Prosecution. You are merely working with them in order to test Mr. Sidar's sample. We are therefore requesting that you agree to a protective order, keeping Mr. Sidar's DNA sample and results here in the United States and that this sample and any results of testing will be used for this court proceeding only and will be destroyed at the conclusion of this civil case.

Also, as a gesture of goodwill we attach Mr. Sidar's test results from when he was tested for hiv, gonorrhea and chlamydia in June where he was found to be negative for those particular diseases.

We would like Mr. Sidar to be in compliance with this Order as soon as possible. Please let us know if you are comfortable with signing such an Order and we will draft it and provide it you for edit and comments.

Alex

Alex Mitrakas
Attorney at Law
 Shareholder
1001 19th Street North
Suite 1200
Arlington, VA 22209
703-888-5517 Direct

**From:** Walter Steimel <wes@sclgrp.com>
**Sent:** Monday, August 10, 2020 1:20 PM
**To:** Anna Dvorchik <anna@advofirm.com>; Alex Mitrakas <amitrakas@mitrakasco.com>
**Cc:** Chantal Lewis <info@mymednovations.com>; Thomas Urban <urban@fhhlaw.com>
**Subject:** DNA and Blood Testing Schedule; Demand

Review and act accordingly. We expect this to be completed within a week.

Walter E. Steimel, Jr.
Steimel Conner Law Group PLLC
1455 Pennsylvania Ave., N.W. Suite 400

Washington, D.C. 20004
202-271-9258
wes@sclgrp.com

<Document-12937475-complete.pdf>

**EXHIBIT D**

**MEDNOVATIONS "NO SHOW FEE"**

**Mednovations LLC**
3122 Golansky Blvd, suite 101
Woodbridge, VA  22192 US
(571)989-4134
info@mymednovations.com
www.mymednovations.com

# Invoice



Mednovations LLC
Innovative Medical Solutions

| BILL TO |
| --- |
| Mr Walter Steimel Esq |
| Steimel Conner Law Group PLLC |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
| --- | --- | --- | --- | --- | --- |
| 1816 | 05/28/2020 | $905.00 | 05/28/2020 | Due on receipt | |

| DESCRIPTION | QTY | RATE | AMOUNT |
| --- | --- | --- | --- |
| **DNA  Collection:DNA sample Collection**<br>Dna sample collection | 1 | 330.00 | 330.00 |
| **Std Testing** | 1 | 500.00 | 500.00 |
| **Patient Services:Patient No Show Fee** | 1 | 75.00 | 75.00 |

BALANCE DUE                    **$905.00**

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

Jane Doe,
    Plaintiff             )
                          )
                          )
v.                      )    Case No. CL 2019 - 12692
                          )
Cenk Sidar          )
    Defendant.           )

## ORDER

This matter came to be heard on the 21 day of _February_ 2020 on the Plaintiff(s)/~~Complainant(s)~~/~~Defendant(s)~~'s motion _to Compel Samples_ _for DNA and other Blood Tests from Defendant._

Upon the matters presented to the Court it is hereby

ORDERED as follows:

_The Motion is GRANTED. Defendant Cenk_
_Sidar shall submit to DNA and blood testing_
_at a facility of the Plaintiff's choosing no_
_later than thirty (30) days after the_
_date of the signing of this Order._

ENTERED this 21 day of Feb , 2020.

_____
JUDGE

SEEN and _Agreed_
_____
Counsel for Plaintiff/Complainant
Va Bar # 40540

SEEN and ~~Endorsement Waived~~
Per Rule 1:13
_____
Counsel for Defendant

JA402

**EXHIBIT E**

**EXCERPTS OF DEFENDANT'S STATEMENTS TO LONDON POLICE**

**Police interview with Cenk Sidar on Friday 23 February 2018 at Holborn Police Station**

**TRANSCRIPTION OF TAPE**

Attendees:   **MP - DC Mark Papasavva**
             **DL - DS Darren Leila**
             **CS – Cenk Sidar**
             **VO – Valeria Owens**

| | |
|---|---|
| MP | This interview is being audio recorded.  My name is Detective Constable Mark Papasavva and I currently work at the Met's Child Abuse and Sexual Offences command.  Also, present is |
| DL | Detective Sergeant Darren Leila. |
| MP | He works in the same unit as I do.  We are here today at Holborn Police Station in interview room 2 and the date is Friday the 23rd of February 2018.  Could you provide me with your full name and your date of birth please? |
| CS | Cenk Sidar, June 8 1982, Istanbul, Turkey. |
| MP | Thank you.  Also present with you is? |
| VO | Valerie Owens representing Don Solicitors. |
| MP | Thank you.  We are here today to interview you Cenk, before we go any further I just need to remind you of a few sort of rights and entitlements.  The first one is your right to free and independent legal advice.  You have a solicitor with you erm Ms Owens, you have spoken to her and if you want to speak to her again at any point during the interview, just let me know, I will stop the interview, me and Darren will leave the room and you can have a further consultation |
| CS | Ok. |
| MP | Just let me know and that's fine.  Also, whist you are here during this interview, I need to remind you of the caution okay. |
| CS | Mm hm. |
| MP | Okay.  You do not have to say anything but it may harm your defence if you do not mention when questioned something which you later rely on in Court.  Anything you do say may be given in evidence |
| CS | Mm hm mm hm |
| MP | I will explain that in a moment.  Although you are under the caution, you are here voluntarily okay |
| CS | Mm hm |
| MP | So you are free to leave at any point if you want to okay |

| | |
|---|---|
| | we start kissing and like getting close a little bit you know. But then I you know at that point nothing you know like, it was just like maybe kissing, hugging and that you know we just fell asleep. That was it, we fell asleep. An hour and a half later or two hours later somehow we wake up again and the same thing happens and in the middle nothing happens, there is no sexual intercourse anything like that, it was just like hugging, of course like she was kissing and she was talking to me you know like she was like telling me about the new guy, he is using what is it called like not Tinder but the |
| MP | Dating app |
| CS | Bumble, bumble. There is another one. It is called Bumble. |
| MP | It's a dating app though? |
| CS | It's a dating app. And she goes and meets people and stuff all the time |
| MP | Yup |
| CS | And she was telling me that she met someone, I think she was staying at her place until Friday you guys. Er you know and basically she was showing me the people and all this stuff and then like at some point we were acting again like hugging and like maybe touching, she was touching me, I was touching her, I don't know how to tell, but then in the middle of it she was like oh what you doing? I said what I am doing? And she basically like you know pushed me, you know like and I said, and I did this, she pushed me like, I was like oh what's going on you know like because all of a sudden like she was like totally, and I was also actually and totally not toxicated or anything like that you know. She pushed me, I said what's going on and we had half of our clothes on. I had my underwear she had her underwear, I don't think I had a t-shirt I had a boxer and that's all and she had underwear, I don't remember she had a t-shirt or not. And she wanted to leave and again, stupid me I am thinking oh you stay here I go its 5am, because it is 5am and its 2am we come home and its like two hours later you know. I say you stay and I leave because you know if you don't wanna be in the same place now you know like young woman, I don't want you to leave at 5am you know like, er but I offered it, I didn't say stay |
| MP | Yeah yeah I understand |
| CS | No no she starts screaming and getting mad at me. I said woah you know like what's going on and I thought she thought she had sex but I am 99.9% sure, 100% we didn't have sex, you know like, I may be like, you know like, hugging your own and on top of her you know like maybe she felt that she was also like doing it but then all of a sudden you know like it looked like she was a different person, you know one second, and next second I stop immediately and I lay it on the table it's total fabricated. I stopped immediately when you know told me that I continued or something like pushed her that's totally a lie, you know. I immediately stop, I let her go, you know, she left and at that point I felt really bad because like you know like, what did I do wrong, you know like, she, I mean, she was a friend. I mean of course we spent a day together, it was you know, a little bit like ah I like her she's good looking you know girl and stuff and there was no emotional attachment, no relationship, you know like I even told her problems in my marriage, you know at that point, you know like because at that point I was considering you know separation and stuff and that was like a blow to me because it was how I, why I invited her stay at my place. Why I let her stay at my place. She basically asked me you know. Then I offered her. I even offered her, you know like I think it was Friday when she sold the place because these are studio, you know, it may not be comfortable, you know, I get a hotel room, if you like to be comfortable, she said no, no, no, that's ok I always stay with you know like friends no problem. I offered her, |

| | |
|---|---|
| | was like sleeping or something or she was like losing like you know. I don't remember maybe I slept first. I mean to be honest I don't remember that. Nothing happened. |
| MP | Ok. The next time though, this is the important part ok, this is where your account and Omitt s account slightly differs. We just need to make sure I have all the information. So she is saying when she woke up you was on top of her and you was having sex with her. So your penis was in her vagina. She is saying she is asleep she cant quite work out what is going on so she tells you, sort of saying stop stop in a you know sort of half awake, she is trying to sort of say stop stop and then when she fully wakes up she sees that she and she pushes you off. So that is the small point where you to differ. Because you are saying she pushed you off. That's fine |
| CS | Hmm hmm |
| MP | Are you 100%? |
| CS | Pushing wasn't like you know |
| MP | Yeah she said she pushed you once and that was it |
| CS | There was no like fight pushing |
| MP | No no you two have given the same account. She says that she pushes you off with two hands and she even said you was stood back going oh whats wrong |
| CS | I said whats going on nothing happened why are you doing this? You know like |
| MP | Did you have sex with her? |
| CS | No I didn't. I don't I don't I didn't put my penis in her vagina. I was you know I was on top of her maybe she felt it but I was in my underwear and I was thinking about it you know because she [inaudible] about it and of course we are I was also half sleepy so you know. That was my you know concern, I was half sleepy because it wasn't like fully [inaudible] you know like I don't know who woke each other up. I because I am a deep sleeper you know like if someone wakes me up like but if she erose me or something I don't remember that part you know I remember I was sleeping. But when it er so basically when I was on top of her shes right I think she maybe felt like I was you know like erected and that point but it wasn't I didn't. |
| MP | She was saying that you she is fairly adamant that you were penetrating her vagina with your penis. |
| CS | I don't, I don't, I don't agree with that no. That's not I may have you know like on top of her maybe she felt something but you know it wasn't like full you know so maybe it touched her but you know there wes underwear you know there was underwear. |
| MP | Just before we. |
| CS | Does she, does she say she has underwear, she tells you that. |
| MP | No. |
| CS | [inaudible] well how we gonna do that okay. |
| MP | She's saying she wasn't wearing her underwear. |

| | |
|---|---|
| CS | That's that's... |
| MP | She said you were completely naked [inaudible]. |
| CS | That a lie, that's a lie.  We both have underwears.  She had a pyjama like underwear. |
| MP | Now tell me in as much detail as you can remember exactly what happened at that point.  So you... |
| CS | When she said stop. |
| MP | No no before that.  You both wake up. |
| CS | Yeah. |
| MP | And you said you started kissing... |
| CS | Mmm. |
| MP | ...and cuddling.  Tell me as much detail as you can remember exactly what happens. |
| CS | I what I remember, I |
| MP | [Inaudible]. |
| CS | I'm on top of her.  I had my underwear, she has her underwear and on top of her but again at that point I'm also waking up fully because she says stop. It wakes me up.  You know like it's, it's also, I, at that point it was like sleepiness, you know like drunk but I wasn't having sex because I remember because I had on underwear. |
| MP | What were you two doing then? |
| CS | Huh? |
| MP | What were you doing?  You said you weren't having sex but were you kissing, where were you touching each other, what...? |
| CS | Yeah it's like, I mean not even you know sex, I was just on top of her and maybe I was just kissing her neck or something you know like but it was like. |
| MP | And what's she doing? |
| CS | She was like, she was also like, her hand was you know on my err neck you know like, but it wasn't like anything extreme on that part you know so that's why I'm shocked.  So basically we had our underwears.  I was, I mean at that point you know it was a weird situation because like I was, we were, we both were wake up, it's kind of half-awake situation you know I was in the same situation too but I know if I knew I would have like sex with someone you know.  So I you know that's why I'm confident that we had underwear because I didn't know about I didn't think about it at that point.  She had her underwear, I had my underwear and I had I had to tell her look we have underwear so how we gonna have [inaudible] but I didn't think about. |
| MP | <span style="color:red">Omitte</span> attended The Haven on the mor... it's what's called The Haven.  It's where victims of serious sexual assault... |
| CS | Mmm mmm. |

16

Transcript of Interview 23.2.2018 prepared by Kingsley Napley_23596790_3

Sidar001092

JA407

| MP | ...where they can be medically examined. |
| CS | Mmm mmm. |
| MP | And also forensically examined investigation. |
| CS | Uh huh. |
| MP | She attended on the morning after it happened. |
| CS | Uh huh, uh huh, uh huh. |
| MP | Any... will your semen come back on any of the swabs that were taken from her? |
| CS | Did it? |
| MP | No, will they, will they? |
| CS | No, no.  I, no *[laughs]* no. |
| **MP** | **[Inaudible]**. |
| CS | No there was no.. |
| MP | There's no way... |
| CS | Ejaculation at any point in that whole story.  Even earlier you know there was no ejaculation anything, even earlier part... is it the word ejaculation? |
| MP | Yeah ejaculation yeah yeah yeah. |
| CS | I don't know like... no. |
| MP | So at no point, they haven't been sent off yet, they will be getting sent off. |
| CS | Uh huh. |
| MP | Because obviously she's saying you've had sex and you're saying you've not has sex. |
| CS | Uh huh. |
| MP | I just wanna clarify... |
| CS | Uh huh. |
| MP | You're aware that's gonna happen. |
| CS | Yeah. |
| MP | And you're adamant... |
| CS | Yeah. |
| MP | ...that you're semen will not come back on it. |
| CS | No no. |

17

Transcript of Interview 23.2.2018 prepared by Kingsley Napley_23596793_3

| MP | And you know what I mean by the word term semen? |
|----|---|
| CS | Yep yep, huh?. |
| MP | You know what I mean by the term semen? |
| CS | Yeah I **[inaudible]**. |
| MP | Yeah I had another interview and someone's said they didn't understand that word so I just have to make sure that word so I have to make sure thats fine. |
| CS | Yeah yeah no no no way.  No I mean there was no, I mean I would be you know like, there is no like even there was no ejaculation in the earlier part you know like whatever called masturbation... |
| MP | Yeah. |
| CS | ...something like, there was nothing you know so.  In the second part not there also. |
| MP | And you two have never had sex together? |
| CS | No no no. |
| MP | **[Inaudible]** |
| CS | Not in our lives.  And I hadn't seen her... |
| MP | Since College. |
| CS | Eight, nine years. |
| MP | Yeah that's fine okay.  So after that she storms out. |
| CS | Uh huh uh huh. |
| MP | And you two started sending WhatsApp messages to each other. |
| CS | Yep yep yep. |
| MP | No I've... I don't know how good your eyesight is, I don't know if you can see off here, if not I'll show it on the screen. |
| CS | Mmm. |
| MP | Can you read that, it's pretty small? |
| CS | **[Inaudible]**. |
| MP | I can clearly understand if you can't see that.  I can just get it up on the err... do you want me to get it up on the laptop? |
| CS | No I can read it yeah. |
| MP | Fine **[inaudible]** I'll do it on the laptop **[inaudible]**.  So basically there's no one message I wanna go to, it's just a general... |

| CS | Uh huh. |
|----|---------|
| MP | ...atmosphere, the messages that you two are sending each other. |
| CS | Yeah this is about the earlier date. Earlier time **[inaudible]**. |
| MP | Oh yeah yeah yeah skip along *[Short pause]*. So if you go to about page 8 no 6. So you're very very apologetic throughout. |
| CS | I am yeah, Im pleasing because I felt him, I felt her bad. I mean I didn't know why I met her extremely upset and I also appeasing because I was thinking that she was going to go, you know crazy with the Facebook and all this stuff. I was like apologetic just to make her, you know, because actually, you know whatever you do like even you know like I felt bad for many reasons. The first thing is I was a married man. I had invited her to my place. That was a mistake that I did. The second thing is I met her till that way. I sincerely believe she thought we had sex, you know I don't think she was making up you know, I think maybe she was dreaming or she was you know, so I want to calm her down, you know if there is anything, so I say like maybe it was asleep you know you went asleep so I do think we had sex. So I wasnt but I wasn't confronting her because she's not someone you want to confront, she's a bit psycho, but if I tell her like you know you're crazy, you know like then she would go on Facebook and kill me *[laughs]*. I don't, yeah I can't read all of them here but **[inaudible]**. |
| MP | No no no I can get them up on the screen. |
| CS | Let me know which one I need to read. |
| MP | So why didn't you tell her you didn't have sex then? If she's, if she's saying, if she's... |
| CS | **[Inaudible]** she said, I don't think she clearly said except one area that... |
| MP | She says at the very very beginning that you raped her. |
| CS | Yeah I mean I didn't exactly thought that she was thinking about sexual penetration at that point. I thought maybe like touch her and stuff you know. So I wasn't sure about that 100%. |
| MP | What's your understanding of the term rape then? What, what does it mean to you? |
| CS | I mean I didn't basically it was like 10 minutes of the case, if you look at the messages the time I think were like, what time was it? |
| MP | **[Inaudible]**. |
| CS | It was like, it was within, mmm for sure it was next two hours. Yeah or something like that but it was probably earlier. And I was like no she is like again after seeing her what she did at the nightclub with this bouncers and you know cursing them and so I was like kind of scared of her you know she could, if someone tells her dad in the US it's a big deal. You know you can't like... |
| MP | It a big deal here as well. |
| CS | Yeah I mean yeah yeah but you know, it's a big deal everywhere yeah but I was basically err appeasing her and... |

| MP | But why didn't you just deny it?  Why didn't you s... if you've not raped her why didn't you say "I did not rape you"? |
|----|----|
| CS | I, I think I did say something like this, I said something like I didn't rape you.  It was like we both were in bed and was sleeping.  I mean I think I said that somewhere.  I deleted those messages because... |
| MP | You said I think I was sleeping when anything happened and I was shocked too. |
| CS | What is it? |
| MP | Err that's on page 8, the eighth page. |
| CS | Okay. |
| MP | Erm it's double, double-sided err, and its... |
| CS | Yeah everything happened yeah I mean everything yeah like all this hugging and touching and you know like making out.  That's what I have said.  I said this is sleep we were both sleeping, I don't know what happened. |
| MP | You say I believe it was a second before I fully woke up as well. |
| CS | Yeah yeah that's right. |
| MP | Is there any possibility that you were having sex with her whilst you were asleep? |
| CS | No I don't think so. |
| MP | [Inaudible]. |
| CS | I was thinking about it but then the reason I got sure about it is because I had my underwear and my underwear was not like open up underwear you know whatever the word is. |
| MP | [Inaudible] |
| CS | So that why I got, at that point I wasn't, I was like shocked you know.  I was never faced anything like this in my life.  So when she wrote me the stuff I was like, I thought still like maybe she was crazy but I could calm her down, what's going on, listen, you know let me know if I can help, because she start complaining about the expense in the summer here of the drugs.  I said I can help you with that if you want so I don't know what's going on.  I even tell her you didn't need to do that.  And also I think we had one, I don't remember it but I think we had also one call we had talk briefly when she was in Dubai because she said and we lost the contact but I said like you know so in this, I mean I wouldn't say this on a WhatsApp, I'm not a stupid guy you know like I was basically appeasing her and saying that listen you need to calm down.  When this happened I'm talking about you know like sexual intimacy like because I was on top of her and you know but then I think like I had my underwear.  And how we gonna have, you know how we gonna have sex because I didn't put my underwear [inaudible] like that. |
| MP | So there's no possibility you have what... |
| CS | I don't no I mean. |
| MP | There's a medical condition called sexsomnia where people... |

Transcript of Interview 23.2.2018 prepared by Kingsley Napley_23596793_3

Sidar001096

| CS | I, I mention on that because I was like because basically you know like I we talk about it.. I was… when I mention that where you hug someone. **[inaudible]** just **[inaudible]** like sex during sleep right, I Google it, I did some research about it.  I err you know Google it, I talk to people about it so I thought that was the case but then I say again sexsomnia I'm thinking about like cuddling and getting close or you know like touching. It wasn't like… |
|----|----|
| MP | So you're not saying… |
| CS | …penetration no. |
| MP | You're not saying **[inaudible]**. |
| CS | No I never talk about penetration in these messages no. |
| MP | So you're saying that there's no possibility that you've had sex? |
| CS | I no no. |
| MP | Even asleep anyway… |
| CS | No no because I would I would have a question mark if I would have I would be fully naked on top of her or like if I, when I woke up I was on top of inside of her or something but I had my underwear, I was just, what is is called… grinding is grinding is the word? |
| MP | It is a word but, but what do you, what do you describe by that what do you mean by that? |
| CS | Having underwears on |
| MP | **[inaudible]** rubbing yourself **[inaudible]**. |
| CS | Be on top of her but you know like yeah, this is, this is the word. |
| MP | Okay. |
| CS | Not nakedly. |
| MP | You also, on page 9, |
| CS | Uh huh. |
| MP | I think it's like the second message down erm it second photo down I think, where you said "I seriously consider stop drinking". |
| CS | Where is it? |
| MP | I'll show you on mine it's just easier.  Erm if you look at the screen, you said I seriously consider stop drinking. |
| CS | Yeah I mean I was of course because I'm sure it impacted the situation but I wasn't drunk you know it make me relax and we were like I wouldn't touch her, I wouldn't kiss her if I wouldn't be fully you know like if I would be fully awake you **[inaudible]** sober. So I was, I was never out of 4 or something 3 but I remember the night and I wasn't… |

**EXHIBIT F**

**DEFENDANT DENIAL OF PENETRATION IN INTERROGATORIES**

V I R G I N I A :

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

———————————————————— )
JANE DOE,                               )
      Plaintiff,                        )
                                )   CL 2019-12642
         v.                             )
                                )
CENK SIDAR,                             )
                                )
         Defendant.                   )
———————————————————— )

### SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR INTERROGATORIES

      Defendant CENK SIDAR, by counsel, hereby submits the following supplemental

responses to Plaintiff's First Request for Interrogatories.

<u>Supplemental Responses to Specific Interrogatories</u>

1.     Set forth the following information with respect to each person who has personal knowledge, information, proof, or evidence as to all or part of the facts described in the Complaint or Defendants' Answer or Demurrer filed in this matter:
     a.     His or her name, address, telephone number, occupation, title and relationship to the parties, if any, and otherwise identify such person;
     b.     The name, address, URL, email address and telephone number of the person's employer;
     c.     The subject matter for which the person may be called to testify if called to testify as a witness by any party; and
     d.     The specific knowledge that you believe this person to possess relevant to this action.

<u>Response to Interrogatory Number 1</u>
     Omar Itum
     ositum@gmail.com
     President, Omie

     Ann Gendaszek
     Defendant`s Girlfriend
     Director, Compliance, Newport Academy
     agendaszek@newportacademy.com

**Supplemental Response to Interrogatory Number 1**

Omar Itum
5821 Cardigan Drive
Dallas, TX 75093
ositum@gmail.com
President, Omie
Omar is a friend of the Defendant. After the evening of September 17, 2017, Omar and Defendant spoke about what had happened between Defendant and Jane Doe and he would be knowledgeable of both party's version of events and the events of the evening of September 16, 2017.

Ann Gendaszek
1441 U Street #418
Washington DC 2009
Ann is the current girlfriend of Defendant. Ann and Defendant spoke about the allegations made by the plaintiff and the current lawsuit. She would be knowledgeable of the accusations and Mr. Sidar's position on those accusations.

Violetta Kalmazova
4615 N. Park Ave
Apt 713
Chevy Chase, MD 20815
469-412-1667
Violetta Kalmazova is a friend of Defendant. She knows there is a lawsuit and that Mr. Sidar is accused of rape in a civil case. She is unaware of the details of the complaint or of any of the events that transpired.

Sandra Paul
Partner
Kingsley Napley LLP
Knights Quarter
14 St John's Lane
London EC1M 4AJ
Direct dial: +44 (0)20 7814 1259
Email: spaul@kingsleynapley.co.uk

Nicholas Dent
Senior Associate
Kingsley Napley LLP
Knights Quarter
14 St John's Lane
London EC1M 4AJ
Direct dial: +44 (0)20 3535 1507
Mobile: +44 (0) 7554 458 210
Switchboard: +44 (0)20 7814 1200

2

Email: ndent@kingsleynapley.co.uk

Mr. Dent and Mr. Paul are Mr. Sidar's solicitors in London. Their knowledge is protected by the attorney client privilege.

Mark Papasavva
DS Darren Leila
Valeria Owens
Juliette A. Long
Juliette.A.Long@met.police.uk
Mark.Papasavva@met.police.uk
DC
Central CASO
07917 883434


These individuals work for the Metropolitan Police Services. Mark Papasavva and DS Darren Leila interviewed Mr. Sidar and were the original investigating officers on the case. Juliette Long is the current investigating officer on the case.

Ms. Long replaced Mr. Papasavva as the investigator and communicated regarding the Metropolitan Police Services interactions with Plaintiff's counsel regarding obtaining Mr. Sidar's DNA and regarding the current state of the Metropolitan Police Services investigation into the matter. She did not interview Mr. Sidar.

Emre Tuncalp
Flat 11 De Novo Place Granville Road St Albans AL15BP
Mr. Tuncalp was out with Mr. Sidar and Jane Doe and others the evening of the 16th. Mr. Tuncalp has knowledge of the behavior of Mr. Sidar and Ms. Doe that evening.


Tariq Hilal
Flat 3
9 Graham road
London E81DA
44 7761302786
tariq77@gmail.com
Mr. Hilal was out with Mr. Sidar and Jane Doe and others the evening of the 16th. Mr. Hilal has knowledge of the behavior of Mr. Sidar and Ms. Doe that evening.  Mr. Hilal is a classmate from the SAIS school.

Bo Friddell
333 Fairfax Ave Norfolk, VA 23507
bofriddelll@gmail.com
Mr. Friddell was out with Mr. Sidar and Jane Doe and others the evening of the 16th. Mr. Hilal has knowledge of the behavior of Mr. Sidar and Ms. Doe that evening.  Mr. Friddell is an alum of the SAIS school.

3

Bilgin Yildirim
bilgun.yildirim85@gmail.com
Ms. Yildirim was out with Mr. Sidar and Jane Doe and others the evening of the 16th.
Ms. Yildirim has knowledge of the behavior of Mr. Sidar and Ms. Doe that evening.  Ms.
Yildirim is an alum of the SAIS school.


2.      Set forth in detail all communications between you and any other person
including but not limited to Plaintiff concerning and/or related to the events, facts, or
matters alleged in the Complaint or Answer, other than communications with counsel,
and identify such person or persons.

Response to Interrogatory Number 2

I discussed the issue with Omar Itum and Ann Gendazscek in person as well as London
authorities when the complaint was made.

## **Supplemental Response to Interrogatory Number 2**

Omar Itum
Mr. Sidar spoke to him within a week of the incident. Mr. Sidar spoke in detail with Mr.
Itum regarding the allegations from the plaintiff. They spoke about what happened
occasionally when they spoke in 2017, 2018, 2019 and 2020. Mr. Sidar does not have the
exact dates of the communications since they speak relatively frequently and as recently
as last month.

Ann Gendaszek
Mr. Sidar told Ms. Gendaszek about the events around mid-October. They have had
conversations about the case allegations and the DNA and the jurisdictional issues. They
have been in a relationship since September 6, 2019. Mr. Sidar's recounting of the
events to her are not recorded but track his Answer and his recounting of the event to
the Metropolitan Services. He did not go into the detail that is in that statement, but he
recounted over time the events of the evening of September 16-17, 2017 and his denial of
Plaintiff's claim that he sexually assaulted her or raped her.

Violetta Kalmazova
Mr. Sidar told her in person that he had been sued and he is being accused of raping
someone. She is unaware of the details of the complaint or of any of the events that
transpired.

Sandra Paul Nicholas Dent
These communications are covered by the attorney client privilege

Mark Papasavva
DS Darren Leila
Valeria Owens

4

Juliette Long
See the statement provided in responses to request for production of documents
identified as SIDAR 1077-1110. See e-mails provided at 1111-1121

3.      Identify all persons who have given statements relevant to any of the facts or
matters involved in this action and indicate whether such statements  were oral or
written,  identify in detail the substance of that statement, and if written, identify  who
has  possession  of said statements.

Response to Interrogatory Number 3
Omar Itum, Ann Gendazscek and the London Police.

**Supplemental Response to Interrogatory Number 3**
See response and supplemental response to Interrogatory number 3.
Defendant's counsel erred in responding to interrogatory 3 the first time. To Mr. Sidar's
knowledge, only Jane Doe and Defendant gave statements relevant to any of these
matters.

Mr. Sidar and Jane Doe gave statements to the Metropolitan Police Services.
Defendant's statement has been provided in the response to the RPDs as SIDAR1077-
1110.
Mr. Sidar also spoke to Omar Itum and Ann Gendazcek as detailed in Interrogatory
Number 2. To the extent that is considered a statement, please see response to
Interrogatory Number 2.

4.      Identify each expert witness whom you intend to call at trial in this matter and as
to each such expert state the subject matter on which the expert  is expected  to testify,
the substance of the facts and opinions to which the expert  is expected  to testify, and
provide a summary of the grounds for each such opinion.

Response to Interrogatory Number 4
None at this time.  Defendant will timely supplement in the event that this information
changes and in accordance with any scheduling order that will be entered in this matter.

5.      Identify each and every company, corporation, or other entity in which you have
any ownership, control, or financial interest, and the percentage interest you have in
that entity.

Response to Interrogatory Number 5
Sidar Global LLC 100% ownership.
GlobalWonks 15.2% ownership.
Conscentia Partners 10% ownership.
Voscreen 1% ownership.

**Supplemental Response to Interrogatory Number 5**
Up until April 30, 2020 Mr. Sidar owned 31 percent of GlobalWonks.  That ownership

5

interest is subordinate to a convertible note that was executed by the company in May 2020 which effectively dilutes his ownership interest to approximately 15.2%.

Voscreen is not a functioning company (about to bankrupt) in Turkey and according to the defendant's knowledge it has over 500K USD in debt.

Mr. Sidar is not an equity holder of Conscentia Group but a partner in profits in the amount stated in his original response. The company did not generate any profits yet.

Mr. Sidar has 50% equity ownership of a London-based company Global Integrity Risk but the company has been inactive since February 2020 as partners do not engage business together.

6.      For any Request for Admission that you denied or qualified your response in any respect, whether in whole or in part, explain in detail the factual basis and state all facts including the identity, custodian, and location of any and all documents that support, or tend to support, the denial or qualification of your response.

**Supplemental Response to Interrogatory Number 6**

RFA Number 2
In September 2017, Defendant volunteered that Plaintiff could stay with him at a rented apartment in London.

RESPONSE: Defendant admits that Plaintiff stayed at an apartment that he rented but denies that that Defendant suggested or volunteered Plaintiff a place to stay.

Mr. Sidar and Plaintiff had coffee on Monday or Tuesday she said she does not have a place to stay because she thought the hotel was expensive so she was just going to go back. They discussed where Defendant was staying and they discussed her staying with him. They had further discussions on Facebook because the place he was staying was a studio he wanted to make sure she was comfortable staying there and at that point also offered that he could stay at a hotel and she could stay at the Airbnb. The conversation in person and on Facebook was an organic conversation where the decision was made to stay at Mr. Sidar's place.

RFA Number 6:
Defendant agreed to sleep on the sofa and allow Plaintiff to sleep in the bed of the apartment Defendant rented.

RESPONSE: Request number six is denied.

6

There was no conversation regarding an agreement about where people would sleep. Mr. Sidar did begin the first evening on the couch but became cold and went to the bed and used the blanket.

RFA Number 7
Defendant attempted to engage in a physical touching of Plaintiff during the evening of September 15, 2017, the first night that she stayed at the apartment Defendant rented.

RESPONSE: Request number seven is denied.
Mr. Sidar went to the bed because he was cold but did not attempt to engage in a physical touching of her. If he touched her it was inadvertent.

RFA Number 8
Plaintiff rejected Defendant's attempt to engage in a physical touching of Plaintiff during the evening of September 15, 2017, the first night that she stayed at the apartment Defendant rented.

RESPONSE: Request number eight is denied.
Plaintiff did not reject Defendant's advances because there were not any advances.

RFA Number 9
At lunch on September 16, 2017, Plaintiff specifically told Defendant that she would not engage in any romantic or sexual acts with Defendant because he was married and had young children.

RESPONSE: Request number nine is denied.
Plaintiff did not make that statement to Mr. Sidar.

RFA Number 10
At lunch on September 16, 2017, Plaintiff specifically told Defendant that she was not interested in him romantically or sexually.

RESPONSE: Request number ten is denied.
Plaintiff did not make that statement to Mr. Sidar.

RFA Number 11
At lunch on September 16, 2017, Defendant told Plaintiff that he would not attempt any further romantic advances on Plaintiff.

RESPONSE: The allegations of request number eleven is denied.
Defendant did not make that statement.

7

RFA Number 12
During the evening of September 16, 2017, Plaintiff spent most of her time talking with a man other than Defendant.

RESPONSE: Defendant has insufficient information to admit or deny this request and so denies.
The evening of September 16, 2017, Plaintiff spoke to many different people that evening. Defendant did not notice if she spent most of her time talking to a man other than Defendant. He noticed talking to Tariq Hilal one of their friends but not that it stood out.

RFA Number13
Early in the morning of September 17, 2017, Defendant engaged in sexual intercourse with Plaintiff.

RESPONSE: Defendant denies request thirteen.
Defendant and Plaintiff did not have sexual intercourse.

RFA Number 14
Early in the morning of September 17, 2017, Plaintiff did not give verbal consent to Defendant to engage in sexual intercourse with her.

RESPONSE: Defendant denies request fourteen.
Plaintiff did not have sexual intercourse with Defendant.

RFA Number 15
Early in the morning of September 17, 2017, Defendant knew that Plaintiff did not consent to sexual intercourse.

RESPONSE: Defendant denies request fifteen.
Plaintiff did not have sexual intercourse with Defendant

RFA Number 16
Early in the morning of September 17, 2017, Plaintiff immediately told Defendant that she had not consented to sexual intercourse or any romantic touching.

RESPONSE: Defendant denies request sixteen.

Defendant and Plaintiff were having a consensual sexual encounter with there was touching and kissing. At the end of the encounter, Plaintiff said stop and Defendant immediately stopped. When she said stop, he had been grinding on her but they were both wearing their underwear.

8

RFA Number 17
Early in the morning of September 17, 2017, Plaintiff immediately left the apartment rented by Defendant after she told him that she had not consented to sexual intercourse.

RESPONSE: Defendant denies request seventeen.
Once she said stop and he stopped, she left the apartment after saying "what are you doing?" Plaintiff and Defendant did not have sexual intercourse.

RFA Number 18
Early in the morning of September 17, 2017, Defendant apologized for engaging in sexual intercourse with Plaintiff without her consent.

RESPONSE: Defendant denies request eighteen.
Defendant apologized to her but not for having sexual intercourse without her consent. Please see SIDAR 001077-001110.

RFA Number 19
Defendant apologized for engaging in sexual intercourse with Plaintiff without her consent over the next few days after September 17, 2017.

RESPONSE: Defendant denies request nineteen.
Defendant apologized to her but not for having sexual intercourse without her consent. Please see SIDAR 001077-001110.

RFA Number 20
At the time that Defendant engaged in sexual intercourse with Plaintiff, he was having an affair with at least one other woman other than the woman to which he was legally married at that time.

RESPONSE: Defendant denies request twenty.
Defendant was not currently having an affair with anyone at the time he saw Plaintiff. Defendant and Plaintiff did not have sexual intercourse.

RFA Number 21
Defendant hid income and assets from his wife when she divorced him in 2018 for infidelity.

RESPONSE: Defendant denies request twenty-one.
Defendant did not hide income and assets from his wife when she divorced him in 2018. Their divorced ended as an uncontested divorce and the parties agreed on all issues.

9

RFA Number 22

Defendant had two children, ages three and one, when he engaged in sexual intercourse with Plaintiff.

RESPONSE: Admitted Defendant has two children, denied that he engaged in sexual intercourse with Plaintiff.

Defendant and Plaintiff did not have sexual intercourse.

RFA Number 23

In 2017, Defendant used dating apps to facilitate his adulterous relationships with women.

RESPONSE: Defendant denies request twenty-three.

Defendant did not use dating apps to facilitate any extramarital relationships in 2017.

RFA Number 24

Defendant abandoned his family when confronted by his wife about his adulterous affairs.

RESPONSE: Defendant denies request twenty-four.

Defendant did not abandon his family when confronted by his wife with relationships he had with other women. He remains an involved and loving father who sees his children regularly now and saw them regularly through the divorce, supported the household during the pendency of the divorce and pays child and spousal support and pays for school expenses.

7.     Please identify your current net worth, including but not limited to the value of bank accounts. ownership interests in companies, investments and the value of real or personal property, wherever located, for consideration of punitive damages.

**Supplemental Response to Interrogatory Number 7**

Please see SIDAR 1122-1292 which include his statements and pay stub.

Bank of America personal account – $4.11
Bank of America business account – (-287.02)

Monthly gross income from Globalwonks – $11, 666.67

Sidar Global – Mr. Sidar gets a variable monthly draw.

Globalwonks – Based on the company's current valuation Mr. Sidar's ownership interest in Globalwonks is approximately 1.5 million. However, as stated above, Mr. Sidar's current interest is subordinate to the convertible debt note of his company which when triggered will affect his ownership interest and we will supplement discovery periodically to reflect changes that occur.

10

Coinbase - $94.36

Robinhood - $7,330.00

Child Support – 3400.00/month, and responsible for school expense 3500/month for two kids – Mater Amoris Montessori School in Ashton, MD
Alimony – 2000.00/month
Rent - $3700.00/month
Car – 600/month
Credit Card Debt – approximately $15,500.00s in credit card debt
On Deck Capital – personal guarantee for business line of credit - $12,016.00s
Cabbage – personal guarantee for this loan- $1600.00
Lending Club – personal loan - $22,000.00 ($500/mth payment plan)
IRS Back taxes – approximately $52,000.00

8.      Please identify all sexual or intimate relationships or encounters you had during the period beginning six (6) months before the occurrence of the events in the Complaint until six (6) months after such period.

I did not have any partner within 6 months before and 6 months after timeframe. Approximately 2 months after the event I had sexual encounters with two or three people whose names I do not recall.

**<u>Supplemental Response to Interrogatory Number 8</u>**
There is nothing to supplement at this time.

<div style="text-align: right;">

CENK SIDAR
By Counsel

</div>

_____
Anna K. Dvorchik, Esq., VSB #65679
The Law Office Of Anna K. Dvorchik, PLLC
3970 Chain Bridge Road
Fairfax, VA 22030
(p)571-839-2301
(f)571-459-2307
anna@advofirm.com
*Counsel for Defendant*

Alexandros K. Mitrakas, VSB 78841
Mitrakas and Company, P.C.
1001 19th Street North
Suite 1200
Arlington, Virginia 22209
(703) 888-5516
amitrakas@mitrakasco.com (email)
Co-Counsel for Defendant

<div style="text-align: center;">11</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2020 I caused a copy of the foregoing document to be sent by US Mail and e-mail to:

| | |
|---|---|
| Thomas F. Urban II, Esq. | Walter Steimel |
| Fletcher Heald and Hildreth | SCLG |
| 1300 North 17th Street | 1455 Pennsylvania Ave., N.W., |
| 11th Floor | Suite 400 |
| Arlington, Virginia 22209 | Washington, D.C. 20004 |
| urban@fhhlaw.com | wes@sclgrp.com |

Anna K. Dvorchik

12

**EXHIBIT G**

**BODE TECHNOLOGY RETENTION**



**Case Submission Form**

Bode Technology
10430 Furnace Rd. Ste 107
Lorton, VA 22079
Phone: 866-263-3443
Fax: 703-646-9741
bode.service@bodetech.com
www.bodetech.com

**Bode Technology Case Number** (To be filled out by Lab): _____

**Submitting Agency Reference/ Case Number:**   CL-2019-0012642

Before Bode Technology can begin processing your case, this form must be filled out in its entirety.  Please submit either along with the evidence or directly to Technical Services. Prior to submitting a case, please call Technical Services at 703-646-9740 x787 or toll free at 866-263-3443 x787

Submitting Agency: Steimel Conner Law Group         Date: 3/28/20

| Billing Information: | Method of Payment: |
|---|---|
| Name: Walter E. Steimel, Jr. | ☐  Purchase Order #: |
| Agency: Steimel Conner Law Group, PLLC | ☐  Contract #: |
| Address: 401 North Saint Asaph | ☑  Credit Card: call 866-263-3443 x787 to provide |
| City/State/Zip: Alexandria, Virginia 22314 | ☐  Other: |
| Office Number: 202-271-9258 | |
| Fax Number: 703-549-7329 (call first) | |
| Email:  wes@sclgrp.com | |
| Quote Number:  0230-046 | |
| | |
| | |

| Report Mailing Address: | Evidence Return: |
|---|---|
| Where the report will be sent. Note: FedEX cannot deliver to PO boxes. | All evidence and generated extracts will be returned to this address following the delivery of the case report, unless otherwise specified. |
| Name: Walter E. Steimel, Jr. | Name: Walter E. Steimel, Jr. |
| Agency: Steimel Conner Law Group, PLLC | Agency: Steimel Conner Law Group, PLLC |
| Address: 401 North Saint Asaph | Address: 401 North Saint Asaph |
| City/State/Zip: Alexandria, Virginia 22314 | City/State/Zip: Alexandria, Virginia 22314 |
| Office Number: 202-271-9258 | Office Number: 202-271-9258 |
| Fax Number: | Fax Number: |
| Email: wes@sclgrp.com | Email: wes@sclgrp.com |

| Authorized Point of Contact: | Additional Point of Contact: |
|---|---|
| Name: Walter E. Steimel, Jr. | Name: Thomas F. Urban II, Esq. |
| Agency: Steimel Conner Law Group, PLLC | Agency: Fletcher Heald & Hildreth |
| Title: Managing Member | Title: Of Counsel |
| Office Number: 202-271-9258 | Office Number: 703-861-5235 |
| Cell Number: 202-271-9258 | Cell Number: |
| Fax Number: | Fax Number: 703-340-1450 |
| Email: wes@sclgrp.com | Email: urban@fhhlaw.com |

*I hereby certify that the information provided on this Case Submission Form is accurate to the best of my knowledge. I understand that I will be charged for services according to the pricing that I have received.*

Walter E. Steimel, Jr.

**Point of Contact Print Name**

**Point of Contact Signature**         Date         3/28/20

Page 1



## Case Submission Form

Bode Technology
10430 Furnace Rd. Ste 107
Lorton, VA 22079
Phone: 866-263-3443
Fax: 703-646-9741
bode.service@bodetech.com
www.bodetech.com

**Bode Technology Case Number** (To be filled out by Lab): _____

**Submitting Agency Reference/ Case Number:** _____

In order to process your case efficiently, this form must be filled out entirely and submitted either along with the evidence or directly to Technical Services. Prior to submitting a case, please call Technical Services at 703-646-9740 x787 or toll free at 866-263-3443 x787.

---

**Select type of service:**

☑ **Standard Service - Turn Around Time is as follows:**
Serology, STR (Short Tandem Repeat), Y-STR & MiniSTR Analysis: 8-10 weeks
MtDNA (Mitochondrial DNA) Analysis: ~16 weeks

☐ **Expedited Service - Select Turn Around Time:**
SUBJECT TO RESTRICTIONS, AVAILABILITY AND ADDITIONAL FEES APPLY.
Please contact Technical Services prior to submission of an Expedited Case

| Serology, STR, Y-STR & MiniSTR | | Mitochondrial DNA Analysis | |
|---|---|---|---|
| ☐ 5 Business Days | ☐ 10 Business Days | ☐ 20 Business Days - Refs ONLY | ☐ 40 Business Days |
| ☐ 15 Business Days | ☐ 20 Business Days | ☐ 50 Business Days | ☐ 60 Business Days |

---

**Case Background & Instructions:**
*If this is an additional submission, please note previous Bode Technology Case Number here:*

The Bode buckle or amp kit should be sent to the Report Mailing Address for handoff to the collection personnel who will be reponsible for returning the sample to Bode. The amp kit should be one that is likely to be compatible with testing perameters used in the UK, to the extent that is known. We will attempt to provide that information before testing, otherwise, the GlobalFiler is likely to be the preferred amp kit. We will provide any additional information as soon as possible.

---

If STR data is obtained, will CODIS entry or search be requested?    ☐ Yes    ☑ No

NOTE: Private forensic DNA laboratories **do not have access** to enter or search samples in CODIS. If "yes" is marked, Bode Technology will contact the appropriate NDIS laboratory Technical Leader prior to initiation of this case. Please be aware that this may increase turnaround time.
*If requesting Expedited service, approval from appropriate NDIS laboratory is required prior to case submission.*

---

**Processing:**
**Amp Kit:**    ☐ MiniFiler   ☐ YFiler   ☐ PPY23   ☐ Fusion
☐ Fusion 6C ☐ GlobalFiler ☐ Investigator24-plex
*If no amp kit is selected, samples will be processed at Bode Technology's discretion. All samples will be processed using the CE platform & analyzed using GMID.*

**All evidence items must be shipped using a traceable carrier (i.e. FedEx, UPS, DHL, Priority Mail) with signature required. Overnight shipping is recommended.**

Evidence should be shipped to:

**ATTN: EVIDENCE DEPARTMENT**
**Bode Technology**
**10430 Furnace Rd. Suite 107**
**Lorton, VA 22079**



Bode Technology
10430 Furnace Rd. Ste 107
Lorton, VA 22079
Phone: 866-263-3443
Fax: 703-842-8418
bode.service@bodetech.com
www.bodetech.com

## CUSTOMIZED PRODUCT AND SERVICES - QUOTATION

| To | |
|---|---|
| **Customer Name:** | Walter Steimel |
| | Attorney |
| | Steimel Counselors Law Group, PLLC |
| | 1455 Pennsylvania Ave., N.W., Suite 400 |
| | Washington, DC 20004 |
| | 202-271-9258 |
| | wes@sclgrp.com |

| **Date:** 8/2/2022 | **Quote#:** 0822-009V1 | **Re:** Attorney Walt Steimel - 2019-12642 | **Client Case #:** 2019-12642 |
|---|---|---|---|

**Quotation Specifications**
Quote Expires:              10/1/2022
Payment term is:            Pre-payment Required
All Terms and Conditions for this quotation can be found on Bode's website here.

The cost of all materials used for laboratory analyses are to be borne by Bode Technology.
Sample analysis will be performed following Bode Technology's validated protocols.
Bode Technology will be paid for each sample tested as long as failure to produce a DNA result is not due to an error or omission on part of the laboratory.
Samples will not be consumed without permission from the authorized point of contact.
For cases received and accessioned by Bode Technology with no testing performed, a case handling fee of $350/case will apply.

Quoted Turnaround Time is              16 weeks
Expedited services may be available.  Please contact the Technical Services Representative if interested in an expedited service.

| Qty | Product Description or Services Provided | | Unit Price | Extended Price |
|---|---|---|---|---|
| 2 | STR Reference Item (blood or buccal swab only) | 1-victim, 1-defendant | $850.00 | $1,700.00 |
| 2 | Comparison to a Previously Generated DNA Profile (per hour) *The unit price applies to each sample that is processed.* | 2 hours comparison | $350.00 | $700.00 |
| | Comments: | | | |
| | | **Grand Total:** | | **$2,400.00** |

| **Optional - Testimony and Discoveries** | | |
|---|---|---|
| **Deposition/ Expert Witness Testimony** *Unit price is per analyst/technician (per hour or per day) that is called to testify and does not include travel expenses.* | | $350/Hour $2,150/Day |
| **Discovery Packet** Standard packet (includes: complete casefile, electropherograms, lab notes, chain of custody, reporting analyst CV and proficiency testing history, and accreditation certificates.) | | |
|    Standard turnaround time: 8-10 weeks | | $0.00 |
|    Rush turnaround time: less than 4 weeks | | $250.00 |
| *NOTE: additional discoverable materials may be available upon request.  There may be additional fees depending on the additional materials requested.* | | |

| **Quote Generated By:** | Angie Lugo | angelica.lugo@bodetech.com |
|---|---|---|

JA429

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

**MAGISTRATE JUDGE: <u>THERESA CARROLL BUCHANAN</u>**

<u>**MOTION HEARING**</u>

**DATE: __8/5/22_____**
**START: _10:02 a.m._____**
**FINISH: __10:09 a.m._____**
**REPORTER: <u>FTR</u>**
**DEPUTY CLERK: <u>TINA FITZGERALD</u>**

**Civil Action Number: __1:22-cv-545_____**

Doe

vs.

Sidar

Appearance of Counsel for:      (  x  ) Plaintiff      (  x  ) Defendant
                                (     ) Pro Se Pltf      (     ) Pro Se Deft

Motion:
_____To Produce Defendant for Examination and DNA Sample DE#26_____
_____

(     ) Matter is Uncontested and Taken Under Advisement

Argued &

(  x  ) Granted (     ) Denied (     ) Granted in part/Denied In Part
(     ) Taken Under Advisement (     ) Continued to _____

_____
_____

(     ) Report and Recommendation to Follow

(  x  ) Order to Follow

(     ) Rule to Show Cause to be Issued

JA430



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JANE DOE                              )
                                     )
                                     )
        VS.                          )    1:22-CV-545  CMH
                                     )
                                     )    ALEXANDRIA, VIRGINIA
                                     )       AUGUST 5, 2022
                                     )
CENK SIDAR                           )
_____)

_____

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE THERESA CARROLL BUCHANAN**
**UNITED STATES MAGISTRATE JUDGE**
_____

**Proceedings reported by stenotype, transcript produced by**

**Julie A. Goodwin.**

Julie A. Goodwin, CSR, RPR

1                    <u>A P P E A R A N C E S</u>

2

3    FOR THE PLAINTIFF:
          THE LAW FIRM OF FLETCHER, HEALD & HILDRETH, PLC
4         By:  MR. THOMAS F. URBAN II
          1300 17th Street North
5         Suite 1100
          Arlington, Virginia  22209
6         703.812.0462
          urban@fhhlaw.com
7
          STEIMEL COUNSELORS LAW GROUP PLLC
8         By:  MR. WALTER E. STEIMEL, JR.
          1455 Pennsylvania Avenue, N.W.
9         Suite 400
          Washington, D.C.  20004
10        202.271.9258
          wes@sclgrp.com
11

12

13
     FOR THE DEFENDANT:
14        REES BROOME, PC
          By:  MS. MARIAM W. TADROS
15        1900 Gallows Road
          Suite 700
16        Tysons Corner, Virginia  22182
          703.790.1911
17        mtadros@reesbroome.com

18

19

20   OFFICIAL U.S. COURT REPORTER:
          MS. JULIE A. GOODWIN, RPR
21        United States District Court
          401 Courthouse Square
22        Eighth Floor
          Alexandria, Virginia  22314
23        512.689.7587

24

25

1  (AUGUST 5, 2022, 10:02 A.M., *FTR GOLD*, OPEN COURT.)

2         THE COURTROOM DEPUTY:  *Doe versus Sidar*; case

3  22-CV-545.

4         MS. TADROS:  Good morning.

5         THE COURT:  Good morning.

6         MR. URBAN:  Good morning, Your Honor.

7         THE COURT:  Would you-all identify yourselves for the

8  record, please.  Thank you.

9         MR. URBAN:  I'm sorry?

10        THE COURT:  Would you-all identify yourselves for the

11 record?

12        MR. URBAN:  Yes.  Tom Urban on behalf of Plaintiff

13 Jane Doe.

14        THE COURT:  Okay.

15        MR. URBAN:  I'm a member of the Virginia Bar.  And I'm

16 going to allow Mr. Steimel, who is a member of the DCN Texas

17 Bar, to argue today.

18        THE COURT:  All right.  That's fine.  Have you been

19 admitted *pro hac vice*?

20           Okay.

21        MR. URBAN:  Yes, Your Honor.

22        THE COURT:  All right.  Good.

23        MS. TADROS:  Good morning, Your Honor.  Mariam Tadros

24 here on behalf of Defendant Sidar.

25        THE COURT:  Okay.

1    I've read all of the pleadings.  Is there anything

2 that you want to add to your motion?

3    MR. STEIMEL:  Good morning, Your Honor.  The only

4 things I would add, since I don't need to re -- don't want to

5 rehash the pleadings, is that we do have the test kits

6 from -- from Bode.

7    THE COURT:  Uh-huh.

8    MR. STEIMEL:  And I reviewed correspondence of London

9 Police.  They had a useable semen sample that they had

10 profiled.  They indicated to me they use an outside lab called

11 Eurofins Europe, and ran a -- ran an ESI-17 and possibly a Y-23

12 on that.  And Bode said that they could compare profiles with

13 those.

14    THE COURT:  Okay.

15    MR. STEIMEL:  I called Eurofins US.  They only do RFCC

16 type testing.  That's what I've used them for.  And that's why

17 I went to Bode.

18    THE COURT:  Uh-huh.

19    MR. STEIMEL:  And Dr. Bruce Beddowsky -- Budowle, who

20 used to be at Quantico, referred me to Bode.

21    I have a company called J and M Paternity who's

22 ready, standing by to take the swab.  We can arrange to have it

23 taken wherever is convenient for defendant.

24    THE COURT:  Well, I was -- that was the only link that

25 I was wondering about.  Is J and M going to be responsible for

1  transferring the samples to the testing labs?

2        MR. STEIMEL:  To Bode?

3        THE COURT:  Yeah.

4        MR. STEIMEL:  Yes, Your Honor.  If they don't, then

5  I'll take it personally.

6        THE COURT:  Well, I think that it's better that they

7  do it --

8        MR. STEIMEL:  Okay.

9        THE COURT:  -- so that there's no -- you know, it's

10  entirely independent and third party.

11        MR. STEIMEL:  Okay.

12        THE COURT:  Okay.

13        MR. STEIMEL:  I will -- I will make sure of that.

14        THE COURT:  I have a -- I'm curious.  What happened

15  when the defendant didn't show up for -- it's Fairfax County.

16  What did the Fairfax County Circuit Court do?  What happened

17  with that?

18        MR. STEIMEL:  We were never successful in

19  getting -- we got an order to show cause at one point.  We were

20  never successful of getting any kind of order to compel.

21        THE COURT:  Okay.  All right.  Thank you.

22        MR. STEIMEL:  Thank you.

23        MS. TADROS:  Your Honor, going to the Fairfax County

24  case, the request by plaintiff was made initially under Rule

25  49.  Judge Smith had granted the order and then reversed

1  himself.

2          The request was subsequently made pursuant to

3  Rule 410, and Judge Shannon denied the request.  Which is why

4  on the day of the nonsuit that plaintiff took in Fairfax, they

5  said, We're going to have a better chance of getting the

6  DNA --

7          THE COURT:  Okay.

8          MS. TADROS:  -- in Fairfax.  But that request was

9  ultimately denied by the Fairfax Circuit Court.

10         THE COURT:  Uh-huh.

11         MS. TADROS:  I have a copy of the order.

12         THE COURT:  I accept your representation.

13         MS. TADROS:  And as far as the issues that were

14  raised, we don't have any update supporting the motion.  We

15  don't -- and I -- I appreciate what Mr. Steimel has said, but

16  there's no evidence before the Court.

17         We don't know where the sample is.  We don't know

18  if it's intact.  We don't know if it can be analyzed.  We don't

19  know if London is cooperating.

20         And then we also have the issue of, I'm entitled to

21  test the sample.  It's with the London Police, maybe.  It's the

22  same people that lost Mr. Sidar's sample.  Unless I have acts

23  to it -- access to that sample so that my experts can analyze

24  it, I'm at a severe disadvantage going into trial.

25         And then the other issue that was raised in the

1   reply yesterday about Bode and test kits, raises the issue of

2   how are they going to get somebody from London here to testify?

3   How am I deposing the London Police if they're willing to

4   cooperate about how the sample was taken, and then also then

5   deposing the Eurofins lab.

6           So, I think there are substantial evidentiary --

7           THE COURT:  Well, those are all -- certainly are all

8   hurdles that the plaintiff would have to overcome.  But why

9   should the plaintiff be stopped at this point and not even have

10   a chance to have the samples compared?

11           MS. TADROS:  Because case law says that you can't have

12   these samples in a vacuum.  And effectively what they're doing

13   is that they're taking a sample and it is going in a vacuum

14   because we don't know, standing here today, if there's a

15   useable sample to which the plaintiff can compare this sample.

16   Without affidavits from the London Police or The Havens or

17   Eurofins labs, none of which are attached to the motion,

18   there's no way to test whether or not there is, in fact, a

19   sample that can be compared to any sample that is generated in

20   the United States.

21           THE COURT:  Okay.  Anything else?

22           MS. TADROS:  No, Your Honor.

23           THE COURT:  Thank you.

24           I am satisfied by counsel's representation that he

25   has talked to the London Police and to the lab and that there

is a sample that can be compared and is useable.  Now, it may

turn out that that is not the case and this is all for nothing,

but I do not believe the affidavit is necessary.  I accept

counsel's representations as an officer of this Court that he

has obtained that information.

I think he is absolutely entitled to this DNA

sample.  And I am going to order that the defendant appear.

And I think you have the date and time in here, do

you not?

MR. URBAN:  Yes, Your Honor.

THE COURT:  Okay.

I am going to order that he appear at your offices

for sampling, and I am going to put in the order, though, of

course, that it be done by J and M Paternity Services and that

they be responsible for transporting it or sending it to the

labs to London and to Bode for testing.

Of course, you can get your own sample from your

client at any time that you want.  And then when the testing is

done by the London Police or sample -- or, you know, depending

on what is -- what it's come up with, you are free to talk to

the London Police, just as they are, about what they

can -- what you can do to get a comparative sample.  But I

believe they are entitled to this.

I do want you to warn your client that if he fails

to show up for the testing -- this is an order of the Court.

1  If he fails to show up, there will be sanctions imposed which
2  could include default.

3              Okay.  The motion is granted.

4              Anything else?  Okay.  Thank you.  Court stands in
5  recess.

6          THE COURTROOM DEPUTY:  All rise.

7        (PROCEEDINGS CONCLUDED AT 10:08 A.M.)

8                        -oOo-

9

10

11

12

13

14  UNITED STATES DISTRICT COURT    )
    EASTERN DISTRICT OF VIRGINIA    )
15
            I, JULIE A. GOODWIN, Official Court Reporter for
16  the United States District Court, Eastern District of Virginia,
    do hereby certify that the foregoing is a correct transcript
17  from the recorded proceedings of FTR Gold, in the above matter,
    to the best of my ability.
18          I further certify that I am neither counsel for,
    related to, nor employed by any of the parties to the action in
19  which this proceeding was taken, and further that I am not
    financially nor otherwise interested in the outcome of the
20  action.
            Certified to by me this 18TH day of APRIL, 2023.
21

22
                            /s/
23                          _____
                            JULIE A. GOODWIN, RPR
                            Official U.S. Court Reporter
24                          401 Courthouse Square
                            Eighth Floor
25                          Alexandria, Virginia  22314

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:22-cv-545  (CMH/TCB) |
| | ) | |
| CENK SIDAR, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER

FOR REASONS stated from the bench, and in accord with specific rulings and instructions thereto, it is hereby

**ORDERED** that Plaintiff Jane Doe's Motion to Obtain Physical Examination of and DNA Sample from Defendant (Dkt. 26) is **GRANTED**; it is further

**ORDERED** that Defendant Cenk Sidar ("Defendant") shall appear on Monday, <u>August 29, 2022</u> at 10:00 a.m. at the office of Plaintiff's counsel, Thomas F. Urban II, Esq. at FLETCHER, HEALD & HILDRETH, PLC, 1300 North 17th Street, Suite 1100, Arlington, Virginia 22209 and shall submit to the employee(s) of J and M Paternity Service, LLC for the buccal swab samples; it is further

**ORDERED** that J and M Paternity Service, LLC shall transfer the samples to Eurofins Europe/London Police and Bode Technologies for testing; and it is further

**ORDERED** that Plaintiff shall provide the Court and counsel with the written results of the analysis of this testing within thirty (30) days after the completion of the analysis of the testing or as soon thereafter as such results may be obtained from the laboratory or laboratories.

1

Defendant is advised that failure to comply with this Order may result in the entry of sanctions, including default judgment, pursuant to Federal Rule of Civil Procedure 37(b)(2).

ENTERED this 5th day of August, 2022.

/s/

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

Theresa Carroll Buchanan
United States Magistrate Judge

Alexandria, Virginia

2

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : | |
| CENK SIDAR | : | |
| | : | |
|     Defendant. | : | |

_____

**MEMORANDUM IN SUPPORT OF DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE THERESA CARROLL BUCHANAN'S AUGUST 5, 2022, ORDER REGARDING <u>MOTION TO COMPEL DNA</u>**

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Memorandum in Support of Defendant's Objection to Magistrate Judge Theresa Carroll Buchanan's[1] August 5, 2022, Order ("Order") Regarding Motion to Compel DNA.

## I.   <u>INTRODUCTION</u>.

This case arises from an alleged assault that occurred in London in 2017. Plaintiff Jane Doe ("Plaintiff") asserts that Defendant sexually assaulted her. She claims that she went to the Havens, a sexual assault referral center and that the Havens created a rape kit. After she went to the Havens, the Defendant gave a DNA sample to the London Police, which the London Police promptly lost. In an effort to obtain DNA to send to the London Police, the Plaintiff has filed this action and issued a subpoena for DNA to the Defendant. Plaintiff, however, has failed to provide a scintilla of evidence demonstrating that: (1) either the Havens or the London Police have Plaintiff's rape kit and the alleged clothing, (2) the rape kit has not been degraded and that it contains enough DNA for testing, and (3) the tests performed by Plaintiff, in the United States, can be validly compared to the rape kit located at the Havens or with the London Police. As Plaintiff has failed to establish these basic facts, and because any results are likely to be inadmissible for the reasons outlined below, the underlying Motion fails to meet the "good cause" requirement of Rule 35. Further, the Notice of Physical Examination and DNA Sampling of Defendant ("Notice") (ECF No. 26-1) contains numerous facts and, therefore, does not comply with the requirements of Rule 35.

## II.   <u>BACKGROUND</u>.

On May 12, 2022, Plaintiff filed a Complaint against Defendant for assault (Count I), battery (Count II), and intentional infliction of emotional distress (Count III) resulting from an

---

[1] On August 15, 2022, this case was reassigned to Magistrate Judge John F. Anderson.

alleged rape. On July 15, 2022, Plaintiff served to Defendant Plaintiff's Notice. The Notice provided that Plaintiff "will conduct an [sic] Physical Examination of Defendant . . . which will include the taking of a sample of Defendant's Deoxyribonucleic acid (DNA)." ECF No. 26-1 at 1. The Notice was "for the taking of samples of Defendant's DNA for the purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit." ECF No. 26-1 p. 1.

Plaintiff continued that "[t]hese tests will be analyzed by one or more independent laboratories of Plaintiff's choosing" and that "Defendant will present himself for the taking of these samples at the office of Plaintiff's Counsel . . . ." ECF No. 26-1 at 1. The Notice provided that "[t]he inspection and taking of the DNA sample will be for the purpose, *among other things*, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by The Havens." ECF No. 26-1 p. 1 (emphasis added). Plaintiff asserts that "[t]his information will further be relevant to Plaintiff's claim for punitive damages." ECF No. 26-1 p. 1.

On July 15, 2022, a few hours after serving her Notice, Plaintiff filed her Motion to Obtain Physical Examination of and DNA Sample from Defendant ("Motion"). In her Motion, "Plaintiff seeks samples of Defendant's blood, hair, skin, urine, and a saliva swab for purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit" and asserts that "[t]hese tests will be analyzed by one or more independent laboratories of Plaintiff's choosing." ECF No. 26 ¶ 2. Plaintiff reiterated that she "seeks to have Defendant present himself for the taking of these samples at the office of Plaintiff's Counsel" and that "[t]he inspection will be for the purpose, *among other things*, of determining whether

Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by the Havens." ECF No. 26 ¶¶ 3-4.

On July 29, 2022, Defendant filed his opposition ("Opposition") to Plaintiff's Motion (ECF No. 37). In accordance with Local Rule 26(C), simultaneously with his Opposition, Defendant served his objections to the Notice (ECF No. 37-1). Plaintiff filed a reply to Defendant's Opposition on August 3, 2022 (ECF No. 38).

Counsel for the parties appeared before Magistrate Judge Theresa Carroll Buchanan on August 5, 2022. Judge Buchanan granted Plaintiff's motion and entered the corresponding Order. The Order mandates that Defendant "appear on Monday, August 29, 2022, at 10:00 a.m. at the office of Plaintiff's counsel . . . and shall submit to the employee(s) of J and M Paternity Service, LLC., for the buccal swab samples . . . ." ECF No. 40 p. 1. The Order continues that "J and M Paternity Service, LLC shall transfer the samples to Eurofins Europe/London Police and Bode Technologies for testing . . . ." ECF No. 40 p. 1. There was no evidence presented that Eurofins Europe or the London Police had a valid rape kit with a testable sample.

Defendant now files his objection to the Order because, *inter alia*, Plaintiff failed to meet her burden to establish the "in controversy" and "good cause" requirements imposed by Rule 35, which are not addressed in the Order. Additionally, the Order does not provide that Plaintiff meets the good cause and in controversy requirements (nor can it) given that there was no evidence presented that there is a valid DNA sample against which to test Defendant's DNA. Further, even if the sample could be tested, the results are likely inadmissible in this Court.

Additionally, the Order does not specify the conditions and scope of the examination, that the examination must be conducted by a medical professional, nor does it designate a proper "place" for such examination. Therefore, Defendant respectfully requests that this Court sustain

his objection and issue a protective order prohibiting Plaintiff from continuing to seek a DNA

sample and/or physical examination of Defendant.

**III.    ARGUMENT.**

    **A.    Legal Standard for Rule 72 Objection.**

      Pursuant to Federal Rule of Civil Procedure 72, a party has fourteen days to object to the

order of a magistrate judge regarding a pretrial matter that is not dispositive of a party's claim or

defense. *See* Fed. R. Civ. P. 72(a). Rule 72(a) provides that a district judge must "modify or set

aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).

A ruling is clearly erroneous "when although there is evidence to support it, the reviewing court

on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." *CertusView Techs., LLC v. S&N Locating Servs., LLC*, 107 F.Supp.3d 500, 504

(E.D. Va. 2015). "In practical terms, the 'contrary to law' standard is equivalent to *de novo*

review." *Riddick v. Norfolk S. Ry. Co.*, 2022 WL 2614877, at *1 (E.D. Va. May 6, 2022).

    **B.    The Court Erred in Granting Plaintiff's Motion, Despite Not Determining
        that Plaintiff Had Established the Good Cause and In Controversy
        Requirements.**

      Rule 35 provides that a court "may order a party whose mental or physical condition—

including blood group—is in controversy to submit to a physical or mental examination by a

suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1). An order "may be made only

on motion for good cause." Fed. R. Civ. P. 35(a)(2)(A). The Fourth Circuit has held that "[u]nder

Rule 35, the invasion of the individual's privacy by a physical or mental examination is so

serious that a strict standard of good cause, supervised by the district courts, is manifestly

appropriate." *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir.

1962); *see also Petition of Trinidad Corp.*, 238 F.Supp. 928, 936 (E.D. Va. 1965) (relying on the

United States Supreme Court opinion *Schlagenhauf v. Holder* and stating "[i]t is plain" that the good cause requirement under Rule 35 "is not to be treated lightly").

The United States Supreme Court has discussed the "in controversy" and "good cause" requirements applicable to Rule 35, stating that these requirements "are not met by mere conclusory allegations of the pleadings—nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). Therefore, the Court noted, Rule 35 "requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements of 'in controversy' and 'good cause.'" *Id.* at 118-19. "[T]he movant must produce sufficient information, by whatever means, so that the district judge can fulfill his function mandated by the Rule." *Id.* at 119. Plaintiff established neither the "good cause" nor "in controversy" requirements. Importantly, the Order does not specify that Plaintiff established either of these, yet her Motion was granted.[2]

      1.    <u>Plaintiff Failed to Demonstrate Good Cause and the Order Does Not State That She Demonstrated Such.</u>

          *a.*    *"Good Cause" Requires More than Mere Relevancy.*

---

[2] According to Plaintiff, "Defendant argues for the application of a legal standard that is too high" and that her "burden is not proof beyond a reasonable doubt, which is a criminal standard, but is only the elements required under Rule 35—(A) good cause, and (B) the time, place, manner conditions, and scope of the examination, as well as the person or persons who will perform it." ECF No. 38 p. 5. Neither of these assertions have any merit. Firstly, Plaintiff must establish the "in controversy" requirement detailed by the United States Supreme Court, which she omits in her interpretation of the standard. Furthermore, Defendant is not arguing that Plaintiff has to meet the "criminal standard" of "proof beyond a reasonable doubt." Rather, as detailed *infra*, Plaintiff must meet the legal burden of a "reasonable possibility" of a match.

The United States Supreme Court has held that physical and mental examinations of parties under Rule 35 are "limited by Rule 26(b)'s provision that 'the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . .'" *Schlagenhauf v. Holder*, 379 U.S. 104, 117 (1964) (citing Fed. R. Civ. P. 26(b)). However, "[t]he scope of Rule 35, Federal Rules of Civil Procedure, is not coextensive with that of Rule 26, Federal Rules of Civil Procedure." *In re Mitchell*, 563 F.2d 143, 143(5th Cir. 1977).

As the Fourth Circuit has noted, "[t]he specific requirement of good cause would be meaningless if good cause could be sufficiently established by merely showing that the desired materials are relevant, for the relevancy standard had already been imposed by Rule 26(b)." *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962). Therefore, in order to establish that she is entitled to a DNA sample pursuant to Rule 35, Plaintiff has a much higher burden than mere relevancy, which she failed to establish, as detailed below.[3]

> b.    *Plaintiff Failed to Make a Prima Facie Showing of a Reasonable Possibility of a Match.*

In *Schlagenhauf v. Holder* 379 U.S. 104 (1964), the United States Supreme Court addressed the compulsion of mental and physical examinations under Rule 35.[4] *Schlagenhauf v. Holder*, 379 U.S. 104 (1964). The matter was a mandamus proceeding challenging the district court's order requiring a defendant to submit to mental and physical examinations. *Id.* at 106. The

---

[3] Plaintiff also asserts in her Reply that her "request is supported by good cause" because "Defendant has denied that he penetrated or raped the Defendant." ECF No. 38 p. 3. Plaintiff continues that "[s]emen was found by the London Police in their examination of the rape kit" and that "[t]he best evidence to prove Defendant raped Plaintiff is to compare the DNA of semen that was found on Plaintiff's underwear, close to her crotch, with a current DNA sample from Defendant." ECF No. 38 p. 3. Rape requires sexual intercourse. *See* Va. Code § 18.2-61. If DNA were found on Plaintiff's underwear, as opposed to inside of Plaintiff, this would not demonstrate rape.

[4] While this case did not involve the actual taking of a DNA sample, many of the district courts ruling on the issues of compelling a DNA sample look to this case for guidance and apply the principles mandated by the United States Supreme Court when interpreting Rule 35.

Court held that "the movant must produce sufficient information, by whatever means, so that the district judge can fulfill his function mandated by the Rule." *Id.* at 119. The Court concluded that "[m]ental and physical examinations are only to be ordered upon a discriminating application by the district judge of the limitations prescribed by the Rule." *Id.* at 120. Plaintiff has repeatedly fallen far short of her duty to provide sufficient information, instead generally asserting in her Motion that "[t]here is authority under the Federal Rules for ordering a DNA sample" and cites to the cases of *D'Angelo v. Potter,* 224 F.R.D. 300 (D. Mass. 2004), and *McGrath v. Nassan Health Care Corporation,* 209 F.R.D. 55 (E.D.N.Y. 2002)ECF No. 26 ¶ 12.  She also relies upon the case of *D'Angelo* again in her Reply, merely stating that "[s]imilar to *D'Angelo* . . . the presence of [Defendant's] DNA in the sperm found on/or in Plaintiff or her underwear would establish a *prima facie* case that Defendant raped Plaintiff." ECF No. 38 p. 4. However, neither of these cases that Plaintiff relies upon offers any support for her and are easily distinguishable.[5]

In *D'Angelo v. Potter* 224 F.R.D. 300 (D. Mass. 2004), the plaintiff brought a sexual assault claim against a male supervisor, alleging that he raped her in the boiler room of a postal station. *D'Angelo v. Potter,* 224 F.R.D. 300 (D. Mass. 2004). She sought an order compelling the defendant to provide samples of his DNA for testing whether his DNA matched semen found in the boiler room. *Id.* at 301. The plaintiff had testified at her deposition that the defendant had raped her, but the defendant denied that he ever had sexual relations with her, consensual or otherwise. *Id.* A senior forensic chemist with the Postal Inspection Service had taken swabs from the boiler room and two tested positive for the presence of semen. *Id.*

---

[5] Additionally, in her Reply, instead of addressing Defendant's case law, Plaintiff merely states that "[t]he caselaw cited in Plaintiff's Motion fully supports Plaintiff's request and we will address that as necessary at the hearing rather than burden the record here." ECF No. 38 p. 4. This is yet another example of the apathy, other than the consistent use of inflammatory baseless language, that Plaintiff has demonstrated throughout the litigation in this matter, including her failure to provide anything other than inadmissible hearsay in support of her Motion.

The defendant argued that his DNA was not "in controversy" and that "good cause" had not been "shown" for an examination of his DNA. The court began by noting that DNA testing "is an 'extreme discovery tool' in that it is only in a very few cases where, as a matter of discovery in a civil suit, litigants are required to provide such a sample." *Id.* at 303. The court next determined that the plaintiff had made "a prima facie showing of a reasonable possibility of a match" because two of the swabs that the forensic chemist took from the boiler room tested positive for semen and that the plaintiff testified as to what occurred in the boiler room and had, therefore, shown a reasonable possibility of a match. *Id.* The court held that in the instant case, the plaintiff had offered an evidentiary basis for concluding that the semen belonged to defendant. Unlike in *D'Angelo v. Potter,* 224 F.R.D. 300 (D. Mass. 2004) Plaintiff did not offer testimony regarding the alleged rape, but rather filed an unverified complaint. She has also not actually established that a useable sample was recovered by the London Police or that such sample still exists or that its integrity has been maintained. Absent an affidavit or other verification from the London Police that she can test Defendant's DNA against an uncompromised, useable sample, Defendant should not be forced to provide his DNA.[6] Plaintiff's bare, unverified allegations in a complaint are woefully insufficient to require Defendant to submit his DNA.

In *McGrath v. Nassau Health Care Corporation,* 209 F.R.D. 55, 57 (E.D.N.Y. 2002), the other case relied upon by Plaintiff, a female hospital employee brought a sexual harassment suit against a hospital and its male employee The plaintiff moved for a protective order precluding the use of a blanket purportedly stained with her menstrual blood. *Id.* at 56-57. The individual defendant cross-moved for an order directing plaintiff to produce a DNA sample. *Id.* at 57. The

---

[6] As detailed, *infra*, Plaintiff's counsel's unverified statements regarding what the London Police allegedly told him falls far short of providing any sort of actual evidence.

defendant claimed that the blanket was stained with plaintiff's blood when he and she engaged in consensual sexual intercourse on it and that it would provide a basis for impeaching the plaintiff's testimony that she and the defendant never had a consensual sexual relationship (which she testified to at deposition and in her responses to interrogatories). *Id.* at 57. The court adopted the requirement "that the movant must make a prima facie showing that the DNA sample is warranted, through the introduction of sworn statements and other evidence." *Id.* at 58.

The court noted "the understanding that a DNA sample is meaningless in a vacuum—the sample must be compared to something to determine if the two DNA profiles match, and there must be some demonstrable possibility that a match will be found." *Id.* at 61. The court continued that "parties should not be permitted to engage in fishing expeditions, hoping that some useful evidence might be gleaned from obtaining the DNA sample, nor should they be allowed to use demands for DNA evidence to pressure or intimidate other parties." *Id.*

The court granted the motion to compel the DNA sample, noting that the defendant "has met his burden of showing a reasonable possibility that the DNA testing is likely to yield a match." *Id.* at 61. First, he had "shown that the evidence to be tested—the blanket—actually contains a male and a female DNA profile that can be tested against individual DNA samples" and that the "letter submitted by [the defendant] from LabCorp states that preliminary testing of the blanket revealed the presence of blood, and the presence of 'a major DNA profile consistent with a male source' and 'a major DNA profile consistent with a female source.'" *Id.* at 61-62. The court continued that "[t]he lab also stated that the DNA profiles 'can be compared to any reference sample submitted.'" *Id.* at 62. The court concluded that the defendant "has shown not only that there is something to test [the plaintiff]'s DNA sample against, but also that there is some factual basis for believing that a match may be made" and the defendant "testified at the

hearing as to the specific incident that allegedly resulted in the semen and blood stains on the blanket." *Id.* at 62. Ultimately, the court found "that the defendant has shown, through his affidavit and testimony at the hearing, a reasonable possibility that such a match may be found." *Id.* at 62.

Conversely, Plaintiff has offered no testimony in support of the bold allegations in her unverified complaint. She has also not provided any admissible evidence, much less a letter appended to an affidavit, from the entity that allegedly took the sample in London, that such a sample still exists, that the sample has not been degraded or that it contains a DNA profile that can be tested against a DNA sample. Moreover, Plaintiff has not provided any evidence regarding the chain of custody of the rape kit that is now five years old. *See Hargrove v. Commonwealth,* 53 Va. App. 545, 554 (Va. App. 2009) (holding that when a vital link in possession or treatment of evidence is unaccounted for, the chain of custody is incomplete, and the evidence is inadmissible); *see also* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.")  Absent any information from the Havens, there is no way for Plaintiff to meet the requirements of Rule 35.

Further, it would be highly prejudicial to allow the profile created in London to be utilized in this matter as Defendant would not have access to the sample to determine if the profile created is accurate or if cross-contamination occurred during the extraction process or at the time a sample was taken as there was clothing nearby that also contained DNA. The word of the London Police, who lost the first sample provided by Defendant, would go unchallenged. *See District Attorney's Office for Third Judicial Dist. v. Osborne,* 557 U.S. 52, 82 (holding that risks of contamination increase every time someone attempts to extract DNA).

Additionally, the DNA sample from London would likely be inadmissible. Any evidence of the DNA sample, including any profile created, is not self-authenticating. At a minimum, the physician who obtained the swabs would need to testify, as well as the police employees who handled and kept custody of the samples over the past nearly five years. *See, e.g., Williams v. Illinois*, 567 U.S. 50, 76 (2012) ("As to the source of the sample, the State offered conventional chain-of-custody evidence, namely, the testimony of the physician who obtained the vaginal swabs, the testimony of the police employees who handled and kept custody of that evidence until it was sent to Cellmark, and the shipping manifests, which provided evidence that the swabs were sent to Cellmark [Diagnostics Laboratory] and then returned to the [Illinois State Police] lab.").

Clearly, Plaintiff has fallen far short of her burden of establishing a *prima facie* showing of a reasonable possibility of a match.

   c.   *Plaintiff's Continued Reliance on Ashby v. Mortimer* 329 F.R.D. 650, 652-53 (D. Idaho 2019) *is Misplaced.*

Plaintiff places much reliance on the case of *Ashby v. Mortimer* 329 F.R.D. 650, 652-53 (D. Idaho 2019). In *Ashby*, a biological mother and her former husband, whose daughter was born during their marriage via artificial insemination, brought a medical malpractice action against a medical practice and her treating obstetrician, alleging that he fraudulently used his own sperm to impregnate her. *Ashby v. Mortimer*, 329 F.R.D. 650, 652-53 (D. Idaho 2019). Many years after her birth, the daughter received a notification from Ancestry.com that a DNA sample that she had submitted matched a sample submitted by the defendant. *Id.* at 653. The website predicted that there was a parent-child relationship between the two based on the samples. *Id.* This eventually led to the medical malpractice action, where the plaintiffs filed a motion to compel the defendant's "submission to a buccal (cheek) swab DNA test." *Id.*

11

The defendant argued that good cause could not "be established because Plaintiffs can simply rely on the Ancestry.com test." *Id.* at 654. The plaintiffs argued that there was good cause to order the defendant "to submit to a DNA test because the Ancestry.com test could not serve as conclusive evidence of paternity at trial" as "the Ancestry.com test is inadmissible evidence of paternity under Idaho law, there is no documented chain of custody for either [the defendant]'s or [the daughter]'s DNA samples, and there is no way for an expert to evaluate Ancestry.com's results in light of the chain of custody issue." *Id.*

The court ultimately concluded that "[g]ood cause supports a DNA test because [the defendant]'s relation to [the daughter] is not, contrary to [the defendant]'s contention, available through other means." *Id.* at 655. The court elaborated:

> Here, the Ancestry.com test does not provide conclusive proof of paternity because, *inter alia*, there is no documented chain of custody. As such, [the defendant] could launch a variety of attacks on the competency of the Ancestry.com results at trial, including: (1) that someone else may have produced the saliva in the sample submitted under his name or in the sample submitted under [the daughter]'s name; (2) that he (or [the daughter]) did not follow the appropriate procedures for giving a sample; (3) that excessive heat, cold, age of test, or some other defect before processing by Ancestry.com degraded the accuracy of the results; or (4) that mix-ups at Ancestry.com rendered the results inconclusive.

*Id.* at 655.[7] Plaintiff asserts that "[t]he instant case goes a step further—not only had Defendant voluntarily provided his DNA, he is seeking a protective order to prevent the sharing of his DNA with the exact same entity with whom he had shared his DNA in the past without objection." ECF No. 26 ¶ 15. Plaintiff continues that:

---

[7] Plaintiff also relies on *Ashby v. Mortimer*, 329 F.R.D. 650, 652-53 (D. Idaho 2019) to support her proposition that "[c]learly, the voluntary provision of DNA once constitutes a waiver of any argument against providing DNA evidence." ECF No. 26 ¶ 15. Under this logic, any time law enforcement wants to obtain a DNA sample, they would merely have to establish that the person previously provided DNA in any context, such as a 23 and Me DNA Ancestry Test or even routine blood work or the donation of blood at a Red Cross blood drive. This is a dangerous precedent implicating a myriad of serious privacy concerns.

> If Plaintiff is prohibited from sharing Defendant's DNA with The Havens or otherwise comparing the DNA samples, Defendant could argue at trial that (1) the comparison was invalid as it was not made against the actual samples; (2) that one or other of the facilities either did not use the proper test, or used different tests; (3) that defects in processing by The Havens or a U.S. lab resulted in inconclusive results; or (4) that there were mix-ups in tests performed in different countries by different agencies. These precise issues were identified as problems in *Ashby*. *Id.* at 655. The court in *Ashby* ordered defendant to provide DNA for direct comparison to commercial test results, as opposed to Ancestry.com's DNA database. *Id.* Any attempt to bar Plaintiff from obtaining DNA and performing a test against the rape kit in the possession of The Havens and the London Police could prevent her from proving that the DNA samples were identical.

ECF No. 26 ¶ 16. Plaintiff's argument lacks any logical consistency and is irrelevant. This logic would apply if Defendant were trying to get Plaintiff to rely upon a prior specimen as opposed to providing one. Here, there is no other sample previously provided by Defendant that Defendant can challenge (such as ancestry.com sample), making the reliance on *Ashby* wholly inapplicable.[8]

        *d.*    *Potential Support for Punitive Damages is Not a Proper Ground for a DNA Request.*

Plaintiff alleges that "[t]he existence of a DNA match would also constitute an important element for punitive damages." ECF No. 26 ¶ 13. Plaintiff fails to specify *how* the existence of a DNA match would constitute an element for punitive damages, much less an "important" one. Regardless, a DNA sample is not to be ordered pursuant to Rule 35 merely for the issue of damages. *See, e.g., Sacramona v. Bridgestone/Firestone, Inc.*, 152 F.R.D. 428, 431-32 (D. Mass. 1993) (noting, in denying a Rule 35 motion, that "defendants seek the blood test to determine future damages, not liability").

---

[8] In her Reply, instead of addressing Defendant's arguments, Plaintiff merely asserts that "as in *Ashby v. Mortimer* . . . Defendant has already voluntarily provided a DNA sample, waiving any argument against providing DNA evidence." ECF No. 38 p. 5.

      1.     <u>The Court Erred in Granting Plaintiff's Motion Because Plaintiff Failed to Establish the "In Controversy" Requirement, as the Request is Not Relevant to Any Party's Claim or Defenses.</u>

Plaintiff's request is not relevant to any party's claim or defense because a DNA sample is meaningless in a vacuum.[9] Defendant asserted in his Opposition that Plaintiff failed to explain, nor could she, how she intends to compare a sample compelled from Defendant to anything. ECF No. 37 p. 10. In response, Plaintiff stated:

> The London Metropolitan Police sent the rape kit collection sample to its outside labs, including Eurofins Europe, for testing after The Havens collected the sample within an hour of Defendant raping Plaintiff. The London Police . . . has told us that Eurofins profiled the DNA using ESI-17 profiling chemistry for standard DNA profiling, and that if YSTR work is required (not performed routinely) it would be Y-23. Plaintiff has engaged Bode Technologies to perform the profiling of Defendant's sample and has discussed this case extensively with Joan Gullickson, a leading expert on DNA profiling and forensics, at Bode Technologies . . . . Bode has supplied Plaintiff with two kits—one for Bode and one to submit to Eurofins Europe/London Police—to compare not only DNA profiles but also any direct comparisons that may be necessary.

ECF No. 38 p. 2. Notably absent from Plaintiff's Reply is any affidavit from either the London Police, Eurofins Europe, The Havens, or Joan Gullickson[10] to offer any sort of support for these statements. Plaintiff's counsel has not actually provided any sort of correspondence or affidavit

---

[9] Plaintiff also alleges that "DNA was obtained on the clothes of Plaintiff, as well as part of a rape kit taken by the medical clinic, The Havens." ECF No. 26 ¶ 1. She states that "[t]he DNA sample is relevant because . . . there is a previous DNA sample against which it can be compared that was taken from Plaintiff's clothing soon after the rape." ECF No. 26 ¶ 17. Firstly, Plaintiff fails to establish how DNA found on Plaintiff's clothing would establish a rape. Defendant's DNA on Plaintiff's clothes would not be surprising, as Plaintiff admitted in her Complaint that she agreed to stay with Defendant for two nights. *See* ECF No. 1 ¶ 19 ("Defendant offered his apartment, in the SoHo area of London, as an alternative and free place to stay for the extra two days. Plaintiff accepted . . . ."); ECF No. 1 ¶ 20 ("Defendant invited Plaintiff to stay in the apartment's bed and stated he would sleep on the sofa in the living room area. Plaintiff agreed to this arrangement . . . ."); ECF No. 1 ¶ 21 (noting that Plaintiff was sleeping in "the apartment's bed").

[10] Plaintiff's assertion that Joan Gullickson is "a leading expert on DNA profiling and forensics" is questionable, at best, as a quick internet search of the name "Joan Gullickson," even adding the additional context of either the search term "DNA" or "Bode" does not yield any results demonstrating such.

from the London Police stating that they would provide the sample to Plaintiff and her counsel or even whether such sample still exists.  Plaintiff admits that the London Police have already lost a previously provided DNA sample. *See* ECF No. 26 ¶ 17; *see also* ECF No. 25 p. 3 (noting that the London Metropolitan Police's testing lab "accidentally lost or destroyed" the DNA sample). Additionally, Plaintiff fails to offer any evidence that there is a DNA sample at The Havens that is of such a quantity and of such a quality as to allow for accurate DNA analysis. She has also not established that the integrity of The Havens sample has been preserved or that it even still exists. As Plaintiff has failed to reliably establish that she will be able to compare a sample obtained from Defendant to anything, she is not entitled to such a sample.

### C.   The Order Does Not Meet the Requirements Imposed by Rule 35.

Rule 35 provides that a court "may order a party . . . to submit to a physical or mental examination *by a suitably licensed or certified examiner*." Fed. R. Civ. P. 35(a)(1) (emphasis added). Rule 35(a)(2) also requires that an order issued pursuant to Rule 35, stating that an order: "must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." Fed. R. Civ. P. 35(a)(2)(B).

1.   <u>The Order Does Not Specify the Conditions and Scope of the Examination</u>.

The Order continues that "J and M Paternity Service, LLC., shall transfer the samples to Eurofins Europe/London Police and Bode Technologies for testing . . . ." ECF No. 40 p. 1. The Order does not specify what "testing" is to take place or the methods for such testing. Nor do Plaintiff's Notice or Motion provide guidance to appropriately limit the scope of the examination.  The Notice provides that "[t]he inspection and taking of the DNA sample will be for the purpose, *among other things*, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by The Havens." ECF No. 26-1 p. 1

(emphasis added). Similarly, the Motion provides that "[t]he inspection will be for the purpose, *among other things*, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by the Havens." ECF No. 26 ¶¶ 3-4. Plaintiff does not specify what these "other things" may be. Considering the wide latitude that Plaintiff apparently wants in the use of these samples, such an order should be more narrowly tailored than the general term "testing." Furthermore, it is unclear, and Plaintiff has not attempted to explain, why a sample needs to be sent to both Eurofins Europe/London Police and Bode Technologies when there is only one DNA sample to compare.

    2.    <u>The Order Does Not Provide that the Examination Must Be Conducted By a Medical Professional.</u>

The Order requires that Defendant "shall submit to the *employee(s)* of J and M Paternity Service, LLC., for the buccal swab samples . . . . " ECF No. 40 p. 1 (emphasis added). However, Rule 35 provides that a court "may order a party . . . to submit to a physical or mental examination *by a suitably licensed or certified examiner.*" Fed. R. Civ. P. 35(a)(1) (emphasis added). Problematically, the generic term "employees" does not impose the requirement of a suitably licensed or certified examiner. Additionally, while Plaintiff's Notice states that it is made "by and through the undersigned counsel and a suitably certified health care provider," Plaintiff did not provide an affidavit or signature of any "suitable heath care provider" that was apparently making the Notice on Plaintiff's behalf. ECF No. 26-1 p. 1. Notably, there was no signature on the Notice from a health care provider, much less a "suitably certified" one. There was also no affidavit or other supporting documentation from any health care provider.

    3.    <u>The "Place" Designated in the Order is Improper</u>.

The Order improperly mandates that Defendant "appear on Monday, August 29, 2022, at 10:00 a.m. at the office of Plaintiff's counsel . . . for the buccal swab samples." ECF No. 40 p. 1.

This is improper as the site of the examination should be a medical office or otherwise neutral location. *See, e.g., Smith v. Café Asia*, 724 F.Supp.2d 125, 126-27 (D.D.C. 2010) (granting a Rule 35 motion after noting that the "*motion agreed to 'a neutral location to be determined by the parties*'") (emphasis added).

> **D.    The Court Erred in Denying Defendant's Request for a Protective Order.**

The United States Supreme Court has noted that physical and mental examinations of parties under Rule 35 are limited by the provisions of the Federal Rules "permitting the district court, upon motion, to limit, terminate, or otherwise control the use of discovery devices so as to prevent either their use in bad faith or undue 'annoyance, embarrassment, or oppression.'" *Schlagenhauf v. Holder*, 379 U.S. 104, 117 (1964). Rule 26(c) provides:

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . [T]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one of more of the following: (A) forbidding the disclosure or discovery.

Fed. R. Civ. P. 26(c)(1)(A). This provision "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rinehart*, 467 U.S. 20, 36 (1984).

As noted *supra,* "DNA testing is an extreme discovery tool which is very intrusive to the targets of such discovery" and should not be used as a "fishing expedition." *Harris v. Athol-Royalston Reg'l Sch. Dist. Comm.*, 206 F.R.D. 30, 35 (D. Mass. 2002); *see also McGrath v. Nassau Health Care Corp.*, 209 F.R.D. 55 (E.D.N.Y. 2002) (directing that "parties should not be permitted to engage in fishing expeditions, hoping that some useful evidence might be gleaned from obtaining the DNA sample, nor should they be allowed to use demands for DNA evidence to pressure or intimidate other parties"). Plaintiff has continuously made

shockingly little effort to show why she is entitled to the extreme relief that she seeks. The conclusion is that, at best, she has no support, or, at worst, that she brought the motion in an attempt to use a discovery device in bad faith, repeatedly used to attempt to pressure and intimidate Defendant, a theme throughout this litigation. Plaintiff's misuse of Rule 35 should not be rewarded; Defendant is entitled to a protective order prohibiting her from obtaining a DNA sample from him.

## IV.    CONCLUSION.

For the reasons set forth herein, Defendant Cenk Sidar respectfully requests that the Court sustain Defendant's Objection to Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order Regarding Motion to Compel DNA, deny Plaintiff Jane Doe's Motion to Obtain Physical Examination of and DNA Sample from Defendant, enter a protective order prohibiting Plaintiff from seeking a DNA sample and/or physical examination of Defendant, and grant such other and further relief in favor of Defendant as this Court deems just and proper.

Dated: August 19, 2022

<div style="margin-left: 40%;">

CENK SIDAR
By Counsel:


Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com
*Counsel for Plaintiff*

</div>

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 19, 2022, a copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE THERESA CARROLL BUCHANAN'S AUGUST 5, 2022, ORDER REGARDING MOTION TO COMPEL DNA** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com


_____
Mariam W. Tadros

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

JANE DOE                                          :
                                                  :
      Plaintiff,                                :
                                                  :
v.                                                : Civil Action No. 1:22-cv-00545 (CMH/TCB)
                                                  :
CENK SIDAR                                        :
                                                  :
      Defendant.                                :
_____

## <u>ORDER</u>

This matter comes before the Court on Defendant's Objection to Magistrate Judge Theresa Carroll Buchanan's August 5, 2022 Order Regarding Motion to Compel DNA. Having reviewed the motion, the opposition thereto, and the argument of counsel, if any, it is hereby:

**ORDERED** that Defendant's Objection to Magistrate Jude Theresa Carroll Buchanan's August 5, 2022 Order Regarding Motion to Compel DNA is **SUSTAINED**, and it is

**ORDERED** that Plaintiff Jane Doe's Motion to Obtain Physical Examination of and DNA Sample from Defendant is **DENIED**, and it is further

**ORDERED** that Defendant is granted a protective order prohibiting Plaintiff from seeking a DNA sample from him.

ENTERED this _____ day of _____, 2022.


_____
Claude M. Hilton
United States District Court Judge
Eastern District of Virginia

JA462

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : | |
| CENK SIDAR | : | |
| | : | |
| Defendant. | : | |

_____

**DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE THERESA CARROLL
BUCHANAN'S AUGUST 5, 2022 ORDER REGARDING MOTION TO COMPEL DNA**

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Objection to

Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order Regarding Plaintiff Jane

Doe's ("Plaintiff") Motion to Compel DNA pursuant to Federal Rule of Civil Procedure 72.

For the reasons set forth in the accompanying memorandum in support, Defendant Cenk

Sidar respectfully requests that the Court sustain Defendant's Objection to Magistrate Judge

Theresa Carroll Buchanan's August 5, 2022, Order Regarding Motion to Compel DNA, deny

Plaintiff Jane Doe's Motion to Obtain Physical Examination of and DNA Sample from

Defendant, enter a protective order prohibiting Plaintiff from seeking a DNA sample and/or

physical examination of Defendant, and grant such other and further relief in favor of Defendant

as this Court deems just and proper.

CENK SIDAR
By Counsel

JA463

_[signature]_

Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 19, 2022, a copy of the foregoing
**DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE THERESA CARROLL
BUCHANAN'S AUGUST 5, 2022 ORDER REGARDING MOTION TO COMPEL DNA**
was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_[signature]_

Mariam W. Tadros

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : | |
| CENK SIDAR | : | |
| | : | |
| Defendant. | : | |

**CORRECTED MEMORANDUM IN SUPPORT OF DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE THERESA CARROLL BUCHANAN'S AUGUST 5, 2022, <u>ORDER REGARDING MOTION TO COMPEL DNA</u>**

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Memorandum in Support of Defendant's Objection to Magistrate Judge Theresa Carroll Buchanan's[1] August 5, 2022, Order ("Order") Regarding Motion to Compel DNA.

## I.    <u>INTRODUCTION</u>.

This case arises from an alleged assault that occurred in London in 2017. Plaintiff Jane Doe ("Plaintiff") asserts that Defendant sexually assaulted her. She claims that she went to the Havens, a sexual assault referral center and that the Havens created a rape kit. After she went to the Havens, the Defendant gave a DNA sample to the London Police, which the London Police promptly lost. In an effort to obtain DNA to send to the London Police, the Plaintiff has filed this action and issued a subpoena for DNA to the Defendant. Plaintiff, however, has failed to provide a scintilla of evidence demonstrating that: (1) either the Havens or the London Police have Plaintiff's rape kit and the alleged clothing, (2) the rape kit has not been degraded and that it contains enough DNA for testing, and (3) the tests performed by Plaintiff, in the United States, can be validly compared to the rape kit located at the Havens or with the London Police. As Plaintiff has failed to establish these basic facts, and because any results are likely to be inadmissible for the reasons outlined below, the underlying Motion fails to meet the "good cause" requirement of Rule 35. Further, the Notice of Physical Examination and DNA Sampling of Defendant ("Notice") (ECF No. 26-1) contains numerous facts and, therefore, does not comply with the requirements of Rule 35.

## II.    <u>BACKGROUND</u>.

On May 12, 2022, Plaintiff filed a Complaint against Defendant for assault (Count I), battery (Count II), and intentional infliction of emotional distress (Count III) resulting from an

---

[1] On August 15, 2022, this case was reassigned to Magistrate Judge John F. Anderson.

alleged rape. On July 15, 2022, Plaintiff served to Defendant Plaintiff's Notice. The Notice provided that Plaintiff "will conduct an [sic] Physical Examination of Defendant . . . which will include the taking of a sample of Defendant's Deoxyribonucleic acid (DNA)." ECF No. 26-1 at 1. The Notice was "for the taking of samples of Defendant's DNA for the purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit." ECF No. 26-1 p. 1.

Plaintiff continued that "[t]hese tests will be analyzed by one or more independent laboratories of Plaintiff's choosing" and that "Defendant will present himself for the taking of these samples at the office of Plaintiff's Counsel . . . ." ECF No. 26-1 at 1. The Notice provided that "[t]he inspection and taking of the DNA sample will be for the purpose, *among other things*, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by The Havens." ECF No. 26-1 p. 1 (emphasis added). Plaintiff asserts that "[t]his information will further be relevant to Plaintiff's claim for punitive damages." ECF No. 26-1 p. 1.

On July 15, 2022, a few hours after serving her Notice, Plaintiff filed her Motion to Obtain Physical Examination of and DNA Sample from Defendant ("Motion"). In her Motion, "Plaintiff seeks samples of Defendant's blood, hair, skin, urine, and a saliva swab for purposes of DNA testing and comparison with DNA that was found on the clothes of Plaintiff and in Plaintiff's rape kit" and asserts that "[t]hese tests will be analyzed by one or more independent laboratories of Plaintiff's choosing." ECF No. 26 ¶ 2. Plaintiff reiterated that she "seeks to have Defendant present himself for the taking of these samples at the office of Plaintiff's Counsel" and that "[t]he inspection will be for the purpose, *among other things*, of determining whether

Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by the Havens." ECF No. 26 ¶¶ 3-4.

On July 29, 2022, Defendant filed his opposition ("Opposition") to Plaintiff's Motion (ECF No. 37). In accordance with Local Rule 26(C), simultaneously with his Opposition, Defendant served his objections to the Notice (ECF No. 37-1). Plaintiff filed a reply to Defendant's Opposition on August 3, 2022 (ECF No. 38).

Counsel for the parties appeared before Magistrate Judge Theresa Carroll Buchanan on August 5, 2022. Judge Buchanan granted Plaintiff's motion and entered the corresponding Order. The Order mandates that Defendant "appear on Monday, August 29, 2022, at 10:00 a.m. at the office of Plaintiff's counsel . . . and shall submit to the employee(s) of J and M Paternity Service, LLC., for the buccal swab samples . . . ." ECF No. 40 p. 1. The Order continues that "J and M Paternity Service, LLC shall transfer the samples to Eurofins Europe/London Police and Bode Technologies for testing . . . ." ECF No. 40 p. 1. There was no evidence presented that Eurofins Europe or the London Police had a valid rape kit with a testable sample.

Defendant now files his objection to the Order because, *inter alia*, Plaintiff failed to meet her burden to establish the "in controversy" and "good cause" requirements imposed by Rule 35, which are not addressed in the Order. Additionally, the Order does not provide that Plaintiff meets the good cause and in controversy requirements (nor can it) given that there was no evidence presented that there is a valid DNA sample against which to test Defendant's DNA. Further, even if the sample could be tested, the results are likely inadmissible in this Court.

Additionally, the Order does not specify the conditions and scope of the examination, that the examination must be conducted by a medical professional, nor does it designate a proper "place" for such examination. Therefore, Defendant respectfully requests that this Court sustain

his objection and issue a protective order prohibiting Plaintiff from continuing to seek a DNA sample and/or physical examination of Defendant.

**III.    ARGUMENT.**

    **A.    Legal Standard for Rule 72 Objection.**

Pursuant to Federal Rule of Civil Procedure 72, a party has fourteen days to object to the order of a magistrate judge regarding a pretrial matter that is not dispositive of a party's claim or defense. *See* Fed. R. Civ. P. 72(a). Rule 72(a) provides that a district judge must "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). A ruling is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *CertusView Techs., LLC v. S&N Locating Servs., LLC*, 107 F.Supp.3d 500, 504 (E.D. Va. 2015). "In practical terms, the 'contrary to law' standard is equivalent to *de novo* review." *Riddick v. Norfolk S. Ry. Co.*, 2022 WL 2614877, at *1 (E.D. Va. May 6, 2022).

    **B.    The Court Erred in Granting Plaintiff's Motion, Despite Not Determining that Plaintiff Had Established the Good Cause and In Controversy Requirements.**

Rule 35 provides that a court "may order a party whose mental or physical condition—including blood group—is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1). An order "may be made only on motion for good cause." Fed. R. Civ. P. 35(a)(2)(A). The Fourth Circuit has held that "[u]nder Rule 35, the invasion of the individual's privacy by a physical or mental examination is so serious that a strict standard of good cause, supervised by the district courts, is manifestly appropriate." *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962); *see also Petition of Trinidad Corp.*, 238 F.Supp. 928, 936 (E.D. Va. 1965) (relying on the

United States Supreme Court opinion *Schlagenhauf v. Holder* and stating "[i]t is plain" that the good cause requirement under Rule 35 "is not to be treated lightly").

The United States Supreme Court has discussed the "in controversy" and "good cause" requirements applicable to Rule 35, stating that these requirements "are not met by mere conclusory allegations of the pleadings—nor by mere relevance to the case—but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). Therefore, the Court noted, Rule 35 "requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements of 'in controversy' and 'good cause.'" *Id.* at 118-19. "[T]he movant must produce sufficient information, by whatever means, so that the district judge can fulfill his function mandated by the Rule." *Id.* at 119. Plaintiff established neither the "good cause" nor "in controversy" requirements. Importantly, the Order does not specify that Plaintiff established either of these, yet her Motion was granted.[2]

        1.   <u>Plaintiff Failed to Demonstrate Good Cause and the Order Does Not State That She Demonstrated Such.</u>

               *a.*    *"Good Cause" Requires More than Mere Relevancy.*

---

[2] According to Plaintiff, "Defendant argues for the application of a legal standard that is too high" and that her "burden is not proof beyond a reasonable doubt, which is a criminal standard, but is only the elements required under Rule 35—(A) good cause, and (B) the time, place, manner conditions, and scope of the examination, as well as the person or persons who will perform it." ECF No. 38 p. 5. Neither of these assertions have any merit. Firstly, Plaintiff must establish the "in controversy" requirement detailed by the United States Supreme Court, which she omits in her interpretation of the standard. Furthermore, Defendant is not arguing that Plaintiff has to meet the "criminal standard" of "proof beyond a reasonable doubt." Rather, as detailed *infra*, Plaintiff must meet the legal burden of a "reasonable possibility" of a match.

The United States Supreme Court has held that physical and mental examinations of parties under Rule 35 are "limited by Rule 26(b)'s provision that 'the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . .'" *Schlagenhauf v. Holder*, 379 U.S. 104, 117 (1964) (citing Fed. R. Civ. P. 26(b)). However, "[t]he scope of Rule 35, Federal Rules of Civil Procedure, is not coextensive with that of Rule 26, Federal Rules of Civil Procedure." *In re Mitchell*, 563 F.2d 143, 143(5th Cir. 1977).

As the Fourth Circuit has noted, "[t]he specific requirement of good cause would be meaningless if good cause could be sufficiently established by merely showing that the desired materials are relevant, for the relevancy standard had already been imposed by Rule 26(b)." *Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962). Therefore, in order to establish that she is entitled to a DNA sample pursuant to Rule 35, Plaintiff has a much higher burden than mere relevancy, which she failed to establish, as detailed below.[3]

> b.   *Plaintiff Failed to Make a Prima Facie Showing of a Reasonable Possibility of a Match.*

In *Schlagenhauf v. Holder* 379 U.S. 104 (1964), the United States Supreme Court addressed the compulsion of mental and physical examinations under Rule 35.[4] *Schlagenhauf v. Holder*, 379 U.S. 104 (1964). The matter was a mandamus proceeding challenging the district court's order requiring a defendant to submit to mental and physical examinations. *Id.* at 106. The

---

[3] Plaintiff also asserts in her Reply that her "request is supported by good cause" because "Defendant has denied that he penetrated or raped the Defendant." ECF No. 38 p. 3. Plaintiff continues that "[s]emen was found by the London Police in their examination of the rape kit" and that "[t]he best evidence to prove Defendant raped Plaintiff is to compare the DNA of semen that was found on Plaintiff's underwear, close to her crotch, with a current DNA sample from Defendant." ECF No. 38 p. 3. Rape requires sexual intercourse. *See* Va. Code § 18.2-61. If DNA were found on Plaintiff's underwear, as opposed to inside of Plaintiff, this would not demonstrate rape.

[4] While this case did not involve the actual taking of a DNA sample, many of the district courts ruling on the issues of compelling a DNA sample look to this case for guidance and apply the principles mandated by the United States Supreme Court when interpreting Rule 35.

Court held that "the movant must produce sufficient information, by whatever means, so that the district judge can fulfill his function mandated by the Rule." *Id.* at 119. The Court concluded that "[m]ental and physical examinations are only to be ordered upon a discriminating application by the district judge of the limitations prescribed by the Rule." *Id.* at 120. Plaintiff has repeatedly fallen far short of her duty to provide sufficient information, instead generally asserting in her Motion that "[t]here is authority under the Federal Rules for ordering a DNA sample" and cites to the cases of *D'Angelo v. Potter,* 224 F.R.D. 300 (D. Mass. 2004), and *McGrath v. Nassan Health Care Corporation,* 209 F.R.D. 55 (E.D.N.Y. 2002)ECF No. 26 ¶ 12.  She also relies upon the case of *D'Angelo* again in her Reply, merely stating that "[s]imilar to *D'Angelo* . . . the presence of [Defendant's] DNA in the sperm found on/or in Plaintiff or her underwear would establish a *prima facie* case that Defendant raped Plaintiff." ECF No. 38 p. 4. However, neither of these cases that Plaintiff relies upon offers any support for her and are easily distinguishable.[5]

In *D'Angelo v. Potter* 224 F.R.D. 300 (D. Mass. 2004), the plaintiff brought a sexual assault claim against a male supervisor, alleging that he raped her in the boiler room of a postal station. *D'Angelo v. Potter,* 224 F.R.D. 300 (D. Mass. 2004). She sought an order compelling the defendant to provide samples of his DNA for testing whether his DNA matched semen found in the boiler room. *Id.* at 301. The plaintiff had testified at her deposition that the defendant had raped her, but the defendant denied that he ever had sexual relations with her, consensual or otherwise. *Id*. A senior forensic chemist with the Postal Inspection Service had taken swabs from the boiler room and two tested positive for the presence of semen. *Id.*

---

[5] Additionally, in her Reply, instead of addressing Defendant's case law, Plaintiff merely states that "[t]he caselaw cited in Plaintiff's Motion fully supports Plaintiff's request and we will address that as necessary at the hearing rather than burden the record here." ECF No. 38 p. 4. This is yet another example of the apathy, other than the consistent use of inflammatory baseless language, that Plaintiff has demonstrated throughout the litigation in this matter, including her failure to provide anything other than inadmissible hearsay in support of her Motion.

The defendant argued that his DNA was not "in controversy" and that "good cause" had

not been "shown" for an examination of his DNA. The court began by noting that DNA testing

"is an 'extreme discovery tool' in that it is only in a very few cases where, as a matter of

discovery in a civil suit, litigants are required to provide such a sample." *Id.* at 303. The court

next determined that the plaintiff had made "a prima facie showing of a reasonable possibility of

a match" because two of the swabs that the forensic chemist took from the boiler room tested

positive for semen and that the plaintiff testified as to what occurred in the boiler room and had,

therefore, shown a reasonable possibility of a match. *Id.* The court held that in the instant case,

the plaintiff had offered an evidentiary basis for concluding that the semen belonged to

defendant. Unlike in *D'Angelo v. Potter,* 224 F.R.D. 300 (D. Mass. 2004) Plaintiff did not offer

testimony regarding the alleged rape, but rather filed an unverified complaint. She has also not

actually established that a useable sample was recovered by the London Police or that such

sample still exists or that its integrity has been maintained. Absent an affidavit or other

verification from the London Police that she can test Defendant's DNA against an

uncompromised, useable sample, Defendant should not be forced to provide his DNA.[6]

Plaintiff's bare, unverified allegations in a complaint are woefully insufficient to require

Defendant to submit his DNA.

   In *McGrath v. Nassau Health Care Corporation,* 209 F.R.D. 55, 57 (E.D.N.Y. 2002),  the

other case relied upon by Plaintiff, a female hospital employee brought a sexual harassment suit

against a hospital and its male employee The plaintiff moved for a protective order precluding

the use of a blanket purportedly stained with her menstrual blood. *Id.* at 56-57. The individual

defendant cross-moved for an order directing plaintiff to produce a DNA sample. *Id.* at 57. The

---

[6] As detailed, *infra*, Plaintiff's counsel's unverified statements regarding what the London Police allegedly told him
falls far short of providing any sort of actual evidence.

defendant claimed that the blanket was stained with plaintiff's blood when he and she engaged in consensual sexual intercourse on it and that it would provide a basis for impeaching the plaintiff's testimony that she and the defendant never had a consensual sexual relationship (which she testified to at deposition and in her responses to interrogatories). *Id.* at 57. The court adopted the requirement "that the movant must make a prima facie showing that the DNA sample is warranted, through the introduction of sworn statements and other evidence." *Id.* at 58.

The court noted "the understanding that a DNA sample is meaningless in a vacuum—the sample must be compared to something to determine if the two DNA profiles match, and there must be some demonstrable possibility that a match will be found." *Id.* at 61. The court continued that "parties should not be permitted to engage in fishing expeditions, hoping that some useful evidence might be gleaned from obtaining the DNA sample, nor should they be allowed to use demands for DNA evidence to pressure or intimidate other parties." *Id.*

The court granted the motion to compel the DNA sample, noting that the defendant "has met his burden of showing a reasonable possibility that the DNA testing is likely to yield a match." *Id.* at 61. First, he had "shown that the evidence to be tested—the blanket—actually contains a male and a female DNA profile that can be tested against individual DNA samples" and that the "letter submitted by [the defendant] from LabCorp states that preliminary testing of the blanket revealed the presence of blood, and the presence of 'a major DNA profile consistent with a male source' and 'a major DNA profile consistent with a female source.'" *Id.* at 61-62. The court continued that "[t]he lab also stated that the DNA profiles 'can be compared to any reference sample submitted.'" *Id.* at 62. The court concluded that the defendant "has shown not only that there is something to test [the plaintiff]'s DNA sample against, but also that there is some factual basis for believing that a match may be made" and the defendant "testified at the

hearing as to the specific incident that allegedly resulted in the semen and blood stains on the blanket." *Id.* at 62. Ultimately, the court found "that the defendant has shown, through his affidavit and testimony at the hearing, a reasonable possibility that such a match may be found." *Id.* at 62.

Conversely, Plaintiff has offered no testimony in support of the bold allegations in her unverified complaint. She has also not provided any admissible evidence, much less a letter appended to an affidavit, from the entity that allegedly took the sample in London, that such a sample still exists, that the sample has not been degraded or that it contains a DNA profile that can be tested against a DNA sample. Moreover, Plaintiff has not provided any evidence regarding the chain of custody of the rape kit that is now five years old. *See Hargrove v. Commonwealth,* 53 Va. App. 545, 554 (Va. App. 2009) (holding that when a vital link in possession or treatment of evidence is unaccounted for, the chain of custody is incomplete, and the evidence is inadmissible); *see also* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.")  Absent any information from the Havens, there is no way for Plaintiff to meet the requirements of Rule 35.

Further, it would be highly prejudicial to allow the profile created in London to be utilized in this matter as Defendant would not have access to the sample to determine if the profile created is accurate or if cross-contamination occurred during the extraction process or at the time a sample was taken as there was clothing nearby that also contained DNA. The word of the London Police, who lost the first sample provided by Defendant, would go unchallenged. *See District Attorney's Office for Third Judicial Dist. v. Osborne,* 557 U.S. 52, 82 (holding that risks of contamination increase every time someone attempts to extract DNA).

Additionally, the DNA sample from London would likely be inadmissible. Any evidence of the DNA sample, including any profile created, is not self-authenticating. At a minimum, the physician who obtained the swabs would need to testify, as well as the police employees who handled and kept custody of the samples over the past nearly five years. *See, e.g., Williams v. Illinois*, 567 U.S. 50, 76 (2012) ("As to the source of the sample, the State offered conventional chain-of-custody evidence, namely, the testimony of the physician who obtained the vaginal swabs, the testimony of the police employees who handled and kept custody of that evidence until it was sent to Cellmark, and the shipping manifests, which provided evidence that the swabs were sent to Cellmark [Diagnostics Laboratory] and then returned to the [Illinois State Police] lab.").

Clearly, Plaintiff has fallen far short of her burden of establishing a *prima facie* showing of a reasonable possibility of a match.

      *c.*     *Plaintiff's Continued Reliance on Ashby v. Mortimer* 329 F.R.D. 650, 652-53 (D. Idaho 2019) *is Misplaced.*

Plaintiff places much reliance on the case of *Ashby v. Mortimer* 329 F.R.D. 650, 652-53 (D. Idaho 2019). In *Ashby*, a biological mother and her former husband, whose daughter was born during their marriage via artificial insemination, brought a medical malpractice action against a medical practice and her treating obstetrician, alleging that he fraudulently used his own sperm to impregnate her. *Ashby v. Mortimer*, 329 F.R.D. 650, 652-53 (D. Idaho 2019). Many years after her birth, the daughter received a notification from Ancestry.com that a DNA sample that she had submitted matched a sample submitted by the defendant. *Id.* at 653. The website predicted that there was a parent-child relationship between the two based on the samples. *Id.* This eventually led to the medical malpractice action, where the plaintiffs filed a motion to compel the defendant's "submission to a buccal (cheek) swab DNA test." *Id.*

The defendant argued that good cause could not "be established because Plaintiffs can simply rely on the Ancestry.com test." *Id.* at 654. The plaintiffs argued that there was good cause to order the defendant "to submit to a DNA test because the Ancestry.com test could not serve as conclusive evidence of paternity at trial" as "the Ancestry.com test is inadmissible evidence of paternity under Idaho law, there is no documented chain of custody for either [the defendant]'s or [the daughter]'s DNA samples, and there is no way for an expert to evaluate Ancestry.com's results in light of the chain of custody issue." *Id.*

The court ultimately concluded that "[g]ood cause supports a DNA test because [the defendant]'s relation to [the daughter] is not, contrary to [the defendant]'s contention, available through other means." *Id.* at 655. The court elaborated:

> Here, the Ancestry.com test does not provide conclusive proof of paternity because, *inter alia*, there is no documented chain of custody. As such, [the defendant] could launch a variety of attacks on the competency of the Ancestry.com results at trial, including: (1) that someone else may have produced the saliva in the sample submitted under his name or in the sample submitted under [the daughter]'s name; (2) that he (or [the daughter]) did not follow the appropriate procedures for giving a sample; (3) that excessive heat, cold, age of test, or some other defect before processing by Ancestry.com degraded the accuracy of the results; or (4) that mix-ups at Ancestry.com rendered the results inconclusive.

*Id.* at 655.[7] Plaintiff asserts that "[t]he instant case goes a step further—not only had Defendant voluntarily provided his DNA, he is seeking a protective order to prevent the sharing of his DNA with the exact same entity with whom he had shared his DNA in the past without objection." ECF No. 26 ¶ 15. Plaintiff continues that:

---

[7] Plaintiff also relies on *Ashby v. Mortimer*, 329 F.R.D. 650, 652-53 (D. Idaho 2019) to support her proposition that "[c]learly, the voluntary provision of DNA once constitutes a waiver of any argument against providing DNA evidence." ECF No. 26 ¶ 15. Under this logic, any time law enforcement wants to obtain a DNA sample, they would merely have to establish that the person previously provided DNA in any context, such as a 23 and Me DNA Ancestry Test or even routine blood work or the donation of blood at a Red Cross blood drive. This is a dangerous precedent implicating a myriad of serious privacy concerns.

> If Plaintiff is prohibited from sharing Defendant's DNA with The Havens or otherwise comparing the DNA samples, Defendant could argue at trial that (1) the comparison was invalid as it was not made against the actual samples; (2) that one or other of the facilities either did not use the proper test, or used different tests; (3) that defects in processing by The Havens or a U.S. lab resulted in inconclusive results; or (4) that there were mix-ups in tests performed in different countries by different agencies. These precise issues were identified as problems in *Ashby*. *Id.* at 655. The court in *Ashby* ordered defendant to provide DNA for direct comparison to commercial test results, as opposed to Ancestry.com's DNA database. *Id.* Any attempt to bar Plaintiff from obtaining DNA and performing a test against the rape kit in the possession of The Havens and the London Police could prevent her from proving that the DNA samples were identical.

ECF No. 26 ¶ 16. Plaintiff's argument lacks any logical consistency and is irrelevant. This logic would apply if Defendant were trying to get Plaintiff to rely upon a prior specimen as opposed to providing one. Here, there is no other sample previously provided by Defendant that Defendant can challenge (such as ancestry.com sample), making the reliance on *Ashby* wholly inapplicable.[8]

    *d.*  *Potential Support for Punitive Damages is Not a Proper Ground for a DNA Request.*

  Plaintiff alleges that "[t]he existence of a DNA match would also constitute an important element for punitive damages." ECF No. 26 ¶ 13. Plaintiff fails to specify *how* the existence of a DNA match would constitute an element for punitive damages, much less an "important" one. Regardless, a DNA sample is not to be ordered pursuant to Rule 35 merely for the issue of damages. *See, e.g., Sacramona v. Bridgestone/Firestone, Inc.*, 152 F.R.D. 428, 431-32 (D. Mass. 1993) (noting, in denying a Rule 35 motion, that "defendants seek the blood test to determine future damages, not liability").

---

[8] In her Reply, instead of addressing Defendant's arguments, Plaintiff merely asserts that "as in *Ashby v. Mortimer* . . . Defendant has already voluntarily provided a DNA sample, waiving any argument against providing DNA evidence." ECF No. 38 p. 5.

13

1.     The Court Erred in Granting Plaintiff's Motion Because Plaintiff Failed to Establish the "In Controversy" Requirement, as the Request is Not Relevant to Any Party's Claim or Defenses.

Plaintiff's request is not relevant to any party's claim or defense because a DNA sample is meaningless in a vacuum.[9] Defendant asserted in his Opposition that Plaintiff failed to explain, nor could she, how she intends to compare a sample compelled from Defendant to anything. ECF No. 37 p. 10. In response, Plaintiff stated:

> The London Metropolitan Police sent the rape kit collection sample to its outside labs, including Eurofins Europe, for testing after The Havens collected the sample within an hour of Defendant raping Plaintiff. The London Police . . . has told us that Eurofins profiled the DNA using ESI-17 profiling chemistry for standard DNA profiling, and that if YSTR work is required (not performed routinely) it would be Y-23. Plaintiff has engaged Bode Technologies to perform the profiling of Defendant's sample and has discussed this case extensively with Joan Gullickson, a leading expert on DNA profiling and forensics, at Bode Technologies . . . . Bode has supplied Plaintiff with two kits—one for Bode and one to submit to Eurofins Europe/London Police—to compare not only DNA profiles but also any direct comparisons that may be necessary.

ECF No. 38 p. 2. Notably absent from Plaintiff's Reply is any affidavit from either the London Police, Eurofins Europe, The Havens, or Joan Gullickson[10] to offer any sort of support for these statements. Plaintiff's counsel has not actually provided any sort of correspondence or affidavit

---

[9] Plaintiff also alleges that "DNA was obtained on the clothes of Plaintiff, as well as part of a rape kit taken by the medical clinic, The Havens." ECF No. 26 ¶ 1. She states that "[t]he DNA sample is relevant because . . . there is a previous DNA sample against which it can be compared that was taken from Plaintiff's clothing soon after the rape." ECF No. 26 ¶ 17. Firstly, Plaintiff fails to establish how DNA found on Plaintiff's clothing would establish a rape. Defendant's DNA on Plaintiff's clothes would not be surprising, as Plaintiff admitted in her Complaint that she agreed to stay with Defendant for two nights. *See* ECF No. 1 ¶ 19 ("Defendant offered his apartment, in the SoHo area of London, as an alternative and free place to stay for the extra two days. Plaintiff accepted . . . ."); ECF No. 1 ¶ 20 ("Defendant invited Plaintiff to stay in the apartment's bed and stated he would sleep on the sofa in the living room area. Plaintiff agreed to this arrangement . . . ."); ECF No. 1 ¶ 21 (noting that Plaintiff was sleeping in "the apartment's bed").

[10] Plaintiff's assertion that Joan Gullickson is "a leading expert on DNA profiling and forensics" is questionable, at best, as a quick internet search of the name "Joan Gullickson," even adding the additional context of either the search term "DNA" or "Bode" does not yield any results demonstrating such.

from the London Police stating that they would provide the sample to Plaintiff and her counsel or even whether such sample still exists.  Plaintiff admits that the London Police have already lost a previously provided DNA sample. *See* ECF No. 26 ¶ 17; *see also* ECF No. 25 p. 3 (noting that the London Metropolitan Police's testing lab "accidentally lost or destroyed" the DNA sample). Additionally, Plaintiff fails to offer any evidence that there is a DNA sample at The Havens that is of such a quantity and of such a quality as to allow for accurate DNA analysis. She has also not established that the integrity of The Havens sample has been preserved or that it even still exists. As Plaintiff has failed to reliably establish that she will be able to compare a sample obtained from Defendant to anything, she is not entitled to such a sample.

     **C.**     **The Order Does Not Meet the Requirements Imposed by Rule 35.**

Rule 35 provides that a court "may order a party . . . to submit to a physical or mental examination *by a suitably licensed or certified examiner*." Fed. R. Civ. P. 35(a)(1) (emphasis added). Rule 35(a)(2) also requires that an order issued pursuant to Rule 35, stating that an order: "must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." Fed. R. Civ. P. 35(a)(2)(B).

     1.     <u>The Order Does Not Specify the Conditions and Scope of the Examination</u>.

The Order continues that "J and M Paternity Service, LLC., shall transfer the samples to Eurofins Europe/London Police and Bode Technologies for testing . . . ." ECF No. 40 p. 1. The Order does not specify what "testing" is to take place or the methods for such testing. Nor do Plaintiff's Notice or Motion provide guidance to appropriately limit the scope of the examination.  The Notice provides that "[t]he inspection and taking of the DNA sample will be for the purpose, *among other things*, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by The Havens." ECF No. 26-1 p. 1

(emphasis added). Similarly, the Motion provides that "[t]he inspection will be for the purpose, *among other things*, of determining whether Defendant's DNA was found on Plaintiff's clothes and/or in Plaintiff's rape kit taken by the Havens." ECF No. 26 ¶¶ 3-4. Plaintiff does not specify what these "other things" may be. Considering the wide latitude that Plaintiff apparently wants in the use of these samples, such an order should be more narrowly tailored than the general term "testing." Furthermore, it is unclear, and Plaintiff has not attempted to explain, why a sample needs to be sent to both Eurofins Europe/London Police and Bode Technologies when there is only one DNA sample to compare.

2.   The Order Does Not Provide that the Examination Must Be Conducted By a Medical Professional.

The Order requires that Defendant "shall submit to the *employee(s)* of J and M Paternity Service, LLC., for the buccal swab samples . . . . " ECF No. 40 p. 1 (emphasis added). However, Rule 35 provides that a court "may order a party . . . to submit to a physical or mental examination *by a suitably licensed or certified examiner*." Fed. R. Civ. P. 35(a)(1) (emphasis added). Problematically, the generic term "employees" does not impose the requirement of a suitably licensed or certified examiner. Additionally, while Plaintiff's Notice states that it is made "by and through the undersigned counsel and a suitably certified health care provider," Plaintiff did not provide an affidavit or signature of any "suitable heath care provider" that was apparently making the Notice on Plaintiff's behalf. ECF No. 26-1 p. 1. Notably, there was no signature on the Notice from a health care provider, much less a "suitably certified" one. There was also no affidavit or other supporting documentation from any health care provider.

3.   The "Place" Designated in the Order is Improper.

The Order improperly mandates that Defendant "appear on Monday, August 29, 2022, at 10:00 a.m. at the office of Plaintiff's counsel . . . for the buccal swab samples." ECF No. 40 p. 1.

This is improper as the site of the examination should be a medical office or otherwise neutral location. *See, e.g., Smith v. Café Asia*, 724 F.Supp.2d 125, 126-27 (D.D.C. 2010) (granting a Rule 35 motion after noting that the "*motion agreed to 'a neutral location to be determined by the parties*'") (emphasis added).

      **D.**      **The Court Erred in Denying Defendant's Request for a Protective Order.**

The United States Supreme Court has noted that physical and mental examinations of parties under Rule 35 are limited by the provisions of the Federal Rules "permitting the district court, upon motion, to limit, terminate, or otherwise control the use of discovery devices so as to prevent either their use in bad faith or undue 'annoyance, embarrassment, or oppression.'" *Schlagenhauf v. Holder*, 379 U.S. 104, 117 (1964). Rule 26(c) provides:

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . [T]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one of more of the following: (A) forbidding the disclosure or discovery.

Fed. R. Civ. P. 26(c)(1)(A). This provision "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rinehart*, 467 U.S. 20, 36 (1984).

As noted *supra,* "DNA testing is an extreme discovery tool which is very intrusive to the targets of such discovery" and should not be used as a "fishing expedition." *Harris v. Athol-Royalston Reg'l Sch. Dist. Comm.*, 206 F.R.D. 30, 35 (D. Mass. 2002); *see also McGrath v. Nassau Health Care Corp.*, 209 F.R.D. 55 (E.D.N.Y. 2002) (directing that "parties should not be permitted to engage in fishing expeditions, hoping that some useful evidence might be gleaned from obtaining the DNA sample, nor should they be allowed to use demands for DNA evidence to pressure or intimidate other parties"). Plaintiff has continuously made

17

shockingly little effort to show why she is entitled to the extreme relief that she seeks. The conclusion is that, at best, she has no support, or, at worst, that she brought the motion in an attempt to use a discovery device in bad faith, repeatedly used to attempt to pressure and intimidate Defendant, a theme throughout this litigation. Plaintiff's misuse of Rule 35 should not be rewarded; Defendant is entitled to a protective order prohibiting her from obtaining a DNA sample from him.

## IV.   CONCLUSION.

For the reasons set forth herein, Defendant Cenk Sidar respectfully requests that the Court sustain Defendant's Objection to Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order Regarding Motion to Compel DNA, deny Plaintiff Jane Doe's Motion to Obtain Physical Examination of and DNA Sample from Defendant, enter a protective order prohibiting Plaintiff from seeking a DNA sample and/or physical examination of Defendant, and grant such other and further relief in favor of Defendant as this Court deems just and proper.

Dated: August 19, 2022

<div style="margin-left:40%">

CENK SIDAR
By Counsel:


Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com
*Counsel for Plaintiff*

</div>

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 19, 2022, a copy of the foregoing **CORRECTED MEMORANDUM IN SUPPORT OF DEFENDANT'S OBJECTION TO MAGISTRATE JUDGE THERESA CARROLL BUCHANAN'S AUGUST 5, 2022, ORDER REGARDING MOTION TO COMPEL DNA** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:22-cv-00545 (CMH/TCB) |
| | : | |
| CENK SIDAR | : | |
| | : | |
| Defendant. | : | |

_____

**ORDER**

This matter comes before the Court on Defendant's Objection to Magistrate Judge
Theresa Carroll Buchanan's August 5, 2022 Order Regarding Motion to Compel DNA. Having
reviewed the motion, the opposition thereto, and the argument of counsel, if any, it is hereby:

**ORDERED** that Defendant's Objection to Magistrate Jude Theresa Carroll Buchanan's
August 5, 2022 Order Regarding Motion to Compel DNA is **SUSTAINED**, and it is

**ORDERED** that Plaintiff Jane Doe's Motion to Obtain Physical Examination of and
DNA Sample from Defendant is **DENIED**, and it is further

**ORDERED** that Defendant is granted a protective order prohibiting Plaintiff from
seeking a DNA sample from him.

ENTERED this _____ day of _____, 2022.


_____
Claude M. Hilton
United States District Court Judge
Eastern District of Virginia

JA485

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
|      Plaintiff, | : |
| | : |
| v. | : Civil Action No. 1:22-cv-00545 (CMH/JFA) |
| | : |
| CENK SIDAR | : |
| | : |
|      Defendant. | : |

_____

**DEFENDANT'S MOTION TO STAY MAGISTRATE JUDGE THERESA CARROLL**
**BUCHANAN'S AUGUST 5, 2022 ORDER**

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Motion to Stay Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order Regarding Plaintiff Jane Doe's ("Plaintiff") Motion to Compel DNA.

For the reasons set forth in the accompanying memorandum in support, Defendant Cenk Sidar respectfully requests that the Court grant his Motion to Stay Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order, stay the Rule 35 exam, and grant such other and further relief in favor of Defendant as this Court deems just and proper.

CENK SIDAR

By Counsel:

_____
Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911

JA486

Fax No.  (703) 848-2530
mtadros@reesbroome.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 28, 2022, a copy of the foregoing
**DEFENDANT'S MOTION TO STAY MAGISTRATE JUDGE THERESA CARROLL
BUCHANAN'S AUGUST 5, 2022 ORDER** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

JA487

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JANE DOE | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:22-cv-00545 (CMH/JFA) |
| | : | |
| CENK SIDAR | : | |
| | : | |
|     Defendant. | : | |

_____

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STAY**
**MAGISTRATE JUDGE THERESA CARROLL BUCHANAN'S AUGUST 5, 2022**
<u>**ORDER**</u>

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Memorandum in Support of Defendant's Motion to Stay Magistrate Judge Theresa Carroll Buchanan's[1] August 5, 2022 Order.

## I.    **BACKGROUND**.

On May 12, 2022, Plaintiff Jane Doe ("Plaintiff") filed a Complaint against Defendant for assault (Count I), battery (Count II), and intentional infliction of emotional distress (Count III) resulting from an alleged rape that purportedly occurred in London. On July 15, 2022, Plaintiff served to Defendant Plaintiff's Notice of Physical Examination and DNA Sampling of Defendant ("Notice") (ECF No. 26-1). The Notice provided that Plaintiff "will conduct an [sic] Physical Examination of Defendant . . . which will include the taking of a sample of Defendant's Deoxyribonucleic acid (DNA)." ECF No. 26-1 at 1. A few hours after serving her Notice, also on July 15, 2022, Plaintiff filed her Motion to Obtain Physical Examination of and DNA Sample from Defendant ("Motion").

On July 29, 2022, Defendant filed his opposition ("Opposition") to Plaintiff's Motion (ECF No. 37). In accordance with Local Rule 26(C), simultaneously with his Opposition, Defendant served his objections to the Notice (ECF No. 37-1). Plaintiff filed a reply to Defendant's Opposition on August 3, 2022 (ECF No. 38).

Counsel for the parties appeared before Magistrate Judge Theresa Carroll Buchanan on August 5, 2022, after which she granted Plaintiff's motion and entered a corresponding order ("Order"). The Order mandates that Defendant "appear on Monday, August 29, 2022, at 10:00 a.m. at the office of Plaintiff's counsel . . . and shall submit to the employee(s) of J and M Paternity Service, LLC for the buccal swab samples . . . . " ECF No. 40 at 1. The Order continues

---

[1] On August 15, 2022, this case was reassigned to Magistrate Judge John F. Anderson.

that "J and M Paternity Service, LLC shall transfer the samples to Eurofins Europe/London Police and Bode Technologies for testing . . . ." ECF No. 40 at 1.

In accordance with Federal Rule of Civil Procedure 72, Defendant filed his Objection ("Objection") to Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order Regarding Motion to Compel DNA (ECF No. 43), together with his Memorandum in Support (ECF No. 44) in accordance with Local Civil Rule 7. The Objection is set for a motions hearing on September 9, 2021 (ECF No. 45).

In the interim, Defendant seeks to stay the Order pending the Court's ruling on his Objection, as the date set for the Rule 35 examination is August 29, 2022, but the hearing on Defendant's Objection is not until September 9, 2022.

## II.    **<u>ARGUMENT</u>**.

While the Federal Rules of Civil Procedure do not expressly provide for a motion to stay proceedings, a district court has the inherent discretion to recognize such a motion under its general equity powers. *See Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983). The United States District Court for the Eastern District of Virginia has previously applied a four-part test to determine whether a motion to stay a magistrate judge's order pending objection filed pursuant to Rule 72 should be granted: "(1) whether the applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) whe[re] the public interest lies." *Digital-Vending Servs. Int'l, LLC. v. Univ. of Pheonix*, 2010 WL 11450510, at *3 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

As detailed in his Objection, and accompanying Memorandum, Defendant is likely to succeed on the merits of his Objection. Plaintiff failed to meet her burden to establish the "in controversy" and "good cause" requirements imposed by Rule 35, which are not addressed in the Order. *See* Fed. R. Civ. P. 35(a). Additionally, the Order does not meet the requirements imposed by Rule 35 because it fails to specify the conditions and scope of the examination and does not provide that the examination must be conducted by a medical professional. *See* Fed. R. Civ. P. 35(a)(1).

Furthermore, if Defendant's DNA sample is compelled to be produced on August 29, 2022, it will result in irreparable harm to Defendant. Plaintiff has made clear that her intention in procuring the DNA sample is to provide it to the London Metropolitan Police so she it can be compared to DNA that was allegedly found in a rape kit taken there in September 2017. Plaintiff has alleged that Defendant violated English criminal laws. ECF No. 1 ¶ 56. The Order mandates that Defendant "appear on Monday, August 29, 2022, at 10:00 a.m. at the office of Plaintiff's counsel . . . and shall submit to the employee(s) of J and M Paternity Service, LLC for the buccal swab samples . . . ." ECF No. 40 at 1. The Order continues that "J and M Paternity Service, LLC shall transfer the samples to Eurofins Europe/London Police and Bode Technologies for testing . . . ." ECF No. 40 at 1. This irreparable harm caused by the production of the sample cannot be undone if the Court ultimately sustains Defendant's Objection, even if the Court requires Plaintiff to return and refrain from using the DNA sample, as it will already be in the hands of the London Police.

Conversely, Plaintiff will suffer no harm if a stay is granted, much less be substantially injured. The alleged assault purportedly occurred on September 17, 2017. ECF No. 1 ¶ 26. Plaintiff did not file her first complaint in this matter, in the Circuit Court of Fairfax County,

Virginia, until September 13, 2019, mere days before the statute of limitations on her claims would have run. Eventually, on November 19, 2021, after failing to comply with her own discovery obligations, Plaintiff presented an order of non-suit pursuant to Virginia Code Section 8.01-380, when the parties were in the Fairfax Circuit Court on Defendant's Motion to Compel Plaintiff's discovery responses. Thereafter, on May 13, 2022, a few days before the deadline to refile her complaint expired, Plaintiff refiled the matter in this Court. A stay of less than two weeks for this Court to Rule on Plaintiff's Objection will not harm Plaintiff, who has already drug this matter out for nearly five years now.

Finally, the public interest is served in protecting parties' bodily integrity and not encouraging the use of the American civil litigation system to obtain evidence to use in criminal proceedings of another country that the government would otherwise would not be entitled to. This is especially the case in the context of a Rule 35 examination, which is a serious invasion of an individual's privacy. *See, e.g., Guilford Nat'l Bank of Greensboro v. S. Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962) ("Under Rule 35, the invasion of the individual's privacy by a physical or mental examination is so serious that a strict standard of good cause, supervised by the district courts, is manifestly appropriate."). The most equitable course of action is to stay the Rule 35 examination, including the compulsion of the DNA sample, until the Court rules on Defendant's Objection to the Order.

### III.    <u>CONCLUSION.</u>

For the reasons set forth herein, Defendant Cenk Sidar respectfully requests this Court grant his Motion to Stay Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order, stay the Rule 35 Exam, and grant such other and further relief in favor of Defendant as this Court deems just and proper.

Dated: August 28, 2022

CENK SIDAR

By Counsel:


_____
Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 28, 2022, a copy of the foregoing
**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STAY
MAGISTRATE JUDGE THERESA CARROLL BUCHANAN'S AUGUST 5, 2022
ORDER** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

5

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

JANE DOE                                          :
                                                  :
        Plaintiff,                                :
                                                  :
v.                                                :   Civil Action No. 1:22-cv-00545 (CMH/JFA)
                                                  :
CENK SIDAR                                        :
                                                  :
        Defendant.                                :
_____

## <u>ORDER</u>

This matter comes before the Court on Defendant's Motion to Stay Magistrate Judge

Theresa Carroll Buchanan's August 5, 2022 Order. Having reviewed the motion, the opposition

thereto, if any, it is hereby:

**ORDERED** that Defendant's Motion to Stay Magistrate Judge Theresa Carroll

Buchanan's August 5, 2022 Order is **GRANTED**, and it is further

**ORDERED** that compliance with Magistrate Judge Theresa Carroll Buchanan's August

5, 2022 Order, including the Rule 35 examination, is stayed in this matter until this Court has

ruled on Defendant's Objection to Magistrate Judge Theresa Carroll Buchanan's August 5, 2022

Order Regarding Motion to Compel.

ENTERED this _____ day of _____, 2022.


_____
Claude M. Hilton
United States District Court Judge
Eastern District of Virginia

JA494

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

JANE DOE                                            :
                                                    :
      Plaintiff,                               :
                                                    :
v.                                                  : Civil Action No. 1:22-cv-00545 (CMH/JFA)
                                                    :
CENK SIDAR                                          :
                                                    :
      Defendant.                               :
_____

## MOTION TO CONTINUE HEARING

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Motion to

Continue the Hearing on his Objection to Magistrate Judge Theresa Carroll Buchanan's August

5, 2022, Order Regarding Plaintiff Jane Doe's ("Plaintiff") Motion to Compel DNA from

September 9, 2022, to September 16, 2022.


                          CENK SIDAR

                          By Counsel:

_____
Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com

*Counsel for Plaintiff*

JA495

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 2, 2022, a copy of the foregoing **MOTION TO CONTINUE HEARING** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 1:22-cv-00545 (CMH/JFA) |
| | : |
| CENK SIDAR | : |
| | : |
| Defendant. | : |

_____

**MEMORANDUM IN SUPPORT OF MOTION TO CONTINUE HEARING**

Defendant, Cenk Sidar ("Defendant"), by counsel, submits the following Memorandum in Support of his Motion ("Motion") to Continue the Hearing on his Objection to Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order Regarding Plaintiff Jane Doe's ("Plaintiff") Motion to Compel DNA from September 9, 2022, to September 16, 2022.

The hearing on Defendant's Motion is currently scheduled for September 9, 2022, at 10:00am (ECF No. 45). However, counsel for Defendant has a conflict and will be out of town on this date. As such, Defendant moves the Court to continue the hearing on his motion from September 9, 2022, to September 16, 2022. Defendant's counsel has advised Plaintiff's counsel of his change and Plaintiff's counsel has not objected.

Therefore, Defendant Cenk Sidar respectfully requests that the Court grant his Motion to Continue the hearing on his Objection to Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order Regarding Plaintiff Jane Doe's Motion to Compel DNA from September 9, 2022, to September 16, 2022.

Dated: September 2, 2022

CENK SIDAR

By Counsel:

_____
Mariam W. Tadros (VSB #75502)
REES BROOME, PC
1900 Gallows Road, Suite 700
Tysons Corner, VA 22182
(703) 790-1911
Fax No.  (703) 848-2530
mtadros@reesbroome.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 2, 2022, a copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO CONTINUE HEARING** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| JANE DOE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 1:22-cv-00545 (CMH/JFA) |
| | : | |
| CENK SIDAR, | : | |
| | : | |
| Defendants. | : | |

## <u>NOTICE OF WAIVER OF ORAL ARGUMENT</u>

PLEASE TAKE NOTICE that Defendant Cenk Sidar hereby waives oral argument on his

Motion to Continue Hearing.


Dated:  September 2, 2022          CENK SIDAR,

                                  By counsel:


                                  /s/ Mariam W. Tadros_____
                                  Mariam W. Tadros (VSB No. 75502)
                                  REES BROOME, PC
                                  1900 Gallows Road, Suite 700
                                  Tysons Corner, VA 22182
                                  (703) 790-1911
                                  Fax No.  (703) 848-2530
                                  Email: mtadros@reesbroome.com
                                  *Counsel for Defendant*

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 2, 2022, a copy of the foregoing **NOTICE OF WAIVER OF ORAL ARGUMENT** was served electronically through CM/ECF to:

Thomas F. Urban II, Esq.
FLETCHER, HEALD & HILDRETH, PLC
1300 North 17th Street, Suite 1100
Arlington, VA  22209
Fax: (703) 340-1450
urban@fhhlaw.com

Walter Steimel, Jr., Esq.
STEIMEL CONNER LAW GROUP PLLC
1455 Pennsylvania Ave., N.W., Suite 400
Washington, DC  20004
wes@sclgrp.com

_____
Mariam W. Tadros

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JANE DOE | : |
| | : |
|     Plaintiff, | : |
| | : |
| v. | :   Civil Action No. 1:22-cv-00545 (CMH/JFA) |
| | : |
| CENK SIDAR | : |
| | : |
|     Defendant. | : |

---

**<u>ORDER</u>**

This matter comes before the Court on Defendant's Motion to Continue Hearing, it is hereby:

**ORDERED** that Defendant's Motion to Continue Hearing is **GRANTED**, and it is further

**ORDERED** that the hearing regarding Defendant's Objection to Magistrate Judge Theresa Carroll Buchanan's August 5, 2022, Order Regarding Plaintiff Jane Doe's Motion to Compel DNA is continued from September 9, 2022, to September 16, 2022.

ENTERED this _____ day of _____, 2022.

_____
Claude M. Hilton
United States District Court Judge
Eastern District of Virginia

JA501